IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05-cv-1067 (JGP) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum of Points and Authorities
in Support of United States'
Motion for Summary Judgment**

The Democratic Leadership Council seeks a refund of $20,083 in income

taxes that it paid when the Internal Revenue Service revoked its tax exempt status

for 1997, 1998, and 1999.  The DLC was granted tax exempt status under Section

501(c)(4) in 1985 because it represented its purpose was to benefit the community

as a whole by developing new ideas and policies on important public issues.  The

Service determined, however, that during 1997, 1998, and 1999 the DLC primarily

operated to benefit a private group:  individuals who might run for office, were

running for elected office, or had been elected to office as Democrats, or particularly

New Democrats.  Based on the undisputed material facts, the DLC was not a tax

exempt organization during 1997, 1998, and 1999, and the United States is entitled

to summary judgment.

-i-

# Table of Contents

**QUESTION PRESENTED** ........................................................ 2

**STATEMENT** ................................................................ 2

    1.    DLC's organization and leadership ................................ 3

    2.    DLC's public events dominated by Democrats .............................. 5

    3.    Statements of DLC's purpose ....................................... 7

    4.    Statements of DLC's role in Democratic election victories .................................................. 9

    5.    Statements about Republicans using DLC ideas and policies .............................................. 13

    6.    DLC's workshops for training elected officials how to implement their policies ................................ 17

**ARGUMENT** ................................................................ 24

    1.    DLC has the burden of establishing it is entitled to be exempt in 1997, 1998, and 1999 to obtain a refund .............................................. 24

    2.    The private benefit doctrine prohibits exempt organizations from operating to benefit a private group, even if the group is made up of individuals who are not members or officers of the organization ....................................... 25

    3.    DLC's primary purpose as reflected in its activities fall within the private benefit prohibition ................... 34

**Conclusion** ................................................................ 37

-ii-

# Table of Authorities

## FEDERAL CASES

**American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989) . 30, 31, 32, 33, 34

*American Women Buyers Club, Inc. v. United States*, 338 F.2d 526 (2d Cir. 1964) .......................................................................................... 27, 29

*Better Business Bureau v. United States*, 326 U.S. 279 (1945) .......... 26, 27, 29

*Bingler v. Johnson*, 394 U.S. 741 (1969) .................................................... 24

*Club Gaona, Inc. v. United States*, 167 F. Supp. 741 (S.D.Cal. 1958) ...... 24-25

*Commissioner v. Lake Forest, Inc.*, *305* F.2d *814* (4th Cir. 1962) ...... 25, 29, 30

*Contracting Plumbers Cooperative Restoration Corp. v. United States*, 488 F.2d 684 (2d Cir. 1973), *cert. denied*, 419 U.S. 827 (1974) .... 28 ,29, 30

*Erie Endowment v. United States*, 316 F.2d 151 (3d Cir. 1962) ................... 28

*Granzow v. Commissioner*, 739 F.2d 265 (7th Cir. 1984) ............................. 25

*Helvering v. Taylor*, 293 U.S. 507 (1935) ................................................. 24, 25

*IHC Health Plans, Inc. v. Commissioner*, 325 F.3d 1188 (10th Cir. 2003) ... 28

*Lewis v. Reynolds*, 284 U.S. 281, *modified*, 284 U.S. 599 (1932) ................. 24

*Sara Lee Corp. v. United States*, 29 Fed. Cl. 330, 334 (Fed. Cl. 1993) .......... 24

*The Fund For the Study Of Economic Growth And Tax Reform v. Internal Revenue Service*, 161 F.3d 755 (D.C. Cir. 1998) ............................................ 25

*Vision Service Plan v. United States*, , 2005 WL. 3406321 (E.D. Cal., December 12, 2005) ....................................................................................... 25

-iii-

## STATUTES, REGULATIONS, AND GUIDANCE

26 U.S.C. §501(c)(4) ................................................................. 3, 27

Rev. Rul. 68, 45, 1968-1 C.B. 259 ................................................. 28

Rev. Rul. 75-286, 1975 C.B. 210 ................................................. 35

Treas. Reg. §1.501(c)(3) ........................................................... 26

Treas. Reg. §1.501(c)(4) ......................................................... 26, 28

## MISCELLANEOUS

Frances Hill and Douglas Mancino, *Taxation of Exempt Organizations*
    ¶ 4.02 (2006) ....................................................................... 27

-2-

## QUESTION PRESENTED

To be tax exempt under § 501(c)(4), an organization's primary purpose must be to benefit the community as a whole.  During the years 1997 through 1999, the DLC primarily developed public policies in order to benefit Democrats—often identified as New Democrats—who would use those policies to be elected to office.  Was the DLC exempt under § 501(c)(4) during 1997 through 1999?

## STATEMENT

The facts are presented in six parts: how the DLC was formed; who has acted as its public face; what DLC officials and officers have said about the organization's purpose; statements about the DLC's role in Democratic Party election victories; what the DLC said about Republicans who used the DLC's ideas; and, an example of the workshops DLC created to show elected officials how to implement the DLC's policies.  A review of  DLC's statements and activities will show its primary purpose.  In making this review, it is fair to note that the DLC uses the terms "New Democrat" and "Third Way" to refer generally to its approach and policies.  (From Dep at p. 19)("And we thought the country needed an alternative.  And that's what we set out to do.  I think that's what we did.  It's called the Third Way [i]nternationally. It is a progressive agenda. And the brand here is New Democrat.")

-3-

## 1.    DLC's organization and leadership.

The DLC was founded by prominent members of the Democratic Party and incorporated on March 4, 1985, in the District of Columbia.  (From Dep. pp. 12-13.) The DLC's articles of incorporation designated Senator Charles S. Robb (D-VA), Senator Sam Nunn (D-Ga), and Congressman Richard A. Gephardt (D-Mo.) as the organization's directors.  (Ex. 66.)  Throughout the years at issue Senator Joseph Lieberman (D. Conn) was the DLC's Chairman.  (From Dep. p. 108.) The Vice Chairman during 1997 through 1999 was Gov. Roy Romer (D-Colo).  Romer, in 1998, also served as Chairman of the Democratic National Committee.  (*See Romer 'relieved' to step down as Chairman of DNC*, The Denver Post p. A-22, September 24, 1999.)  Al From has been the DLC's President and Chief Executive Officer from its formation, including the years 1997 through 1999.  (From Dep. p. 42; Ex 67.)

In November 1985, DLC filed its application for tax exempt status as an organization under 26 U.S.C. §501(c)(4).  The DLC's application listed a number of activities that it contemplated in executing "its sole purpose – the stimulation of public policy dialogue and innovation within and outside the Democratic Party, under the general leadership of certain elected offices of the party."[1]  (Pltf Ex 2 p.

---

[1]    To further this purpose, the application stated that the DLC intended to conduct the following activities:  task forces, town meeting and issue forums on business, labor, civic, student, and other audiences, policy meetings, contracting for studies (such as the Wharton Econometrics study on the competitive position of the American economy),  public affairs programs (including press conferences, meetings with editorial boards, and press releases), and fund raising receptions and dinners. Pltf. Ex. 2 pp. 23-24.

(continued...)

-4-

29.)  The application cited two task forces the DLC had created as examples of its

policy work:  a Task Force on National Defense Strategy and a Task Force on

Economic Growth and Competitiveness.  (Pltf Ex. 2 pp 29-30.)  Although the phrase

"within and without the Democratic Party" could describe policies on anything,

describing the DLC's "sole purpose" by fixing the Democratic Party as the

touchstone of its policy development shows the DLC's ties to the Democratic Party.

