IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

DEMOCRATIC LEADERSHIP COUNCIL,
INC.,

                Plaintiff,

     v.

UNITED STATES,

                Defendant.

No. 1:05-cv-1067 (JGP)

## MOTION FOR SUMMARY JUDGMENT

Plaintiff Democratic Leadership Council, Inc. ("DLC") through undersigned counsel, respectfully moves this Court for a summary judgment pursuant to Fed. R. Civ. P. 56, finding that the revocation by the Internal Revenue Service ("IRS") of DLC's tax-exempt status for the period between January 1, 1997 and December 31, 1999 was erroneous, and awarding recovery of all federal income tax paid by DLC for the taxable years ending December 31, 1997; December 31, 1998; and December 31, 1999.

A memorandum of points and authorities, Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute, and a Proposed Order are submitted herewith.  Plaintiff requests oral argument on this motion.

Respectfully Submitted,

Dated July 17, 2006                    _____/s/_____
                                       Robert F. Bauer (D.C. Bar No. 938902)
                                       Marc E. Elias (D.C. Bar No. 442007)
                                       Ezra W. Reese (D.C. Bar No. 487760)
                                       PERKINS COIE LLP
                                       607 Fourteenth Street, N.W.
                                       Washington, D.C.  20005-2011
                                       (202) 628-6600

                                       Attorneys for Democratic Leadership Council,
                                       Inc.

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

DEMOCRATIC LEADERSHIP COUNCIL,
INC.,

               Plaintiff,

    v.

UNITED STATES,

               Defendant.

No. 1:05-cv-1067 (JGP)

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT**

Robert F. Bauer (D.C. Bar No. 938902)
Marc E. Elias (D.C. Bar No. 442007)
Ezra W. Reese (D.C. Bar No. 487760)
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C.  20005-2011
(202) 628-6600

Attorneys for Democratic Leadership Council,
Inc.

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................................... 2

        A.      Factual History ............................................................................. 2

        B.      Procedural History........................................................................... 10

III.    ARGUMENT ........................................................................................................ 12

        A.      DLC Is Tax-Exempt under Section 501(c)(4) ................................. 12

                1.      Legal Background ............................................................. 12

                2.      DLC Does Not Benefit the Democratic Party or New
                        Democrat Elected Officials ........................................... 17

        B.      IRS's Revocation was Retroactive........................................... 25

IV.     CONCLUSION .................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Am. Campaign Acad. v. Comm'r*, 92 T.C. 1053 (1989) ....................................................... 14, 24

*Comm'r v. Lake Forest Inc.*, 305 F.2d 814 (4th Cir. 1962)..................................................... 13

*Prince Edward Sch. Found v. Comm'r*,  478 F. Supp. 107 (D.D.C. 1979) ............................ 29

*Virginia Educ. Fund v. C.I.R.*,  85 T.C. 743 (1985) ............................................................... 29

**Statutes**

I.R.C. § 501(c)(4) (2006) ...........................................................................................4, 11, 12

**Other Authorities**

Rev. Rul. 75-286, 1975-2 C.B. 210 .......................................................................................... 24

Rev. Rul. 80-206, 1980-31 I.R.B. 11 ........................................................................................ 24

**Regulations**

Treas. Reg. § 1.501(c)(3)-1 (2006) .......................................................................................... 12

Treas. Reg. § 1.501(c)(4)-1 (2006) ...................................................................................... 12, 24

Treas. Reg. § 601.201 (2006) .................................................................................................... 29

## I.  INTRODUCTION

Plaintiff Democratic Leadership Council, Inc. ("DLC") is a nonprofit think tank, organized under section 501(c)(4) of the Internal Revenue Code ("the Code") as a social welfare organization.  DLC was founded in 1985 by a group of centrist Democrats, including Democratic elected officials, dissatisfied with the policy positions of both the Republican and Democratic parties.  The purpose of DLC is to develop "fresh policy options and approaches which could spark and advance public debate."  (DLC Form 1024, *attached as* Exhibit A).  Since that time, DLC has operated in a manner consistent with that mission, by cultivating and promoting a set of ideas consistent with the New Democrat philosophy.  Almost all of DLC's funds and efforts are spent to produce written materials such as the two magazines *Blueprint* and the *New Democrat*, and other regular and intermittent policy and legislative briefings materials.  All of these materials are distributed on a bipartisan basis, and are available on the DLC's website, at http://www.dlc.org.  DLC has never had any relationship, formal or otherwise, with the Democratic National Committee or any other Democratic Party organization.

In the first year of its existence, DLC filed with the Internal Revenue Service ("IRS") an Application for Recognition of Exemption Under Section 501(c)(4).  DLC made explicit in its application that its founders were Democratic elected officials, and that its focus included policy debate both within and without the Democratic Party.  Shortly thereafter, the IRS approved DLC's application without qualification.

In 1999, the IRS began to investigate DLC's tax returns for the years 1997, 1998, and 1999.  The IRS subsequently revoked DLC's tax-exempt status for those years.  The investigation uncovered no evidence that DLC's primary purpose was political intervention, and Defendant is not relying on political intervention to sustain

its revocation of DLC's tax-exempt status. Instead, the IRS concluded that DLC "primarily benefited affiliated New Democrat elected officials, with a secondary benefit to the Democratic party, rather than primarily benefiting the community as a whole." This theory had never before been used by the IRS to revoke the exemption of a section 501(c)(4) public policy organization.

The IRS's revocation of DLC's tax status was erroneous. The private benefit theory, developed to prevent section 501(c)(4) organizations from becoming purely member service providers, has no application to a think tank that makes the fruits of its labor publicly available. Furthermore, even were this not the case, DLC has at all times operated consistent with its Application for Exemption, subsequently approved by the IRS; the IRS has not met the high factual bar required to retroactively revoke DLC's tax-exempt status. DLC brings this action to recover the full amount of the $20,082.91 it paid in taxes to the IRS for those three years, plus interest and costs allowed by law, including the award of reasonable litigation costs incurred in this proceeding under I.R.C. § 7430.

## II. STATEMENT OF FACTS

### A. Factual History

DLC was founded on March 1, 1985. Its initial directors were three Democratic elected officials: then-Governor Charles Robb, Senator Sam Nunn, and Congressman Richard Gephardt. As stated in its Articles of Incorporation, DLC was founded "for the promotion of welfare" under section 501(c)(4) of the Code, "for the purpose of bringing about civil betterments and social improvements." Though it was not legally required for a section 501(c)(4) organization, DLC also forswore any "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." (DLC Form 1024). The name "Democratic Leadership Council" was chosen not because of any intentions on the

part of the founders to influence elections, but simply because the group of people that came together to form the organization were Democrats.  (A. From dep. 5:14-15, Feb. 23, 2006, *attached as* Exhibit B).  Al From, the founder and CEO of DLC, described the individuals who formed the organization as "interested in pushing a different kind of an agenda, sort of like a third way, which was progressive.  And so, you know, we put together a social action entity to push that agenda."  (*Id.* 12:2-11).

