IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

DEMOCRATIC LEADERSHIP COUNCIL,
INC.,

        Plaintiff,

   v.

UNITED STATES,

        Defendant.

No. 1:05-cv-1067 (JGP)

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvRs 7(h) and 56.1, Plaintiff Democratic Leadership Council, Inc. hereby submits the following statement of material facts as to which there is no genuine issue, to accompany its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

Plaintiff Democratic Leadership Council, Inc. ("DLC") seeks a summary judgment pursuant to Fed. R. Civ. P. 56, finding that the revocation by the Internal Revenue Service ("IRS") of DLC's tax-exempt status for the period between January 1, 1997 and December 31, 1999 was erroneous, and awarding recovery of all federal income tax paid by DLC for the taxable years ending December 31, 1997; December 31, 1998; and December 31, 1999.

1. DLC was founded on March 1, 1985.  (DLC Form 1024, *attached as* Exhibit A).

2. Its initial directors were three Democratic elected officials: then-Governor Charles Robb, Senator Sam Nunn, and Congressman Richard Gephardt. (*Id.*)

3. As stated in its Articles of Incorporation, DLC was founded "for the promotion of welfare" under section 501(c)(4) of the Code, "for the purpose of bringing about civil betterments and social improvements." (*Id.*)

4. Though it was not legally required for a section 501(c)(4) organization, DLC also forswore any "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." (*Id.*)

5. The name "Democratic Leadership Council" was chosen not because of any intentions on the part of the founders to influence elections, but simply because the group of people that came together to form the organization were Democrats. (A. From Dep. 5:14-15, Feb. 23, 2006, *attached as* Exhibit B).

6. Al From, the founder and CEO of DLC, described the individuals who formed the organization as "interested in pushing a different kind of an agenda, sort of like a third way, which was progressive. And so, you know, we put together a social action entity to push that agenda." (*Id.* 12:2-11).

7. On November 8, 1985, DLC filed an Application for Recognition of Exemption under § 501(a), seeking recognition under section 501(c)(4) of the Code. The application included a copy of DLC's Articles of Incorporation. (DLC Form 2024).

8. The application openly described DLC's proposal to operate as a think tank and policy organization that was founded by self-identified Democrats troubled by the state of the Democratic Party. (*Id.*)

9. The application also made clear that it was "organized by and operates under the leadership of certain Democratic elected officials." (*Id.*)

10. In its application, DLC stated:

> The Democratic Leadership Council is so named because it was founded by federal and state elected officials who are Democrats and who were concerned with the direction of policy debate within their party, as well as within the country as a whole. Through the establishment of DLC, these officials and others with similar interests and goals expected to improve the overall contribution to Democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the

>    party and the general public new and innovative approaches to
>    policy.

(*Id.*)

11. On February 7, 1986, the IRS recognized DLC as an exempt organization under I.R.C. § 501(c)(4). The exemption letter included no caveats limiting DLC's operations, other than a request that DLC notify the IRS if its "purpose, character, or method of operation change." (DLC Exemption Letter, *attached as* Exhibit C).

12. Al From described DLC's mission "[t]o develop a progressive agenda for the country and get that agenda enacted into law." (From dep. 16:11-12).

13. DLC was founded on a progressive modern philosophy different fundamentally different from the Democratic Party as it existed at the time. (*Id.* 17:11-25).

14. DLC believed that the government should play an active role in the lives of Americans, but that it should equip them with the tools they need to thrive instead of merely providing a handout. (*Id.* 20:10-13).

15. The policies of DLC were "grounded in fiscal discipline, investing in people, in technologies, and expanding trade." (*Id.* 17:23-24). This approach is now known as "the Third Way." (*Id.* 19:3).

