Page 54

1  was train people to deliver them in a way in the broad
2  sense, not the partisan sense, but sent a political
3  message, a message about what they stood for. And so
4  their ideas weren't just transactional politics with
5  whatever interest group they wanted to build on this or
6  that. So, you know, it was policy training. It was
7  not political training. We never talked about raising
8  money, campaign stuff. We never talked about campaign
9  fund-raising or anything like that, how to organize a
10 campaign. It is all idea-based training.
11     Q   And who conducted the training?
12     A   Well, again, we had consultants who started
13 it who were, you know, a consulting firm. I don't know
14 the name of the company, but I think it was a woman
15 named Anita Gotley. And then after a while, we decided
16 to do more of it in-house. And that's when we got
17 in -- I think she sued us because we wanted to use the
18 Policy Tree or Idea Tree. But it wound up with
19 whatever one we were using was something in Mother
20 Theresa's book so they dropped the suit.
21     Q   So you say Anita Gotley sued the DLC
22 subsequently?
23     A   Either that or threatened to sue. I mean, I
24 don't know.
25     Q   Now, I am going to show you a document that

Page 55

1  has already been marked here. And it would be easier
2  if I just walk over here. This is Exhibit No. 52.
3  This has been in a previous deposition. I just want to
4  show you. I am going to stay right here. And I want
5  to show you if this document -- do you recognize -- can
6  you identify Exhibit 52 for me?
7        MR. BAUER: Take your time and look through
8  it.
9        THE WITNESS: You know, the answer is, I
10 don't necessarily remember that document. I am sure
11 that that's an accurate document. I do sort of
12 remember that was one of the earlier training sessions
13 we did.
14       BY MR. MARTINEAU:
15     Q   Now, Mr. Alston, I believe testified and I
16 believe the document reflects that this was the DLC
17 workshop held in Washington, D.C., June 19 and 20,
18 1998, correct?
19     A   I guess, yeah.
20     Q   And then this was -- here as part of the
21 document is a list of participants in the meeting,
22 correct?
23     A   Yeah.
24     Q   How was one selected to participate in DLC
25 leadership workshops?

Page 56

1      A   To be honest with you, I am not sure how they
2  did that one. But that looks like there were a lot of
3  people who were on the Legislative Advisory Board
4  around the country.
5      Q   And does the Legislative Advisory Board, as
6  you testified earlier, is a board of elected state
7  legislators?
8      A   Yes.
9      Q   Are there any Republican state legislators on
10 the DLC Legislative Advisory Board?
11     A   No.
12     Q   All right. Are any of the participants that
13 you recognize in this particular document Republican
14 state-elected officials?
15     A   No.
16     Q   So to the best of your knowledge, each of the
17 elected officials represented is a Democrat; is that
18 right?
19     A   Yes.
20     Q   Now, I am going to show you another document
21 that has been previously marked. And this has been
22 marked as No. 46. And take your time and look at it.
23     A   Okay.
24     Q   Now, this document, I understand, indicates
25 that the DLC had a leadership workshop July 31 and

Page 57

1  August 1, 1998, in St. Petersburg, Florida, correct?
2      A   Yeah. I remember that. We were in a fire
3  trap.
4      Q   That where's it was held in a fire trap?
5      A   Yeah, an old hotel that was wood with no
6  electrical outlets.
7      Q   I understand. And --
8      A   That would indicate we had a web base because
9  I was complaining about it.
10     Q   And this document reflects that the
11 individuals received invitations for the training,
12 correct?
13     A   Yes.
14     Q   And also it indicates the individuals who
15 actually participated and showed up?
16     A   Yes.
17     Q   For the individuals who were invited to the
18 training, how was it determined who was invited to the
19 training?
20     A   Well, again, you know, I don't know exactly.
21 But I would assume that the people who are our leaders
22 down there were Lawrence Hefner and John Mills, who is
23 the former speaker of the legislature and a couple of
24 other people, you know, said here are the most people
25 who are most likely to be advocates and opponents of

## Page 58

1  DLC ideas. And so they were invited.
2  Q  And those people would be elected officials
3  in Florida?
4  A  Yeah.
5  Q  And those individuals would be
6  Democratic-elected officials in Florida, correct?
7  A  Yeah.
8  Q  And as far as the individuals who actually
9  attended --
10  A  My guess is they are all Democrats even
11  though, again, what I can't tell you is whether any of
12  them have changed parties.
13  Q  But at the time the document, DLC 09628, the
14  individuals who actually participated were
15  all Democratic-elected officials?
16  A  Yes.
17  Q  In the State of Florida?
18  A  Well, John Mills was the former speaker. And
19  he was chair of the party. And I don't even know who
20  this was, but he is probably a professor who helped.
21  Q  Very good. But as far as you know, these
22  individuals at the time, they were all Democrats,
23  correct?
24  A  Correct.
25  Q  Very good.

## Page 59

1  MR. BAUER: Can we take a five-minute break?
2  THE WITNESS: Let me just make --
3  MR. BAUER: Is this in response to
4  Mr. Martineau's last question?
5  THE WITNESS: Yes. I mean, the point that
6  has to be very clear is the elected officials who
7  participated who were invited were Democrats. But they
8  were people who we thought would be willing and would
9  be skillful when trained to promote a Third-Way New
10  Democrat agenda and philosophy.
11  And so, you know, again, it is not surprising
12  that at a time when the country was extraordinarily
13  polarized that, you know, Republicans weren't jumping
14  on the bandwagon, at least a lot of them weren't. Most
15  of them weren't. And so we went to the most likely
16  base of our support. But at the same time, as I am
17  sure we will get into before this afternoon or morning
18  is over, we were also doing events with -- you know, we
19  did an event with Rudy Guiliani and did other stuff
20  with the Heritage Foundation and others.
21  MR. MARTINEAU: Okay. Fair enough. Let's
22  take a break.
23  (A recess was held.)
24  BY MR. MARTINEAU:
25  Q  Mr. From, we have been talking about

## Page 60

1  activities undertaken by the DLC in the years '97, '98
2  '99. One of the activities you referred to was an
3  activity with the Heritage Foundation, correct?
4  A  Yes.
5  Q  I am going to show you -- let's have marked
6  for identification purposes a document you produced to
7  me this morning in response to my subpoena. And I
8  believe it would be No. 121.
9  MR. MARTINEAU: And then why don't you mark
10  122 as well.
11  (Exhibit Nos. 121 through 122, marked for
12  identification.)
13  BY MR. MARTINEAU:
14  Q  Mr. From, you have before you what has been
15  marked Government's Exhibit 121. Can you identify that
16  document?
17  A  It looks like an invitation that went out for
18  a forum we were holding with the Heritage Foundation.
19  Q  And this was July 31, 1997?
20  A  No, it was January.
21  Q  I mean January 31 of '97?
22  A  Yeah.
23  Q  And this was a discussion on -- what was the
24  subject matter of the forum?
25  A  I believe it was healthcare but -- well, I

## Page 61

1  believe it was healthcare.
2  Q  Okay. And the document reflects that -- it
3  states here that two leading think tanks, the Heritage
4  Foundation and the Progressive Policy Institute, would
5  be involved in the particular joint activity, correct?
6  A  Yes.
7  Q  And this document reflects PPI and Heritage
8  Foundation. They are symbols?
9  A  Correct.
10  Q  It does not reflect DLC, per se, correct?
11  A  But PPI was the project of the DLC during
12  that time.
13  Q  I understand. Very good. Let's go to
14  Exhibit No. 122. I want to show you that particular
15  document.
16  A  Uh-huh.
17  Q  Can you identify that document?
18  A  Well, you know, actually, let me just correct
19  it. I am not sure what the subject of that first one
20  is. I know that this one was on healthcare. I don't
21  know. It I could have been on --
22  MR. BAUER: In the witness' response, he
23  refers to the subject matter of the event that is
24  described in Exhibit 121.
25  THE WITNESS: Yeah, I am just not sure.

Page 62

1    BY MR. MARTINEAU:
2    Q    And it is entitled Common Ground Finding a
3    Consensus Agenda for the 105th Congress?
4    A    Yes. It was probably more broader.
5    Q    Now, let's look at Exhibit No. 122. Can you
6    identify that document?
7    A    That looks like, you know, sort of an
8    announcement of a healthcare event that we were holding
9    at PPI with a bipartisan group of legislators.
10   Q    Okay. And this was the healthcare event with
11   the Heritage Foundation you referred to earlier in your
12   testimony?
13   A    Yeah, I assume. That is -- yeah, this is the
14   healthcare event.
15   Q    And that's what you were referring to in your
16   earlier testimony?
17   A    Well, when I talked about 121, I am sorry, I
18   assumed that since we had gotten it, it referred to the
19   same thing. But I guess they are different events. So
20   this is the healthcare event.
21   Q    So they are two separate events?
22   A    Right, yes.
23   Q    Events with PPI and the Heritage Foundation?
24   A    That's right.
25   Q    One involved the broader congressional

Page 63

1    agenda, 121. And number 122 involved the healthcare
2    agenda?
3    A    Right.
4    Q    Okay. Very good. And, again, this document
5    reflects that the event was being jointly held by the
6    Heritage Foundation and PPI, correct?
7    A    That's right. But PPI was a project of the
8    DLC at that time. And as you will see, it is hosted by
9    Bob Bennett, a Republican of Utah; Joe Lieberman,
10   Senator from Connecticut, a Democrat; Dennis Haster, a
11   Republican of Illinois, who I think has gone on to
12   bigger things; and John Tanner from Tennessee.
13   Q    And the date of this just for the record?
14   A    Is February 12, 1997, I believe.
15   Q    Okay. All right. Fair enough. Other than
16   these two particular joint events, did the DLC hold any
17   other joint events with any other organizations during
18   1997, 1998, and 1999?
19   A    To be honest with you, I don't remember. We
20   have held events with Empower America. We have held
21   events with the Hudson Foundation. At least the PPI
22   has held events with the Hudson Foundation. The DLC is
23   probably in 1996. But with Empower America we did an
24   event. Actually, the DLC, I believe, was the sponsor
25   with Jack Kemp and Joe Lieberman.

