# Exhibit

# D

# ORIGINAL

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) NO.  1:05-CV-1067 (JGP) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| DEFENDANT. | ) |
| | ) |
| ——————————————————— | ) |

DEPOSITION OF DEBBIE COX BULTAN

MARCH 22, 2006

REPORTED BY:
SHERYL WILLIAMS
CSR NO. 7453

## *Seijas Court Reporters*

*A Professional Corporation*
*1260 Huntington Drive, Suite 107, South Pasadena, California 91030*
*(626) 799-0810 ~ Fax (626) 799-5565*

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                        DISTRICT OF COLUMBIA

3

4  DEMOCRATIC LEADERSHIP          )
   COUNCIL, INC.,                 )
5                                 )
                   PLAINTIFF,     )
6                                 )
       VS.                        )        NO. 1:05-CV-1067 (JGP)
7                                 )
   UNITED STATES,                 )
8                                 )
                   DEFENDANT.     )
9  _____)

10

11

12          THE DEPOSITION OF DEBBIE COX BULTAN, TAKEN ON

13  BEHALF OF THE DEFENDANT, AT 1620 26TH STREET, SIXTH

14  FLOOR, SANTA MONICA, CALIFORNIA, AT 10:07 A.M.,

15  WEDNESDAY, MARCH 22, 2006, BEFORE SHERYL WILLIAMS,

16  CERTIFIED SHORTHAND REPORTER NO. 7453, PURSUANT TO

17  NOTICE.

18

19

20

21

22

23

24

25

1

SEIJAS COURT REPORTERS

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:

 3    PERKINS COIE LLP
      BY:  ROBERT BAUER, ESQ.
 4    607 14TH STREET NW
      SUITE 800
 5    WASHINGTON, D.C. 20005
      (202) 434-1602
 6
      FOR DEFENDANT:
 7
      U.S. DEPARTMENT OF JUSTICE
 8    BY:   MARTIN J. MARTINEAU, ESQ.
      555 4TH STREET NW
 9    ROOM 6122
      WASHINGTON, D.C. 20001
10    (202) 307-6483

11

12
      ALSO PRESENT:  DUDLEY FETZER, VIDEOGRAPHER
13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

SEIJAS COURT REPORTERS

```
 1                    I N D E X

 2   WITNESS              EXAMINATION              PAGE

 3   DEBBIE COX           BY MR. MARTINEAU         6, 89

 4                        BY MR. BAUER             78, 91

 5

 6

 7                       EXHIBITS

 8   DEFENDANT'S                                   PAGE

 9      143     NOTICE OF DEPOSITION                6

10      144     DLC LEADERSHIP WORKSHOPS            24

11      145     "NEW YORK TIMES" ARTICLE            27

12      49      JUNE 11, 1998 FACSIMILE             31

13      50      JUNE 17, 1998 FACSIMILE             33

14      46      JULY 28, 1998 FACSIMILE             36

15      146     AUGUST 3, 1998 FACSIMILE            37

16      147     JANUARY 27, 1999 LETTER             39

17      148     JULY 7, 1998 MEMO                   43

18      55      AUGUST 31, 1999 MEMO                46

19      57      SEPTEMBER 2, 1999 MEMO              53

20      149     NOVEMBER 18, 1997 LETTER            55

21      43      NOVEMBER 4, 1998 MEMO               59

22      59      JULY 21, 1999 BUSINESS PLAN         61

23      150     DLC PROPOSAL FOR LEADERSHIP
                TRAINING                            64
24
        151     DLC LEADERSHIP FORUM                67
25
```

