1          A.    YES.

2          Q.    THE SECOND BULLET POINT SAYS, "FOR THE NEXT

3    PROGRAM YEAR, WE USE --" THESE ARE RECOMMENDATIONS AND

4    PROPOSALS, IF YOU WOULD AGREE WITH ME -- "WE USE ANITA AND

5    STEVE FOR TRAINING SESSIONS IN THESE FIVE SPECIFIC AREAS

6    WITH THESE CONSTITUENCIES."

7                DO YOU SEE THAT?

8          A.    YES.

9          Q.    THE FIRST AREA IS DEMOCRATIC GUBERNATORIAL STAFF.

10   DO YOU SEE THAT?

11         A.    YES.

12         Q.    DO YOU RECALL IF YOU FOCUSED THE TRAINING

13   SESSIONS ON DEMOCRATIC GUBERNATORIAL STAFF?

14         A.    THAT DID NOT HAPPEN.

15         Q.    DID THE DLC CONTACT DEMOCRATIC GUBERNATORIAL

16   STAFF ABOUT PARTICIPATION IN THE DLC TRAINING PROGRAM?

17         A.    PROBABLY.  PROBABLY.  BUT I DID NOT, SO I CAN'T

18   SWEAR TO THAT.

19         Q.    AND THE REFERENCE WAS TO DEMOCRATIC GUBERNATORIAL

20   STAFF, AND YOU'RE TALKING ABOUT TRAINING SESSIONS TO BE

21   HELD IN WASHINGTON IN JANUARY RIGHT BEFORE OR AFTER THE

22   NGA/DGA ANNUAL MEETING.  DO YOU SEE THAT?

23         A.    UH-HUH.

24         Q.    FOR THE RECORD, WHAT IS THE NGA/DGA?  WHAT IS

25   THAT IN REFERENCE TO?

1          A.    THAT IS IN REFERENCE TO THE NATIONAL GOVERNORS

2    ASSOCIATION AND THE DEMOCRATIC GOVERNORS ASSOCIATION.

3          Q.    ALSO IT INDICATES THAT, QUOTE, WE SHOULD ALSO

4    WORK THROUGH ANNE RUNG TO DETERMINE WHETHER RECENT

5    CONGRESSIONAL STAFF INTEREST IN THESE TRAINING SESSIONS

6    (STIMULATED BY THE 'NEW YORK TIMES' ARTICLE) IS SUFFICIENT

7    TO WARRANT A WASHINGTON SESSION WITH A SIZABLE

8    CONGRESSIONAL STAFF CONTINGENT - THE NDC COMES TO MIND.

9          DO YOU SEE THAT?

10         A.    YES.

11         Q.    FIRST, WHAT IS THE NDC?  WHAT DOES THAT REFER TO?

12         A.    THAT IS THE NEW DEMOCRAT COALITION.

13         Q.    IS THAT MEMBERS OF CONGRESS WHO ARE MEMBERS OF

14   THE NEW DEMOCRAT COALITION?

15         A.    YES.

16         Q.    DID STAFF MEMBERS FROM THE NEW DEMOCRAT COALITION

17   PARTICIPATE IN DLC TRAINING SESSIONS?

18         A.    NO, NOT IN -- I DO NOT BELIEVE WE DID A TRAINING

19   SESSION FOR -- I DON'T KNOW.  I DON'T KNOW.  I DO NOT -- I

20   DON'T RECALL US DOING A TRAINING SESSION FOR CONGRESSIONAL

21   STAFF IN '98 OR '99.

22         Q.    HOW ABOUT SUBSEQUENTLY?

23         A.    WE DID -- WE DID RECENTLY.  YES, WE DID A

24   CONGRESSIONAL STAFF TRAINING VERY RECENTLY WITHIN THE LAST

25   YEAR OR SO.

51

SEIJAS COURT REPORTERS

1      Q.    VERY GOOD.

2      A.    NOT IN CONJUNCTION WITH THE NDC.

3      Q.    WELL, WHAT DO YOU MEAN NOT IN CONJUNCTION WITH

4    THE NDC?

5      A.    YOU ASKED ME WHETHER -- I THINK YOU ASKED ME

6    SPECIFICALLY IF WE DID A CONGRESSIONAL STAFF TRAINING FOR

7    THE NDC.  THAT'S WHAT I HEARD.  MAYBE THAT'S NOT WHAT YOU

8    ASKED ME.  BUT WE DID A CONGRESSIONAL STAFF TRAINING THAT

9    WAS NOT LIMITED TO PARTICIPANTS OF THE NDC.

10     Q.    WHO WERE THE PARTICIPANTS FROM THE HILL, STAFFERS

11   FROM THE HILL WHO PARTICIPATED?

12     A.    I DIDN'T ATTEND THAT SESSION.  I DIDN'T ATTEND

13   THAT SESSION, SO I'M NOT EXACTLY SURE WHO WAS THERE.

14     Q.    WERE THEY STAFF PEOPLE OF DEMOCRAT MEMBERS OF

15   CONGRESS WHO PARTICIPATED?

16     A.    YEAH, YEAH.  I THINK SO.

17     Q.    THERE'S A REFERENCE DOWN BELOW IN THE LAST BULLET

18   POINT TO TRAINING THE TRAINERS.

19     A.    YES.

20     Q.    IS THAT THE SAME CONCEPT THAT YOU WERE TESTIFYING

21   TO EARLIER TODAY ABOUT TRAINING THE TRAINERS?

22     A.    YES.

23     Q.    AND SUBSEQUENTLY DLC STAFF MEMBERS DID BECOME THE

24   TRAINERS OR FACILITATORS OF THE PROGRAM?

25     A.    YES.  DLC STAFF MEMBERS AND SOME OUTSIDE PEOPLE,

1    YES.

2        Q.    VERY GOOD.  I JUST WANTED TO SHOW YOU A DOCUMENT

3    THAT HAS BEEN PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 57.

4            DO YOU SEE THAT?

5        A.    YES.

6        Q.    THIS IS A DOCUMENT THAT IS DATED -- IT'S A

7    MEMORANDUM DATED SEPTEMBER 2, 1999 FROM ANNE RUNG TO TOM

8    SUGAR; CORRECT?

9        A.    SUGAR, YES.

10       Q.    FOR THE RECORD, WHO IS ANNE RUNG?

11       A.    ANNE RUNG WAS AT THAT TIME DLC'S CONGRESSIONAL

12   LIAISON.

13       Q.    AND WHAT WERE HER DUTIES AND RESPONSIBILITIES AS

14   CONGRESSIONAL LIAISON?

15       A.    TO WORK WITH MEMBERS OF CONGRESS AND THEIR STAFFS

16   ON BEHALF OF THE DLC.

17       Q.    AND WHO IS TOM SUGAR?

18       A.    HE WOULD HAVE BEEN CHIEF OF STAFF FOR SENATOR

19   EVAN BAYH.

20       Q.    AND UNDER THE BACKGROUND SECTION OF THE --

21       A.    I'M GOING TO READ THIS IF YOU DON'T MIND.

22       Q.    TAKE YOUR TIME.  JUST READ THE BACKGROUND

23   SECTION.

24       A.    OKAY.

25       Q.    IT SAYS IN THAT FIRST SENTENCE, MS. COX, QUOTE,

SEIJAS COURT REPORTERS

1    THE DLC IN 1998 DESIGNED AND TESTED A PROGRAM TO TEACH

2    ELECTED OFFICIALS AND OTHER RISING POLITICAL LEADERS HOW TO

3    DEVELOP AND ARTICULATE A NEW DEMOCRAT GOVERNING AGENDA.

4    THE PROGRAM RELIES OF THE PROVEN TECHNIQUE OF EXPERIENTIAL

5    LEARNING WIDELY USED IN CORPORATE TRAINING PROGRAMS.   THE

6    TWO-DAY WORKSHOPS ARE DESIGNED TO TEACH THE PARTICIPANTS

7    THE ESSENTIALS OF THE NEW DEMOCRAT GOVERNING PHILOSOPHY AND

8    HOW TO TURN IT INTO EFFECTIVE POLITICAL MESSAGES AND POLICY

9    PROPOSALS RELEVANT TO THEIR LOCAL ISSUES.

10         DO YOU AGREE -- IS THAT AN ACCURATE STATEMENT OF

11   THE DESIGN AND PURPOSE OF THE DLC TRAINING PROGRAM?

12        A.   YEAH, YEAH.   ALTHOUGH WE HAD REALLY -- WE REALLY

13   FOCUSED ON ELECTED OFFICIALS.

14        Q.   AT THAT POINT IN TIME?

15        A.   YEAH.

16        Q.   SUBSEQUENTLY IS STATES THAT THE DLC ROLLED OUT

17   THE PROGRAM LAST SUMMER IN WASHINGTON, D.C.   THAT WOULD BE

18   THE SUMMER OF 1998.   AND HAS SINCE VISITED EIGHT STATES AND

19   WORKED WITH 105 ELECTED OFFICIALS.

20         DO YOU SEE THAT?

21        A.   YES.

22        Q.   SO THE FOCUS WAS ON STATE AND LOCAL ELECTED

23   OFFICIALS?

24        A.   THAT WOULD HAVE BEEN THE BULK OF THE AUDIENCE,

25   YEAH.

54

SEIJAS COURT REPORTERS

1      Q.    OF THE 105 ELECTED OFFICIALS REFERENCED IN THIS

2   PARTICULAR DOCUMENT, WERE THOSE ELECTED OFFICIALS

3   DEMOCRATS?

4      A.    YES.    PROBABLY.    I WOULD HAVE TO LOOK AT LISTS TO

5   CONFIRM EVERY SINGLE PERSON, BUT I WOULD SAY YES.

6      Q.    AND THEN THE LAST, THE NEXT PAGE INDICATES THE

7   WORKSHOP CONTENT, AND I JUST WANT TO MAKE SURE THAT I

8   UNDERSTAND THAT UNDER WORKSHOP CONTENT THERE'S A -- IT'S IN

9   THE SECOND BULLET POINT.    "THE CONTENT INCLUDED A

10  COMPARISON OF NEW DEMOCRAT VALUES AS OPPOSED TO THOSE

11  ADVANCED BY THE TRADITIONAL RIGHT AND LEFT.    A KEY

12  TECHNIQUE IS TO ANALYZE THE CONTENT OF SPEECHES BY MAJOR

13  POLITICAL FIGURES."

14          DO YOU SEE THAT?

15     A.    YES.

16     Q.    IS THAT AN ACCURATE STATEMENT OF WHAT ONE ASPECT

17  OF THE CONTENT OF THE PROGRAM AS YOU PARTICIPATED IN IT?

18     A.    THIS WAS CONSISTENT WITH WHAT I TESTIFIED WITH

19  EARLIER IN TERMS OF THE PEOPLE THAT -- THE SPEECHES THAT

20  WERE USED, THE THREE SPEECHES THAT WERE USED.

21     Q.    VERY GOOD.    I HAVE A COUPLE MORE DOCUMENTS, AND

22  THEN WE'LL TAKE A BREAK.

23          LET ME SHOW YOU A DOCUMENT THAT WE'LL HAVE MARKED

24  AS EXHIBIT 149.

25          (DEFENDANT'S EXHIBIT 149 WAS MARKED FOR

SEIJAS COURT REPORTERS

1          IDENTIFICATION AND IS ATTACHED HERETO.)

2          Q.   BY MR. MARTINEAU:  CAN YOU IDENTIFY THAT DOCUMENT

3     FOR ME?

4          A.   IT IS A LETTER TO A FORMER COLLEAGUE OF YOURS,

5     NANCY CHARD, WHO HAD AGREED TO JOIN THE DLC LEGISLATIVE

6     ADVISORY BOARD.

7          Q.   AND FOR THE RECORD, WHAT IS THE DLC LEGISLATIVE

8     ADVISORY BOARD?

9          A.   IT WAS A GROUP OF STATE LEGISLATORS WHO WERE TO

10    GIVE -- TO HELP THE DLC DEVELOP ITS PROGRAMMING AND ITS

11    IDEA DEVELOPMENT AT THE STATE AND LOCAL LEVEL.

12         Q.   IT STATES HERE, MR. FROM STATES TO SENATOR CHARD

13    OF VERMONT THAT, QUOTE, UNDER WISCONSIN STATE

14    REPRESENTATIVE ANTONIO RILEY'S CHAIRMANSHIP, THIS GROUP

15    WILL BE PIVOTAL TO OVERCOMING WHAT I SEE AS THE BIGGEST

16    CHALLENGE FACING THE NEW DEMOCRAT MOVEMENT TODAY; HOW TO

17    BUILD A NATIONAL NETWORK TO ENSURE THE CHANGES WE'VE MADE

18    IN THE PARTY AND THE COUNTRY WILL BE SUSTAINED.

19         DO YOU SEE THAT?

20    A.   YES.

21    Q.   DID YOU AGREE THAT THAT IS --

22    A.   IT'S MISSING A PERIOD.

23    Q.   IT'S MISSING A PERIOD.  DO YOU AGREE THAT THE

24    LEGISLATIVE ADVISORY BOARD WAS ESTABLISHED TO HELP BUILD A

25    NATIONAL NETWORK TO ENSURE THAT THE CHANGES MADE IN THE

56

SEIJAS COURT REPORTERS

1    DEMOCRATIC PARTY IN THE COUNTRY WILL BE SUSTAINED?

2        A.    I THINK THAT THE DLC'S STATE LEGISLATIVE ADVISORY

3    BOARD WAS DEVELOPED TO HAVE A GROUP OF ELECTED OFFICIALS

4    WHO GENERALLY SHARED OUR PHILOSOPHY HELP US CONTINUE TO

5    PROMOTE IDEAS THAT WERE CONSISTENT WITH OUR PHILOSOPHY OVER

6    TIME, YES.

7        Q.    AND ON THAT SAME LINE OF REASONING, MR. FROM

8    STATES HERE IN THE LAST PARAGRAPH, "AS THE FIRST ORDER OF

9    BUSINESS, THE GROUP LAID OUT ITS GOALS TO BUILD A STATE

