# Exhibit

# E

Chuck Alston

Washington, DC

February 10, 2006

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - x

4    DEMOCRATIC LEADERSHIP COUNCIL,   :

5    INC.,                           :

6              Plaintiff,     : No.1:05-cv-1067

7         vs.                 : (JGP)

8    UNITED STATES,                  :

9              Defendant.     :

10   - - - - - - - - - - - - - - - x

11

12                   February 10, 2006

13                   Washington, D.C.

14

15       Deposition of CHUCK ALSTON, held at the

16   offices of Perkins Coie, 607 14th Street, N.W.,

17   Suite 800, Washington, D.C., commencing at 9:57

18   a.m., Friday, February 10, 2006, before Elizabeth

19   Mingione, Notary Public.

20

21

22

23

24

25

Chuck Alston                                                                February 10, 2006
Washington, DC

**Page 2**

1  APPEARANCES OF COUNSEL:
2  ON BEHALF OF THE UNITED STATES:
3          MICHAEL J. MARTINEAU, ESQUIRE
4          U.S. DEPARTMENT OF JUSTICE
5          P.O. Box 227
6          Ben Franklin Station
7          Washington, D.C. 20044
8          (202) 307-6483
9
10 ON BEHALF OF THE DEMOCRATIC LEADERSHIP COUNCIL
11 INC.:
12         ROBERT F. BAUER, ESQUIRE
13         EZRA W. REESE, ESQUIRE
14         Perkins Coie
15         607 Fourteenth Street, N.W., Suite 800
16         Washington, D.C. 20005-2011
17         (202) 628-6600
18
19
20
21
22
23
24
25

**Page 3**

1          C O N T E N T S
2  WITNESS: CHUCK ALSTON
3  EXAMINATION BY:                    PAGE
4     Mr. Martineau ............................. 7
5     Mr. Reese ................................ 223
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1          DEPOSITION EXHIBITS
2               CHUCK ALSTON
3  NUMBER     DESCRIPTION          PAGE
4  31   Notice of Deposition with Subpoena .... 8
5  32   1997 Form 990 for Democratic ........ 121
6       Leadership Council, Inc.
7  33   1998 Form 990 for Democratic ....... 124
8       Leadership Council, Inc.
9  34   1999 Form 990 for Democratic ....... 125
10      Leadership Council, Inc.
11 35   Democratic Leadership Council List . 127
12      of Workers
13 36   Memo Dated April 8, 1997 From Julie   137
14      Kizer Ball
15 37   Memo Dated March 25, 1997 Re:  PF .. 147
16      Organizational and Marketing
17      Issues, DLC 08656-08659
18 38   Memo Dated April 2, 1997, DLC ...... 153
19      11643-11645
20 39   Memo Dated May 8, 1997, DLC ........ 158
21      11646-11648
22 40   Memo Dated May 16, 1997, DLC ....... 160
23      10286-10290
24 41   DLC Licensing Agreement, DLC ....... 165
25      10097-10101

**Page 5**

1      DEPOSITION EXHIBITS (continued)
2  NUMBER     DESCRIPTION          PAGE
3  42   Letter Dated January 16, 1998 ....... 166
4  43   Memo Dated November 4, 1998 from  ... 170
5       Doug Wilson
6  44   Memo Dated June 19, 1998 from John . 176
7       Decken
8  45   Briefing Memorandum Dated November . 179
9       30, 1998 from John Hasselmann
10 46   Memo Dated July 28, 1998 from John . 182
11      Hasselmann
12 47   DLC Leadership Forum Schedule, DLC . 183
13      09575-09577
14 48   DLC Design for Leadership Workshop . 185
15      Document
16 49   Memo Dated June 11, 1998 from ...... 190
17      Debbie Cox
18 50   Memo Dated June 17, 1998 from ...... 192
19      Debbie Cox
20 51   E-Mail Correspondence Dated 6/18/98  193
21      Regarding Training
22 52   DLC Leadership Workshop Document ... 195
23      Dated June 19-20, 1998
24 53   Document Dated June 20, 1998 on .... 196
25      Leadership Training Participants

2 (Pages 2 to 5)

Chuck Alston                                                    February 10, 2006
Washington, DC

---

Page 6

1        DEPOSITION EXHIBITS (continued)
2    NUMBER        DESCRIPTION         PAGE
3    54   Document Dated August 15, 1998 on .. 197
4         Workshop Feedback
5    55   Memo Dated August 31, 1999 from .... 199
6         Doug Wilson on Values-Based
7         Training
8    56   Draft Memo Dated 8/31 to Anita, DLC  201
9         01588-01590
10   57   Memo Dated September 2, 1999 to Tom  205
11        Sugar from Anne Rung
12   58   Memo Dated October 13, 1999, DLC ... 207
13        01586-01587
14   59   New Democrats Online Business Plan . 212
15        Dated 7/21/99
16   60   Memo Dated February 8, 1999 from ... 216
17        New Democrat Message Group
18   61   1997 DLC Annual Conference and ..... 218
19        Leadership Dinner Document
20   62   Special Guest Registration Form for  220
21        1998 DLC-PPI Spring Retreat in New
22        Orleans
23   63   Memo Dated August 1, 1999 from Eric  222
24        to Political Team
25

---

Page 7

1            P R O C E E D I N G S
2    Whereupon,
3               CHUCK ALSTON,
4         having been first duly sworn by
5         Elizabeth Mingione, a Notary Public
6         within and for the District of Columbia,
7         was examined and testified as follows:
8                  - - -
9         DIRECT EXAMINATION CONDUCTED
10        BY MR. MARTINEAU:
11   Q.   Good morning, Mr. Alston.
12   A.   Good morning.
13   Q.   Could you just state your name and spell
14   it for us, for the record, to get us started.
15   A.   Charles, conventional spelling, middle
16   initial, C as in Clark, last name A-L-S-T-O-N.
17   Q.   Very good.  Mr. Alston, I'm Mike
18   Martineau for the Department of Justice.  I
19   represent the United States in this suit brought by
20   the DLC.  First, have you ever had your deposition
21   taken before, sir?
22   A.   Yes.
23   Q.   So you know what the drill is?
24   A.   Yeah.
25   Q.   I'll try not to speak too fast.  I'll

---

Page 8

1    make sure that I finish my question, give the court
2    reporter a chance to take it down.  You give the
3    answer, go from there.  What have you done to
4    prepare for your deposition today, sir?
5    A.   Very little.  I did meet with DLC's
6    counsel yesterday briefly.
7    Q.   And you are represented by counsel
8    Mr. Bauer and Mr. Reese here today?
9    A.   My understanding is they do not represent
10   me.
11   Q.   Okay.  Fine.  Did you receive a subpoena
12   that was served on you in this particular case?  And
13   I'll have you refer to Exhibit 31.
14                  - - -
15        (A document was marked as Government
16   Exhibit Number 31)
17                  - - -
18   A.   Okay.
19   Q.   That is the notice of deposition.  And
20   there was a subpoena attached to it asking that you
21   produce any documents in your possession pertaining
22   to activities of the DLC.
23   A.   Right.
24   Q.   During the years 1997, 1998 and 1999.
25   A.   Right.  I did receive that or was

---

Page 9

1    informed of it.  And I had no more.
2    Q.   You had no documents.
3    A.   I left DLC.
4    Q.   You left DLC.  You had no documents in
5    response to the subpoena then?
6    A.   That is correct.
7    Q.   Okay.  Very good.  Now, are you familiar
8    with what this lawsuit is all about?
9    A.   I am.
10   Q.   How are you familiar with it?
11   A.   I'm formerly the Executive Director of
12   the Democratic Leadership Council.
13   Q.   And outside of talking to DLC's counsel
14   yesterday, have you spoken to anyone else concerning
15   your deposition?
16   A.   I have not, other than the DLC asking me
17   to be deposed.
18   Q.   Okay.  Did they discuss with you what the
19   suit was all about?
20   A.   They did not.
21   Q.   Okay.  Did they discuss with you what
22   they thought your -- the kind of questions that the
23   government might be interested in asking?
24   A.   They did not.
25   Q.   Okay.  Have you discussed your deposition

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400                    Washington, DC  20005

Chuck Alston                             February 10, 2006

Washington, DC

---

**Page 10**

1 appearance here today with Mr. Al From from DLC?
2    A.  I have not.
3    Q.  When was the last time you spoke to
4 Mr. From?
5    A.  I saw Al -- I saw him last week.
6    Q.  And did the subject matter of this
7 particular lawsuit come up in your discussion with
8 him?
9    A.  No, other than I told him that I was
10 being deposed.
11    Q.  Have you ever talked to Mr. From about
12 this particular lawsuit other than what you have
13 testified to?
14    A.  Extensively.
15    Q.  And when was that?
16    A.  When I was in the employ of the
17 Democratic Leadership Council.
18    Q.  Very good. We are going to talk about
19 that obviously here today. Just for more background
20 information, what is your educational background,
21 sir?
22    A.  I have a bachelor of arts degree in
23 political science.
24    Q.  And from what institute did you graduate?
25    A.  The University of North Carolina.

