Page 74

1   A.   In those days, see, we quit doing this.
2   In those days this has events, kind of promoting
3   upcoming events and stuff, as well as communicating,
4   you know, something on teen pregnancy. Oh, how
5   about that, teen pregnancy. Wow.
6        Yeah, so this would probably have been
7   mostly to people who considered themselves, you
8   know, kind of DLCers. Because, I mean, just looking
9   at this why, you know, we are talking about a policy
10  forum that had Joe Klein, who I guess was -- I can't
11  remember whether he was at Time Magazine at that
12  time or not.
13  Q.   Very good and --
14  A.   But I think it was more of an internal
15  thing, but I can't --
16  Q.   DLC supporters.
17  A.   But, yeah, but it might have also -- I'd
18  have to go back and look at the computer records,
19  but I think we liked to send those things to press
20  in those days too, which was why we put the 1200
21  down there to try to make the press see that we had,
22  you know, some folks.
23  Q.   Very good. I want to show you another
24  document, Mr. Alston, that's been marked as
25  Government's Exhibit 18. Can you identify this

Page 75

1   document for me?
2        - - -
3        (The witness reviews a document)
4        - - -
5   A.   Yes.
6   Q.   What is that document?
7   A.   This would have been, you know, the top
8   is clipped off, but it would have been one of these
9   kinds of things.
10  Q.   Just what does it say?
11  A.   This says "Idea of the Week."
12  Q.   Idea of the week. Okay.
13  A.   But the idea of the week was something,
14  and they still do it to this day, at a certain point
15  we did something called the New Dem Daily. And it
16  was our attempt to, every day by noon, get something
17  out, a point of view on something. And it was kind
18  of a classic what have you got to say kind of
19  something.
20       And at the end of the week, we would take
21  a couple of those and summarize them. And I think
22  we kind of really liked the idea of the week, so
23  this looks like, you know, I thought we had two
24  pages. That's why I'm kind of surprised to see one.
25  Q.   I might have just used this as an

Page 76

1   example, so it very well could have been two.
2   A.   But we would summarize the end of the
3   week. And on Friday we would send out a fax,
4   because we didn't want to send out a fax every day,
5   that would summarize of the five we wrote that week,
6   the one or two or three best that we could fit on
7   the two pages. And we always did the "Idea of the
8   Week," because that was kind of the highlight.
9   Q.   And who drafted up the "Idea of the
10  Week"? Was it yourself or Ed Kilgore?
11  A.   This was generally Ed.
12  Q.   Ed. Okay. And the audience that
13  received this, was this DLC supporters like the
14  other -- like the previous document you identified?
15  A.   Yeah. And I would note that this one is
16  on physician profiles. I mean, boy, talk about a
17  cutting edge winner of an issue.
18  Q.   Got you. Very good. Let me show you
19  another product that's previously been marked as
20  Government's Exhibit 19. Can you identify this?
21       - - -
22       (The witness reviews a document)
23       - - -
24  A.   Yeah. I think this was, what year is
25  this, '95.

Page 77

1   Q.   Just identify, this is called State,
2   Monthly State --
3   A.   Oh, I'm sorry. Monthly State Leadership
4   Update.
5   Q.   Okay.
6   A.   I don't know how long we did this.
7   Q.   Okay.
8   A.   But there was a time, and this would have
9   been when Simon Rosenberg was there, where he really
10  wanted, you know, people around the country wanted
11  to see our stuff. And so I think we sent this
12  around the country.
13       It would probably have been mostly to the
14  people who were, you know, like I mentioned John
15  Mills earlier, it would have been to the John Mills
16  and Barney Bishops of the world. Probably, we are
17  probably talking in dozens or scores probably, maybe
18  three digits but I'm not sure because, you know, it
19  would have been a packet of materials.
20  Q.   All right. You mentioned Simon
21  Rosenberg. And I think he is an individual that's
22  involved somehow in The New Democrat movement. Is
23  that correct?
24  A.   When I -- Simon was the field director of
25  the DLC in the early days.

Chuck Alston  
Washington, DC  
February 10, 2006

Page 78

1  Q. What is he doing right now?
2  A. He runs The New Democrat Network.
3  Q. Okay. Is that New Democrat Network
4  affiliated with the Democratic Leadership Council?
5  A. No.
6  Q. What is the organization, just so it's
7  clear, that Mr. Rosenberg runs that has New Democrat
8  in its name?
9  A. You know, I'm not sure. I think it's a
10 pact but it might be a 527. I just don't know. You
11 would have to --
12 Q. Okay. Very good. Now, let me -- I've
13 got a couple more here.
14 A. But, but --
15 Q. Go ahead. Finish your question. You had
16 a comment about Mr. Rosenberg's group?
17 A. It was self-serving. Just go ahead.
18 Q. Well, I want to hear it. I'm asking the
19 deposition. Tell me what it was.
20 A. Simon left to do all the things we
21 couldn't do at the DLC.
22 Q. And what things could you not do at the
23 DLC that Simon could do?
24 A. To be solely for and about electing
25 Democrats.

Page 79

1  Q. And why couldn't you do that?
2  A. Because that's not what our goal was.
3  Q. What is your goal?
4  A. And that's what Simon wanted to do.
5  Q. What is your goal?
6  A. To advance this New Democrat ideology.
7  Q. I'm sorry?
8  A. To advance this New Democrat ideology.
9  Q. And some elected officials adopt that New
10 Democrat ideology when they run for office; correct?
11 A. Some adopt it when the President of the
12 United States in the past --
13 Q. That's right, including the president of
14 the United States.
15 A. Of both parties.
16 Q. Give me an example of someone from the
17 Republican party who ran as a New Democrat or
18 supported the New Democrat ideology.
19 A. George Bush, in fact you will find
20 somewhere in a speech where he talks about having
21 admiring what we did and being knowledgeable of it.
22 And I think the aforementioned example I gave you of
23 his education interest, and Sandy Cress who got that
24 because of the DLC. He in fact boasted of having
25 stolen our ideas.

Page 80

1  Q. Did outside -- and this you are talking
2  about George W. Bush?
3  A. Yes, sir.
4  Q. Okay. Other than President Bush, is
5  there any other Republican who you know who's run
6  for office as -- and promoting the New Democrat
7  philosophy?
8  A. Well, I don't know that any Republican
9  would run saying I'm a New Democrat, but there are
10 many who ran for office on our philosophy or have
11 used it as legislators, yes, I mean, plenty.
12 Q. But you are saying but not in name. No
13 Republican has adopted the name, saying I am a New
14 Democrat but I'm running on the Republican ticket
15 for a certain elected official office?
16 A. If they did, they should have their head
17 examined. You would never get out of a primary.
18 Q. I understand. So the answer to my
19 question is, no, you don't know of any Republican
20 who's run publicly avowing the New Democrat
21 philosophy?
22     MR. REESE: That's a mischaracterization.
23 He said that there was no one running as a New
24 Democrat, not that there was no Republican avowing
25 using New Democrat philosophy.

Page 81

1  A. I don't know. To be honest, I don't know
2  that a Republican has never called himself a New
3  Democrat.
4  Q. Fair enough.
5  A. I don't know.
6  Q. You don't know.
7  A. I don't know.
8  Q. Okay. Let me look at another document
9  here, number 20. This is a document that has been
10 previously marked as Government's Exhibit 20. Can
11 you just identify that and tell us what the document
12 is and to whom it was distributed, Mr. Alston?
13     - - -
14     (The witness reviews a document)
15     - - -
16 A. This says DLC news release.
17 Q. Yes, sir.
18 A. We would have sent it to reporters.
19 Q. Okay.
20 A. The news releases go to reporters.
21 Q. Okay. And that was the news release in
22 regard -- what was the subject matter of that
23 particular one?
24 A. Penn poll outlining Americans post Cold
25 War attitude on foreign policy and national

21 (Pages 78 to 81)

### Page 82

1  security.
2  Q. Very good. And that one went to press as
3  a news release?
4  A. Yes, sir.
5  Q. Let me ask you about a couple other
6  products and then we are going to take a break. Can
7  you tell me, so I understand, what was the DLC Idea
8  Book? Do you know what that is?
9  A. The idea book was a, well, have you seen
10 one?
11 Q. I have seen one. Yes, sir.
12 A. It's a collection of our policy ideas.
13 Q. And who supplied the content of those
14 policy ideas? Where did they come from?
15 A. A variety of sources. In fact, one of
16 the reasons we started the Idea Book is we needed a
17 vehicle not only to promote our own ideas but also,
18 you know, a way to take kind of best practices so
19 like, you know, that thing we were looking at
20 earlier, the physician profiling.
21 Q. Yes, sir.
22 A. That was something Mark Pacheco did up in
23 Massachusetts. So we would take that or, you know,
24 so it was a way to do our own stuff but also other
25 people's and put it into a concise notebook that

### Page 83

1  somebody could actually get through.
2  Q. So it would articulate the New Democrat
3  principles is what you are saying, in the --
4  A. No. This was more practical ideas that
5  you could implement, but it was a little mix of
6  both. And some of them would have been like here's
7  theory. And others would have been like here's a
8  really good example of something they did in
9  Colorado, you know, that you could do in your state.
10 Q. Who published it? Did the DLC publish it
11 or did the PPI?
12 A. The DLC.
13 Q. Very good. How often was that, the Idea
14 Book published?
15 A. Well, published makes it sound like it
16 happened at a discreet moment in time. We would try
17 to update it once a year, but if there was
18 something, you know, good came up, you know, it was
19 done in a loose-leaf notebook so you could, you
20 know, stick it in. So, but, yeah, we generally
21 tried to go through it once a year to make sure it
22 was still accurate.
23 Q. Very good. Now, a couple other products
24 that I've seen referenced in the documents are The
25 New Democratic Dispatch. Do you recall what that