And, in fact, all of the members of both task forces cited in the application were

elected Democrats.[2]  Thus, the task forces presented as incubating policy ideas to

benefit the general public were staffed exclusively by Democrats elected at the

federal and state levels.

The DLC's application also included a copy "Winning the World Economy," as

an example of the type of publication the DLC would make available to the public.

(Pltf Ex 2 p. 29; Ex. 65.)  The publication's preface reiterates that, "[t]he Council

_____

[1](...continued)

[2]  The members of the Task Force on National Defense Strategy were: Co-Chairmen,
Sen. Sam Nunn (D-Ga.); Gov. Bruce Babbitt (D-Ariz.); and, Rep. Les Aspin (D-Wis.);
and Members, Sen. Dennis DeConcini (D-Ariz.); Sen. Jeff Bingaman (D-N.M.); Sen.
Ed Zorinsky ( D-Neb.); Rep. Beverly Byron (D-Md.); Rep. Dan Glickman (D-Kansas);
Rep. Ike Skelton (D-Mo.); Rep. Norm Dicks (D-Wash.); and Rep. Tim Wirth (D-
Colo.).  The members of the Task Force on Economic Growth and Competitiveness
were:  Co-Chairmen, Sen. Lloyd Bentsen (D-Texas); Gov. Jim Blanchard (D-Mich.);
and, Rep. Leon Panetta (D-Calif.); and Members Sen. Max Baucus (D-Mont.); Sen.
Jim Sasser (D-Tenn.); Sen. James Exon (D-Neb.); Gov. Bill Clinton (D-Ark.); Gov.
George Nigh (D-Okla.); Gov. Richard Lamm (D-Colo.); Rep. Ronnie Flippo (D-Al);
Rep. Dick Durbin (D-Ill.); Rep. Phil Sharp (D-Ind.); Rep. Jim Wright (D-Texas); Rep.
Lindsay Thomas (D-Ga.); Rep. Dan Mica (D-Fla.); Rep. Bill Gray (D-Pa.); and, Rep.
Buddy MacKay (D-Fla.).

-5-

(DLC) is an unprecedented collaboration of elected Democrats at all levels: governors, senators, representatives, state legislators and mayors." (Ex. 65, p. USA 1219.). The publication lists "The Republican Record" on several economic issues, and then outlines a "Democratic Competitive Strategy" that recommends approaches "as an alternative to Republican inaction and a point of departure for a vigorous debate on competitiveness..." (Ex. 65 p. USA 1229.) The conclusion for "Winning in the World Economy" states:

> Devoid of vision and intent on inaction, the Republican Party offers no coherent response to the greatest domestic challenge facing America during the rest of this century. The Democratic Party—traditionally the agent of change and progress in America—must fill the leadership vacuum and illuminate the way ahead.

(Ex. 65 p. USA 1238.) In contrasting the Republican record in negative terms and presenting the DLC's prescription for the Democratic Party to fill a vacuum and illuminate the way, this publication hints at what became clear in 1997, 1998, and 1999: the DLC was committed to policy development as it represented in its application, but in practice it saw and presented those policies as a way for Democrats to best Republicans.

**2.      DLC's public events dominated by Democrats.**

The DLC's relationship with elected Democrats is evidenced by the active participation in DLC events by New Democrat elected officials, and the lack of any participation in these events by Republican elected officials, officials of any other party, or independents. The most obvious example is the prevalent participation of Democratic elected officials in the DLC's Annual Policy Conference. Speakers at

-6-

the 1997, 1998 and 1999 annual conferences included prominent Democratic elected officials, including President Clinton and Vice-President Gore, both of whom have had substantial involvement in DLC activities for many years, including President Clinton's role in the founding of DLC and serving as its Chairman. *(See* Gov't MSJ Ex. 1; Ex. 80; and, Ex. 81.)  The 1998 annual conference included speakers such as Senator John Kerry (D-MA), Senator Bob Kerrey (D-NE) and Vice President Al Gore. (Ex. 80.) Speakers at the 1999 conferences included President Clinton, then Vice-President and 2000 Democratic Presidential Candidate Al Gore, and Senator and 2000 Democratic Vice-Presidential candidate Joe Lieberman. (Ex. 81.) No Republican elected officials, officials of any other party or independents were featured speakers in the DLC Annual Conferences in 1997, 1998, and 1999. (Lincoln Declar., Ex. 1 at ¶¶ 21, 24, and 26.)  The DLC Annual Conference consisted of three facets: a leadership dinner, a conference, and a reception. (Lincoln Declar., Ex. 1 at ¶15.) Of the 141 elected officials who said they would attend at least one facet of the Annual Conference festivities in the years studied, at least 139 were Democrats, and the political affiliations of the others could not be determined. (Lincoln Declar., Ex. 1 at ¶ 16, 20, 22, 25, and n.11.)  The Annual Conferences during the years at issue were dominated by Democrats, and had little—if any—representation from other political parties.

-7-

**3.     Statements of DLC's purpose**.

During 1997, 1998, and 1999, Al From, the DLC's president and CEO, made several statements about the organization's goals during those years that indicate the organization's primary purpose for its activities.  While the organization still had a goal of creating attractive public policies, the reason for doing so was to benefit Democrats.  At the Democratic Nucleus Club in Phoenix, Arizona, on April 20, 1998, From stated:

> In 1985, a small band of New Democrats-including a young governor from Arkansas and a freshman Senator from Tennessee-formed the Democratic Leadership Council to redefine our party. We believed that was essential to reversing our party's fortunes in presidential elections and building a New Democratic majority in national politics.
>
> *                              *                              *
>
> The bottom line is this: We need to build a new 21st century political infrastructure-a new information based political network, if you will-that will help, not hinder, our candidates who run on the New Democrat message.
>
> We can do that. And, the DLC is expanding considerable energy to find tomorrow's leaders in our party and to build that network. We want you to be part of that network.
>
> *                              *                              *
>
> If we want to become a majority party at the dawn of the 21st century, we simply need to replicate our success at the presidential level at every other level of American politics.
>
> You can help make that happen.  Join with us, and together we will build a Democratic Party that again unites those Americans struggling to join the middle class with those struggling to stay there- a broad-based Democratic Party united around President Clinton's core New Democrat principles of opportunity , responsibility, community, and empowering government.

-8-

> Together, we can build such a party. And when we do, we will be back
> in our rightful places as America's majority party.

(From Dep. p. 161, Ex 114.)  As From describes, in 1998, the DLC's purpose was not

solely to benefit the community with better policy ideas, but to foster a Democratic

majority by developing through policies that would attract a majority of voters for

the individuals espousing the DLC's ideas.

In fact, From frequently used terms such as "our party" to make clear that

the DLC's activities advance or benefit New Democrats and the Democratic Party to

the exclusion of other political parties and independents.  During the years at issue,

DLC president From made these statements that focus on benefits to Democrats,

rather than advocating policies the DLC supports.   For example, in the DLC

Update, Tuesday, May 6, 1997, From wrote (MSJ Ex. 8):

> Passing [a balanced budget] in Congress with Democratic support is
> crucial to the future of **our Party**.

> Only then can **we as Democrats** begin to deal with the second
> problem of reorganizing budget priorities to promote public
> investment.