On November 8, 1985, DLC filed an Application for Recognition of Exemption under § 501(a), seeking recognition under section 501(c)(4) of the Code. The application included a copy of DLC's Articles of Incorporation.  The application openly described DLC's proposal to operate as a think tank and policy organization that was founded by self-identified Democrats troubled by the state of the Democratic Party.  "The Democratic Leadership Council was organized in early 1985 by certain elected and others who were concerned with the formulation of national policy and with the direction of policy debate within the Democratic Party."  (DLC Form 1024, Part III, Question 3, at 1).  The application also made clear that it was "organized by and operates under the leadership of certain Democratic elected officials."  (*Id.* Part III, Question 12, at 1).

In its application, DLC specifically addressed its relationship with the Democratic Party.

> The Democratic Leadership Council is so named because it was founded by federal and state elected officials who are Democrats and who were concerned with the direction of policy debate within their party, as well as within the country as a whole. Through the establishment of DLC, these officials and others with similar interests and goals expected to improve the overall contribution to Democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy.

(*Id.* Part III, Question 3, at 1).  On February 7, 1986, the IRS recognized DLC as an exempt organization under I.R.C. § 501(c)(4).  The exemption letter included no caveats limiting DLC's operations, other than a request that DLC notify the IRS if its "purpose, character, or method of operation change."  (DLC Exemption Letter, *attached as* Exhibit C).

As Al From described it, DLC's mission was: "To develop a progressive agenda for the country and get that agenda enacted into law."  (From dep. 16:11-12).  DLC was founded on a progressive modern philosophy different fundamentally different from the Democratic Party as it existed at the time.

> We thought that the economic agenda of the Democratic Party was grounded in redistribution and not growing the economy.  We believe that you had to grow the economy.  But we also differed from the conservatives.  They were concerned only about growing the economy and now about helping ordinary people benefit from that growth.
>
> And so we developed a set of policies grounded in fiscal discipline, investing in people, in technologies, and expanding trade that I believe had a great impact when they were actually put into place.

(*Id.* 17:11-25).  DLC believed that the government should play an active role in the lives of Americans, but that it should equip them with the tools they need to thrive instead of merely providing a handout.  (*Id.* 20:10-13).  The policies of DLC were "grounded in fiscal discipline, investing in people, in technologies, and expanding trade."  (*Id.* 17:23-24).  This approach is now known as "the Third Way."  (*Id.* 19:3).  The Democratic Party at the time, especially the organized labor interests, resisted DLC's approach, (From dep. 17:15-19:5) and DLC's position was sometimes at odds with traditional Democratic Party values.  (D. Cox-Bultan dep. 85:10-87:23, *attached as* Exhibit D).

As an example of DLC's policy positions, Chuck Alston, the former Executive Director DLC, described DLC's position during the welfare reform debate:

> The Reagan era ushered in kind of a popular conservative thinking that was every man for himself. We felt that there was a different role for government and for public policy in terms of giving an individual the tools they needed to lift themselves out of poverty, but limiting that assistance and limiting the role of government to giving its – the old elected Christian principal, teach a man to fish, then you don't have to give him his fish every day. He can catch them.
>
> That was our theory. Let's give these mothers the education they need. Let's give them the child support they need. Let's remove all the barriers to them working and having a dignified way of living. And then we will set limits on how long that will last. And that would be the new role that the government would play.

(C. Alston dep. 28:20-29:11, Feb. 10, 2006, *attached as* Exhibit E). In the end, welfare reform was passed by the Republican Congress in 1995. (*Id.* 49:5-6).

DLC's position on education was similar to its position on welfare: "We were not opposed to putting a lot more money into the system, but we believed that you couldn't do that without proper accountability." (*Id.* 49:25-50:2). DLC's proposals did not meet with much success, until George Bush was elected in 2000, and brought in a Texas school board member who had been a believer in the DLC system. He adopted DLC's education platform into the "No Child Left Behind" platform. (*Id.* 50:15-24).

DLC had numerous tools to get its policy positions across. DLC publishes two magazines: *New Democrat* and *Blueprint*. The "DLC Update" is a regular fax that was sent to thousands of public officials, activists and supporters. The "DLC Briefing" is a regular product in which DLC describes a policy controversy and DLC's public policy principles and recommendation. The "DLC Talking Points" succinctly describes DLC's position on the issues of the day. (*Id.* 58:1-73:24). The "New Dem

Daily" was a daily policy update, later changed to the "New Dem Dispatch."  (*Id.* 84:2-6).  The "Idea of the Week" is a summary of DLC's weekly policy stances.  (*Id.* 75:1-24).  The "Monthly State Leadership Update" is sent around the country.  (*Id.* 77:3-19).  The "DLC News Release" is, as the name suggests, meant for reporters.  (*Id.* 81:16-20).  Finally, DLC uses its website to publish publicly all DLC materials.  (*Id.* 87:8-9).

From the beginning, DLC has been "very explicit" that it could not become involved in political campaigns.  (From dep. 21:23-24).  To that end, and in accordance with its corporate charter, DLC did not recruit or support political candidates, nor did it engage in any sort of voter registration or get-out-the-vote activity.  (*Id.* 170:24); (Alston dep. 18:22-25); (W. Marshall dep. 154:3-22, Feb. 8, 2006, *attached as* Exhibit F).  DLC has never made donations to any state or local candidates, even when otherwise permitted by state campaign finance law, and it has never endorsed any candidate for public office.  (From dep. 170:23-171:17).

Because the goal of DLC is to produce and support policies in keeping with its Third Way agenda, it necessarily worked with the elected officials who had the power to enact those policies.  (*Id.* 223:13-20).

> Q.      Now, to get an agenda enacted into law, how did you intend to go about doing that?
>
> A.      Well, the way we intended to go about doing that is exactly what we did, which is we developed ideas.  Sometimes we developed them on our own.  Sometimes we took ideas that we found around the country.  And what we tried to do was push them in the public debate.  And the agents who were pushing them in the public debate were our elected officials.