16. Chuck Alston, the former Executive Director DLC, described DLC's position during the welfare reform debate thusly:

>    The Reagan era ushered in kind of a popular conservative thinking that was every man for himself. We felt that there was a different role for government and for public policy in terms of giving an individual the tools they needed to lift themselves out of poverty, but limiting that assistance and limiting the role of government to giving its – the old elected Christian principal, teach a man to fish, then you don't have to give him his fish every day. He can catch them.
>
>    That was our theory. Let's give these mothers the education they need. Let's give them the child support they need. Let's remove all the barriers to them working and having a dignified way of living. And then we will set limits on how long that will last. And that would be the new role that the government would play.

(C. Alston dep. 28:20-29:11, Feb. 10, 2006, *attached as* Exhibit E).

17. Welfare reform was passed by the Republican Congress in 1995. (*Id.* 49:5-6).

18. DLC's position on education was that there should be more accountability. (*Id.* 49:25-50:2).

19. DLC's proposals did not meet with much success, until George Bush was elected in 2000, and brought in a Texas school board member who had been a believer in the DLC system. He adopted DLC's education platform into the "No Child Left Behind" platform. (*Id.* 50:15-24).

20. DLC publishes two magazines: *New Democrat* and *Blueprint*. (*Id.* 58:1-73:24).

21. The "DLC Update" is a regular fax that was sent to thousands of public officials, activists and supporters. (*Id.* 58:1-73:24).

22. The "DLC Briefing" is a regular product in which DLC describes a policy controversy and DLC's public policy principles and recommendation. The "DLC Talking Points" succinctly describes DLC's position on the issues of the day. (*Id.* 58:1-73:24).

23. The "New Dem Daily" was a daily policy update, later changed to the "New Dem Dispatch." (*Id.* 84:2-6).

24. The "Idea of the Week" is a summary of DLC's weekly policy stances. (*Id.* 75:1-24).

25. The "Monthly State Leadership Update" is sent around the country. (*Id.* 77:3-19).

26. The "DLC News Release" is, as the name suggests, meant for reporters. (*Id.* 81:16-20).

27. DLC uses its website to publish publicly all DLC materials. (*Id.* 87:8-9).

28. The Democratic Party, especially the organized labor interests, resisted DLC's approach. (From dep. 17:15-19:5).

29. DLC's position was sometimes at odds with traditional Democratic Party values. (D. Cox-Bultan dep. 85:10-87:23, *attached as* Exhibit D).

30. From the beginning, DLC has been "very explicit" that it could not become involved in political campaigns.  (From dep. 21:22-23).

31. DLC did not recruit or support political candidates, nor did it engage in any sort of voter registration or get-out-the-vote activity.  (*Id.* 170:24); (Alston dep. 18:22-25); (W. Marshall dep. 154:3-22, Feb. 8, 2006, *attached as* Exhibit F).

32. DLC has never made donations to any state or local candidates, even when otherwise permitted by state campaign finance law, and it has never endorsed any candidate for public office.  (From dep. 170:23-171:17).

33. Because the goal of DLC is to produce and support policies in keeping with its Third Way agenda, it necessarily worked with the elected officials who had the power to enact those policies.  (*Id.* 223:13-20).

34. DLC worked with Democrats, for the simple reason that DLC's proposals were progressive, and the natural base of support was primarily within the Democratic side of the aisle.  (*Id.* 59:11-16).

35. DLC worked with Republican elected officials and organizations whenever possible, with the goal of advancing DLC's policy positions.  (From dep. 14:23); (C. Dooley dep. 50:8-13, Mar. 9, 2006, *attached as* Exhibit G).

36. Americorps was a DLC proposal that was supported most fervently in the Senate by Senators Bayh, a Democrat, and McCain, a Republican.  (From dep. 14:1-6).

37. Welfare reform, another DLC policy proposal, was supported by over twice as many Republicans in Congress than Democrats.  (*Id.* 14:7-11).

38. DLC's efforts to expand trade were supported by "many more" Republicans than Democrats in Congress.  (*Id.* 14:11-13).

39. DLC believed that the President ought to have fast track trade promotion authority.  DLC fought to win support for this concept and to pass it in Congress.  DLC "wanted to actually see these policies that we thought were good for the country and have a chance at going into effect."  (*Id.* 90:21-96:17).