Page 64

1    Q    So just so we identify those vents, in 1996
2    your testimony is that DLC did an event with Empower
3    America?
4    A    I believe that's right.
5    Q    And then --
6    A    I am not sure. You know --
7    Q    I am not asking you to guess. Just from the
8    best of your recollection.
9    A    You know, we have done events over the years,
10   either with DLC or PPI. Most of them are under the PPI
11   banner with Heritage, with the Hudson Institute. And
12   there may be others, but I just don't recall.
13   Q    Fair enough. Okay. Now, I want to ask you
14   about -- you made a reference to an event just before
15   the break with Mayor Guiliani?
16   A    Yes.
17   Q    Can you describe to me when did that
18   particular event take place?
19   A    I think it took place in July of 1997, I
20   believe.
21   Q    And what was the structure of the event?
22   A    It was an event in New York at -- it was held
23   at the Gillman Paper Company. Howard Gillman had
24   sponsored -- had sponsored events for DLC and PPI. And
25   it was -- you know. It included sort of a -- I think

Page 65

1    it included a board of the PPI, which at that point was
2    composed of people who had given large donations really
3    at that point still to the DLC. And Mayor Guiliani
4    came and his police commissioner came. And we talked
5    about welfare and crime.
6    Q    Now, was this an event organized by the PPI,
7    and Mayor Guiliani was an invitee.
8    A    Yes. It was -- you know, it was a -- we
9    organized it. Mayor Guiliani was an invitee. I had
10   met with him before. I can't remember when, whether it
11   was '97 or earlier. The idea was to talk about two
12   policy innovations that I think we have already talked
13   about here -- welfare reform and community policing.
14   Q    I understand.
15   A    And you know he was -- I believe -- and I
16   think you can probably look this up in the New York
17   Times that he was -- you know, he was a policy
18   innovator who was actually implementing things that I
19   thought were part of the New Democrat philosophy.
20   Q    So the event was organized by PPI, and Mr.
21   Guiliani was invited amongst others. And was it a like
22   a seminar, a policy-type seminar. Just describe what
23   happened at the event.
24   A    It was -- you know, I don't know 15, 20 maybe
25   25 people sitting around the table having a discussion.

### Page 66

1    Q   About those particular policies?
2    A   About those issues.
3    Q   All right. Fair enough. Can you look at
4  document number 109 in your book. Now, that document
5  is it not, is a handwritten note from you, Mr. From, to
6  Mayor Guiliani, dated July 22, 1997, correct?
7    A   Yeah.
8    Q   And that note is a follow-up or thank you
9  note to the mayor for his attendance at that particular
10 event?
11   A   Yes.
12   Q   And that event, it says in the first
13 sentence, made reference to PPI trustees, correct?
14   A   Yes.
15   Q   They were the host of the event, correct?
16   A   Yes.
17   Q   And then in the next sentence, you said, As a
18 Democrat who has never voted for a Republican in my
19 life, I am sure glad that I came to New York. And you
20 indicated because you wanted and appreciated his
21 participation, correct?
22   A   Yes.
23       MR. BAUER: Excuse me. Just for the record,
24 it doesn't say I am sure glad to New York.
25       MR. MARTINEAU: Right. I am sure glad I-- go

### Page 67

1  ahead and read what you said.
2       MR. BAUER: There is a word missing -- "to
3  vote in New York to break that record." So it seems to
4  suggest that if he voted in New York, he would vote for
5  Mr. Guiliani.
6       "I am blown away with how you changed your
7  city. Thanks again for meeting with me, Al."
8       BY MR. MARTINEAU:
9    Q   Is that a fair statement of what your
10 handwritten note is?
11   A   Yeah. I mean, this is a thank you note to
12 the mayor for participating.
13   Q   Very good. And who are the PPI trustees
14 referenced in the note?
15   A   The PPI trustees are, you know, sort of -- at
16 that point, I believe they were the advisory -- again,
17 there's a history of this. The PPI trustees were the
18 original trustees of the PPI when it was formed as a
19 C-3. When it became part of the DLC, they continued to
20 meet, but they didn't have any legal responsibility.
21   Q   In 1997, '98, and '99 who were the members by
22 name who were the PPI trustees?
23   A   Boy, that's a good question. I mean, they
24 were, I think, people like Bob Cocog, Lou Manilow from
25 Chicago; Michael Stann was the original chair. I don't

### Page 68

1  believe he was still part of that. A guy named Bill
2  Bladener of Colorado. Actually, he may have been a
3  Republican at that time. I think Howard Gillman was
4  probably listed as a trustee.
5    Q   Were there any elected officials who were
6  trustees -- PPI trustees?
7    A   No.
8    Q   Originally when PPI was set up, were there
9  any elected officials who were trustees --
10   A   No.
11   Q   Let me finish the question just so she can
12 take it down. Were there any elected officials that
13 were trustees when the PPI was set up?
14   A   No.
15   Q   So throughout the time prior to this suit,
16 all the PPI trustees were private citizens?
17   A   They were private citizens.
18   Q   Very good. Okay. Now, during 1997 and 1998
19 and 1999, did the DLC conduct any polling during that
20 period of time?
21   A   Yes.
22   Q   And how did you go about conducting the
23 polling?
24   A   Well, I am not an expert on how you go out
25 and --

### Page 69

1    Q   Did you contract with someone to do it or did
2  you do it in-house?
3    A   We contracted with Mark Penn.
4    Q   Who is Mark Penn just for the record?
5    A   Mark Penn -- he is now the CEO of
6  Bursen-Marsteller. He is a pollster who does some
7  political but now mostly and almost all private sector
8  polling.
9    Q   And the name of his firm is?
10   A   Penn, Schoen, and Berlan.
11   Q   Mow, focusing just on the period of '97, '98
12 and '99, was Mr. Penn engaged in polling as a full-time
13 occupation?
14   A   Yes, yes.
15   Q   And did he also conduct polling for the White
16 House at that particular point in time?
17   A   Yes, he did.
18   Q   And prior to Mr. Penn being contracted by the
19 DLC, did the DLC have another pollster that you worked
20 with?
21   A   Yes. We worked with Stan Greenberg.
22   Q   And how long did you work with Mr. Greenberg?
23   A   I think our first poll was probably in 1987.
24   Q   Okay. And then approximately when did
25 Mr. Penn and his firm start conducting polls on behalf

18 (Pages 66 to 69)

Page 70

1  of the DLC?
2     A  I think that the first poll that Mark Penn
3  did was after the '96 election.
4     Q  Okay. All right. Now, what was the purpose
5  of the polling activity conducted by Mark Penn and his
6  firm?
7     A  Well, there were two purposes. One was to
8  test our ideas. And I think that almost all of the
9  polling that we did in that period, almost all of it
10 was actually done from Blueprint Magazine. And they
11 were sort of issue-oriented polls. He also -- and the
12 purposes were twofold. One to test our ideas and see
13 how we could make them the most salient. And the
14 second -- the reason, you know, we would poll is if our
15 ideas were popular that helps convince elected
16 officials to be agents for our ideas.
17    Q  All right. Now, you said the first poll that
18 Mr. Penn and his firm conducted for you was immediately
19 after the '96 election?
20    A  Yeah.
21    Q  When you say after the election, was it
22 within days? Was it a period of months? What was the
23 time frame of that poll?
24    A  I don't remember exactly. But it would be
25 within a week or two of the election.

Page 71

1     Q  Now, which one of these two purposes was that
2  particular poll was directed to?
3     A  Probably to both of them.
4     Q  And how was the poll taken immediately after
5  the '96 election? How did that relate to testing your
6  ideas?
7     A  Well, the way it related to testing our ideas
8  is that in 1996, President Clinton talked about a lot
9  of the DLC ideas in the campaign. There were other
10 agendas being discussed by Democrats as well, including
11 the congressional Democrats. And they didn't always
12 talk about the same things because they didn't always
13 talk about our ideas. So we wanted to test our ideas,
14 test their's, see if -- so part of the reason -- I
15 mean, part of the reason we did polling and political
16 analysis is we want to be able to make an argument to
17 people who we would like agents that our ideas have
18 resonance in a public arena. I don't remember all the
19 questions on this poll. Whenever we did polls with
20 Mark Penn, we did these extensive issue polling which,
21 you know, actually -- I mean, we just did extensive
22 polling on a whole variety of issues.
23    Q  Now, how did the '96 poll -- the post-'96
24 election poll relate to the second basis or reason for
25 your poll, that is to say, to convince elected

Page 72

1  officials to adopt your ideas?
2     A  Well, I think it is pretty obvious. If our
3  ideas seem to have resonance, that can convince -- I
4  mean, that can influence people to support ideas that
5  they might other be nervous about because even if they
6  liked them, they may think that it will be politically
7  difficult for them to undertake. You know, the
8  other -- the reason that we often -- you know, I
9  haven't done this recently.
10       But we did post-election polling because that
11 is the period when people are most focused on the ideas
12 that are in the public debate. We don't do
13 pre-election polling because we don't have anything to
14 do with the campaigns. But part of setting public
15 policy and figuring out how you are going to describe
16 it is to get a sense of what people are thinking. And
17 there is no better time than when ideas are on their
18 mind.
19    Q  So the post-election polls, then, was
20 designed, in part, to convince elected officials that
21 it would be okay to take these ideas and run with them
22 and they wouldn't risk themselves at the polls with the
23 voters?
24    A  Well, it was designed to make them more
25 comfortable with the ideas because they are capable of

Page 73

1  winning public support.
2     Q  And the converse of that is if they adopted
3  those positions, then they wouldn't put their
4  re-elections at risk.
5        MR. BAUER: I have to say I find you forcing
6  Mr. From to confront your assumptions. And he has
7  already told you that his are different. He is telling
8  you what he is trying to emphasize here what is
9  comfortable for Republican-elected officials. He said
10 nothing about voters and campaigns. I want to make
11 sure the record doesn't suggest something in your
12 question that is, in fact, not reflected in his
13 answer.
14       MR. MARTINEAU: I am trying to find out what
15 he means when he says the elected official would be
16 comfortable with adopting those positions.
17       THE WITNESS: Well, often we take positions
18 that go against party orthodoxy. And so what they hear
19 from the interest groups is you can't do this.
20 Organized labor is going to be against it. This group
21 is going to be against it. And what we try to show in
22 our polling is, well, maybe there are some resonance --
23 if you have a national purpose agenda, maybe there is
24 some resonance out in the public for things that the
25 interest groups don't support.