3

SEIJAS COURT REPORTERS

```
 1                    EXHIBITS, CONT'D

 2    DEFENDANT'S                                      PAGE

 3       152      DLC DESIGN FOR LEADERSHIP WORKSHOP    68

 4       153      FRIDAY, JANUARY 23RD AGENDA           71

 5       154      DLC 1999 BUSINESS PLAN                74

 6       155      APRIL 29, 1998 LETTER                 76

 7       156      BILL FOR FEES AND EXPENSES            77

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

SEIJAS COURT REPORTERS

1          SANTA MONICA, CALIFORNIA, WEDNESDAY, MARCH 22, 2006

2                          10:07 A.M.

3                          -oOo-

4          THE VIDEOGRAPHER:  GOOD MORNING.  WE'RE ON THE RECORD

5     AT 10:07 A.M. ON WEDNESDAY, MARCH 22, 2006 FOR THE

6     VIDEOTAPED DEPOSITION OF DEBBIE COX BULTAN.  WE'RE TAPING

7     THIS DEPOSITION AT 1620 26TH STREET IN SANTA MONICA,

8     CALIFORNIA ON BEHALF OF THE DEFENDANTS IN THE ACTION

9     ENTITLED DEMOCRATIC LEADERSHIP COUNCIL, INC. VERSUS UNITED

10    STATES, CASE NO. 105 CV 1067.

11          MY NAME IS DUDLEY FETZER.  I'M THE VIDEOGRAPHER

12    FROM ON RECORD LOCATED IN LOS ANGELES, CALIFORNIA.  THIS IS

13    TAPE NO. 1 OF VOLUME I.

14          WOULD COUNSEL PLEASE IDENTIFY YOURSELVES AND

15    STATE WHOM YOU REPRESENT.

16          MR. BAUER:  I'M ROBERT BAUER WITH THE DEMOCRATIC

17    LEADERSHIP COUNCIL.

18          MR. MARTINEAU:  I AM MIKE MARTINEAU WITH THE UNITED

19    STATES DEPARTMENT OF JUSTICE, TAX DIVISION, ON BEHALF OF

20    THE DEFENDANT UNITED STATES.

21          THE VIDEOGRAPHER:  THE COURT REPORTER MAY SWEAR THE

22    WITNESS.

23          THE COURT REPORTER:  WOULD YOU PLEASE RAISE YOUR RIGHT

24    HAND.

25          YOU DO SOLEMNLY STATE THAT THE TESTIMONY YOU'RE

5

1    ABOUT TO GIVE IN THIS MATTER WILL BE THE TRUTH, THE WHOLE

2    TRUTH AND NOTHING BUT THE TRUTH?

3            THE WITNESS:  YES.

4                                EXAMINATION

5    BY MR. MARTINEAU:

6            Q.    GOOD MORNING, MS. COX BULTAN.

7            A.    GOOD MORNING.  MS. COX IS FINE.

8            Q.    MS. COX IS FINE.  I WAS GOING TO ASK YOU.  I AM

9    MIKE MARTINEAU FROM THE DEPARTMENT OF JUSTICE, AND I WANT

10   TO ASK YOU IF YOU'LL FIRST STATE FOR YOUR RECORD YOUR FULL

11   NAME AND YOUR PRESENT EMPLOYMENT POSITION FOR US.

12           A.    DEBORAH COX BULTAN, AND I'M WITH THE DEMOCRATIC

13   LEADERSHIP COUNCIL.

14           Q.    YOU'RE LOCATED IN CALIFORNIA?

15           A.    SANTA BARBARA, CALIFORNIA.

16           Q.    OKAY.  YOU'RE HERE TODAY PURSUANT TO THE SUBPOENA

17   THAT WAS SERVED UPON YOU BY THE UNITED STATES IN THIS CASE;

18   CORRECT?

19           A.    YES.

20           Q.    I'M GOING TO HAVE WHAT HAS BEEN PREVIOUSLY MARKED

21   AS EXHIBIT 143 GIVEN TO YOU.

22           (DEFENDANT'S EXHIBIT 143 WAS MARKED FOR

23            IDENTIFICATION AND IS ATTACHED HERETO.)

24           Q.    BY MR. MARTINEAU:  IS THIS THE NOTICE OF

25   DEPOSITION AND THE SUBPOENA THAT WAS SERVED UPON YOU IN

6

SEIJAS COURT REPORTERS

1    THIS CASE, MS. COX?

2         A.   I DIDN'T SEE IT.

3         Q.   CAN YOU GO AND LOOK AT THE BACK WHERE THERE'S A

4    SUBPOENA.  DO YOU SEE THAT?

5         A.   THIS ONE?

6         Q.   YES, SIR.  YES, MA'AM.

7         A.   I DIDN'T SEE THE SUBPOENA.  I WAS TOLD I WAS

8    SUBPOENAED.

9         Q.   OKAY.  VERY WELL.  NOW, THERE'S ATTACHED TO THE

10   SUBPOENA IS THE VERY LAST PAGE A DOCUMENT, AND IT STATES

11   "LIST OF DOCUMENTS TO BE PRODUCED."  DO YOU SEE THAT?

12        A.   YES.

13        Q.   HAVE YOU PRODUCED ANY DOCUMENTS PURSUANT TO THE

14   SUBPOENA TODAY?

15        A.   YES, I HAVE.

16        Q.   IF YOU DID NOT SEE THE SUBPOENA BEFORE TODAY, HOW

17   DID YOU KNOW TO PRODUCE DOCUMENTS TO THE GOVERNMENT?

18        A.   MY, OUR ATTORNEYS, OUR COUNSEL LET US KNOW WHAT

19   NEEDED TO BE PRODUCED.

20        Q.   OKAY.  AND WHEREABOUTS DID YOU GO ABOUT SEARCHING

21   FOR DOCUMENTS RESPONSIVE TO THE SUBPOENA?

22        A.   EVERYTHING IN MY POSSESSION, IN MY HARD FILES

23   RELATING TO THE LEADERSHIP WORKSHOPS.

24        Q.   THAT'S THE DLC LEADERSHIP WORKSHOPS?

25        A.   UH-HUH.

7

SEIJAS COURT REPORTERS

1      Q.   OKAY.  FOR PURPOSES OF OUR DEPOSITION, YOU MUST

2  SAY YES OR NO.

3      A.   I'M SORRY.  YES.

4      Q.   SO THE COURT REPORTER CAN TAKE IT.  VERY GOOD.

5           DO YOU HAVE THOSE DOCUMENTS WITH YOU TODAY?

6      A.   YES.

7      Q.   MAY I SEE THOSE, COUNSEL.  THESE ARE THE

8  DOCUMENTS?

9      MR. BAUER:  I'M TRYING TO GET A FULL SET HERE.  GIVE

10  ME ONE SECOND.

11      MR. MARTINEAU:  YES.  I WANT TO MAKE SURE.  VERY GOOD.

12      MR. BAUER:  MAKE SURE NOTHING IS DUPLICATES.

13      MR. MARTINEAU:  UNDERSTAND.  WE'LL GO THROUGH THEM AND

14  HAVE THEM IDENTIFIED AT THE APPROPRIATE TIME AND MAKE SURE

15  WE ONLY HAVE ONE OF EACH ON THE RECORD.

16      MR. BAUER:  I'M NOT QUITE DONE.

17           THAT SHOULD BE THE DOCUMENTS.

18      MR. MARTINEAU:  OKAY.  VERY GOOD.

19      Q.   MS. COX, JUST SOME PRELIMINARY MATTERS.  HAVE YOU

20  HAD YOUR DEPOSITION TAKEN BEFORE?

21      A.   NO.

22      Q.   I WILL ASK YOU SOME QUESTIONS.  YOU PROVIDE THE

23  ANSWERS.  WE'LL MAKE SURE WE DON'T TALK OVER EACH OTHER SO

24  THE COURT REPORTER CAN TAKE IT DOWN.

25      A.   OKAY.

8

1      Q.    IN PREPARATION FOR YOUR DEPOSITION OTHER THAN

2   SEARCHING FOR THESE RECORDS HAVE YOU SPOKEN TO ANYBODY

3   CONCERNING THE DEPOSITION TODAY?

4      A.    JUST OUR COUNSEL, PERKINS COIE.

5      Q.    HAVE YOU SPOKEN TO MR. FROM AT ANY TIME

6   CONCERNING YOUR TAKING A DEPOSITION IN THIS PARTICULAR

7   CASE?

8      A.    ONLY THAT I WOULD BE DEPOSED.

9      Q.    DO YOU HAVE AN UNDERSTANDING OF WHAT THIS

10  PARTICULAR CASE IS ABOUT?

11     A.    ROUGHLY.  YES, YES, I DO.

12     Q.    WHAT IS YOUR UNDERSTANDING OF WHAT THE CASE IS

13  ABOUT?

14     A.    I UNDERSTAND THAT THE DLC IS BEING LOOKED AT FOR

15  WHETHER OR NOT WE BENEFIT, HAVE A PRIVATE BENEFIT TO A

16  CERTAIN GROUP OF PEOPLE.

17     Q.    VERY GOOD.  TELL ME WHAT IS YOUR CURRENT POSITION

18  WITH THE DLC?

19     A.    I'M CURRENTLY CHIEF OF STAFF.

20     Q.    HOW LONG HAVE YOU BEEN CHIEF OF STAFF TO THE DLC?

21     A.    SINCE MAY OF LAST YEAR.

22     Q.    THAT WOULD HAVE BEEN MAY OF --

23     A.    I'M SORRY.  MAY OF 2003.

24     Q.    MAY OF 2003?

25     A.    MAY OF 2004.

9

1      Q.    OKAY.  MAY OF 2004.  PRIOR TO BEING CHIEF OF

2   STAFF FOR THE DLC, DID YOU HAVE ANOTHER POSITION WITH THE

3   DLC?

4      A.    SEVERAL.

5      Q.    WHY DON'T YOU WORK BACK FROM YOUR CURRENT

6   POSITION OF CHIEF OF STAFF FROM MAY OF 2004.  LET'S WORK

7   BACK AND EXPLAIN TO ME, IDENTIFY YOUR POSITIONS WITH THE

8   DLC.

9      A.    OKAY.  PREVIOUS TO THAT I WAS DLC'S POLITICAL

10   DIRECTOR.  PREVIOUS TO THAT I WAS THE DLC'S WESTERN STATES

11   DIRECTOR.  PRIOR TO THAT I WAS THE DLC'S FIELD DIRECTOR,

12   AND PRIOR TO THAT I WAS THE DLC'S MANAGER FOR NATIONAL

13   FUNDRAISING.

14      Q.    WHEN DID YOU FIRST BECOME EMPLOYED BY THE DLC?

15      A.    ON A TEMPORARY BASIS IN THE FALL OF 1994.  ON A

16   PERMANENT BASIS IN JANUARY OF 2005.

17      Q.    JANUARY OF 2005?

18      A.    1995.  SORRY.

19      Q.    NOW, PRIOR TO WORKING FOR THE DLC, WERE YOU

20   EMPLOYED ELSEWHERE?

21      A.    YES.

22      Q.    WHERE WERE YOU EMPLOYED?

23      A.    I WAS EMPLOYED ON SEVERAL CAMPAIGNS FOR ELECTED

24   OFFICIALS.  YEAH, THAT'S WHERE I WAS EMPLOYED.

25      Q.    AND WHERE DID YOU ATTEND COLLEGE?

10

SEIJAS COURT REPORTERS

1          A.    UC SANTA BARBARA.

2          Q.    WHAT YEAR DID YOU GRADUATE FROM UC SANTA BARBARA?

3          A.    1991.

4          Q.    WHAT WAS YOUR MAJOR FIELD OF STUDY AT UC SANTA

5    BARBARA?

6          A.    I WAS A DOUBLE MAJOR IN POLITICAL SCIENCE AND

7    ENGLISH.

8          Q.    AND THEN AFTER YOU GRADUATED FROM UC SANTA

9    BARBARA IN 1991 YOU WENT TO WORK ON CERTAIN CAMPAIGNS?

10         A.    I WENT TO WORK FOR -- IN SAN FRANCISCO MY FIRST

11   PAID JOB WAS FOR A FUNDRAISING FIRM WHO HAD MULTIPLE

12   CLIENTS.    SOME OF WHOM WERE I GUESS -- I HAVEN'T THOUGHT