10   LEGISLATIVE NETWORK OF LIKE MINDED LEADERS AND EMPOWER THEM

11   WITH NEW DEMOCRATIC IDEAS."

12            IS THAT WHAT YOU MEAN BY YOUR TESTIMONY HERE

13   TODAY?

14       A.    LET ME READ THAT AGAIN.  I'M SORRY.

15       Q.    SURE.

16       A.    YEAH, YES.

17       Q.    AND MR. FROM INDICATES THAT IF SENATOR CHARD IS

18   INTERESTED THAT YOU WOULD SET UP CONFERENCE CALLS WITH

19   YOURSELF AS FIELD DIRECTOR TO DISCUSS AND PROMOTE THAT

20   PARTICULAR GOAL; IS THAT CORRECT?

21       A.    NO, THAT'S NOT CORRECT.  THAT I WOULD -- NOT

22   NECESSARILY I SHOULD SAY.  THAT I WOULD FACILITATE THE

23   GROUP TALKING TOGETHER ON A REGULAR BASIS EITHER WITH --

24   SOMETIMES WITH GUEST SPEAKERS, SOMETIMES NOT, BUT, YES, I

25   WOULD FACILITATE, NOT NECESSARILY THAT I WOULD BE THE

57

SEIJAS COURT REPORTERS

1    FEATURED GUEST AT EACH CONFERENCE CALL.

2         Q.    UNDERSTAND.  AND DID YOU FACILITATE CONFERENCE

3    CALLS AMONGST STATE AND LOCAL LEGISLATIVE LEADERS FOR THIS

4    PARTICULAR PURPOSE?

5         A.    WE HAD CALLS TO TALK ABOUT HOW THE DLC COULD WORK

6    WITH STATE LEGISLATORS ON PROMOTING IDEAS, YES.

7         Q.    AND HOW OFTEN DID THOSE CALLS TAKE PLACE?

8         A.    NOT VERY REGULARLY.  IF I -- NOT VERY REGULARLY.

9    PROBABLY QUARTERLY OR SO AT BEST.

10        Q.    APPROXIMATELY HOW MANY STATE AND LOCAL ELECTED

11   OFFICIALS WOULD PARTICIPATE IN THOSE CONFERENCE CALLS?

12        A.    OH, ANYWHERE FROM, YOU KNOW, FIVE TO TEN PROBABLY

13   USUALLY.

14        Q.    AND WHAT WAS THE FORMAT OF THE CALLS?  DID YOU

15   HAVE A GUEST SPEAKER, OR DID THE LEGISLATORS TALK AMONGST

16   THEMSELVES?  HOW DID THAT WORK?

17        A.    I DON'T REMEMBER IN THIS PARTICULAR TIME PERIOD,

18   BUT THEY WOULD -- THEY WOULD HAVE DONE BOTH.  WE WOULD HAVE

19   SOMETIMES HAD A SPEAKER THAT MIGHT BE TALKING ABOUT AN

20   ISSUE.  SOMETIMES ANTONIO RILEY WOULD CHAIR THE CALL THAT

21   WOULD BE MORE LOGISTICAL IN NATURE OR TO DISCUSS AN

22   UPCOMING EVENT OR PROGRAM.

23        Q.    THESE STATE AND LOCAL LEGISLATIVE LEADERS, THESE

24   WERE DEMOCRAT STATE AND LOCAL LEGISLATIVE LEADERS; IS THAT

25   CORRECT?

SEIJAS COURT REPORTERS

1    A.    YES.

2    Q.    I WANT TO SHOW YOU A DOCUMENT THAT HAS BEEN

3    PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 43.  IF YOU'LL

4    TAKE A MOMENT TO LOOK AT THAT PARTICULAR DOCUMENT.

5    A.    OKAY.

6    Q.    THIS IS A MEMO, IS IT NOT, DATED NOVEMBER 4, 1998

7    FROM DOUG WILSON TO HOLLY PAGE; CORRECT?

8    A.    YES.

9    Q.    FOR THE RECORD, AND SO WE CAN PUT THIS DOCUMENT

10   IN CONTEXT, WHO IS DOUG WILSON?

11   A.    HE WOULD HAVE AT THE TIME BEEN DLC POLITICAL

12   DIRECTOR.

13   Q.    AT THAT TIME WHAT WAS HOLLY PAGE'S POSITION?

14   A.    PROBABLY DIRECTOR OF STRATEGIC DEVELOPMENT,

15   PERHAPS VICE PRESIDENT.

16   Q.    IN THE VERY FIRST SENTENCE MR. WILSON WRITES,

17   "WHEN WE MET FOR LUNCH LATE LAST MONTH, YOU ASKED ME TO

18   GIVE YOU A 2 TO 3 PAGE SUMMARY OF MY THOUGHTS REGARDING A

19   DLC POLITICAL STRATEGY OUTREACH PROGRAM."

20       DO YOU SEE THAT?

21   A.    YES.

22   Q.    WHAT WAS THE DLC POLITICAL STRATEGY AND OUTREACH

23   PROGRAM?

24   A.    I HAVE NO IDEA WHAT HE'S TALKING ABOUT.  I

25   HAVEN'T SEEN THIS MEMO BEFORE, AND MANY OF THE THINGS IN

59

1   HERE WE CAN'T DO AND DIDN'T DO, SO I'M NOT EXACTLY SURE

2   WHAT HE'S REFERRING TO.

3       Q.   SO YOU'VE NEVER SEEN THIS DOCUMENT BEFORE?

4       A.   NO.

5       Q.   THERE IS ONE SECTION OF THE MEMO THAT REFERENCES

6   GOALS IN THE SECOND PAGE.  DO YOU SEE THAT?

7       A.   YES.

8       Q.   AND MR. WILSON WRITES UNDER GOALS, "A DLC

9   POLITICAL OUTREACH PROGRAM SHOULD NOT TRY TO DUPLICATE,

10  REPLACE OR SUPPLANT WHAT GOES ON AT THE DNC."

11          DO YOU SEE THAT?

12      A.   YES.

13      Q.   WHAT -- FIRST, WHAT IS THE DNC?

14      A.   THE DEMOCRATIC NATIONAL COMMITTEE.

15      Q.   AND HE SAYS, "INSTEAD, WE SHOULD FOCUS ON HOW WE

16  CAN MOST EFFECTIVELY IMPLEMENT THE NEXT LOGICAL STEPS IN

17  DLC DEVELOPMENT."

18          DO YOU SEE THAT?

19      A.   YES.

20      Q.   THE FIRST STEP WAS "IDENTIFYING, ENCOURAGING MEN

21  AND WOMEN WHO ARE RESPECTED AND INFLUENTIAL MEMBERS OF

22  THEIR COMMUNITY TO RUN FOR STATE AND NATIONAL LEGISLATIVE

23  AND ADMINISTRATIVE OFFICES AS DEMOCRATS CARRYING THE NEW

24  DEMOCRAT MESSAGES."

25      A.   YES.

SEIJAS COURT REPORTERS

1    Q.    WAS ONE OF THE PURPOSES OF THE DLC'S POLITICAL

2    OUTREACH PROGRAM TO ENCOURAGE MEN AND WOMEN WHO ARE

3    RESPECTED IN THEIR COMMUNITIES TO RUN AS NEW DEMOCRATS?

4    MR. BAUER:    COUNSEL, I'M GOING TO OBJECT BECAUSE SHE

5    JUST TOLD YOU THAT SHE DIDN'T KNOW HOW IT WAS THAT THIS

6    PARTICULAR PROGRAM CAME TO BE SO NAMED OR THAT IT WAS

7    CHARACTERIZED IN THE WAY IT APPEARS IN THIS MEMORANDUM.

8    MR. MARTINEAU:    UNDERSTAND.

9    Q.    DOES THIS DOCUMENT REFRESH YOUR RECOLLECTION AS

10   TO WHAT THE PURPOSE OF THE DLC POLITICAL OUTREACH PROGRAM

11   WAS IN 1998?

12   A.    THE DLC'S POLITICAL OUTREACH PROGRAM DIDN'T

13   REMOTELY INCLUDE ANYTHING LIKE BULLET POINT NO. 1.  DOUG

14   WILSON WAS PROBABLY NEWLY HIRED AT THIS POINT, AND MAY OR

15   MAY NOT HAVE BEEN AWARE OF WHAT THE DLC COULD DO.  THE

16   DLC'S POLITICAL OUTREACH PROGRAM HAS NEVER, EVER INCLUDED

17   RECRUITING CANDIDATES FOR OFFICE.

18   Q.    FAIR ENOUGH.  I HAVE ONE OTHER DOCUMENT I WANT TO

19   SHOW YOU.  THIS DOCUMENT HAS PREVIOUSLY BEEN MARKED AS NO.

20   59.  I JUST WANT YOU TO IDENTIFY THIS DOCUMENT.  ARE YOU

21   THE AUTHOR OF THIS PARTICULAR DOCUMENT?

22   A.    I WORKED ON THIS DOCUMENT.  I'M NOT THE SOLE OR

23   PERHAPS EVEN THE PRIMARY AUTHOR.

24   Q.    AND JUST FOR THE RECORD, THE DOCUMENT IS DATED

25   7-21-99, AND THE SUBJECT MATTER IS NEW DEMOCRATS ONLINE

61

SEIJAS COURT REPORTERS

1    BUSINESS PLAN.

2        A.    I'M SORRY.  I'M SORRY.  I DID NOT -- I NEED TO GO

3    SLOWER.  I THOUGHT IT WAS A DIFFERENT DOCUMENT.  I WAS NOT

4    INVOLVED IN THE WRITING OF THIS DOCUMENT.

5        Q.    IT SAYS IN THE UPPER LEFT-HAND CORNER, "DEBBIE

6    COX - BIZPLAN 7-20-99."

7        A.    I PROBABLY RECEIVED IT AS AN E-MAIL, AND THIS

8    REFERS TO THE FACT THAT IT WAS PRINTED OUT FROM MY E-MAIL.

9    I'M SURE I'VE SEEN IT.  I DIDN'T HELP DRAFT IT.

10        Q.    DO YOU KNOW WHO DRAFTED THIS MEMO?

11        A.    LET ME LOOK AT IT.

12        Q.    TAKE YOUR TIME.

13        A.    I DON'T KNOW WHO DRAFTED THIS.

14        Q.    I JUST HAVE A QUESTION.  THE VERY FIRST SENTENCE

15    STATES UNDER SUMMARY, "THE DEMOCRATIC LEADERSHIP COUNCIL

16    AND ITS AFFILIATED THINK TANK, THE PROGRESSIVE POLICY

17    INSTITUTE, IN 1994 ESTABLISHED A WORLD WIDE WEBSITE TO POST

18    PUBLIC POLICY REPORTS AND BRIEFINGS AND TO SERVE AS A

19    SOURCE OF INFORMATION ABOUT THE DLC, PPI AND THE

20    PROGRESSIVE FOUNDATION."

21            DO YOU SEE THAT?

22        A.    YES.

23        Q.    WERE YOU INVOLVED IN THE ESTABLISHMENT, MS. COX,

24    OF THE DLC WEBSITE?

25        A.    NO.

62

SEIJAS COURT REPORTERS

1    Q.    WHO ESTABLISHED THE DLC WEBSITE?

2    A.    I DON'T KNOW.  CHUCK ALSTON I SUSPECT WOULD HAVE

3  BEEN ONE OF THE PEOPLE INVOLVED.  WE ALSO HAD A STAFF

4  PERSON WHO RAN THE DLC WEBSITE, BUT I DON'T RECALL WHETHER

5  IT WAS IN EXISTENCE BEFORE HE WAS HIRED OR WHETHER HE

6  HELPED CREATE IT.

7    Q.    SUBSEQUENTLY DID AN OUTSIDE PARTY MANAGE THE

8  WEBSITE, OR HAS IT ALWAYS BEEN DONE IN-HOUSE BASED UPON

9  YOUR UNDERSTANDING?

10    A.    CLARIFY THE QUESTION FOR ME.  I'M SORRY.

11    Q.    WELL, WHO MANAGED THE DLC WEBSITE DURING THE

12  YEARS 1998 AND 1999?

13    A.    IN TERMS OF WHAT?  WAS IT HOSTED AT THE DLC?

14    Q.    YES.

15    A.    I DON'T KNOW WHETHER IT WAS HOSTED INTERNALLY OR

16  EXTERNALLY AT THAT TIME.

17    Q.    IF YOU HAD AN ITEM IN YOUR POSITION THAT YOU

18  WANTED POSTED ON THE DLC'S WEBSITE, HOW DID YOU GO ABOUT

19  MAKING THAT PARTICULAR THING HAPPEN?

20    A.    TO WORK WITH THE PERSON WHO RAN THE DLC WEBSITE,

21  TO COORDINATE WITH THEM.  YOU KNOW, I DON'T KNOW WHO THAT

22  WOULD HAVE BEEN AT THAT TIME.  IT COULD HAVE BEEN ONE OF

23  SEVERAL PEOPLE.  I'M HAPPY TO GIVE YOU NAMES OF FOLKS IF

24  THAT'S HELPFUL.  IT COULD HAVE BEEN ELIZA CULBERTSON, OUR

25  MIS DIRECTOR, OR WE HAD A GENTLEMAN WHOSE NAME IS RANDOLPH

63

SEIJAS COURT REPORTERS

1    CORT WHO ULTIMATELY BECAME MANAGER OF THE DLC WEBSITE, AND

2    I'M NOT SURE, LIKE I SAID, WHAT YEARS WHO WAS RUNNING IT.

3    SO I WOULD HAVE TALKED TO -- IF I WANTED TO POST SOMETHING

4    ON OUR SITE, I WOULD HAVE TALKED TO WHOEVER WAS MANAGING

5    THE SITE ABOUT POSTING IT.

6        Q.    WHAT IF SOMEONE FROM THE PROGRESSIVE POLICY

7    INSTITUTE, WHAT IF THEY WANTED TO POST SOMETHING ON THE

8    WEBSITE?  WHAT STEPS TO YOUR KNOWLEDGE WOULD THAT PERSON

9    TAKE?

10       A.    THEY WOULD HAVE TALKED TO THE SAME PERSON.  THAT

11   PERSON WOULD HAVE BEEN PROBABLY -- WOULD HAVE BEEN A JOINT

12   EMPLOYEE OR HAD BEEN AN EMPLOYEE AT BOTH ORGANIZATIONS.

13       Q.    FAIR ENOUGH.

14             LET'S TAKE A BREAK.

15       THE VIDEOGRAPHER:  IT'S APPROXIMATELY 11:28.  IT'S THE

16   END OF TAPE NO. 1.  WE'RE OFF THE RECORD.

17       (A RECESS WAS TAKEN.)