---

**Page 11**

1    Q.  Very good. Are you an attorney?
2    A.  I am not.
3    Q.  Congratulate you on that.
4    A.  It's worse though. I'm in public
5 relations.
6    Q.  I was just going to ask you, what is your
7 current line of work?
8    A.  I'm a public relations executive.
9    Q.  And with what public relations firm?
10    A.  Manning, M-A-N-N-I-N-G, Selvage,
11 S-E-L-V-A-G-E, ampersand, Lee, L-E-E.
12    Q.  All right. And how long have you been
13 with Manning public relations firm?
14    A.  Twenty-two months.
15    Q.  Okay. And they are located in
16 Washington, D.C.?
17    A.  They are. Well, global.
18    Q.  Global?
19    A.  I am in Washington, D.C.
20    Q.  You are in Washington, D.C.
21    A.  Yes, sir.
22    Q.  And what kind of clients do you work for
23 at the firm that you are with now?
24    A.  A variety. My current clients include
25 the Robert Wood Johnson Foundation, Blue Cross/Blue

---

**Page 12**

1 Shield Association, the National Geographic Society,
2 that sort of captures the flavor.
3    Q.  That's fine. Do you have any clients
4 currently that have political entities or a
5 political affiliation that you work for?
6    A.  No, I do not.
7    Q.  So you don't have like the DNC or any of
8 the other, or RNC or any political party
9 affiliations in your current job?
10    A.  I do not.
11    Q.  So basically you are doing commercial
12 type public relations --
13    A.  I do.
14    Q.  -- in this job? Okay. And prior to
15 working at the DLC and, first, what year did you
16 begin at the DLC?
17    A.  1993.
18    Q.  Okay. Prior to '93, where were you
19 employed? Just work backwards.
20    A.  I was a journalist at Congressional
21 Quarterly from 1988 to 1993. In '86, '87, I was at
22 Harvard as a Nieman fellow. Before that I was at
23 the Greensboro, North Carolina News and Record
24 Newspaper. So I was a journalist for 15 years.
25    Q.  And so the Nieman fellowship is a

---

**Page 13**

1 journalist type fellowship?
2    A.  It is.
3    Q.  So your background is in journalism?
4    A.  It is.
5    Q.  Very good. All right. So have you ever
6 worked up on Capitol Hill, for example, in a staff
7 capacity?
8    A.  I have not.
9    Q.  Okay. Have you ever worked on a
10 political campaign in a staff capacity?
11    A.  I have not.
12    Q.  So you have been in journalism, then you
13 went to the DLC, and from '93 until, what, 2000?
14    A.  2004.
15    Q.  Right. And then you are at public
16 relations?
17    A.  Steady arch upward.
18    Q.  I'm sorry?
19    A.  A steady arch upward.
20    Q.  Thank you. All right. Let's talk about
21 your employment at the DLC. You said you began in
22 193?
23    A.  Yes, sir.
24    Q.  And how was it that you became associated
25 with the DLC in 1993?

---

4 (Pages 10 to 13)

Chuck Alston                                                    February 10, 2006
Washington, DC

**Page 14**

1    A.   Gosh, they -- this would have been right
2  after the election of Bill Clinton as President.
3  The DLC was growing, and they wanted to
4  professionalize their staff. I was hired as their
5  first ever communications director.
6        I was brought in to oversee the
7  development of a web site, upgrade the magazine,
8  publications, a variety of things.
9    Q.   Okay. And who brought you into the
10 organization? Who recruited you into the
11 organization?
12   A.   Well, it's interesting. Two people take
13 credit for it. Rob Shapiro, who was an economist at
14 the Progressive Policy Institute had worked with my
15 wife at U.S. News and World Report.
16       I think it was Rob who mentioned to me
17 that they were looking for the post. I called Will
18 Marshall who was then and still is, I guess, the
19 president of the Progressive Policy Institute.
20       And I had known Will in 1984. He had
21 been the press secretary on a campaign that I
22 covered as reporter. He told me about the post and
23 I went and interviewed for it.
24   Q.   Very good. Who actually hired you? Was
25 it --

**Page 15**

1    A.   Deb Smulyan.
2    Q.   And was Mr. From with the organization --
3    A.   Yes.
4    Q.   -- at that point in time? Did you know
5  Mr. From before you joined the DLC?
6    A.   I did not. I knew of him. I did not
7  know him.
8    Q.   Okay. Very good. So you came in as
9  Communications Director of the DLC?
10   A.   I did.
11   Q.   And then did you assume any other posts
12 for the DLC subsequently?
13   A.   Yeah, in 1996, thereabouts, either early
14 '97, late '96, I don't recall, I became Executive
15 Director.
16   Q.   Okay. And what were the duties and
17 responsibilities as Executive Director? What were
18 your duties and responsibilities?
19   A.   First, I have to say DLC is not really
20 hierarchal, so it was varied, but I would say
21 roughly speaking I was in charge of day-to-day
22 operations, in charge of the finances and in charge
23 of legal issues, personnel issues. But I also
24 worked across all areas.
25       And then I think -- I can't remember if

**Page 16**

1  this were true all the way along the way but I had
2  kind of a titular title with the magazine as well.
3    Q.   What was the name of the magazine?
4    A.   The New Democrat.
5    Q.   Very good. Now, when you said you were
6  involved in day-to-day operations, so you were in
7  charge of, I would say making the trains run on
8  time?
9    A.   That's right.
10   Q.   And so all of the --
11   A.   It would be making the brains run on
12 time.
13   Q.   I understand. In the structure of the
14 DLC, were there various departments that reported to
15 you as Executive Director?
16   A.   Yes. My direct reports would have been
17 the Administration Department, and this was what I
18 mean by not really hierarchal, the Development
19 Department; and then I worked, well, I guess the
20 what we called the Field Department would have been
21 direct reports. And then I would have reported kind
22 of cooperatively with the people who would do policy
23 work.
24   Q.   Who were the people that did the policy
25 work that you would have reported to?

**Page 17**

1    A.   That I worked with?
2    Q.   That you -- you said you reported to
3  people who did the policy work who --
4    A.   No. No. No. I did not report to them.
5  I worked with them kind of laterally.
6    Q.   Okay. Good.
7    A.   In other words, Will and I worked
8  together. I would not call him my boss, and he
9  would not have called me his boss.
10   Q.   So when you say the policy people, you
11 are talking about Will Marshall and the Progressive
12 Policy Institute people?
13   A.   Mostly. Yeah.
14   Q.   Okay. Very good. And when you talked
15 about the other areas that you had sort of over you
16 was the finances, what do you mean by the finances?
17   A.   Both money coming in and money going out.
18   Q.   So that would include fundraising?
19   A.   Fundraising and also purchasing,
20 negotiating leases, you name it.
21   Q.   The expenditure side of the organization?
22   A.   Yes.
23   Q.   Very good. And you also mentioned that
24 you had oversight, if you will, for the legal issues
25 or legal matters. Is that correct?

Alderson Reporting Company
1111 14th Street, NW Suite 400        1-800-FOR-DEPO        Washington, DC  20005

Chuck Alston                                                      February 10, 2006
Washington, DC

Page 18

1    A.   Yes.
2    Q.   And what was your responsibilities, what
3    kind of legal issues are you referring to there?
4    A.   It could be anything from employment
5    matters and, you know, the nature of, you know,
6    hiring someone or firing someone.  It could also be
7    keeping us within the straight and narrow as far as
8    exempt laws went.
9    Q.   So was the DLC a tax exempt organization
10   at this time?
11   A.   It still is.
12   Q.   And under what provision of the Internal
13   Revenue Code is it a tax exempt?
14   A.   501(c)(4).
15   Q.   And what is your understanding of what
16   activities a 501(c)(4) organization may engage in?
17   A.   Gosh, that's a long conversation.  From
18   our perspective, we engaged in advocacy.  We engaged
19   in lobbying.  We engaged in -- the way we did it, I
20   think it's easier to define it the other way.
21   Q.   Okay.
22   A.   We just did not do anything that involved
23   electionary, anything that I would call, you know,
24   no advocating for someone's election or "turning out
25   the vote" or any of those kinds of activities.

Page 19

1    Those were all verboten.
2    Q.   Okay.  Very good.  And now you mentioned
3    the Progressive Policy Institute.  And we'll refer
4    to that as PPI, if it's all right.  Were they a tax
5    exempt organization?
6    A.   Oh, yes.
7    Q.   And what was their exempt -- what was
8    their --
9    A.   It varied at different times.
10   Q.   Well, in 19, let's say '93, when you
11   first started, what was it?
12   A.   In 1993 when I first started, my
13   recollection is that PPI was an operating arm of the
14   Democratic Leadership Council at the point.
15   Q.   So it was not an exempt organization?
16   A.   No, it was within the C4.
17   Q.   It was within the C4.  Okay.  Did it at
18   any point in time take on its own status as a C3 or
19   a C4?
20   A.   Yes, sir.  It had begun as a C3.
21   Q.   I see.  And then what happened after
22   that?
23   A.   It -- this predates me.  So my knowledge
24   only comes from the records that were given me.
25   Q.   Okay.