### Page 84

1  is?
2  A. The New Dem Dispatch was the successor to
3  The New Dem Daily. The name changed because they no
4  longer wanted to do a daily. So you couldn't call
5  it a daily if it were twice a week, so they just
6  changed the name to the Dispatch.
7  Q. In all other respects, is it the same as
8  The New Dem Daily?
9  A. Yes.
10 Q. Okay. And then the New Dem Daily was
11 another part that I had. You described it, to whom
12 was The New Democrat Daily, slash, Dispatch
13 disseminated to?
14 A. You know, that's an e-mail product and
15 anybody in the world can come sign up and ask for
16 it. So to tell you the truth, I don't think there's
17 a soul on the earth other than a computer operator
18 who even knows.
19 Q. That was an e-mail product, you said?
20 A. Yes. That was an e-mail product. And
21 then, but as I indicated there were people who could
22 opt in to have it faxed to them. So you could type
23 in your fax number. And I think that they still do
24 that, although I'm not certain.
25 Q. How about the DLC Overview? Do you

### Page 85

1  recall a product called the DLC Overview?
2  A. Oh, lord. But if you show it to me, I'm
3  sure it's something that I started.
4  Q. I don't have it with me, so I'm going to
5  move on to another area and then we'll take a break.
6  Did the DLC have a web site when you were
7  the Executive Director?
8  A. Yes, sir.
9  Q. When was the web site established?
10 A. I don't know exactly but it would have
11 been somewhere in the mid -- Simon was still there
12 because I remember arguing with him about it. So
13 that would have placed it before '96.
14 So I want to say '94 or '95, about the
15 same time that other people were getting into it.
16 You know it was kind of if you don't do this, you
17 are not cool.
18 Q. So it was in existence when you came on
19 board as first communications director of DLC?
20 A. No, it was not.
21 Q. It was not.
22 A. That was the source of the quarrel.
23 Q. Well, I was just going to ask you what
24 was the quarrel that you had?
25 A. Over whose department got to run it.

Page 86

1  Q. I see. So whose department did get to
2  run it?
3  A. The Communications Department.
4  Q. And you were the head of the
5  Communications Department when you first started?
6  A. Yes, sir.
7  Q. So you won that particular battle then?
8  A. Well, yeah, I mean, I suppose. I think I
9  got the short straw, actually.
10 Q. How did it work? Was it operated in
11 house? Did you contract out for it when it first
12 started?
13 A. I think we, you know, I don't remember.
14 I remember we -- because the original was kind of
15 failing wire and chewing gum. And I can't
16 remember -- it was probably hosted on an outside
17 server, but I just can't remember. And we hired --
18 it was really rudimentary.
19    And then we hired, we had somebody
20 in-house who learned how to do the post stuff.
21 Because we didn't have -- it wasn't a database web
22 site then. It was just one you posted items to.
23 And then we upgraded it at some later point. But we
24 probably hosted it on an outside server in the early
25 days. And I think they still did.

Page 87

1  Q. In the early days, what was the source of
2  the content that was posted on the web site?
3  A. Oh, it was nothing more than a place to
4  put all the other "shlock" that we did, you know, on
5  line.
6  Q. Okay.
7  A. So it would be the magazine, I mean, our
8  rule of thumb was no product existed in print that
9  didn't immediately go on the web.
10 Q. I see. All right. And then did
11 subsequently an outside party take over the
12 management of the web site? Do I understand you
13 correctly?
14 A. No. No. What we -- we always managed
15 it. I mean there's two things about the web site.
16 One is the content and one is whatever happens in
17 the back office. We were always in charge of the
18 content.
19    I'm just -- I think that at a certain
20 point, though, we hired some, you know, firm. So it
21 actually the content actually resides on some
22 computer out in the Maryland suburbs somewhere but,
23 no, we always wrote it.
24 Q. We being who?
25 A. DLC personnel.

Page 88

1  Q. DLC personnel. Okay. And did the DLC
2  share the same web site with the PPI or did they
3  have separate web sites when the web site first came
4  into existence?
5  A. Well, when it first came into existence,
6  PPI was part of DLC. And I think that it was
7  DLCPPI.ORG. And then when the organizations -- but
8  I think PPI was always wanting, even then when it
9  was a wholly-owned subsidiary always kind of wanted
10 its own little identity. So I'm sure it probably
11 had a separate home page.
12 Q. To this day, do DLC and PPI, do they
13 share a web site; do you know?
14 A. No. The PPI on line, www.ppionline.org
15 is the web site of the PPI. And www.dlc.org is the
16 web site of the DLC.
17 Q. Okay. Very good. Let's take a break
18 now, about ten minutes.
19    - - -
20    (Recessed at 11:22 a.m.)
21    (Reconvened at 11:36 a.m.)
22    - - -
23 BY MR. MARTINEAU:
24 Q. We are back on the record. Mr. Alston, I
25 want to focus your attention on some other

Page 89

1  activities that I understand --
2  A. Okay.
3  Q. -- from the documents provided to me from
4  DLC that the DLC engaged in in the years 1997, '98
5  and '99.
6  A. Okay.
7  Q. One of the activities, and you have
8  related or referenced it in your earlier testimony
9  today, had to do with trade and fast track
10 legislation. Do you recall that?
11 A. Yes, sir.
12 Q. And there was a trade project I
13 understand that DLC --
14 A. Right.
15 Q. -- was involved in in 1997, I believe?
16 A. Right.
17 Q. And that was the year when President
18 Clinton was trying to get the fast track legislation
19 passed?
20 A. Yes.
21 Q. Tell us first, for the record, what is
22 the fast track legislation, just briefly, and then I
23 want to ask you some questions about what DLC did in
24 regards to that?
25 A. All right. Fast track legislation gives

Page 90

1   the -- fast track gives the President the authority
2   to negotiate and send to the Congress trade
3   agreements that then have to be voted on an up or
4   down basis.
5       Q.   And the DLC's view was that that
6   legislation was consistent with its philosophy about
7   free and open-end trade. Is that right?
8       A.   Yes, sir.
9       Q.   And non-protectionist measures, if you
10  will. Is that correct?
11      A.   Yes, sir.
12      Q.   And what steps or what activities did the
13  DLC undertake in order to promote that particular
14  legislation?
15      A.   Boy.
16      Q.   Just identify them. You don't have to
17  describe them. Just identify them so I understand.
18      A.   I know we did research. We published
19  things. We held meetings. Ninety seven, we might
20  have even done a -- I can't remember it was either
21  for China or fast track when we actually did a
22  commercial that we put on the CNN airport download.
23       But it could have been China, but I can't
24  remember. Because we did three big trade things
25  while I was there.

Page 91

1       Q.   Tell me what those --
2       A.   NAFTA, fast track and most favored nation
3   status for China, or as they changed it PNTR; what's
4   that, do you remember?
5       Q.   Okay. Now with respect to the
6   commercial, tell me what issue was the commercial
7   focused on; do you recall?
8       A.   It was on, gosh, I think it was basically
9   saying that, you know, there were Democrats who are
10  in favor of fast track, I think, but I'd have to see
11  it.
12      Q.   Okay. And do you recall where the idea
13  generated from? Who generated the idea to have the
14  commercial on this particular area?
15      A.   That would have been probably Al and me
16  and, you know, maybe Edie Wilson. We might have
17  been -- I'm sure the President had a guy who was at
18  -- I think he was the guy who was with Hannah Rosen
19  at the recording industry.
20       I mean the administration had a big
21  effort. And I'm sure that the White House asked us
22  to do anything and everything to be supportive.
23      Q.   Including putting a commercial on?
24      A.   No, I don't know that they would have
25  asked that because that would have been awful

Page 92

1   tactical for them to have asked for that
2   specifically. I think we probably wanted to do it
3   just to show the world that we were for it.
4       Q.   And then who actually produced the TV
5   commercial?
6       A.   You know what, we hired a political firm,
7   an advertising firm.
8       Q.   Was the Bob Squire firm --
9       A.   Yeah.
10      Q.   -- the firm that you did?
11      A.   Yeah, Bob Squire.
12      Q.   And who is Bob Squire, for the record?
13      A.   He's dead now, but he was a pretty big ad
14  guy.
15      Q.   Squire Knapp Communications, was that the
16  name of his firm?
17      A.   I think. We worked with some kid there,
18  I can't remember his name but, yeah, I think it was
19  Squire Knapp.
20      Q.   And who actually wrote the contents of
21  the commercial? Was it the Squire firm or the DLC
22  or what?
23      A.   Yeah, we went back and forth on it. We
24  always wanted it to be more substantive and they
25  wanted it to be more catchy or whatever, yeah.

Page 93

1       Q.   And then how was that commercial
2   financed?
3       A.   We raised money from corporations.
4       Q.   Okay. Was that a separate project to
5   finance that particular commercial?
6       A.   Well, yes and no. I mean, whenever you
7   are doing what I used to do, if you wanted to make
8   something sound special, you would hang the label
9   project on it. And that way let's say you were with
10  a company, like XYZ company, and you were already
11  DLC member and you already gave me $25,000 a year
12  this would give me an excuse to go back to you and
13  say, Hey, do you have another budget that you could
14  tap because this is really a special thing that's in
15  addition to what we are doing.
16       So we would call it, but it was not a
17  separate entity. No, sir.
18      Q.   Now, when you made reference to where or
19  what medium the commercial was aired, could you
20  clarify that for us?
21      A.   It ran only over one venue, and that
22  was -- I hate to admit this -- CNN Airport. And
23  that's because we didn't really have enough money to
24  give it big nationwide lift but we did want to at
25  least put it where somebody would use it.