> But, if Democrats sabotage a balanced budget on the brink of its
> achievement by a Democratic President, much of the ground we have
> gained since 1992 achieving political parity with the Republicans will
> be rapidly lost as we once again get labeled as "tax and spend" liberals
> unfit to guard taxpayer's money.

> All Democrats should support the President on this agreement. For our
> country, and for **our party**, it is a simple choice of either moving
> ahead or going back.

In the DLC magazine "The New Democrat," DLC president From authored a short

essay known as the "Political Memo."  From's statements in these essays include:

-9-

In sum, the best way for Democrats to further our enduring values in
the Information Age is to promote New Democrat ideas and govern as
New Democrats

. . . The best way to be a true Democrat is to be a New Democrat. That's the
bottom line.

(January/February 1998)(MSJ Ex. 2.)

. . . America is strong today because President Clinton had the vision
and the courage  to put so many New Democratic ideas into action -
ideas that are making this a better, safer, and more prosperous
country.

New Democratic ideas shaped by the DLC and our affiliated think tank, the
Progressive Policy Institute, have transformed the Democratic party. . .

We succeeded because we offered new and innovative ways to further
our party's cherished values and highest ideals. . .

We made the 1990's the New Democratic decade.  Let's make the 21st
century the New Democratic century. We can do it if we keep our
sights set on the future...It is the destiny of this New Democratic
movement to remain young forever. The vital center starts here.

(November/December 1999) (MSJ Ex. 3.)

Each of From's statements place the DLC's policy innovations in the context of the

Democratic Party and usually electoral gains for the Democratic Party.

**4.      Statements of DLC's role in Democratic election victories.**

The DLC repeatedly credited its policies and activities with getting

Democrats, and particularly candidates identified as New Democrats, elected.

These claims indicate that the DLC was not satisfied with past success, but was

focused on more electoral success in the future.  From's statements show that

success of DLC policies in the past and the future was dependent on election of

-10-

Democrats to implement those ideas.  At several points From made illustrative

statements:

- DLC 1996 Policy Forum and Gala on December 11, 1996 (Ex. 111.)(emphasis

  supplied):

  1996 was a very good year for the DLC-and 1997 promises to be an
  even better one. We meet today at a time of great triumph, great
  challenge, and great opportunity for the new Democratic movement.


  *Our triumph is President Clinton's historic reelection victory, the culmination
  of an effort we have waged together for more than a decade to pick the
  Republican lock on the electoral college and to put and keep a New Democrat
  in the White House.*

- 1997 DLC Annual Conference on October 27, 1997(Ex. 112.)(emphasis
  supplied):

  I want to report to you this morning the state of the New Democrat
  movement. Looking back over more than 12 years of hard work and
  struggle, we can be justly proud of what we have accomplished
  together. We have been instrumental to the success of our nation's first
  two-term Democratic President since Franklin Roosevelt. We have
  become the prime source of intellectual leadership and innovation for a
  party that once seemed hopelessly wedded to the status quo. *And we've
  begun to reclaim the Democratic Party from the hard left and move it
  back into the vital center of American politics.*

- 1998 DLC Annual Conference on December 2, 1998 (Ex. 113.):

  Our triumph is that New Democrats, led by President Clinton and Vice
  President Gore, have redefined the center of American politics and in
  doing so we've also redefined our party.

  That triumph is our opportunity—for we now have the chance to make
  the Democratic Party once again the dominant party in American
  politics. But our challenge is to turn that opportunity into a reality—to
  resist the temptation to return to old, discredited ways of the
  1980s—and to build a modern, centrist, progressive party for the 21st
  century.

-11-

With this conference, we, in the Democratic Leadership Council, accept that challenge.

Let me be very clear about why we're here and what the DLC is about. Our mission is to ensure that the new Democrat politics that has dominated our party for the last six years continues to be the defining politics for the Democratic Party and for our country after President Clinton leaves office in 2001. We need a Democratic Party that tackles America's most difficult challenges with the kind of bold and innovative ideas that we are hearing about today. That is the key, not only to holding onto the White House in the year 2000, but to rebuild our party at the congressional and gubernatorial levels, as well.

- 1999 DLC Annual Conference on October 14, 1999 (Ex. 115.):

We began this decade hoping to end the Democratic Party's losing streak in presidential politics. We end it with a New Democrat president finishing his second successful term, and with our sights set on returning a transformed Democratic Party to its rightful place as the majority party in American politics.

\*                                    \*                                    \*

In the 1990's the New Democrats reversed our party's fortunes in presidential elections. Now we must set our sights on making a modernized Democratic Party the majority party in America once again. Let's make the 21st Century the New Democratic Century. (emphasis supplied).

- At the Democratic Party Legislative Ball in Salt Lake City, Utah, on January

13, 1999, Al From said (Ex. 116):

In 1999, the DLC has a very clear mission: to ensure that the New Democratic politics that has dominated our party for the last six years, continues to be the defining politics for the Democratic Party and for our country after President Clinton leaves office in 2001.

We need—and are determined to build—a modern, centrist, progressive Democratic Party that tackles America's most difficult challenges with bold and innovative ideas. That is the key, not only to holding onto the White House in the year 2000, but to rebuilding our party at the congressional and gubernatorial levels, as well.

-12-

New Democrats have come a very long way. When we launched the
DLC in 1985, most political observers believed no Democrat would be
elected President again this century. We proved the experts wrong.
New Democrat Bill Clinton was not only elected in 1992, but became
the first Democrat to be re-elected to a second term since Franklin
Roosevelt 60 years before.

•     At the Jefferson-Jackson Dinner in Boise, Idaho, on June 13, 1999, From
stated (Ex. 117)(emphasis supplied):

I come to you tonight with a message of hope. I know the last four
years have not been the best four years in the history of the Idaho
Democratic Party. But my message to you tonight is: don't get
discouraged; don't give up. You can turn this around—and you will
turn this around.

*I know something about turning parties around.*

In 1984, the party of Franklin Roosevelt, and Harry Truman, and John
Kennedy; the party that led America to most of its economic and social
progress in the 20th century, the party that dominated American
politics for nearly five decades, lost 49 states. There are a lot of people
who thought if the election had been a day or two later, we would have
lost all 50. We hit bedrock. Indeed, in 1980's, in each of those three
presidential elections, we lost at least 40 states. By 1992, we had lost
five of the last six presidential elections, and most political experts
said we would not win the presidency again this century.

Be we did not give up. With a young governor from Arkansas and a
freshman senator from Tennessee, we formed the Democratic
Leadership Council. We believed that if we held firmly to the first
principles of the Democratic Party, but furthered those principles with
fresh ideas and modern means; if we built a modern, centrist,
progressive Democratic Party that tackles America's most difficult
challenges with bold and innovative ideas, the American people would
once again turn to us for national leadership. That is what we did, and
that is what they did. We built the New Democrat movement, and the
American people responded. (emphasis supplied).

Statements by the DLC's Chairman, Senator Joseph Lieberman, also manifest the

DLC's focus on the Democrats' electoral success.  At the DLC 1996 Policy Forum

-13-

and Gala on December 11, 1996, Senator Lieberman stated (MSJ Ex. 7.):

> That's why we're here today. The DLC wanted to help elect a Democrat
> President, and we did so ... twice!
>
> But we're not resting on those substantial laurels. We're looking
> forward to the new millennium, and we want to bring the Democratic
> Party around to the fact that change is inevitable, change is good, and
> we must change or we will lose.
>
> Ours is fast becoming the party of innovation and fresh ideas.