(From dep. 16:14-22).  Many of those officials were Democrats, for the simple reason that DLC's proposals were progressive, and the natural base of support was primarily within the Democratic side of the aisle.  (*Id.* 59:11-16).  However, while DLC was

explicitly founded as a Democratically-aligned organization, it worked with Republican elected officials and organizations whenever possible, with the goal of advancing DLC's policy positions.  (From dep. 14:23); (C. Dooley dep. 50:8-13, Mar. 9, 2006, *attached as* Exhibit G).

For instance, Americorps was a DLC proposal that was supported most fervently in the Senate by Senators Bayh, a Democrat, and McCain, a Republican. (From dep. 14:1-6).  Welfare reform, another DLC policy proposal, was supported by over twice as many Republicans in Congress than Democrats.  (*Id.* 14:7-11).  DLC's efforts to expand trade were supported by "many more" Republicans than Democrats in Congress.  (*Id.* 14:11-13).   DLC believed that the President ought to have fast track trade promotion authority.  DLC fought to win support for this concept and to pass it in Congress.  DLC "wanted to actually see these policies that we thought were good for the country and have a chance at going into effect."  (*Id.* 90:21-96:17).  It lobbied for the bill in Congress, and even went so far as to raise funds for a television advertisement promoting the fast track legislation.  (*Id.* 94:23-25).  In this instance, DLC did not successfully make its case, and the legislation died in Congress.  "[I]t got almost all the Republican votes and only a handful of the Democratic votes."  (*Id.* 21-23).

DLC regularly worked with coalitions made up of both Democrats and Republican legislators to promote and enact legislation.  (*Id.* 230:1-12).  DLC also invited Republicans to participate in public events when they supported DLC on particular issues.  (Marshall dep. 153:1-5).  Al From stated that DLC worked with Republicans "wherever we could."  (From dep. 14:23).  DLC also worked extensively with Democrats who were not adherents to the New Democrat philosophy, when there was agreement on the issue at hand.  (Alston dep. 226:4-227:8).  Republicans as well as Democrats could use DLC ideas for both legislative and electoral purposes.  (*Id.*

32:3-6). Many Republicans ran for office on DLC ideas, including George W. Bush. (*Id.* 79:19; From dep. 180:1-3).

DLC hosted events with Republican organizations. For instance, DLC has held events with the Jack Kemp-affiliated Empower America. (Alston dep. 63:19-25). In 1991, DLC cosponsored a conference with the Heritage Foundation. (Marshall dep. 31:15-20). In 1996, DLC hosted another event with the Heritage Foundation, on the subject of healthcare; it was co-hosted by Bob Bennett, a Republican from Utah; Dennis Hastert, now-Speaker of the House; John Tanner, a Democrat from Tennessee, and Joe Lieberman, a Democrat from Connecticut. (From dep. 62:10:63-9).

DLC did occasionally host small events meant to be attended exclusively by Democratic elected officials and their staff, such as policy briefings or leadership training workshops. These were not a large part of DLC activities; for instance, the leadership workshop trainings on average took no more than two or three percent of DLC's annual budget. (From dep. 189:18). At its peak, the workshops consumed less than five percent of DLC's $4 million budget. (Cox-Bultan dep. 88:24-25, 91:12-13,). Except for these small exceptions, all DLC events were open to the public, and to members of both political parties. (From dep. 186:17).

The fruits of DLC's labor were made available to the public at large, on a nonpartisan basis. Every copy of the DLC magazines *Blueprint* and *New Democrat* went to every member of Congress of both parties, and to every Governor no matter his or her political affiliation; the magazines are also available on DLC's website to be accessed by the general public. (*Id.* 119:7-9, 186:2-7); (Alston dep. 60:16-17, 61:15-18). For a time, the *Blueprint* magazine was even distributed on the shuttle from Washington, D.C. to New York and Boston. (From dep. 190:2-3). Policy statements sent by facsimile were also distributed on a bipartisan basis. (Alston dep. 66:1-4).

The DLC Briefing, another policy paper, was sent out on a purely bipartisan basis. (*Id.* 70:9-10). And all print materials produced by DLC were available on the Internet. (*Id.* 87:8-9).

DLC donors included a wide variety of individuals and organizations; Republican donors often contributed to the DLC. (From dep. 51:1-2). Donors were, as a rule, not motivated by partisan interests.

> Q. Right. Now was one of the reasons that an individual donor, for example, wanted to attend your event and to participate was to help get New Democrats elected to public office to carry out the philosophy that the DLC was promoting?
>
> A. You know, I can't speak for what was in their mind. That wouldn't have been what we told them they got for giving us money. Now, you know, I just – I don't know what their motivation would have been. But that's not what the – that's not what the brand promise of the DLC.

(Alston Dep. 117:1-11). No Democratic Party organization aids DLC in its fundraising efforts, nor does DLC use fundraising lists acquired from any Democratic Party committee. (*Id.* 118:6-120:8).

The CEO of DLC estimated that the organization spends at least seventy percent of its annual budget on public policy materials that are published to the general public. (From dep. 190:22). DLC's Chief of Staff estimated that ninety-five to ninety-nine percent of the budget is spent on materials and conferences open to and available to the public. (Cox-Bultan dep. 89:16-17).

DLC is affiliated with the Progressive Policy Institute ("PPI"), a nonpartisan educational think tank. From January until July 1997, PPI was a project of DLC; after July 1997, PPI was moved to its current organizational home, as a project of the Progressive Foundation, an affiliated section 501(c)(3) organization. (From dep. 35:2-36:4). DLC and PPI rigorously allocate all costs between the organizations,

including requiring employees to complete time sheets, so that PPI funds are not spent on DLC activities.  (*Id.* 40:6-41:6).

### B.  Procedural History

DLC was first notified that the IRS was examining its 1997 tax return by a letter from George T. Smith, Revenue Agent, issued on October 14, 1999.  (Letter from G. Smith, *attached as* Exhibit H).  The letter stated merely, "We plan to examine the form [990]," and it requested a series of documents.  The letter also noted, "An examination of a return does not suggest suspicion of any wrongdoing."  (*Id.*)

After an investigation of almost three years, the IRS issued a Proposed Adverse Action Letter on June 28, 2002 revoking DLC's tax-exempt status for the calendar years 1997 and 1998.  (Proposed Adverse Action Letter (tax years 1997 & 1998), *attached as* Exhibit I).  The IRS found that DLC "primarily benefited affiliated New Democrat elected officials, with a secondary benefit to the Democratic party, rather than primarily benefiting the community as a whole."  (*Id.*)  On August 7, 2002, the IRS issued a Notice of Deficiency, requiring that DLC file Forms 1120 for the years 1997 and 1998 and pay a tax of $3,839.00 and $5,264.00, respectively, for those two taxable years (Def.'s Answer 21).  On November 29, 2002, the IRS sent DLC a Notice of Tax Due for $5,510.24 for tax year 1997; and $6,985.82 for tax year 1998 (Def.'s Answer 22).