40. DLC lobbied for the bill in Congress, and even went so far as to raise funds for a television advertisement promoting the fast track legislation.  (*Id.* 94:23-25).

41. Fast Track legislation got almost all Republican votes, and only a handful of Democratic votes (*Id.* 21-23).

42. DLC regularly worked with coalitions made up of both Democrats and Republican legislators to promote and enact legislation. (*Id.* 230:1-12).

43. DLC also invited Republicans to participate in public events when they supported DLC on particular issues. (Marshall dep. 153:1-5).

44. Al From stated that DLC worked with Republicans "wherever we could." (From dep. 14:23).

45. DLC also worked extensively with Democrats who were not adherents to the New Democrat philosophy, when there was agreement on the issue at hand. (Alston dep. 226:4-227:8).

46. DLC has held events with the Jack Kemp-affiliated Empower America, (*Id.* 63:19-25).

47. In 1991, DLC cosponsored a conference with the Heritage Foundation. (Marshall dep. 31:15-20).

48. In 1996, DLC hosted an event with the Heritage Foundation, on the subject of healthcare; it was co-hosted by Bob Bennett, a Republican from Utah; Dennis Hastert, now-Speaker of the House; John Tanner, a Democrat from Tennessee, and Joe Lieberman, a Democrat from Connecticut. (From dep. 62:10:63-9).

49. Republicans as well as Democrats could use DLC ideas for both legislative and electoral purposes. (Alston dep. 32:3-6).

50. Many Republicans ran for office on DLC ideas, including George W. Bush. (*Id.* 79:19); (From dep. 180:1-3).

51. DLC did occasionally host small events meant to be attended exclusively by Democratic elected officials and their staff, such as policy briefings or leadership training workshops. These were not a large part of DLC activities; for instance, the leadership workshop trainings on average took no more than two or three percent of DLC's annual budget. (From dep. 189:18).

52. At its peak, the workshops consumed less than five percent of DLC's $4 million budget. (Cox dep. 88:24-25, 91:12-13,).

53. Except for the leadership workshops and policy briefings, all DLC events were open to the public, and to members of both political parties. (From dep.186:17).

54. The fruits of DLC's labor were made available to the public at large, on a nonpartisan basis. Every copy of the DLC magazines *Blueprint* and *New Democrat* went to every member of Congress of both parties, and every Governor no matter his or her political affiliation; the magazines are also available on DLC's website to be accessed by the general public. (*Id.* 119:7-9, 186:2-7); (Alston dep. 60:16-17, 61:15-18).

55. For a time, the *Blueprint* magazine was even distributed on the shuttle from Washington, D.C. to New York and Boston. (From dep. 190:2-3).

56. Policy statements sent by facsimile were also distributed on a bipartisan basis. (Alston dep. 66:1-4).

57. The DLC Briefing, another policy paper, was sent out on a purely bipartisan basis. (*Id.* 70:9-10).

58. All print materials produced by DLC were available on the Internet. (*Id.* 87:8-9).

59. DLC donors included a wide variety of individuals and organizations; Republican donors often contributed to the DLC. (From dep. 51:1-2).

60. Donors were, as a rule, not motivated by partisan interests. (C. Alston Dep. 117:1-11).

61. No Democratic Party organization aids DLC in its fundraising efforts, nor does DLC use fundraising lists acquired from any Democratic Party committee. (*Id.* 118:6-120:8).

62. Ninety-five to ninety-nine percent of the budget is spent on materials and conferences open to and available to the public. (Cox dep. 89:16-17).

63. DLC is affiliated with the Progressive Policy Institute ("PPI"), a nonpartisan educational think tank. From January until July 1997, PPI was a project of DLC; after July 1997, PPI was moved to its current organizational home, as a project of the Progressive Foundation, an affiliated section 501(c)(3) organization. (From dep. 35:2-36:4).