Page 74

BY MR. MARTINEAU:
Q    Why, then, are the elected officials concerned whether or not organized labor is for an issue or against it?
A    I can't tell you -- I am not an elected official. And I can't surmise why they would be -- why they would care. I have taken plenty of shots from organized labor. But, look, there are a lot of interests in this town that support candidates that get involved in elections directly. And, you know, they have positions. And they try to -- they try to use all means of enforcing it.
    What we have to do is win in the public debate essentially. And we don't do -- you know, if we wanted to influence or to make the electoral case, we would do polling leading up to the election, not after the election.
    You know, what happens after the election is there is a new Congress after every election. So we may want to promote an idea. We want to test it. You know, polling is just one of the ways we decide, you know, how we are going to -- what ideas we are for but, more importantly, how we are going to frame them. You know, so we do survey ideas to see if the public will support them.

Page 75

Q    I would like to have you identify -- just identify the polls that were taken in '97, '98 '99. I have some documents I want to show. I just want you to identify them, so I know what polls were taken.
A    All right.
Q    Let's look at number -- starting with 98 -- excuse me, 89. I am going to lead you a little bit just so we can -- for identification purposes. I understand, Mr. From, when the polls are taken. This is a press release, dated August 6, 1997, and issued by the DLC, correct?
A    Yes.
Q    About the poll that Mr. Penn took concerning what is called the Vital Center Poll, correct?
A    Uh-huh.
Q    Do you recall what was the particular purpose -- strike that. Is that the first poll that Mr. Penn took in 1997 for the DLC?
A    I believe it was. But, you know, there is a possibility he did something before, but I don't think so.
Q    Did the DLC contract with Mr. Penn for each and every poll?
A    Individually.
Q    Individually, okay. And did you have a

Page 76

written contract with him?
A    You know, you are going to have to talk to somebody who actually administered it. I assume he did, but don't really know.
Q    How often, let's say in 1997, did Mr. Penn conduct polls for the DLC?
A    I believe he did this one. Then when we started Blueprint, he did a poll for each Blueprint for two or three years on whatever the issue was in the Blueprint. So he probably did one more in -- well, '97. We started Blueprint in 1998. To be honest with you, I just don't remember. You know, but every poll that Penn has done for us is on the website so everybody can see it.
Q    Now, I understand from Mr. Alston, if I understand him correctly, that Mr. Penn was conducting polls on a regular basis. I think that's what he testified to. Is that consistent with your understanding?
A    Well, yeah. I mean, in a sense, it was a regular basis. But for us, a regular basis might be a poll every three months when there was a new Blueprint coming out. It is not -- we don't do polling every week.
Q    Fair enough. So number 89 is what I would

Page 77

call the vital -- we will call it the Vital Center Poll that Mr. Penn took for the DLC in 1997, correct?
A    Yeah.
Q    Now, No. 90. Look at No. 90. There is a reference here. And I just -- did the -- I made a copy just of the cover sheet. It says, DLC National Conversation Poll, June 3, 1998. Do you see that?
A    Uh-huh.
Q    What was the DLC National Conversation Poll. Just look at No. 90 is all I am asking. You are looking at 91?
A    Oh, I am.
Q    Yeah. Number 90. What was the DLC National Conversation poll, June 3, 1998? Again, I just want you to identify the poll.
A    To be honest with you, I don't remember. I can assume that we started our National Conversations, I believe, in 1997. I believe -- you know, I am sure it was a polling on some issues that we were going to discuss at National Conversation. But I don't know for sure.
Q    Okay. And just for the record, what are the National Conversations?
A    The National Conversations are meetings of our network of state and local officials that we

Page 78

1  started, I think, in 1997. And I think we did in
2  1998. And we have done it ever since.
3     Q  Okay. Let's go to -- and was the DLC
4  National Conversation, was that another poll that
5  Mr. Penn and his firm conducted on behalf of the DLC?
6     A  Yeah. Again, I don't remember the specific
7  poll. But the answer is, yes, Penn would have done it.
8     Q  Now, let's go to No. 91, and let me ask you
9  if you can identify that document.
10    A  Yes. This looks like the release of the
11 first Blueprint -- the press release.
12    Q  Just for the record, what was Blueprint and
13 when did it come into existence?
14    A  Blueprint is a journal of ideas. It is a
15 magazine policy journal that we began at the end of
16 1998 and eventually over time replaced the New Democrat
17 Magazine.
18    Q  And was the Blueprint a PPI publication or
19 was it a DLC?
20    A  It was a DLC publication.
21    Q  Okay. And so is it fair to say that Mr. Penn
22 took a poll for the -- in 1998, September 23, 1998, as
23 the release indicates, regarding the Active Center. Is
24 that what the subject of that form was?
25    A  I am sure it was. I mean, the Blueprint --

Page 79

1  Mr. Penn did polls -- short polls before every
2  Blueprint.
3     Q  Okay. And how often was Blueprint published?
4     A  Anywhere from four to six times a year. It
5  gives new meaning to the word periodical.
6     Q  So for each one of those Blueprint Magazines,
7  Mr. Penn and his firm conducted a poll on a subject
8  matter?
9     A  Yeah, I am almost sure that's right.
10    Q  And that subject matter of the polls was
11 related to the subject matter of the Blueprint
12 Magazine; is that right?
13    A  Yes.
14    Q  Let's go to No. 92. Now, that is a news
15 release, dated February 2, 1999. And that relates to a
16 poll that Mr. Penn and his firm took regarding the
17 developing skills gap; is that correct?
18    A  Yes. This magazine was about an economic
19 agenda for the 21st century. And the Penn poll was on
20 economic issues, and the highlight was that people were
21 wary about a developing skills gap. And, you know, I
22 am sure we talked about in that Blueprint ideas like
23 the Regional Skill Alliances, which a number of states
24 have adopted.
25    Q  Let's go to No. 93, Exhibit 93. Now, this is

Page 80

1  a news release, dated November 2 of '99. That relates
2  to a Penn poll relating to issues of foreign policy and
3  national security, correct?
4     A  Absolutely. It looks like it.
5     Q  And that was another Blueprint poll taken by
6  Mr. Penn?
7     A  It was a Blueprint poll. And as you can see
8  in Exhibit, whatever they are, 91 -- starting with
9  whatever the first one was with the Blueprint, which
10 was 91, every Penn poll was related to the issue in the
11 Blueprint magazine.
12    Q  I understand that. Now, I understand. Were
13 there any other polls that you know independently other
14 than what I have shown here from documents that you
15 have produced to me -- that DLC has produced to me that
16 the Penn firm took in '97, '98, and '99 on behalf of the
17 DLC?
18    A  I assume that if you asked for them. Every
19 poll that we did was given to you.
20    Q  Okay. Now, what did the DLC do with the
21 polling results from these polls that the Penn firm
22 took?
23    A  We put them on the website so that everybody
24 could see them.
25    Q  What else did you do with them?

Page 81

1     A  Well, we published articles -- I mean,
2  obviously Penn wrote an article about them. And we
3  I am sure it took them into account as we were figuring
4  out how to shape and frame the ideas.
5     Q  Did you, DLC, and/or Mr. Penn have any
6  briefings with any individuals or groups concerning the
7  results of these polls?
8     A  You know, I really don't remember. It is
9  conceivable that we had -- that Penn appeared at some
10 of our events and talked about some of the polling. He
11 is, you know, is -- again, I don't remember
12 specifically. But undoubtedly we probably did some
13 briefings.
14    Q  Let me refer you to Exhibit No. 96.
15    A  Okay.
16    Q  Can you identify that document for me,
17 Mr. From?
18    A  It looks like a memorandum that we sent to
19 the chiefs of staff of people who supported the New
20 Democratic philosophy in the House and Senate.
21    Q  And this is a memo, dated February 6, 1998,
22 correct?
23    A  Yes.
24    Q  And it is regarding a Mark Penn briefing. Do
25 you see that?

Page 82

1   A   Yes.
2   Q   And the substance of the briefing concerns
3   the poll that Mr. Penn took on or about that time,
4   correct?
5   A   Yes.
6   Q   And it has to do with the opinions -- the
7   poll rank-and-file Democrats. Do you see that? That
8   was the subject matter of his poll; is that correct?
9   A   The subject matter of this poll -- let me
10  read it -- was --
11      MR. BAUER: Take your time if you need to
12  take a look at the poll.
13      THE WITNESS: The subject matter of this poll
14  essentially -- it goes exactly to the point that I was
15  trying to make to you before, which is, you know, this
16  poll showed support for the general governing
17  philosophy. And if you go back to the first document
18  you showed me, we actually, I think, laid out in the
19  press release three different views -- so the
20  traditional Democrat, traditional Republican, and a
21  third way for you governing. It showed support for
22  that. And then on particular issues, including issues
23  that were right in the middle of the congressional
24  agenda -- entitlement reform, educational reform, and
25  reform and consensus on a trade policy to expand

Page 83

1   markets overseas were issues that were of an important
2   contention in the country in the Congress in those
3   years.
4       And if you -- you know, I don't have the
5   specifics of this poll. But during that period, let me
6   just tell you what happened. But it is important to
7   understand the context as how the DLC functions. There
8   was an effort on Medicare and Medicaid reform. Senator
9   John Brow, who was a supporter of the DLC, worked with
10  Congressman Bill Thomas, a Republican. They came out
11  with a reform. It actually was on Medicare. A lot of
12  the DLC -- it was based on our work. It was different
13  than either the Republican or the Democrats. It had
14  bipartisan support. In education reform we were
15  pushing a regime of charter schools and standards in
16  testing.
17      In those days, President Clinton actually
18  went to a bunch of state legislatures to make the
19  case. The first -- I believe the first governor to
20  embrace this regime that we proposed was John Embler
21  when he was governor of Michigan, a Republican. On
22  trade, that was in the context of the fight over Fast
23  Track legislation.
24      The Fast Track legislation failed. But I
25  think about six times as many Republicans voted for it