13   ABOUT THESE THINGS IN A LONG TIME.    SOME OF WHOM WERE

14   POLITICAL CAMPAIGNS.    ACTUALLY WE ALSO HAD NONPROFIT

15   CLIENTS AND OTHER CLIENTS WE FUNDRAISED FOR.

16         Q.    AND THEN AFTER YOU WORKED FOR THE FUNDRAISING

17   FIRM IN SAN FRANCISCO, DID YOU WORK ON A POLITICAL

18   CAMPAIGN?

19         A.    NEXT I WORKED FOR ONE OF OUR CLIENTS FOR HER

20   CONGRESSIONAL RACE AS FINANCE DIRECTOR.

21         Q.    WHAT WAS THAT PERSON'S NAME?

22         A.    PATTY GARAMENDI.

23         Q.    WAS SHE A DEMOCRAT OR REPUBLICAN?

24         A.    SHE'S A DEMOCRAT.

25         Q.    AFTER YOU WORKED ON THE GARAMENDI CAMPAIGN, DID

11

SEIJAS COURT REPORTERS

1    YOU WORK ON ANOTHER CAMPAIGN?

2        A.    I WORKED FOR HER HUSBAND JOHN GARAMENDI WHO WAS

3    RUNNING FOR GOVERNOR.

4        Q.    MR. GARAMENDI IS HE A DEMOCRAT OR REPUBLICAN?

5        A.    HE'S A DEMOCRAT.

6        Q.    AFTER YOU WORKED FOR HIS CAMPAIGN, DID YOU WORK

7    ON ANOTHER CAMPAIGN?

8        A.    I WAS CAMPAIGN MANAGER FOR A STATE SENATE RACE

9    FOR GEORGE NAKANO.

10       Q.    WAS MR. NAKANO A DEMOCRAT OR REPUBLICAN?

11       A.    HE'S A DEMOCRAT.

12       Q.    AND AFTER THAT PARTICULAR CAMPAIGN WHO DID YOU

13   WORK FOR?

14       A.    THEN I WORKED FOR A -- VERY BRIEFLY FOR A FIRM

15   WHO DID DIRECT MAIL FOR VARIOUS CLIENTS.

16       Q.    AND THEN AFTER THE DIRECT MAIL FIRM WHO DID YOU

17   WORK FOR?

18       A.    THEN I STARTED WORK FOR THE DEMOCRATIC LEADERSHIP

19   COUNCIL.

20       Q.    YOU INDICATED YOUR FIRST POSITION WITH THE

21   DEMOCRATIC LEADERSHIP COUNCIL, OTHER THAN YOUR TEMPORARY

22   POSITION, WAS TO BE THE MANAGER OF THEIR NATIONAL

23   FUNDRAISING; IS THAT CORRECT?

24       A.    YES.  I MAY HAVE HAD MORE TITLES, BUT THAT WAS

25   THE GIST.

12

SEIJAS COURT REPORTERS

1      Q.    THAT WAS THE GIST OF IT.  UNDERSTAND.  WHAT WAS

2    YOUR PRIMARY RESPONSIBILITY AS MANAGER OF THE NATIONAL

3    FUNDRAISING APPARATUS FOR THE DLC?

4      A.    I PUT TOGETHER OUR STRATEGY FOR TRYING TO SOLICIT

5    DONATIONS FROM INDIVIDUALS WHO -- FOR THE DLC.

6      Q.    AND HOW DID YOU GO ABOUT DEVELOPING A DONOR LIST,

7    IF YOU WILL, FOR THE DLC?

8      A.    MANY WAYS.  OBVIOUSLY WE WOULD START WITH PEOPLE

9    WHO GAVE US MONEY AND ASK THEM FOR FRIENDS AND COLLEAGUES

10   WHO MIGHT BE INTERESTED IN WHAT WE DO.  WE ALSO, YOU KNOW,

11   TALKED TO PAST DONORS WHO MAY HAVE FALLEN OFF FOR SOME

12   REASON TO TRY TO REENGAGE THEM.  AND THEN WE LOOKED FOR

13   PEOPLE WHO GAVE MONEY TO ALL KINDS OF DIFFERENT CAUSES THAT

14   MIGHT BE LIKE MINDED.

15     Q.    GIVE ME AN EXAMPLE OF SOME CAUSES THAT MIGHT BE

16   LIKE MINDED THAT YOU LOOKED TO FOR DONORS FOR THE DLC.

17     A.    ALL SORTS OF PROGRESSIVE CAUSES I WOULD SAY.

18   IT'S HARD TO CHARACTERIZE SPECIFICALLY.

19     Q.    DID YOU LOOK AT OTHER EXISTING ORGANIZATIONS AND

20   THEIR DONOR LIST?

21     A.    YEAH.  TO THE EXTENT THEY'RE AVAILABLE, BUT,

22   YEAH, PROBABLY.

23     Q.    GIVE ME AN EXAMPLE OF AN EXISTING ORGANIZATION.

24     A.    I, I DON'T REMEMBER SPECIFICS.  I DON'T REMEMBER

25   SPECIFICS.

SEIJAS COURT REPORTERS

1    Q.   DID YOU LOOK TO, FOR EXAMPLE, THE PARTY'S, THE

2    DEMOCRATIC PARTY'S LIST OF DONORS OR PEOPLE WHO HAD GIVEN

3    TO THE DEMOCRATIC PARTY?

4    A.   YEAH.  PROBABLY.  YEAH.  ALSO, YOU KNOW, ELECTED

5    OFFICIALS, YOU KNOW, LIKE MINDED ELECTED OFFICIALS

6    WHO -- WHETHER WE LOOKED AT THEIR DONOR LIST OR TALKED TO

7    THEM ABOUT PEOPLE WHO GAVE TO THEM THAT MIGHT BE INTERESTED

8    IN THE DLC.  YOU KNOW, THAT'S SPLITTING HAIRS.  I'M NOT

9    SURE WHETHER WE LOOKED AT LISTS OR WHETHER WE TALKED TO

10   PEOPLE, BUT THAT TYPE OF LINE OF QUESTIONING.

11   Q.   WHEN YOU SAY LIKE MINDED ELECTED OFFICIALS, WHAT

12   DO YOU MEAN BY THAT?

13   A.   PEOPLE WHO SHARE OUR NEW DEMOCRAT PHILOSOPHY

14   GENERALLY.

15   Q.   WOULD THOSE BE DEMOCRAT ELECTED OFFICIALS,

16   REPUBLICAN ELECTED OFFICIALS OR BOTH?

17   A.   BOTH.  BOTH.  BOTH.  THERE ARE DEMOCRATIC ELECTED

18   OFFICIALS WHO SHARE OUR PHILOSOPHY.  THERE ARE ALSO SOME

19   REPUBLICAN ELECTED OFFICIALS, YOU KNOW, MORE INDEPENDENT

20   REPUBLICANS -- JOHN MCCAIN COMES TO MIND -- WHOSE DONORS

21   MIGHT BE INTERESTED IN WHAT WE DO.  SO MORE ABOUT PEOPLE

22   WHO SHARED OUR GENERAL PHILOSOPHY AND OUTLOOK IN THE WORLD.

23   Q.   WHAT ABOUT LIKE THE DEMOCRATIC NATIONAL

24   SENATORIAL COMMITTEE OR THE DCCC?  DID YOU LOOK TO THOSE

25   ORGANIZATIONS FOR POTENTIAL DONORS TO THE DLC?

14

1      A.    NOT IN ANY -- NOT IN ANY COORDINATED WAY, NO.

2      Q.    WHETHER IT WAS COORDINATED OR NOT, DID YOU LOOK,

3   FOR EXAMPLE, TO THE DEMOCRATIC SENATORIAL CAMPAIGN

4   COMMITTEE FOR POTENTIAL DONORS?

5      MR. BAUER:    COULD I ASK YOU TO CLARIFY JUST WHAT YOU

6   MEAN BY LOOK TO BECAUSE I THINK WE'RE HAVING TROUBLE WITH

7   THE WAY YOU'RE ASKING THE QUESTION.

8      Q.    BY MR. MARTINEAU:    WELL, YOU HAD USED, I BELIEVE,

9   A TERM LIKE THAT IN SAYING THAT YOU LOOKED TO OR CONTACTED

10   OR HAD DISCUSSIONS WITH --

11      A.    YEAH.

12      Q.    -- THOSE VARIOUS ORGANIZATIONS IN THE CONTEXT OF

13   YOUR FUNDRAISING; IS THAT CORRECT?

14      A.    THOSE WOULD BE PEOPLE -- DONORS TO SOME OF THOSE

15   COMMITTEES MAY OR MAY NOT SHARE DLC PHILOSOPHY.  IT'S HARD

16   TO SAY THAT WE WOULD BE LOOKING AT THAT LIST IN ITS

17   ENTIRETY.  WE REALLY WERE LOOKING FOR PEOPLE WHO SHARED OUR

18   PHILOSOPHY.  SOME DEMOCRATIC GIVERS SHARED OUR PHILOSOPHY.

19   SOME DEMOCRATIC GIVERS DON'T.  SO IT WAS -- I GUESS THE

20   PROBLEM I WAS HAVING IT'S A BROAD QUESTION.  SO WE MAY

21   HAVE -- I DON'T REMEMBER, RECALL WHETHER OR NOT WE HAD

22   LISTS OF DONORS THAT WE WERE LOOKING AT, BUT IF SOMEONE

23   SAID I HAVE A FRIEND WHO GIVES TO THE DCCC HE, SHE MIGHT BE

24   INTERESTED IN GIVING TO THE DLC, WE CERTAINLY WOULD PURSUE

25   THAT LEAD, BUT WE WOULDN'T ASSUME JUST BECAUSE THEY GAVE TO

15

1    ONE OF THE PARTY COMMITTEES THEY WOULD WANT TO GIVE TO THE

2    DLC BECAUSE WE HAVE A MUCH MORE -- WE HAVE A MUCH MORE

3    DEFINED PHILOSOPHY THAN BROADLY DEMOCRATIC.

4        Q.    SO IT'S FAIR TO SAY THAT AS PART OF YOUR

5    FUNDRAISING EFFORTS YOU LOOKED TO, FOR EXAMPLE, THE DCCC

6    FOR LEADS TO POTENTIAL DONORS?

7        A.    NO, I WOULDN'T SAY THAT.

8        MR. BAUER:  I'LL HAVE TO OBJECT TO THAT QUESTION JUST

9    ON THE GROUNDS THAT SHE JUST ANSWERED YOUR QUESTION, AND

10   NOW YOU'RE ACTUALLY REFRAMING HER ANSWER.  I JUST WANT TO

11   HELP HER OUT.  SHE'S BEEN IN A THREE HOUR TRAFFIC JAM HERE.

12   SHE'S DOING VERY WELL, BUT I JUST WANT TO MAKE SURE THAT

13   YOU ASK THE QUESTIONS AS CLEARLY AS POSSIBLE AND NOT

14   ACTUALLY REFRAME HER ANSWERS.

15       Q.    BY MR. MARTINEAU:  YOU CAN GO AHEAD AND ANSWER

16   THE QUESTION.

17       MR. BAUER:  COULD YOU RESTATE THE QUESTION.

18       Q.    BY MR. MARTINEAU:  YOU SAID THAT YOU EITHER

19   CONSULTED OR LOOKED TO, FOR EXAMPLE, THE DCCC FOR LEADS FOR

20   POTENTIAL DONORS TO THE DLC?

21       A.    THAT'S ACTUALLY NOT WHAT I SAID.

22       Q.    EXPLAIN WHAT YOU SAID.

23       A.    I SAID -- I THINK WHEN I STARTED THIS

24   CONVERSATION YOU ASKED ME HOW, HOW DID WE GO ABOUT

25   DEVELOPING OUR LIST, IF I RECALL CORRECTLY, AND I SAID WE

16

SEIJAS COURT REPORTERS

1    WOULD LOOK FOR PRIMARILY EITHER PEOPLE WHO -- PRIMARILY

2    PEOPLE WHO EITHER GIVE US, GIVE US MONEY AND ASK FOR THEIR

3    COLLEAGUES OR PEOPLE WHO MAY HAVE GIVEN US IN THE PAST AND

4    GO BACK TO THEM AND FIND OUT WHY THEY DIDN'T.

5         (INTERRUPTION.)

6         THE WITNESS:  I THINK WHAT I SAID WAS WE WERE

7    RECAPPING HOW WE GOT TO THIS PLACE RIGHT WHERE WE ARE, AND

8    I THINK I SAID THAT WE WOULD FIRST LOOK TO OUR CURRENT

9    DONORS FOR LEADS.  WE WOULD PROBABLY LOOK TO OUR PAST

10   DONORS FOR LEADS OR FOR SUGGESTIONS OF PEOPLE WHO MIGHT BE

11   INTERESTED IN US, AND I SAID WE WOULD ALSO PROBABLY LOOK

12   FOR PEOPLE WHO MIGHT -- WE WOULD HAVE REASON -- I WILL

13   RESTATE WHAT I SAID.  WHAT I MEANT WAS WE WOULD HAVE REASON

14   TO THINK THAT THEY MIGHT BE INTERESTED IN OUR PHILOSOPHY IS