18       THE VIDEOGRAPHER:  TIME IS APPROXIMATELY 12:03.  START

19   OF TAPE NO. 2.  WE'RE ON RECORD.

20       Q.    BY MR. MARTINEAU:  MS. COX, I'M GOING TO SHOW YOU

21   A DOCUMENT THAT I WILL HAVE MARKED AS EXHIBIT 150.

22       (DEFENDANT'S EXHIBIT 150 WAS MARKED FOR

23        IDENTIFICATION AND IS ATTACHED HERETO.)

24       Q.    BY MR. MARTINEAU:  THIS DOCUMENT, IS IT NOT, IS

25   ONE OF THE DOCUMENTS THAT YOU PRODUCED PURSUANT TO THE

64

SEIJAS COURT REPORTERS

1    GOVERNMENT'S SUBPOENA?

2         A.   YES.

3         Q.   AND CAN YOU IDENTIFY THAT DOCUMENT FOR ME.

4         A.   IT WAS A PROPOSAL THAT AN OUTSIDE GROUP CAME IN

5    TO, TO PITCH US ON WORKING WITH US ON OUR LEADERSHIP

6    WORKSHOPS.  WE DID NOT HIRE THEM.

7         Q.   WHAT WAS THIS OUTSIDE -- WHAT WAS THE NAME OF

8    THIS GROUP?

9         A.   I DON'T REMEMBER.

10        Q.   IN THE SECOND PAGE THERE'S A REFERENCE TO AMOUNTS

11   OF THE COST, 200 TO $400?

12        A.   UH-HUH.

13        Q.   WHEN THE DLC LEADERSHIP WORKSHOP CAME ON BOARD IN

14   1998, DID THE PARTICIPANTS PAY TO PARTICIPATE IN THE

15   WORKSHOP?

16        A.   NO.

17        Q.   WHO FINANCED THE WORKSHOP?

18        A.   DLC.

19        Q.   IN TOTAL?

20        A.   YES.  SOME -- YES.

21        Q.   DID THE DLC PAY FOR THE TRAVEL EXPENSES FOR THE

22   STATE AND LOCAL ELECTED OFFICIALS TO TRAVEL TO WASHINGTON

23   FOR THE FIRST TRAINING PROGRAM?

24        A.   FOR THE FIRST ONE, YES.

25        Q.   AND WAS THERE A SPECIFIC DOLLAR AMOUNT THAT EACH

65

SEIJAS COURT REPORTERS

1    PERSON RECEIVED, OR DID THEY JUST SUBMIT THEIR OWN

2    INDIVIDUAL EXPENSES TO THE DLC?

3        A.    I DON'T REMEMBER HOW WE REIMBURSED, BUT I DON'T

4    THINK WE HAD A SET DOLLAR AMOUNT.

5        Q.    BUT THE DLC DID PAY FOR ALL OF THE TRAVEL AND

6    LODGING AND MEALS EXPENSES FOR THE PARTICIPANTS?

7        A.    FOR AT LEAST THE TRAVEL, FOR THE TRAVEL, THE

8    MEALS THAT WERE PART OF THE WORKSHOP.  WE PROVIDED LUNCH,

9    FOR EXAMPLE, AND BREAKFAST, I THINK, AND LODGING.

10       Q.    VERY GOOD.

11       THE VIDEOGRAPHER:  COUNSEL, YOU MIGHT WANT TO PUT ON

12   YOUR MIKE.  IT WILL REACH RIGHT OVER THERE.

13       MR. MARTINEAU:  DID YOU GET WHAT I JUST SAID?

14       THE VIDEOGRAPHER:  YES.

15       MR. MARTINEAU:  I FORGOT ABOUT THAT.  IT MAKES IT A

16   LOT EASIER.

17       MR. BAUER:  NEXT ONE?

18       MR. MARTINEAU:  WHY DON'T YOU JUST BRING --

19       MR. BAUER:  YOU WANT ME TO BRING THE ENTIRE PACKET?

20       MR. MARTINEAU:  YEAH.  LET ME BRING THE PACKET.  DON'T

21   MIX THEM UP.

22       MR. BAUER:  I'M NOT MIXING THEM UP.  JUST IN ORDER.

23   JUST IN ORDER.

24       Q.    BY MR. MARTINEAU:  MS. COX, I'M SHOWING YOU A

25   DOCUMENT THAT WE WILL HAVE MARKED AS EXHIBIT 151.

66

SEIJAS COURT REPORTERS

1          (DEFENDANT'S EXHIBIT 151 WAS MARKED FOR

2           IDENTIFICATION AND IS ATTACHED HERETO.)

3          Q.    BY MR. MARTINEAU:   MS. COX, CAN YOU IDENTIFY THAT

4      DOCUMENT FOR ME.

5          A.    IT IS AN EARLY, EARLY DRAFT AGENDA OF THE

6      LEADERSHIP WORKSHOPS.

7          Q.    THAT IS DATED 3-20-1998?

8          A.    YES.

9          Q.    THAT WOULD BE A TIME PERIOD BEFORE THE FIRST

10     TRAINING PROGRAM THAT OCCURRED IN JUNE OF 1998?

11         A.    THAT'S RIGHT.

12         Q.    UNDER THE VERY FIRST ENTRY, EIGHT O'CLOCK,

13     "WELCOME REMARKS/ICE BREAKER EXERCISE (AL, A LEGISLATOR,

14     OTHER DLC REP).   DO YOU SEE THAT?

15         A.    UH-HUH.

16         Q.    THERE'S A HANDWRITTEN NOTATION, "WHAT IS THE

17     DEMOCRATIC PARTY."   WHOSE HANDWRITING NOTATION IS THAT?

18         A.    THAT'S MY HANDWRITING.

19         Q.    AND WHY DID YOU INDICATE THAT AS PART OF THE

20     WELCOME AND REMARKS WHAT IS THE DEMOCRATIC PARTY WOULD BE A

21     TOPIC?

22         A.    I BELIEVE IT WAS ONE IDEA FOR A DISCUSSION OF

23     WHAT THE ICE BREAKER EXERCISE WOULD BE.   ULTIMATELY THAT'S

24     NOT WHAT WE USED.

25         Q.    WHY DID YOU NOT USE THAT PARTICULAR TOPIC?

SEIJAS COURT REPORTERS

1          A.    IT WASN'T -- IT WASN'T ENTIRELY CONSISTENT WITH

2     THE REST OF THE DAY WHICH WAS MORE FOCUSED ON VALUES BASED

3     POLICY DEVELOPMENT.

4          Q.    I'M GOING TO SHOW YOU A DOCUMENT, COMPOSITE

5     DOCUMENT THAT WILL BE MARKED AS EXHIBIT 152.

6          (DEFENDANT'S EXHIBIT 152 WAS MARKED FOR

7               IDENTIFICATION AND IS ATTACHED HERETO.)

8          Q.    BY MR. MARTINEAU:  MS. COX, COULD YOU IDENTIFY

9     THAT PARTICULAR DOCUMENT FOR ME.

10         A.    THIS WAS A DRAFT AGENDA FOR THE FIRST LEADERSHIP

11    WORKSHOP IN WASHINGTON, D.C.

12         Q.    DID THIS PARTICULAR AGENDA -- WAS THIS PARTICULAR

13    AGENDA THE ONE THAT WAS ADOPTED AND USED AT THE FIRST

14    TRAINING PROGRAM IN WASHINGTON, D.C.?

15         A.    I DON'T KNOW.  I DIDN'T READ IT CAREFULLY.

16               YES, ROUGHLY.  I BELIEVE WE CHANGED THE QUESTION,

17    THE ICE BREAKER QUESTION AGAIN TO SOMETHING ALONG THE LINES

18    OF WHY ARE YOU HERE, BUT ROUGHLY IT'S THE AGENDA.

19         Q.    OKAY.  NOW, UNDER THE AGENDA, THE LAST ITEM IS

20    NO. 5, THERE'S TWO FIVES, THE SECOND FIVE SAYS THAT AS A

21    RESULT OF THE WORKSHOP PARTICIPANTS WILL RECOGNIZE THAT

22    THERE IS A COMMUNITY OF LIKE MINDED ELECTED OFFICIALS IN

23    THEIR STATE (AND AROUND THE COUNTRY) AND COMMIT TO FINDING

24    WAYS TO CONTINUE TO WORK TOGETHER.

25               DO YOU SEE THAT?

68

SEIJAS COURT REPORTERS

1          A.    YES.

2          Q.    WHO SPOKE TO THAT PARTICULAR ISSUE THAT IS LISTED

3    ON THE AGENDA?

4          A.    I DON'T REMEMBER WHO DID IT THE VERY FIRST

5    WORKSHOP.   IT'S POSSIBLE THAT I DID IT.   IT'S POSSIBLE

6    THAT -- IT'S PROBABLE THAT I DID IT.   IT'S PROBABLE THAT I

7    DID IT.

8          Q.    SINCE IT'S PROBABLE THAT YOU DID IT, WHAT DID YOU

9    MEAN WHEN YOU SAY THAT THERE'S A COMMUNITY OF LIKE MINDED

10   ELECTED OFFICIALS IN THEIR STATE AND AROUND THE COUNTRY?

11         A.    WELL, AGAIN, I THINK THE WORKSHOPS WERE -- ONE OF

12   THE GOALS OF THE WORKSHOPS WAS THAT PEOPLE WHO FELT -- THAT

13   SHARED OUR PHILOSOPHY WOULD THEN AFTER THE WORKSHOP HELP

14   AMPLIFY THE DLC'S MESSAGE AND PHILOSOPHY THROUGH SPECIFIC

15   IDEAS.   THAT WAS THE GOAL THERE WAS TO TALK ABOUT WAYS TO

16   DO THAT.   WE ULTIMATELY DIDN'T HAVE ENOUGH SPECIFICS OF

17   WHAT WE WERE ASKING AND DROPPED THAT, DROPPED THAT AGENDA

18   ITEM IN LATER WORKSHOPS.

19         Q.    NOW, THERE'S ANOTHER DOCUMENT ATTACHED TO THIS