Page 20

1    A.   But PPI was originally founded as a
2    501(c)(3) institution.
3    Q.   Okay.
4    A.   At a certain point it was not viable, and
5    became an operating arm of the Democratic Leadership
6    Council.  And my recollection is that the
7    Progressive Policy Institute changed names and
8    became the Progressive Foundation.  Subsequent to
9    that -- you did ask me to trace this off.
10   Q.   Yes, sir.
11   A.   I want to give you an answer that you
12   asked for.
13   Q.   Go ahead.  Take your time.
14   A.   Sometime in the late '90s, I can't recall
15   when, because I'm 48, we decided that the C3 was a
16   viable entity and that PPI would be -- it became
17   apparent to me that PPI did nothing that was not
18   completely comfortable within a 501(c)(3) as I
19   understood it.
20        Its activities were completely within
21   that realm.  And I saw no reason why it shouldn't --
22   those operations shouldn't enjoy the full benefit of
23   that status.  It's easier to raise money as a C3.
24   You can raise money from foundations, all these
25   things that you are aware of.

Page 21

1        So at that point, somewhere in the late
2    '90s PPI went back into C3.  And I guess it still,
3    you know, remains that way to this day.
4    Q.   C3, is it fair to say is more of an
5    educational kind of organization?
6    A.   Educational research.  Yes, sir.
7    Q.   Okay.  Very good.  Now, you also
8    indicated that there were some departments that were
9    part of the structure of DLC; correct?
10   A.   Yes.
11   Q.   One of those departments you said was the
12   Field Department?
13   A.   Yes.
14   Q.   What was the Field Department?
15   A.   Basically a liaison to any third-party
16   groups that wanted to work with us.
17   Q.   And what kind of third-party groups are
18   you referring to?
19   A.   It could have been anything from -- let's
20   just say like a mayor would call, or some outside
21   group would call, or maybe Al was going to take a
22   trip to California, you know, they would plan the
23   trip.  They were just kind of the classic external
24   affairs function.
25   Q.   And did the DLC at this point in time

6 (Pages 18 to 21)

**Page 22**

1  have state chapters around the United States?
2      A.  It wished.  It had a few chapters but not
3  extensive.  And they were pretty spotty and, yeah.
4      Q.  What were the most active state chapters
5  that you recall back in the early to mid '90s?
6      A.  Florida.  It was pretty thin, I have to
7  tell you.  California got a little bit active as a
8  group of legislators, as I recall.
9          There was not a lot there.  Colorado, Jim
10 Gibson was always kind of a stalwart.  At various
11 times Pennsylvania had a little bit of a group,
12 Wisconsin had a little bit of a group.
13          And you have to understand when I say
14 little bit of a group, I mean a little bit of a
15 group.  We were not -- not a mass movement.  It
16 would be incorrect to think of us in the way you
17 would think of like a -- there were no shock troops.
18 I'll put it that way.
19     Q.  No what?
20     A.  No shock troops.  If we had a dozen
21 people in a chapter, it would be a good day.
22     Q.  Did DLC have any volunteers around the
23 country?
24     A.  Yeah, that's what I meant.  That's what
25 these people were.  There's -- largely voluntary.  I

**Page 23**

1  would be shocked if any of them ever raised or
2  spent more than $5,000 in a year.
3      Q.  Let's take Florida as an example, since
4  you said it was one of the more active troops.
5      A.  Yes.
6      Q.  Who were the members of the Florida DLC?
7      A.  My recollection is that the leadership
8  was John Mills, who was a former speaker of the
9  House.  And I think now John is the dean of the law
10 school -- do you know which school in Florida has
11 the law school; Florida or Florida State?
12     MR. BAUER:  Probably both.
13     MR. MARTINEAU:  I think they both have
14 law schools.
15     A.  Well, he's the dean at one of the law
16 schools there.  John was very active.
17          I think that there would have been
18 probably been what was his name, Barney, Barney
19 Bishop, who later actually became a Republican and
20 supported Jeb Bush.  Barney was the Executive
21 Director.
22          Mayor of Tallahassee, Scott, I forget his
23 name, couple legislators from the Tampa area.  What
24 was that wacky guy from Palm Beach that was a big
25 fundraiser, Monty, I forget his name.  Anyway, it

**Page 24**

1  was just kind of a kind of an assortment.
2      Q.  Okay.  And were these individuals elected
3  officials in Florida?
4      A.  John was not.  He was the former Speaker
5  of the House.  And I think he had run for Congress
6  and lost.
7      Q.  And was he a Democrat or Republican?
8      A.  John was a Democrat.
9      Q.  Are all these individuals you mentioned
10 were they all Democrats at the time they were part
11 of the Florida DLC?
12     A.  You know, I don't know.  My suspicion
13 would be yes but, you know, truth be told, we didn't
14 check at the door.
15     Q.  Okay.  Very good.  And what was the
16 relationship, just so I understand, between the DLC
17 or the national DLC and the state chapters?
18     A.  We granted them a license to use the
19 name.  Otherwise, they were separate entities.
20     Q.  Okay.  Did you have any joint activities
21 with them?  Did the DLC and the state chapters have
22 joint activities?
23     A.  Only insofar as like, say, they would
24 have an annual meeting and ask one of us to come
25 down and speak.

**Page 25**

1      Q.  All right.  Did the national DLC, we'll
2  refer to the DLC as the subject of the case, did
3  they have any training programs with regard to these
4  state chapters that you are discussing?
5      A.  We had a training program.  Sometimes the
6  state chapters helped us execute it.  Yes.
7      Q.  What was the training program?
8      A.  Gosh.  Somewhere around the mid '90s, we
9  concluded that the ideology we were trying to
10 advance, let's just for the sake of this discussion
11 call it New Democrat Ideology, was not something
12 that people woke up every day and understood.
13          It was truly different from traditional
14 policy thinking and that Clinton kind of got it.  He
15 was the exemplar, if you will, of a new kind of
16 thinking.  And we felt that it wasn't widely
17 understood, much less to people understand how to
18 apply it.
19          We were a small organization and couldn't
20 be everywhere.  And as I've indicated to you, the
21 chapters were pretty much a paper tiger.  So we
22 decided that we needed to try to, you know, educate
23 people.
24          So we put together, we hired a
25 professional business training consultant who

7 (Pages 22 to 25)

Chuck Alston                                                    February 10, 2006

Washington, DC

---

Page 26

1  helped, who taught us the concept of experiential
2  learning. Because we had concluded that the methods
3  we were using were not succeeding very well. So we
4  needed something better. So we borrowed a page from
5  Corporate America, and we would -- so we decided to
6  do these workshops.
7       And there were various iterations of
8  them, but we used the workshops to try to teach
9  people what this kind of New Democrat thing was all
10 about.
11      Q. Okay. Were these, I've seen some
12 documents and I've seen reference to the DLC
13 leadership workshop; is that what you are talking
14 about?
15      A. Yes, sir.
16      Q. And these workshops, if I understand
17 then, were focused on the various state chapters.
18 Is that correct?
19      A. No. They were focused on state and local
20 officials.
21      Q. Okay.
22      A. But not on -- not necessarily on state
23 chapters. As I indicated before, sometimes the
24 state chapter assisted us, but sometimes we were --
25 we worked with other groups.

Page 27

1       Q. Okay. So --
2       A. But that was one method to it, not the
3  sole method.
4       Q. So the participants in the DLC leadership
5  workshops would be state elected officials. Is that
6  correct?
7       A. That was generally the case.
8       Q. Okay. And there could have been some
9  activist types that participated as well?
10      A. Yes, or third-party types, you know,
11 maybe a Sierra Club member or somebody like that who
12 was kind of peripherally interested in what we were
13 doing.
14      Q. Okay. And were the elected officials,
15 the state elected officials who did participate,
16 were they Democrats, the ones that would
17 participate?
18      A. Largely. But again I want it to be
19 clear, not once did we ever ask for, you know, some
20 kind of show us your card or what's your
21 registration before we would do this.
22      Q. Understand. Now -- go ahead.
23      A. But we were the Democrat Leadership
24 Council.
25      Q. You were the Democrat Leadership Council.

Page 28

1       Now, you said that the purpose of these DLC
2  leadership workshops was to explain and promote the
3  New Democrat ideology, I think you said. Is that
4  correct?
5       A. Yes.
6       Q. What do you mean by The New Democrat
7  ideology?
8       A. Have you got a day?
9       Q. I do.
10      A. It took us a day to teach these guys.
11 Let me see if I can come up with one in a nutshell
12 that would be a good one. Take welfare.
13      Q. Yes, sir.
14      A. It's a good issue actually to look at
15 because it ended up with us on kind of both sides of
16 the aisle and kind of everybody irritated with us.
17 The Old Democratic way of doing, you know, kind of
18 welfare state politics was to give people all the
19 income assistance they needed.
20      The Reagan era ushered in kind of a
21 popular conservative thinking that was every man for
22 himself. We felt that there was a different role
23 for government and for public policy in terms of
24 giving an individual the tools they needed to lift
25 themselves out of poverty, but limiting that

Page 29

1  assistance and limiting the role of government to
2  giving its -- the old elected Christian principal,
3  teach a man to fish, then you don't have to give him
4  his fish every day. He can catch them.
5       That was our theory. Let's give these
6  mothers the education they need. Let's give them
7  the child support they need. Let's remove all the
8  barriers to them working and having a dignified way
9  of living. And then we will set limits on how long
10 that will last. And that would be the new role that
11 the government would play.
12      So I guess what I'm trying to say is it
13 was generally a new thing and a new way of thinking.
14 And what we learned is that we were too small to say
15 this is how you apply that thinking to a guy who's
16 got to write zoning codes or do development issues.
17 But if we could teach them the principles of
18 ideology and kind of give them a few examples, then
19 they could apply that to the policy decisions they
20 faced every day on the ground.
21      That was the thinking behind the workshop
22 was that, you know, that we had to teach people what
23 it is we were about, and then they would have to go
24 back home and apply it to the everyday lives of
25 their community.