24 (Pages 90 to 93)

|  Page 94 | Page 96 |
|---|---|
| | |

### Page 94

1  So they sell a very exclusive
2  distribution to airports.
3      Q.  Now, what about the Hill at that time?
4  Did the DLC coordinate with any Hill people, any
5  congressmen or senators regarding promotion of the
6  fast track legislation?
7      A.  You know, I'm sure we would have because
8  the whole point was to get their votes. So I'm sure
9  we would have.
10     Q.  So the DLC then was advocating the
11 enactment of that particular piece of legislation
12 then?
13     A.  We were.
14     Q.  Did the DLC, did you file any lobbying
15 disclosure forms regarding that legislation?
16     A.  You know, it's really interesting because
17 the disclosure laws came and went during then. And
18 for employees I cannot remember whether any employee
19 actually tripped the ten percent rule or whatever
20 there was some -- I'm not a lawyer. I had to play
21 one in real life sometimes, so I'm not sure.
22         But I think as far as any of those
23 employees, we may have registered the organization.
24 I know we registered the organization during NAFTA
25 but there was, you know, I just can't remember where

### Page 95

1  we fell out in terms of the percentages and how much
2  of our budget and all the kind of rules that kick
3  in. But if we needed to, we would have.
4      Q.  Yeah. Sure. And it is fair to say the
5  DLC was seeking to get that legislation enacted, and
6  so you took steps to do that?
7      A.  Yes, sir.
8      Q.  Okay. Very good. And did some of those
9  steps include were you -- was the DLC counting votes
10 as far as when the legislation came up on the floor
11 and committee for enactment, for consideration?
12     A.  Counting votes, again I'm conflating two
13 things, China and fast track. And I cannot sort
14 them out. But I know on one of those that we would
15 have people at our means who would tell us what whip
16 counts were. But we, and sometimes the White House
17 might call and say, Hey, do you know where
18 Congressman Jones stands.
19         And we might call and try to seek that
20 information on their behalf. But we would not -- we
21 were not the keeper of the count or the counter.
22     Q.  Very good. Who you, when you made
23 reference to the White House, was there a person or
24 persons who were the liaison with the DLC with
25 respect to this issue?

### Page 96

1      A.  Again, and they all run together. One
2  was Mickey Cantor. No, that was NAFTA when Mickey
3  Cantor was there. Who was, if you told me who USTR
4  was, I don't --
5          MR. BAUER:  Can we go off the record for
6  a second.
7              - - -
8          (Discussion off the Record)
9              - - -
10     A.  The answer is -- the question is?
11     Q.  Who at the White House did you coordinate
12 with? You have made reference to coordinating with
13 the White House. Who would you have coordinated
14 with?
15     A.  It would have been somebody in their
16 legislative operation or a deputy chief of staff,
17 someone like that.
18     Q.  And you don't specifically remember the
19 person's name at that point?
20     A.  It would have been more than one person.
21 And it would been in the White House and USTR.
22     Q.  All right. Now, let me focus your
23 attention on another activity that I understand the
24 DLC was engaged in in the '97, '98 and '99 time
25 period. That was polling.

### Page 97

1          Do you recall the DLC being involved in
2  polling operation?
3      A.  Yes, sir.
4      Q.  What were the polling operations that the
5  DLC engaged in during this time?
6      A.  I think most of the polls we did then we
7  did in Blueprint.
8      Q.  Okay.
9      A.  And my recollection is that they were
10 generally tied to the theme of the issue. We may
11 have done also some polls during this period. It
12 was frequently our practice over the years to take a
13 poll after an election just to kind of see why the
14 country did what it did. So it would have been
15 those two things.
16         I don't think we did any polls outside of
17 that but I could be wrong.
18     Q.  Okay. Now, when you said first polling
19 that was in Blueprint, what exactly do you mean by
20 that? Who conducted the polls?
21     A.  The polls were all done by -- they were
22 done by Penn's firm. And the guy who actually did
23 them is not there anymore but it was Penn, Schoen
24 and Berland.
25     Q.  Okay.

Page 98

1    A.  Penn, P-E-N-N, Schoen, S-C-H-O-E-N, and
2  Berland, B-E-R-L-A-N-D.
3    Q.  Now, when was the first poll conducted by
4  the Penn firm?
5    A.  You know what, I don't know. I just know
6  that we switched pollsters at some point from
7  Greenberg to Penn.
8    Q.  And when did Mr. Greenberg -- strike
9  that. When did you switch from Greenberg to Mark
10 Penn?
11   A.  It would have been sometime after the mid
12 '90s.
13   Q.  And why did the DLC switch from the
14 Greenberg firm to the Penn firm?
15   A.  Well, you know, Al and Stan have been
16 close, but I think Stan was probably more
17 traditional in his thinking, and Mark was more kind
18 of interested in kind of looking for a new path
19 forward. I mean I think Al and Mark were more
20 ideologically compatible.
21   Q.  Mr. Greenberg was probably more
22 associated with the traditional Democratic party and
23 way of thinking. Is that correct? Is that what you
24 are saying?
25   A.  I think that would be fair.

Page 99

1    Q.  And you are saying that Mr. Penn was
2  probably more amenable at least to considering the
3  New Democrat --
4    A.  More a New Democrat. Yes.
5    Q.  Okay. So there was some distinction
6  between the two in your mind then?
7    A.  Yes, sir.
8    Q.  Okay. Very good. Now, with respect to
9  the Penn poll, tell me what you remember about that.
10 Who supplied the questions for the Penn poll?
11   A.  Well, it was a combination. We would
12 suggest questions and topics, and then they would
13 come back with things. It was a real struggle but
14 it was back and forth between us, the client, and
15 the firm.
16   Q.  Okay. And what was the purpose of the
17 poll, the first Penn poll that we are talking about?
18 What was the purpose in --
19   A.  You would have to, if you have got a
20 copy, I could look at it and tell you because we did
21 more than one. And I don't remember which the first
22 one was, if that were Blueprint or --
23   Q.  What about the New Democrat Electorate
24 poll in 1997. Are you familiar with that?
25   A.  I'm sure I am. Do you have a copy?

Page 100

1    Q.  It is in the other documents that we've
2  introduced.
3    A.  Okay.
4    Q.  Or that we will introduce.
5    A.  Okay.
6    Q.  I just want to know what your
7  recollection is. And so the questions were
8  formulated in part by the back and forth between the
9  pollster and the DLC is that right?
10   A.  Yes, sir.
11   Q.  Was there any kind of a memorandum of
12 understanding or any kind of contract where the DLC
13 indicated what it wanted the Penn poll to do, the
14 Penn firm to do in conducting a poll?
15   A.  No. Typically the way these things
16 happened was they would come over, we'd sit down and
17 talk about the topic. They would take a bunch of
18 notes. They would send us a questionnaire back and
19 we'd go, No. No. And we'd go back and forth.
20   Q.  And then the first poll I think you've
21 mentioned was after the '96 election. Is that
22 right? You are not certain?
23   A.  I know we did one after an election. I
24 can't remember which one we did with Mark first, but
25 that could well be correct.

Page 101

1    Q.  And then was there a second poll that the
2  Penn firm conducted for the DLC?
3    A.  I am -- and a third and a fourth and a
4  fifth, I believe.
5    Q.  Okay.
6    A.  And more. I mean, because we did them a
7  lot in Blueprint.
8    Q.  So is it fair to say in Blueprint there
9  was a regular polling activity that Penn firm
10 carried out for the DLC?
11   A.  There was for a while. Yeah.
12   Q.  Okay. And was the process the same as
13 far as the interaction between the DLC and the
14 pollsters in formulating the questions?
15   A.  Yeah. They would come over and we'd say,
16 you know, we are doing something on the new economy.
17 We wand want to find out what people think about our
18 ideas, what people think about the new economy,
19 blah, blah, blah, blah.
20       And that way we would have this kind of
21 cool poll to put alongside in the magazine so, you
22 know.
23   Q.  Okay. So the polling then was a regular
24 feature of the Blueprint magazine, that the results
25 of the poll --

### Page 102

1  A. I believe it was.
2  Q. Okay.
3  A. And then I think there was a certain
4  point which we might not have been able to afford it
5  for every issue, but we wanted it to be. Yeah.
6  Q. And so the polling would touch upon
7  various topics that --
8  A. The Blueprint polls. Yes.
9  Q. Okay. And other than publishing the
10 polls in the Blueprint magazine, were the results of
11 these polls disseminated in any other fashion by the
12 DLC?
13 A. Oh, yes. We would put them on the web.
14 We would have, if we thought there was interest, we
15 usually the first thing we would do is we would
16 invite the press in, because we were hoping to get
17 press attention.
18     Polls were often a way to get press
19 attention, because the press is endlessly fascinated
20 with polls. So that was generally step one was to
21 invite the press in, do a press briefing and then
22 put it up on the web.
23     In fact, our counsel had always been very
24 clear to us that we had to be very careful about
25 polling and make sure that, you know, the whole

### Page 103

1  world got to see our polls.
2  Q. Okay.
3     MR. BAUER: I do want to interpose just
4  on behalf of DLC some cautionary note about any
5  conversations. I don't want a waiver to be a factor
6  here of any privileged conversations with counsel.
7     THE WITNESS: I'm sorry.
8     MR. BAUER: Nothing to apologize for.
9  You are trying to be helpful here but I just want to
10 make that clear.
11    THE WITNESS: Yeah.
12    BY MR. MARTINEAU:
13 Q. Understand. Explain to me what the DLC
14 was -- what was the purpose behind having these
15 polls on a regular basis that are published in the
16 Blueprint magazine?
17 A. Well, there would have been more than
18 one.
19 Q. Okay. Identify what those were.
20 A. One, as I indicated, the press is
21 endlessly fascinated with polls. And it was a good
22 way to get attention. Two, ideas don't exist in a
23 vacuum. So we wanted to know what people think
24 about ideas. So you would ask them.
25    And, you know, three, the general