These statements by the DLC's leaders evidence a primary focus on benefitting

Democrats running for, or elected to, office with the DLC's policies and ideas.

## 5.    Statements about Republicans using DLC ideas and policies.

The DLC might insist that all of these statements about electing Democrats

as the DLC'S purpose can be dismissed because the DLC simply advocated policies

and supported whoever would support and adopt those policies.  That insistence,

however, is belied by the DLC's leaders' statements about Republicans, and

particularly Republicans who adopted or used DLC policies.  During his speech to

the DLC Annual Conference in 1998, From claimed that the DLC's "Third Way"

policies were bringing electoral gains:  "Today, our Third Way-New Democrat

message defines the center of American politics.  And it has revitalized our party.

The lesson of this election is abundantly clear:  Where Democrats followed the

President's lead and seized the political center, they did unexpectedly well, winning

in states which the political experts had long ago ceded to the Republicans."  After

noting how the DLC's policies benefitted Democrats to the Republicans'

disadvantage, From added this about then Governor George Bush: "Even some

-14-

Republicans seem to have gotten that message. There's a certain Governor of Texas

who ran on our themes. I call him New Democrat Lite.  Imitation may be the

greatest form of flattery, but later today when we hear from the Vice President and

the President, we'll see there is a clear difference between the imposter and the real

thing." (Ex. 113.)  From was not commending or praising a Republican for using the

DLC's policies, but indicating that a Republican was not able to implement the

DLC's policies as well as a Democrat.

A year later at the July 1999 National Conversation, From again addressed

the dichotomy between Democrats and Republicans using the DLC's policies.  From

declared (Ex. 118 p. 2-3.):

> This New Democrat agenda has been pretty successful.  In fact, it has
> been so successful that the Republicans are trying to parrot our
> politics.  They're trying to pilfer our New Democrat themes of
> opportunity, responsibility and community.

> Now I really don't know what a compassionate conservative stands for.
> But I've got a message for our Republican imitators.  Transforming a
> political party, hammering out a political philosophy and crafting a
> governing agenda that works is accomplished through hard work,
> spirited debate and even a few tough fights, not just with a clever
> slogan or by inheritance.

> . . . After all we went through, we're not going to sit idly by and let the
> Republicans reclaim the political center on the cheap.

> That's why this conversation and what we do over the next two days is
> so important.  You are the future of the New Democrat movement.

Will Marshall, who was involved in founding the DLC, and during the years

at issue served as president of a think tank related to the DLC and also performed

work for the DLC, indirectly captured how the DLC viewed Republicans when he

-15-

describes how the DLC looked to officials who shared the DLC's views—and then

admits they were all Democrats (Marshall Dep. pp. 21-22):

Q.    Very good.  Now, once the [S]ervice granted the [(c)(4)]

status, what were the activities that the DLC undertook to advance

the mission that you have described here today?

A.    Well, let's see.  You know, trying to attract prominent

political figures was important. Trying to focus on the reasons for the

political setbacks and the reasons for conservative gains over time.

Traveling around the country trying to buck up demoralized folks,

some of whom were defecting to the [R]epublican side.

Q.    Good.  Now, as far as the first activity you identified,

attracting the political figures, how did you go about trying to attract

political figures, sir?

A.    Well, you know, there were lots of folks we had been talking

to down the years about the need for, you know, to try to change the

direction of the political debate.  And so we already knew a bunch of

folks who sort of saw things in a similar light.  And we went to them

and just tried to sign them up. And then we sort of did public meetings

organized around them.  And often we would do that and travel around

the country.

Q.    Were these political figures Democrats, Republicans or

both?

-16-

A.   Democrats.

In fact, these comments from the "DLC Update" from January and February

1999 show the preference for Democrats using DLC's policies over Republicans:

> All those empty seats, folded arms, and smirking, scowling faces on the
> Republican side of the House during the President's (Clinton) address
> spoke volumes about how interested the GOP really is in debating and
> conducting the business of the American people. If the empty and
> rather tired anti-government rhetoric in the official Republican
> responses by Reps. Steve Largent (R-OK) and Jennifer Dunn (R-WA)
> are any indication, maybe they don't really have anything to say.

(January 22, 1999)(MSJ Ex. 4.)

> Governor (George) Bush is certainly a skilled politician, and perhaps
> some day he will develop "compassionate conservatism" into a fully
> articulated philosophy of governance. But for now, as Texans would
> say "it's more sizzle than steak-all hat and no cattle."

(February 12, 1999)(MSJ Ex. 5.)

Finally, From penned a "Political Memo" in the May/June 1999 issue of *The

New Democrat* magazine.  From's article was titled "Who Owns the Third Way," and

originally had a subheading of "Some Republicans Would Have You Believe They

Do."[3]  (MSJ Ex. 6.)  In his statement From noted some "GOP groups" that were

adopting the DLC's policies.  He then wrote:

> Imitation may be the sincerest form of flattery. But for Democrats,
> imitation in this case poses a serious political challenge. We can't
> afford to take this intellectual piracy lightly.

---------------------------------

[3]  A copy of this article is still available on the DLC's website.  In the listing of
From's articles, the phrase "Some Republicans Would Have You Believe They Do" is
under the title, as it was in the original version provided in discovery.  But the
article now available on the website lacks the phrase.

-17-

> The actions of many congressional Republicans notwithstanding, not
> all Republicans are fools.  Republican governors in particular
> understand the power of the New Democrat message. They know it is a
> winning political formula precisely because its ideas work. And they
> are bound and determined to steal that formula from us.

"We" and "us" in From's statement refers to Democrats.  And the DLC's president

cautions about Republicans stealing the DLC's "winning political formula."  Again,

the purpose of DLC's activities is cast in electoral, partisan terms.

The DLC will surely point to examples and instances when it sided with

certain Republicans in seeking passage of legislation with policies the DLC

supported.  But those instances of cooperation do nothing to blunt the statements of

how the DLC viewed Republicans using the DLC's policies and strategies for

Republican partisan gain at the expense of Democrats.  And that view, evidenced by

the derisive manner in which those Republicans were discussed, demonstrates the

DLC did not seek to develop policies for any elected official to use.  Instead, it shows

that the DLC had a purpose of Democrats using the policies developed through its

activities for gain.

**6.      DLC's workshops for training elected officials how to implement
their policies.**

The distinction between success for the DLC's policies in the general

community and the purpose of electing Democrats through DLC's policies is further

manifest in how the DLC operated its leadership workshops.  The DLC began

conducting these workshops in 1998 to teach state and local elected officials how to

implement the DLC's values and policies.  According to a September 2, 1999, DLC

-18-

memorandum, "in 1998, the DLC designed and tested a program to teach elected

officials and other rising political leaders how to develop and articulate a New

Democrat governing agenda." (Bultan Dep. p. 53-54 , Ex. 57).  The Leadership

Workshop is "a two day training session designed to teach the participants the

essentials of the New Democrat governing philosophy and how to turn it into

effective political messages and policy proposals relevant to their local issues." (Id.).

The program is designed to be "an intimate, intensive two-day workshop for key

leaders, chiefly elected officials, at the state and local level.  Led by professional

facilitators, workshop participants will experience a series of interactive group

exercises designed to help them understand the values that underpin New

Democrat philosophy. They learn to identify and articulate their own values, and to

develop those core values from the perspective of their local constituencies." (Id.).