On February 24, 2003, DLC paid $5,510.24 for payment of tax assessed plus interest for the tax year 1997; and $6,985.82 for payment of tax assessed plus interest for the tax year 1998.  The payments were made to the IRS office in Washington, D.C. (Def.'s Answer 23).  Also on February 24, 2003, DLC submitted a claim for a refund for taxable years 1997 and 1998, in the form of a Form 1120 with statements of grounds and reasons attached. (Def.'s Answer 24).  On April 16, 2003, DLC paid additional amounts of $134.21 and $176.14 for interest accrued on the tax due for

taxable years 1997 and 1998, respectively. (Def.'s Answer 25).  On July 28, 2003, the

IRS denied the DLC's claim for a refund for tax year 1997 and 1998. (Def.'s Answer

26)

On August 1, 2003, the IRS issued an Examination Report that proposed

revocation of DLC's exempt status for taxable year 1999 and found a tax deficiency of

$5,595.00. (Def.'s Answer 27); (Examination Report (tax year 1999), *attached as*

Exhibit J).  On August 28, 2003, DLC appealed the Examination Report issued

August 1, 2003. (Def.'s Answer 30).  On October 30, 2003, the IRS sent a Notice of

Deficiency to DLC for taxable year 1999, in the amount of $5,595.00. (Def.'s Answer

31).  On March 22, 2004, DLC paid $7276.50 for payment of tax assessed for the tax

year 1999 plus interest.  The payments were made to the IRS office in Washington,

D.C.  (Def.'s Answer 32).  Also on March 22, 2004, DLC submitted a claim for a

refund for taxable year 1999, in the form or Form 1120 with statements of grounds

and reasons attached. (Def.'s Answer 33).  On April 5, 2004, the IRS denied the

DLC's appeal for tax year 1999. (Def.'s Answer 34).

On June 20, 2000, the IRS revoked the exemption of the Ohio chapter of DLC,

the Ohio Democratic Leadership Council ("Ohio DLC") under section 501(c)(4),

effective January 1, 1995.  The revocation was based on a finding that Ohio DLC was

"operated primarily to benefit a small group rather than the community as a whole."

(Def.'s Answer 45).  On June 18, 2001, the Tax Court entered a stipulated decision

that rescinded the IRS's revocation of Ohio DLC's exemption.  The IRS stipulated that

"specifically petitioner's activity did not impermissibly confer a private benefit on any

person inconsistent with its I.R.C. § 501(c)(4) status." (Def.'s Answer 48).

The IRS has not revoked DLC's tax-exempt status for any time period

subsequent to December 31, 1999. (Def.'s Answer 35).  As a result, DLC is currently

filing as a section 501(c)(4) organization with the IRS.  The limitations period under

I.R.C. § 6501(a) has already passed for the forms 990 for calendar years 2000, 2001, and 2002.

## III.    ARGUMENT

### A.  DLC Is Tax-Exempt under Section 501(c)(4)

#### 1.  Legal Background

An entity organized under section 501(c)(4) of the Code must be:

> [N]ot organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

I.R.C. § 501(c)(4) (2006).  IRS regulations define the statutory requirements further.

> An organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community.  An organization embraced within this section is one which is operated primarily for the purpose of bringing about civic betterments and social improvements.

Treas. Reg. § 1.501(c)(4)-1(a)(2)(i) (2006).  The term "promotion of social welfare" expressly does not include "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office."  *Id.* § 1.501(c)(4)-1(a)(2)(ii).

IRS regulations provide that for a section 501(c)(3) organization to maintain its tax-exempt status, it must establish that it "serves a public rather than a private interest."  *Id.* § 1.501(c)(3)-1(d)(1)(ii).  In a series of cases and revenue rulings, the IRS has established that a similar prohibition on excessive "private benefit" applies to section 501(c)(4) organizations.  In *Commissioner of Internal Revenue v. Lake Forest Inc.*, 305 F.2d 814 (4th Cir. 1962), the Fourth Circuit reviewed the tax status of an

organization that was created to buy apartment complexes for the use of its members. While membership was open to the public, no benefits were received by anyone other than members in the organization. The court found that the organization was not tax-exempt under section 501(c)(4), because it was "not a movement of the citizenry of the community." *Id.* at 818. The court contrasted this organization with ones that served the public without regard to membership, such as a nonprofit radio station devoted to "liberal and progressive social views," and a nonprofit public utility providing electricity "to be enjoyed by the public at large." *Id.* at 819-20. The law recognizes that a section 501(c)(4)organization must not be a "privately-devoted endeavor." *Id.* at 818.

A publicly-devoted endeavor, one focused on policy promotion, may arise in the political context and be influenced by associations with particular political parties. For example, the IRS considered, in l997,  the application for (c)(4) recognition by an organization called Empower America which, among other activities, had distributed issue briefings critical of the Clinton administration, and "endorsements of policies similar, if not identical, to those expressed by the Republican Party."  The organization also held candidate schools to "educate candidates . . . from a conservative perspective," featuring instructors connected to the Republican Party. (IRS Letter to Empower America, Feb. 21, 1997, *attached as* Exhibit K).  The IRS initially concluded that Empower America was "a partisan issues-oriented organization—one that was designed to promote the electoral interests of the Republican Party and politicians affiliated with the Republican Party."  (*Id.* at 10).

The Service eventually ruled that Empower America qualified for section 501(c)(4) tax-exempt status.  In making this determination, the IRS identified those activities not allowed to a (c)(4) organization with political or partisan associations. Such organizations may not solicit or receive financial support from political parties;

the advocacy issues on which they focus must be chosen by the board of directors for their importance to the nation, not in coordination with any other organization; any director running for office must disassociate from the organization; and the organization may "not operate to further the private interests of any political party, candidate, or prospective candidate." (IRS Exemption Ruling 97-32503 (Nov. 21, 1997), *reprinted in* 1997 Tax Notes Today 231-15 (Dec. 2, 1997), *attached as* Exhibit L). The Service's decision was grounded, therefore, in the absence of election-related activities or financial connections to party organizations, and in the independent conduct of activities with intent and effect of providing policy and other related benefits to the public at large.

The case stands in sharp contrast to the facts considered by the Service in deciding *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989). There are an organization was denied tax-exempt status under 501(c)(3) precisely because of its formal relationship to political party organizations, and because of its intention, and foreseeable effect, of benefiting only a class of Republican party organizations, candidates and campaign workers. The petitioner operated a school to train individuals to staff political campaigns; the school described itself as an "outgrowth" of a program operated by the National Republican Congressional Committee; and it was funded entirely by a Republican-affiliated political committee. *Id.* at 1056, 1062.