64. DLC and PPI rigorously allocate all costs between the organizations, including requiring employees to complete time sheets, so that PPI funds are not spent on DLC activities. (*Id.* 40:6-41:6).

65. DLC was first notified that the IRS was examining its 1997 tax return by a letter from George T. Smith, Revenue Agent, issued on October 14, 1999. The letter stated merely, "We plan to examine the form [990]," and it requested a series of documents. The letter also noted, "An examination of a return does not suggest suspicion of any wrongdoing." (Letter from G. Smith, *attached as* Exhibit H).

66. After an investigation of almost three years, the IRS issued a Proposed Adverse Action Letter on June 28, 2002 revoking DLC's tax-exempt status for the calendar years 1997 and 1998. (Proposed Adverse Action Letter (tax years 1997 & 1998), *attached as* Exhibit I).

67. The IRS found that DLC "primarily benefited affiliated New Democrat elected officials, with a secondary benefit to the Democratic party, rather than primarily benefiting the community as a whole." (*Id.*)

68. On August 7, 2002, the IRS issued a Notice of Deficiency, requiring that DLC file Forms 1120 for the years 1997 and 1998 and pay a tax of $3,839.00 and $5,264.00, respectively, for those two taxable years (Def.'s Answer 21).

69. On November 29, 2002, the IRS sent DLC a Notice of Tax Due for $5,510.24 for tax year 1997; and $6,985.82 for tax year 1998 (Def.'s Answer 22).

70. On February 24, 2003, DLC paid $5,510.24 for payment of tax assessed plus interest for the tax year 1997; and $6,985.82 for payment of tax assessed plus interest for the tax year 1998. The payments were made to the IRS office in Washington, D.C. (Def.'s Answer 23).

71. Also on February 24, 2003, DLC submitted a claim for a refund for taxable years 1997 and 1998, in the form of a Form 1120 with statements of grounds and reasons attached. (Def.'s Answer 24).

72. On April 16, 2003, DLC paid additional amounts of $134.21 and $176.14 for interest accrued on the tax due for taxable years 1997 and 1998, respectively. (Def.'s Answer 25).

73. On July 28, 2003, the IRS denied the DLC's claim for a refund for tax year 1997 and 1998. (Def.'s Answer 26)

74. On August 1, 2003, the IRS issued an Examination Report that proposed revocation of DLC's exempt status for taxable year 1999 and found a tax deficiency of $5,595.00. (Def.'s Answer 27).

75. On August 28, 2003, DLC appealed the Examination Report issued August 1, 2003. (Def.'s Answer 30).

76. On October 30, 2003, the IRS sent a Notice of Deficiency to DLC for taxable year 1999, in the amount of $5,595.00. (Def.'s Answer 31).

77. On March 22, 2004, DLC paid $7276.50 for payment of tax assessed for the tax year 1999 plus interest. The payments were made to the IRS office in Washington, D.C. (Def.'s Answer 32).

78. Also on March 22, 2004, DLC submitted a claim for a refund for taxable year 1999, in the form or Form 1120 with statements of grounds and reasons attached. (Def.'s Answer 33).

79. On April 5, 2004, the IRS denied the DLC's appeal for tax year 1999. (Def.'s Answer 34).

80. On June 20, 2000, the IRS revoked the exemption of the Ohio chapter of DLC, the Ohio Democratic Leadership Council ("Ohio DLC") under section 501(c)(4), effective January 1, 1995. The revocation was based on a finding that Ohio DLC was "operated primarily to benefit a small group rather than the community as a whole." (Def.'s Answer 45).

81. On June 18, 2001, the Tax Court entered a stipulated decision that rescinded the IRS's revocation of Ohio DLC's exemption. The IRS stipulated that "specifically petitioner's activity did not impermissibly confer a private benefit on any person inconsistent with its I.R.C. § 501(c)(4) status." (Def.'s Answer 48).