Page 84

1   as Democrats. So the ideas -- I mean, part of what we
2   were trying to do as we briefed these people was to
3   make this argument for ideas that we thought were good
4   for the country that unfortunately people in the
5   Democratic Party didn't always support.
6   Q   Now, getting back to this document that I
7   just -- the second paragraph says, Building on a poll
8   that Penn conducted for the DLC following the 1996
9   election. That's the first poll that you identified?
10  A   Right.
11  Q   That was subject matter of this briefing?
12  A   No. This was -- well, that wasn't, no. I
13  guarantee you that it was -- this was in 1998. So I
14  think -- didn't we identify a poll in 1997, too.
15  Q   You think that's what this is?
16  A   I mean, it is probably --
17  Q   That's the Vital Center Poll in 1997?
18  A   Yeah.
19  Q   It builds on that 1996 election poll, and it
20  is in reference to the '97 poll?
21  A   Well, I don't know -- I can't tell you
22  exactly what the -- I can't tell you exactly what the
23  subject of the briefing was. But it would be -- we
24  wouldn't be briefing on a '96 poll from '98.
25  Q   Very good. Now, let's look at the

Page 85

1   participants in the briefing. The participants were
2   the Senate New Democrats chiefs of staff, correct, and
3   the House New Democrat chiefs of staff?
4   A   Yeah.
5   Q   No R's in there. No Republican chiefs of
6   staff on either the House or Senate side participated
7   in the briefing?
8   A   No. They already supported those ideas.
9   Q   Very good. Let's go to --
10      MR. BAUER: If I can make one suggestion just
11  if I can for the sake of having a clear record. I
12  think the question you asked him was what that document
13  indicated about the attendees. I don't think Mr. From
14  is testifying that he was present. And I don't think
15  he is testifying that he knew who was in the room or
16  that there were only those people identified --
17      MR. MARTINEAU: I asked him what the document
18  identified.
19      MR. BAUER: I want to make sure that's clear.
20      MR. MARTINEAU: That is clear and I
21  understand.
22      BY MR. MARTINEAU:
23  Q   Now, let me just show you some other
24  documents you have produced today concerning polling
25  activities. I just want you to identify them. Have

Page 86

1  you seen them before?
2       MR. MARTINEAU: And for identification
3  purposes, what are we up to here?
4       THE REPORTER: 123.
5       (Exhibit No. 123, marked for identification.)
6       BY MR. MARTINEAU:
7    Q  Now, I am going to show you a document,
8  Mr. From, that has been marked as Government's Exhibit
9  123. Can you identify that document for me?
10   A  It looks like a document that our staff sent
11 to Mark Penn before -- you know, as we are going over a
12 questionnaire for a poll that we contracted with Penn
13 to do. And, I mean, you can just go through. And what
14 it does is it lists the questions that we wanted to
15 have re-worded on Medicare, Social Security, college
16 scholarships, tax deductibility for job training.
17      As you can see, as you go through this whole
18 document, it's on issue after issue after issue.
19   Q  I understand. Now, the document is undated.
20 To which of the polls that you have identified here
21 today does this particular document relate?
22   A  You know, I assume -- I don't know. But of
23 the polls that -- my guess is just based on the
24 comprehensiveness, it would have been the Vital Center
25 Poll in the summer of whenever it was -- the summer

Page 87

1  of --
2    Q  1997?
3    A  1997.
4    Q  Do you know if DLC staff prepared a
5  similar-type document for the other polls that Mr. Penn
6  undertook that you have identified in your testimony
7  today?
8    A  I don't think we ever did anything with that
9  kind of depth. You know, the way we do these polls is
10 that Penn does a draft questionnaire and then we go
11 over it. But often, it is verbal. This time, for
12 whatever reason, maybe it was because it was a long
13 poll, it went through.
14   Q  Prior to Mr. Penn and his firm conducting the
15 poll, did you Mr. From and/or your staff meet with
16 Mr. Penn and his people to discuss what the focus of
17 the poll was going to be?
18   A  Absolutely. Since most of the polling in the
19 period that we are talking about was Blueprint polling,
20 we would go through what -- we would talk about what
21 the issue of the Blueprint is. We would go through a
22 set of DLC ideas that we wanted tested. And then Mark
23 would come back with a questionnaire, and we would go
24 through it and say this does this do what we want or it
25 doesn't do what we want.

Page 88

1    Q  Okay. Fair enough. And with respect to this
2  particular poll, which you have identified you believe
3  relates to the Vital Center Poll, do you recall
4  specifically having a discussion with Mr. Penn and/or
5  his people concerning that poll, the Vital Center Poll?
6    A  You know, do I recall specifically? The
7  answer is no. Did it likely happen? The answer is
8  yes. I mean, it is -- I mean, I talked to Mark Penn a
9  lot. And he was on the Blueprint Advisory board. So
10 he was in meetings where we discussed future issues of
11 Blueprint and what the subject matter would be. But do
12 I specifically remember? I can't specifically tell
13 you that's the Vital Center Poll. I believe it is
14 based on just what I have seen this morning. But I
15 can't tell you whether I had a meeting with Mark Penn,
16 you know, before this or not. You know, likely I did,
17 but I just don't remember.
18   Q  Fair enough.
19   A  That's nine years ago.
20      (Exhibit No. 124, marked for identification.)
21      BY MR. MARTINEAU:
22   Q  Fair enough. Let me just ask you to identify
23 what has been marked as Government's No. 124. Can you
24 identify that?
25   A  It looks like a note that I probably sent to

Page 89

1  Mark with all of the -- you know, the ideas we were
2  promoting for state officials on key issues before --
3  you know, either before his poll or maybe before he was
4  going to speak. And the second thing we sent him were
5  every weekly faxes that we have done in 1998. And the
6  weekly faxes, just for the record, are called the Idea
7  of the Week.
8    Q  Now, the document here is dated June 2,
9  1998. And the document mentions this -- and as you
10 testified, this document was generated prior to the
11 National Conversation in 1998?
12   A  Yes.
13   Q  So it had to do with the subject of the
14 National Conversation, either his speaking at it or the
15 poll -- the National Conversation poll that you
16 identified?
17   A  Yes.
18   Q  Is that correct?
19   A  Yes.
20   Q  And you have said here -- and you were the
21 author of this particular memo; is that correct?
22   A  I assume. Again, I write a lot of stuff.
23 But I assume I was because it refers to, you know, a
24 memo that probably I did. Somebody else could have
25 done it, but I assume it was me. It was I.

23 (Pages 86 to 89)

Page 90

1  Q  I want to get that right. And you state
2  here, "And, as we discussed, your presentation should
3  focus on why Clinton runs ahead of congressional and
4  state and local Democrats on keys issues and with key
5  new constituencies."
6     Do you see that?
7  A  Yes.
8  Q  How does that discussion relate to the
9  purpose of the poll that you have indicated, which was
10 to promote your ideas for the DLC?
11 A  I think it relates very directly.
12 Q  How so?
13 A  Because on a lot of those ideas, President
14 Clinton pushed the New Democrat philosophy and New
15 Democrat ideas. Congressional Democrats resisted
16 them. And what we were trying to say was that the
17 ideas in the new democrat philosophy had more public
18 resonance than the ideas that they were talking about
19 as Congressional Democrats or that other Democratic
20 constituencies were talking about.
21    Again, that was in 1998 in the middle of a
22 battle on trade, which was a very big difference --
23 where we had a very big difference. And when we --
24 because we supported giving the President authority
25 to -- Fast Track authority on trade. And most

Page 91

1  congressional Democrats voted against it. In fact, it
2  lost because we couldn't get enough Democratic support.
3  Q  Let's talk about the trade issues, since
4  that's an issue you have identified that was important
5  at DLC. And you have identified certain activities
6  undertaken by DLC in connection with that, correct?
7  A  Yes.
8  Q  Let me finish and then you can answer. Let
9  me refer you to document No. 86.
10 A  Eighty-six.
11 Q  Yes.
12 A  Yeah.
13 Q  First of all, you reference and I have seen
14 reference in the document to the DLC's trade project.
15 Are you familiar with that term?
16 A  Yes.
17 Q  What do you mean by the DLC's trade project?
18 What was or what is the DLC's trade project?
19 A  The DLC's trade project was a project that we
20 had in the DLC to promote expanded trade. It had some
21 late leadership, including some people -- you know, it
22 had late leadership. It included work that -- you
23 know, DLC people who were shaping the trade agenda.
24 And it also included members mostly in the business
25 community who had been Republicans or Democrats.

Page 92

1  Q  From the DLC's perspective, what was the
2  purpose in setting up and carrying out the trade
3  project?
4  A  We had two purposes.
5  Q  Okay. Let's identify them.
6  A  One was to promote the idea of expanded
7  trade. And the second to engage some people who gave
8  us financial support in a way that -- because we were
9  taking a position that was consistent with where we
10 thought they were. We might actually raise a little
11 money.
12 Q  So you might raise money from, say, a
13 business group that were what you would consider
14 appropriate trade?
15 A  Yes.
16 Q  Whereas you labor side, your AFL-CIO might
17 have been against that bill?
18 A  Right.
19 Q  Was the AFL-CIO against the Fast Track
20 legislation?
21 A  Yes, absolutely.
22 Q  And many business groups were opposed to Fast
23 Track, correct?
24 A  Right.
25 Q  And so your trade project was designed to,

Page 93

1  what, achieve the passage of that particular piece of
2  legislation?
3  A  It was -- on that piece. It was designed to
4  do two things. One, to shape the new trade policy that
5  would get broader support in the public. And one of
6  the things, you know, that came out of it was the idea
7  that we needed -- you know, putting a human face on the
8  whole economy. We talked about expanding the winner's
9  circle.
10    So it was putting together a set of ideas
11 that we thought would help carry the trade debate. And
12 we had sharp differences with the AFL-CIO. I think we
13 actually did a New Dem Daily or had somewhere on our
14 website where we once had, you know, 10 offers. The
15 AFL-CIO said offers on trade or something like that.
16 So trade was a very divisive issue on the country and
17 in the Democratic Party. And we were trying to shape
18 an agenda on trade.
19 Q  Now, let's look at what actions you took.
20 Strike that. Did your actions include on that trade
21 issue lobbying activity?
22 A  Yes, it did.
23 Q  Did the DLC register and fill out and file
24 the lobbying legislation forms?
25 A  I believe that we did.