15   PROBABLY A BETTER WAY TO SAY WHAT I WAS TRYING TO SAY.

16        NOW WE'RE IN SPECIFICALLY WHO, WHAT ORGANIZATIONS

17   MIGHT BE THOSE.  THAT'S VERY HARD TO CHARACTERIZE, AND

18   AGAIN, I DON'T -- YOU KNOW, WE WOULD BE LOOKING AT -- AND

19   MORE OFTEN IT WOULD BE SOMEBODY WOULD SUGGEST SOMEONE TO

20   US, AND IF WE KNEW THEY GAVE TO DEMOCRATIC CAUSES, SURE, WE

21   WOULD LOOK AT THEM BECAUSE THEY MIGHT BE PROGRESSIVE, BUT

22   THAT DOES NOT NECESSARILY MEAN BECAUSE THEY WERE A

23   DEMOCRATIC GIVER THEY WOULD BE A DLC GIVER, AND WE MIGHT

24   HAVE PEOPLE -- IN FACT, WE OFTEN HAD PEOPLE WHO WOULD SAY

25   THIS PERSON IS A REPUBLICAN, BUT THEY'RE A REPUBLICAN WHO

17

SEIJAS COURT REPORTERS

1    SHARES YOUR VIEW OF INTERNATIONAL AFFAIRS TO TRADE ISSUE.

2    YOU KNOW, THIS COULD BE -- YOU KNOW, WE ALSO WOULD DO THE

3    SAME THING WITH OTHER DONORS, BUT SO WE WOULD NOT LIMIT IT

4    TO DEMOCRATIC GIVERS I GUESS IS WHAT I HEAR YOU SAYING

5    WHICH I DIDN'T MEAN TO SUGGEST.

6         Q.    I ASKED YOU SPECIFICALLY ABOUT A PARTICULAR

7    ENTITY.  JUST ONE MORE QUESTION ON THIS, AND I THINK WE

8    USED AS AN EXAMPLE THE DCCC, AND JUST FOR THE RECORD WHAT

9    IS THE DCCC?

10        A.    DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE.

11        Q.    AND I ASKED YOU, I THINK, IF THE DCCC WAS ONE OF

12   THE ENTITIES THAT YOU LOOKED TO OR CONSULTED IN CONNECTION

13   WITH THIS PROCESS THAT YOU JUST DESCRIBED.

14        A.    WE ABSOLUTELY WOULD NOT HAVE CONSULTED, AND I

15   DON'T THINK WE WOULD HAVE LOOKED AT ANY DIFFERENT THAN WE

16   WOULD HAVE LOOK AT SOMEONE WHO GAVE TO, FOR EXAMPLE, THE

17   BROOKINGS INSTITUTE FOR AN ISSUE THAT WE SHARED WITH THEM.

18   SO IF PEOPLE GAVE TO BROOKINGS BECAUSE THEY WERE DOING A

19   PROJECT ON TRADE THAT WE, THAT WAS OUR SIMILAR PHILOSOPHY,

20   WE WOULD LOOK FOR THAT DONOR LIST TOO.

21        Q.    FAIR ENOUGH.  NOW, YOU INDICATED ANOTHER POSITION

22   YOU HELD AFTER THE FUNDRAISING POSITION WAS AS FIELD

23   DIRECTOR.  WHAT IS THE DLC FIELD OFFICE THAT YOU WERE FIELD

24   DIRECTOR OF?

25        A.    THAT BASICALLY MEANT THAT I WAS RESPONSIBLE FOR

18

SEIJAS COURT REPORTERS

1    MANAGING OUR RELATIONSHIPS WITH ELECTED OFFICIALS AND

2    COMMUNITY LEADERS AND OTHER PEOPLE OUTSIDE THE BELTWAY.

3        Q.    AND WHEN YOU -- WHEN YOU SAY OUTSIDE THE BELTWAY,

4    ARE YOU TALKING ABOUT ELECTED OFFICIALS ON THE STATE LEVEL,

5    OR ARE YOU TALKING ABOUT ON THE FEDERAL LEVEL?  WHAT LEVEL

6    ARE WE TALKING ABOUT?

7        A.    ON THE ELECTED OFFICIALS IT WOULD HAVE BEEN

8    ELECTED OFFICIALS AT THE STATE AND LOCAL LEVEL, BUT AGAIN

9    IT WOULD ALSO, THAT OFFICE AS YOU CALLED IT, WAS ALSO

10   RESPONSIBLE FOR MANAGING OUR MAINSTREAM MOVEMENT MEMBERS

11   WHICH IS ANYONE WHO GIVES US $50 AND ANY OTHER NONELECTED

12   OFFICIAL WHO HAD OCCASION TO WANT TO PARTICIPATE WITH US.

13       Q.    WERE THE STATE AND LOCAL ELECTED OFFICIALS WERE

14   THEY DEMOCRATIC ELECTED OFFICIALS THAT YOU WORKED WITH AS

15   THE FIELD DIRECTOR FOR THE DLC?

16       A.    PRIMARILY, YES.

17       Q.    NOW, YOU ALSO MENTIONED THAT YOU WERE WESTERN

18   STATES COORDINATOR, I BELIEVE.  WHAT WAS THE WESTERN STATES

19   COORDINATOR?

20       A.    WHEN I MOVED TO CALIFORNIA IN 1998, I CONTINUED

21   MY ROLE OF DOING EXACTLY WHAT I JUST EXPLAINED BUT

22   PRIMARILY FOR THE WESTERN STATES WEST OF THE ROCKIES.

23       Q.    AND YOU ALSO INDICATED THAT YOU WERE POLITICAL

24   DIRECTOR FOR THE DLC.  WHAT WAS THE JOB RESPONSIBILITY OF

25   POLITICAL DIRECTOR?

19

1    A.   THE EXACT SAME JOB THAT I DESCRIBED AS FIELD

2    DIRECTOR.  I WENT BACK TO BEING OUR NATIONAL OVERSEER OF

3    THAT AFTER SOME TIME OF DOING WESTERN STATES, AND THE TITLE

4    CHANGED.

5    Q.   FAIR ENOUGH.  AND YOU'RE CURRENTLY CHIEF OF STAFF

6    TO THE DLC; CORRECT?

7    A.   YES, AT THE MOMENT.

8    Q.   AND JUST EXPLAIN BRIEFLY WHAT IS THE POSITION OF

9    CHIEF OF STAFF.

10   A.   PRIMARILY TO RUN DAY-TO-DAY OPERATIONS FOR THE

11   DLC.  I SHOULD CLARIFY, HOWEVER, ON THIS POINT THAT I JUST

12   MOVED TO, BACK TO CALIFORNIA SO MY DUTIES ARE IN TRANSITION

13   BECAUSE I CAN'T DO ALL OF MY FORMER CHIEF OF STAFF DUTIES

14   FROM HERE.

15   Q.   FAIR ENOUGH.  NOW, AS PART OF THE POSITION AS

16   POLITICAL DIRECTOR, WERE YOU INVOLVED WITH THE DLC

17   LEADERSHIP WORKSHOPS?

18   A.   YES.

19   Q.   EXPLAIN TO THE COURT WHAT ARE THE DLC LEADERSHIP

20   WORKSHOPS.

21   A.   THE DLC LEADERSHIP WORKSHOPS ARE A PROJECT WE

22   STARTED IN 1998 TO HELP ELECTED OFFICIALS AND OTHERS

23   UNDERSTAND THE NEW DEMOCRAT PHILOSOPHY AND HELP THEM LEARN

24   HOW TO DEVELOP POLICIES AND IDEAS CONSISTENT WITH THAT

25   PHILOSOPHY.

20

1    Q.    NOW, WERE THESE ELECTED OFFICIALS AT THE STATE

2  AND LOCAL LEVEL?

3    A.    PRIMARILY, YES.

4    Q.    WERE THESE ELECTED OFFICIALS DEMOCRAT ELECTED

5  OFFICIALS OR REPUBLICAN ELECTED OFFICIALS?

6    A.    PRIMARILY DEMOCRATS.

7    Q.    DO YOU KNOW OF ANY INSTANCE WHEN A REPUBLICAN

8  ELECTED OFFICIAL AT THE STATE AND LOCAL LEVEL PARTICIPATED

9  IN A DLC LEADERSHIP WORKSHOP?

10    A.    NOT SPECIFICALLY THOUGH.  WE DIDN'T CHECK

11  CREDENTIALS AT THE DOOR, SO I CAN'T -- I'D HAVE TO LOOK

12  THROUGH EVERY LIST TO SAY THAT THIS IS A DEMOCRAT, THIS IS

13  A REPUBLICAN, BUT I'M SURE PRIMARILY THEY WERE DEMOCRATS.

14    Q.    VERY GOOD.  NOW, WOULD YOU JUST DESCRIBE WHAT THE

15  WORKSHOPS WERE ABOUT.  HOW DID THEY WORK?

16    A.    CAN YOU CLARIFY THE QUESTION FOR ME.  DO YOU WANT

17  ME TO SPECIFICALLY WALK YOU THROUGH WHAT A DAY WOULD LOOK

18  LIKE?

19    Q.    WALK THROUGH WHAT A DAY WOULD LOOK LIKE IN THE

20  DLC LEADERSHIP WORKSHOP.

21    A.    THEY EVOLVED OVER TIME, BUT THEY MOSTLY ENTAILED

22  A SECTION WHERE WE WOULD TALK ABOUT THE VALUES INHERENT ON

23  THE POLITICAL SPECTRUM OF LEFT, RIGHT AND CENTER, AND WE

24  WOULD DO THAT BY USING SPEECHES THAT WE FELT EXEMPLIFIED

25  THOSE THREE POSITIONS ON THE POLITICAL SPECTRUM, AND WE

21

SEIJAS COURT REPORTERS

1    WOULD HAVE THE PARTICIPANTS DRAW OUT FROM EACH SPEECH

2    VALUES THAT WERE IN THE SPEECH, AND WE WOULD DISCUSS THE

3    DIFFERENCE BETWEEN THOSE THREE PHILOSOPHIES.  USUALLY WHERE

4    THAT LED TO WAS A DISCUSSION OF HOW THE RIGHT WAS MORE

5    INTERESTED IN MORE GOVERNMENT -- I MEAN, I'M SORRY -- IN

6    ZERO GOVERNMENT, HOW THE CENTER BELIEVED THERE SHOULD BE AN

7    EMPOWERING GOVERNMENT AND HOW THE LEFT BELIEVED THERE WAS A

8    GOVERNMENT THAT CAN SOLVE EVERYONE'S PROBLEMS.

9         Q.    CONTINUE.

10        A.    AND THEN FROM THAT AFTER THE GROUP WOULD DEVELOP

11   THEIR OWN LIST OF VALUES THAT THEY WERE COMFORTABLE WITH

12   REPRESENTING THEIR VALUES AS PUBLIC OFFICIALS OR AS

13   COMMUNITY LEADERS, THEN WE WOULD GO INTO THE METAPHOR THAT

14   WE USED CALLED THE IDEA TREE, AND THE IDEA TREE IN BRIEF IS

15   AN IDEA THAT YOU THINK OF DEVELOPING POLICY AS A TREE, AND

16   THE ROOTS ARE THE VALUES WHICH IS WHAT YOU NEED TO START

17   WITH, AND THE TRUNK IS YOUR POLICY GOAL AND, THE BRANCHES

18   ARE THE PROGRAMS OR THE IDEAS, THE POLICIES THAT YOU USE TO

19   TRY TO FURTHER THOSE VALUES AND REACH THAT PROGRAM GOAL.

20        Q.    NOW, WHO TAUGHT THE OR WAS THE PERSON THAT TAUGHT

21   OR FACILITATED THIS LEADERSHIP WORKSHOP?

22        A.    WE'VE HAD DIFFERENT, BUT IN THE YEARS I THINK

23   WE'RE TALKING ABOUT THEY WERE FACILITATED PRIMARILY BY A

24   WOMAN NAMED ANITA GOTTLIEB WHO'S A CONSULTANT OF OURS.

25        Q.    AND THESE YEARS WOULD HAVE BEEN 1998 AND 1999; IS


                                                          22


                        SEIJAS COURT REPORTERS

1   THAT CORRECT?

2        A.   YES.

3        Q.   AND WHO IS ANITA GOTTLIEB?

4        A.   SHE IS A WOMAN WHO HELPED DEVELOP A TRAINING

5   PROGRAM FOR THE FLEMINGS FELLOWSHIP, A BIPARTISAN TRAINING

6   TO TEACH VALUES BASED LEADERSHIP, AND WE DREW ON HER

7   EXPERTISE IN DEVELOPING THAT TO HELP DEVELOP OUR WORKSHOPS.

8        Q.   DOES MS. GOTTLIEB CONTINUE TO THIS DAY AS THE

9   FACILITATOR OF THE DLC LEADERSHIP WORKSHOPS?

10       A.   NO.

11       Q.   FOR HOW LONG DID SHE DO THAT?