20   DOCUMENT.   I'LL REFER YOUR ATTENTION TO IT.   THE DOCUMENT

21   IS ENTITLED "ON-CAMERA INTERVIEW TIPS."

22              DO YOU SEE THAT?

23         A.    YES.

24         Q.    AND IT HAS ENTRIES FOR THE "WARDROBE" BROKEN DOWN

25   FOR "MEN" AND "WOMEN" AND MATTERS TO CONSIDER.   DO YOU SEE

69

1    THAT?

2        A.    YES.

3        Q.    WHAT WAS THE PURPOSE IN THE DLC LEADERSHIP

4    TRAINING PROGRAM OF OFFERING THE PARTICIPANTS ON-CAMERA

5    INTERVIEW TIPS?

6        A.    WHAT WAS THE PURPOSE OF US DOING THIS SEGMENT OF

7    THE WORKSHOP?

8        Q.    EXACTLY.

9        A.    I -- I DON'T KNOW THAT I KNOW THE ANSWER TO THAT

10    QUESTION.  I THINK ONE OF THE GOALS WAS TO TRY TO HELP

11    PEOPLE BE ABLE TO BETTER COMMUNICATE THEIR POLICY IDEAS.

12    AGAIN, WE ONLY DID THIS SECTION ONCE, AND IT WASN'T OVERLY

13    EFFECTIVE, AND IT MADE THE WORKSHOP TOO LONG, AND IT WASN'T

14    CENTRAL TO THE WORKSHOP'S GOALS, SO WE ONLY DID THIS AT THE

15    PILOT WORKSHOP.

16        Q.    THE PILOT WORKSHOP BEING THE FIRST WORKSHOP?

17        A.    THE WASHINGTON WORKSHOP.

18        Q.    THE LAST DOCUMENT IN THIS EXHIBIT IS ENTITLED,

19    QUOTE, SOME KEY FACTORS FOR NEW DEMOCRATS TO CONSIDER TO

20    GAIN MORE VISIBILITY IN THE MEDIA, UNQUOTE.

21            DO YOU SEE THAT?

22        A.    YES.

23        Q.    WHAT WAS THE PURPOSE OF THIS SEGMENT OF THE

24    WORKSHOP?

25        A.    SAME THING.  IT WAS -- THESE WERE TWO HANDOUTS

70

SEIJAS COURT REPORTERS

1    THAT WERE AS PART OF THE COMMUNICATION TIPS OR TO HELP

2    PEOPLE BE ABLE TO BE MORE -- TO GET MORE ATTENTION FOR

3    THEIR IDEAS AND THEIR POLICIES.

4        Q.    WAS ONE OF THE TIPS THAT THE DLC OFFERED THE

5    PARTICIPANTS FOCUSED ON HOW TO WRITE A MORE EFFECTIVE PRESS

6    RELEASE FOR THEIR POLICIES?

7        A.    NO.  WE DIDN'T SPEAK SPECIFICALLY TO PRESS

8    RELEASES.  THIS -- NO.

9        Q.    WHAT ABOUT DRAFTING THEIR RESUME, POLITICAL

10   RESUME FOR -- THAT PERTAINS TO THE STATE AND LOCAL ELECTED

11   OFFICIALS?

12       A.    NO.  WE DIDN'T TALK ABOUT THAT.

13       MR. BAUER:  AND THE EXHIBIT NUMBER ON THAT COUNSEL,

14   PLEASE.

15       MR. MARTINEAU:  THAT WAS 152.

16       Q.    MS. COX, I'M GOING TO SHOW YOU A DOCUMENT THAT

17   WE'LL HAVE MARKED AS EXHIBIT 153.

18       (DEFENDANT'S EXHIBIT 153 WAS MARKED FOR

19        IDENTIFICATION AND IS ATTACHED HERETO.)

20       Q.    BY MR. MARTINEAU:  YOU HAVE BEFORE YOU A DOCUMENT

21   MARKED EXHIBIT 153.  DO YOU SEE THAT DOCUMENT?

22       A.    YES, I SEE IT.

23       Q.    CAN YOU FIRST IDENTIFY THAT DOCUMENT FOR ME.

24       A.    IT'S AN AGENDA FROM A JANUARY 23, 1998 MEETING

25   ABOUT -- BRAINSTORMING SESSION ABOUT OUR LEADERSHIP

71

SEIJAS COURT REPORTERS

1    WORKSHOPS.

2         Q.   AND WHO WOULD BE THE PARTICIPANTS IN THE

3    BRAINSTORMING SESSION REFERENCED IN THE DOCUMENT?

4         A.   I BELIEVE THIS -- I DON'T RECALL SPECIFICALLY.  I

5    BELIEVE THAT THE PARTICIPANTS WERE THE PEOPLE IN THE FIELD

6    DEPARTMENT/POLITICAL DEPARTMENT TEAM.

7         Q.   AND IT'S INDICATED HERE THAT THE LONG TERM GOAL

8    IS TRAINING TO HELP BUILD A NEW DEMOCRATIC NETWORK.  DO YOU

9    SEE THAT?

10        A.   UH-HUH.

11        Q.   IS THE DLC LEADERSHIP TRAINING PROGRAM PART OF

12   THE LONG TERM GOAL TO TRAIN AND BUILD A NEW -- THE NATIONAL

13   NETWORK OF NEW DEMOCRATIC LEADERS?

14        A.   CAN YOU REPEAT THAT QUESTION.  I'M SORRY.

15        Q.   IS ONE OF THE GOALS OF THE DLC -- STRIKE THAT.

16             WAS ONE OF THE PURPOSES OF THE LEADERSHIP

17   TRAINING PROGRAM TO HELP BUILD THE NATIONAL NETWORK OF NEW

18   DEMOCRATIC LEADERS AT THE STATE AND LOCAL LEVEL?

19        A.   ONE OF THE GOALS OF THE LEADERSHIP WORKSHOPS WAS

20   TO FIND LIKE MINDED ELECTED OFFICIALS AROUND THE COUNTRY.

21   THAT'S WHAT THE NATIONAL NETWORK REFERRED TO HERE.

22        Q.   VERY GOOD.  LET ME SHOW YOU ANOTHER DOCUMENT HERE

23   THAT -- ANOTHER PORTION OF THIS DOCUMENT.  THERE'S A

24   REFERENCE IN HANDWRITING HERE IN THIS DOCUMENT INVOLVING

25   THE BRAINSTORMING SESSION, AND THERE'S A REFERENCE TO THE

72

1    PENN POLE - POLITICAL CALCULUS THAT WORKS.

2         DO YOU SEE THAT?

3    A.    UH-HUH.

4    Q.    WHAT WAS THE PURPOSE OF THE PENN POLE IN THE

5    POLITICAL CALCULUS IN THE DLC LEADERSHIP TRAINING PROGRAM?

6    A.    THIS WAS A BRAINSTORMING SESSION SO I WANT TO

7    CLARIFY THE QUESTION THAT THIS WAS -- THE QUESTION WOULD BE

8    ABOUT WHAT WAS -- WAS THE QUESTION ABOUT THE DISCUSSION OR

9    IS THE QUESTION ABOUT THE -- ABOUT WHAT ACTUALLY ULTIMATELY

10   TOOK PLACE IN THE LEADERSHIP WORKSHOPS?

11   Q.    FIRST THE DISCUSSION THAT'S REFERENCED ON THIS

12   PARTICULAR DOCUMENT WITH RESPECT TO THE PENN POLE AND THE

13   POLITICAL CALCULUS.

14   A.    SO WHAT WAS THE DISCUSSION ABOUT THIS REFERENCE?

15   Q.    YES.

16   A.    I DON'T RECALL SPECIFICALLY, BUT I, I, I THINK

17   THAT ONE TOOL THAT THE DLC USES IN ENCOURAGING ELECTED

18   OFFICIALS OF ALL KINDS TO USE DLC TO PROMOTE NEW DEMOCRATIC

19   IDEAS IS TO CONVINCE THEM IT IS IN THEIR POLITICAL INTEREST

20   TO DO SO, AND THE DISCUSSION WAS WHETHER OR NOT REFERENCING

21   SOME OF OUR PUBLIC PENN POLES WOULD HAVE BEEN HELPFUL TO

22   THAT CAUSE.  WE ULTIMATELY DID NOT USE POLLING IN THE

23   LEADERSHIP WORKSHOPS.

24   Q.    THAT'S 153.

25         MS. COX, I'M GOING TO SHOW YOU A DOCUMENT THAT

73

SEIJAS COURT REPORTERS

1    WE'LL HAVE MARKED AS EXHIBIT 154.

2         (DEFENDANT'S EXHIBIT 154 WAS MARKED FOR

3          IDENTIFICATION AND IS ATTACHED HERETO.)

4         Q.    BY MR. MARTINEAU:  MS. COX, CAN YOU IDENTIFY

5    EXHIBIT 154?

6         A.    IT'S A BUSINESS PLAN FOR THE LEADERSHIP WORKSHOP

7    THAT WAS FROM 1999.

8         Q.    NOW, THE LEADERSHIP WORKSHOP PROGRAM ORIGINATED

9    IN 1998 I BELIEVE YOU TESTIFIED?

10        A.    YES.

11        Q.    NOW, IN 1999 WERE THERE CHANGES MADE TO THE

12   LEADERSHIP PROGRAM FROM WHAT WAS TAKING PLACE IN 1998?

13        A.    YES.  SOME CHANGES THAT WE'VE ALREADY DISCUSSED.

14   THE WORKSHOP I BELIEVE IN THAT TIME PERIOD WENT TO A --

15   SOMETIME IN AROUND THAT TIME PERIOD WENT TO A ONE DAY

16   WORKSHOP, ONE DAY PROGRAM AS OPPOSED TO A TWO DAY PROGRAM.

17   I DON'T KNOW WHETHER OR NOT AT THIS POINT IT WAS, WHICH ONE

18   IT WAS.

19        Q.    WHY WAS -- IF THE PROGRAM WAS ALREADY UP AND

20   RUNNING IN 1998 AND INTO 1999, WHAT WAS THE PURPOSE OF A

21   1999 BUSINESS PLAN FOR THE LEADERSHIP WORKSHOP?