8 (Pages 26 to 29)

Chuck Alston                                                    February 10, 2006

Washington, DC

**Page 30**

1    Q.   Okay.  Now, so the DLC leadership
2  workshops were focused on articulating and teaching
3  the principles of ideology that you just explained.
4  Is that right?
5    A.   Yes.
6    Q.   And the idea was that, for example, a
7  state or local official, if they understood those
8  ideological principles, could then apply that in
9  their policy-making decisions?
10   A.   That's right.
11   Q.   Presumably some of them would be running
12  for office or running for re-election and
13  articulating those principles as well, I would take
14  it?
15   A.   I would imagine they would.
16   Q.   Now, you said the manner in which you did
17  this was to hire -- the DLC hired an outside firm to
18  teach the --
19   A.   We hired a woman.  The first one was
20  Anita Gottlieb, I think.  I could be wrong about
21  that, but --
22   Q.   And she was with a consulting firm?
23   A.   No.  I think she was a, in fact, I'm not
24  even sure that Gottlieb was her last name.
25   Q.   There's some documents I have to show you

**Page 31**

1  later that may refresh you.  Be that as it may, you
2  hired someone?
3    A.   We hired her.  And we developed a program
4  in which we developed this thing called the policy
5  tree.
6    Q.   Okay.
7    A.   And, you know, together we helped develop
8  this thing.  And that was, you know, and that was
9  kind of a tool.  And then we would -- I'm sorry.  I
10  forgot the question.  I don't want to go blathering
11  off.
12   Q.   That's fine.  I wanted you to explain who
13  conducted the workshops and how they went about
14  conducting them?
15   A.   At first we would have Anita actually
16  come and we would do it with her.  And then we began
17  to think, well, this isn't rocket science.  So we
18  would conduct them ourselves, to save the money.
19       And then we even trained other people to
20  do it, the train the trainers program.
21   Q.   Training the trainers.  Just so I
22  understand, initially Anita, let's say, was the
23  person who actually was hired to actually conduct
24  the workshops?
25   A.   Right.

**Page 32**

1    Q.   And then subsequently DLC personnel
2  conducted those workshops?
3    A.   Right.
4    Q.   Who were the DLC personnel who conducted
5  the workshops?
6    A.   Oh, boy.  It was largely me.  I think
7  maybe Doug Wilson might have done some.
8    Q.   Just for the record, who is Doug Wilson?
9    A.   Doug Wilson, I forget his title.
10   Q.   But he was a DLC staffer?
11   A.   Yeah.
12   Q.   Okay.
13   A.   Debbie Cox.  Did I mention Ed Kilgore.
14   At one point but, yes, go ahead.
15   A.   We were staffed by John Hasselmann, Jeff
16  Valenzuela, and in the latter years, gosh, he's
17  still there, I think he's a young kid, an attorney;
18  I don't -- I think that's who largely did them.
19   Q.   Okay.  Good.  And then when you said,
20  Mr. Alston, that you were training the trainers,
21  what do you mean by that, just so I understand?
22   A.   We would have like, I don't remember who
23  but, you know, we would take them through and teach
24  them what we had learned from Anita so that we
25  wouldn't, I mean, the point of this is we were

**Page 33**

1  always very small, no budget.  So we couldn't get
2  places, so the idea was teach them and then, God
3  bless you, go do the best you can.
4    Q.   Sure.  And where did these sessions, the
5  DLC leadership workshops take place?  Were they in
6  the States?  Were they in Washington or both?
7    A.   Both.  But largely in the States is my
8  recollection.  Yeah.
9    Q.   So you -- the teachers would actually go
10  to the states --
11   A.   Right.
12   Q.   -- conduct them, the workshops?
13   A.   Right.
14   Q.   And how long did they last?  Were they
15  one-day workshops, were they --
16   A.   We started out -- they were more than a
17  day, because I do recall that at a point we had to
18  pull back because we -- people told us it was too
19  much.  Because you understand that everybody had a
20  day job.  And so they had to like give up time to
21  come.
22       So it was very difficult to get people to
23  come to a two-day.  So I think we developed a
24  shorter version.
25   Q.   Okay.  And you called it experiential

9  (Pages 30 to 33)

Chuck Alston
February 10, 2006
Washington, DC

Page 34

1  learning. Just so the record is clear, what did you
2  mean by that?
3      A.  You learn better by doing than by sitting
4  there passively having someone talk to you.
5      Q.  So I take it the actual workshops were
6  interactive between the teachers and the
7  participants?
8      A.  They were.
9      Q.  So they weren't purely a lecture
10 situation then?
11     A.  No.
12     Q.  Very good. Just a couple other questions
13 about the structure of the DLC so I understand it.
14 You mentioned the Field Department. We've discussed
15 that. Was there a political department within the
16 DLC?
17     A.  Some people referred to the, you know,
18 Field Department as a political department.
19     Q.  Okay. And other than what you have
20 described here today already about the Field
21 Department --
22     A.  Right.
23     Q.  Were there any other responsibilities
24 that the political department had within the
25 structure of the DLC?

Page 35

1      A.  No. And the reason it had that name is
2  just because it's a, you know, a more commonly
3  understood name than Field Department.
4      Q.  Okay. All right.
5      A.  But it was a liaison function.
6      Q.  It was a liaison function with the states
7  and with third-party groups?
8      A.  Right.
9      Q.  Was Ed Kilgore the head of the group?
10     A.  At one time he was a political director,
11 but he was not the field director.
12     Q.  Okay.
13     A.  Ed was a general with no troops.
14     Q.  Okay.
15     A.  There was someone else who actually saw
16 the field operations. Ed, should you meet him, you
17 will come to understand that you would not put him
18 in charge of lots of people.
19     Q.  Okay. All right. Very well. Now, let's
20 just talk about the DLC as an entity. And let's
21 focus on the time that, from the time you were
22 Executive Director, approximately how many members
23 did the DLC have?
24     A.  You know, not many, because we really --
25 probably never more than a thousand.

Page 36

1      Q.  Okay.
2      A.  That was not a focus of the organization.
3      Q.  Okay. And how does one -- did one become
4  a member of the DLC? What do you mean by a member
5  of the DLC?
6      A.  If the truth be told, it was very hard to
7  become a member of the DLC because dealing with
8  people and their $50 memberships was more trouble
9  than it was worth. On the other hand, as any
10 organization, if someone comes to you and says, I
11 would like to join; you have got to give them a way
12 to join you.
13     Q.  Right.
14     A.  So basically you could become a member by
15 sending us 50 bucks and we sent you a magazine. And
16 you could come to a meeting and things like that.
17     Q.  You could go to events and things like
18 that?
19     A.  Yeah, if we had them. But we didn't
20 require people to join, necessarily.
21     Q.  So how was the organization then
22 financed, if you didn't have these --
23     A.  We went and raised money from
24 corporations and individuals.
25     Q.  Okay. Good. Now, so you had fundraising

Page 37

1  events then to raise the --
2      A.  No. No.
3      Q.  No?
4      A.  No. We raised money but it was not
5  largely event driven. It was more programmatically
6  driven.
7      Q.  I see. Now, were the -- when I talked
8  about membership, I'm talking about individual
9  citizens participating?
10     A.  Right.
11     Q.  Now, did the DLC attempt to recruit
12 elected officials to be associated with or members
13 of the DLC?
14     A.  You know, not really. Because then
15 people wanted to play score-keeping games. You know
16 some -- and we never wanted to play the game on
17 anyone else's turf. Let me explain.
18     Q.  Explain. Yes, sir.
19     A.  You are a reporter and you call and you
20 ask the series of questions that you just asked.
21     Q.  Yes, sir.
22     A.  And they go, well, gosh, you only have
23 1850 members. The AFL-CIO has 400,000 members, and
24 the National Rifle Association has 750,000 members,
25 and the Christian Coalition has all these other, you

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400                    Washington, DC  20005

Chuck Alston                                                      February 10, 2006

Washington, DC

## Page 38

1  know, activist groups. You have only got -- or they
2  would want to say, well, how many elected officials
3  are members.
4       Well, I didn't -- and Al didn't, and no
5  one wanted to play that game because that's not the
6  way we wanted to keep score. You know, we wanted to
7  keep score on the bigger picture, like was this
8  country changing, and not get mired down into the do
9  you have as much muscle as these people or those
10  people.
11       So the truth be told, we never really
12  gave a fig about the membership numbers except for
13  the purposes of, you know, if you needed to raise
14  money from a corporation, you of course wanted to
15  appear very impressive. So you would want to say,
16  you know, we've got all these, you know,
17  relationships with people who matter.
18       But that was just not -- it's not the way
19  we kept score.
20       Q.  Okay. Now, during this period of time
21  when you were Executive Director, was there in the
22  House of Representatives a House New Democratic
23  caucus, so to speak?
24       A.  One was formed by Cal Dooley sometime in
25  the '90s.