### Page 104

1  audience, you know, would think about it, I mean
2  policy-makers, elected officials, other academics,
3  wonks. I mean they are also fascinated with polls.
4  So it was a feature to -- we weren't in the business
5  of selling magazines to make a living, but we did
6  want people to look at it.
7     So it was kind of like to draw attention.
8  So it was yet another device to draw you in to
9  whatever issue we would be working on.
10 Q. Okay. Now, let's say that we pick a
11 particular issue and, like trade, and the DLC would
12 commission one of these polls through the Penn
13 group. And the response came back that the public
14 favored a position that was not the same as the
15 position of the DLC. For example, the public may be
16 more concerned about the loss of jobs from free
17 trade.
18 A. Right.
19 Q. Than they would the possible expansion of
20 jobs, which is as you advocated.
21 A. Right.
22 Q. What did you do, how did you handle those
23 poll results?
24 A. Well, because that's the trouble with
25 polls. They don't always turn out the way you want

### Page 105

1  them do. And we would do two things.
2     One, we would look to see if there was a
3  more effective way to communicate the idea to the
4  public. In other words, we would learn from that.
5  Perhaps the way we were talking about equipping
6  workers to succeed in the new economy wasn't
7  catching on with people.
8     So maybe we needed a new formulation.
9  Because our concern was always to allay the fears of
10 the public. But the one thing that we never used
11 polls for was to decide what our position was. We
12 were kind of, you know, kind of, you know,
13 relentlessly boneheaded in that fashion. We always
14 stuck by our guns.
15 Q. Okay. And you said there were two
16 things. That was one. What was the other?
17 A. To test, I mean, two things: One was to
18 learn where people were at; and the second was to
19 learn if there was a better formulation.
20 Q. Okay?
21 A. So if you looked at some of those polls
22 that we got back, I'm not sure what we published
23 versus what we got back, you would probably see more
24 than one formulation of a way to talk to the public
25 about an issue.

Page 106

1  Q. Okay.
2  A. Because, you know, what we were trying to
3  do was to find out a way that people would accept
4  our ideas.
5  Q. Okay. Good. And when the poll results
6  were published in Blueprint, were they sent to
7  members of Congress when you would get a poll result
8  in from the Penn group?
9  A. Only insofar as all members of Congress,
10 as I indicated to you earlier, all the members of
11 Congress received Blueprint.
12 Q. And then there were press conferences
13 were there not --
14 A. For some. Probably not for the Blueprint
15 polls but probably for the other polls we would do
16 press conferences.
17 Q. And who would participate in those press
18 conferences?
19 A. It just depends. I'm sure Mark and Al
20 would have. And then, you know, that would have
21 been the core.
22 Q. Okay. Let me ask you about some other
23 activities that are related to -- what was the DLC
24 National Conversation? Can you explain that to me?
25 A. Yeah. That was our attempt to, well, it

Page 107

1  evolved over time, but the essential principle in
2  National Conversation was to have an event that we
3  invited people from across the country to attend
4  where you could, kind an idea swap, and also to hear
5  speakers; just kind of a classic -- another name for
6  an annual meeting.
7  Q. Okay. And who would be invited to
8  participate in the National Conversation?
9  A. Gosh, I know we invited donors. When you
10 go to a place like Indianapolis, you would hope that
11 you could get, you know, local people to come. You
12 know, you'd get a huge contingent of press at some
13 of these things.
14       You would get, you know, policy types,
15 certainly get elected officials, you know, kind of
16 an eclectic mix.
17 Q. Okay. Were the elected officials that
18 attended, were they exclusively members of the
19 Democrat party, members of the Republican party?
20 A. I don't know. We wouldn't have asked.
21 But, I mean, we were the Democratic Leadership
22 Council.
23 Q. So we can infer from that that the focus
24 was on Democrats that -- elected officials that --
25 A. No. No. I was only trying to respond to

Page 108

1  your saying were Republicans there. And I was
2  trying to say, I don't know. We never asked them to
3  tell us who they were at the door but I just -- so I
4  don't know how many Republicans would go to
5  something called a Democratic Leadership Council.
6  Q. Understood. Do you recall a Capitol Hill
7  lunch series that the DLC put on when you were --
8  during the time you were Executive Director?
9  A. That sounds familiar. Was this -- this
10 is the one we did at our office.
11 Q. Well, you tell me.
12 A. I think this is -- I think we started
13 doing those at our office as a donor program.
14 Q. I see.
15 A. It was a chance to give donors an
16 opportunity to meet people.
17 Q. Okay. All right. And how did you
18 decide -- what was the just the format? What was
19 the structure? Was there speakers?
20 A. Yeah. You know, you come in, you got
21 sandwiches. There's, you know, we've got a big
22 conference room table. It's like 25 seats and
23 somebody comes in and talks for a few minutes. Al
24 introduces them and they talk for a few minutes, and
25 then people do Q&A.

Page 109

1  Q. And then do you recall the DLC PPI Spring
2  Retreat? Was there such a retreat?
3  A. Yes, sir.
4  Q. What is the spring retreat?
5  A. A fundraising event, largely. Not an
6  event that you pay money to go to, but it's part of
7  our donor program.
8  Q. Okay. And by the definition of it, it
9  was, what, held in the springtime? Is that an
10 annual event or was that a one-time event?
11 A. Yes, sir. It was every year.
12 Q. Was it held in Washington or held --
13 A. It was usually held in Washington.
14 Q. Do you recall a spring retreat being held
15 down in New Orleans?
16 A. Yes, sir.
17 Q. And what was the purpose of that
18 particular spring retreat?
19 A. Well, there were several in New Orleans.
20 Which one?
21 Q. Well, the one in 1998?
22 A. Ninety-eight. Do you remember who was on
23 the program?
24 Q. I can --
25 A. They are all the same. They were always

## Page 110

1  the same. And it was programming. You know,
2  sometimes we'd have some outside speakers. Then
3  we'd have panels of our own policy people.
4       Sometimes we'd have outside policy
5  people. Some years you would try to invite somebody
6  like, you know, we'd have like, you know, Paul
7  should go, things like the editor of the Wall Street
8  Journal would come. Or you would get like, you
9  know, David Brooks did one, one time. You know,
10 people who would, you know, make the donors feel
11 like they had heard some really interesting stuff or
12 gotten some insights that they couldn't get anywhere
13 else.
14      Q.  The donors oftentimes are like government
15 affairs reps of corporations; right?
16      A.  Almost always.
17      Q.  And this gave them an opportunity to rub
18 elbows with some elected officials?
19      A.  Yeah, elected officials and also, you
20 know, we tried to give some political analysis,
21 something that, you know, something that made it
22 worth their while going so they could write a good
23 memo back home.
24      Q.  Very good. Now, another event that I
25 understand was an annual event was the annual

## Page 111

1  conference and leadership dinner that the DLC put
2  on. Do you recall that?
3       A.  Right.
4       Q.  What was the -- what was the conference
5  and what was it intended to achieve?
6       A.  The annual conference in its early days
7  was similar to the spring retreat except it was here
8  in Washington. You would do a day-long program. In
9  the years when Clinton was in office, it was almost
10 that we would address it each year.
11      And then we'd have, you know, some other
12 big cheeses, maybe some governors or senators. And
13 then there would be a policy discussion. But the
14 same kind of idea, except for when we were in
15 Washington, it was not as exclusive because you
16 weren't going out of town.
17      So we would always invite the press and,
18 you know, staff or, you know, because in Washington
19 the imperative was to fill the hall. So when the
20 President came to speak, there would be 800 people
21 in there. And we didn't have 800 corporate donors.
22 So you would open the doors a little bit.
23      Q.  When you opened the doors, who else was
24 invited to participate in the annual leadership
25 dinner?

## Page 112

1       A.  Well, like I said, press. You would have
2  lots of people who would call wanting to know if
3  they could get in, you know, from around town, kind
4  of the classic deal.
5       Q.  Among elected officials, who was invited
6  to attend?
7       A.  Gosh, I'm sure we would have -- I'm sure
8  we would have invited, you know, the Hill. And the
9  truth be told, we probably invited both parties.
10 But I am not sure. I just can't -- it's like the
11 kind of deal that you can invite everybody but I
12 don't know whether any Republicans actually ever
13 showed up, although we did have a Republican address
14 us one time.
15      I would have to go back and search to see
16 who.
17      Q.  Okay. And the annual conference, as the
18 name suggested, was held every year, particularly
19 time frame?
20      A.  Yes, sir.
21      Q.  And was there like a different subject
22 matter that was the theme of each of the
23 conferences?
24      A.  Yeah.
25      Q.  Okay. And as far as the individuals, the

## Page 113

1  elected officials invited, do you recall whether --
2  and I want to make sure I understand this, whether
3  Democrats were invited, Republicans or both?
4       A.  You mean to speak?
5       Q.  To, first to speak, yes.
6       A.  You know, I don't recall every one of
7  them but, you know, principally, like I said, it
8  would be the President, you know, maybe a cabinet
9  official. I mean, somebody that was impressive,
10 United States senator. I do remember one time we
11 had Ross Perot's pollster.
12      Q.  Okay. Would it surprise you if I told
13 you that the DLC has indicated that -- and they have
14 listed for me all of the elected officials who spoke
15 at the annual conference?
16      A.  Right.
17      Q.  That each one of those elected officials
18 was a Democrat?
19      A.  The elected officials?
20      Q.  Yes.
21      A.  No. That would not surprise me.
22      Q.  Okay. This is the Democratic Leadership
23 council?
24      A.  Right.
25      Q.  Okay. Very good. Now, just briefly fill