Outwardly these workshops appear to be just the sort of policy advocacy training a

group might do to benefit the broader community.  Tellingly, however, from the

record it appears that every state and local official who attended the DLC's

workshops was a Democrat.  (Taylor Declar. Ex. 1 at ¶¶ 32-33; Alston Dep. 191-195,

205-206, 219-220; Ex. 57.)[4]  Thus, the very tool the DLC created to show elected

officials how they could most effectively implement the DLC's policies was used to

---

[4]  *See* Alston Dep. pp. 182-183 and 195-196 (from reviewing list of workshop
participants in Washington, D.C. and Florida, all were elected Democrats); From
Dep. pp. 57-59 (all participants in Florida workshop were elected Democrats); and
Bultan Dep. pp. 20-21 (doesn't recall any specific instances of elected Republicans
attending workshops and is sure those attending were "primarily" elected
Democrats.).

-19-

gain an advantage for Democrats.

In fact, the DLC considered the workshop training to be a "critical component of the DLC's strategy for ensuing that New Democrat ideas continue to shape American politics in the Information Age after President Clinton leaves office." (Id.). Part of that strategy "includes developing and promoting the next generation of New Democrat ideas while identifying and engaging the next generation of New Democrat leaders to take these ideas and apply them to public policy problems." (Id.). The workshop goals include teaching participants "to develop a thorough understanding of the New Democrat governing philosophy and principles," and "to leave the workshop with the knowledge that there is a community of like-minded elected officials in their state (and around the country), and commit to finding ways to continue to work together." (Id.).

The initial DLC Leadership Workshop, held in June, 1998, shows the design, goals, and content of the program. In a June 11, 1998, memorandum to participants, DLC Field Director Debbie Cox—now Debbie Bultan—states that "[a]s you know, this training is part of the DLC's larger goal to arm the next generation of New Democratic elected leaders, particularly at the state and local levels, with New Democratic ideas. The training program ... will be small, intensive and interactive. The aim is to help New Democrats: articulate their political philosophy, apply that philosophy to state and local public policy problems; and effectively deliver New Democrat messages through a variety of mediums." (Bultan Dep. p. 31; Ex. 49.). The agenda for a June 1998 workshop included the following

-20-

sessions (Bultan Dep. pp. 33-34; Ex. 50):

•        Examining DLC Values, Beliefs, Principles / How they match our own; and

•        Exploring what makes us New Democrats:  How our values are different from

         Republicans and traditional liberals.

The goals of the training go on to include assisting the participants to:

•        "Identify the public policy issues of most importance to them, how the DLC

         might add value to their efforts to address those issues, and how they and the

         DLC can  work most productively together;"

•        Identify the next steps they can take to work at home on behalf of the DLC,

         and specify at least one event or project through which they can stay

         involved.

(Ex 49.)  Note, again, how Republicans are contrasted from the DLC's policies, and

how the DLC wanted to "add value" to the efforts of state and local elected

Democrats.

         In 1998 and 1999, the DLC conducted Leadership Workshops in Washington,

D.C.,  Florida, Colorado, Arizona, Utah, Wisconsin, Pennsylvania, and Kansas.

More than 105 state and local Democratic elected officials took part. (Ex. 57.)  The

record indicates that all were Democrats.  (Taylor Declar. Ex. 1 ¶¶ 32-33; Alston

Dep. 191-195, 219-220; Ex. 57.)  Indeed, the DLC's Field Director Bultan testified

that the workshops were designed to assist the DLC to identify potential elected

officials who shared the New Democrat philosophy. She said:

         Q.       How did the training sessions work to assist the DLC to identify

-21-

potential New Democrats?

A.     What that means is through the course of the one day, or two

day at that time, workshops, we would have a sense to observe elected

officials, and by spending time with them understand better who

shared our philosophy and who might be partners later in helping us

promote specific ideas beyond the workshops.

Q.     So is it fair to say that these workshops helped identify what

might be called true believers of the DLC's point of view?

A.     Yeah. Or I would call it, I would rather call it something along

the lines of like minded thinkers. People who shared our philosophy.

(Bultan Dep. at 48-49.)  In clarifying her testimony regarding the term "true

believers," Bultan again stated that the elected officials who attended the

workshops "were people who generally shared our philosophy and might be good

partners in the future."  (Bultan Dep. at 49.)  From provided the same view that

elected Democrats were the only individuals likely to find the workshops on DLC

policies worthwhile.  After acknowledging that all of the participants at the

workshop in Florida were Democrats, From added (From Dep. p. 57):

> Yes.  I mean, the point that has to be very clear is the elected officials
> who participated who were invited were Democrats.  But they were
> people who we thought would be willing and would be skillful when
> trained to promote a Third-Way New Democrat agenda and
> philosophy.  And so, you know, again, it is not surprising that at a time
> when the country was extraordinarily polarized that, you know,
> Republicans weren't jumping on the bandwagon, at least a lot of them
> weren't.  Most of them weren't.  And so we went to the most likely base
> of our support.  But at the same time, as I am sure we will get into

-22-

before this afternoon or morning is over, we were also doing events
with -- you know, we did an event with Rudy Guiliani and did other
stuff with the Heritage Foundation and others.

Two other examples show how the DLC directed its activities of showing

individuals how to implement its policies to Democrats—particularly New

Democrats—and not all groups.  The DLC published *The Idea Book: A Reference*

*Manual for New Democrats* in 1998, as it had in earlier years, to bring together

many of its ideas in one place.[5]  And while the book is indeed a compendium of

talking points on a host of policy issues and includes From's April 1998 speech to

the Democratic Nucleus Club in Phoenix, Arizona, it starts with a one-page "New

Democrat Credo."  (Marshall Dep. p. 114, Ex. 13.)  This list refers solely to what

"we" Democrats and New Democrats believe.  The Credo is followed by a letter from

Senator and DLC Chairman Lieberman and DLC President From welcoming

readers to the book of ideas that is addressed "Dear Democratic Leader."  This book

of the DLC's ideas issued in 1998 seems to include only Democrats within its

intended audience.

In a similar fashion, the DLC, along with its related think tank the Public

Policy Institute, held a short orientation in February 1999 for the "freshman class"

of newly elected members of the House of Representatives.  But only Democrat

members were invited.  From testifies (From Dep. p. 11.)

Q    No newly elected freshman Republicans were invited to this

---

[5]  *The DLC Update* issued on April 2, 1996, listed products, including *The Idea Book*, available
for "turning ideas into action."  The list was prefaced with the claim that "The DLC is proud of
its role as the primary idea generator in the Democratic Party."

-23-

particular briefing?

A    That's right.

Q    What would be the purpose of a briefing of newly elected freshman
Democrats?

A    Well, again, to try to encourage them to support our point of view.
As we have discussed over and over again, you know, on a major issues
of ours, which was trade, we had just lost a major vote in the House.
We were trying to build support for the New Democrat philosophy
among the most likely audience.

The Republicans at this point were trying to impeach a Democratic
president.  They probably weren't particularly eager to, you know, hear
or to join in on ideas that reflected a philosophy that he also embraces.
But, you know, we were trying to build support.  I mean, again, just to
make it very clear, the purpose of the DLC is to promote a new
progressive agenda.  Republicans aren't likely to support that.  The
agents for promoting it are elected officials who are Democrats.  Now,
sometimes Republicans also support the ideas.  And when they do, we
work with them.