The tax court found that the school "operated to advance Republican interests." *Id.* at 1072. The court was not troubled by the benefit accruing to the individuals being educated. *Id.* at 1074. At issue was whether secondary benefit provided to the Republican Party at large was more than incidental, constituting, in lieu of a broader public benefit, the focus of the organization's efforts. The court ruled that the school, to maintain tax-exempt status under section 501(c)(3), "must establish that the

Republican entities and candidates benefiting from the employment of its graduates are members of a charitable class and within that charitable class do not comprise a select group of members earmarked to receive benefits." *Id.* The court refused to find that, despite its large size, the Republican Party was a charitable class. *Id.* at 1077. Because the school conferred a more than incidental benefit on a non-charitable class, it could not be tax-exempt under section 501(c)(3). *Id.* at 1079.

Since the *ACA* case, the IRS has considered at least one other section 501(c)(3) organization accused of providing a substantial benefit to a political party: the Progress & Freedom Foundation ("PFF"), an educational think tank created by former Speaker Newt Gingrich. PFF planned to develop a teleconference course; sponsor research and writing; produce a magazine; and sponsor conferences. The teleconference course, the focus of the IRS's inquiry, was entitled "Renewing American Civilization," and was disseminated broadly. Gingrich's goal was to use the course "as a means of communicating the message of the movement." PFF Technical Advice Memorandum, *reprinted in* 1999 Tax Notes Today 24-25 (Feb. 5, 1999), *attached as* Exhibit M).

The program also had strong ties to the Republican Party. Gingrich's political action committee, GOPAC, "was planning to use RAC principles in its political message, and it used the RAC message extensively in its training and development during 1993 and 1994." (*Id.*) Gingrich also stated that one goal of the course was:

> [T]o have 200,000-plus activists trained in the course, with a common vision and commitment to renew America and replace the welfare state; to have these activists run for government office (including hospital and school boards) and work on campaigns; to have the media and the public discussing the course; *and to have all Republican candidates using the same language and having the same goals*. It was hoped that by 1996 the Republican Party, with RAC as its platform, would win the elections at all levels of government.

(*Id.* emphasis supplied).  However, while Gingrich made a number of statements expressing a partisan political purpose for the creation of RAC, all of these statements were made outside his capacity as a representative of PFF.  (*Id.*)  Similarly, the GOPAC finance director described the goals of RAC as "to educate the American voting population to Republican ideals, increasing our opportunity to win local, state and Congressional seats."  (*Id.*)  RAC looked, in short, to the broader public for the realization of its goals.

The IRS district office first concluded that PFF "provided more than incidental private benefit to Mr. Gingrich, GOPAC, and other Republican entities, individuals, and interests."  (*Id.*).  This finding was overruled by the IRS.  The IRS stressed that the key to a tax-exempt analysis was the nature of the work itself:

> The central problem in arguing that PFF provided more than incidental private benefit to Mr. Gingrich, GOPAC, and other Republican entities was that the content of the RAC course and the course book, which were PFF's major activities in its first tax year, were educational and, within the four corners of the materials, were not biased toward any of those who were supposed to be benefited. Moreover, the RAC course and course book were widely disseminated by PFF in its educational form.

(*Id.*)  In short, PFF was found to have been independently organized and operated as an educational think tank; the fact that its founders saw PFF and its RAC course as part of a larger political framework was irrelevant so long as PFF's operation was for an exempt purpose, directed toward the benefit of the public at large.

## 2.  DLC Does Not Benefit the Democratic Party or New Democrat Elected Officials

The record in this case shows beyond any possible question that the DLC, for some 25 years, has operate in strict compliance with its exemption in publicly producing and disseminating, in collaboration with both political parties,  policy information, analysis and advocacy.  There is simply no support on these facts for the

IRS's decision that DLC primarily benefits New Democrat elected officials, and the Democratic Party as a whole. This conclusion is not only at variance with the facts, but it is also impossible to reconcile with the law, including IRS precedent construing the requirements for lawful (c)(4) status.

The government has a heavy burden to claim that DLC is not tax exempt under section 501(c)(4).[1]  Defendant lists three factors in support of the revocation of DLC's tax-exempt status.  First, Defendant cites the use of the term" Democratic" in DLC's name.  Second, Defendant notes the founding of DLC by Democratic elected officials "concerned with the direction of their party."  Third, Defendant argues that DLC's "strategy for getting the policy implemented was to get a majority of New Democrats elected . . . .  Advancing the policy was inextricably intermingled with getting New Democrats elected to public office."  In particular, activities noted by Defendant include various speeches by DLC President Al From; polls produced by Mark Penn; policy materials critical of George W. Bush and praising Al Gore; and the involvement of and purported control by Democratic elected officials. (Def.'s Answer to Pl.'s Interrog. 4).

That the individuals who organized and now control the DLC are Democrats by self-description and voting habit has no bearing on the legal issues in this case. The use of the name "Democratic" was used because the founders were, in fact, Democrats.  (From dep. 5:14-15).  This fact was well-known to the IRS, since it was clearly set out in the organization's application for tax-exempt status.  Indeed, the very inspiration for the policy work of these individuals was precisely their involvement in

_____

[1] Defendant has foresworn arguing that DLC "participated in, or intervened in, any political campaign on behalf of (or in opposition to) any candidate for public office, during the years 1997, 1998, or 1999."  (Def.'s Answers to Plaintiff's Interrogatories 1).

and experience with appointed and elective government office.  Their work, however, has been aimed at a larger audience –
the broader public – and in doing that work, they have called upon any and all who would help, including members of the Republican party and even members of that party's elected officialdom.  Indeed, DLC employs self-identified Republicans, including individuals with a history of working for Republican candidates and officeholders.  (Alston dep. 231:6-232:5).

     No evidence has been adduced to support the suggestion that DLC is itself, or is otherwise related to, a political party organization.  Robert Engel, one of plaintiff's designated expert witnesses, has worked in Democratic party politics for almost twenty-five years, serving as Political Director of the Democratic Congressional Campaign Committee in 1997 and 1998, and as Executive Director of the Democratic National Committee in 1999.  He testified unequivocally, "The DLC did not provide any tangible benefit to the Democratic Party or its candidates for public office in the years 1997, 1998, or 1999.  DLC did not carry out any functions of the Democratic Party, and it did not alleviate any burden, financial or otherwise, of the Democratic Party."  (Expert Report of R. Engel, *attached as* Exhibit N).