82. The IRS has not revoked DLC's tax-exempt status for any time period subsequent to December 31, 1999. As a result, DLC is currently filing as a section 501(c)(4) organization with the IRS. The limitations period under I.R.C. § 6501(a) has already passed for the forms 990 for calendar years 2000, 2001, and 2002. (Def.'s Answer 35).

83. The IRS initially concluded that Empower America was "a partisan issues-oriented organization—one that was designed to promote the electoral interests of the Republican Party and politicians affiliated with the Republican Party." (IRS Letter to Empower America, Feb. 21, 1997, *attached as* Exhibit K)).

84. The IRS eventually concluded that Empower America qualified for section 501(c)(4) tax-exempt status. (IRS Exemption Ruling 97-32503 (Nov. 21, 1997), *reprinted in* 1997 Tax Notes Today 231-15 (Dec. 2, 1997), *attached as* Exhibit L).

85. The IRS granted section 501(c)(3) status to the Progress & Freedom Foundation despite evidence of its creation for a partisan purpose. (PFF Technical Advice Memorandum, *reprinted in* 1999 Tax Notes Today 24-25 (Feb. 5, 1999), *attached as* Exhibit M).

86. DLC employs self-identified Republicans, including individuals with a history of working for Republican candidates and officeholders. (Alston dep. 231:6-232:5).

87. Robert Engel testified , "The DLC did not provide any tangible benefit to the Democratic Party or its candidates for public office in the years 1997, 1998, or 1999. DLC did not carry out any functions of the Democratic Party, and it did not alleviate any burden, financial or otherwise, of the Democratic Party." (Expert Report of R. Engel, *attached as* Exhibit N).

88. Charles Moskos testified that DLC is not an organization operated for the narrow benefit of a particular political party or set of partisan interests. (Expert Report of C. Moskos, *attached* as Exhibit O).

89. Jim Pinkerton testified that DLC is committed to influence beyond just Democrats, and that DLC is motivated by belief and ideas, as opposed to partisanship and electioneering. (Expert Report of J. Pinkerton, *attached* as Exhibit P).

90. When President Bush promoted "No Child Left Behind" to Congress, DLC defended it against its Democratic detractors. (Marshall dep. 150:8-151:10).

91. The DLC allied itself with Republican Members of Congress who support free trade and advocated strongly for the North American Free Trade Agreement – against the positions, among others, of many House Democratic members and their Leader, former Congressman and DLC founder Richard A. Gephardt. (From dep. 99:10-11).

92. DLC has instead been "more than pleased" when Republican officials use DLC ideas, because "it widens the audience for [DLC] ideas." (Alston dep. 149:2-15).

93. DLC does not do pre-election polling (From dep. 72:12-14).

94. DLC polls are used as a way to draw attention to DLC, and to help promote DLC's magazines. (Alston dep. 103:20-104:9)

95. All DLC poll results are published and available to the general public. (*Id.* 102:23-103:1).

96. DLC polling information is distributed to the press; it is published in DLC's magazines; and it is available on DLC's website. (*Id.* 233:5-9).

97. DLC doesn't do things on request for people, including contributors or elected officials. (*Id.* 41:21-23).

98. Even elected officials who consider themselves to be "New Democrats" do not agree with DLC positions all of the time. (*Id.* dep. 225:1-23)

99. DLC did not provide members of the New Democrat Coalition in the House of Representatives with any resources or services that would not have been available to any other member of Congress. (Dooley dep. 22:7-8).

100. Legislators are not DLC's actual audience for ideas; instead, they serve an amplification function. (Marshall dep. 141:16-22).

101. DLC does not provide any public policy resources for the purpose of aiding legislators' campaigns. (Dooley dep. 23:1-8, 51:14:24).

102. DLC's leadership workshops were created to help state and local elected officials to promote DLC policies. (Cox-Bultan dep. 82:6-15).

103. The workshops never absorbed more than five percent of DLC's total budget. (*Id.* 88:24-25).

104. They did not involve political training; but instead the articulation and teaching of a particular approach to the construction of public policy. (Allston dep. 30:1-5).