24 (Pages 90 to 93)

Page 94

1    Q   On that particular issue?
2    A   You know, again, I can't tell you for sure.
3  My guess is I believe we did. I know I filed with the
4  lobbyists on trade issues. I just can't remember
5  whether we did it on that one or not.
6    Q   With regard to any other issues during
7  '97, '98, and '99, did the DLC or yourself file any
8  lobbying disclosure forms on other issues?
9    A   I don't think.
10   Q   So if you did, it would have been just on
11 trade issues?
12   A   Yes.
13   Q   Now, let's look at No. 86 just so I can
14 understand exactly what actions and activities that the
15 DLC engaged in, in their trade project in 1997
16 regarding the Fast Track authority. First, this is 86,
17 is it not? It's an October 17, '97 press release from
18 the DLC, correct?
19   A   Yes, sir.
20   Q   And it relates to -- it's entitled DLC
21 Announces Fast Track Television Ads. Do you see that?
22   A   Yes.
23   Q   Did the DLC produce or fund TV ads promoting
24 the Fast Track legislation at that time?
25   A   The answer is, yes, we did. As far as I

Page 95

1  know, it's the only time we ever have done that. I
2  think I raised a couple hundred thousand dollars,
3  250 maybe to do it. And we did it. We did the kind of
4  advertising campaign that you do when you have a press
5  conference and play your ads and hope that the press
6  picks it up because you don't have enough money for a
7  real advertising campaign.
8    Q   And I was going to ask you how you financed
9  the ad campaign and how much it was. And you think it
10 was about $250,000?
11   A   Yes.
12   Q   How did you finance that campaign?
13   A   I just went to some of our supporters and
14 asked them for money.
15   Q   So that was separate -- a special appeal to
16 those supporters for money to fund this particular
17 people, correct?
18   A   Yes.
19   Q   Now, it says here that the TV ads will air
20 nationwide on the Larry King Show, to select Cable News
21 Network audiences, and on news programs in the
22 Washington, D.C. area. Do you see that?
23   A   Yes.
24   Q   Did the ad actually air on those particular
25 mediums?

Page 96

1    A   I don't know. I think -- probably in a
2  limited way because it was a pretty small buy. I mean,
3  this press release -- if you read my quote, it
4  basically talks about the New Democrat economic policy
5  of fiscal discipline, investing, and essentially people
6  in technologies and opening markets.
7         And what we wanted to make an argument is
8  that that strategy, which President Clinton followed
9  often with congressional support, sometimes with
10 congressional opposition but often with congressional
11 support in both parties, more on the Republican side,
12 it was a great success for the country. And part of
13 the reason that we took this action was because, you
14 know, as sort of an action organization we wanted to
15 see -- we didn't want to make the academic case. We
16 wanted to actually see these policies that we thought
17 were good for the country and have a chance at going
18 into effect, but we lost.
19   Q   Okay. You lost as in the Fast Track
20 authority did not pass; is that right?
21   A   Yes. It got -- you know, it got almost all
22 the Republican votes and only a handful of the
23 Democratic votes.
24   Q   Just go to page 4144. I just want to --
25      MR. BAUER: Which page number?

Page 97

1       MR. MARTINEAU: DLC 04144. It is part of
2  Exhibit No. 86. The ad, as I understand, was produced
3  by the Squire, Knapp, Ochs Communications firm?
4    A   Yes.
5    Q   The late Bob Squire?
6    A   The late Bob Squire, my dear friend.
7    Q   And the -- is this document here, this page,
8  does this set forth the actual text of the ad what was
9  stated in the ads, Mr. From?
10   A   Yeah, I think so. But, again, I mean, I
11 don't really remember specifically, but I think that's
12 probably a pretty good assumption.
13   Q   And the ad did play on the Larry King Show
14 during the Larry King episode, I believe?
15   A   You know, again, we would have to check the
16 records and, you know, Squire -- Squire can't do it.
17 But Knapp might be able to tell us. But I think that's
18 right. I mean, what we did is had a very limited buy,
19 but we tried to place the ads strategically.
20   Q   Let's go to number 87 just for identification
21 purposes. This is a press release on October 17, '97.
22 And you made a statement concerning the advertising
23 campaign, correct?
24   A   Yes.
25   Q   You say here in paragraph four, quote, For

25 (Pages 94 to 97)

Page 98

1  the Democratic Leadership Council, this advertising
2  campaign is unprecedented. We are undertaking it
3  because we believe that granting the President Fast
4  Track authority is right; right for our country and
5  right for the Democratic Party.
6       Do you see that?
7  A  Yes.
8  Q  You said that?
9  A  Yes, I am sure I did.
10 Q  Did the DLC seek to enlist support from
11 Republicans in the Congress for this particular piece
12 of legislation?
13 A  The answer is, yes, but our problem wasn't
14 with Republicans. I mean, just to give you an example
15 that I remember very specifically. It wasn't about
16 this, but it was about the NAFTA fight, which was -- it
17 wound up to be a closer fight. One of my friends
18 from --
19 Q  Just for the record, NAFTA would have been
20 the North American Free Trade Agreement?
21 A  In 1993.
22 Q  That would have been 1993?
23 A  And one of my friends from my days in the
24 House Democratic Caucus was a guy a named William
25 Pitts, who was the chief aide to Bob Michael, who was

Page 99

1  the leader of the House -- Republican leader of the
2  House, I think, still at that point. Or if not, Billy
3  was -- I can't remember when Gingrich beat Michael.
4  But Billy was either still in his capacity in the House
5  Republicans or working with the leadership.
6       And I remember having several meetings with
7  him going over the list of Republicans and Democrats.
8  In the 1997 Fast Track fight or 1998 whenever it was,
9  we -- the President had the support of most
10 Republicans. The leader of the opposition was Dick
11 Gephardt, which -- Andrew Gephardt, the leader of the
12 President's party in the House of Representatives. I
13 believe there was a vote in the House. And I probably
14 could get you the numbers, if you wanted. But it was a
15 very small number of Democrats who supported it. And
16 almost all the Republicans supported it. And there
17 would have more had Democrats supplied whatever level
18 of votes that Gingrich wanted.
19 Q  Okay. And let's go to Exhibit No. 88, then.
20 Number 88 -- as part of -- strike that. Exhibit 88 is
21 a press release, dated October 21, 1997?
22 A  Yes.
23 Q  And it is titled Democrats Urge Congress to
24 Pass Fast Track. Do you see that?
25 A  Yes.

Page 100

1  Q  And this relates to an appeal to state and
2  local office holders urging Congress to give the
3  President the Fast Track authority?
4  A  Yes.
5  Q  And that appeal was organized by and promoted
6  by the DLC?
7  A  That's right.
8  Q  As part of your trade project; is that
9  correct?
10 A  That is absolutely right.
11 Q  And the leaders of that appeal at the state
12 level it says here were, The appeal was circulated for
13 the DLC by Florida Governor Lawton Chiles?
14 A  Yes.
15 Q  Mayor Ed Rendell of Philadelphia; Susan
16 Hammer, the San Jose mayor; Antonio Riley, the
17 Wisconsin State Rep., also chairman of the leadership;
18 and Michael Box from the Alabama State rep. And that
19 appeal is -- the signors of the appeal are listed here
20 in the next two pages of the document, correct?
21 A  Yes.
22 Q  And what exactly did -- well, strike that.
23 Each of the signors of the appeal, I understand, are
24 Democrats; is that correct?
25 A  Yes.

Page 101

1  Q  They are no Republican signors of this
2  particular appeal, correct?
3  A  I don't think so.
4  Q  And what was the DLC's actual role in
5  generating this appeal? What steps did you actually
6  take?
7  A  Well, I think we drafted a statement and then
8  working with our supporters tried to encourage elected
9  officials, Democratic elected officials, to sign it.
10 This is a case -- a very clear case where we thought
11 our position different than the official position of
12 the Democratic leadership in the House and the position
13 of most Democrats and most Democratic interest groups
14 within the interest of our country. And so we knew if
15 we were going to get this passed, we had to change
16 Democratic goals. And so we went out and tried to
17 build Democratic support for it.
18 Q  Now, did the DLC maintain any kind of list of
19 state -- new democrats, if you will, or democrats that
20 were sympathetic to your position? How did you know
21 who to contact to generate this support?
22 A  I think you give us too much credit. We had
23 leaders in the states, as I have already testified, who
24 were on the State Legislative Advisory Board. And
25 again, I don't know specifically, but I assume what we

26 (Pages 98 to 101)

Page 102

1  did is we sent it out to these people and said who do
2  you think we ought to go or can you get these people to
3  sign it. I don't think we had -- we may have had a
4  list of every -- because I am sure they are available--
5  of every state legislator in the country. But, you
6  know, basically my guess this was a pretty
7  decentralized project.
8      Q   Very good. Do you know if people on your
9  staff -- the DLC staff or yourself-- did you actually
10 contact state legislatures in certain jurisdictions to
11 ask them to join the appeal?
12     A   Again, I don't remember specifically, but I
13 am sure it is likely that I called maybe some governors
14 or I might have called some legislators.
15     Q   You might have asked them to go to their --
16 they know the people and have them join the appeal?
17     A   Yeah.
18     Q   Other than these activities, with respect to
19 the appeal that you have already testified, did the DLC
20 engage in any other activities to seek to obtain a
21 passage o the Fast Track authority in 1997?
22     A   The question -- again, I don't recall. But
23 it is likely that we did, you know, may have had
24 briefings. I know one of our national or our annual
25 conferences during that period. But I think it might

Page 103

1  have been 98 or '99 was focused on the trade issue.
2  But that may have been when we were pushing for most
3  favorite nation status.
4      Q   Okay. Very good. Let's take a break now and
5  then we will come back.
6          MR. BAUER: 120.
7          BY MR. MARTINEAU:
8      Q   Back on the record. Mr. From, before we took
9  our break, we were talking about the DLC's trade
10 project and the involvement of -- you made reference to
11 members of Congress. And I want to turn your attention
12 to Exhibit No. 94, if you will. Can you identify
13 number 94 for me?
14     A   Yeah. This is a membership of the New
15 Democrat Coalition.
16     Q   In the United States House of
17 Representatives?
18     A   Yes.
19     Q   What is the New Democrat Coalition in the
20 United States House of Representatives?
21     A   It is a group of members who got together in
22 I would say probably a loose coalition who were
23 supporters or at least purported to be supporters of
24 the New Democrat philosophy.
25     Q   And the group, according to this document,

Page 104

1  was founded in 1997; is that correct?
2      A   Yes, sir.
3      Q   And it was founded by Congressman Cooley --
4  excuse me-- Congressman Cal Dooley from California;
5  Congressman Jim Moran from Virginia, and Tim Roemer
6  from Indiana, correct?
7      A   Yes.
8      Q   And these are all democratic members of the
9  House?
10     A   Yes, sir.
11     Q   And I believe there is 41 members here; is
12 that correct?
13     A   Yes.
14     Q   And what was the -- strike that. Did the DLC
15 have a role in the establishment of the House New
16 Democrat Coalition?
17     A   Not really a formal role in it.
18     Q   Did you have any kind of a role?
19     A   Well, all of the -- you know, Cal Dooley and
20 Jim Moran, Tim Roemer were supporters of the New
21 Democrat philosophy. And the true is that after the 94
22 election, Jim Moran had come to me and wanted to do
23 something, and I discouraged it. But Cal Dooley was
24 really the leader of this. And he put it together.
25 And it was a reasonably effective organization.