12       A.   I CAN'T RECALL SPECIFICALLY.  I CAN'T RECALL

13   SPECIFICALLY, BUT PROBABLY INTO 2001 OR 2002.

14       Q.   AFTER MS. GOTTLIEB WAS NO LONGER THE FACILITATOR,

15   DID SOMEONE TAKE OVER HER POSITION?

16       A.   I WOULDN'T CHARACTERIZE IT AS TAKING OVER HER

17   POSITION, BUT WE HAD OTHER PEOPLE FACILITATE, YES.

18       Q.   WERE THEY DLC PEOPLE OR OUTSIDE PEOPLE?

19       A.   BOTH.

20       Q.   GIVE ME A NAME OF AN INDIVIDUAL WITHIN THE DLC

21   WHO WAS A FACILITATOR FOR THE DLC TRAINING PROGRAM.

22       A.   CHUCK ALSTON AT THE TIME OUR EXECUTIVE DIRECTOR.

23       Q.   WHEN WAS THE LAST TIME YOU SPOKE WITH MS.

24   GOTTLIEB?

25       A.   OH, 2000 -- WHENEVER WE -- THAT'S NOT TRUE.

23

SEIJAS COURT REPORTERS

1    ABOUT THE DLC STUFF OR IN GENERAL?

2        Q.    YES, ABOUT THE DLC STUFF.

3        A.    THE LAST TIME WHEN WE ENDED THE CONTRACT WHICH

4    WAS 2001 OR 2002.

5        Q.    WHY DID THE DLC END THE CONTRACT WITH MS.

6    GOTTLIEB IN 2001 OR 2002?

7        A.    PRIMARILY BECAUSE SHE FELT STRONGLY THAT THE

8    SESSIONS NEEDED TO -- THAT WE WANT -- LET ME SAY THAT

9    DIFFERENTLY.  WE WANTED TO HAVE MORE FACILITATORS SO THAT

10    WE COULD EXPAND OUR TRAINING PROGRAM.  SHE WAS WORRIED

11    ABOUT THE QUALITY IF WE DID THAT AND FELT THAT WE NEEDED TO

12    KEEP IT MORE CENTRALIZED.

13        Q.    DOES MS. GOTTLIEB TO THIS DAY CONTINUE TO RUN

14    TRAINING-TYPE PROGRAMS TO YOUR KNOWLEDGE?

15        A.    I DON'T KNOW.

16        Q.    WHEN WAS THE LAST TIME YOU SPOKE TO HER?

17        A.    I RAN INTO HER AT AN EVENT IN WASHINGTON PROBABLY

18    TWO YEARS AFTER WE DIDN'T WORK TOGETHER ANYMORE AND HAD A

19    NICE CONVERSATION, BUT THAT'S THE LAST TIME.

20        Q.    VERY GOOD.  LET ME SHOW YOU A DOCUMENT THAT WE'LL

21    HAVE MARKED AS GOVERNMENT'S EXHIBIT OR EXHIBIT NO. 144.

22    THIS DOCUMENT I'LL REPRESENT TO YOU COMES FROM THE DLC'S

23    WEBSITE.

24        (DEFENDANT'S EXHIBIT 144 WAS MARKED FOR

25         IDENTIFICATION AND IS ATTACHED HERETO.)


24

1    Q.   BY MR. MARTINEAU:  CAN YOU IDENTIFY THE DOCUMENT

2  FOR ME?

3        MR. BAUER:  TAKE A MOMENT.  TAKE YOUR TIME.

4        THE WITNESS:  YES.  IT LOOKS LIKE A PRINTOUT FROM OUR

5  WEBSITE OF AN EXPLANATION AND INFORMATION ABOUT OUR

6  LEADERSHIP WORKSHOPS.

7        Q.   BY MR. MARTINEAU:  AND HERE, JUST SO THE RECORD

8  IS CLEAR, IT'S UNDER THE TITLE OF "THE PROGRAM."  IT

9  STATES, "IN THE SUMMER OF 1998, THE DLC LAUNCHED A PROGRAM

10 TO HELP STATE AND LOCAL ELECTED LEADERS DEVELOP AND

11 ARTICULATE A NEW DEMOCRAT GOVERNING AGENDA.  PROFILED IN

12 THE "NEW YORK TIMES" IN AUGUST OF 1999, THE DLC LEADERSHIP

13 WORKSHOPS ARE DESIGNED TO TEACH THE PARTICIPANTS THE

14 ESSENTIALS OF THE NEW DEMOCRAT GOVERNING PHILOSOPHY AND HOW

15 TO TURN IT INTO EFFECTIVE POLITICAL MESSAGES AND POLICY

16 PROPOSALS RELEVANT TO THEIR LOCAL ISSUES."

17       DO YOU SEE THAT?

18    A.   YES.

19    Q.   IS THAT A FAIR SUMMARY OF THE PURPOSE OF THE DLC

20 LEADERSHIP WORKSHOP PROGRAM?

21    A.   YES, YES, YES.  I -- YES.

22    Q.   IS THERE ANYTHING ELSE THAT YOU WOULD ADD AS A

23 DESCRIPTION IN THE DLC LEADERSHIP WORKSHOP THAT IS NOT SET

24 FORTH HERE?

25    A.   NO.

25

1    Q.    DO YOU KNOW WHO DRAFTED THIS PARTICULAR LANGUAGE?

2    A.    I DON'T RECALL THAT.

3    Q.    YOU DID NOT NECESSARILY DRAFT IT YOURSELF?

4    A.    I COULD HAVE.

5    Q.    VERY GOOD.  NOW, I JUST WANT TO SHOW YOU HERE

6    JUST SO WE CAN IDENTIFY THE WORKSHOPS THAT WERE CONDUCTED

7    BY THE DLC IN THE PERTINENT YEARS.

8    MR. BAUER:  COUNSEL, I JUST WANT TO ASK YOU A

9    QUESTION.

10    MR. MARTINEAU:  YES.

11    MR. BAUER:  WHAT IS THE NUMBER AGAIN?

12    MR. MARTINEAU:  THIS WOULD BE 144, COUNSEL.

13    MR. BAUER:  THANK YOU.

14    Q.    BY MR. MARTINEAU:  ON EXHIBIT 144, MS. COX GO TO

15    THE -- AS YOU SEE AT THE BOTTOM OF THE FIRST PAGE IT SAYS

16    "WORKSHOP SCHEDULE"?

17    A.    YES.

18    Q.    AND THEN IT LISTS ALL OF THE WORKSHOPS, I

19    BELIEVE, IN REVERSE CHRONOLOGICAL ORDER?

20    A.    YES.

21    Q.    AND THE VERY FIRST WORKSHOP THAT WAS LISTED WAS

22    IN WASHINGTON, D.C. ON JUNE THE 19TH AND 20TH OF 1998;

23    RIGHT?

24    A.    YES.

25    Q.    THEN THERE'S A SERIES OF WORKSHOPS IN ST.

26

1    PETERSBURG, FLORIDA; DENVER, COLORADO; PHOENIX, ARIZONA;

2    SALT LAKE CITY, UTAH; TALLAHASSEE, FLORIDA; MILWAUKEE,

3    WISCONSIN; HARRISBURG, PA; DENVER, COLORADO; AND TOPEKA,

4    KANSAS.  DO YOU SEE THAT?

5        A.    YES.

6        Q.    THOSE WERE THE WORKSHOPS THAT WERE CONDUCTED BY

7    THE DLC IN 1998 AND 1999; IS THAT CORRECT?

8        A.    YES.

9        Q.    I BELIEVE I COUNTED TEN.  DOES THAT FAIRLY

10   REPRESENT WHAT THE DOCUMENT DEMONSTRATES?

11       A.    YES.

12       Q.    NOW, DID YOU PARTICIPATE IN EACH OF THOSE TEN

13   WORKSHOPS?

14       A.    MOST BUT NOT ALL.

15       Q.    AND DID MS. GOTTLIEB TO YOUR KNOWLEDGE DID SHE,

16   WAS SHE THE FACILITATOR FOR EACH OF THOSE TEN WORKSHOPS?

17       A.    I WOULD ASSUME SO, YES.

18       Q.    VERY GOOD.

19       A.    YES.

20       Q.    NOW, THE DOCUMENT REFERENCES A "NEW YORK TIMES"

21   ARTICLE.  DO YOU SEE THAT?

22       A.    YES.

23       Q.    I'M GOING TO SHOW YOU A DOCUMENT THAT WE'LL HAVE

24   MARKED AS 145.

25           (DEFENDANT'S EXHIBIT 145 WAS MARKED FOR

27

SEIJAS COURT REPORTERS

1        IDENTIFICATION AND IS ATTACHED HERETO.)

2        Q.    BY MR. MARTINEAU:  MS. COX, YOU HAVE BEFORE YOU A

3   DOCUMENT THAT HAS BEEN MARKED AS EXHIBIT 145.  DO YOU SEE

4   THAT?

5        A.    YES.

6        Q.    IS THIS THE "NEW YORK TIMES" ARTICLE DATED AUGUST

7   20, 1999 BY ALISON MITCHELL REFERENCED IN THE WEBSITE OF

8   THE DLC GOVERNMENT EXHIBIT NO. 144?

9        A.    I ASSUME SO, YES.

10       Q.    IT SAYS HERE IN THE FIRST PARAGRAPH, MS. MITCHELL

11   WRITES, QUOTE, EVERY FEW MONTHS, SMALL GROUPS OF LOCAL

12   DEMOCRATIC OFFICIALS JOURNEY TO SPECIAL SEMINARS TO LEARN

13   HOW TO COMBAT A PARTY VULNERABILITY; DOUBTS AMONG VOTERS

14   THAT THE DEMOCRATS EMBRACE MAINSTREAM FAMILY VALUES,

15   UNQUOTE.  DO YOU SEE THAT?

16       A.    YES.

17       Q.    IS A CONCERN ABOUT DOUBTS AMONG VOTERS THAT THE

18   DEMOCRATS EMBRACE MAINSTREAM FAMILY VALUES IS THAT ONE OF

19   THE REASONS WHY THE DLC ESTABLISHED THE LEADERSHIP TRAINING

20   PROGRAMS?

21       A.    NO.

22       Q.    WHAT IS REASON WHY THE DLC ESTABLISHED THE

23   LEADERSHIP TRAINING PROGRAM?

24       A.    THE DLC ESTABLISHED THE LEADERSHIP TRAINING

25   PROGRAM BECAUSE WE UNDERSTOOD THAT WE COULD NOT SOLVE EVERY

28

SEIJAS COURT REPORTERS

1    STATE AND LOCAL POLICY PROBLEM, AND THAT WE NEEDED -- BUT

2    THAT WE THOUGHT THAT OUR PHILOSOPHY COULD HELP INFORM

3    POLICY MAKING AT THE STATE AND LOCAL LEVEL, AND THAT

4    INSTEAD OF TRYING TO COME UP WITH SPECIFIC IDEAS THAT WE

5    WANTED -- THAT WOULD ADDRESS EVERY POSSIBLE PROBLEM, WE

6    WANTED TO HELP PEOPLE HAVE A PROCESS BY WHICH THEY COULD

7    DEVELOP THEIR OWN POLICIES AND IDEAS TO ADDRESSING THOSE

8    PROBLEMS.  THAT WAS THE PRIMARY REASON FOR DEVELOPING THE

9    WORKSHOPS.

10        Q.    NOW, HERE MS. MITCHELL STATES IN THE FOURTH

11   PARAGRAPH, QUOTE, THAT THE COUNCIL, MEANING THE DEMOCRATIC

12   LEADERSHIP COUNCIL, FEELS THE NEED TO RUN SUCH WORKSHOPS

13   SAYS SOMETHING ABOUT A PERSISTENT DIFFICULTY FACING

14   DEMOCRATS AS THEY HEAD INTO THE NEXT ELECTIONS.  POLITICAL

15   STRATEGISTS SAY THE PUBLIC ONCE AGAIN SEES THE REPUBLICANS

16   AS THE PARTY OF VALUES, CONSIDERING THEM MORE TRUSTWORTHY

17   ON A RANGE OF MORAL AND ETHICAL MATTERS LIKE HONESTY,

18   BELIEF IN GOD, BELIEF IN PERSONAL RESPONSIBILITY AND

19   KNOWING RIGHT FROM WRONG, UNQUOTE.

20        DO YOU SEE THAT?

21   A.    YES.

22   Q.    DO YOU AGREE WITH THAT STATEMENT BY MS. MITCHELL?

23   A.    CAN I READ IT AGAIN?

24   Q.    YES.  BY ALL MEANS.

25   MR. BAUER:  COUNSEL, IF YOU COULD HELP US BY SAYING

29

SEIJAS COURT REPORTERS

1    PRECISELY WHAT THE QUESTION IS.  ARE YOU ASKING WHETHER

2    THAT REFLECTS ALISON MITCHELL'S POINT OF VIEW, WHETHER THAT

3    REFLECTS HER POINT OF VIEW, WHETHER THAT REFLECTS THE DLC'S