22        A.    ONCE WE PILOTED THE WORKSHOPS IN 1998 AND WE

23   DECIDED THAT IF WE WANTED TO EXPAND THE PROGRAM

24   SIGNIFICANTLY WE WOULD NEED MORE FUNDING FOR IT.  SO THIS

25   IS A BUSINESS PLAN TO SEE IF PEOPLE WOULD BE INTERESTED IN

SEIJAS COURT REPORTERS

1    FUNDING OUR WORKSHOPS.

2         Q.    AND SO THIS WAS A PLAN THAT WOULD BE SENT OUT TO

3    PROSPECTIVE DONORS TO HELP FINANCE THE DLC LEADERSHIP

4    TRAINING PROGRAM?

5         A.    YES.

6         Q.    AND HOW WAS THE DLC LEADERSHIP TRAINING PROGRAM

7    FINANCED IN 1999?

8         A.    WE RECEIVED A CONTRIBUTION FROM A SUPPORTER

9    INTERESTED IN LEADERSHIP WORKSHOPS FOR A SINGLE YEAR, BUT

10   IT DIDN'T COVER ALL OF THE EXPENSES.  SOME OF IT WAS

11   FINANCED FROM DLC GENERAL FUNDS.

12        Q.    AND IS IT TRUE THAT IN 1999, JUST AS IN 1998, THE

13   PARTICIPANTS WHO PARTICIPATED IN THE PROGRAM, THEIR

14   EXPENSES WERE PAID BY THE DLC; IS THAT CORRECT?

15        A.    I'M SORRY?

16        Q.    DID THE DLC PAY THE EXPENSES FOR THE PARTICIPANTS

17   IN THE DLC LEADERSHIP TRAINING PROGRAM IN 1999 AS THEY DID

18   IN 1998?

19        A.    NOT ALWAYS, NO.

20        Q.    HOW MUCH WOULD IT COST AN INDIVIDUAL STATE

21   LEGISLATOR TO PARTICIPATE IN A DLC LEADERSHIP TRAINING

22   PROGRAM?

23        A.    SOME OF THE WORKSHOPS WE ASKED -- IT DEPENDED ON

24   THE PERSON HELPING US PUT TOGETHER THE WORKSHOPS.  IN SOME

25   WORKSHOPS WE ASKED PARTICIPANTS TO JOIN THE DLC AT THE $50

SEIJAS COURT REPORTERS

1    MEMBERSHIP LEVEL.  IN SOME WORKS SHOPS WE DID NOT.

2        Q.    AND DID THE DLC COVER THE EXPENSES OF THE

3    PARTICIPANTS THROUGHOUT 1998 AND 1999?

4        A.    WELL, THE EXPENSES AT THAT POINT WOULD BE LUNCH.

5    SO IN SOME CASES, YES.

6        Q.    WHAT ABOUT TRAVEL AND LODGING EXPENSES?

7        A.    FOR THE MOST PART THEY WERE DONE IN CITIES AND

8    STATES WHERE THEY LIVED.

9        Q.    OKAY.  VERY GOOD.

10        NOW I WANT TO HAVE AN EXHIBIT MARKED AS

11    GOVERNMENT'S EXHIBIT 155.  I'M SHOWING YOU A DOCUMENT,

12    REALLY A SERIES OF DOCUMENTS WHICH YOU PRODUCED HERE TODAY

13    MARKED AS GOVERNMENT'S EXHIBIT 155.

14        (DEFENDANT'S EXHIBIT 155 WAS MARKED FOR

15         IDENTIFICATION AND IS ATTACHED HERETO.)

16        Q.    BY MR. MARTINEAU:  CAN YOU IDENTIFY THOSE

17    DOCUMENTS FOR ME.

18        A.    THESE ARE THE CONTRACTS BETWEEN ANITA GOTTLIEB OR

19    GOTTLIEB & ASSOCIATES AND THE DLC FOR HER WORK FOR

20    LEADERSHIP WORKSHOPS.

21        Q.    OKAY.  AND AS YOU TESTIFIED EARLIER, ANITA

22    GOTTLIEB & ASSOCIATES IS THE -- SHE SERVED AS THE

23    FACILITATOR FOR THE DLC LEADERSHIP WORKSHOPS IN 1998 AND

24    1999?