## Page 39

1       Q.  Um-hmm. Okay. Approximately how many
2  members of that caucus were there?
3       A.  You know, I think at one point it might
4  have gotten all the way into the 70s, but think they
5  subsequently decided to pull back because people
6  would join for the convenience of the label, who
7  weren't really kind of New Democrats.
8       Q.  Okay. And what about -- and what was the
9  relationship between like the House New Democratic
10  caucus and the DLC?
11       A.  Well, it came and went. They didn't have
12  to license the name from us. So they were able to
13  use it. I mean, you can't --
14       Q.  They did not have to license it?
15       A.  No. Because New Democrat is kind of like
16  conservative or liberal. You can't, like, put a
17  mark on it. So we couldn't keep them from doing it.
18       There were times when we were kind of
19  furious with them because they would want to play
20  the games within the House caucus that we thought
21  didn't really move the ball down the field. But on
22  the other hand, it was warm. I mean Cal is a great
23  guy. I still keep up with him.
24       They generally were interested in the
25  things we were, trade in particular, I think. You

## Page 40

1  know, we were very pro trade, very much thinking
2  global engagement is a good thing for the country.
3  So that was probably the issue we were most strongly
4  allied with them. So it was, you know, and --
5       Q.  Did the DLC conduct events with the House
6  New Democratic caucus?
7       A.  We did things with people who were in the
8  caucus, but we didn't like put on events for them.
9  I mean there were members of the House like, you
10  know, like, you know what these guys are like. You
11  can't really guarantee that they'll do anything or
12  be anywhere.
13       But, yeah, we would invite their people,
14  you know, to speak at our events. Or if they said,
15  well, gosh, could you send your economist up here;
16  we have members who are really interested in the
17  intellectual property issue. We had a pretty good
18  relationship with them, particularly with Rob
19  Atkinson of our technology and new economy project,
20  because they wanted to brand themselves as the
21  Democrats who really understood the new economy.
22       So, yeah, intellectually they might be
23  interested in some, and so we would coordinate. But
24  there was not a tight, day-to-day relationship.
25       Q.  Did the DLC provide any services other

## Page 41

1  than what you have described to the House Democratic
2  caucus?
3       A.  The House Democrat caucus?
4       Q.  Yes.
5       A.  No. We were usually at war with the
6  House Democrat caucus.
7       Q.  The New Democratic caucus. I'm sorry.
8  Congress Dooley's group.
9       A.  The Cal Dooley group.
10       Q.  Did you provide services? You said you
11  provided some speaker and you provided some
12  assistance to them?
13       A.  Yeah, they would have a meeting, let's
14  say, but they would do this with lots of groups, I
15  know. I know I went there and, you know, mostly,
16  you know, sometimes it's -- it was us trying to ask
17  them for things that they didn't want to do.
18       I mean, you have to understand, we are
19  not a service organization. We kind of have a point
20  of view and we are not like our way or the highway
21  but, you know, we don't do things on request for
22  people; not the corporations who fund us or the
23  members.
24       So it would be more like let's say tort
25  reform was going to come up on the House floor, you

Chuck Alston                                                                                                          February 10, 2006

Washington, DC

Page 42

1  know. I might go down there and say, Here's what we
2  think about the tort reform. But you know what,
3  half those guys were going to, you know, vote a
4  different way.
5        So it was not -- it would be really wrong
6  because we wish that they would have done everything
7  they said. And they would probably wish that we
8  would have done these things for them. But that was
9  not the nature of the relationship.
10      Q.   Okay. What about on the Senate side?
11 Was there a Senate New Democratic caucus?
12      A.   Yeah. They formed one. I forget who is
13 the leader.
14      Q.   Was Senator Lieberman involved at that
15 time?
16      A.   Actually, Joe was chairman for many years
17 but he wasn't the actual one who formed that. I
18 think it was some of the younger turks, maybe like
19 Blanche, Lincoln and Tom Carver or some of those
20 folks.
21      Q.   What about Senator Breaux?
22      A.   Well, Breaux, no, the caucus was formed
23 as Breaux was leaving. Breaux was actually more
24 interested in the Centrist caucus, I mean, not that
25 he didn't participate in the New Democratic Caucus,

Page 43

1  but he and Olympia snow did a lot of things
2  together.
3        And I know that, you know, that group
4  took a lot of our health care stuff, for instance
5  but, yes, they formed one, and --
6      Q.   Okay. And so did the DLC provide the
7  same kind of services, if you will, on requests from
8  the Senate New Democrat Caucus as you describe on
9  the House side?
10      A.   Well, I don't think I characterized the
11 House side as us providing services on request.
12      Q.   You said that they asked you for --
13      A.   Sometimes they might ask for a speaker,
14 and if we had something that was on point, we would
15 provide it. But often it would be the case we might
16 also ask if we could appear because we were trying
17 to persuade members to do something that they
18 probably didn't want to do. That happened in fact
19 as much as the other.
20      Q.   Okay. So with respect then to the DLC's
21 relationship with these two caucuses in the
22 Congress --
23      A.   Yes, sir.
24      Q.   Did you provide, did the DLC provide any
25 other kind of assistance other than what you have

Page 44

1  just described to the members up on the Hill?
2      A.   No.
3      Q.   You did not. So it was mostly providing
4  them either on their request or at your request?
5      A.   Right.
6      Q.   Information concerning the policy issues
7  that you --
8      A.   That's right.
9      Q.   So DLC did not provide any staff for
10 these individuals?
11      A.   No.
12      Q.   Okay. All right. Now, we've been
13 talking about and we've made reference to the New
14 Democrats. What is a New Democrat?
15      A.   Well, as I think I tried to explain
16 before, the only way you can really understand this
17 organization or that label or this movement is by
18 looking at ideology and policy. And I think the
19 welfare reform example I gave you is about as a good
20 one as I can.
21        There are people who are interested in --
22 and, look, let's be clear. You go ask any five
23 people what a New Democrat is, you are going to get
24 five different answers. In my opinion, they are
25 people who are interested in modernizing progressive

Page 45

1  policy for the times we live in.
2      Q.   And I've heard the DLC in this case and
3  others talk about modernizing the policy?
4      A.   Right.
5      Q.   And what do you mean by modernizing the
6  policy?
7      A.   Well, the ends remain the same. The ends
8  remain things like equal opportunity for all. But
9  you get there not through as I indicated before,
10 necessarily a bureaucratic driven state supported
11 effort, but maybe you get there through an
12 empowerment strategy where you provide individuals
13 with the tools to do things for themselves.
14        But again it's the idea of the
15 collective action through the community. Of
16 everyone getting equal opportunity, not some getting
17 more opportunity than others. Of the idea that if
18 you get something from the Commonwealth, you give
19 back to the Commonwealth, the idea that underpin
20 national service.
21        I mean a very, I mean, Al would do far
22 better than I ever would at rattling off the five
23 tenets. But, you know, we believed in engagement
24 abroad at a time when most of our party, or most of
25 the Democratic party at least was pulling back from

12 (Pages 42 to 45)

Chuck Alston                                                    February 10, 2006
Washington, DC

**Page 46**

1  that.
2      So it's a very -- it's understood through
3  the principles. And there's really no other way to
4  think about it.
5      Q.  Okay. Now you joined the DLC after the
6  DLC was formulated; correct?
7      A.  Yes, sir.
8      Q.  So you weren't there at the beginning in
9  1985 when they formed the DLC then?
10     A.  1985.
11     Q.  1985.
12     A.  Yes, sir.
13     Q.  Were you asked to or at that point in
14 time to join or did you -- when did you first become
15 contacted by the DLC as far as joining the
16 organization?
17     A.  The first time I ever heard about the DLC
18 I was a reporter in Greensboro, North Carolina. And
19 I actually covered an event with Dick Gephardt or
20 someone who was making a speech. And Will was
21 there. And Joe Biden was there. That's right.
22 That's when I first became aware of the
23 organization.
24         I never joined the organization. I was
25 hired as professional staff in '93, as I indicated,

**Page 47**

1  to become communications director. They hired me.
2  I was a journalist.
3      Q.  You said, if I understood you right, that
4  the purpose of the organization was to modernize
5  thinking on certain policy issues. Is that correct?
6  You used welfare as the example.
7      A.  Yeah, but I think what I indicated that's
8  the best way to understand what a New Democrat is.
9  A New Democrat is someone who believes in
10 modernizing progressive politics and policy for this
11 --- or ideology, I guess, for the era.
12     Q.  Then the DLC's mission, if I understand
13 it, was to promote this New Democrat --
14     A.  That's right.
15     Q.  -- agenda; correct?
16     A.  Yes, sir.
17     Q.  Now, articulate to me what activities the
18 DLC undertook in order to achieve that mission?
19     A.  A wide variety.
20     Q.  Let's articulate them. Take your time.
21     A.  Take national service. I think there's
22 probably no idea that better exemplifies the
23 organization than national service.
24         And this, I've always used this even
25 though it kind of predates me, Will Marshall wrote a