Page 114

1  in for me a little bit so I understand, the record's
2  clear, about -- and I touched on this earlier, I
3  don't want to replow ground; what was the
4  fundraising apparatus of the DLC during the years
5  '97, '98 and '99?
6      A.  By apparatus you mean like how many
7  people? What was the --
8      Q.  What was the structure? How did
9  fundraising -- how was fundraising conducted by the
10 DLC?
11     A.  Yeah. The biggest return on the
12 investment came by trying to raise money from
13 corporations in 15-, 25- and 50-thousand-dollar
14 denominations. And so we structured a membership
15 program, and from individuals, $10,000 and more.
16 And anything other than that would have been a very
17 small percentage of what raised.
18     Q.  Okay.
19     A.  And so we created program instructors to
20 try to keep those people interested in us.
21     Q.  Did you conduct these operations in house
22 or did you contract with a professional?
23     A.  All in house. All in house.
24     Q.  So DLC staff people, people who worked --
25     A.  Oh, no. We had -- let me be clear. We

Page 115

1  would hire some people who were contractors to us,
2  but we didn't go hire some firm and say, Be in
3  charge of our fundraising.
4      Q.  Okay. And so how did they do go about
5  raising the money? Did you have events or did they
6  make telephone solicitations, personal
7  solicitations?
8      A.  No, neither of those. In fact, that's
9  not a very successful model for us. We would do --
10 with corporations, we would literally, you know, try
11 to persuade them that it was in their interest to
12 have an organization that promoted the economic
13 principles that we did and took the positions that
14 we took, given that it was probably -- I never like
15 to say pro business, because pro business can mean
16 just shelling out money for business; pro economic
17 growth, pro competition.
18         And so we would try to show them that
19 that was in their company's interest to have this
20 organization supporting those policies. And then
21 you would try to hit critical mass in an industry.
22 Because if you are Blue Cross/Blue Shield and you
23 see that Aetna and Cigna are at DLC giving money,
24 then you want to be there. Because you want to make
25 damn certain that you know what's going on in those

Page 116

1  conversations and what the other guy would say.
2          So you kind of duked it out sector by
3  sector. Let's say you want to start doing energy
4  policy. Well, if you are going to do energy policy,
5  then all of a sudden a few electric utilities and
6  the oil companies might want to know a little bit
7  about what you are doing; not that they can, you
8  know, we didn't do their policy, but they certainly
9  would want to be able to come to a luncheon and ask
10 what are you guys thinking about oil policy.
11         So, you know, you do it that way in
12 industry. And then with individual donors, no two
13 ever gave money for the same reason. So what you
14 would try to find is what it was that clicked.
15         You know, some guy might really have a
16 Jones about teenage pregnancy and really was
17 interested because we thought teenage pregnancy was
18 a problem. So he would support that.
19         Another might really want to be able to
20 come to an event because they like to hang out with
21 the United States senators and go back to Chicago
22 and say, you know, I was with somebody important.
23 So no two were ever alike. But that's the way we
24 did it, by programming, not by $10,000 to attend an
25 event.

Page 117

1      Q.  Right. Now was one of the reasons that
2  an individual donor, for example, wanted to attend
3  your event and to participate was to help get New
4  Democrats elected to public office to carry out the
5  philosophy that the DLC was promoting?
6      A.  You know, I can't speak for what was in
7  their mind. That wouldn't have been what we told
8  them they got for giving us money. Now, you know, I
9  just -- I don't know what their motivation would
10 have been. But that's not what the -- that's not
11 what the brand promise of the DLC.
12     Q.  Now, what about potential donors? Did
13 you have a mechanism to identify potential donors
14 that -- for the DLC?
15     A.  Yeah but, you know, it's hard because
16 there wasn't, you know, going down to the FEC and
17 looking at party fundraising lists wouldn't be much
18 value to us because we were different. Usually it
19 was word of mouth like, say, you would get a guy,
20 Goldman Sacks in New York who thinks that Al From's
21 ideas are the greatest thing in the world.
22         And so he would hold a deal with the firm
23 at a lunch and invite 20 of his friends. Al would
24 come in and make the spiel. And then we'd have the
25 people in the Development Department follow up

30 (Pages 114 to 117)

### Page 118

1  individually and say, gee, did you like what you
2  hear; are you interested. We've got this event next
3  month; that kind of thing.
4  　　　Really one target at a time. It's very
5  hard.
6  　Q. Okay. Did you -- did the DLC contact,
7  let's say like the DNC and say you guys have a donor
8  list, can we look at that?
9  　A. No, sir.
10 　Q. As prospect for potential donor?
11 　A. No, sir.
12 　Q. What about members of Congress, their
13 particular donor lists. Did you look at those donor
14 lists?
15 　A. No, sir.
16 　Q. What about --
17 　A. We -- I just don't think we did that. I
18 mean because it wasn't very effective for us.
19 　Q. Why would that not be effective. These
20 are people who have already given -- let me just
21 finish the question -- why would that not be
22 effective in as much as those people had already
23 given to a Democratic, say, senator or a Democratic
24 member of Congress. You are the DLC. Why would
25 that have not been effective?

### Page 119

1  　A. Well, they all rely.
2  　　　MR. BAUER: Sorry?
3  　A. The return on investment. We are small.
4  You have got five people in the department. A
5  member of Congress probably has hundreds of people
6  on their list.
7  　　　We don't do mail solicitation. We don't
8  do telephone. More likely if a member were to help
9  us, it would have been a member saying, Bob, you
10 know, I hear what you are saying. You know what,
11 you really ought to meet Al From; and the member,
12 you know, pointing somebody to go see Al.
13 　　　That would have been the way it would
14 have happened there. But the truth be told, DLC was
15 kind of an island. We wished we would have gotten
16 help but people jealously guard their fundraising
17 just as we, you know, wouldn't like people poaching
18 our people. People are kind of worried that if Mike
19 gives Bob 10K, then that's 10K you don't have to
20 give me.
21 　　　So it's not as cooperative as you might
22 imagine on the outside looking in; would that it
23 were.
24 　Q. So some members of Congress have their
25 own pacts, like leadership pacts?

### Page 120

1  　A. Yes, sir.
2  　Q. Is that a place that you might look at to
3  try to identify potential donors from?
4  　A. No, sir.
5  　Q. Okay. And then like say the Democratic
6  Senatorial Campaign Committee, is that their donor
7  list, did the DLC look at those?
8  　A. No. But I cannot speak for the fact that
9  we do hire -- we did hire some people who were
10 fundraisers.
11 　Q. Yes, sir.
12 　A. And you know they, some of them were
13 professional fundraisers in politics. And I don't
14 know that they didn't have their lists of people
15 that they had raised money for for Senate campaigns.
16 I just don't know. They may.
17 　　　But as an organization, we did not go
18 down to the FEC, get lists, come back and prospect.
19 　Q. And you don't recall if you went to the
20 DNC or individual --
21 　A. I know we never went to the party. If we
22 had done anything like that, we would have done it
23 through outside lists. We never would have done
24 that with a party.
25 　Q. Okay. Let's identify some documents. I

### Page 121

1  have some documents I want to give you. Let's go
2  and we'll look at them and have you identify them.
3  I've got some questions for you.
4  　　　Let's start with Government's Number 32.
5  Why don't you that take that before you. I'm going
6  to ask you some questions.
7  　　　　　- - -
8  　　　(A document was marked as Government
9  Exhibit Number 32)
10 　　　　　- - -
11 　　　BY MR. MARTINEAU:
12 　Q. Mr. Alston, you have before you what's
13 been marked as Government's Exhibit 32. Can you
14 identify that document for me?
15 　A. Yes, sir. It's the Democratic Leadership
16 Council's 1997 tax return.
17 　Q. And that's the Form 990; correct?
18 　A. Yes, sir.
19 　Q. And were you involved in the preparation
20 of this return?
21 　A. Yes, sir.
22 　Q. And how were you involved?
23 　A. I would have reviewed it. And as my
24 signature indicates, I approved it.
25 　Q. Very good. And there was an outside firm

### Page 122

1  that it looks like assisted in the preparation of
2  the Gilbert and Wolfand?
3      A.  Yes, sir.
4      Q.  And on page 0007, I believe, you signed
5  the return. I guess that's not the return. That's
6  the consent. 0010 is your signature. Is that
7  correct?
8      A.  Yes, sir.
9      Q.  Okay. Now I just want to direct your
10 attention to page 0014. And there's a line here, I
11 believe it's 81A. See it there where it says enter
12 the amount of political expenditures, direct or
13 indirect, as described in the instructions at line
14 81. Do you see that?
15     A.  Yes, sir.
16     Q.  And it's listed none?
17     A.  Yes, sir.
18     Q.  What was your understanding in signing
19 this return as to what the direct or indirect
20 political expenditures that was being referred to on
21 the 990?
22     A.  You know, the truth be told, I don't
23 recall. I just don't recall.
24     Q.  Okay. Well, the DLC operates, does it
25 not, in a political environment?