But we were building -- we were trying to encourage more people in
the Democratic party to go against the party orthodoxy and support
our ideas.

In 1999, the DLC was not looking to attract all newly elected House members to its

policies and ideas, but invited only Democrats.

All of these facts about the DLC's purpose are not recounted to discount the

DLC's considerable policy work.  And there is no dispute that the DLC at times

worked with Republicans to advance its policies.  But when all of the facts and

circumstances are reviewed, the DLC's organization, the DLC's events that

presented only elected Democrats, the statements of DLC's purpose by its leaders,

the way it contrasted its policies from those of Republicans, and the way the DLC

-24-

trained only Democrats to implement its policies, show the DLC's primary purpose

for its activities in 1997, 1998, and 1999.  That purpose was to assist individuals

running for office as Democrats or elected to office as Democrats.

## ARGUMENT

1.    **DLC has the burden of establishing it is entitled to be exempt in**
      **1997, 1998, and 1999 to obtain a refund.**

A tax refund suit is a de novo proceeding.  The DLC bears the burden of

proof, including the burden of going forward and the burden of persuasion.  *E.g.*,

*Helvering v. Taylor*, 293 U.S. 507, 514 (1935) (the plaintiff in a tax refund suit has

the burden, "specifically to show not merely that the assessment was erroneous but

also the amount to which he is entitled"); *Lewis v. Reynolds*, 284 U.S. 281, *modified*,

284 U.S. 599 (1932).  The DLC "must first rebut the presumption of correctness

associated with any determination made by the Commissioner ...."  *Sara Lee Corp.*

*v. United States*, 29 Fed. Cl. 330, 334 (Fed. Cl. 1993)(citing *United States v. Janis*,

428 U.S. 433 (1976)).  In this context, determinations by the Service regarding an

organization's qualifications for exemption are presumptively correct.  *Helvering v.*

*Taylor*, 293 U.S. at 515.  Federal tax exemption is a matter of legislative grace and

the Court must narrowly construe exemptions from taxation.  *Bingler v. Johnson*,

394 U.S. 741, 751-52 (1969) (recognizing the "principle that exemptions from

taxation are to be construed narrowly.").  "As exemptions do not depend upon

equitable considerations, but are acts of legislative grace, they are to be construed

and applied narrowly."  *Club Gaona, Inc. v. United States*, 167 F.Supp. 741, 747

-25-

(S.D.Cal. 1958); *see also, The Fund For the Study Of Economic Growth And Tax Reform v. Internal Revenue Service*, 161 F.3d 755, 759 (D.C. Cir. 1998) ("the burden is on the taxpayer seeking exemption from taxation to demonstrate that it is in fact entitled to tax-exempt status"), *citing Granzow v. Commissioner*, 739 F.2d 265, 268 (7th Cir. 1984) (per curiam) ("Exemption from income taxation is a matter of legislative grace. A taxpayer requesting an exemption must demonstrate compliance with the specific requirements set forth in the statute granting the exemption .... The party claiming the exemption bears the burden of proof of entitlement."); *Commissioner v. Lake Forest, Inc., 305 F.2d 814, 818* (4th Cir. 1962) ("Of course, a taxpayer must bring himself substantially within the terms of a statute granting exemption from taxation to claim the benefit it affords.") Accordingly, "[a] taxpayer seeking exemption from taxation has the burden of proving by clear and convincing proof that he is within a specific exemption clause." *Vision Service Plan v. United States*, 2005 WL 3406321 (E.D. Cal., December 12, 2005), *citing Club Gaona, Inc. v. United States*, 167 F.Supp. 741, 746 (S.D.Cal. 1958).

## 2. The private benefit doctrine prohibits exempt organizations from operating to benefit a private group, even if the group is made up of individuals who are not members or officers of the organization.

To be exempt under either Section 501(c)(3) or (c)(4), an organization must be devoted "exclusively" to one or more exempt purposes. Regarding this exclusivity requirement, the Treasury Regulations under Section 501(c)(3) provide:

> An organization is not organized or operated exclusively for one

-26-

> or more ... [exempt] ... purposes unless it serves a public rather than a
> private interest.  Thus, to meet the requirement of ... [Section
> 501(c)(3)], it is necessary for an organization to establish that it is not
> organized or operated for the benefit of private interests such as
> designated individuals, ...

Treasury Regulations on Income Tax §1.501(c)(3)-1(d)(1)(ii).  The Treasury

Regulations under Section 501(c)(4) encapsulate the same theme in requiring that a

"social welfare" organization "promot[e] in some way the common good and general

welfare of the people of the community."  Treas. Reg. §1.501(c)(4)-1(a)(2).  Thus,

under either Section 501(c)(3) or (c)(4), the rule always has been to include

organizations exclusively dedicated to the public good, while excluding those

organizations whose main aim is to further the private interests of a limited class of

beneficiaries.[6]

The leading case on the "exclusivity" of exempt purposes requirement is

*Better Business Bureau v. United States*, 326 U.S. 279 (1945).  In that case, a non-

profit group of merchants—the Bureau—sought to be classified as an educational

organization within the meaning of Section 811(b)(8) of the Social Security Act,

whose language was drawn from the predecessor of Section 501(c)(3).  According to

its charter, the group was dedicated to the securing of the "educational and

scientific advancements of business methods" so that merchants might "successfully

---

[6] Not all of the more than twenty categories of groups listed in Section 501(c) are
expected to serve society first and their members second.  Some, such as social clubs
and voluntary employees' beneficiary associations, are clearly devoted first and
foremost to meeting the needs of their members.  See 26 U.S.C., §501(c)(7) and
(c)(9).

-27-

and profitably conduct their business." *Better Business Bureau*, 326 U.S. at 281.

Analyzing this situation in light of the requirements of the §501(c)(3) statute, the

Supreme Court observed that "the presence of a single ... [non-exempt] purpose, if

substantial in nature, will destroy the exemption regardless of the number or

importance of truly ... [exempt] purposes." *Better Business Bureau*, 326 U.S. at 283.

Applying this standard, the Court found that, although the Bureau's efforts to

expose unethical business practice were "commendable" and might even serve to

"educate" business professionals, those efforts were also "directed fundamentally to

ends other than that of education," and, as such, the Bureau was not organized and

operated "exclusively" for exempt purposes. *Better Business Bureau*, 326 U.S. at

284. This limitation is generally referred to as the private benefit doctrine. *See*

*generally* Frances Hill and Douglas Mancino, *Taxation of Exempt Organizations*

¶ 4.02 (2006).

The private benefit doctrine also applies to section 501(c)(4) organizations,

although the allowed extent of non-exempt activity is different. In the context of

§ 501(c)(4), somewhat counter to what one might expect, courts interpret the phrase

"operated exclusively" to mean "primarily engaged" in promoting the common good.

Treas. Reg. §1.501(c)(4)-1(a)(2); *e.g.*, *American Women Buyers Club, Inc. v. United*

*States*, 338 F.2d 526, 528 (2d Cir. 1964)("[t]he word 'exclusively' as used in the

statute has not been given a strict interpretation ... but rather has been interpreted

to mean 'primarily'."). Thus, the non-exempt activities of an organization cannot be

the organization's primary purpose. Whether an organization is "primarily"

-28-

engaged in promoting social welfare is a "facts and circumstances" determination.
*See IHC Health Plans, Inc. v. Commissioner*, 325 F.3d 1188, 1199 (10th Cir.
2003)(Tax Court correctly reviewed all facts and circumstances in considering
community benefit test); *see also* Rev. Rul. 68, 45, 1968-1 C.B. 259 ("All facts and
circumstances are taken into account in determining an organization's primary
activity.").