     The sworn testimony in this case establishes that a partisan approach would have made it impossible for DLC to operate in fulfillment of its goals a public policy organization.  For example, Charles Moskos, professor emeritus at Northwestern University and one of plaintiff's designated expert witnesses, is a respected academic who works with both Republicans and Democrats on the subject of military recruitment.  He has served on the Board of Advisors of the DLC magazine *Blueprint*, a role that he testified that he would never have agreed to take had DLC been a partisan organization.  Professor Moskos stated: "Indeed a public intellectual risks reputational and other professional risks if he or she associates with an organization

operating for the narrow benefit of a particular political party or set of partisan interests. This is not a risk presented by my association with the DLC . . . ." (Expert Report of C. Moskos, *attached* as Exhibit O).

Whereas Professor Moskos has avoided affiliation with any party, another expert witness Jim Pinkerton is an avowed Republican who has worked for both Republican candidates and officeholders as well as being a respected author and scholar.  Mr. Pinkerton has authored numerous articles for DLC magazines and materials.  He testified that DLC "is committed to the broadest sphere of influence, beyond just Democrats, if it is to succeed in its missions, which is to change the direction of national policy as a whole."  And he submits that, "DLC falls squarely in the camp of those motivated by belief and ideas, as opposed to partisanship and electioneering."  (Expert Report of J. Pinkerton, *attached* as Exhibit P).  This explains why, despite his deep roots in the Republican party, he has been openly involved in the activities of this organization.  (*Id.*)

The vast majority of DLC's time and energy are spent engaging in substantive policy work.  (From dep. 23:21-23).  And the products of that work – all of it – are made available to the general public, including members of both political parties.  The mission of DLC, as described by its founder and CEO, is "to drive a new progressive agenda and that the agents who were driving that were elected officials. . . . We are not an organization that get involved in campaigns."  (From dep. 23:21-23, 25:7-8).

Inexplicably, Defendant insists that DLC is shaping policies to win elections, for Democrats.  Yet if DLC focused on Democratic elections rather than policy ideas, it would not work with Republicans at all, much less whenever it proves helpful to advance DLC policies.  And it would certainly not defend those ideas when adopted by Republicans and attacked by Democrats.  For instance, DLC's education proposal was at the heart of President Bush's "No Child Left Behind" bill.  When President

Bush promoted this idea to Congress, DLC defended it against its Democratic detractors.  (Marshall dep. 150:8-151:10).  Senator McCain borrowed from DLC on the subject of national service.  The DLC allied itself with Republican Members of Congress who support free trade and advocated strongly for the North American Free Trade Agreement – against the positions, among others, of many House Democratic members and their Leader, former Congressman and DLC founder Richard A. Gephardt.  (From dep. 99:10-11).

These are not the actions or aspirations of a political party organization.  And it is this nonpartisan stance, opening its work to the participation of all who take an interest in it,  that allows Republican-affiliated individuals to work there, (Alston dep. 231:6-232:5), and for Republican-affiliated contributors to donate to DLC.  (*Id.* 232:8-10).  Far from fighting to prevent such use by Republican elected officials, DLC has instead been "more than pleased," because "it widens the audience for [DLC] ideas."  (*Id.* 149:2-15).

Defendant, unable to locate "bias" in DLC's policy work, focuses on the polls commissioned by DLC using Penn, Schoen & Berland Associates, Inc., as proof that DLC crafts its message to be useful in political elections.  (Def.'s Answer to Pl.'s Interrog. 4).  There is, in fact, no evidence that these polls were electoral in nature, or that they were designed to benefit either individual legislators or the Democratic Party.  All the evidence is to the contrary, showing that DLC commissioned this data after elections to assess the persuasiveness of centrist policies on voter choice.  If DLC were interested in shaping their policies to win an election, it would engage in polling *before* elections, and it would provide the data to candidates and parties that could make use of it in shaping electoral strategies.  DLC has done no such thing. "We don't do pre-election polling because we don't have anything to do with the campaigns."  (From dep. 72:12-14).   These polls are also used as a way to draw

attention to DLC, and to help promote DLC's magazines. (Alston dep. 103:20-104:9), and all the results are published and available to the general public. (*Id.* 102:23-103:1). The polling information is distributed to the press; it is published in DLC's magazines; and it is available on the website. (*Id.* 233:5-9). And finally, there is no evidence that these polls were anything but a small part of DLC's overall activities.

Just as the Service could not relate the use of polling data to partisan electoral activity, nor could it show, much as it tried, to prove that DLC operates as a "service organization" for particular legislators. The government has attempted to portray DLC as primarily interested in serving a cadre of elected New Democrat officials by providing them with political tools and policy advice. But DLC doesn't "do things on request for people; not the corporations who funds us or the members." (*Id.* 41:21-23). Even elected officials who consider themselves to be "New Democrats" do not agree with DLC positions all of the time. (*Id.* 225:1-23), and the former Chair of the House "New Democrats" testified that The DLC did not provide members of the New Democrat Coalition in the House of Representatives with any resources or services "that would not have been available to any other member of Congress." (Dooley dep. 22:7-8). And, as noted, DLC regularly works with non-New Democrat officials as well as with Republican officials where there is common ground.

In short, DLC acts as any other policy organization: it partners with any and all elected officials who support it on a particular policy initiative. Though some elected officials of course work with and support DLC more than others, due to a greater confluence of policy positions, DLC does not discriminate against those legislators, either Republican or Democratic, who disagree with the New Democrat agenda, when they were willing to work with it on the issue at hand. (*Id.* 226:7-21). For DLC, as for all other organizations of its type, legislators are not the actual audience for ideas; instead, they serve an "amplification function." (Marshall dep. 141:16-22). Elected

officials have great power both to advertise policy to the wider public, and actually to enact the legislative proposals that DLC supports. DLC works to convince elected officials to support its policy proposals, and then once they agree, helps them to promote those proposals so that they become accepted by the public and enacted into law. Any benefits provided to legislators are secondary to those purposes. And DLC does not provide any public policy resources for the purpose of aiding legislators' campaigns. (Dooley dep. 23:1-8, 51:14:24).

These facts leave no room for the claims that Defendants have made about the significance of the DLC" leadership workshops." These were neither in nature nor quantity inconsistent with the broad public policy mission of the organization. Created to help state and local elected officials to promote DLC policies, (Cox-Bultan dep. 82:6-15), these workshops never absorbed more than five percent of DLC's total budget. (*Id.* 88:24-25). They did not involve political training; but instead the articulation and teaching of a particular approach to the construction of public policy. (Allston dep. 30:1-5). By providing training to those legislators who wish to serve as mouthpieces for DLC, the organization effectively and efficiently advanced those policies in the public sphere. As with any other lobbying effort, any benefit provided to elected officials to help them to become better advocates of DLC policy was and is secondary to the intended benefit to the public through the enactment of DLC-sponsored policy initiatives.