105. The Log Cabin Republicans is a tax-exempt organization that the IRS has permitted to file under section 501(c)(4). (Def.'s Answers to Pl.'s Interrog. 53-54).

106. The Ripon Society is a section 501(c)(4) organization whose exemption the IRS has not revoked.  (*Id.* 55-56).

107. DLC's Form 1024 was filed under the name "Democratic Leadership Council," and the attached Articles of Incorporation showed that the applying organization was incorporated under the name "Democratic Leadership Council, Inc."  (DLC Form 1024).

108. In the answer to Form 1024, Part III, Question 3, DLC made clear that it was founded by "federal and state elected officials who are Democrats."  (DLC Form 1024).

109. The Articles of Incorporation list, as the initial Directors, three prominent Democratic elected officials: Senator Sam Nunn; Representative Richard Gephardt; and then-Governor Charles Robb.  (DLC Form 1024).

110. The Application listed the members of two task forces: the "Task Force on National Defense Strategy" and the "Task Force on Economic Growth and Competitiveness."  The first task force was comprised of four Senators, three Congressmen, and a Governor – all Democratic elected officials.  The second task force was comprised of four Senators, nine Congressmen, and four Governors – also all Democratic elected officials. (*Id.*)

111. In DLC's answer to Form 1024, Part III, question 3, DLC stated that DLC was founded by "certain elected officials and others who were concerned with the formulation of national policy and with the direction of policy debate within the Democratic Party."  (*Id.*)

112. DLC's Form 1024 stated that it was created "to improve the overall contribution of Democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  (*Id.*)

113. George T. Smith, the original revenue agent on the DLC matter, investigated DLC over a period of three years.  (G. Smith dep. 76:14-16, Mar. 30, 2006, *attached as* Exhibit Q).

114. DLC was operating within the terms of its exemption ruling in the years 1997, 1998, and 999.  (*Id.* 43:13-44:18, 50:12-18, 56:11-57:10, 57:23-58:21).

115. Exhibit A is the DLC's Application for Recognition of Exemption Under Section 501(a).  (Smith Dep. 35:3-4)

116. Exhibit B is the deposition of Al From, taken on February 23, 2006.

117. Exhibit C is the DLC Exemption Letter, dated February 7, 1986.

118. Exhibit D is the deposition of Debbie Cox Bultan, taken on March 22, 2006.

119. Exhibit E is the deposition of Chuck Alston, taken on February 10, 2006.

120. Exhibit F is the deposition of Will Marshall, taken on February 8, 2006.

121. Exhibit G is the deposition of Cal Dooley, taken on March 9, 2006.

122. Exhibit H is a letter from George Smith, dated October 14, 1999.

123. Exhibit I is the IRS Proposed Adverse Action Letter for tax years 1997 & 1998. (Smith dep. 106:19-23).

124. Exhibit J is the IRS Examination Report for tax year 1999. (Smith dep. 117:5-6).

125. Exhibit K is a letter from the IRS to Empower America dated February 21, 1997.

126. Exhibit L is the Empower America Exemption Letter, dated November 21, 1997.

127. Exhibit M is the Technical Advice Memorandum issued by the IRS regarding the Progress & Freedom Foundation.

128. Exhibit N is the Expert Report of Robert Engel.

129. Exhibit O is the Expert Report of Charles Moskos.

130. Exhibit P is the Expert Report of Jim Pinkerton.

131. Exhibit Q is the deposition of George Smith, taken on March 30, 2006.

Dated July 17, 2006            _____/s/_____
                               Robert F. Bauer (D.C. Bar No. 938902)
                               Marc E. Elias (D.C. Bar No. 442007)
                               Ezra W. Reese (D.C. Bar No. 487760)
                               PERKINS COIE LLP
                               607 Fourteenth Street, N.W.

Washington, D.C. 20005-2011
(202) 628-6600

Attorneys for Democratic Leadership Council, Inc.