Page 105

1      Q   Okay. Now, you said after the '94 election,
2  Congressman Moran came to you and wanted you to do
3  something. What did you mean?
4      A   In early '95 he wanted to put together a
5  group in the House. And I just -- I had my own reasons
6  for not being -- you know, I mean, these are all people
7  we work with, and so that's fine and they organize.
8  Most of them are people we work with at some point or
9  another who have expressed some interest in DLC or new
10 Democrat ideas.
11         But operating in the House is -- I always
12 find very difficult when you want to promote ideas
13 because there are all sort of votes that often
14 undermine the larger message that you are trying to
15 send.
16     Q   Just for the record, after '94 was when the
17 Republicans took over the House of Representatives
18 after a long time of Democrat control of the House?
19     A   We had had -- I mean, we had had groups of
20 supporters before in the Congress. I mean, when we
21 started we had members of the House, members of the
22 Senate, and also governors. And it was not unusual for
23 groups of members of the House or Senate to try to
24 organize around their ideas. I mean, in the House this
25 is probably in the main group. But in the Senate there

## Page 106

1. was there were two groups. One was a New Democrat
2. Coalition that had a bunch of members, but it was also
3. the central coalition that involved -- that John Brow,
4. who was the former chair of the DLC and I think
5. Leiberman, who was a chair of it, were involved in with
6. a light number of Republicans.
7.    Q   Now, just focusing on after '94. Congressman
8. Moran came you and wanted you to do something, and you
9. discouraged it and decide not to. Why not?
10.    A   Because we were in the business of promoting
11. ideas. We weren't -- we are not in the business of
12. organizing the House of Representatives. That's an
13. internal thing in the House.
14.    Q   Okay. Any other reason?
15.    A   That's the main reason.
16.    Q   Now, subsequently. The New Democrat
17. Coalition was formed in the House in '97. And you said
18. Congressman Dooly was the most active member.
19.    A   I think he was really the force behind it.
20.    Q   And did Congressman Dooley come to you, as
21. did Congressman Moran, before he set up and organized
22. the New Democrat Coalition?
23.    A   You know, I don't really remember whether he
24. did or not. Cal Dooley worked with us on a number of
25. ideas. He was a big advocate of expanded trade. At a

## Page 107

1. time we had new Democrats supporting our healthcare
2. ideas. He was a big advocate of those. So I can't
3. remember whether he did or not, to be honest with you.
4.    Q   And during '97 '98 and '99, the New Democrat
5. Coalition was in existence, right?
6.    A   Yes.
7.    Q   Did the DLC and the New Democrat Coalition
8. have any joint activities during that particular period
9. of time?
10.    A   I don't know that we really had joint
11. activities. We obviously met with the New Democrat
12. Coalition and at least assumed a lot of the New
13. Democrat Coalition, but not all of it supported our
14. ideas. I mean, I think if you went through and checked
15. the votes on Fast Track, for example, you would find
16. that a lot of these people were nonsupportive.
17.    Q   When you say you met with him, tell me what
18. was the context of your meeting with him them?
19.    A   Well, they had -- I believe they had regular
20. weekly meetings. And occasionally I would go over and
21. meet with them about ideas and talk about the ideas we
22. were thinking about that we were working on at the
23. time.
24.    Q   Now, you indicated that sometimes when there
25. were votes sometimes they supported you and sometimes

## Page 108

1. they did not; is that correct?
2.    A   Yeah.
3.    Q   I will get to that. Let's just go to number
4. 95, please. Can you identify Exhibit No. 95?
5.    A   That looks like -- it looks like a list of
6. people who supported our ideas in the Senate.
7.    Q   And these are the New Democrat Senators,
8. correct?
9.    A   Yeah.
10.    Q   And who was the most active member of the New
11. Democrat amongst the senators during '97 '98 and '99?
12.    A   Well, Joe Lieberman was chair of the DLC.
13. John Brow was a former chair. They were both very
14. active. And, as I said, they also had another group
15. that they were engaged in, which was a bipartisan group
16. that was trying to promote a lot of the ideas that we
17. supported as well.
18.    Q   Did the DLC have a role in setting up just
19. the New Democrat Senators Group?
20.    A   You know, I don't really remember. I think
21. that the driving force behind this was Brow, who wanted
22. to build this center in the Senate. And, you know, he
23. had a long history of working with people on both
24. parties. And I think he wanted to get the most likely
25. Democrats who would be willing to work with Republicans

## Page 109

1. on ideas because that was the time of the Rowe Thomas
2. Medicare Bill and a lot of health stuff that Rowe was
3. interested in.
4.    Q   Could you turn to Exhibit No. 97, please.
5. Can you identify that document for me?
6.    A   It looks like a briefing we did for the New
7. Democrat chiefs of staff on the consequences of the
8. 2000 census on redistricting.
9.    Q   Now, this was a briefing that was held, the
10. document reflects, on March 26, 1998, correct?
11.    A   Yeah, probably.
12.    Q   And it was an invitation to the Senate New
13. Democrat chiefs of staff and House New Democrat chiefs
14. of staff, correct?
15.    A   Yes.
16.    Q   I take that it there were no memo similar to
17. Republican New Dems chiefs of staff under the House or
18. Senate side?
19.    A   I think that's probably right.
20.    Q   Now, the guests at this particular briefing
21. were Kevin Mach. Who is Kevin Mach?
22.    A   He looks like he is the executive director of
23. the -- well, the Democratic Legislative Campaign
24. Committee. Actually, that was the organization of
25. Democratic legislators around the country and state

28 (Pages 106 to 109)

### Page 110

1 legislators, not congressional.
2  Q  And Mark Gersh is the director of the
3 National Committee for an Effective Congress, right?
4  A  Yes.
5  Q  What is that organization?
6  A  Mark Gersh is a demographer. And he does
7 analyses of the changing population in the country.
8 Now, the National Committee, I don't know all of what
9 it does, to be honest with you. I mean, it used to be
10 a reform committee for Congress. I mean, I know Mark.
11 I just don't know what that does or the activities of
12 the organization.
13  Q  Okay. Now, why would the DLC be interested
14 in having a briefing concerning redistricting as it
15 relates to what you indicated your purpose is?
16  A  Well, the reason we would be interested in
17 having a briefing concerning redistricting is because
18 we have a great concern about the polarization of the
19 Congress and the fact that it is harder to get
20 Democrats and Republicans to work together. And part
21 of the reason for that is the way congressional
22 districts are drawn.
23     The other reason we wanted to do that is
24 because we believe that our ideas have particular
25 resonance in growing parts of the country that were

### Page 111

1 going to be better represented in the -- within the
2 Congress or more represented in the Congress with each
3 election.
4  Q  Okay. Well, what areas of the country, then,
5 do you think are more -- are you saying certain areas
6 of the country are more receptive to your ideas?
7  A  Yeah, growing suburban areas. Remember, the
8 DLC is about opportunity and growth. And it is about
9 fiscal discipline. And it is about education reform.
10 Those are -- we did a lot of work in those days,
11 including a bunch on the environment with a group of
12 Republicans on a thing we called Second Generation
13 Environmental Studies. All of those things have real
14 appeal in the suburban and growing areas of the
15 country.
16     And part of the argument that we make on why
17 people ought to support our ideas, and particularly
18 people with -- as I have explained to you before, we
19 have a lot of trouble getting Democratic support for
20 some of our ideas. One of the arguments we make is
21 that this is where the country is going, so the
22 Democratic Party ought to get with it.
23  Q  Let's move on to No. 98. Can you identify
24 Exhibit No. 98.
25  A  It looks like a training session we had for

### Page 112

1 the freshman Democratic members of the House.
2  Q  And the date of this memo is February 9,
3 1999, correct?
4  A  Yes.
5  Q  And it was a memo from Anne Rung; is that
6 correct?
7  A  Yes.
8  Q  Who is Anne Rung, for the record?
9  A  Anne Rung was at that time a staff member of
10 ours who dealt with the Congress.
11  Q  And she wrote you a memo regarding having a
12 briefing for newly elected freshman Democrats, right?
13  A  Right.
14  Q  No newly elected freshman Republicans were
15 invited to this particular briefing?
16  A  That's right.
17  Q  What would be the purpose of a briefing of
18 newly elected freshman Democrats?
19  A  Well, again, to try to encourage them to
20 support our point of view. As we have discussed over
21 and over again, you know, on a major issues of ours,
22 which was trade, we had just lost a major vote in the
23 House. We were trying to build support for the New
24 Democrat philosophy among the most likely audience.
25     The Republicans at this point were trying to