4    POINT OF VIEW?  THAT WOULD BE HELPFUL FOR THE RECORD.

5         MR. MARTINEAU:  MY QUESTION WAS DOES THAT REFLECT YOUR

6    POINT OF VIEW.

7         MR. BAUER:  POINT OF VIEW ABOUT THE ORIGINS OF THE

8    WORKSHOPS?

9         MR. MARTINEAU:  YES, SIR.

10        THE WITNESS:  NO.  THAT DOESN'T REFLECT MY POINT OF

11   VIEW ABOUT THE ORIGINS OF THE WORKSHOPS.

12        Q.   BY MR. MARTINEAU:  DOES THAT REFLECT THE DLC'S

13   POINT OF VIEW ABOUT THE ORIGINS OF THE WORKSHOPS?

14        A.   I DON'T THINK SO.

15        Q.   WERE YOU INTERVIEWED BY MS. MITCHELL WHEN SHE

16   DRAFTED THIS PARTICULAR ARTICLE?

17        A.   I DON'T THINK -- NO.

18        Q.   WAS MR. FROM INTERVIEWED BY MS. MITCHELL?

19        A.   I DON'T BELIEVE SO, BUT I DON'T -- I WOULDN'T

20   SWEAR TO THAT.

21        Q.   DID MS. MITCHELL ATTEND TO YOUR KNOWLEDGE ANY OF

22   THE TRAINING SESSIONS OF THE DLC LEADERSHIP COUNCIL?

23        A.   NO.

24        Q.   DO YOU KNOW HOW SHE WENT ABOUT GETTING THE

25   INFORMATION FOR THIS PARTICULAR ARTICLE?

30

1        A.   I BELIEVE SHE SPOKE TO ANITA GOTTLIEB, AND I

2    BELIEVE SHE MAY HAVE SPOKEN TO ED KILGORE, ANOTHER DLC

3    STAFF PERSON WHO WAS ONE OF THE FACILITATORS OCCASIONALLY.

4        Q.   OKAY.  VERY GOOD.  FAIR ENOUGH.

5             MS. COX, I WANT TO SHOW YOU ANOTHER DOCUMENT THAT

6    HAS PREVIOUSLY BEEN MARKED AS GOVERNMENT'S EXHIBIT 49.

7             MS. COX, CAN YOU IDENTIFY THIS DOCUMENT FOR ME.

8        A.   YES.  THIS IS A FAX COVER SHEET THAT WENT TO

9    PARTICIPANTS IN THE DLC'S TRAINING WORKSHOP JUNE 19TH AND

10   20TH, 1998.

11       Q.   THIS WAS THE -- AND THIS WAS A FAX THAT YOU

12   WROTE; IS THAT CORRECT?

13       A.   YES.

14       Q.   AND THIS RELATES TO THE FIRST TRAINING SESSION IN

15   WASHINGTON, D.C., JUNE 19TH AND 20TH, 1998?

16       A.   YES.

17       Q.   IT STATES IN THE SECOND PARAGRAPH, YOU WRITE,

18   QUOTE, AS YOU KNOW, THIS TRAINING IS PART OF THE DLC'S

19   LARGER GOAL TO ARM THE NEXT GENERATION OF NEW DEMOCRAT

20   ELECTED LEADERS, PARTICULARLY AT THE STATE AND LOCAL

21   LEVELS, WITH NEW DEMOCRATIC IDEAS, UNQUOTE.

22            DO YOU SEE THAT?

23       A.   YES.

24       Q.   DO YOU AGREE WITH THAT PARTICULAR STATEMENT AS TO

25   THE PURPOSE OF WHAT THE DLC'S TRAINING PROGRAM IS?

SEIJAS COURT REPORTERS

1      A.   YES.

2      Q.   VERY GOOD.  AND THEN YOU SUBSEQUENTLY INDICATE

3   THAT, QUOTE, THE AIM IS TO HELP NEW DEMOCRATS ARTICULATE

4   THEIR POLITICAL PHILOSOPHY, APPLY THAT PHILOSOPHY TO STATE

5   AND LOCAL PUBLIC POLICY PROBLEMS, AND EFFECTIVELY DELIVER

6   NEW DEMOCRAT MESSAGES THROUGH A VARIETY OF MEDIUMS,

7   UNQUOTE.

8           DO YOU SEE THAT?

9      A.   YES.

10     Q.   IS THAT A FAIR STATEMENT OF WHAT THE AIM OF THE

11  DLC LEADERSHIP TRAINING PROGRAM IS?

12     A.   YES.  WITH -- AFTER THIS PARTICULAR FIRST EFFORT,

13  WE SUBSEQUENTLY CHANGED THE AGENDA AND DID LESS OF THE LAST

14  POINT.

15     Q.   AND WHAT SPECIFICALLY WAS THE LAST POINT?

16     A.   DELIVERING NEW DEMOCRAT MESSAGES THROUGH A

17  VARIETY OF MEDIUMS.  WE DID NOT DO THAT PORTION OF THE

18  TRAINING AFTER THE FIRST INITIAL PILOT PROJECT WHICH IS

19  WHAT THIS WAS.

20     Q.   WHY DID YOU NOT DO THAT?

21     A.   IT WAS TOO LONG.

22     Q.   VERY GOOD.  AND I JUST WANT YOU TO LOOK AT THE

23  ATTACHED LIST OF PARTICIPANTS IN THE FIRST LEGISLATIVE

24  TRAINING PROGRAM.  THERE'S A LIST OF STATE AND LOCAL

25  ELECTED OFFICIALS WHO ARE PARTICIPANTS IN THE FIRST

32

1    TRAINING PROGRAM; CORRECT?

2        A.    YES.

3        Q.    CAN YOU LOOK AT THAT LIST AND INDICATE TO ME

4    WHETHER THERE ARE ANY REPUBLICAN STATE AND LOCAL ELECTED

5    OFFICIALS ON THAT PARTICULAR LIST.

6        A.    NO, THERE ARE NOT ANY REPUBLICAN ELECTED

7    OFFICIALS ON THIS LIST.

8        Q.    TO THE BEST OF YOUR KNOWLEDGE, ALL OF THE STATE

9    AND LOCAL ELECTED OFFICIALS ON THE LIST ARE DEMOCRATS?

10       A.    YES.

11       Q.    MS. COX, LET ME SHOW YOU WHAT'S -- ANOTHER

12   DOCUMENT THAT'S BEEN PREVIOUSLY MARKED AS GOVERNMENT'S

13   EXHIBIT 50 IN THIS PARTICULAR CASE.

14             CAN YOU IDENTIFY THAT DOCUMENT FOR ME.

15       A.    IT'S MANY DOCUMENTS.  DO YOU WANT ME TO IDENTIFY

16   THE TOP ONE?

17       Q.    YES, THE TOP ONE.  THE TOP ONE IS A FAX I BELIEVE

18   YOU WROTE DATED JUNE 17, 1998; CORRECT?

19       A.    YES.

20       Q.    IT'S ADDRESSED TO THE PARTICIPANTS IN THE

21   LEADERSHIP TRAINING PROGRAM; CORRECT?

22       A.    YES.

23       Q.    THAT WAS -- AGAIN THE WORD REFERENCING HERE THE

24   FIRST LEGISLATIVE TRAINING PROGRAM IN WASHINGON, D.C.?

25       A.    YES.

33

SEIJAS COURT REPORTERS

1        Q.    THIS WAS SENT BY YOU TO THE PARTICIPANTS TO GIVE

2    THEM INFORMATION ABOUT PARTICIPATION IN THE PROGRAM;

3    CORRECT?

4        A.    YES.

5        Q.    ON THE SECOND PAGE HERE IS THE AGENDA.  DO YOU

6    SEE THAT?

7        A.    UH-HUH.

8        Q.    DO YOU SEE THAT?

9        A.    UH-HUH.

10       Q.    DID YOU DRAFT UP THE AGENDA FOR THE INITIAL

11   TRAINING PROGRAM?

12       A.    I WOULD HAVE BEEN INVOLVED.  WHETHER ANITA

13   GOTTLIEB OR I DRAFTED IT, I DON'T REMEMBER.

14       Q.    VERY GOOD.  ONE OF THE ITEMS ON THE AGENDA AT

15   1:00 P.M. SAYS, "EXPLORING WHAT MAKES US NEW DEMOCRATS.

16   HOW OUR VALUES ARE DIFFERENT FROM REPUBLICANS AND

17   TRADITIONAL LIBERALS."  DO YOU SEE THAT?

18       A.    YES.

19       Q.    WHAT WAS INVOLVED IN THAT PARTICULAR AGENDA ITEM?

20       A.    THAT IS THE PORTION OF THE PROGRAM I REFERENCED

21   EARLIER WHICH IS JUST REVIEWING SPEECHES FROM ACROSS THE

22   POLITICAL SPECTRUM AND DISCUSSING THE VALUES, THE VALUES

23   FROM EACH THREE POINTS ON THE POLITICAL SPECTRUM -- LEFT,

24   RIGHT AND CENTER.

25       Q.    DO YOU RECALL WHAT, WHO WERE THE SPEECHES, SPEECH

34

1    MAKERS THAT YOU REVIEWED IN THAT PORTION OF THE PROGRAM?

2        A.    I BELIEVE THAT WE WOULD HAVE USED MARIO COUMO'S

3    SPEECH, A RUSH LIMBAUGH SPEECH AND AN AL FROM SPEECH.

4        Q.    VERY GOOD.   NOW, CAN YOU TURN TO TWO MORE PAGES

5    WHERE IT SAYS, "GOALS OF THE FORUM."

6        A.    UH-HUH.

7        Q.    GOAL NO. 6 SAYS, "IMPROVE --" THIS STATES, "AS A

8    RESULT OF THE FORUM, PARTICIPANTS WILL, NO. 6, IMPROVE

9    THEIR SKILLS FOR DELIVERING MESSAGES THROUGH A VARIETY OF

10   MEDIUMS."   WHAT EXACTLY WAS THAT PORTION OF THE PROGRAM

11   ABOUT?

12       A.    IN THIS FIRST WORKSHOP WE DID SOME COMMUNICATION

13   TRAINING.   WE HAD OUTSIDE CONSULTANTS VIDEOTAPE

14   PARTICIPANTS' SPEECHES, AND THEY WERE OFFERED CONSTRUCTIVE

15   CRITICISM ABOUT HOW THEY COULD IMPROVE OR THEIR

16   COMMUNICATION TECHNIQUES.

17       Q.    SO THE PARTICIPANTS WOULD MAKE LIKE A MOCK

18   SPEECH, IT WOULD BE VIDEOTAPED AND THEN CRITIQUED BY THE

19   OUTSIDE FACILITATORS?

20       A.    YES.   AND THEIR COLLEAGUES.

21       Q.    AND THEIR COLLEAGUES, CERTAINLY.

22             COULD YOU TURN TO THE NEXT PAGE.   IT STATES A

23   "LIST OF PARTICIPANTS."   DO YOU SEE THAT?

24       A.    YES.

25       Q.    THERE'S A LIST OF STATE AND LOCAL

35

SEIJAS COURT REPORTERS

1    FEDERAL -- STATE AND LOCAL ELECTED OFFICIALS THAT

2    PARTICIPATED IN THE FIRST PROGRAM.  DO YOU SEE THAT?

3        A.    YES.

4        Q.    ARE ANY OF THOSE PARTICIPANTS REPUBLICAN STATE

5    AND LOCAL ELECTED OFFICIALS?

6        A.    NO.

7        Q.    ARE THEY ALL DEMOCRAT STATE AND LOCAL ELECTED

8    OFFICIALS?

9        A.    YES.

10       Q.    I WANT TO SHOW YOU A DOCUMENT THAT HAS PREVIOUSLY

11   BEEN MARKED AS GOVERNMENT'S EXHIBIT 46.  JUST ASK IF YOU

12   CAN IDENTIFY THAT DOCUMENT.

13       A.    I'M NOT FAMILIAR WITH THIS DOCUMENT, BUT IT IS A

14   FAX COVER SHEET FROM JOHN HASSELMAN TO AN ELECTED OFFICIAL

15   PRESUMABLY BECAUSE IT SAYS "HONORABLE" ABOUT LEADERSHIP

16   WORKSHOP I THINK IN FLORIDA, JULY 31ST AND AUGUST 1ST.

17       Q.    SO THIS WOULD BE ANOTHER LEADERSHIP WORKSHOP

18   CONDUCTED BY THE DLC IN FLORIDA?

19       A.    YES.

20       Q.    AND WHO FOR THE RECORD IS JOHN HASSELMAN?

21       A.    HE WAS STATE COORDINATOR WHO WORKED UNDER ME AS