25        A.    YES.


76

SEIJAS COURT REPORTERS

1      Q.   DID SHE HERSELF SERVE AS THE FACILITATOR, OR DID

2    SHE HAVE A STAFF WITH HER WHO ALSO SERVED AS THE

3    FACILITATOR?

4      A.   SHE SERVED AS THE FACILITATOR.  SHE ALSO USED TWO

5    OTHER PEOPLE TO HELP FACILITATE.

6      Q.   WHO WERE THOSE OTHER PEOPLE?

7      A.   A GENTLEMAN BY THE NAME OF STEVEN CHITWOOD AND A

8    GENTLEMAN BY THE NAME OF WES WATKINS, I BELIEVE.  I BELIEVE

9    HE FACILITATED ONE OF THE WORKSHOPS.  I COULDN'T SWEAR TO

10   THAT.  IT MAY HAVE JUST BEEN STEVEN AND ANITA.

11     Q.   ARE THESE TWO INDIVIDUALS EMPLOYEES OF GOTTLIEB &

12   ASSOCIATES OR ARE THEY OUTSIDE INDIVIDUALS?

13     A.   I DON'T KNOW HOW SHE PAID.  WE PAID ANITA.  SO

14   I'M NOT SURE WHAT THE CONTRACT WAS, HOW THAT RELATIONSHIP

15   WAS.

16     Q.   OKAY.  VERY GOOD.

17          I WANT TO SHOW YOU A DOCUMENT THAT WE'LL HAVE

18   MARKED AS EXHIBIT 156.

19     (DEFENDANT'S EXHIBIT 156 WAS MARKED FOR

20      IDENTIFICATION AND IS ATTACHED HERETO.)

21     Q.   BY MR. MARTINEAU:  I BELIEVE, MS. COX, I HAVE

22   BEFORE YOU A DOCUMENT THAT HAS BEEN MARKED AS GOVERNMENT'S

23   EXHIBIT 156.  DO YOU SEE THAT DOCUMENT?

24     A.   YEAH.

25     Q.   CAN YOU IDENTIFY THE DOCUMENT FOR ME.

77

1        A.    THE SERIES OF DOCUMENTS?

2        Q.    THE SERIES OF DOCUMENTS.

3        A.    THESE ARE INVOICES SUBMITTED FOR FEES AND

4    EXPENSES FROM GOTTLIEB & ASSOCIATES FOR VARIOUS TRAINING,

5    VARIOUS LEADERSHIP WORKSHOPS.

6        Q.    THOSE ARE PURSUANT TO THE CONTRACTS THAT WE

7    JUST IDENTIFIED IN THE PREVIOUS EXHIBIT?

8        A.    YES.

9        Q.    DO YOU KNOW IN 1998 WHAT THE TOTAL AMOUNT OF

10   DOLLARS THAT THE DLC PAID GOTTLIEB & ASSOCIATES TO CONDUCT

11   THE LEADERSHIP TRAINING PROGRAMS?

12       A.    IN 1998?

13       Q.    YES.

14       A.    WE'VE GOT THE CONTRACTS THERE, BUT I WOULD SAY

15   IT'S PROBABLY, YOU KNOW, NO MORE THAN $30,000.  SOMETHING

16   ALONG THOSE LINES.

17       Q.    HOW ABOUT IN 1999?

18       A.    MAYBE SLIGHTLY MORE THAN THAT.  45, $50,000.

19       MR. MARTINEAU:  AT THIS TIME I HAVE NO OTHER FURTHER

20   QUESTIONS FOR YOU.

21       MR. BAUER:  I HAVE ONLY A FEW QUESTIONS, COUNSEL.

22       MR. MARTINEAU:  VERY WELL.

23                        EXAMINATION

24   BY MR. BAUER:

25       Q.    MS. COX, EARLIER IN THE EXCHANGE THAT YOU HAD

SEIJAS COURT REPORTERS

1    WITH COUNSEL FOR THE GOVERNMENT ABOUT LEADERSHIP WORKSHOPS

2    YOU DESCRIBED THE POLICY TREE AND THE WAY IN WHICH THAT WAS

3    DEVELOPED FOR PURPOSES OF THE WORKSHOP PARTICIPANTS, AND

4    YOU SPECIFICALLY INDICATED THAT VALUES WERE ARRAYED ALONG A

5    CONTINUUM FROM LIBERAL TO CONSERVATIVE OR LEFT TO RIGHT TO

6    CONSERVATIVE?

7        A.    YES.

8        Q.    IS THAT A CORRECT STATEMENT OF WHAT YOUR

9    TESTIMONY WAS?

10       A.    YES.  I, I WAS DESCRIBING THE ONE SECTION OF

11   THE -- SPECIFICALLY ONE SECTION OF THE WORKSHOP THAT DEALT

12   WITH DISCUSSION OF VALUES IN PUBLIC LIFE OR VALUES THAT

13   UNDERLIE A POLITICAL PHILOSOPHY, AND WE DISCUSSED THOSE

14   ACROSS THE POLITICAL SPECTRUM FROM LEFT, CENTER TO RIGHT.

15       Q.    LEFT, CENTER TO RIGHT.  EXCUSE ME.  THAT'S WHAT I

16   MEANT.  SO IS IT FAIR TO SAY THEN THAT IN DESCRIBING THIS,

17   THESE ARE POSITIONS THAT COULD BE FOUND IN SOME

18   CONFIGURATION JUST AS A MATTER OF COMMON SENSE WITHIN EACH

19   POLITICAL PARTY, THAT IS TO SAY, YOU COULD HAVE LIBERAL

20   REPPUBLICANS AS WELL AS CONSERVATIVE DEMOCRATS AND VICE

21   VERSA?

22       A.    ABSOLUTELY.

23       Q.    WAS THE EMPHASIS ON THAT AS THE CONTINUUM

24   CONSISTENT WITH YOUR TESTIMONY, OR DO YOU NEED TO ELABORATE

25   FURTHER WHETHER THERE IS SOME INCONSISTENCY TO THE POINT

79

SEIJAS COURT REPORTERS

1    THAT WHERE DLC IS CONCERNED WITH HERE WAS POLICY RATHER

2    THAN PARTISAN POLICY DEVELOPMENT?

3        A.    I THINK THAT I CAN CLARIFY THAT ULTIMATELY THE

4    POINT ABOUT THE -- THE POINT ABOUT THAT PART OF THE

5    EXERCISE IN THE WORKSHOP WAS THAT THERE ARE -- THAT THE

6    DLC'S VALUES AS A GOVERNING PHILOSOPHY HOVER AROUND THE

7    CENTER OF THE POLITICAL SPECTRUM.   THERE ARE CERTAINLY MANY

8    PEOPLE WHO HOLD VALUES THAT ARE TO THE LEFT OF THE DLC, AND

9    IN MANY CASES THOSE ARE DEMOCRATS THAT HOLD THOSE POSITIONS

10   THAT ARE LEFT OF THE DLC, AND THERE ARE MANY PEOPLE WHO

11   HOLD THE, YOU KNOW, THE RIGHT, THE VALUES THAT ARE MORE TO

12   THE RIGHT.   I THINK THAT ABSOLUTELY THERE ARE, YOU KNOW,

13   LIBERAL -- I MEAN WITHIN THESE PARTIES THERE ARE PEOPLE

14   HOVERED AROUND THE CENTER.   SO I THINK IN SOME CASES WE

15   SHARE VALUES WITH REPUBLICANS.   WE ACTUALLY DISCUSS THAT AS

16   PART OF THE LEADERSHIP WORKSHOP THAT, YOU KNOW, IN MANY

17   WAYS EVEN IN THE RUSH LIMBAUGH SPEECH, WHICH PEOPLE THINK

18   WE HAVE NOTHING IN COMMON WITH, WE TALK ABOUT THE DLC'S

19   COMMON GROUND WITH HIM ON THE RESPONSIBILITIES, FOR

20   EXAMPLE.   THE DLC BELIEVES THAT RESPONSIBILITY, MUTUAL

21   RESPONSIBILITY INSTEAD OF GOVERNMENT SOLVING PEOPLE'S

22   PROBLEMS IS A CORNERSTONE OF THE DLC PHILOSOPHY.

23       Q.    SO IS IT YOUR TESTIMONY THEN THE DLC WOULD HAVE

24   BEEN COMFORTABLE WORKING WITH SOMEBODY WHO WAS ON THE

25   CENTER SIDE OR WITHIN THE CENTER FACTION OR WING OF THE

1    REPUBLICAN PARTY?

2        A.    YES.

3        Q.    AND WOULD YOU SAY THAT CONSISTENT WITH DLC'S

4    GOVERNING PHILOSOPHIES AND AGENDAS THAT YOU'VE DESCRIBED

5    THAT THE DLC MIGHT BE MORE COMFORTABLE AND WAS MORE

6    CONSISTENT WITH ITS MISSION TO WORK WITH A REPUBLICAN IN

7    THE CENTER THAN WITH A DEMOCRAT IN WHAT IS DESCRIBED IN

8    SOME OF YOUR MATERIALS ON THE TRADITIONAL LEFT?

9        A.    YES.    AND AS PART OF THE LEADERSHIP WORKSHOPS, WE

10   OFTEN SPOKE ABOUT, ENCOURAGED PARTICIPANTS TO USE THE TREE

11   METAPHOR OUTSIDE OF THE WORKSHOPS AND THAT -- BECAUSE IN

12   ORDER TO ADVANCE PUBLIC POLICY, YOU HAD TO FORGE CONSENSUS

13   AND THAT YOU FIRST NEEDED TO LOOK FOR PEOPLE TO BE ABLE TO

14   HAVE CONVERSATIONS AT THE VALUE LEVEL WAS OFTEN THE BEST

15   WAY TO DO THAT AND VERY OFTEN THAT WAS WITH PEOPLE ACROSS

16   PARTY LINES.

17       Q.    IN EXHIBIT 144, WHICH YOU REVIEWED PREVIOUSLY

18   WITH COUNSEL FOR THE GOVERNMENT WHICH IS ENTITLED "DLC

19   LEADERSHIP WORKSHOPS," THE MATERIAL THAT FALLS IMMEDIATELY

20   UNDER THE HEADING "PROGRAM" ON THE FIRST PAGE READS, "IN

21   THE SUMMER OF 1998, THE DLC LAUNCHED A PROGRAM TO HELP

22   STATE AND LOCAL ELECTED LEADERS DEVELOP AND ARTICULATE A

23   NEW DEMOCRATIC GOVERNING AGENDA."

24            THERE ARE TWO VERBS THERE, ONE DEVELOP, ONE

25   ARTICULATE.    WHAT WAS DLC'S GOAL IN TRYING TO TRAIN OR

81

1    ASSIST NEW DEMOCRATIC LEADERS IN ARTICULATING THE GOVERNING

2    AGENDA AS DISTINGUISHED FROM DEVELOPING IT AND CONCEIVEABLY

3    AS ELECTED OFFICIALS IMPLEMENTING IT.  WHAT IS THE

4    ARTICULATION FUNCTION THAT YOU'RE EAGER TO TRAIN THEM TO

5    PERFORM?

6         A.    WELL, THE DLC IS A -- I LIKE TO CALL IT IN THE

7    WHOLESALE BUSINESS, AND ELECTED OFFICIALS ARE IN THE RETAIL

8    BUSINESS MEANING THAT THE DLC CAN'T ACTUALLY IMPLEMENT

9    POLICIES.  SO THE GOAL OF HELPING LIKE MINDED ELECTED

10   OFFICIALS ARTICULATE THEIR PHILOSOPHY IS TO HELP, HOPEFULLY

11   BE ABLE TO HELP THEM CARRY OUT THOSE, YOU KNOW, TO PROPOSE,

12   SUCCESSFULLY PROMOTE, SUCCESSFULLY ENACT POLICIES THAT THE

13   DLC -- TO BOTH AMPLIFY THE DLC'S MESSAGE AND TO ENACT

14   POLICIES THAT THE DLC COULDN'T DO IN ITS OWN RIGHT WITHOUT

15   HELP FROM ELECTED OFFICIALS.

16        Q.    SO IF I UNDERSTAND CORRECTLY THEN WHEN YOU SAY

17   AMPLIFICATION, MEANING THEY SERVE IN EFFECT AS THE MEANS BY

18   WHICH THE DLC DISSEMINATES ITS GOVERNING AGENDA?

19        A.    THAT'S RIGHT.

20        Q.    YOU WERE PREVIOUSLY SHOWN EXHIBIT 50 WHICH IS A

21   MEMORANDUM FROM YOU TO PARTICIPANTS IN LEADERSHIP TRAINING

22   DATED JUNE -- EXCUSE ME.  BEAR WITH ME FOR ONE SECOND.  I

23   WANT TO MAKE SURE I HAVE THE RIGHT ONE.

24             CAN WE GO OFF THE RECORD FOR ONE SECOND.

25             THE VIDEOGRAPHER:  APPROXIMATELY 12:32.  WE'RE OFF THE

82

SEIJAS COURT REPORTERS

1    RECORD.

2         (A RECESS WAS TAKEN.)

3         THE VIDEOGRAPHER:    THE TIME IS APPROXIMATELY 12:32.

4    WE'RE ON THE RECORD.

5         Q.    BY MR. BAUER:    THANK YOU.    I WANTED TO MAKE SURE

6    WE CLARIFIED WHICH DOCUMENT WAS IN FRONT OF US HERE AS

7    EXHIBIT 50, AND IT IS IN FACT A MEMORANDUM DATED JUNE 17

8    FROM YOU TO PARTICIPANTS IN LEADERSHIP TRAINING, AND ON

9    PAGE CA 025 THERE IS A REFERENCE ON THE AGENDA FOR THE

10   SEGMENT AT 1:00 P.M., "EXPLORING WHAT MAKES US NEW

11   DEMOCRATS.    HOW OUR VALUES ARE DIFFERENT FROM REPUBLICANS

12   AND TRADITIONAL LIBERALS."

13             I SIMPLY WANTED TO ASK AGAIN HERE, I TAKE IT THEN

14   AGAIN THAT AS NEW DEMOCRATS YOU WERE -- I WANTED YOU TO

15   AGAIN TELL ME IF I UNDERSTAND YOUR TESTIMONY CORRECTLY IN

16   THIS SENSE THAT AS NEW DEMOCRATS HERE YOU'RE POSING

17   YOURSELF BOTH TO DEMOCRATS AND REPUBLICANS IN THE SENSE OF

18   REPUBLICANS WHO MAY NOT SHARE THE PROGRESSIVE MESSAGE AND

19   DEMOCRATS WHO ARE WHAT YOU DESCRIBE AS TRADITIONAL LIBERALS

20   AND, THEREFORE, NEW DEMOCRATS STAND OUTSIDE BOTH THE

21   POLITICAL PARTIES IN THAT RESPECT.    IS THAT A FAIR

22   STATEMENT OF YOUR TESTIMONY?

23        MR. MARTINEAU:    I WOULD JUST OBJECT.    I THINK THE

24   ATTORNEY IS TESTIFYING THERE, AND I OBJECT.

25        MR. BAUER:    LET ME PUT THE QUESTION TO YOU

83

SEIJAS COURT REPORTERS

1    DIFFERENTLY.

2        Q.    HOW WOULD YOU CHARACTERIZE THEN THE SIGNIFICANCE

3    OF STATING NEW DEMOCRATS HERE BUT THEN REFERRING IN THE

4    FOLLOWING LINE TO REPUBLICANS AND TRADITIONAL LIBERALS

5    ASSOCIATED WITH ALSO THE DEMOCRATIC PARTY?

6        A.    WELL, AGAIN, AS I TESTIFIED EARLIER, THE DLC

7    PHILOSOPHY DOESN'T FIT SQUARELY WITHIN THE DEMOCRATIC

8    PARTY.  IT IS -- THEY'RE DIFFERENTIATING VALUES AND

9    PRINCIPLES AND POLICY AND POLICIES WITHIN THE DEMOCRATIC

10   PARTY THAT DIFFERENTIATES FROM REPUBLICANS.  I TALKED

11   SPECIFICALLY ABOUT THE ROLE OF GOVERNMENT AS AN EXAMPLE OF

12   THAT.  THAT THE SPEECHES IN THE WORKSHOPS SERVE TO

13   ILLUSTRATE THAT REPUBLICANS BELIEVE THAT THE GOVERNMENT HAS

14   NO ROLE TO PLAY.  TRADITIONAL LIBERALS OFTEN BELIEVE

15   GOVERNMENT CAN SOLVE ALL PROBLEMS, AND THE DLC PEOPLE

16   BELIEVES IN AN EMPOWERING GOVERNMENT.  THE GOVERNMENT HAS A

17   ROLE TO PLAY, BUT THAT IT CAN'T SOLVE EVERYONE'S PROBLEMS.

18   THAT IS ONE EXAMPLE OF HOW THE DLC SEE ITSELF DIFFERENT

19   FROM BOTH THE RIGHT AND THE LEFT, AND THERE ARE MANY.

20       Q.    CONTINUING ON WITH SOMEWHAT THAT LINE OF

21   QUESTIONING, EXHIBIT 147 BEGINNING AT DLC 02245 INCLUDES ON

22   ITS BEGINNING WITH I GUESS 02248, PAGE 02248, A PAGE

23   ENTITLED "DLC WORKSHOP SALT LAKE CITY, JANUARY 15 & 16,

24   1999, DLC/NEW DEMOCRAT VALUES AS RATIFIED BY PARTICIPANTS."