**Page 48**

1  book on citizenship and national service. It was
2  all about the idea that became Americorps. I mean
3  that's kind of the living embodiment, the fact that
4  there's an Americorps and it's actually survived
5  through all these administrations.
6      So he wrote a book. They went out and
7  they promoted it. People like Dave McCurdy, who was
8  then in the House of Representatives, introduced
9  legislation. Americorps, I mean, people ran for
10 office on it. City Year was launched in Boston.
11     This whole notion of that the country
12 would, you know, kind of, I mean, George Will used
13 to deride it, because it was a classic conservative
14 response. He would deride it as paid volunteerism.
15     But, you know, the idea was that you
16 would go out and you would do a year or two of
17 community service, and then the country would help
18 you go to college. And that was -- that was one of
19 the consistent with the principle, that you give
20 something to the Commonwealth, you get something
21 back. So that would embody it.
22     Q.  Okay.
23     A.  Welfare reform. We believed that, you
24 know, welfare reform was one of the great challenges
25 of our time. So as I indicated to you before, we

**Page 49**

1  came up with a third way on welfare reform.
2      Education, this is kind of an interesting
3  one. Well, welfare reform illustrates it too. You
4  throw your ideas out there, you never know what's
5  going to happen to them. Welfare reform very much
6  along the lines that we promoted was passed by the
7  Republican Congress in 1995 because the Democratic
8  controlled Congress did not pass it in 1994.
9      And President Clinton signed that into
10 law. And it was hugely controversial. And what you
11 would think of as the Democratic party, you know,
12 when people think of the Democratic party, they were
13 mad at him, they were mad at us, because they didn't
14 like it.
15     Education is another good example of what
16 we do. We believe that, in fact, education kind of
17 ties everything together we've been talking about
18 over the last hour. It was our belief that public
19 education needed more accountability in this system,
20 that it should be judged on its outputs and not its
21 inputs.
22     And the classic, quote, education
23 reformers in this country, what their solutions
24 were, were to let's put lots more money into the
25 system. We were not opposed to putting a lot more

13  (Pages 46 to 49)

Chuck Alston

February 10, 2006

Washington, DC

Page 50

1 money into the system, but we believed that you
2 couldn't do that without proper accountability.
3      So we believed in a heavy regimen of
4 testing, of promoting teachers based on merit,
5 paying them based on merit; a whole system. I don't
6 want to get into a wonkery, but even like let's get
7 good teachers and put them in the worst classrooms
8 and reward them more for making incremental
9 improvements in a whole range of things.
10     Q.   Well, you know, a guy named Andy
11 Rotherham at the Progressive Policy Institute wrote
12 this. And we called it the 3Rs. Three Rs was
13 something that Lieberman and others promoted widely
14 up on the Hill.
15     There was a guy, we didn't get where we
16 wanted to, and then Bush got elected in 2000. And
17 in '01, shows you how small the world is, this guy
18 down in Dallas, Sandy Cress, who was a school beard
19 member, and he had been a fellow traveler with the
20 DLC in the '80s, I think, in Texas, Bush brought him
21 up to be his education guy.
22     And he took 3Rs. It became "No Child
23 Left Behind," with some modifications, and became
24 the law of the land. And I remember we worked with,
25 you know, anybody and everybody on that thing.

Page 51

1      But again that was our -- it was a
2 distinct point of view. We developed a point of
3 view. We developed a policy. You know clearly we
4 don't write legislation because it takes people who
5 are in the legislature to write legislation.
6      And so that's what we would do. We would
7 do, you know, the same kind of thing across a
8 variety of issues. You would say how can we apply
9 our point of view to this societal problem in a way
10 that breaks the log jam of if you get Will in here,
11 he's the one who will give you the old, he always
12 used that word sclerotic and the stale debate
13 between left and right and get past the old
14 orthodoxies of left and right.
15     So that was the operating MO. Take an
16 issue, apply the framework to it and see if you
17 couldn't get the idea out of the quagmire of the
18 past and get the country onto a new path and an
19 area.
20     Q.   Now, you have described very much in
21 detail those types of policy issues to which you --
22     A.   Right.
23     Q.   -- were trying to change the debate on.
24 It sounds to me as the way it worked as a matter of
25 practical reality, the PPI like Will, those folks

Page 52

1 would develop policy, and then the DLC would try to
2 advocate that and bring it out into the community.
3 Is that a fair statement of what was really
4 happening in reality?
5      A.   Sometimes, yeah. There was other times
6 when, you know, yeah, I'd say a majority of the time
7 that might be a pretty good description. But DLC
8 often had some tension with PPI. And this is even
9 when PPI was within the operating arms of the DLC,
10 because they might come up with an idea that didn't
11 have enough traction or it couldn't be understood
12 well enough.
13     And so sometimes, it was always
14 interesting for me because I had title to both
15 organizations, but so sometimes you would go
16 elsewhere to get the idea. But generally speaking,
17 PPI produced a lot of the ideas. But as I
18 indicated, a lot of other people in the DLC often
19 used those ideas too because they were out there.
20     Q.   Now, you said you had two titles?
21     A.   Right.
22     Q.   Or a title with respect to each one of
23 the organizations?
24     A.   Right.
25     Q.   Just tell us what those titles were?

Page 53

1      A.   I was Executive Director of both.
2      Q.   You were?
3      A.   Yes, sir.
4      Q.   Okay. Good. Now, let's just look at how
5 the DLC -- what vehicles it used to get these --
6      A.   Okay.
7      Q.   -- policy ideas that PPI would generate
8 out into the public domain. Let me just ask you
9 about some specific matters. You indicated earlier
10 that publications were a part of the activities, if
11 I understand, that the DLC undertook. Is that
12 correct? There was a magazine and things like that.
13     A.   Yeah, but I want to make sure I'm
14 answering your question clearly because you put a
15 little premise in there that I am not sure I know
16 how to answer. I want to be clear, PPI put its own
17 ideas out into the public domain.
18     Q.   Understand.
19     A.   The DLC had a variety of communication
20 vehicles that promoted lots of things, including
21 PPI.
22     Q.   I understand.
23     A.   So if the question is tell me about the
24 vehicles DLC used to promote PPI insofar as that's
25 the only thing those vehicles were challenged or

14 (Pages 50 to 53)

Chuck Alston

Washington, DC

February 10, 2006

Page 54

1  did, this answer would be there are none. If it's
2  PPI as a subset of the topics that those things
3  covered, then I can talk to you about the variety.
4  Because it seemed to me you were kind of putting a
5  distinction there that I want to be clear about.
6      Q.  Sure. I understand. Thank you. Let's
7  just look at the communication vehicles that the DLC
8  used.
9      A.  Okay.
10     Q.  That's all I want.
11         MR. BAUER:  If I may, I just want to make
12  sure I understand.  So I apologize if this is, if
13  you prefer that I wait, I just want to make sure I
14  understand.
15         MR. MARTINEAU:  Go ahead.
16         MR. BAUER:  I take it, therefore, what
17  you are saying is the DLC continued to develop its
18  own policy promotions and perspectives so that has
19  to be taken into consideration as well. You seem to
20  be --
21         THE WITNESS:  Well, it's both ways.
22         MR. BAUER:  Right.  That PPI did and as
23  well DLC.
24         THE WITNESS:  Right.  I'm trying to draw
25  a set of diagrams for him.  And it seemed to me he

Page 55

1  was asking me to only do this, which is what DLC
2  vehicles were to promote PPI policies. There were
3  none that were solely devoted to that.  And that's
4  the point I was trying to make.
5         BY MR. BAUER:
6      Q.  And the implication is that, if I
7  understand you correctly, you are suggesting that
8  DLC had policy directions of its own which it
9  developed.
10     A.  It did.  I mean --
11         MR. BAUER:  That's what I wanted to be
12  clear about.
13     A.  And you have to understand at different
14  times though, and you have to understand at
15  different points, there was time in the life of the
16  PPI when it was a, if you will, a wholly-owned
17  operating subsidiary of the DLC, and then there was
18  another time when it was a different organization.
19         So clearly it changed over time.  So I
20  just want to sure that we are not painting with
21  broad strokes something that could have changed over
22  time.
23     Q.  Okay.  Now I just want to, and I thank
24  you for your clarification.
25     A.  Because believe me, I had to live this