### Page 123

1      A.  We do.
2      Q.  So you don't recall what the reference to
3  the political expenditure is?
4      A.  No, I don't.
5          MR. BAUER: If I may interpose, and I'm
6  not quite sure I would raise this to the level of an
7  objection, but the characterization there is a
8  little bit misleading because we are talking so far
9  in his testimony about politics in the sense of
10 policy formulation and legislative influence, which
11 is a little different, I think, than the reference
12 to the political world that you may have -- I don't
13 want that to hang on the record as implying one
14 thing when we've been discussing something else.
15         MR. MARTINEAU: I just want to understand
16 what his understanding was of what line 81,
17 indicated no, and there was none, and I just wanted
18 to know.
19     A.  Right. I just don't remember what the
20 exact definition was.
21     Q.  Who actually, well, did you consult with
22 council, without telling me what they said, did you
23 consult with counsel before signing this particular
24 return?
25     A.  Consult with counsel?

### Page 124

1      Q.  Yeah.
2      A.  I would have talked to Amy.
3      Q.  Who is Amy?
4      A.  And I would have talked to our
5  comptroller. Amy Gilbert was the accountant.
6      Q.  Okay. And then you talked to your
7  comptroller as well?
8      A.  Yes.
9      Q.  And I have the same questions with
10 respect to the next two documents, 33 and 34. Let's
11 go to 33, just identify that document for me.
12         - - -
13         (A document was marked as Government
14 Exhibit Number 33)
15         - - -
16     A.  That's the 990 from 198.
17     Q.  Okay. And I believe on page 48 is your
18 signature; correct?
19     A.  Yes, sir.
20     Q.  And you signed that on 10/29/99 as
21 Executive Director?
22     A.  10/25.
23     Q.  10/25/99 as Executive Director?
24     A.  Yes, sir. No, 10/28. I am sorry. You
25 are right.

### Page 125

1      Q.  Okay. And then on page 47 there's --
2  here again there's the reference to the amount of
3  political expenditures, direct or indirect, as
4  described in the instructions for line 81. And you
5  have indicated none. Is that correct?
6      A.  That's right.
7      Q.  Same question with respect to 1998. Do
8  you --
9      A.  I don't recall the specific definition,
10 but I do know that I am sure I would have agreed
11 that we didn't qualify.
12     Q.  Okay. That you didn't carry out
13 activities that would be entered on line 81?
14     A.  No.
15     Q.  Okay.
16     A.  I signed it.
17     Q.  Let's go to Number 34, if you will.
18 Exhibit 34, just identify that document for me.
19         - - -
20         (A document was marked as Government
21 Exhibit Number 34)
22         - - -
23     A.  That's our 990 for 1999.
24         MR. BAUER: Counsel, we seem to be
25 without a 34 here. You went from 33 to 35. You

32 (Pages 122 to 125)

Page 126

1 just described the document to me.
2    - - -
3        (Discussion off the Record)
4    - - -
5        MR. MARTINEAU: Exhibit 34.
6        MR. BAUER: Okay. Fire away.
7    A. As I said, that's our 1999, 990.
8    Q. Okay. And then on page 0083, I believe
9 that's your signature on that. Is that correct?
10   A. Yes, sir.
11   Q. Okay. And on page 82, I want to
12 reference you to that again. And look at line 81A,
13 when it says, Enter the amount of political
14 expenditures, direct or indirect, and describe in
15 the instructions.
16   A. Yes, sir.
17   Q. And you have listed none?
18   A. Yes, sir.
19   Q. Same question as to what your
20 understanding of the political expenditures, direct
21 or indirect, are as referenced there?
22   A. I can't remember the exact definition but
23 I'm sure I agreed with that declaration.
24   Q. Okay. Very good. Let's go to Exhibit
25 Number 35, if you will. And you have it right in

Page 127

1 front of you.
2    A. Right.
3    - - -
4        (A document was marked as Government
5 Exhibit Number 35)
6    - - -
7        BY MR. MARTINEAU:
8    Q. Can you just identify this document for
9 me?
10   A. It looks to be just a listing of the
11 people who worked at the DLC.
12   Q. And I think it's self-explanatory and it,
13 if I may say, it relates to the testimony you have
14 given earlier here today. This is a list of the
15 various departments and the personnel within each
16 department?
17   A. Yes, sir.
18   Q. At the DLC during the time that you were
19 Executive Director?
20   A. During the time of this sheet.
21   Q. Of this sheet?
22   A. I'm sure it changed over time. Yes, sir.
23   Q. And the major departments are the Field
24 Department, which I believe you described?
25   A. Yes, sir.

Page 128

1    Q. And the Communications Department and the
2 Development Department and the Administration and
3 Information Systems Departments?
4    A. Yes, sir.
5    Q. Okay. Now, as you are looking at the
6 Field Department, is there -- was one of these
7 people the person that was primarily responsible for
8 conducting the DLC leadership workshops that you
9 testified earlier? I think you said you weren't
10 sure who it was.
11   A. Well, I think I indicated that John
12 Hasselmann and Jeff Valenzuela staffed us, and that
13 Ed and I and Debbie usually did them from our staff.
14 Yes, sir.
15   Q. Very good. And is John Hasselmann, do
16 you know is he still employed with the DLC?
17   A. No, sir.
18   Q. Where is he employed now?
19   A. He's a lobbyist here in town.
20   Q. Do you know which firm he works for?
21   A. No. He's with a group that does
22 software, a trade association.
23   Q. How about Jeff Valenzuela. Is he still
24 employed with the DLC?
25   A. No, sir.

Page 129

1    Q. Okay. Good. And then Ed Kilgore is
2 listed as political director here?
3    A. Yes, sir.
4    Q. Is he still with the DLC?
5    A. He is.
6    Q. And what is his position currently with
7 DLC?
8    A. I believe it to be Vice President for
9 Policy.
10   Q. Okay. Who succeeded you as Executive
11 Director of the DLC?
12   A. No one.
13   Q. No one. Okay. No one was big enough to
14 fill your shoes?
15   A. I wouldn't characterize it that way.
16 They busted the job up into three.
17   Q. What were the three components that they
18 bust the job, just so I understand?
19   A. A chief of staff for the Democratic
20 Leadership Council, a chief operating officer for
21 the Progressive Policy Institute, and then they
22 hired a position that was kind of a liaison between
23 the DLC and the business community.
24   Q. When you first came on board at the DLC
25 as communications director, what was your salary?

Page 130

1  A. Gosh.
2  Q. Approximately?
3  A. It was a huge raise. I think it was
4  $70,000 a year.
5  Q. And then when you became Executive
6  Director of the DLC, Executive Director, what was
7  your salary as Executive?
8  A. Maybe like 90, 92, something like that.
9  Q. And when you became Executive Director,
10 Mr. From was still, is then and is now the president
11 of the DLC?
12 A. And the chief executive officer. He's no
13 longer the president, but he's still the chief
14 executive officer.
15 Q. Is there a president?
16 A. Bruce Reed.
17 Q. And what was Mr. From's salary as
18 president in 1997, roughly speaking, if you know?
19 A. I don't know. Couple hundred grand, 225
20 maybe.
21 Q. Okay.
22 A. 200. I don't know.
23 Q. Fair enough. And you indicated -- we've
24 discussed the Communications Department. And the
25 Development Department, is that the fundraising

Page 131

1  mechanism?
2  A. Yes, sir. And also the events.
3  Q. And the events. Administration would be
4  keeping track of the dollars and cents of --
5  A. Right, and HR, and, you know.
6  Q. Okay.
7  A. Upkeep.
8  Q. And is the Information Systems, are those
9  folks in charge of the web site and the --
10 A. No. They weren't in charge of the web
11 site. They were in charge of the computers. We had
12 65 people, so they had to maintain the computer
13 network and all the individual software and that
14 stuff.
15 Q. Okay. Good. Now, under Communications
16 Department there's a reference to Tom Mirga, who's
17 the editor of the New Democrat. Do you see that?
18 A. Yes, sir.
19 Q. Did Tom, Mr. Mirga, did he work full-time
20 for the DLC or did he work also for the --
21 A. He was full-time with the DLC.
22 Q. Okay. Do any of the employees listed
23 here, any of the individuals, did they also perform
24 services for the Progressive Policy Institute?
25 A. Well, at this time, what year is this?

Page 132

1  Q. I don't know. It was not -- but it was
2  produced to me in response to a request for
3  documents in 1997, '98 and '99. So it should be in
4  one of those.
5  A. Well, clearly it's one of those times.
6  Well, the answer would be yes. If you, including
7  me, worked for everyone. I mean, so if you are the
8  receptionist, you would answer the phone, you know,
9  for each organization.
10 Q. For DLC and PPI?
11 A. It's just at that time PPI may well have
12 been part of the DLC. As you know, it went back and
13 forth.
14 Q. I don't know that well, and you are going
15 to help explain that to me in a little while. So go
16 ahead.
17 A. Can I get two minutes.
18         - - -
19     (Recessed at 12:22 p.m.)
20     (Reconvened at 12:25 p.m.)
21         - - -
22     BY MR. MARTINEAU:
23 Q. Let's go back, just a few questions on
24 Exhibit 35, the second page, the document is
25 entitled Finding Your Way Around the Democratic

Page 133

1  Leadership Council?
2  A. Right.
3  Q. I asked you earlier this morning,
4  Mr. Alston, about the Political department?
5  A. Right.
6  Q. Do you see the list of the individual's
7  name there?
8  A. Yes.
9  Q. And Doug Wilson was the political
10 director during that time; correct?
11 A. Yes.
12 Q. And what was his overall area of
13 responsibility as political director?
14 A. He, it was basically we renamed the Field
15 Department. And Ed became policy director because
16 political director in politics has a meaning of it's
17 the kind of the person that liaises with the world.
18 And that really wasn't an accurate description of
19 what Ed did.
20     Ed was more of a policy guy. And so he
21 became policy. And Doug asked that we rename the
22 department the political department because that is
23 traditionally in the world of policy and politics.
24 Like at the White House, the White House has a
25 political director.