To qualify under section 501(c)(4), an organization must be "a community
movement designed to accomplish community ends." *Erie Endowment v. United
States*, 316 F.2d 151, 156 (3d Cir. 1962). An organization does not qualify under
section 501(c)(4) if it is operated primarily for the benefit of a private group such as
its members, rather than for the purpose of benefitting the community as a whole.
Even if an organization can establish some benefit to the community, it still does
not meet the requirement of a section 501(c)(4) organization if it is operated
primarily to benefit a private group rather than the community as a whole.

Determinations are easy when the benefits flow directly to members of the
organization, even though the public as a whole also receives some benefit. In
*Contracting Plumbers Cooperative Restoration Corp. v. United States*, 488 F.2d 684
(2d Cir. 1973), *cert. denied*, 419 U.S. 827 (1974), the Second Circuit ruled an
organization assisting member plumbers in their profession by repairing the cuts or
trenches they made in city streets was not exempt under section 501(c)(4). Before
the organization was formed, the city had repaired the cuts and billed the plumbers
individually. This system was highly inefficient. An organization was formed as a

-29-

cooperative in order to restore the city streets.  It, however, only repaired cuts made

by its members.  The joint effort of the plumbers reduced their liability and their

expenses.  In evaluating the organization's value to the community and to its

individual members, the Court followed "the rule that the presence of a single

substantial non-exempt purpose precludes exempt status regardless of the number

or importance of the exempt purposes."  *Contracting Plumbers,* 488 F.2d at 686,

*citing People's Educational Camp Society, Inc. v. Commissioner*, 331 F.2d 923, 931

(2d Cir.), *cert. denied*, 379 U.S. 839 (1964); *American Women Buyer's Club, Inc. v.

United States*, 338 F.2d 526, 528 (2d Cir. 1964); *Better Business Bureau of

Washington, D.C., Inc. v. United States*, 326 U.S. 279, 283 (1945); *Commissioner v.

Lake Forest, Inc.*, 305 F.2d 814, 820 (4th Cir. 1962).

 In reaching this decision, the court considered several factors, including the

plumbers' apparent business interest in forming the organization, the mutual aid

purpose of the organization reflected in its bylaws, the substantial member benefits

given the organization provided members better services at cheaper prices than

would have been eventually charged by the city while providing no services to

nonmembers, and the receipt by members of economic benefits precisely to the

extent that they used and paid for the organization's services.  While the court

found the program "totally commendable," it concluded "the taxpayer provides

substantial and different benefits to both the public and its private members, and

that we therefore cannot say it is 'primarily' devoted to the common good as

required by even the most liberal reading of § 501(c)(4)."  *Contracting Plumbers*, 488

-30-

F.2d at 685 and 687.

The private benefit doctrine also applies to organizations that provide benefits to its members, and not the community as a whole, even if anyone is eligible to join the organization.  In *Commissioner v. Lake Forest, Inc.*, 305 F.2d 814 (4th Cir.  Cir. 1962), the Fourth Circuit found a membership-based corporation providing housing on a cooperative basis was not an organization described in section 501(c)(4) because the corporation operated as a private self-help enterprise with only incidental benefit to the community.  The court explained:  "Lake Forest does, of course, furnish housing to a certain group of citizens but it does not do so on a community basis.  It is a public-spirited but privately-devoted endeavor.  Its work in part incidentally redounds to society but this is not the 'social welfare' of the tax statute."  *Lake Forest*, 305 F.2d at 818.  The Court further explained the "[c]lassification as "'civic' or 'social' depends upon the character—as public or private—of the benefits bestowed, of the beneficiary, and of the benefactor."  *Lake Forest*, 305 F.2d at 818.

The private benefit principle similarly applies when otherwise exempt activity indirectly benefits a political party.  In *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court denied exemption under section 501(c)(3) to an otherwise tax exempt school organized to train individuals for careers as political campaign professionals because the school operated for the substantial nonexempt purpose of benefitting the private interests of Republican Party entities and candidates.

-31-

The case is not important here for the quantum of non-exempt activity allowed, but for the way the Tax Court defined the private benefit inquiry. In reaching its decision, the Court enunciated four principles underlying the concept of private benefit. First, the Court held that an organization may violate the "public rather than private interest" mandate under section 501(c)(3) by conferring non-incidental benefits to unrelated parties not having a personal and private interest in the organization. *Am. Campaign Acad.*, 92 T.C. at 1067-1069. In other words, the benefits can flow to individuals or a group that are not members, officers, or employees of the organization.

Second, the Court held that exempt educational activity could nevertheless be a private benefit. The Academy argued that its educational activity benefitted its students, and insulated any benefits that directly or indirectly flowed to the Republican Party. The Court found the Academy "conducted its educational activities with the *partisan objective* of benefitting Republican candidates and entities." *Am. Campaign Acad.*, 92 T.C. at 1070 (emphasis supplied). The Court based its finding about objective or purpose on several factors, including the incorporation of the school by the General Counsel of the National Republic Campaign Committee, the funding of the school by Republican Party interests, the fact two of the school's initial directors had strong ties to the Republican party, the failure of the school to counterbalance the Republican Party focus of its curriculum with comparable studies of the Democratic Party or other political parties, and the fact nearly all of the school's graduates became employed by Republican Party

-32-

organizations or candidates.  These facts demonstrated the purpose behind the

Academy's educational program.

Third, the Court concluded that, despite the fact that there were millions of

Republicans who might benefit—making a numerous class of individuals receiving

a benefit, it was the nature of the group made it a private group rather than

representative of the community as a whole.  The Academy argued that

organizations restricting benefits to identified classes based on geography or

industry could still qualify as tax exempt if the benefitted class is sufficiently broad

to represent the community and "that since Republican entities and candidates

arguably represent the interests of a class consisting of hundreds of organizations

and millions of citizens, the benefits accruing to this class should be construed as

public in nature."  *Am. Campaign Acad.*, 92 T.C. at 1073-1074.

In rejecting the Academy's argument and in considering this issue of a

charitable class, the Court distinguished between those receiving the primary

benefit of the organization's efforts and those receiving a secondary benefit.  In

*American Campaign Academy*, the beneficiaries of the primary private benefit were

the students; the beneficiaries of the secondary private benefit were the Republican

entities who employ the school's graduates.  In finding it was the secondary private

benefit conferred by the school on Republican entities and candidates caused the

school to lose its tax exempt status, the Court found no authority for the taxpayer's

contention that "size alone transforms a benefitted class into a charitable class."

Rather, the Court stated that "we believe a qualitative as opposed to a quantitative

-33-

analysis is more appropriate in assessing the charitable characteristics of a

benefitted class." Id. at 1076.  The Court reasoned "[c]lass size is only one factor to

be considered in our qualitative analysis. It is not the sole determinant." Id. at

1077.  Rather, the taxpayer must demonstrate the "Republican entities and

candidates possess charitable characteristics in order that the entities and

candidates be deemed members of a charitable class." Id.  The Court found that the

taxpayer "has not established that the specific Republican entities and candidates

which benefitted by its educational programs were members of a charitable class."

Id.