In sum, DLC has operated consistently as a nonpartisan public policy organization. Almost all of its budget is spent on policy creation and promotion materials that are available and able to be used by both the general public and any elected official with the desire to use them. DLC has worked with members of both political parties, and with elected officials of all ideological stripes, in the pursuit of its Third Way progressive proposals. It has no ties to any Democratic Party

organizations.  The activities carried on by DLC that were targeted only to Democratic elected officials were meant to promote the use of those officials as amplifiers of DLC policy, and in any case, represented but a small fraction of DLC's total budget and time. DLC has operated consistently in keeping with its primary purpose: to develop and promote policy ideas to the public at large.

DLC's structure and operation fits squarely within section 501(c)(4) of the Code.  As the IRS's treatment of Empower America illustrates,  an organization avoids excessive private benefit to a political party or elected officials by operating independently of formal party structures, in pursuit of issues rather than partisan gain. DLC has done more than that: it has consistently worked to further its ideals by partnering with any legislator, Republican or Democrat, willing to support them.  It is not only unaffiliated with the national Democratic Party, but it has, for most of its existence, contested against the party on major policy issues such as trade and education reform.  It is an independent social welfare organization, fully qualified, as the IRS concluded 25 years ago, under section 501(c)(4) of the Code.

Finally, even setting aside the overwhelming facts in this the government is mistaken in arguing that an organization benefiting a political party, but avoiding excessive intervention into political campaigns, is not properly recognized as tax exempt under section 501(c)(4).  Treasury regulations define a section 50(c)(4) organization as one "primarily engaged in promoting in some way the common good and general welfare of the people of the community."  Treas. Reg. § 1.501(c)(4)-1(a)(2)(i).  While intervention in political campaigns cannot make up the primary activity of a section 501(c)(4) organization, nothing prevents such an organization from engaging in public policy lobbying, including lobbying with a party-specific

focus, as its primary purpose. *See id.* § 1.501(c)(4)-1(1)(a)(2)(ii).[2] DLC did not have such a focus, as the facts of this case have established; but even if it had, this would not be the basis for denial of its status as a (c)(4) social welfare organization.

To both parties' knowledge, no section 501(c)(4) organization other than DLC and DLC Ohio has had its tax-exempt status revoked because of claims of an excessive private benefit to a political party or candidate. ((Def.'s Answer to Pl.'s Interrog. 11) In fact, many section 501(c)(4) organizations are affiliated with partisan causes. The Log Cabin Republicans, for example, is a tax-exempt organization that the IRS has permitted to file under section 501(c)(4). (Def.'s Answers to Pl.'s Interrog. 53-54). The Ripon Society, a Republican-affiliated organization, is also a section 501(c)(4) organization whose exemption the IRS has not attempted to revoke. (*Id.* 55-56). Presumably, in these cases, the IRS has granted (c)(4) status because the party affiliations of those organizing and running the organizations are not at odds with their claim for exemption. What matters is the nature of their work, and most specifically, its public production for the betterment of the community as a whole. As the IRS found 25 years ago, DLC also does this kind of work, and its recognition as a 501(c)(4) organization remains as true to the law today as it was when first granted.

---

[2] The Service confuses the issue by citing to the *American Campaign Academy* case, which, while potentially a landmark decision as applied to section 501(c)(3) organizations, has no application to the tax-exempt status of a section 501(c)(4) organization. The decision turned on the secondary benefits supplied to the campaign school to the Republican Party, which was not a charitable class. Because a section 501(c)(3) organization must operate "exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes," the tax status of the school was inconsistent with a substantial secondary benefit that could not be defended as either charitable or educational. Section 501(c)(4) organizations are not similarly limited. If a city block, a business district, and even a single apartment building are large enough to be considered a "community" for purposes of tax exemption under section 501(c)(4), *see* Rev. Rul. 80-206, 1980-31 I.R.B. 11; Rev. Rul. 75-286, 1975-2 C.B. 210, then there is no reason why a political party whose members comprise half of the voting population of the united states should not also serve as a "community" capable of being served by a social welfare organization.

## B. IRS's Revocation was Retroactive

DLC received a letter of exemption from the Internal Revenue Service on February 7, 1986.  This application was based on a Form 1024 Application for Recognition of Exemption under Section 501(a), which was filed along with DLC's Articles of Incorporation.  The application was filed under the name "Democratic Leadership Council," and the attached Articles of Incorporation showed that the applying organization was incorporated under the name "Democratic Leadership Council, Inc."  (DLC Form 1024).

In the answer to Form 1024, Part III, Question 3, DLC made clear that it was founded by "federal and state elected officials who are Democrats."  The Articles of Incorporation list, as the initial Directors, three prominent Democratic elected officials: Senator Sam Nunn; Representative Richard Gephardt; and then-Governor Charles Robb.  And the Application also listed the members of two task forces: the "Task Force on National Defense Strategy" and the "Task Force on Economic Growth and Competitiveness."  The first task force was comprised of four Senators, three Congressmen, and a Governor – all Democratic elected officials.  The second task force was comprised of four Senators, nine Congressmen, and four Governors – also all Democratic elected officials. (*Id.*)

DLC also made its operation and goals clear in its Form 1024.  In DLC's answer to Part III, question 3, DLC stated that DLC was founded by "certain elected officials and others who were concerned with the formulation of national policy and with the direction of policy debate within the Democratic Party."  DLC was created "to improve the overall contribution of Democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  (*Id.*)

DLC's Form 1024 made clear that DLC was using the word "Democratic" in its name.   It made explicit that DLC was founded by, and would be controlled by, Democratic elected officials.  And it stated plainly that DLC's goal was to formulate policy in part to give tools to Democratic officials and to urge changes in the policies adopted by the Democratic Party.  In response to this application, the IRS granted DLC's tax-exempt status.  (DLC Exemption Letter).

George T. Smith, the original revenue agent on the DLC matter, investigated DLC over a period of three years.  (G. Smith dep. 76:14-16, Mar. 30, 2006, *attached as* Exhibit Q).  Smith agreed that DLC was, in fact, operating within the terms of its exemption ruling in the years 1997, 1998, and 999.