### Page 113

1 impeach a Democratic president. They probably weren't
2 particularly eager to, you know, hear or to join in on
3 ideas that reflected a philosophy that he also
4 embraces. But, you know, we were trying to build
5 support. I mean, again, just to make it very clear,
6 the purpose of the DLC is to promote a new progressive
7 agenda. Republicans aren't likely to support that.
8 The agents for promoting it are elected officials who
9 are Democrats. Now, sometimes Republicans also support
10 the ideas. And when they do, we work with them.
11     But we were building -- we were trying to
12 encourage more people in the Democratic party to go
13 against the party orthodoxy and support our ideas.
14  Q  Let's go to Exhibit No. '99, if you will.
15 Can you identify this document for me?
16  A  It looks like a call list for me.
17  Q  Now, this was a -- it looks like Debbie Cox
18 sent you a memorandum suggesting you make phone calls
19 on a trade bill to those particular elected officials;
20 is that correct?
21  A  Yes.
22  Q  These are all Democrat-elected officials;
23 correct?
24  A  Yes. This actually relates to what we were
25 talking about in the trade project. You know, you

Page 114

1 asked me if I made calls. And I said I couldn't
2 remember for sure, but I probably did.
3   Q   Well, that's what I wanted to show. This
4 refreshes your recollection?
5   A   Yeah.
6   Q   You made calls?
7   A   Yeah, I am sure I made most of these calls.
8   Q   And that was on behalf of trying to get that
9 Fast Track legislation?
10   A   We were trying to get the Fast Track
11 legislation.
12   Q   And the next document is 100. Can you
13 identify that document for me?
14   A   It looks like a list of the Democrats who
15 voted for Fast Track legislation.
16   Q   And this was a list that was prepared by your
17 staff to you on that particular piece of legislation?
18   A   Yes.
19   Q   No list of the overall vote on both sides of
20 aisle on this particular matter?
21   A   Well, I can tell you that the Republicans
22 voted four to one for it. And there were 42 Democrats
23 out of whatever it was 210 Democrats. And, again, to
24 make the point I made before -- I haven't counted. But
25 it says 17 members of the New Democrat Coalition, and

Page 115

1 the list was 42. So most the New Democrat Coalition
2 supported it.
3   Q   Let's go to Exhibit 101. Can you identify
4 Exhibit 101 for me? What's this document?
5   A   You know, it looks like a document -- a memo
6 to me from Lisa Quigley, who was the chief of staff for
7 Cal Dooley. And, you know, it is reporting on -- this
8 summary is reporting on assignments on, I am sorry, on
9 how the people who joined the New Democrat Coalition
10 voted on our ideas.
11   Q   So Lisa Quigley works for Congressman Dooley,
12 and she was giving a report about votes on the New
13 Democrat House members on what they call key votes?
14   A   Right.
15   Q   Those are votes of particular interest to the
16 DLC, then, correct?
17   A   Well, or at least -- no. They were the key
18 votes to the New Democrat Coalition.
19   Q   Okay. I want you to you turn to Exhibit
20 102. Can you identify this? I will tell you what this
21 is, and you can tell me if you agree with it. This
22 looks like a transcript of proceedings at the '97
23 Annual Conference of the Democratic Leadership
24 Conference. Do you see that? Senator Leiberman was
25 the --

Page 116

1   A   Yes.
2   Q   And then you go to the next, and there is at
3 the bottom of the page Representative Harman made a
4 statement. Do you see that?
5   A   Uh-huh.
6   Q   And that's Representative Jane Harman,
7 Democrat from California, correct?
8   A   Uh-huh.
9   Q   She was a member of the House New Democrat
10 Coalition, correct?
11   A   Yeah.
12   Q   This is what she said as quoted here on page
13 DLC 10924. It says, quote -- this is Representative
14 Harman. I also want to salute the leadership of my
15 colleague Jim Moran in the House, who is co-chair of
16 the New Democrats Coalitions, which is a DLC offshoot.
17 I am sure you all know that -- and a very productive
18 new group in the House, unquote. Do you see that?
19   A   Yes.
20   Q   Is DLC -- is the New Democrat Coalition a DLC
21 offshoot?
22   A   Well, it is a group of people who have
23 generally but as we have gone through on the record not
24 always supported the New Democrat ideas promoted by the
25 DLC. So it could be called DLC, I guess, followers.

Page 117

1 In that sense, I guess it is a DLC offshoot. But I
2 think the language that Jane Harman uses is very loose.
3   Q   And other than what you have mentioned today,
4 what services or assistance does the DLC provide to the
5 New Democrat Coalition during through '97 through '99?
6   A   You know, I don't remember. I am sure we did
7 some briefings for them on particular issues. And, you
8 know, I am sure they got our policy papers. All of
9 those are on the web, so anybody who wants to be bored
10 could look at those. You know, I am sure I met from
11 time to time with Cal Dooley. I am sure that our staff
12 people worked with them on specific issue --
13 legislative issue ideas. But I think that's probably
14 about what we did. And a lot of them came to the DLC
15 events but not all of them.
16   Q   Okay. Fair enough. Let's go back to --
17 let's continue on here. I am going to refer you to
18 103. And you have testified that part of what the
19 DLC -- and I don't think it is a secret. DLC had
20 certain publications?
21   A   Yes.
22   Q   New Democratic Magazine, Blueprint Magazine?
23   A   Uh-huh.
24   Q   And I want to know if you can identify 103
25 for me and what that particular document is?

30 (Pages 114 to 117)

Page 118

1    A  It looks like a memo that, I guess it
2  must be -- it was during the time we were talking about
3  launching the Blueprint Magazine. It looks like it is
4  a memo from somebody who had been a consultant to us on
5  the New Democrat Magazine talking about the
6  relationship.
7    Q  And who is Charles Rodin?
8    A  He is a consultant.
9    Q  And he was involved in the development of the
10 new -- I mean, the Blueprint Magazine?
11   A  No. He actually -- he worked, I think, with
12 Chuck Alston. And he worked with us on the New
13 Democrat. But as we were thinking about doing a new
14 publication, I think he offered this advice to Chuck.
15   Q  Okay. And he is talking in this memo, dated
16 February 3, '98, about the distribution pattern and the
17 circulation in paragraph two?
18   A  Yes.
19   Q  And he is suggesting that primary circulation
20 be amongst other people, DLC members,
21 Democratic-elected officials, senior party leaders,
22 cabinet and senior executive appointments all to
23 receive it at no cost?
24   A  That's right. I think all -- I mean, in the
25 reality, I think all members of Congress receive it at

Page 119

1  no cost.
2    Q  When you say all members of Congress, this
3  appears to be focused on Democratic members of
4  Congress?
5    A  But, you know, this is a memo that was
6  offered by the consultant who made his recommendation.
7  And I think, you know, every magazine we do, I believe,
8  goes to every member of Congress. And it goes to --
9  and it's also put on the web.
10   Q  Okay. Fair enough. Let's go to 104. And,
11 again, we are in the context of the publications that
12 the DLC has. Can you identify 104 for me?
13   A  This looks like a memo that a consultant did
14 to Chuck and Charles Rodin on what the circulation
15 should be for the new -- for the Blueprint.
16   Q  Okay. And this is a memo, dated April 20,
17 '98, correct?
18   A  Yeah.
19   Q  Let me refer you to 8645 -- DLC 8645, under
20 where it says, Second Draft.
21   A  Uh-huh.
22   Q  And it appears that the recommendation here
23 is that the magazine be in the first box given to state
24 legislators, Dem, and Democratic Hill Chiefs of Staff.
25 Do you see that?

Page 120

1    A  Yeah.
2    Q  Nothing on the Republican side on that; is
3  that correct?
4    A  No. It says -- look.
5    Q  What does it say?
6    A  Look at government staff, city managers,
7  Democrats, Republicans, assistant to mayors, Democrats,
8  Republicans. I mean, first of all, this is -- I think
9  we need understand that this was a recommendation by a
10 consultant. It was not actually done. So it is also
11 done several months before we actually did anything.
12   Q  Okay. So is it your testimony that the
13 Blueprint Magazine was circulated to all members of the
14 House and senate?
15   A  I am almost certain it is. Again, I don't
16 run the circulation of the Blueprint. But I know that
17 it is on the web. And we have, you know, from time to
18 time had -- we have a lot of academics write reports.
19   Q  Let's go to Exhibit 105. Can you just
20 identify that document for me?
21   A  It looks like a survey that we did of -- is
22 there a date? It may have been a survey.
23   Q  8/11/99 survey?
24   A  Yeah. It is probably -- at the National
25 Conversation, we probably put these forms out and then

Page 121

1  asked people who were there to fill them out about what
2  products they used.
3    Q  And why were you interested in that
4  particular information?
5    A  Well, because if are producing something and
6  nobody is reading it, we probably would want to take a
7  look at why.
8    Q  All right. Any other reason?
9    A  I think that's the main thing. We just
10 wanted to see what -- I mean, you know, we put out a
11 lot of stuff. And, you know, we put out stuff
12 everyday. It's available to everybody on our website.
13 But one of the things we wanted to do is to see whether
14 people were actually paying any attention to it. And
15 the National Conversation was one of the
16 organizations -- it was a meeting of people who were
17 most interested in the DLC ideas. So we thought that
18 would be a pretty good test.
19   Q  Okay. Fair enough. Let's go to document
20 number 65.
21   A  Sixty-five?
22   Q  Yeah, back towards the beginning.
23      MR. MARTINEAU: Let's go off the record for a
24 second.
25      (Discussion was held off the record.)

Page 122

1  BY MR. MARTINEAU:
2  Q  Let's go back on the record. Mr. From, you
3  have before you what has been marked as Exhibit No.
4  65.
5  A  Yes, sir.
6  Q  Now, can you identify that document?
7  A  It looks like the application that we did for
8  our C-4 status.
9  Q  Now, this is the Form 1044 application for
10 recognition of exemption?
11 A  Yes.
12 Q  That was a document filed with the Internal
13 Revenue Service?
14 A  Yes, sir.
15 Q  And that relates to the Democratic Leadership
16 Council?
17 A  Yes.
18 Q  And it is dated November 8, 1985, correct?
19 A  Yes.
20 Q  And it is signed by yourself as president and
21 executive director on the bottom of page 1187?
22 A  Yes.
23 Q  If you recall this morning when we talked
24 about the time of the formation of the DLC, you
25 testified that it was in 1985 after the '84 elections,

Page 123

1  correct?
2  A  What I said is it was March 1, 1985.
3  Q  But this document is dated November 8, 1998,
4  front page?
5  A  Okay. No, I understand. You can talk to my
6  lawyers, but we operated under the guidelines. We have
7  a year and a half to file; isn't that right? We
8  operated under the guidelines of the C-4.
9  Q  Okay. Very good. Let me refer you to page
10 you listed 1197. Do you see that?
11 A  Uh-huh.
12 Q  Page 1197?
13 A  Uh-huh.
14 Q  Now, this is part of the application,
15 correct?
16 A  Yes.
17 Q  And it lists task forces that were part of
18 the DLC as it was originally constituted, correct?
19 A  Uh-huh.
20 Q  And there is a task force on national
21 defense?
22 A  Uh-huh.
23 Q  And a task force on Economic Growth and
24 Competitiveness. Do you see that?
25 A  Yes.