22   FIELD DIRECTOR.

23       Q.    SO HE WAS PART OF THE SAME PROGRAM OR SAME

24   DEPARTMENT WITHIN THE DLC AS YOU; IS THAT CORRECT?

25       A.    YES.

36

SEIJAS COURT REPORTERS

1      Q.   DID YOU PARTICIPATE YOURSELF IN THIS PARTICULAR

2   PROGRAM?

3      A.   NO.

4      Q.   I WANT TO REFER YOU TO DLC 09628.

5      A.   YES.

6      Q.   DO YOU SEE THE LIST OF THE PARTICIPANTS IN THE

7   ST. PETERSBURG'S WORKSHOP?

8      A.   YES.

9      Q.   TO THE BEST OF YOUR KNOWLEDGE, ARE EACH OF THESE

10  INDIVIDUALS LISTED STATE AND LOCAL ELECTED OFFICIALS?

11     A.   I THINK THAT THIS -- I DON'T THINK THEY'RE ALL

12  STATE AND LOCAL ELECTED OFFICIALS.

13     Q.   OF THE ONES WHO ARE STATE AND LOCAL ELECTED

14  OFFICIALS, WHAT IS THE POLITICAL PARTY WITH WHICH EACH ONE

15  IS AFFILIATED?

16     A.   DEMOCRATIC.

17     Q.   ARE THERE ANY REPUBLICAN -- TO YOUR KNOWLEDGE ARE

18  THERE ANY REPUBLICAN STATE AND LOCAL ELECTED OFFICIALS

19  LISTED ON THIS PARTICULAR DOCUMENT?

20     A.   NOT WITH ELECTED OFFICIALS, NO.

21     Q.   VERY GOOD.  I HAVE ONE MORE DOCUMENT THAT I WANT

22  TO SHOW YOU THAT RELATES TO ANOTHER ONE OF THE DLC

23  LEADERSHIP WORKSHOPS THAT YOU IDENTIFIED EARLIER.  THAT IS

24  A DOCUMENT THAT WE'LL MARK AS EXHIBIT NO. 146.

25          (DEFENDANT'S EXHIBIT 146 WAS MARKED FOR

37

SEIJAS COURT REPORTERS

1          IDENTIFICATION AND IS ATTACHED HERETO.)

2          Q.    BY MR. MARTINEAU:  DO YOU HAVE THAT DOCUMENT

3    BEFORE YOU?

4          A.    YES.

5          Q.    NOW, THAT IS A -- THAT DOCUMENT IS A FAX COVER

6    SHEET DATED AUGUST 3, 1998 THAT YOU WROTE TO THE

7    PARTICIPANTS IN THE DLC LEADERSHIP WORKSHOP IN DENVER,

8    COLORADO; IS THAT CORRECT?

9          A.    YES.

10         Q.    AND THAT'S PROVIDING THEM CERTAIN INFORMATION

11   ABOUT THE WORKSHOP THAT WOULD BE UPCOMING; CORRECT?

12         A.    YES.

13         Q.    THERE'S A STATEMENT IN THE SECOND PARAGRAPH HERE

14   ABOUT WHAT THE DLC'S GOAL IS WITH RESPECT TO THE DLC

15   LEADERSHIP WORKSHOPS; CORRECT?

16         A.    YES.

17         Q.    AND THAT'S THE SAME STATEMENT ALMOST VERBATIM

18   THAT WAS ON THE OTHER DOCUMENTS THAT WE'VE IDENTIFIED HERE

19   TODAY?

20         A.    YES.

21         Q.    AND YOU BELIEVE YOU WROTE THAT PARTICULAR

22   STATEMENT?

23         A.    PROBABLY.

24         Q.    VERY GOOD.  AND AGAIN, THE LAST PAGE OF THE

25   DOCUMENT SETS FORTH THE AGENDA, AND IT STATES AT 1:30

38

1    THERE'S THE SAME AGENDA ITEM THAT WE REFERENCED IN THE

2    PREVIOUS DOCUMENTS, QUOTE, WHAT MAKES US NEW DEMOCRATS, HOW

3    OUR VALUES DIFFER FROM REPUBLICAN AND TRADITIONAL LIBERALS.

4    SO THAT PARTICULAR ITEM REMAINED ON THE AGENDA FOR THIS

5    PARTICULAR WORKSHOP?

6        A.    YES.

7        Q.    NOW I WANT TO HAND YOU A DOCUMENT THAT WE WILL

8    HAVE MARKED AS GOVERNMENT'S EXHIBIT NO. 147.

9        (DEFENDANT'S EXHIBIT 147 WAS MARKED FOR

10        IDENTIFICATION AND IS ATTACHED HERETO.)

11       Q.    BY MR. MARTINEAU:  CAN YOU IDENTIFY THAT

12   DOCUMENT.

13       A.    THE TOP PAGE IS A FOLLOW-UP LETTER TO

14   PARTICIPANTS FROM THE SALT LAKE CITY LEADERSHIP TRAINING.

15       Q.    THIS WAS WRITTEN BY YOURSELF ON JANUARY 27, 1999?

16       A.    PRESUMABLY.

17       Q.    THIS WOULD BE AFTER THAT PARTICULAR LEADERSHIP

18   TRAINING PROGRAM?

19       A.    YES.

20       Q.    AND IT INITIALLY THANKS THE PARTICIPANTS FOR

21   ATTENDING AND PARTICIPATING IN THAT EVENT?

22       A.    YES.

23       Q.    AND IT ALSO, DOES IT NOT, INCLUDE MATERIAL THAT

24   WAS GENERATED FROM THE LEADERSHIP TRAINING PROGRAM?

25       A.    I'D HAVE TO LOOK AT THAT.

39

SEIJAS COURT REPORTERS

1        Q.    TAKE YOUR TIME.

2              DID YOU PARTICIPATE IN THE SALT LAKE CITY?

3        A.    I WAS PRESENT, YES.

4        Q.    YOU WERE PRESENT.  NOW, IF YOU'LL GO TO THE THIRD

5    PAGE IT SAYS, "DLC WORKSHOP, SALT LAKE CITY, JANUARY 15 &

6    16, 1999, DLC/NEW DEMOCRAT VALUES AS RATIFIED BY

7    PARTICIPANTS."

8        MR. BAUER:  WHAT IS THE PAGE NUMBER FOR THE RECORD?

9        MR. MARTINEAU:  DLC 02248.

10       MR. BAUER:  THANK YOU.

11       Q.    BY MR. MARTINEAU:  DO YOU HAVE THAT PAGE BEFORE

12   YOU?

13       A.    YES.

14       Q.    THIS PAGE REFLECTS THE VALUES THAT WERE

15   IDENTIFIED BY THE PARTICIPANTS IN THE TRAINING PROGRAM AS I

16   UNDERSTAND IT; IS THAT CORRECT?

17       A.    YES.

18       Q.    SO THIS ENTIRE DOCUMENT IS LIKE A RECAP OF WHAT

19   WAS -- WHAT TOOK PLACE AT THE SALT LAKE CITY LEADERSHIP

20   TRAINING PROGRAM; IS THAT CORRECT?

21       A.    THIS DOCUMENT IS A RECAP OF ONE OF THE SECTIONS

22   WITHIN THE LEADERSHIP WORKSHOP THAT DAY, YES.

23       Q.    UNDERSTAND.

24       A.    OR THAT TWO DAYS, YES.

25       Q.    NOW, IF YOU GO TO THE NEXT PAGE, THERE'S A

SEIJAS COURT REPORTERS

1    STATEMENT, AND IT SAYS, "POLICY TREE." DO YOU SEE THAT?

2         A.    UH-HUH.

3         Q.    WHAT EXACTLY DOES THAT DOCUMENT REPRESENT?

4         A.    THIS DOCUMENT IS THE WRITEUP OF ONE OF WHAT LOOKS

5    TO BE FOUR GROUPS OF SUBGROUPS WHERE THE PARTICIPANTS

6    WORKED ON THE IDEA/POLICY TREE THAT WE TALKED ABOUT BEFORE.

7    IT INDICATES THE POLICY GOAL, THE VALUES AND THE PROGRAMS

8    OR IDEAS/POLICIES THAT THEY WOULD -- THAT WOULD BE

9    REFLECTIVE OF THE VALUES IN THE PREVIOUS PAGE IN THE

10   SPECIFIC AREA ON CRIME AND RAPE OR RAPE.

11        Q.    IF YOU WOULD GO TO THE NEXT PAGE FOR ME.  THE

12   NEXT PAGE IS HEADED AS "SOUND BITES." DO YOU SEE THAT?

13        A.    YES.

14        Q.    WHAT DO YOU MEAN BY SOUND BITES?

15        A.    SOUND BITES WERE AN INTERMEDIARY STEP TO TRY TO

16   HELP ELECTED OFFICIALS BE CONCISE ABOUT THEIR POLICIES.

17        Q.    CONCISE AS IN EXPRESSING WHAT THEIR PARTICULAR

18   VIEWS ON POLICIES ARE?

19        A.    YEAH, YEAH.  ALTHOUGH THIS IS -- YES.  THIS WAS

20   DONE IN, YOU KNOW, A FEW -- 20, 30 MINUTES, AND THEY ARE

21   OFTEN, YOU KNOW, NEVER USED OUTSIDE THE, YOU KNOW --

22   THEY'RE OFTEN KIND OF MORE FUN THAN, THAN, THAN, THAN A

23   VERY GOOD REFLECTION OF WHAT THEIR POLICIES ACTUALLY ARE IF

24   THAT MAKES SENSE.

25        Q.    SO THE SOUND BITES THAT ARE LISTED HERE, THOSE

41

SEIJAS COURT REPORTERS

1    ARE SOUND BITES THAT CAME FROM THE PARTICIPANTS?

2        A.    YES.    CAME FROM THE PARTICIPANTS, YES.

3        Q.    AND THEN YOU'VE LISTED THOSE?

4        A.    YES, YES.    THIS IS A WRITEUP OF WHAT THEY TALKED

5    ABOUT, YES.

6        Q.    THIS WAS YOUR WRITEUP?    YOU ACTUALLY WROTE THIS

7    UP AS A SUMMARY OF WHAT HAPPENED?

8        A.    THEY WROTE THEM UP ON FLIP CHARTS.    WE

9    TRANSCRIBED THEM AND SENT THEM BACK TO THEM.

10       Q.    UNDERSTAND.    OKAY.    VERY GOOD.

11             NOW, IF YOU'LL LOOK AT THE NEXT PAGE, THAT PAGE

12   IS ENTITLED "TWO MINUTE SPEECH."

13       MR. BAUER:    AND AGAIN FOR THE RECORD, COUNSELOR,

14   THAT'S PAGE?

15       MR. MARTINEAU:    02251.

16       MR. BAUER:    THANK YOU.

17       Q.    BY MR. MARTINEAU:    WHAT DO YOU MEAN BY TWO-MINUTE

18   SPEECH?

19       A.    THEN AFTER THE POLICY TREE IS DEVELOPED, THE

20   SOUND BITES ARE CREATED, THE GROUPS WOULD CREATE A

21   TWO-MINUTE SPEECH TO ARTICULATE -- TO THE BEST OF THEIR

22   ABILITY TO COMMUNICATE THEIR POLICY IN TWO MINUTES, AND

23   THEY WOULD GIVE THE SPEECH.    THEY WOULD WRITE UP THEIR

24   SPEECH.    SOMEBODY WOULD DELIVER IT.    WE AGAIN TOOK THE FLIP

25   CHARTS, TYPED THEM UP AND SENT THEM BACK AROUND.

SEIJAS COURT REPORTERS

1      Q.    OKAY.  VERY GOOD.  LET ME JUST REFER YOU TO THE

2  DOCUMENT PAGE 02261 THROUGH 02264.

3      A.    YES.

4      Q.    THAT, IS IT NOT, IS A LIST OF THE PARTICIPANTS AT

5  THE SALT LAKE CITY, UTAH, JANUARY 15TH AND 16TH, 1999

6  LEADERSHIP TRAINING SESSION; CORRECT?

7      A.    YES.

8      Q.    TO YOUR KNOWLEDGE ARE ALL OF THE STATE AND LOCAL

9  ELECTED OFFICIALS ON THIS LIST DEMOCRATS?

10     A.    YES.

11     Q.    DO YOU KNOW OF ANY STATE AND LOCAL OFFICIALS THAT

12 ATTENDED THE SALT LAKE CITY LEADERSHIP TRAINING PROGRAM WHO

13 WERE REPUBLICANS?

14     A.    NO.