25            I WOULD JUST LIKE TO DISCUSS FOR A SECOND THESE

84

SEIJAS COURT REPORTERS

 1    SPECIFIC VALUES REFLECTED ON THIS PAGE AND RATIFIED BY THE

 2    PARTICIPANTS.   HAVE YOU HAD AN OPPORTUNITY TO REVIEW THAT

 3    DOCUMENT?

 4        A.   YES.

 5        Q.   IS IT FAIR TO SAY THAT MOST OF THESE DLC NEW

 6    DEMOCRATIC VALUES AS RATIFIED BY PARTICIPANTS ARE INTENDED

 7    TO BE PRESENTED ON THESE PAGES AS CONSISTENT GENERALLY WITH

 8    DLC'S POLICY, MISSION AND GOVERNING AGENDA?

 9        A.   YES.

10        Q.   LET ME DIRECT YOUR ATTENTION TO A FEW OF THE

11    VALUES ON THIS PAGE AND ASK YOU SPECIFIC QUESTIONS ABOUT

12    EACH ONE OF THEM.

13             WITH RESPECT TO EACH OF THESE VALUES, I'M GOING

14    TO ASK YOU WHETHER OR NOT YOU BELIEVE THEY ARE IDENTIFIED

15    TO ONE PARTY OR TO BOTH PARTIES DEPENDING ON WHERE THE

16    MEMBERS OF THE PARTY STAND ON THAT SPECTRUM YOU'VE

17    IDENTIFIED AS LIBERAL, CENTER, RIGHT.   MUTUAL

18    RESPONSIBILITY, IS THAT IDENTIFIED TO ONE PARTY OR TO BOTH

19    PARTIES ALONG THAT CONTINUUM?

20        A.   I THINK IT'S IDENTIFIED WITH EITHER PARTY.   I

21    THINK THAT THE REPUBLICANS, OR THE RIGHT, WOULD LEAN MORE

22    TOWARD INDIVIDUAL RESPONSIBILITY, AND THE LEFT WOULD LEAN

23    MORE TOWARD GOVERNMENT RESPONSIBILITY AND THE DLC BELIEVES

24    IN MORE MUTUAL RESPONSIBILITY.

25        Q.   SO IN THAT SENSE ARE YOU TESTIFYING THAT THE DLC

85

SEIJAS COURT REPORTERS

1  WITH RESPECT TO THAT VALUE ACTUALLY STANDS OUTSIDE THE TWO

2  POLITICAL PARTIES?

3      A.    YES.

4      Q.    ON THE QUESTION OF FAITH, THE VALUE OF FAITH IN

5  PARTICULAR, WHAT WOULD YOUR STATEMENT BE AS TO WHETHER OR

6  NOT IT STANDS OUTSIDE THE PARTIES AS IDENTIFIED TO EITHER

7  OR IT WOULD DEPEND ON WHERE SOMEONE STOOD ON THAT

8  CONTINUUM, LEFT, CENTER, RIGHT?

9      A.    I THINK IT'S WIDELY BELIEVED THAT THE REPUBLICAN

10  PARTY REPRESENTS FAITH TO VOTERS OR TO AMERICANS MORE THAN

11  THE DEMOCRATIC PARTY DOES.   PROBABLY WITH RESPECT TO THAT

12  SPECIFIC VALUE, THE DLC MIGHT BE IDENTIFIED MORE WITH THE

13  REPUBLICAN PARTY ON THAT ISSUE.

14      Q.    WHAT ABOUT FAMILY?

15      A.    SIMILAR.   SIMILAR TO THE REPUBLICAN PARTY

16  PROBABLY.

17      Q.    WHAT ABOUT THE PRIVATE SECTOR AS A PRIMARY ENGINE

18  FOR ECONOMIC GROWTH AND OPPORTUNITY?

19      A.    WELL, I HOPE THAT THE DLC HAS HAD SOME ROLE IN

20  MOVING THE DEMOCRATIC PARTY AND THE COUNTRY TOWARD THAT

21  FUNDAMENTAL VALUE, BUT PROBABLY HISTORICALLY SPEAKING THAT

22  HAS BEEN -- PRIVATE SECTOR GROWTH HAS BEEN MORE IDENTIFIED

23  WITH THE REPUBLICAN PARTY.

24      Q.    WHAT ABOUT PATRIOTISM?

25      A.    SIMILAR PROBABLY WITH THE REPUBLICAN PARTY.

86

1       Q.    WHAT ABOUT PUBLIC EDUCATION, SPECIFICALLY IN THE

2   MOST RECENT INCARNATION OF THE DEBATE WHICH I BELIEVE

3   YOU'RE FAMILIAR WITH AS YOU'VE BEEN WITH DLC OVER THIS

4   PERIOD IN THE ADMINISTRATION OF PRESENT BUSH NO. 44?

5       A.    WELL, OBVIOUSLY THE DLC WORKED VERY -- WORKED

6   WITH BOTH REPUBLICANS AND DEMOCRATS, BUT SPECIFICALLY TO

7   HELP WRITE WHAT ULTIMATELY BECAME THE NO CHILD LEFT BEHIND

8   ACT THAT THE PRESIDENT SIGNED INTO LAW.  SO IN THAT CASE,

9   EDUCATION REFORM, WE HAVE WORKED WITH THE REPUBLICAN

10  ADMINISTRATION.  WE'VE WORKED WITH REPUBLICANS AND

11  DEMOCRATS IN CONGRESS TO ULTIMATLY PRODUCE SOMETHING THAT

12  BECAME A REPUBLICAN BILL THAT THIS ADMINISTRATION SIGNED I

13  MEAN.

14      Q.    SO IT'S YOUR TESTIMONY THEN AS YOU LOOK DOWN THIS

15  LIST OF VALUES THAT SOME NOT ONLY WOULD BE IDENTIFIED TO

16  THE REPUBLICAN PARTY AND STILL BE CONSIDERED NEW DEMOCRATIC

17  VALUES, BUT YOU'RE TESTIFYING SPECIFICALLY TO PUBLIC

18  EDUCATION THAT IT FURTHER COULD REFLECT A BASIS FOR

19  COOPERATION BETWEEN DEMOCRATS AND REPUBLICANS IN ENACTING A

20  BIPARTISAN POLICY AGENDA?

21      MR. MARTINEAU:  I OBJECT TO THAT QUESTION AGAIN.

22      Q.    BY MR. BAUER:  YOU MAY ANSWER IT.

23      A.    YES.

24      Q.    THANK YOU.

25            YOU AS CHIEF OF STAFF OVER THE PERIOD OF TIME

87

SEIJAS COURT REPORTERS

1    THAT YOU WERE CHIEF OF STAFF AND THEN I ASSUME IN OTHER

2    POSITIONS, BUT YOU CAN TELL ME OTHERWISE IF I'M WRONG, AT

3    DLC HAVE HAD AN OPPORTUNITY TO OBSERVE, MONITOR AND HELP

4    ENFORCE THE DLC'S BUDGET FOR ITS VARIOUS PROGRAMS IN A

5    CALENDAR YEAR?

6        A.    YES.

7        Q.    ARE YOU FAMILIAR ROUGHLY SPEAKING WITH THE

8    ALLOCATION OF RESOURCES THAT THE DLC MAKES FOR THE VARIOUS

9    PROGRAMS WITHIN ITS POLICY AGENDA?

10       A.    YES.

11       Q.    CAN YOU TELL ME ROUGHLY SPEAKING AS A PERCENTAGE

12   OF THE BUDGET HOW MUCH ON AN ANNUAL BASIS DURING THE PERIOD

13   OF TIME THAT YOU'VE BEEN INVOLVED WITH THE DLC HAS SPENT ON

14   THE LEADERSHIP WORKSHOPS?

15       A.    CURRENTLY I SUSPECT THAT THE LEADERSHIP WORKSHOPS

16   ARE LESS THAN 1 PERCENT OF OUR BUDGET.

17       Q.    CAN YOU TELL US FOR THE RECORD --

18       A.    OR CLOSE TO THAT.

19       Q.    -- WHEN IT ABSORBED THE MOST IN ANY GIVEN

20   CALENDAR YEAR HISTORICALLY SPEAKING OF THE RESOURCES

21   ALLOCATED TO IT, THAT IS TO SAY AT ITS PEAK, WHAT WAS

22   ABSORBED BY THE LEADERSHIP WORKSHOPS?

23       A.    THE PEAK WOULD HAVE BEEN PROBABLY 1998, 1999, AND

24   I SUSPECT THAT THE -- IT IS STILL LESS THAN PROBABLY 5

25   PERCENT OF THE BUDGET.

1      Q.    TO WHICH AUDIENCE VERY SPECIFICALLY, SORT OF AS

2   SPECIFICALLY AS YOU CAN GET, WHAT PERCENTAGE OF DLC'S

3   RESOURCES FOR BOTH POLICY DEVELOPMENT AND POLICY

4   DISCUSSION, THAT IS TO SAY, THE DISCUSSION EVEN OF

5   DEVELOPED POLICIES IS AVAILABLE ON AN UNRESTRICTED BASIS TO

6   THE PUBLIC, AND TO MAKE IT CLEAR WHAT I MEAN BY THAT, I

7   MEAN EITHER IN CONFERENCES THAT ARE OPEN TO ANYONE WHO

8   SIGNS UP FOR THEM FROM THE WEBSITE THROUGH PUBLICATIONS

9   THAT ARE AVAILABLE TO ANYONE THAT ASKS FOR THEM.

10     A.    CAN I REPEAT THE QUESTION TO MAKE SURE I

11  UNDERSTOOD IT?

12     Q.    YES.

13     A.    YOU'RE ASKING ME WHAT PERCENTAGE OF THE DLC'S

14  WORK, ESSENTIALLY WORK, THAT IS AVAILABLE TO THE PUBLIC?

15     Q.    ON AN UNRESTRICTED BASIS.

16     A.    I UNDERSTAND.  OH, 95 PERCENT IF NOT MORE.  99

17  PERCENT.

18     MR. BAUER:  I HAVE NO FURTHER QUESTIONS.

19                    FURTHER EXAMINATION

20  BY MR. MARTINEAU:

21     Q.    MS. COX, IN COUNSEL'S QUESTIONING OF YOU HE ASKED

22  YOU WHAT PERCENTAGE OF THE BUDGET THAT THE LEADERSHIP

23  TRAINING PROGRAM COMPRISED FOR THE DLC IN 1998 AND 1999.

24  YOU HAVE NOT DONE AN ANALYSIS, A FINANCIAL ANALYSIS OF THE

25  BUDGET FOR DLC FOR THE YEAR 1998 FOR EXAMPLE, HAVE YOU?


89

SEIJAS COURT REPORTERS

1    A.    NO.  BUT I WAS RESPONSIBLE FOR OVERSEEING THE

2    BUDGET OF THE LEADERSHIP WORKSHOPS AT THAT TIME.  SO I'M

3    FAMILIAR WITH THE EXPENSES THAT WE INCURRED, AND I'M

4    FAMILIAR WITH THE DLC'S OVERALL BUDGET IN ROUGH NUMBERS.

5    Q.    BUT YOUR TESTIMONY IS BASED ON YOUR UNDERSTANDING

6    OF THOSE ROUGH NUMBERS; CORRECT?

7    A.    YES.

8    Q.    AND THE SAME WOULD BE TRUE FOR 1999 AS WELL;

9    CORRECT?

10    A.    YES.

11    Q.    NOW, IN YOUR TESTIMONY ABOUT WHAT PERCENTAGE OF

12    THE DLC'S RESOURCES ARE AVAILABLE ON AN UNRESTRICTED BASIS,

13    YOUR TESTIMONY WOULD BE THE SAME THERE; IS THAT CORRECT?

14    IT'S BASED ON YOUR GENERAL UNDERSTANDING AS TO THOSE

15    PARTICULAR NUMBERS; CORRECT?

16    A.    YEAH.  IT'S BASED ON -- YES.  IT'S BASED ON MY

17    GENERAL UNDERSTANDING HAVING BEEN AT THE DLC FOR 12 YEARS

18    AND SEEING WHAT WE DO AND WHAT WE PUT ON OUR WEBSITE.

19    EVERY POLICY WE'VE EVER DEVELOPED WHETHER IT'S

20    THROUGH WHATEVER CAPACITY ALWAYS GOES ON OUR WEBSITE.

21    Q.    I UNDERSTAND, BUT YOUR TESTIMONY IS BASED NOT ON

22    A SPECIFIC STUDY OR ANALYSIS THAT YOU'VE DONE, BUT RATHER

23    ON YOUR GENERAL UNDERSTANDING OF WHAT THE RESOURCES OF THE

24    DLC ARE ALLOCATED FOR; IS THAT CORRECT?

25    A.    YES.  THAT'S RIGHT.


90


SEIJAS COURT REPORTERS

1      MR. MARTINEAU:  NO OTHER QUESTIONS.  THANK YOU.

2      MR. BAUER:  I JUST HAVE ONE FINAL FOLLOW-UP QUESTION

3   SINCE THE GOVERNMENT'S COUNSEL IS INTERESTED IN SOME MORE

4   SPECIFICITY ON THE QUESTION OF THE COST OF THE LEADERSHIP

5   WORKSHOP.

6                    FURTHER EXAMINATION

7   BY MR. BAUER:

8      Q.    WHAT WAS THE TOTAL BUDGET IN GENERAL TERMS, THAT

9   IS TO SAY, IT DOESN'T HAVE TO BE TO THE PENNY, OF THE

10  DEMOCRATIC LEADERSHIP COUNSEL IN 1998 AND 1999?

11     A.    THE TOTAL DLC BUDGET IN 1998 AND 1999?  I SUSPECT

12  IT WAS SOMEWHERE BETWEEN -- SOMEWHERE RIGHT AROUND 3 AND A

13  HALF, $4 MILLION.

14     Q.    IT WOULD HAVE BEEN ROUGHLY THE SAME AMOUNT IN

15  1997?