Page 56

1  stuff every day.  That made a difference to me then,
2  and I want to be clear about it now.
3      Q.  When you say you had to live this stuff,
4  are you talking about living of what was the
5  activities of the PPI?
6      A.  How to conduct activities properly within
7  the organizations.
8      Q.  Okay.  Very good.  We are going to talk
9  about that a little bit more.  But what I'm going to
10  ask you now are some series of questions of some
11  very practical activities that I understand DLC did.
12  And you tell me what they are, what the purpose of
13  those was.
14     A.  Right.
15     Q.  Magazines, there was a magazine I
16  understood called The New Democrat Magazine.  Is
17  that correct?
18     A.  Yes, sir.
19     Q.  What was the purpose of The New Democrat
20  Magazine?
21     A.  Oh, boy.  The purpose was very noble.
22  I'm not sure in reality whether it ever really met
23  the purpose.  You know, you have got to have a kind
24  of a voice, a flagship for the movement.
25         I mean I wish -- we always called it a

Page 57

1  movement.  I mean, I don't know, it might be a
2  little grandiose but for the purposes of this
3  conversation.
4      Q.  Sure.
5      A.  Kind of the public face, the voice,
6  something the people could pick up and actually, you
7  know, have and throw on the coffee table and show
8  their friends.
9      Q.  Okay.  How much did it cost to produce a
10  magazine like that?  Is that an expensive
11  proposition?
12     A.  No, not really.  And it's hard, you have
13  to understand we didn't allocate personnel costs to
14  the magazine except for, you know, if they went
15  across organizations.  So I can't tell you what the
16  personnel cost is.
17         So as a proposition, stand-alone
18  proposition, I think of the cost directly allocated
19  to the magazine, I think maybe a quarter million a
20  year.  That would have covered Tom Mirga's salary,
21  printing, you know, so not terribly expensive.
22     Q.  And then who provided the content of The
23  New Democrat Magazine?
24     A.  Boy, it was kind of a catch-all.  I mean,
25  I would have to go back through, but it would vary

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400

Washington, DC  20005

Page 58

1    from year to year.  But at times there might be
2    issues that would be largely staff driven.
3           At times it might be we go up and get a
4    guy, like I remember the one with the barn on the
5    cover where we had the picture of the barn raising.
6    I think that was kind of a -- this weird
7    communitarian thing we were doing that had -- that
8    Harry Boyd wrote from the University of Minnesota I
9    think at the Humphrey Center.
10          So it would be kind of an oddball
11   assortment of academics, politicians, policy wonks,
12   and a few journalists.  We would hire professional
13   journalists and commission some pieces sometimes.
14   But it was kind of a catch king because we didn't
15   have much money to pay anybody.
16     Q.   And where, as far as elected officials
17   that you referenced, did Republican-elected
18   officials contribute articles to The New Democrat
19   Magazine?
20     A.   You know, I can't remember.  But I bet
21   you that if I put down those articles there that
22   somewhere in there we did.  Because I know we did
23   stuff with Republicans.  So I'm sure we must have
24   had something along the way.
25     Q.   Okay.

Page 59

1    A.   I know we did Jim Pinkerton, who held a
2    position, I think he was a domestic policy director
3    for George Bush.  I remember Jim wrote a piece for
4    us.  We did, when we had Rudy Giuliani on the cover,
5    I can't remember whether we wrote about him, or it
6    was him, but we actually put kind of Rudy Giuliani
7    on the cover.  We had a little dalliance with him in
8    the '90s.
9           I can't -- did McCain -- I don't know.
10   But I'm sure we did somewhere in there.
11     Q.   Okay.
12
13          MR. REESE:  Just to be clear, the
14   question was not did they, which I think you
15   answered, but could they.  I believe that was the
16   question.
17          THE WITNESS:  No, he asked --
18          MR. MARTINEAU:  I asked did they
19   contribute --
20          THE WITNESS:  Yeah.
21          MR. MARTINEAU:  -- to the magazine, and I
22   think you answered that.
23     A.   I think somewhere we had Republicans.  I
24   know we did, because I know about Jim.  I mean, I
25   think, you know, if we could get more Republicans

Page 60

1    who would write about a New Democrat philosophy, I
2    think we'd publish them.
3      Q.   Now, to whom was the magazine
4    distributed?
5      A.   Boy, I can tell you generally.  I can't
6    recall specifically.
7      Q.   That's fine.
8      A.   First of all, anybody who sent us the 50
9    bucks.
10     Q.   So you had to be a member, DLC member?
11     A.   What few members there were.  Second, you
12   know, our contributors.  So if you are like a
13   corporation or something.
14     Q.   Okay.
15     A.   I know we sent it, because I remember
16   Howard Coble joked with me about this.  We sent it
17   to every member of Congress without regard to party
18   because Coble --
19          MR. BAUER:  You might want to describe
20   who Howard Coble is.
21     A.   Oh, Howard Coble, he was my member of
22   Congress from Greensboro, North Carolina, which is
23   where I'm from.  And Howard is a guy I've known
24   since he was in the state house in North Carolina.
25     Q.   Is he a Democrat?

Page 61

1      A.   He's a Republican.  In fact, if he lives
2    long enough, he'll probably chair the Judiciary
3    Committee, God fear us all.
4           He, I went to see him and, God, what was
5    Ed's name, Ed who was his Chief of Staff, two guys I
6    had known from home, and he thought I had sent it to
7    him special.  He said, Oh, I guess I get this
8    magazine because, you know, I know you.  And I said,
9    no, you know, and I told him we sent it to every
10   member of Congress.
11          I said I'd like to be able to take credit
12   for doing you a special favor, Howard, but I am
13   sorry, we give it to all of them.
14     Q.   Very good.
15     A.   So we do all them.  We send it to, I
16   think we sent it to every governor also, you know,
17   every governor.  I don't think we counted Ds or Rs
18   on that.
19          I think we bought some lists, and I can't
20   say outside of Washington with specificity, but I
21   know we sent it to some state local officials.  I
22   don't know whether they were completely ecumenical
23   or it might have been more Ds than Rs.  I just don't
24   know.
25     Q.   Now, there's another publication.  I want

16 (Pages 58 to 61)

Chuck Alston                                                        February 10, 2006
Washington, DC

**Page 62**

1  to ask you specific questions about each of these
2  publications so I understand the activities.
3      A.   Got you.
4      Q.   That's what we are trying to do here.
5  And I appreciate your time.  What was the Blueprint?
6      A.   Blueprint was a -- Blueprint -- will Al
7  see this transcript?
8          MR. BAUER:  He can.  Yes.  But on the
9  other hand, you have taken an oath to speak
10  truthfully.
11      A.   Blueprint was an example whether DLC
12  couldn't -- was at war with itself.  We had a
13  contributor, Bernard Schwartz, great guy, who was
14  really interested in the magazine, because Bernard's
15  a real kind of, you know, the collection of ideas
16  guy.  But he didn't want to put money into the
17  magazine we had.  He wanted his own thing, so to
18  speak.
19          So even though we already had one
20  magazine, we went out and we founded another
21  magazine.  And originally we had wanted to do, I
22  think maybe do the magazine in the C3, but that
23  never came off the ground.  And so Blueprint became
24  a DLC thing.
25          And then over time it made no sense at

**Page 63**

1  all to have two magazines, so we killed the New
2  Democrat and Blueprint is the survivor.
3      Q.   And which entity published the Blueprint?
4  Was it DLC or the --
5      A.   DLC.
6      Q.   DLC.  Okay.  And to whom was the
7  Blueprint magazine distributed?
8      A.   It would be very similar to what I told
9  you.  Because we were pretty careful to try to be
10  ecumenical in publications and stuff.
11      Q.   When you say ecumenical, just for the
12  record, what do you mean by that?
13      A.   For anything we did like the magazine or
14  the think tank publications, anything like that, we
15  made sure that we would send it to, if it went to
16  the Hill, it went to everybody on the Hill.
17      Q.   Democrats and Republicans?
18      A.   Right.  Right.  Although, you know, in
19  today's world with a web site being the chief form
20  of distribution, it's, you know --
21      Q.   I was going to ask --
22      A.   The world.
23      Q.   -- you about the web site in a little
24  while.  So as far as the Blueprint, how much did
25  that cost to print?

**Page 64**

1      A.   The Blueprint was probably more like,
2  because The New Democrat was a lot cheaper.  We
3  actually, Mr. Schwartz gave us enough money to hire
4  some staff, so that would probably be more closer to
5  a half million maybe.
6      Q.   I see.
7      A.   Because we had color.  We actually had
8  some money to do some exclusive polls and, you know,
9  commission pieces.  So it might have been more like
10  four or five hundred thousand.
11      Q.   Okay.  And you said Mr. Schwartz helped
12  to finance the Blueprint magazine?
13      A.   Yes, sir.
14      Q.   And when Blueprint came into being, did
15  The New Democrat disappear or did that continue to
16  be published?
17      A.   They overlapped for awhile and then The
18  New Democrat went away.
19      Q.   And then the Blueprint continued on?
20      A.   Yes.
21      Q.   Now, okay.  Let's focus on some
22  newsletters.  I've seen some newsletters that it
23  likes like the DLC published.  Are you familiar with
24  the DLC update?
25      A.   I am.