34 (Pages 130 to 133)

### Page 134

```
 1       The political director does not decide
 2  the President's politics. Believe me. The
 3  political director is the liaison with the mayors
 4  and the governors and the abortion rights groups and
 5  the tree huggers and the gun people, whatever.
 6     Q.  Understand.
 7     A.  So that -- it was just a renaming of the
 8  function.
 9     Q.  And Debbie Cox was the Western States
10  Director. Now, do I understand that we are talking
11  about state chapters of the DLC?
12     A.  No.
13     Q.  In the west or not --
14     A.  What happens was Debbie's husband got
15  appointed to the faculty at UC Santa Barbara. And
16  she was a really valuable employee, and I didn't
17  want to lose her because she had huge institutional
18  knowledge. So we kind of cooked up this title for
19  her. And she did basically did liaison activities,
20  Denver west.
21     Q.  With state DLC?
22     A.  No, there really wasn't enough. This is
23  more of an indicator of her geographical territory.
24  There really wasn't a lot of chapters. But she
25  would have been the person, let's say someone in
```

### Page 135

```
 1  Washington state wanted to know something about the
 2  DLC, she would have been the person we would have
 3  used to fulfill the request.
 4     Q.  And Anne Rung is listed as Congressional
 5  Director?
 6     A.  Right.
 7     Q.  What were her duties as --
 8     A.  Her duties were to -- it was probably far
 9  more logistical than she would have wished. If we
10  had events and we needed a speaker for the Capitol
11  Hill lunch areas, it was her job to get the speaker.
12  When we went on the spring retreat, it was her job
13  to make sure all the members of Congress were taken
14  care of and, you know, to know who was coming and
15  who wasn't coming.
16       It was that. I think she would have
17  liked for it to have been more substantive, but it
18  was primarily getting bodies in places.
19     Q.  And then John Hasselmann was the State
20  Coordinator. And what was his --
21     A.  Basically the same kind of role. These
22  are primarily people like, let's say Al wanted to
23  make a trip, and he was going to go; John would be
24  the guy who would get on the plane with him and go.
25  He would be on help line of the schedule of who we
```

### Page 136

```
 1  are going to see or where we might speak.
 2       And, similarly, if someone was coming to
 3  Washington from the states, they would call John.
 4  Or if somebody was like, you know, we are doing
 5  education reform, you guys got anything on education
 6  reform, or is there somebody I could talk to; John
 7  would be the point of contact.
 8     Q.  And Jeff Valenzuela, you mentioned him
 9  before, is Political Programming coordinator?
10     A.  He was like the administrative assistant
11  for the department.
12     Q.  Okay. And then the other two
13  individuals, Christine Dunham and Jeff Jaynes were
14  membership assistant; what was their job?
15     A.  Yeah. Christine basically ran the
16  database, tracked that kind of stuff, you know,
17  mail. All three of those -- although Jeff was a
18  little more substantive but basically they were all
19  just administrative positions.
20     Q.  Okay. Let's go to, just on the next
21  page, just fill in some details on that web
22  development team, Randolph Court was Internet
23  Operations Manager. Tell me what their job was?
24     A.  We, somewhere in this period, we
25  relaunched our web site. We went from a kind of one
```

### Page 137

```
 1  set of technologies to another. And that required
 2  us to -- we really spent a lot of money. It was a
 3  couple hundred thousand dollar undertaking.
 4       So we had Randolph, who had been a policy
 5  guy actually, who knew a lot more about this than
 6  any of the rest of us. I put him in charge of this.
 7  And that was the title we gave him was, you know,
 8  Internet Operations Manager. And Amy was in our
 9  Communications Department. She in effect helped him
10  launch the site and was his first kind of editor.
11     Q.  Okay. Very good. Let's go to number 36,
12  Exhibit 36.
13              - - -
14       (A document was marked as Government
15  Exhibit Number 36)
16              - - -
17     BY MR. MARTINEAU:
18     Q.  And I want to have you identify the
19  document, and can you identify -- you have before
20  you Government's 36. Can you identify it? Take
21  your time and look at it.
22     A.  Yeah. Yes. This would be Julie, who was
23  then the administrative director, memorializing our
24  procedures for time allocation.
25     Q.  And explain to me what you mean by the
```

### Page 138

1 time allocation?
2   A.  Well, as you and I discussed earlier, we
3 had two entities, two separate corporations. And
4 each corporation has its own books. And each
5 corporation, in some cases you might work six hours
6 a day for one corporation, and two hours a day for
7 the other corporation.
8       We wanted to make sure that you were
9 being paid properly, according to where and for whom
10 you did that work.
11   Q.  Okay. Very good. Now let's go to the
12 next page, give me an example so we understand, the
13 record is clear. The two corporations of course is
14 the DLC and the Progressive Foundation, PF; right?
15   A.  At that point. Yes.
16   Q.  And we'll go down and we'll look at Chuck
17 Alston, where, and this is the salary allocation for
18 March of '97?
19   A.  Right.
20   Q.  Do you see that?
21   A.  Right.
22   Q.  And it says you worked 83 hours for the
23 DLC during that --
24   A.  Right.
25   Q.  Which was 49.40 percent of your time;

### Page 139

1 correct?
2   A.  Right.
3   Q.  And then you worked 85 hours?
4   A.  Right.
5   Q.  For the PF, which represented about 56.0
6 percent?
7   A.  Wow. It's rather precise; isn't it?
8   Q.  Obviously it has to total 100 percent.
9   A.  Right.
10   Q.  Now, if we looked at your time sheets for
11 each of the months that you were employed, we could
12 add those up and determine basically how much time
13 you spent sort of working with your DLC hat on and
14 how much time you --
15   A.  That was the object. Yes, sir.
16   Q.  That was the object. Okay. Now, how was
17 it determined to which entity your time would be
18 allocated to when you were performing your job?
19   A.  Well, it was hard for some people. And
20 for others, it was easy. But you want to know just
21 about me or you in general.
22   Q.  Let's talk about in general and then
23 we'll use you as an example.
24   A.  Okay. Well, in general, we asked
25 employees, and you don't know what they are actually

### Page 140

1 doing, you know, but we asked the employees, because
2 we wanted to make sure that they were being paid
3 from the right bucket, to say, okay, well, today,
4 now whether they did it every day, I don't know, I
5 have to keep a time sheet in my new life, so I
6 actually do it every day, or I won't get paid, but
7 we would ask them to track this because, I mean, you
8 understand why we wanted to do this.
9   Q.  I want you to explain to me why you did
10 this?
11   A.  Because we wanted to get paid from the
12 right bucket and we were trying to be very careful
13 that we were not cross subsidized in the wrong
14 direction. So we had two rules. And the rules were
15 keep track of your time. And if there's any doubt
16 about which organization, you allocate it to the
17 DLC.
18   Q.  Why is that?
19   A.  Because the DLC, if you look at this
20 uphill and downhill, C3 is allowed to accept monies
21 that cannot be used to subsidize activities of the
22 C4. So we had to be very careful that we not have
23 someone being paid by the C3 doing things for the
24 C4.
25       Because that would have, I don't know

### Page 141

1 what the right word is, but that would have been --
2 it would have been wrong. We weren't supposed to do
3 that. So, you know, you were supposed to keep track
4 of your time, and then turn it in to, you know, each
5 month. And, you know, truth be told, the
6 administrator director had to pound some people to
7 get their sheets in.
8       But that was the point was to keep an
9 accurate reflection of your work so you would be
10 paid by the proper corporation.
11   Q.  And then when you said cross subsidize in
12 the wrong direction, what do you mean by that?
13   A.  Well, as I explained earlier, as you
14 know, I mean, you are an attorney, there are
15 different exemptions these enjoy. An organization
16 that receives charitable contributions and gives
17 people a tax deduction for it cannot have activities
18 that subsidize those of an advocacy organization
19 like a C4.
20       So we did not want the Foundation to
21 subsidize the activities of the Democratic
22 Leadership Council.
23   Q.  And with respect to a given employee on a
24 given day, who within these two organizations would
25 direct that employee to perform a function for --

## Page 142

1  under each one?
2     A.  Most people in an organization like this
3  are self-directed. You come to work in the morning
4  and you kind of -- you are doing your thing. But
5  let's just say that, for the sake of argument, that
6  somebody who, and at this time, again, you know, the
7  PPI was still under the DLC, I believe. So I think
8  you are going to probably see, you know, generally a
9  split.
10         But, so if you were at the foundation,
11 let's say that, you know, you decided you really
12 liked to write a magazine article for The New
13 Democrat.
14    Q.  Yes, sir.
15    A.  Well, if you were to do that, then we
16 wanted to make sure that you were being paid by the
17 DLC. So, you know, you would say, okay, well, gosh,
18 it took me one and a half days to write that
19 magazine article. So you would allocate 12 of your
20 hours to the DLC as opposed to your home.
21         So everybody was assigned to a home
22 organization. So my home organization was the DLC.
23 If I didn't indicate otherwise, I would have been
24 paid 100 percent by the DLC. Or I might have been a
25 50/50. I can't remember. But that's what this memo

## Page 143

1  was about.
2         Here's your home. You do anything for
3  the other guy, you have got to charge him.
4     Q.  Who was Will Marshall who I deposed the
5  other day, what was his home organization?
6     A.  Well, Will was the president of
7  Progressive Policy Institute. Will was also an
8  officer of the corporation of the foundation. At
9  this point in time specifically, I can't tell you.
10 But, you know, my guess is it might have been the
11 foundation. I don't know. I could probably look
12 and see.
13         Yeah. It would have probably been the
14 foundation.
15    Q.  Now, how about Mr. From? What was his
16 home organization as between the two entities?
17    A.  I can't remember. He might have been
18 like me. He might have started out as a 50/50 guy.
19 I just don't know. Does the memo indicate it?
20         - - -
21         (The witness reviews a document)
22         - - -
23    A.  John, Julie, Al From, executive
24 assistant, no. So we would have, you know, probably
25 both of us were, you know, just tracked it.