        Finally, the Tax Court determined that benefitting partisan interests confers

a private benefit for purposes of determining tax exemption.  The Court stated

"even were we to find political entities and candidates to generally comprise a

charitable class, petitioner would bear the burden of proving that its activities

benefitted the members of the class in a nonselect manner." Id. at 1077.  The Court

found that the administrative record and the partisan affiliation of the candidates

served by the campaign academy failed to establish that the taxpayer "broadly

distributed its secondary benefits among political entities and candidates in a

nonselect manner." Id.  The Court noted "while petitioner may incidentally benefit

the public, ... the administrative record and the partisan affiliation of the

candidates served by petitioner's graduates in the 1986 election fully support [the

Commissioner's] determination that petitioner confers substantial private benefits

on Republican entities and candidates." Id. at 1078.  The Court found "[h]ad the

-34-

record established that the Academy's activities were nonpartisan in nature and that its graduates were not intended to primarily benefit Republicans, we would have a different case.  We are not, however, deciding such a case.... [W]e conclude petitioner is operated for the benefit of private interests, a nonexempt purpose."  Id. at 1078.

Although *American Campaign Academy* involves a section 501(c)(3) organization and not a section 501(c)(4) organization, the private benefit principles enunciated in *American Campaign Academy* are applicable in both instances.  For purposes of this case, the only difference is the permissible amount of private benefit allowed.  *American Campaign Academy* applies a section 501(c)(3) private benefit standard in which any private benefit (considered along with any other nonexempt purpose) must be incidental or insubstantial. Reg. § 1.501(c)(3)-1(c)(1); *Am. Campaign Acad.*, 92 T.C. at 1065-1066.  Private benefit (combined with any other nonsocial welfare activity) for a section 501(c)(4) organization must be less than primary.  Thus, the section 501(c)(4) standard allows for more private benefit than the section 501(c)(3) standard.  *See* Rev. Rul. 75-286, 1975 C.B. 210.  But private benefit cannot be the primary purpose of a purported § 501(c)(4) organization.

**3.    DLC's primary purpose as reflected in its activities fall within the private benefit prohibition.**

The DLC's activities during 1997, 1998, and 1999 demonstrate its primary purpose falls well within the private benefit doctrine.  The DLC was founded by

-35-

elected Democrats. Elected Democrats or individuals working for elected Democrats almost exclusively made up the DLC's public face at its annual conventions and National Conversations during the years at issue . The DLC created and ran leadership workshops designed to teach individuals how to best effect the DLC'S preferred policies; but the benefit of that activity ran only to Democrats. And while we do not allege or contend the DLC somehow denied access to Republicans, the record remains that the benefit went only to Democrats. The DLC's *Idea Book* for 1998 referred to "we" as Democrats and New Democrats, not all individuals who might share the DLC's policy views. Thus, Democrats and New Democrats, and the benefits that flowed to them, permeated the DLC's activities during the years at issue.

The DLC's purpose is made all the more clear when one looks at the way Republicans were addressed. Although the DLC developed many policies during its tenure that attracted support from individual Republicans, and we expect the DLC will describe them all, the DLC during the years at issue publicly belittled Republicans who "pilfered" the DLC's ideas and policies, while lauding the Democrats who did so. Although the fact statement above has a litany of statements by DLC officials who tie the DLC's fortunes to those of elected Democrats, perhaps two statements distill the purpose of the DLC's activities best. Speaking before the 1998 DLC Annual Conference, From outlined the DLC's purpose of creating policies that carry the Democratic Party this way:

Let me be very clear about why we're here and what the DLC is about.

-36-

> Our mission is to ensure that the new Democrat politics that has dominated our party for the last six years continues to be the defining politics for the Democratic Party and for our country after President Clinton leaves office in 2001. We need a Democratic Party that tackles America's most difficult challenges with the kind of bold and innovative ideas that we are hearing about today. That is the key, not only to holding onto the White House in the year 2000, but to rebuild our party at the congressional and gubernatorial levels, as well.

From put this same intention in another way when he wrote a memorandum in July 1998 to the DLC's Trustees describing what he saw as the DLC's future.  In that memorandum, From delineated the DLC's purpose in creating policies this way (From Dep. p. 152; Ex. 107 p. 3):

> Realistically, New Democrats will never match organized labor and other traditional interest groups in the ability to raise funds or organize troops for campaigns.  So what we have to do is to make our brand—our message and ideas—so valuable that candidates will find it advantageous to run on them, even candidates who get labor money and organizational help.  Since we can't top labor's money, we need to make it work for us.

> In other words, we need to increase the value of our brand—so that being labeled a New Democrat candidate is as valuable as receiving interest group money.

Making policies a valuable commodity for Democrat candidates is benefitting a private group.  The DLC was creating policies with the foreseeable, anticipated, and intended result of Democrats being elected.  Following the November 1998 elections, and just a few months after writing that memorandum, the DLC released "Talking Points" of From's post-election DLC press conference.  (MSJ Ex 9.)  The last point is titled "The successful Democratic elections yesterday foreshadows a formula for success for Democrats in the Year 2000."  The successful Democrat

-37-

election formula was to rally around "New Democrat ideas and themes," ideas and themes created by the DLC. One is left wondering that if DLC believed its policies were good for the entire community, why it did not extol the electoral value of those policies for every candidate no matter what his or her party affiliation? How can the DLC meet its burden of showing that its primary purpose during the years at issue was creating policies intended to benefit the community—and not just a private group of Democrats—when "success" was creating policies that were valuable electoral resources for Democrats? Of course, the undisputed facts as a whole and the *American Campaign Academy* decision, among the many applying the private benefit doctrine, show that the DLC cannot meet its burden. Organizations primarily conferring these indirect benefits on a private group of party members cannot be exempt under § 501(c)(4).

## Conclusion.

We do not argue that the DLC failed to develop policies that its officers, directors, employees, and members believed would benefit the community as a whole if enacted. The undisputed material facts, however, show that the DLC's primary purpose and activities during 1997, 1998, and 1999 were to create policies that would allow Democratic majorities to be elected and sustained. That purpose and those activities benefit a private group of individuals. And that primary

-38-

purpose and those activities disqualify the DLC from being tax exempt under

§ 501(c)(4) during 1997, 1998, and 1999.  Accordingly, summary judgment should be

entered for the United States, and the complaint dismissed.

Dated: July 17 2006

                              Respectfully Submitted,


                              /s/ Pat S. Genis
                              PAT S. GENIS, #446244
                              DAVID A. HUBBERT
                              Trial Attorneys, Tax Division
                              U.S. Department of Justice
                              P.O. Box 227
                              Washington, DC 20044
                              Phone/Fax: (202) 307-6390/514-6866
                              Email: pat.genis@usdoj.gov




OF COUNSEL:

KENNETH L. WAINSTEIN
United States Attorney

<u>CERTIFICATE OF SERVICE</u>

IT IS CERTIFIED that the foregoing UNITED STATES MEMORANDUM OF

POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY

JUDGMENT was caused to be served upon plaintiff's counsel on the 17th day of July,

2006, in accordance with the Court's ECF procedures, and by depositing a copy thereof

in the United States mail, postage prepaid, addressed as follows:

> ROBERT F. BAUER, ESQUIRE
> MARC E. ELIAS, ESQUIRE
> EZRA W. REESE, ESQUIRE
> Perkins Coie
> 607 Fourteenth Street, NW,
> Suite 800
> Washington, DC  20005-2011.
> rbauer@perkinscoie.com

> /s/ Pat S. Genis
> PAT S. GENIS