> THE WITNESS: You're saying, when I went out and looked at their activities, did it comply with what was in the – what was in the articles of incorporation?
>
> BY MR. ELIAS:
>
> Q.  Yes.
>
> A.  Were they in fact doing that?
>
> Q.  Yes.
>
> A.  I would say they were doing that, what they said they was doing, they were doing that.
>
> Q.  Okay.  And specifically did you find any activities that they were engaged in that were inconsistent with what they described as their activities would be in their application for recognition and exemption?
>
> A.  Okay.  Repeat the question one more time.
>
> MR. ELIAS:  Why don't you read it back.
>
> THE WITNESS:  Read it back.
>
> (The record was read as follows:)

"QUESTION:  And specifically did you find any activities that they were engaged in that were inconsistent with what they described as their activities would be in their application for recognition and exemption?"

THE WITNESS: No.  I would not say – I didn't see any activities that they would – that they were not doing as they stated in the exempt – in their articles of incorporation.

(*Id.* 43:13-44:18).

Q.  So when you reviewed what they had done in 1997, 1998, and 1999, after the fact, your after-the-fact review, the DLC's activities during those three years were consistent with what they told the IRS they would be doing.

A.  Right.

(*Id.* 50:12-18).

Q.  Do you see – maybe you should read the – that paragraph for the record.  "The Democratic Leadership Council is so named because it was founded by federal and state elected officials who are democrats and who were concerned with the direction of policy debate within their party, as well as within the country as a whole."  Let's just stop there.  Do you believe that's consistent with –

A.  Definitely.

Q.  You believe –

MR. MARTINEAU: Let him ask the question.

BY MR. ELIAS:

Q. Is that consistent with what activity they engaged in?

A.  Let me read it again.  (Pause in the proceedings.)  Yes, that's –

Q.  that's consistent with?

A.  What they're doing.

      Q. With what they're doing?

      A. Yes.

(*Id.* 56:11-57:10).

      Q. And the next sentence: "Through the establishment of DLC, these officials and others with similar interests and goals expected to improve the overall contribution of democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy." Is that consistent with what you reviewed their actual activities to be?

      A. Sure, sure.

      *---*---*

      Q. So is it fair to say that the DLC accurately described the activity it was going to engage in?

      A. It sure is.

      Q. Engaged in that activity?

      A. It sure did.

(*Id.* 57:23-58:21). Revenue Agent Smith, whose investigation was the basis of the IRS's decision to revoke DLC's tax-exempt status, stated unequivocally that DLC was operating in accordance with its tax-exempt application in the years in question. He testified that his belief that DLC's tax-exempt status should be revoked stemmed not from a finding that DLC misstated or omitted any facts in its application, or that it operated in a different manner than represented in its application, but because he disagreed that DLC should ever have received an exemption letter in the first place.

      Treasury Regulation 601.201 specifies that determination letters shall only be issued "where a determination can be made on the basis of clearly established rules." Treas. Reg. § 601.201(a)(3). Once issued, exemption rulings and determination letters may be revoked or modified retroactively only "if the organization *omitted or*

*misstated a material fact [or] operated in a manner materially different from that originally represented . . . ."* *Id.* § 601.201(n)(6)(i) (emphasis supplied).  Revenue Procedure 90-27 reiterates this standard.  *See* Rev. Proc. 90-27. 1990-18 I.R.B. 17. "[T]he Secretary has limited the Commissioner's discretion to revoke retroactively a favorable ruling on exempt status."  *Virginia Educ. Fund v. C.I.R.*, 85 T.C. 743, 752 (1985).  Barring the conditions noted above, the IRS may revoke an exemption only from the date the organization "was placed on notice . . . that its tax-exempt ruling letter might be revoked or modified."  P*rince Edward Sch. Found v. Comm'r*, 478 F. Supp. 107, 113 (D.D.C. 1979).

The IRS revoked DLC's tax-exemption retroactively.  The IRS's first communication on this subject was a letter dated October 14, 1999, notifying DLC that the IRS was examining its return, and this letter did not suggest that DLC's exemption might be revoked.  (Letter from G. Smith).  The IRS first indicated that it might revoke DLC's tax-exempt status for any year on June 28, 2002.  (Proposed Adverse Action Letter (tax years 1997 & 1998).  In the end, the IRS revoked tax-exempt status only for calendar years 1997, 1998, and 1999.  Therefore, the entire revocation was retroactive.

Because it was retroactive, the IRS must base the revocation on either the misstatement of a material fact, or operation in a materially different manner. Defendant argues neither of these.  The facts prove conclusively that DLC has, since its inception, operated in the manner described in its application, including its use of the name "Democratic Leadership Council," its control by Democratic elected officials, and its creation "to improve the overall contribution of Democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  (DLC

1024).  The IRS's revocation of DLC's tax-exempt status was in violation of Treasury Regulation  601.201.

## IV.CONCLUSION

For the foregoing reasons, Plaintiff Democratic Leadership Council's Motion for Summary Judgment should be granted.


Dated July 17, 2006                     _____/s/_____
                                        Robert F. Bauer (D.C. Bar No. 938902)
                                        Marc E. Elias (D.C. Bar No. 442007)
                                        Ezra W. Reese (D.C. Bar No. 487760)
                                        PERKINS COIE LLP
                                        607 Fourteenth Street, N.W.
                                        Washington, D.C.  20005-2011
                                        (202) 628-6600

                                        Attorneys for Democratic Leadership Council,
                                        Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRATIC LEADERSHIP COUNCIL,
INC.,

                    Plaintiff,

      v.

UNITED STATES OF AMERICA,

                    Defendant.

CIVIL ACTION NO. 05-1067 (JGP)

**CERTIFICATE OF SERVICE**

       I hereby certify that service of the foregoing Democratic Leadership Council's

Motion for Summary Judgment was made on July 17, 2006 via the Court's electronic

case management system, to:

               Michael Martineau
               Tax Division
               U.S. Department of Justice
               P.O. Box 227
               Washington, DC 20044

And via first-class United States mail, to:

               Kenneth L. Wainstein
               United States Attorney
               United States Attorney's Office for the District of Columbia
               555 4th Street NW
               Washington, DC 20530

               David A. Hubbert
               Tax Division
               U.S. Department of Justice
               P.O. Box 227
               Washington, DC 20044

Respectfully Submitted,

Dated: July 17, 2006                     _____/s/_____
                                         Robert F. Bauer (D.C. Bar No. 938902)
                                         Marc E. Elias (D.C. Bar No. 442007)
                                         Ezra W. Reese (D.C. Bar No. 487760)
                                         PERKINS COIE
                                         607 Fourteenth Street, N.W.
                                         Washington, D.C.  20005-2011
                                         (202) 628-6600

                                         Attorneys for Democratic Leadership Council,
                                         Inc.