Page 124

1  Q  These individuals who are on the task forces
2  are Democratic-elected officials, correct?
3  A  Yes, sir.
4  Q  And that's what we testified this morning.
5  These were people that were the founders of the DLC?
6  A  There may have been others. But obviously
7  all of these are Democrats.
8  Q  Very good. And what was the -- just so I
9  understand, what was the purpose of these task forces?
10 A  To develop policies on national defense
11 strategy and on economic growth and competitiveness.
12 And I believe the first document -- the first idea of
13 things we did in the DLC were first on growth and
14 competitiveness; and, second, the paper we did in 1986
15 called Defending America.
16 Q  And let me refer you to another document
17 that's included as an exhibit to the Form 1023. It is
18 on page 1217.
19 A  Yes, sir.
20 Q  Can you identify that document for me?
21 A  Yes. That's the paper I just talked about --
22 Winning in the World Economy.
23 Q  That was that one you just referred to?
24 A  Yeah.
25 Q  And who created or who generated this

Page 125

1  document called Winning in the World Economy?
2  A  It came out of the work of the members who
3  were the DLC members. And our staff wrote it probably
4  with some outside help from policy experts.
5  Q  So did the DLC, then, in 85 -- you had staff
6  that was in place. And they worked on --
7  A  Yeah, a small staff.
8  Q  Go ahead.
9  A  As I remember here, actually the
10 competition -- I think we did the competition index
11 here. And I believe we contracted with the Warten
12 School to do this for us.
13 Q  So this document was generated by DLC staff?
14 A  Yes.
15 Q  In conjunction with the Warten School?
16 A  Yeah. This is part of our application, I am
17 sure.
18 Q  Yes, it is. That's what I wanted to make
19 sure that the record is clear on that.
20    MR. BAUER: Counsel, I just need two minutes.
21 Can we take a two-minute break.
22    MR. MARTINEAU: That's fine.
23    (Discussion was held off the record.)
24    BY MR. MARTINEAU:
25 Q  Back on the record. Let's turn to Exhibit

32 (Pages 122 to 125)

Page 126

66. Mr. From, can you identify this document for me?
A   It looks like our incorporation papers with the D.C. Government.
Q   These are the articles of incorporation filed with the D.C. Government of DLC, correct?
A   Yes.
Q   Dated March 4, 1985?
A   Yes, sir.
Q   And just so I understand on page 9958, the original directors -- I believe you testified to this, this morning -- were the Honorable Charles S. Robb, correct?
A   Yes.
Q   At that time Mr. Robb was governor of Virginia, correct, 1985? It says, State Capitol of Richmond, Virginia.
A   Yeah, I know. I am trying to remember when his term ended. Actually, yes, he was. He was governor until January 1986.
Q   I thought that was the case.
A   Yes, sir.
Q   And then Honorable Sam Nunn, of course, he was the United States Senator?
A   Yes.
Q   And Congressman Gephardt, U.S. House of

Page 127

Representatives?
A   Yes.
Q   Under incorporators there's three individuals. Could you identify each of those, including the first one?
A   Bob Bauer was my attorney. And judging from the -- Guy Martin, I guess, was a partner. And Judith Corley was something here at Perkins, Coie because we are in the room of the incorporators.
Q   So those three individuals were attorneys for the DLC at that point in time?
A   Yes, yes.
Q   Now, I would like to direct your attention to Exhibit 67, please. Sixty-seven is the bylaws of the corporation; is that correct?
A   Yes, sir.
Q   And those were filed on March 7, 1985?
A   Yes.
Q   And they were signed by the three original directors that you just testified to, correct?
A   Yes, sir.
Q   And then on the front page, just so I understand and the record is clear, page 9960, the present executive director and treasurer of the DLC at its inception was yourself, Mr. From; is that right?

Page 128

A   Yes.
Q   The secretary was Stewart Gammage; is that correct?
A   Stewart Gammage.
Q   Who is Stewart Gammage?
A   She was at the time a -- I think an employee who ran the Washington office for the State of Virginia under Governor Robb. And I think she is now on the trustee or at least was on the trustees at William & Mary.
Q   Now, No. 68. I just want to refer you to that. I just made separate exhibit of that of a portion of the Form 1024 because I am going to refer to that later on. But the section I want to have you pay attention to and we will come back to this -- and I just did this to make it easy; and I have a copy right her to give to you -- is the section that states in the Form 1024 that although DLC was organized by and operates under the leadership of certain Democratic-elected officials, the activity it conducts are intended for the benefit of the general public without regard to party affiliation.
    Do you see that at the bottom?
A   Yeah.
Q   Who drafted that particular statement?

Page 129

A   You know, I guess I am responsible for it. But I assume our lawyers who prepared the application drafted it.
Q   But you agree with that particular statement?
A   Yeah.
Q   That the activities that the DLC conducts are intended for the benefit of the general public without regard to party affiliation; is that correct?
A   Uh-huh.
Q   And do you believe that statement is true for the years 1997, 1998, and 1999?
A   Absolutely. The ideas that we promoted at the DLC have been for the good of the country. And, you know, this is -- you know, the activities '97, '98, and '99 are absolutely consistent with this, including one of the big issues we have talked about over and over again today which is trade, which was what Winning in the World Economy was about, which we cited in our application. The ideas that we talked about were absolutely for the good of the country, and I think the record will show that.
Q   Fair enough. Let's go to Exhibit 69. Exhibit 69 is a memo, dated June 9, 1997, from yourself to Congresswoman Boggs; is that correct?
A   Yes, sir.

Page 130

1   Q   And that relates to, does it not, the
2   enclosed unanimous consent of the board of directors to
3   transfer Progressive Policy Institute to the
4   Progressive Foundation?
5   A   Yes.
6   Q   That's the document that memorializes your
7   testimony this morning about the transfer of the PPI to
8   the Progressive Foundation?
9   A   That's right.
10  Q   And that transfer took place, I believe you
11  testified, on or about July 1, 1997, correct?
12  A   That's exactly what it says on the 1090 or
13  190.
14  Q   So just so the record is clear, as of July 1,
15  1997, the PPI was a project of the Progressive
16  Foundation, correct?
17  A   That's correct.
18  Q   And the Progressive Foundation had the C-3
19  status, correct?
20  A   It did.
21  Q   And the board of directors in 1997, as
22  reflected in this document, were yourself,
23  Congresswoman Boggs, and Robert L. Healy, correct?
24  A   That's right, even though I think --.
25      THE WITNESS:  And Bob, correct me if I am

Page 131

1   wrong on this.
2       MR. BAUER:  I can't do that.  I am not the
3   witness.
4       THE WITNESS:  I think Lindy had retired
5   because one of the things we did in, I think, either
6   maybe in 1990 because of the evolution of ethics rules
7   in the House, was removed the elected officials from
8   actual governing responsibility.
9       BY MR. MARTINEAU:
10  Q   For the DLC?
11  A   Yeah.  So I think Lindy was a former member
12  of Congress.
13  Q   I see.  Okay.  And then the other member of
14  the board of directors in '97 was Robert Healy?
15  A   Yes.
16  Q   Who is Robert Healy?
17  A   He is a Washington -- he has been in
18  Washington a long time.  He was at that time the head
19  of our field office in Washington.  He is now with
20  Westwood & Associates.
21  Q   With Westwood & Associates?
22  A   Yeah.
23  Q   Did these three individuals, yourself
24  included, comprise the board of directors for
25  the '97, '98, and '99 time period?

Page 132

1   A   The answer is, I am not sure because at one
2   point Lindy Boggs had to get off because she was going
3   back into the government to be the ambassador to the
4   Vatican.  And she was replaced by Sandy Robinson --
5   Sanford Robinson.
6   Q   Okay.  Who is Sanford Robinson?
7   A   He is a venture capitalist in San Francisco.
8   Q   And the chairman of the DLC for '97, '98, and
9   '99 for those three years was Senator Joe Lieberman,
10  correct?
11  A   Yes.  But the chair is actually an advisory
12  position because he doesn't have legal authority.  I
13  think I am probably chairman of the board.
14  Q   And I was going to say you are chairman of
15  the board?
16  A   Yeah.
17  Q   And you testified earlier you had
18  responsibilities for the PPI and the DLC during the
19  period in question?
20  A   Yes.
21  Q   Now, I want to talk to you just a little bit
22  so I can understand about the membership of the DLC.
23  We talked about that this morning.  I just want to
24  understand it a little bit better.  Exhibit 70.  Can
25  you identify Exhibit 70 for me?

Page 133

1   A   That looks like what we -- that looks like a
2   letter that we had sent out to somebody who might sign
3   up on our website.  It was a $50 number on something
4   like that.
5   Q   Now, some of these individuals here, many of
6   them are elected officials.  Do you see that,
7   particularly on page 172?
8   A   Yeah, it looks like some of them are, but
9   some of them -- you know, if it says, mainstream
10  movement member, it means it is -- it is just somebody
11  who has sent in 50 bucks.
12  Q   So to be a member, you needed to -- to
13  technically be a member, you needed to send in your 50
14  bucks and you got the magazine?
15  A   And whatever else it says here.  But, you
16  know, I mean, the membership was really more of a
17  fund-raising deal than anything else.
18  Q   I understand.  Mr. Alston indicated, if I
19  understood correctly, that membership -- trying to
20  expand the membership, per se, of the DLC with a $50 --
21  it wasn't a major focus of the organization; is that
22  right?
23  A   I would say it was not a major focus at all.
24  I have no idea what -- if we spent a half a percent of
25  our budget on it, there's probably a line on the

34 (Pages 130 to 133)