15     Q.    DO YOU KNOW HOW MUCH MS. GOTTLIEB WAS PAID TO

16 SERVE AS A FACILITATOR FOR THE DLC?

17     A.    ONE OF THE DOCUMENTS I'VE PRODUCED ARE HER

18 CONTRACTS.  SO I COULD SPECULATE, BUT WE'LL GET THERE.

19     Q.    WE'LL GET THERE.  OKAY.  VERY GOOD.  I'M JUST

20 GOING TO SHOW YOU A DOCUMENT THAT MIGHT HELP REFRESH YOUR

21 RECOLLECTION.  WE'LL HAVE THIS MARKED AS GOVERNMENT'S 148.

22     (DEFENDANT'S EXHIBIT 148 WAS MARKED FOR

23      IDENTIFICATION AND IS ATTACHED HERETO.)

24     Q.    BY MR. MARTINEAU:  DO YOU SEE THAT DOCUMENT?

25     A.    YES.

43

SEIJAS COURT REPORTERS

1    Q.    THAT IS A DOCUMENT, IS IT NOT, IT'S A MEMO FROM

2    CHUCK ALSTON TO INTERESTED PARTIES -- CORRECT -- DATED JULY

3    7, 1999?

4    A.    YES.  I'D LIKE TO READ IT REAL QUICK.

5    Q.    YEAH.  TAKE YOUR TIME.

6    A.    YES.

7    Q.    CAN YOU JUST DESCRIBE WHAT THIS PARTICULAR

8    DOCUMENT CONCERNS.

9    A.    THIS IS A RECAP OF A MEETING WITH CHUCK ALSTON,

10   THEN EXECUTIVE DIRECTOR OF THE DLC, AND OTHER STAFFERS TO

11   TALK ABOUT MOVING THE TRAINING PROGRAM, LEADERSHIP

12   WORKSHOPS FORWARD FROM THAT POINT ON.

13   Q.    AND JUST REFERENCE SUBPARAGRAPH NO. 2.  IT

14   REFERENCES A $9,600 CONSULTING FEE.  DO YOU SEE THAT?

15   A.    YES.

16   Q.    DOES THAT REFRESH YOUR RECOLLECTION AS TO HOW

17   MUCH ANITA GOTTLIEB WAS PAID?

18   A.    I'M SURE THAT'S CORRECT, YES.

19   Q.    NOW, YOU SAID THAT THE DOCUMENT WAS IN REFERENCE

20   TO A MEETING TO DISCUSS HOW TO MOVE THE TRAINING PROGRAM

21   FORWARD?

22   A.    YES.

23   Q.    DID ANY CHANGES IN THE TRAINING PROGRAM TAKE

24   PLACE SUBSEQUENT TO THIS, THE TIME PERIOD REFERENCED IN

25   THIS DOCUMENT?

44

SEIJAS COURT REPORTERS

1    A.    YES.  I DON'T KNOW THE TIME FRAME EXACTLY, BUT,

2    YES, WE CHANGED THE STRUCTURE FROM A TWO DAY TO A ONE DAY

3    PROGRAM WHICH AFFECTED ANITA OBVIOUSLY.  WE AS I MENTIONED

4    EARLIER -- I DON'T KNOW THAT -- I DON'T KNOW THE CHRONOLOGY

5    OF WHEN THIS HAPPENED, BUT ULTIMATELY WE DID NOT USE ANITA.

6    AND I THINK THOSE ARE THE TWO.  AND THEN ULTIMATELY WE DID

7    TRAIN MORE PEOPLE TO FACILITATE THE WORKSHOPS, BUT THAT WAS

8    PROBABLY SOMETIME AFTER THIS MEETING.

9    Q.    GOOD.  HOW DID YOU GO ABOUT TRAINING PEOPLE TO

10   CONDUCT THE WORKSHOPS?

11   A.    WE HIRED ANOTHER FACILITATOR AT SOME POINT, BOB

12   LOUIS, WHO HAD A BACKGROUND IN CORPORATE TRAINING PROGRAMS,

13   AND HE BOTH FACILITATED ACTUAL LEADERSHIP WORKSHOPS, AND

14   ONE OF THE PROJECTS WE DID WITH HIM WAS TO IDENTIFY

15   IN-HOUSE DLC STAFF AND OUTSIDE PEOPLE WHO COULD FACILITATE

16   THE WORKSHOPS.  WE DID A TRAIN-THE-TRAINER SESSION.

17   Q.    TRAIN-THE-TRAINER SESSION.  VERY GOOD.  WERE YOU

18   ONE OF THE TRAINERS THAT BECAME -- THAT TRAINED UNDER THAT

19   PROGRAM THAT TRAIN-THE-TRAINERS PROGRAM?

20   A.    YES.

21   Q.    WHO ELSE WITHIN THE DLC STAFF BECAME TRAINERS OF

22   THE PROGRAM?

23   A.    WHO WAS PRESENT AT THE TRAIN THE TRAINERS AND

24   ACTUALLY DID TRAIN OR WHO DID -- WHO DID WE TRAIN TO TRAIN

25   OR WHO ACTUALLY THEN SUBSEQUENTLY TRAINED?

45

1       Q.   LET'S START BOTH, FIRST WHO PARTICIPATED IN THE

2    TRAIN-THE-TRAINERS SESSION AMONGST DLC STAFF?

3       A.   THE PEOPLE I REMEMBER ARE MYSELF, CHUCK ALSTON,

4    ED KILGORE.  I SUSPECT HOLLY PAGE.  AND THERE MAY HAVE BEEN

5    ONE OTHER PERSON FROM THE POLITICAL DEPARTMENT WOULD BE MY

6    RECOLLECTION.

7       Q.   FOR THE RECORD, WHO'S HOLLY PAGE?

8       A.   AT THAT TIME PROBABLY A DIRECTOR FOR STRATEGIC

9    DEVELOPMENT I SUSPECT WAS HER TITLE.  SHE'S CURRENTLY VICE

10   PRESIDENT OF THE DLC.

11      Q.   WAS MR. FROM ONE OF THE INDIVIDUALS WHO

12   PARTICIPATED IN THE TRAIN-THE-TRAINERS PROGRAM?

13      A.   I DON'T REMEMBER.  I DON'T REMEMBER.

14      Q.   OKAY.  FAIR ENOUGH.

15           I WANT TO SHOW YOU A DOCUMENT THAT'S BEEN

16   PREVIOUSLY MARKED AS GOVERNMENT'S 55.  DO YOU HAVE THAT

17   DOCUMENT IN FRONT OF YOU?

18      A.   YOU HAVE ALL THE THINGS I BROUGHT YOU.  I DIDN'T

19   NEED TO PRODUCE ANYTHING.

20      Q.   YOU HAVE BEFORE YOU, MS. COX, A DOCUMENT THAT HAS

21   BEEN PREVIOUSLY MARKED AS EXHIBIT 55.  DO YOU SEE THAT?

22      A.   YES.

23      Q.   THAT IS A MEMORANDUM DATED AUGUST 31, 1999 FROM

24   DOUG WILSON TO CHUCK ALSTON; CORRECT?

25      A.   YES.

46

SEIJAS COURT REPORTERS

1    Q.   FOR THE RECORD WHO IS DOUG WILSON?

2    A.   AT THAT TIME WOULD HAVE BEEN DLC'S FIELD DIRECTOR

3  OR POLITICAL DIRECTOR WAS PROBABLY HIS TITLE, ONE OF THE

4  TWO.

5    Q.   THE SUBJECT MATTER IS THE VALUES BASED TRAINING

6  THAT WE'VE BEEN TALKING ABOUT HERE TODAY; CORRECT?

7    A.   YES.

8    Q.   THERE'S A SECTION HERE ABOUT THE BACKGROUND OF

9  THE PROGRAM THAT WAS REFERENCED IN THE "NEW YORK TIMES"

10  ARTICLE THAT WE TALKED ABOUT TODAY?

11    A.   LET ME READ IT.

12    Q.   YES.

13    A.   UH-HUH.

14    Q.   IN THE VERY FIRST PARAGRAPH OF THE BACKGROUND

15  SECTION, MS. COX, THE DOCUMENT STATES THAT THESE SESSIONS

16  HAVE ALSO OFFERED OPPORTUNITIES FOR THE DLC POLITICAL TEAM

17  WORKING WITH ONE OR MORE KEY LOCAL SUPPORTERS TO IDENTIFY

18  POTENTIAL NEW DEMOCRATS AND EXPAND OUR NATIONWIDE NETWORK.

19    DO YOU SEE THAT?

20    A.   YES.

21    Q.   WHO COMPRISED THE DLC POLITICAL TEAM REFERENCED

22  IN THAT PARTICULAR STATEMENT?

23    A.   THAT WOULD HAVE BEEN THE FIELD

24  DEPARTMENT/POLITICAL DEPARTMENT.  SPECIFICALLY WHO

25  WAS -- WHAT ARE YOU ASKING ME?  I'M SORRY.

47

1          Q.    BOTH.    THAT'S THE DEPARTMENT THAT IS REFERENCED?

2          A.    THE DEPARTMENT THAT IS REFERENCED IS THE FIELD

3    DEPARTMENT OR POLITICAL DEPARTMENT.    WE'VE CALLED IT BOTH

4    OVER THE YEARS.

5          Q.    WHO ARE THE INDIVIDUALS THAT WERE PART OF THAT

6    DEPARTMENT TO YOUR RECOLLECTION AT THAT PARTICULAR POINT IN

7    TIME?

8          A.    AT THAT TIME PROBABLY DOUG WILSON, MYSELF, JEFF

9    VALENZUELA.    THE THREE OF US PROBABLY.

10         Q.    IS MR. ALSTON CONSIDERED PART OF THE POLITICAL

11   TEAM THAT WAS REFERENCED IN THIS PARTICULAR DOCUMENT?

12         A.    NO.

13         Q.    HOW ABOUT MR. FROM?    WAS HE PART OF THE POLITICAL

14   TEAM AS REFERENCED IN THIS DOCUMENT?

15         A.    NO.

16         Q.    NOW, THE DOCUMENT STATES THAT THE SESSIONS OFFER

17   OPPORTUNITIES FOR THAT POLITICAL TEAM TO IDENTIFY POTENTIAL

18   NEW DEMOCRATS AND EXPAND OUR NATIONWIDE NETWORK.

19               DO YOU SEE THAT?

20         A.    YES.

21         Q.    HOW DID THE TRAINING SESSIONS WORK TO ASSIST THE

22   DLC TO IDENTIFY POTENTIAL NEW DEMOCRATS?

23         A.    WHAT THAT MEANS IS THROUGH THE COURSE OF THE ONE

24   DAY, OR TWO DAY AT THAT TIME, WORKSHOPS, WE WOULD HAVE A

25   SENSE TO OBSERVE ELECTED OFFICIALS, AND BY SPENDING TIME


48

1    WITH THEM UNDERSTAND BETTER WHO SHARED OUR PHILOSOPHY AND

2    WHO MIGHT BE PARTNERS LATER IN HELPING US PROMOTE SPECIFIC

3    IDEAS BEYOND THE WORKSHOPS.

4        Q.    SO IS IT FAIR TO SAY THAT THESE WORKSHOPS HELPED

5    IDENTIFY WHAT MIGHT BE CALLED TRUE BELIEVERS OF THE DLC'S

6    POINT OF VIEW?

7        A.    YEAH.  OR I WOULD CALL IT, I WOULD CALL IT, I

8    WOULD RATHER CALL IT SOMETHING ALONG THE LINES OF LIKE

9    MINDED THINKERS.  PEOPLE WHO SHARED OUR PHILOSOPHY.

10       Q.    VERY GOOD.  CAN YOU TURN TO THE NEXT PAGE.  IT

11   STATES --

12       A.    CAN I --

13       Q.    ABSOLUTELY.  TAKE YOUR TIME.

14       A.    NO.  CAN I JUST MAKE A POINT ABOUT WHAT I JUST

15   SAID.  I WANTED TO BE CLEAR BECAUSE I SAID YES, BUT CAN I

16   RESTATE.  I REALLY DIDN'T MEAN YES.  YOU SAID WOULD YOU

17   CALL THEM TRUE BELIEVERS OF THE DLC, AND I SAID YES, BUT I

18   WOULD RATHER THAT BE SAY NO BECAUSE TRUE BELIEVERS OF THE

19   DLC, SOMETIMES PEOPLE AGREE WITH US ON A SPECIFIC ISSUE BUT

20   NOT ANOTHER.  SO I DON'T WANT TO GIVE THE IMPRESSION THAT,

21   YOU KNOW, IF WE IDENTIFIED THESE PEOPLE THEY ALL OF A

22   SUDDEN, YOU KNOW, HOOK, LINE AND SINKER WERE WITH US.  THEY

23   WERE PEOPLE WHO GENERALLY SHARED OUR PHILOSOPHY AND MIGHT

24   MAKE GOOD PARTNERS IN THE FUTURE.

25       Q.    VERY GOOD.  CAN YOU LOOK AT THE NEXT PAGE 01584.

49

SEIJAS COURT REPORTERS