16     A.    YES.

17     Q.    THREE AND A HALF TO $4 MILLION.  WHAT WAS THE

18  MOST THAT WAS PAID TO ANITA GOTTLIEB FOR HER FACILITATION

19  SERVICES IN ANY ONE YEAR?

20     A.    I THINK $50,000.

21     Q.    AND IS IT YOUR TESTIMONY THAT -- CAN YOU TELL US

22  ROUGHLY SPEAKING THE COST OF A PARTICULAR WORKSHOP?  YOU

23  MENTIONED A FEW COST ITEMS LIKE, FOR EXAMPLE, LUNCH.  THE

24  DLC MIGHT HAVE ASSUMED OTHER COST ITEMS IT WASN'T REQUIRED

25  TO ASSUME BECAUSE THE PARTICIPANTS LIVED IN THE CITY WHERE

SEIJAS COURT REPORTERS

1    THE EVENTS ARE HELD.  DO YOU HAVE ANY ROUGH IDEA OF WHAT

2    THE ACTUAL OVERHEAD BEYOND MS. GOTTLIEB'S FEE THE DLC WAS

3    REQUIRED TO CARRY FOR THE LEADERSHIP WORKSHOPS?

4         A.    WELL, WITH THE EXCEPTION OF THE FIRST PILOT

5    LEADERSHIP WORKSHOP, NOT COUNTING ANITA'S FEE OF 9,500 OR

6    SO, WOULD HAVE BEEN TWO OR THREE THOUSAND DOLLARS.

7         Q.    SO A GIVEN LEADERSHIP WORKSHOP --

8         A.    $5,000 AT THE MOST.

9         Q.    $5,000 AT THE MOST PLUS HER FEE OF 9,000.  SO

10   IT'S YOUR TESTIMONY THAT ANY GIVEN LEADERSHIP WORKSHOP AT

11   THE MOST WOULD HAVE COST ROUGHLY $15,000?

12        A.    YES.

13        Q.    HOW MANY WORKSHOPS PER YEAR DID YOU HOLD?

14        A.    WELL, THE '99 WAS OUR PEAK, AND I BELIEVE '99

15   WAS, IF I'M NOT MISTAKEN, SEVEN OR SO.  NO.  ABOUT SIX

16   WORKSHOPS I THINK.

17        Q.    SO IT'S YOUR TESTIMONY HERE THAT AT ITS PEAK THE

18   WORKSHOPS ALL TOLD EXPENSES AND MS. GOTTLIEB'S FEE WOULD

19   HAVE COME TO $90,000?

20        A.    YES.

21        Q.    AND THAT'S 90,000 OUT OF A BUDGET OF ROUGHLY 3

22   AND A HALF TO 4 MILLION?

23        A.    YES.

24        MR. BAUER:  I HAVE NO FURTHER QUESTIONS.

25        MR. MARTINEAU:  I HAVE NO FURTHER.  THANK YOU.


92

SEIJAS COURT REPORTERS

1          THE WITNESS:  THANKS.

2          THE VIDEOGRAPHER:  TIME IS APPROXIMATELY 12:44.  THIS

3    IS THE END OF TAPE 2 OF 2 AND CONCLUDES THE DEPOSITION.

4    OFF THE RECORD.

5          (THE DEPOSITION WAS CONCLUDED AT 12:44 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

93

SEIJAS COURT REPORTERS

1    STATE OF CALIFORNIA  )
                         ) SS.
2    COUNTY OF LOS ANGELES)

3

4              I, THE UNDERSIGNED, HEREBY DECLARE THAT I AM

5    THE WITNESS IN THE WITHIN MATTER; THAT I HAVE READ THE

6    FOREGOING DEPOSITION AND KNOW THE CONTENTS THEREOF, AND I

7    DECLARE THAT THE SAME IS TRUE OF MY OWN KNOWLEDGE EXCEPT AS

8    TO THOSE MATTERS WHICH ARE THEREIN STATED UPON MY

9    INFORMATION AND BELIEF, AND AS TO THOSE MATTERS, I BELIEVE

10   IT TO BE TRUE.

11             I DECLARE UNDER PENALTY OF PERJURY, UNDER THE

12   LAWS OF THE STATE OF CALIFORNIA, THAT THE FOREGOING IS TRUE

13   AND CORRECT.

14             EXECUTED ON THE _____ DAY OF _____,

15   2006, AT _____, CALIFORNIA.

16

17

18

19             _____
                         DEBBIE COX BULTAN
20

21

22

23

24

25


                                                          94

                  SEIJAS COURT REPORTERS

1                    <u>REPORTER'S CERTIFICATE</u>

2

3           I, SHERYL WILLIAMS, CSR NO. 7453, CERTIFIED

4    SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA DO

5    HEREBY CERTIFY:

6           THAT PRIOR TO BEING EXAMINED THE WITNESS

7    NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN

8    TO TESTIFY THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

9    THE TRUTH;

10          THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

11   SHORTHAND AT THE TIME AND PLACE NAMED HEREIN AND WAS

12   THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION AND

13   SUPERVISION;

14          THAT THE FOREGOING DEPOSITION IS A FULL, TRUE

15   AND CORRECT TRANSCRIPTION OF MY ORIGINAL SHORTHAND

16   NOTES.

17          I FURTHER CERTIFY THAT I HAVE NO INTEREST IN

18   THE OUTCOME OF THE ACTION.

19          WITNESS MY HAND THIS ___5TH___ DAY OF

20   _____, _2006_ .

21

22          _____

23          SHERYL WILLIAMS, CSR NO. 7453

24          CERTIFIED SHORTHAND REPORTER IN

25          AND FOR THE STATE OF CALIFORNIA

                                                    95

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

DEMOCRATIC LEADERSHIP )
COUNCIL, INC., )
)
   Plaintiff, )
)
  v. )  No. 1:05-cv-1067 (JGP)
)
UNITED STATES, )
)
   Defendant. )

<u>NOTICE OF DEPOSITION OF DEBBIE COX BULTAN</u>

   PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30, defendant

United States of America will appear at the offices of Perkins, Coie, 1620 26th Street, Sixth

Floor, Santa Monica, California, on March 22, 2006, at 10:00 a.m., to take the deposition of

Debbie Cox Bultan. The deposition will be in the form of an oral examination before a notary

public or other person authorized by law to administer an oath and recorded by stenographic

means and by videotape. You are invited to attend and cross-examine.



DATE: March _10_ , 2006.


MICHAEL J. MARTINEAU
Trial Attorney, Tax Division
U. S. Department of Justice
Post Office Box 227
Washington, DC  20044
Telephone:  (202) 307-6483


OF COUNSEL:

KENNETH L. WAINSTEIN
United States Attorney

## CERTIFICATE OF SERVICE

IT IS CERTIFIED that the foregoing NOTICE OF DEPOSITION OF DEBBIE COX

BULTAN was caused to be served upon plaintiff's counsel on the _10th_ day of March,

2006, by depositing a copy thereof in the United States mail, postage prepaid, addressed

as follows:

ROBERT F. BAUER, ESQUIRE
MARC E. ELIAS, ESQUIRE
EZRA W. REESE, ESQUIRE
Perkins Coie
607 Fourteenth Street, NW,
Suite 800
Washington, DC  20005-2011.


MICHAEL J. MARTINEAU

A. 88 (Rev. 11/91) Subpoena in a Civil Case

# United States District Court

| Central | DISTRICT OF | California |
|---------|-------------|-----------|

Democratic Leadership Council, Inc.,

**PLAINTIFF**

v.

United States of America

**DEFENDANT**

## SUBPOENA IN A CIVIL CASE

**CASE NUMBER:**  1:05-cv-1067
(USDC District of Columbia)

**TO:**   Debbie Cox Bultan
c/o Perkins, Coie, 1620 26th Street, Sixth Floor
Santa Monica, California 90904

☐ **YOU ARE COMMANDED** to appear in the United States District  Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|--------------------|-----------|
|                    | DATE AND TIME |

☒ **YOU ARE COMMANDED** to appear at the place, date, and time specified below at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---------------------|---------------|
| Law Offices of the Perkins Coie, 1620 26th Street, Sixth Floor, Santa Monica, California 90904 | March 22, 2006 10:00 a.m. |

☒    **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): see attached List Of Documents To Be Produced

| PLACE | DATE AND TIME |
|-------|---------------|
|       |               |

☐  **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|----------|---------------|
|          |               |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE  IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Michael J. Martineau*        (Attorney for Defendant) | March 10, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER Michael J. Martineau, Attorney, Tax Division, Department of Justice, P. O. Box 227, Ben Franklin Station, Washington, D.C.  20044 -- Telephone:  (202) 307-6483

1583929.1

A 88 (Rev. 11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | March 10, 2006 | Washington, D.C. |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Debbie Cox Bultan<br>c/o Ezra Reese, Perkins Coie<br>607 Fourteenth Street, N.W., Suite 800<br>Washington, D.C. 20005-20011 | U.S. Mail |
| SERVED BY (PRINT NAME) | TITLE |
| Michael J. Martineau | Trial Attorney |

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___March 10, 2006___
　　　　　　　　　DATE

_Michael J. Martineau_
SIGNATURE OF SERVER
Trial Attorney, Tax Division
U.S. Department of Justice, P.O. Box 227, Ben Franklin Station
Washington, D.C. 20044

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

　　(1)　A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

　　(2)(A)　A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

　　(B)　Subject to paragraph(d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

　　(3)(A)　On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
　　　(i)　fails to allow reasonable time for compliance;
　　　(ii)　require a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is

employed or regularly transactions business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

　　　(iii)　requires disclosure of privileged or other protected matter and no exception or waiver applies, or
　　　(iv)　subjects a person to undue burden
　　(B)　if a subpoena

　　　(i)　requires disclosure of a trade secret or other confidential research, development, or commercial information, or
　　　(ii)　requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
　　　(iii)　requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

　　(1)　A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

　　(2)　When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature

1583929.1

## LIST OF DOCUMENTS TO BE PRODUCED

1.    All documents in your possession relating to or concerning the DLC Leadership Workshops conducted by the Democratic Leadership Council in the years 1997, 1998, and 1999.

The documents requested do not include documents already produced to the defendant in the Plaintiff's Responses To Defendant's First Request For Production Of Documents.

1507248.1