**Page 65**

1      Q.   What was the DLC update?
2      A.   That was originally a fax product back
3  when fax was the new fangled way of distributing
4  things.  And we would fax it out, I think it was
5  once a week.
6          And I think that people had to supply us
7  their fax number, because I don't think we had, you
8  know, I know where it began.  It began in the NAFTA
9  campaign.  We worked to help promote the passage of
10  the North American Free Trade Act Agreement.
11      Q.   Understand.
12      A.   And every week we wanted to send around a
13  fax of with statistics on why you should be for the
14  Trade Agreement and all that kind of stuff.  And it
15  turned out that people really liked it, because for
16  the first time they were kind of getting something
17  timely from us.
18          So when NAFTA went away, we decided to
19  convert the NAFTA facts into this DLC update.  And I
20  believe, I could be wrong, but I believe it was a
21  weekly kind of update.
22      Q.   And to whom was the DLC faxed to?
23      A.   That's what I'm trying to -- I can't
24  remember whether you had to call and give us your
25  fax number and ask for it.  I don't -- if it went to

17 (Pages 62 to 65)

Chuck Alston

February 10, 2006

Washington, DC

Page 66

1  the Hill, we'd have done it by the same rules that
2  we did everything else, which would have been we
3  would have hired a firm to blast it at everybody.
4  And we were pretty careful about that.
5      Q.  Now, are you familiar with the so-called
6  DLC briefing; do you recall that?
7      A.  Yes.
8      Q.  What is the DLC briefing?
9      A.  Do you, in fact, do you have a copy?
10     Q.  I do.
11     A.  Because I have to tell you we launched a
12 lot of different products and I want to make sure I
13 have the right one in mind.
14     Q.  Just for the record, we had previously
15 marked in this case Exhibit 14 as the DLC update.
16 Just to make sure in reference to your responses
17 about the DLC update --
18     A.  Right.
19     Q.  That's the fax?
20     A.  That's the fax.  Yes.
21     Q.  And let me just look at the -- it says
22 here at the bottom, this fax is broadcast to
23 thousands of public officials, citizen activists and
24 supporters in the DLC network nationwide?
25     A.  Right.

Page 67

1      Q.  So it would appear that this was faxed to
2  people who supported the DLC's --
3      A.  Right.
4      Q.  -- point of view.  Is that right?
5      A.  Right.  But I think, I just want to be
6  clear, I don't -- if we were pushing out on people
7  who hadn't asked for it, we would have pushed it out
8  to -- we would have bought the list and we would
9  have bought them from a vendor who would have sold
10 us an entire list.
11     But I just can't -- to be honest, I just
12 can't remember whether you had to ask for it or
13 whether we kind of gave it to you whether you wanted
14 it or not.
15     Q.  When you buy it from a vendor, describe
16 what you mean by that?
17     A.  Well, it was back in those days when
18 people still faxed stuff, other than mortgages you
19 don't want, you would go to these vendors who would
20 kind of like -- it's kind of like the books with all
21 the members of Congress in them, they would have,
22 you know, all the fax numbers in some kind of
23 program.  And we would actually give them, this was
24 before we had the technology ourselves, I sort of
25 recall buying it.

Page 68

1      We would give them that and they would
2  charge you like four cents a piece or something to
3  send them all out for you.  And that's what we
4  started doing at NAFTA.  At a certain point we
5  brought it in house.
6      Q.  Okay.  And then you would start faxing
7  out from in house?
8      A.  Right.  And then we killed that product
9  somewhere along the way.  I know to this day, I
10 think there's a -- they still probably do a weekly
11 fax of some sort.
12     Q.  Okay.  Very good.
13     A.  But it's probably slim.
14     Q.  Let's look at the next product, the DLC
15 briefing.  That was previously marked as Exhibit 15
16 in this case.
17     A.  Right.
18     Q.  Identify that document for me and explain
19 what the DLC briefing is?
20     A.  I think that, yeah, this is actually -- I
21 think that, gosh, I think we started this one
22 because when these things would come up like this,
23 we had no way of make making known what we thought
24 point of view was on an issue that was live.
25     So, for instance, the balanced budget

Page 69

1  deal, this would have been our attempt to say, oh,
2  yeah, I remember Al never liked this because I
3  always -- this is my CQ background coming through.
4  If you'll notice, this starts with a very dry
5  President Clinton and the Congressional leadership
6  reached a decision to balance the budget, you know,
7  like a news story.
8      And then so we would lay out the
9  situation.  Then we would establish what are our
10 principles.  So this is the private sector, not
11 government.  This is the primary engine for economic
12 growth and opportunity.
13     So we would say, here's the issue,
14 balanced budget.  Here's the applicable principles,
15 private sector, not government -- fiscal disciplines
16 critical to our country's economic success, you
17 know.  So we laid out the principles and then say,
18 that's why, you know, the New Democrat position on
19 this is a vote yes.
20     Q.  All right, sir.  And to whom was the DLC
21 briefing disseminated?
22     A.  You know, I can't tell you.  My guess
23 would be it would have probably been people in the
24 administration, people on the Hill, reporters.  You
25 know, I mean, because we want journalists to know

18 (Pages 66 to 69)

Chuck Alston                                                              February 10, 2006
Washington, DC

**Page 70**

1  what the position we were taking is so hopefully
2  they would, you know, they never paid as much
3  attention as we wished, but so they would say the
4  DLC is supporting the President's deal with the
5  Republicans on the balanced budget.
6        So it would be kind of everybody.
7    Q.  What about members of Congress?  Would it
8  go to both sides or just Democratic supporters?
9    A.  It would have gone to both sides.  If it
10  went to the Hill, it would have gone to both sides.
11    Q.  Okay.  We are going to run through a few
12  more, and then we are going to take a break.
13    A.  Sure.
14    Q.  Try to get through this part of my
15  questioning.  Are you familiar with the DLC Talking
16  Points?
17    A.  Yeah.
18    Q.  And I can show you one here.
19    A.  Sure.
20    Q.  This DLC Talking Points is dated May 14,
21  1997, previously marked as Exhibit 16.  Identify the
22  document and tell me what the DLC Talking Points is,
23  if you would.
24    A.  You picked a doozy here.  This one got me
25  in big trouble.

**Page 71**

1    Q.  All right.  Well, first identify it and
2  then tell me why it got you in big trouble.
3    A.  The DLC Talking Points, this was our
4  attempt again on, you know, in the world in which we
5  live, in a policy world, there's nothing more
6  valuable, and the Heritage Foundation pioneered
7  this, than a brief, concise summary of a position;
8  what everybody calls the talking points.
9        You know, if you are for something, tell
10  me the five reasons you are for it.  Those are
11  talking points.  So that was, you know, on issues of
12  the day.  And none of these things, you know, we
13  would start these off with noble purposes.  We would
14  do them like a few times, and then we would kind of
15  run out of issues and wouldn't do them again.
16        But this was our attempt to summarize
17  succinctly what we thought the right take was on it.
18  Usually, as in the case of comp time, it was often
19  trying to get people to go where they really didn't
20  want to go.
21        And the reason I laugh about this one is
22  because I got in huge trouble within Democratic
23  circles for this because I took a position it was
24  very -- that the labor movement hated.  And that was
25  very kind of pro business.  And I even wrote a piece

**Page 72**

1  for the Wall Street Journal criticizing, you know,
2  Democrats for not modernizing.  Because, do you
3  know, are you familiar with the issue of comp time,
4  flex time?
5    Q.  I do.  Yeah.
6    A.  So that was, you know, the unions hated
7  that.
8    Q.  So the DLC Talking Points was another
9  vehicle to communicate?
10    A.  Communicate succinctly a point of view on
11  issues of the day.
12    Q.  Okay.  And this particular one got you in
13  trouble because it was the policy that you
14  advocated?
15    A.  Senator Kennedy's staff hated it.
16    Q.  Very fair enough.  And who drafted up
17  those talking points?  Who actually did the
18  drafting?
19    A.  Usually it would be Ed Kilgore or me.
20  Sometimes maybe, you know, sometimes maybe if --
21  because, you know, the wonks weren't very good at
22  doing talking points.  That's why they are wonks.
23    Q.  And so it's the same with the DLC update,
24  it would be yourself or Ed Kilgore?
25    A.  Ed Kilgore or maybe, you know, but it was

**Page 73**

1  generally somebody who was a writer.
2    Q.  Right.  The wonks would do more extensive
3  policy research type work and you --
4    A.  Some were capable of doing both.
5    Q.  Right.
6    A.  But by and large those products were
7  produced by Ed or myself or someone.
8    Q.  Very good.  I want to show you another
9  document called -- that's been marked as Exhibit 17.
10  It's called The DLC Fax.  Could you identify that
11  document for me?
12    A.  Yeah.  You notice how all these products
13  are kind of -- this was my move toward -- I really
14  wish that -- there was a time when I wanted to call
15  it The DLC Fax, The DLC Magazine, the DLC, you know
16  just have it all generic.  No Blueprint, no New
17  Democrat, just DLC this and that.
18    Q.  Go ahead and identify it.
19    A.  This was a -- I think this was -- I can't
20  remember whether we summarized, yeah, I think we
21  tried to just cram a couple of things once a week,
22  you know, and blast it out to people so they would
23  know we are alive and well.
24    Q.  And when you say blast it out to people,
25  who do you blast it out to?

19 (Pages 70 to 73)