## Page 144

1     Q.  Right.
2         MR. BAUER: If I could just interpose
3  again, I want to make sure we don't wander too much
4  into speculation. If you don't know, I would prefer
5  here for my purposes that he won't reconstruct it
6  from the documents or engage in speculation.
7         THE WITNESS: Okay. Fine. I can't
8  remember.
9         BY MR. MARTINEAU:
10    Q.  Okay. But you know about yourself and
11 you were -- your home organization was the DLC?
12    A.  DLC.
13    Q.  Okay. And you had a position on both the
14 DLC, and you held an office for the DLC as well as
15 the PPI?
16    A.  No. I think just misstated that. I
17 think that we had people who had home organizations
18 were those people who so very clearly worked for one
19 or the other. Like if you were in the Field
20 Department of the DLC, that's what you did. If you
21 ran the DLC's magazine, that's what you did.
22         Because I'm hearing what you are saying,
23 and I don't want to reconstruct something
24 inaccurately. I think most of us probably just came
25 in and kept our sheet and we didn't have a, quote,

## Page 145

1  home organization. So I just want to make sure I
2  didn't, you know, mischaracterize that.
3     Q.  So are you now saying that your earlier
4  testimony --
5     A.  Certain people were apparent, yes, I am
6  saying that I might have been wrong because I am --
7     Q.  But there were certain people it was
8  apparent --
9     A.  They had a home organization. I'm not
10 sure that every one of us had a home organization is
11 all I'm trying to say.
12    Q.  Did you, Chuck Alston, have a home
13 organization?
14    A.  That's what I'm trying to say. I can't
15 remember. Because I was the Executive Director of
16 both organizations, so it would not have been
17 apparent.
18    Q.  But you would allocate your time --
19    A.  Yes, sir.
20    Q.  -- based on the guidelines set forth?
21    A.  Yeah. I just want to clear that up.
22    Q.  If we looked at your time over a period
23 of time, we could determine roughly how much time
24 you spend in --
25    A.  How much I'll spend in any --

## Page 146

1  Q. -- each place? Fair enough. And that
2  would be true of Mr. From as well; correct?
3  A. Yes, sir.
4  Q. And any of the other individuals listed
5  on these time sheets?
6  A. Yes, sir.
7  Q. Correct? Okay. Very good.
8  A. I'm actually happy to see that those are
9  there.
10 Q. What?
11 A. The time sheets. Yeah.
12 Q. Did you not think that they were
13 maintained?
14 A. No. No. It's just I am not a detail
15 guy. It's good to see that people do what you ask
16 them.
17 Q. You are a big picture guy.
18 A. Well, sometimes.
19 Q. Sometimes. Okay. Now, I have a series
20 of memos, the next several documents that I believe
21 you wrote. And I want to have you identify them for
22 me.
23 A. Yes, sir.
24 Q. Take your time, we'll go through them
25 step by step. You referenced earlier that the

## Page 147

1  relationship between the DLC, the Progressive
2  Foundation, and the PPI; correct?
3  A. Yes, sir.
4  Q. And I want -- so would that -- in that
5  context, I want you to identify Government's Exhibit
6  37 for me.
7       - - -
8       (A document was marked as Government
9  Exhibit Number 37)
10      - - -
11      BY MR. MARTINEAU:
12 Q. And I ask if you can identify it, and if
13 you recall writing this memo?
14 A. Yeah, I do recall writing it. And this
15 was many, many times during this period we were
16 going back and forth about what was the right
17 organizational structure and home for our
18 operations.
19 Q. Yes, sir.
20 A. And I can see some things that are in
21 here that actually did not happen, but I was trying
22 to, as this indicates, raise these issues and
23 generate a discussion about some possible scenarios
24 for how we would organize things, missions, et
25 cetera.

## Page 148

1  Q. Did you write this memo on your own
2  accord or did someone direct you to write such a
3  memo?
4  A. No. I think at the time I was trying to
5  generate a discussion. I was trying to generate a
6  discussion.
7  Q. And if I understand from reading the
8  memo, the discussion concerned what is the proper
9  structure of these three different entities;
10 correct?
11 A. Yes, sir.
12 Q. Now, I want you to look under issues to
13 consider.
14 A. Okay.
15 Q. And Number 2, do you see that?
16 A. Yes.
17 Q. It says, what to do with PPI?
18 A. Right.
19 Q. Now at this time, just so we understand,
20 where was PPI in the organizational structure? Was
21 it under as a project of the DLC or was it --
22 A. It was a project of the DLC.
23 Q. Was it a C3 organization in 1997?
24 A. No. The C3 would have been the
25 Progressive Foundation.

## Page 149

1  Q. So it was a project?
2  A. It was a project of the DLC. Yes, sir.
3  Q. Now, you say here, Number 2, and I want
4  to understand what you are saying here.
5  A. Right.
6  Q. One of the issues to consider was what to
7  do with PPI?
8  A. Right.
9  Q. And it says it still exists as nameplate;
10 should it. Do you see that?
11 A. Right.
12 Q. Now, it says here, Alternatively, can we
13 move it to the Progressive Foundation?
14 A. Yes, sir.
15 Q. And then it says, Our lawyers have argued
16 against this, contending that PPI?
17 A. Right.
18 Q. And its bipartisan programming and
19 general policy activities?
20 A. Yes, sir.
21 Q. Help protects -- help protects DLC from
22 the charge that it is solely by, for and about
23 Democrats. Do you see that?
24 A. Yes, sir.
25 Q. You recall writing that?

Chuck Alston  
Washington, DC  
February 10, 2006

**Page 150**

1    A.   I do.
2    Q.   And, subsequently, was PPI moved from
3  underneath the DLC as a project to the Progressive
4  Foundation?
5    A.   Yes, sir.
6    Q.   Okay. So it appears that although your
7  lawyers have argued against it, that ultimately that
8  is the decision that was made. Is that correct?
9    A.   Yes.
10   Q.   Okay. And who were your attorneys that
11 you were referring to at that point in time?
12   A.   That would have been Holly Schadler
13 probably at that point. I can't remember.
14   Q.   She was the General Counsel, was she, of
15 the organization?
16   A.   I just don't remember. But I think she
17 was then, of this firm.
18   Q.   Okay. All right. Now, paragraph 6 says,
19 talks about positioning the magazine?
20   A.   Yes, sir.
21   Q.   And it makes another reference to your
22 attorneys and their advice. Do you see that?
23   A.   Yes, sir.
24   Q.   And they are talking about that --
25 explain what paragraph 6 is focused on.

**Page 151**

1    A.   Yeah. We were contemplating at the time
2  starting a magazine at the foundation.
3    Q.   Okay.
4    A.   We subsequently did not.
5    Q.   Okay. And then one of the concerns that
6  your lawyers had expressed to you, as I understand,
7  is represented in that last sentence when it says,
8  "it," presumably the magazine?
9    A.   Yes, sir.
10   Q.   Cannot be seen as an extension of the New
11 Democrat movement launched at the DLC?
12   A.   That's right.
13   Q.   And why did they, what is your
14 recollection as to why did they --
15   A.   Well, you are right. They were doing
16 what they were supposed to do, and we were doing
17 what we were supposed to do, which is to make sure
18 that the proper activities were conducted by the
19 proper corporation. And, you know, clearly there
20 are differences in the activities, as we discussed
21 earlier, that a C3 and C4 can conduct.
22        And they just wanted us to make sure that
23 if there were C4 type activities, that it wasn't
24 done in the C3.
25   Q.   Understand. Now your attorneys that you

**Page 152**

1  are referring to here again, would that be
2  Ms. Schadler?
3    A.   I believe so at this point.
4    Q.   Did the attorneys also reference your
5  outside counsel, if in fact there was an outside
6  counsel?
7    A.   She was the outside counsel.
8    Q.   She was the outside counsel?
9    A.   Yes.
10   Q.   She was not in house?
11   A.   Right.
12   Q.   What firm did she work for?
13   A.   Perkins Coie.
14   Q.   Was Mr. Bauer involved in --
15   A.   Yes, sir. He was also.
16   Q.   So when you make reference to our
17 lawyers --
18   A.   It would have been this whole blob over
19 here.
20   Q.   Whole blob meaning the counsel here
21 representing --
22        MR. BAUER: Distinguished counsel.
23   Q.   Distinguished counsel. No question about
24 that. I will stipulate to that. I want to refer
25 you to Exhibit 38 then, ask you if you can identify

**Page 153**

1  this document?
2        - - -
3        (A document was marked as Government
4  Exhibit Number 38)
5        - - -
6    A.   Yes.
7    Q.   Okay. And just identify, this is a memo
8  you wrote to Mr. From and others dated April 2,
9  1997. Do you see that?
10   A.   Yes, sir.
11   Q.   And it contains your recommendation that
12 the Progressive Foundation acquire the Progressive
13 Policy Institute from the DLC?
14   A.   Yes, sir.
15   Q.   And consolidate all think tank programs
16 under the PPI banner. Do you see that?
17   A.   Yes, sir.
18   Q.   Now, is that in fact what happened?
19   A.   It is.
20   Q.   Okay. If you look at paragraph 2 here,
21 there's a reference to again your discussion of
22 these issues with counsel. Do you see that?
23   A.   Distinguished counsel. Yes, sir.
24   Q.   And it says here, you wrote, "Based on my
25 previous discussions with Holly Schadler and Bob

39 (Pages 150 to 153)