Chuck Alston                                                          February 10, 2006

Washington, DC

---

Page 154

1  Bauer, I believe they would advise against such a
2  move, unless it is accompanied by vigorous steps to
3  bolster the DLC's efforts to promote its policy
4  ideas to a broader, bipartisan audience, in pursuit
5  of its mission as a social welfare organization."
6      Do you see that?
7   A.   Yes, sir.
8   Q.   So my understanding is not withstanding
9  the advice of counsel as you reference here, that
10 the determination was made to put PPI as a project
11 under the heading of the Progressive Foundation?
12  A.   That would be -- that would be the wrong
13 interpretation.
14  Q.   Okay.  What did you mean by that?
15  A.   Counsel's advice was do this and do this;
16 not do this at your peril.
17  Q.   Okay.
18  A.   So what we would have in fact done was
19 followed counsel's advice and done so in a manner
20 that would be consistent with pursuit of the mission
21 and social welfare organization.
22  Q.   So it would be a two-step process.  One,
23 you transferred PPI underneath PF?
24  A.   Yes, sir.
25  Q.   And Number 2 --

Page 155

1   A.   Ensure that we were --
2   Q.   Ensure that you were trying to --
3   A.   We were hitting the straight and narrow.
4   Q.   To operate as a social welfare
5  organization?
6   A.   Yes, sir.
7   Q.   Okay.  And you would agree that if the
8  DLC did not operate as a social welfare
9  organization, then it would not be properly a C4
10 organization under your two-step process?
11      MR. BAUER:  I have to object.  That was
12 reflected by counsel's understanding of the law, for
13 which he is not qualified to provide --
14  A.   Yeah.  I was going to say I don't think I
15 can --
16  Q.   Okay.
17  A.   That's beyond my --
18  Q.   But the way you saw it then was you would
19 have to, one, you make the transfer and then you
20 carry out the activities accordingly?
21  A.   The way I saw it then and the way I saw
22 it always was it was explained to me what the law --
23      MR. BAUER:  I once again think we should
24 stay with the document as it's written, and try not
25 to characterize the advice you received at the time

Page 156

1  as an executive of DLC from DLC's counsel.
2      THE WITNESS:  Okay.  I was just trying to
3  answer the question.
4      MR. BAUER:  I understand.  And you are
5  getting caught in the middle of a friendly exchange
6  between Mr. Martineau and myself as to what the
7  proper scope of the question is.  So you are not
8  doing anything wrong.  I just want to make sure that
9  from the DLC's point of view it protects its
10 privilege.
11      BY MR. MARTINEAU:
12  Q.   Very good.  I am just again asking you to
13 just flesh out what it is you meant in paragraph 2?
14  A.   What I meant there is that we always have
15 to do things within what the law permits.  And we
16 did.  That's what I meant.
17  Q.   Okay.
18  A.   If we are going to do it, we've got to do
19 it right.  I wouldn't have put it down on paper, in
20 a record, if I hadn't have believed that.
21  Q.   Understand.  Now, I want to just refer
22 you to the last page, 11645, it's the second full
23 paragraph that talks about the solution here with
24 counsel's advice.  Do you see that?
25  A.   Um-hmm.

Page 157

1   Q.   Can you just read that and then I'm going
2  to ask you a question about it.
3   A.   "The solution here, with counsel's
4  advice, would seem to make sure that the DLC offers
5  its own heavy -- did I spell dose that way -- dose
6  of policy activities and make the publications and
7  programming available to a broad audience beyond
8  Democrats.  That should represent no problem insofar
9  as the DLC discussion of issues has and will be
10 focused on changing the national policy debate
11 beyond the debate among Democrats.  Hence, DLC
12 advocacy and training efforts would be targeted
13 broadly."
14  Q.   Now, when you say that DLC advocacy and
15 training efforts will be targeted broadly, what do
16 mean by targeted broadly?
17  A.   That they will be targeted toward, you
18 know, broadly towards the issues in the country.
19  Q.   Is the targeted make -- are you concerned
20 about to whom those advocacy and training efforts
21 would be focused?
22  A.   No.
23  Q.   So you are referencing there -- what
24 exactly are you referencing there about targeting
25 broadly?

40 (Pages 154 to 157)

Chuck Alston                                                    February 10, 2006

Washington, DC

Page 158

1     A.   That they are targeted broadly at the
2  issues of the day.
3     Q.   Okay.  Fair enough.  I want to direct
4  your attention to Government's Exhibit 39.  Okay?
5              - - -
6        (A document was marked as Government
7  Exhibit Number 39)
8              - - -
9     A.   Okay.
10    Q.   That's a memorandum from you to the
11 officers and directors of the Progressive Foundation
12 and the DLC.  Do you see that?
13    A.   Yes, sir.
14    Q.   And do you recall writing this particular
15 memorandum?
16    A.   This is ancient history.  Hold on.  I
17 can't believe I had the word "dowse" in this instead
18 of dose.  It's kind of embarrassing.  Oh, there's
19 your history.
20    Q.   Very good.  Under "background" is your
21 history of the organizations.  Is that correct?
22    A.   Yes.  I think that this was doing my
23 effort to do, you know, due diligence for the those
24 people who like me had, you know, fiduciary
25 responsibility for the organizations to explain what

Page 159

1  we were doing, why we were doing it, how it would be
2  carried out.
3     Q.   Okay.  Let me refer you to page 11648.
4     A.   Yes, sir.
5     Q.   And actually, if you refer to the
6  previous page, it's under the heading, the
7  subheading "Implementation."  Do you see that?
8     A.   Yes, sir.
9     Q.   And it says, "Third, the DLC could and
10 may want to contract with PPI to produce certain
11 policy work.  PPI would bill the DLC for this work."
12 Do you see that?
13    A.   Yes.
14    Q.   Did the DLC in fact contract with PPI to
15 produce certain policy work?
16    A.   Not in a formal sense, no.  But we did in
17 the sense that any time, you know, since these
18 people were all still under the same two
19 organizations, that any time the PPI, let's say I
20 walked down the hall, and David Kendall and said,
21 Dave, we really want to do an issue brief on health
22 care.  We want you to read behind us, make sure it's
23 accurate.
24        So then he would bill us for the time.
25 But at the time, we had envisioned that we might

Page 160

1  actually let contracts for things but it turned out
2  we just never needed to do that.
3     Q.   And why was it that you never needed to
4  do that?
5     A.   We just didn't need to.  I thought at the
6  time that there would be some kind of like, you
7  know, that we'd want to maybe have big products or
8  something.  We just didn't do it.
9     Q.   Okay.  All right.  Very good.  Let's look
10 at, this is the last memo in this series of memos.
11 And it's dated May 16, '97 from yourself to Mr. From
12 and Mr. Marshall.  Do you see that?
13             - - -
14        (A document was marked as Government
15 Exhibit Number 40)
16             - - -
17        MR. REESE:  For the record, this is
18 Government's Exhibit 40?
19        BY MR. MARTINEAU:
20    Q.   Yes.  Thank you.  Do you recall writing
21 this particular memo?
22    A.   Yeah.  I am trying to see what's
23 different about it from the previous one.
24    Q.   Well, that's what I wanted to ask you.
25    A.   I have to go line by line to see what's

Page 161

1  different.  A lot of it is the same but it looks
2  like some of it is different.  Hang on.
3        They are different.
4     Q.   Just show me what the difference is
5  between the two?
6     A.   I'm going to have to read it to tell you.
7     Q.   Take your time.
8              - - -
9        (The witness reviews a document)
10             - - -
11    A.   I don't know why I was asked to go back
12 at this, but clearly I must not have had a good
13 enough argument the first time around and had to
14 make it again, or wanted to hone it.  Yeah.  It's
15 just a different cut at the same thing, which is
16 what does this mean and how do we do it and how do
17 we explain it to the world.
18    Q.   Very good.  And then paragraph 2 under
19 implementation here with respect to DLC contracting
20 with PPI.
21    A.   Right.
22    Q.   Is the same as in the other document;
23 correct?
24    A.   Same as the other.
25    Q.   And your answer would be the same with

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC  20005

Page 162

1  respect to whether that in fact occurred?
2     A.   Yes, sir.
3     Q.   And to your knowledge it did not in fact
4  occur?
5     A.   No contracts let but this did occur, PPI
6  -- if you put the word "personnel" in there, that
7  occurred.  PPI personnel would bill DLC.  That was
8  just easier.
9     Q.   When you say "bill" are we talking back
10  here about the allocation?
11    A.   Yes, sir.
12    Q.   Payroll allocation that we already
13  discussed?
14    A.   Yes, sir.
15    Q.   Got you.  Not a separate billing?
16    A.   No, sir.
17    Q.   Okay.  Very good.  Now, these series of
18  memos appeared in the spring of 1997.  That's what
19  they all started.
20    A.   Right.
21    Q.   Was there some reason why this particular
22  issue, Mr. Alston, emerged in 1997 that you needed
23  to address in these memos?
24    A.   Yeah.  As I think the memos reflect, we
25  were able to attract more funding for the

Page 163

1  foundation.  That was one part.  Two, we were also
2  doing things as the Progressive Foundation, as the
3  Democratic Leadership Council and the Progressive
4  Policy Institute, and that presented a confusing
5  face to the public.
6        And, three, as we looked at PPI's
7  activities, even though they were within the
8  umbrella of the C4, there was not a thing they were
9  not doing that wasn't consistent with the C3.  And
10  my thinking was, if it walks like a duck and quacks
11  like a duck, let's go put it over where a duck ought
12  to be.
13        And so that's what we did.  Because it
14  wasn't doing anything that was beyond the balance of
15  what a C3 should do.  And, therefore, it would enjoy
16  the advantages that come with being a C3.
17    Q.   Okay.
18    A.   So that was -- it was clarification and
19  to locate something where it properly belonged with
20  its activities and, three, it would make it easier
21  to raise money for.
22    Q.   Now, after the transfer occurred, one
23  more time, the structure is the DLC is C4?
24    A.   Yes, sir.
25    Q.   Progressive Foundation, what was that?

Page 164

1     A.   That's a C3.
2     Q.   And what about the Progressive Policy
3  Institute?
4     A.   Moved from a C4 to a C3.
5     Q.   And was it a C3 or was it a project of --
6  was it it's own C3?
7     A.   No, sir.  It was a project of the C4.  It
8  had started out as a C3, became a project of the C4,
9  went back to being part of the C3.  So it then
10  became a project of the C3.
11        What happened was that was the original
12  name of the corporation formed way back in 1989.
13    Q.   Okay.  Very good.  All right.  Now, I
14  have a series of documents here that I want to show
15  you that relates to some of your earlier testimony
16  about the field work.
17    A.   Okay.
18    Q.   And I just want you to identify them for
19  me so I understand where it fits in in your earlier
20  testimony.
21    A.   Okay.
22    Q.   Let's go to Government's Exhibit 41.  Can
23  you identify that document?
24                  - - -
25        (A document was marked as Government

Page 165

1  Exhibit Number 41)
2                  - - -
3     A.   Yeah.  I think that Florida had a more
4  politically permissible, if you will --
5        MR. BAUER:  I'm confused.  I'm very
6  sorry.  Just so we have a clear record, is that a
7  document identification are you asking him --
8        MR. MARTINEAU:  I'm asking him to
9  identify the document first.
10        MR. BAUER:  Is this a document -- are you
11  asking him whether he recalls the document?
12    A.   Yes.  I recall not the specific document
13  but I recall wanting this exchange to take place.
14        BY MR. MARTINEAU:
15    Q.   Just for the record, it's Exhibit 41.
16  It's a memo from Debbie Cox to Mr. Barney Bishop and
17  Bob Grizzard regarding an updated license agreement
18  with respect to the Florida DLC.
19    A.   Right.
20    Q.   Okay.  You made reference to a licensing
21  agreement between state DLCs and the national DLC in
22  your earlier testimony; correct?
23    A.   Right.
24    Q.   Is this an example of such a licensing
25  agreement?

42 (Pages 162 to 165)

Chuck Alston                                                    February 10, 2006
Washington, DC

Page 166

1  A.  Yes, sir.
2  Q.  And this pertains to the Florida DLC?
3  A.  Yes, sir.
4  Q.  And the Florida DLC, you testified that
5  was one of the more active?
6  A.  At that point in time.
7  Q.  Very good.  Let's go to the next
8  document?
9          - - -
10        (A document was marked as Government
11 Exhibit Number 42)
12         - - -
13      BY MR. MARTINEAU:
14  Q.  This is Government's Exhibit 42.  And
15 this document is a letter, if I may say, I don't
16 think it's in dispute, January 16, 1998.  And it's
17 written by members of the Florida DLC to apparently
18 other Florida potential or actual DLC members,
19 Florida DLC members.  Is that correct?
20  A.  Yes.
21  Q.  Okay.  And it's inviting them to
22 participate in a Florida DLC event; correct?
23  A.  Yes.
24  Q.  And I want to refer you to page 8831.
25  A.  Okay.

Page 167

1  Q.  And it's, 8831, is an attachment to the
2  letter.  And it says, "The following is a list of
3  elected officials who have been invited and
4  attendance anticipated."  Do you see that?
5  A.  Yes, sir.
6  Q.  These are state and local elected
7  officials in the state of Florida.  Is that correct?
8  A.  Yes, they all appear to be so.  Yes, sir.
9  Q.  Now, are these individuals, are they
10 Democrats or are they Republicans?
11  A.  I don't know.
12  Q.  Okay.  Well, you certainly know Senator
13 Bob Graham?
14  A.  Yes.  I mean I do -- if you are asking me
15 blanket do I know, I do not.  I could go one by one
16 and tell you the ones I do know.
17  Q.  Let's go one by one, tell me the party
18 affiliation of each of these individuals.
19  A.  Yes, sir.  Bob Graham and Lawton Chiles
20 were Democrats.
21  Q.  Okay.  U.S. Congress?
22  A.  They were Democrats.
23  Q.  All four of those?
24  A.  Uh-huh.
25  Q.  Candidates?

Page 168

1  A.  I don't know who the candidates are.
2  Q.  Is that Buddy MacKay, congressman?
3  A.  It may be.  Buddy was a founder of the
4  DLC.
5  Q.  That's what I understand.  Cabinet?
6  A.  I guess that would be Bill Nelson, and
7  the Attorney General was Butterworth.  I don't know
8  who Crawford is.
9  Q.  Bill Nelson is now --
10  A.  He's a United States Senator.
11  Q.  He's a Democrat?
12  A.  Yes.
13  Q.  And Mr. Butterworth ran for governor?
14  A.  Right.
15  Q.  He's a Democrat; right?
16  A.  Yes, sir.
17  Q.  And how about state legislators?
18  A.  I wouldn't know any of these guys if they
19 were standing the room now.
20  Q.  How about the list of former state
21 legislators?
22  A.  I know John and Mike, and they are
23 Democrats.  Yes, sir.
24  Q.  That would be John Mills and Mike --
25  A.  Mike Landon.

Page 169

1  Q.  How about Mr. Smith, a State's Attorney
2  from Gainesville?
3  A.  I do know Rod.  He's a democrat.
4  Q.  How about under mayors?
5  A.  I know Scott Maddux.  He's a Democrat.
6  Q.  How about Alex Pinellas; do you know him?
7  A.  He was the mayor of Miami.  I assume he
8  would be a Democrat.
9  Q.  How about the St. Petersburg City
10 Council.  Do you know any of those individuals?
11  A.  I know Bob Buckhorn.  Yes, sir.
12  Q.  Is he a Democrat?
13  A.  He was then, and I assume he is now.
14  Q.  Tampa City Council, you just identified
15 him?
16  A.  Yes, sir.
17  Q.  And then other participants, it says DLC
18 founders; do you see that?
19  A.  I do.
20  Q.  DLC members.
21  A.  I see it.
22  Q.  And potential DLC members; do you see
23 that?
24  A.  Yes, sir.
25  Q.  To your knowledge, just what you know,

43 (Pages 166 to 169)

Chuck Alston

February 10, 2006

Washington, DC

---

**Page 170**

1  were any of these individuals or groups that are
2  referenced on this document Republicans?
3      A.   Not -- I do not know.
4      Q.   But to the best of your knowledge, as far
5  as --
6      A.   Can I tell you the ones that, no, sir, I
7  cannot.
8      Q.   Very good.  All right.  Now I want to go
9  to refer you to Government's Exhibit 43, the next
10 exhibit.
11     A.   That's very interesting.  It's the first
12 I've seen this and I've learned all these CEOs.  I
13 wonder if they got them there.
14     Q.   You don't know if they actually intended
15 or if they were just potential or invitees?
16     A.   Florida was Florida at that time.  Who
17 knows.
18              - - -
19         (A document was marked as Government
20 Exhibit Number 43)
21
22     BY MR. MARTINEAU:
23     Q.   Now, I just want to reference you a
24 document here that is -- can you identify
25 Government's Exhibit 43 for me?

---

**Page 171**

1      A.   It's a memorandum for Holly Page, written
2  by Doug Wilson.
3      Q.   and Doug Wilson, again --
4      A.   At the time, he was the political
5  director of the Democratic Leadership Council.
6      Q.   And who was Holly Page?
7      A.   Holly Page would have been, gosh, I think
8  her title then was -- I can't remember if she was a
9  vice president, but she kind of oversaw the
10 political and development departments jointly.
11     Q.   Very good.  Now, the first line makes
12 reference to a DLC political strategy and outreach
13 program.  Do you see that?
14     A.   Yes.
15     Q.   And I want to refer you to, at the end of
16 the first page where it says, "Here's the work that
17 lies ahead."  Do you see that?
18     A.   Okay.
19     Q.   It says, "We have no real bench, no real
20 farm team."  Do you see that?
21     A.   Right.
22     Q.   What is your understanding of what the
23 term "no real bench" and "no real farm team" refers
24 to?
25     A.   Well, I don't know what Doug meant.

---

**Page 172**

1      Q.   Understand.
2      A.   I can't speak for Doug.
3      Q.   Understand.
4      A.   Okay.
5      Q.   But do you know what the term no real
6  bench and what a farm team is in the context of
7  politics?
8      A.   Oh, yeah.  Like I said, I can't speak for
9  Doug but I know exactly what he was talking about.
10     Q.   And what was he talking about?
11     A.   Bill Clinton had become President.  The
12 DLC had an ideology that was affiliated with the
13 President.  And as I had indicated earlier, we had
14 not been able to penetrate down to make those
15 policies the kinds of things that were happening in
16 every community in the country because, you know,
17 politics and policy lags.
18         And by the time you get to a position of
19 power, you are a prisoner of what you have learned
20 10 or 15 years before.  And so there's no -- there's
21 nothing coming underneath this wonderful thing that
22 has happened in Washington with policy, even in the
23 bipartisan Congress that we had at the time.
24         So there wasn't a farm team.  There
25 wasn't anybody who was doing this at the city

---

**Page 173**

1  council, and who was talking about trade and state
2  legislature because they were still kind of captive
3  of all the old liberal interest groups.  So we
4  didn't have a farm team.
5      Q.   Farm team could be understood to be
6  potential, either -- candidates for elected office
7  that would run under a New Democratic ideology?
8      A.   No.  In our -- you could see it that way.
9  What we cared about was who was in the office.  So
10 our focus was always on who got into the office.
11         So, now, clearly if you are going to
12 advocate welfare reform as we see it, it's going to
13 have to have been part of your political life, and
14 you are going to have to have succeeded having done
15 it.  Because you can't be something once you are in
16 office that you are not as you run there.
17         But if where you are going with this is
18 were we trying to whup up a bunch of candidates, the
19 answer is no.  We had no farm team to carry out the
20 ideology anywhere other than in Washington.
21     Q.   I'm not going anywhere.  I am just asking
22 the questions.  I just want to refer you to one more
23 statement made in this memo.
24         And I understand you didn't write it, but
25 under "Goals," the very first goal says, you see it

---

44 (Pages 170 to 173)

Chuck Alston                                                                    February 10, 2006

Washington, DC

Page 174

1  on the second page?
2      A.   Right.
3      Q.   Identifying, encouraging men and women
4  who are respected and influential members of their
5  community to run for state and national legislative
6  and administrative offices as Democrats carrying The
7  New Democratic messages.  Do you see that?
8      A.   I do.
9      Q.   Now --
10     A.   That would have been -- that's not what
11 we did.  No.  Maybe Doug wanted to do that, but
12 that's not what we did.
13     Q.   Okay.  Fair enough.  Did you ever?
14 Discuss this particular strategy with Doug that is
15 reflected on this particular document.
16     A.   I'm sure at a certain point I would have.
17 Yes.  And I would have clearly told Doug, as I had
18 to tell many people who worked for the organization,
19 what was within the bounds and what was outside the
20 bounds of the activities.
21     Q.   Did you direct Doug to write this
22 particular memo?
23     A.   I don't think I did.
24     Q.   Do you know who did?
25     A.   No.  I think Doug probably wrote this on

Page 175

1  his own.
2      Q.   After this memo was written, do you
3  recall if the DLC took any steps to carry out the
4  achievement of the goals that are reflected in this
5  particular document?
6      A.   I know we -- I know we took a lot of
7  efforts to, I mean, this is when we were, you know,
8  launching the Idea Book and all of these things that
9  I talked to about for policies at the state and
10 local level.  That's when we did all of that.  But
11 there were many times in, you know, that you would
12 have to tell people that they can't do certain
13 things.
14     Q.   Do you ever recall specifically telling
15 Doug he could not do what's in this?
16     A.   No.  I do not recall ever telling him he
17 could not do point A, B or C within this memo.  In
18 fact, I've never seen this memo until right now.
19 This is the first time I've ever seen this memo.
20 This is clearly something Doug wrote to Holly.
21      All I know is what we did.  And we didn't
22 do that.
23     Q.   All right.  Fair enough.  Let's go to
24 Exhibit 44.  And I just want you to identify this
25 exhibit and tell me if you have ever seen it before.

Page 176

1          - - -
2      (A document was marked as Government
3  Exhibit Number 44)
4          - - -
5      BY MR. MARTINEAU:
6      Q.   First, identify it for us if you would,
7  Mr. Alston.
8      A.   This is a memo written to Debbie Cox from
9  John Decken who would have been Communications
10 Director in 1998.
11     Q.   And it's regarding a plan for the DLC to
12 do state-based polling in-house.  Do you see that?
13 That's what it's in regard to?
14     A.   Yes.
15     Q.   Okay.  If you want to take a minute to
16 look at it, I just have a couple of questions for
17 you.
18     A.   This is the first I've seen it.
19     Q.   Now, it sets forth I think, if you see --
20 if you see it, a plan to do state-based polling
21 in-house.  Do you recall whether the DLC ever in
22 fact did state-based polling in-house?
23     A.   No, we didn't.
24     Q.   And in the last paragraph under
25 "Conclusion," it says, "Instead of costing a half a

Page 177

1  million dollars, we could conduct in-depth polls in
2  ten states over the next two years, including New
3  Hampshire, Iowa, Florida, California, Texas,
4  Michigan, Illinois, and three other key presidential
5  primary states, for about $50,000."  Do you see
6  that?
7      A.   I see that.
8      Q.   Did the DLC conduct in-depth polls in
9  those particular states as referenced in this
10 particular memo?
11     A.   We did not.
12     Q.   Is today the first day you have ever seen
13 this particular memo?
14     A.   Yes.
15     Q.   Did you ever instruct Mr. Decken or
16 Ms. Cox to either carry out or not carry out what
17 are proposed state-based polling as reflected in the
18 document?
19     A.   No, I never did -- told them to do it or
20 not to do it.
21     Q.   Did you ever have a discussion with them
22 about conducting state-based polling?
23     A.   Not that I recall.
24     Q.   Do you know if Mr. From ever had a
25 discussion with these individuals about doing

45 (Pages 174 to 177)

Page 178

1   state-based polling?
2       A.   I don't believe he did.
3       Q.   You don't know for sure though?
4       A.   No, I -- you would have to ask Al, but I
5   don't believe so.  I know we didn't ever do it.  And
6   I kind of disagree with him that we have the
7   capability of doing it in-house.  We didn't even
8   have SBSC at the time.
9       Q.   Very good.
10      A.   As I said earlier, many times people had
11  ideas that wouldn't be consistent.
12      Q.   But you don't specifically recall
13  discussing this particular idea with those
14  individuals?
15      A.   No, sir.
16      Q.   Did you ever discuss this particular idea
17  with Mr. From?
18      A.   No.
19      Q.   Did you discuss it with anybody
20  associated with the DLC?
21      A.   No.
22      Q.   Okay.  Fair enough.  Let's go to Exhibit
23  45.  Now, I will tell you there's a series of
24  exhibits that I believe are about the same subject
25  matter.  And I just want you to identify them, and I

Page 179

1   may have a question with respect to each one.
2       A.   Okay.
3       Q.   Exhibit 45, could you identify that
4   particular exhibit for me, sir?
5              - - -
6              (A document was marked as Government
7   Exhibit Number 45)
8              - - -
9       A.   Appears to be a briefing memorandum
10  written by John Hasselmann to John Podesta who at
11  this time I think was Bill Clinton's Chief of Staff.
12      Q.   And this relates to the DLC State Leaders
13  Dinner.  Is that correct?
14      A.   Yes, sir.
15      Q.   Now, there is a reference to -- and this
16  document involves or addresses doing some, quote,
17  major outreach to state and local elected leaders,
18  primarily state legislators.  Do you see that on the
19  front page?
20      A.   Okay.  I see.
21      Q.   And it makes reference to the DLC
22  Legislative Advisory Board?
23      A.   Yes, sir.
24      Q.   What is the DLC Legislative Advisory
25  Board that?

Page 180

1       A.   It was a group of state legislators who
2   were our advisory board.
3       Q.   And were they all -- were those advisory
4   board members Democrats or Republicans or
5   Independents?
6       A.   They were Democrats.
7       Q.   Okay.  And it says here that we have also
8   started our leadership workshops that have become a
9   highly effective medium for introducing emerging
10  leaders to DLC ideas and, by promoting their use of
11  ideas in their political efforts.  Do you see that?
12      A.   Yes, sir.
13      Q.   The leadership workshops that are
14  referenced here are the training workshops that you
15  testified to earlier?
16      A.   Yes, sir.
17      Q.   And they started, at least initially,
18  back in 1998.  Is that correct?
19      A.   Yes, sir.
20      Q.   And did they continue on in 1999?
21      A.   They did.
22      Q.   And those leadership workshops that you
23  testified earlier were toward state and local
24  officials.  Is that correct?
25      A.   Yes, sir.

Page 181

1       Q.   Okay.  Now I want to, and this was a
2   briefing memo to Mr. Podesta asking him to, and
3   actually thanking him for agreeing to be the guest
4   at the State Leaders Dinner.  Is that correct?
5       A.   Yes.
6       Q.   Did Mr. Podesta in fact attend?
7       A.   You know what, I think he did.  And I
8   think I was there.
9       Q.   Okay.  Very good.  Now, I just want to
10  refer you to page 2689 through 2696.  And these were
11  the RSVPs for that particular dinner.  Do you
12  recall?
13      A.   Yes, sir.
14      Q.   That's what it says?
15      A.   Okay.
16      Q.   Of these individuals that you know, were
17  any of these individuals, well, strike that.  Were
18  each of these individuals, the elected officials,
19  were they Democrat-elected officials?
20      A.   I believe so.  Yes, sir.
21      Q.   Do you recognize any Republican elected
22  officials on this particular list?
23      A.   I do not.
24      Q.   Okay.  You yourself attended this
25  particular dinner; correct?

46 (Pages 178 to 181)

Chuck Alston                                                                February 10, 2006

Washington, DC

Page 182

1      A.   I did.
2      Q.   Very good.  Let's go to Exhibit 46.
3                - - -
4           (A document was marked as Government
5      Exhibit Number 46)
6                - - -
7           BY MR. MARTINEAU:
8      Q.   Could you identify this document for me?
9      A.   It's a memorandum from John Hasselmann
10     who was on the DLC staff to someone named Peter
11     Altman.  I don't know who he is.
12     Q.   To the honorable Peter Altman.  So he may
13     have been an elected official; right?
14     A.   Probably.
15     Q.   And this refers to the Florida
16     invitations for training dated 7/20/98; correct?
17     A.   Okay.
18     Q.   That's what the document says.
19     A.   It does.
20     Q.   And this refers to your earlier testimony
21     about the DLC leadership workshop at the --
22     involving the Florida DLC; correct?
23     A.   Yes.  When was this?
24     Q.   It's dated July 20, 1998.
25     A.   Okay.

Page 183

1      Q.   And I think you testified that these
2      leadership workshops occurred in 1998 and 1999?
3      A.   Yes.
4      Q.   We are focusing now on 1998.  The
5      invitations list here, I would like to have you
6      review it and ask me if you recognize any
7      Republican-elected officials, just based on your
8      knowledge being in politics all those years, that
9      were listed on this particular document?
10     A.   I do not.
11     Q.   To the best of your recollection, is each
12     individual, elected official on this list a
13     Democrat?
14     A.   To the best of my knowledge, yes.
15     Q.   Go to 47.
16               - - -
17          (A document was marked as Government
18     Exhibit Number 47)
19               - - -
20          BY MR. MARTINEAU:
21     Q.   Can you just identify this particular
22     document for me?
23     A.   Yeah.  It appears to be, I don't know who
24     wrote it, it appears to be somebody's kind of
25     run-a-show for what a day would look like for a

Page 184

1      leadership forum.
2      Q.   And you participated in that, I think you
3      said?
4      A.   In many of them, yes, not all but many of
5      them.  I led some.
6      Q.   And this is part of what you described
7      earlier as how the leadership workshops were set up.
8      You had some speakers, you had experiential training
9      and so on?
10     A.   Yeah.  But, no, you know, wait a minute.
11     Hang on.
12     Q.   Take your time.
13     A.   This is not -- this is the training
14     workshop.  Because it doesn't have the idea tree and
15     the other tools we used.  This was -- this is
16     somebody's -- I don't know what this is, to tell you
17     the truth.
18     Q.   Okay.  Fair enough.  Is the DLC training
19     project --
20     A.   Because this isn't our training project.
21     Q.   This is what?
22     A.   This is not our training project.
23     Q.   This is not the DLC leadership workshop?
24     A.   No.
25     Q.   This is some other kind of training

Page 185

1      project.  Is that right?
2      A.   This is somebody else proposing
3      something.  There are elements I see that look
4      familiar but this is not the way we did the workshop
5      because we always started the workshop -- this is
6      not the workshop.
7      Q.   Fair enough.
8      A.   What the hell is this.
9      Q.   I'm asking you.
10     A.   I have no earthly idea, to be honest.
11     Q.   If you don't know, we are going go to the
12     next document.
13     A.   People ought to put names on memorandums.
14     Q.   I would like to refer you to Government
15     Exhibit 48.
16               - - -
17          (A document was marked as Government
18     Exhibit Number 48)
19               - - -
20     A.   Okay.
21     Q.   Can you identify that document?
22     A.   I see.  Okay.  So this is now starting to
23     make a little more sense.  This is a period in which
24     clearly people are trying to come up with initial
25     thinking of how to come up with a training workshop could be.  So

47 (Pages 182 to 185)

### Page 186

1  probably somebody -- okay. That contextualizes
2  things.
3         This looks to be something we would have
4  gotten from Anita suggesting, you know, some kind of
5  cut at what a workshop might look like.
6     Q.   And this is Anita Gottlieb who was the
7  consultant that was hired by the DLC?
8     A.   Yes, sir.
9     Q.   And just so we can move through the
10 document, DLC design for leadership workshop is the
11 title of this?
12    A.   Right.
13    Q.   And one of the very first goals for the
14 day, it says that as a result of the workshop,
15 participants will: One, develop a thorough
16 understanding of the DLC's governing philosophy and
17 underlying principles principals. Do you see that?
18    A.   Where are we? Okay. I see that.
19    Q.   Do you know if this particular document
20 was implemented and used in the particular DLC
21 workshop?
22    A.   I don't know about this document. I can
23 tell you what a workshop did but I don't know about
24 this document.
25    Q.   Tell me what a workshop did.

### Page 187

1     A.   What we did typically in a workshop,
2  gosh, I haven't done one of these in years. And
3  somebody else might have a better idea, but just so
4  you get the picture of it, we would start by giving
5  people a speech. And it varied over the years.
6         Sometimes it was Reagan, sometimes Rush
7  Limbaugh, but it was always a Limbaugh, Reagan, a
8  Mario Cuomo speech and then an Al From speech. And
9  then we would ask, this is kind of -- we would ask
10 people to read the speeches and identify the values.
11 What are the core values that come out of these
12 speeches.
13        And the point is that we were trying to
14 get people to understand that where they are at in
15 terms of making policy. And their political
16 statement arises out of values. So that was the
17 first thing, values.
18        Then we would introduce the concept of,
19 and this is the short version, of what we called the
20 idea tree. And then it later became the policy
21 tree. And I forget why we changed it.
22        And that is that your roots are your
23 values. And that all policy flows from your values.
24 So if you value competition, if you value social
25 justice, whatever your values were.

### Page 188

1         And then the trunk is what your policy
2  goals were. And then the branches were the actual
3  programs to implement your policy goals. And the
4  reason we did this is we were trying to teach people
5  that policies have to reflect your values. They
6  have to reflect the values of the people who you are
7  appealing to. And they have to be the core and be
8  supportive because the branches are just programs.
9         And it was our feeling that too many
10 people are married to programs. And what we wanted
11 people to understand is it's what your values are
12 and what you are trying to accomplish that matter.
13 And to this way wedge them off from the idea that
14 you had to always be married to the Title 3, Chapter
15 43 reading program. The point was to prepare
16 students to compete in the new economy.
17        And so this is how you work through it.
18 And then they would take these trees and they would
19 use that and then we would make them do a series of
20 exercises. Okay, write a three-paragraph statement
21 of your policy based on your tree. Write five
22 talking points based on your tree. And then they
23 would present back to the class.
24        And that goes back to what I talked to
25 you about earlier, experiential learning. It was

### Page 189

1  far different for me to say, Bauer, your polls ought
2  to reflect your values; than for me to say, Bauer,
3  show me what your values are. Show me how those go.
4         And that's what the workshop was about.
5  And that was the metaphor was always the tree.
6     Q.   And those values were the New Democratic
7  values?
8     A.   Well, no, that was a point of dispute.
9  We wanted their values at the end of the day to be
10 The New Democratic values.
11    Q.   I understand.
12    A.   But they came in the room, and that's
13 where we would often quarrel, over what those values
14 were. And in fact sometimes we would have arguments
15 and people would say, well, you are a New Democrat.
16 You can't possibly tell us you stand for
17 environmental stewardship because, you know, you are
18 in league with big business and you are not real
19 liberals.
20    Q.   At the end of the day, you said you
21 would want --
22    A.   We would hope to persuade them. But you
23 know what, we were also quite happy if we at least
24 had people thinking about politics in terms of
25 values. Given the way most people think about

Chuck Alston                                                    February 10, 2006
Washington, DC

### Page 190

1  politics in this country, that in and of itself is
2  victory.
3      Q.  Very good.  Let's go to Government --
4      MR. BAUER:  Off the record.
5              - - -
6      (Recessed at 1:21 p.m.)
7      (Reconvened at 1:30 p.m.)
8              - - -
9      BY MR. MARTINEAU:
10     Q.  Mr. Alston, I want to refer you to
11  Government's Exhibit 49, if you would.
12     A.  That's going back one.
13     Q.  Yup.
14     A.  All right.
15     Q.  Can you identify that document for me?
16              - - -
17     (A document was marked as Government
18  Exhibit Number 49)
19              - - -
20     A.  This is a memorandum written by Debbie
21  Cox who was the field director in 1998 to
22  participants in a training program.  It doesn't
23  indicate who or where.
24     Q.  I think on the next page it's June 19 and
25  20, 1998.

### Page 191

1      A.  Okay.
2      Q.  Training program at the DLC headquarters.
3  Do you see that on the second page?
4      A.  Okay.
5      Q.  And I just want to reference you to the
6  first or second paragraph on the first page, 9537.
7  And it says, "As you know, this training is part of
8  DLC's larger goal to arm the next generation of New
9  Democrat elected leaders, particularly at the state
10  and local levels, with New Democrat ideas."
11         Do you see that?
12     A.  Yes, sir.
13     Q.  Is that what you understand one of the
14  goals of the training program is to arm that next
15  generation of New Democrat leaders so that they
16  can --
17     A.  Advance ideas.  Yes, sir.
18     Q.  Is that a --
19     A.  Yes, sir.
20     Q.  And then I want to reference you to the
21  list of participants of legislative training
22  participants on 9540 and 9541?
23     A.  Okay.
24     Q.  I believe you have identified these
25  individuals in another context.  But do you know if

### Page 192

1  any of these individuals are Republicans?
2      A.  They are not.
3      Q.  So as far as you know, these are all the
4  Democrats?
5      A.  Yes, sir.
6      Q.  Reference Number 50, Government's Exhibit
7  50.
8      A.  Yes, sir.
9              - - -
10     (A document was marked as Government
11  Exhibit Number 50)
12              - - -
13     BY MR. MARTINEAU:
14     Q.  And that document, can you identify that
15  document for me?
16     A.  Yes.  It appears to be a memorandum from
17  Debbie Cox to participants in the DLC training
18  program.
19     Q.  And it sets forth a lot of the mechanics
20  of the training part, or the map, the agenda and so
21  forth; right?
22     A.  Yes, sir.
23     Q.  Okay.  There is a, on page 9547, there is
24  a list of participants.
25     A.  Yes, sir.

### Page 193

1      Q.  Do you see that?  Can you tell me if each
2  of those elected officials, state and elected
3  officials are Democrats or Republicans?
4      A.  I believe they are Democrats.
5      Q.  Okay.  Do you recognize any of these
6  participants as being Republicans?
7      A.  I do not.
8      Q.  Okay.  Go to number 51, I believe.
9              - - -
10     (A document was marked as Government
11  Exhibit Number 51)
12              - - -
13     A.  Yes, sir.
14     Q.  Can you identify 51?
15     A.  I don't know what this is.
16     Q.  Let me refer you to a couple things that
17  might refresh your recollection.
18     A.  Okay.
19     Q.  The document is dated 6/18/98.
20     A.  Uh-huh.
21     Q.  And it's to DLC.MAIN, DCOX.  Do you see
22  that?
23     A.  That would be to Debbie Cox.
24     Q.  And it was from the Bennett and Beard
25  Media Consulting Firm.  Do you see that?

49 (Pages 190 to 193)

Chuck Alston
Washington, DC

February 10, 2006

---

Page 194

1   A.  Yes.
2   Q.  Is that Anita Gottlieb's firm?
3   A.  No, I don't think so. That's what I'm
4 puzzling over. I don't know who that is.
5   Q.  And it references to Debbie, here are the
6 revised questions. Do you see that, in the very
7 first paragraph?
8   A.  Yes.
9   Q.  And then it sets forth under the heading
10 Revised Memo, DLC Training Questions 6/18/98. Do
11 you see that?
12   A.  Yeah.
13   Q.  Okay. Have you seen this document
14 before?
15   A.  No.
16   Q.  Do you recall having been a participant
17 in the DLC leadership training program, whether
18 these particular questions were addressed in that
19 program?
20   A.  I tell you, I -- I don't know what we
21 would have been doing with this, to tell you the
22 truth. I have no idea.
23   Q.  Okay. Well, is -- are you familiar with
24 the Bennett and Beard Media Consulting Firm?
25   A.  I am not.

---

Page 195

1   Q.  This is the first time you have seen
2 this?
3   A.  It is.
4   Q.  Let's move to Exhibit 52.
5   - - -
6   (A document was marked as Government
7 Exhibit Number 52)
8   - - -
9   BY MR. MARTINEAU:
10   Q.  Can you identify that document?
11   A.  I have no earthly idea.
12   Q.  Okay.
13   A.  It appears to be a document about a
14 training workshop we did June 19 and 20, but I -- as
15 the earlier guest list indicated, I wasn't in this
16 one.
17   Q.  Okay. But the cover sheet says, DLC
18 Leadership Workshop, just for identification?
19   A.  Yes, it does, says DLC Leadership
20 Workshop, June 19-20, 1998.
21   Q.  And there's a list here of participants
22 in this particular workshop. Can you just look at
23 that list and tell me if the individuals on this
24 list are Democrats or Republicans?
25   A.  Interesting. Democrats.

---

Page 196

1   Q.  These are all Democrats?
2   A.  Yes, sir.
3   Q.  You don't recognize any Republican state
4 elected officials on that list?
5   A.  No, sir.
6   Q.  Okay. Now let's go to Exhibit 53.
7   A.  Okay.
8   - - -
9   (A document was marked as Government
10 Exhibit Number 53)
11   - - -
12   BY MR. MARTINEAU:
13   Q.  I just want you to identify 53 and 54 are
14 like documents, I'll represent that to you. Can you
15 identify that document?
16   A.  This appears to be a document for the
17 same training session which we asked participants to
18 give their feedback.
19   Q.  And so these are, if I may say, the
20 actual feedback -- the documents where the
21 participants indicated their feedback in regarding
22 the legislative training, the leadership training
23 workshop; correct?
24   A.  Yes. But I have to just tell you I'm
25 puzzled. This is not in the same format as the ones

---

Page 197

1 we usually did.
2   Q.  How are these different from the format
3 you usually did?
4   A.  Because we, as I indicated to you
5 earlier, the meat and potatoes was to do these idea
6 trees. And that's what evolved over time to be the
7 standard format that we used. So that's why I'm
8 puzzled. And I didn't even recognize who Susan
9 Bennett and Ellen Beard were.
10   Q.  But these are the feedback from the
11 June --
12   A.  Yes, sir.
13   Q.  -- 20, 1998 training programs?
14   A.  Yes, sir.
15   Q.  Okay. Now, same with number 54, identify
16 that for me?
17   - - -
18   (A document was marked as Government
19 Exhibit Number 54)
20   - - -
21   A.  Same thing. This appears to be feedback
22 document for participations in a Colorado leadership
23 workshop.
24   Q.  In August 1998?
25   A.  Yes, sir.

---

50 (Pages 194 to 197)

Chuck Alston                                                    February 10, 2006

Washington, DC

---

Page 198

1    Q.   Okay.  So did you participate in that
2  particular workshop yourself?
3    A.   No, sir.
4    Q.   Okay.  But appears that the DLC did
5  conduct a leadership workshop in Colorado in August
6  of '98?
7    A.   Yes, sir.
8    Q.   And to the best of your knowledge, would
9  the format be the same as we've already described
10  regarding the Florida workshops?
11    A.   I don't know.
12    Q.   You don't know.
13    A.   Because I couldn't -- it doesn't indicate
14  the program.
15    Q.   But you do know that the DLC conducted a
16  leadership workshop?
17    A.   Yes, I do know that we did.
18    Q.   For Colorado in 1998.
19    A.   Absolutely.  That's not an issue.
20    Q.   Very good.  Now, let me move to number
21  55.
22    A.   Skipping over 54?
23    Q.   No, I think we were on 54.
24    A.   Okay.  Sorry.
25    Q.   We are on 55 now.

---

Page 199

1              - - -
2         (A document was marked as Government
3  Exhibit Number 55)
4              - - -
5         BY MR. MARTINEAU:
6    Q.   And I wonder if you could identify this
7  document for me?
8    A.   This was a memorandum from Doug Wilson to
9  me.  It appears that Doug is making recommendations
10  for where to go with the training program.
11    Q.   Okay.  Do you recall asking him to write
12  this particular memorandum?
13    A.   No.  But that doesn't mean anything.  I
14  wouldn't have to ask Doug to write a memo.
15    Q.   Right.  And so one of the things he's
16  writing to you is that in the -- under the
17  background section it says that, "In addition, we
18  should consider training sessions for a few target
19  groups which are politically rather than
20  geographically defined, paren, such as Democratic
21  governor's staffs, see below."  See that?
22    A.   Where are you, which paragraph?
23    Q.   Here.  Read that last paragraph and
24  explain to me what it is that Doug is --
25    A.   I think he would probably mean, I mean, I

---

Page 200

1  can't speak for him, but politically, rather than
2  geographically, normally we would go to Harrisburg,
3  Pennsylvania, which is one that I did.  And so
4  geography defined who you invited.
5         So, in other words, you would invite
6  people from Harrisburg, whether they were state
7  legislatures, city council people, staffers or
8  whatever.  This is suggesting proceeding along a
9  different vector, which is not defining your
10  participants by the city you go to, but by what
11  positions they hold.
12         So, in other words, it seems to be saying
13  let's do a training for staffers, you know, not
14  because they are in Tallahassee but because they are
15  a Democratic staff or a Democratic gubernatorial
16  staff is what I think this suggests.
17    Q.   Fair enough.  And the values-based
18  training that is the subject of the memo is the kind
19  of -- is the same training that you talked about
20  here today?
21    A.   Right.
22    Q.   So this document --
23    A.   That's more consistent, I mean the values
24  based training I believe would reflect more of the
25  tree I drew you earlier.

---

Page 201

1    Q.   Understand.  And the date of this memo
2  was August 31, 1999; correct?
3    A.   Yeah, which would have been a year and a
4  month later than the first one.
5    Q.   That's right.  The other DLC leadership
6  workshops were in 1998, the ones we've been looking
7  at?
8    A.   Right.
9    Q.   So the DLC conducted these workshops both
10  in '98 and in '99?
11    A.   Right.
12    Q.   Is that right?
13    A.   Yes, sir.
14    Q.   And I'd like to have you refer you to
15  Government Exhibit 56, if you will.
16    A.   Okay.
17    Q.   Can you identify that document?
18              - - -
19         (A document was marked as Government
20  Exhibit Number 56)
21              - - -
22    A.   It appears to be a memorandum from some
23  of us on the DLC staff to Anita Gottlieb who is our
24  leadership training consultant.
25    Q.   And, just for the record, was she with a

---

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC  20005

## Page 202

1 firm or was she on her own?

2    A.   No.  She just was a single entity.  I

3 mean, it's just Anita.  And she was married to a guy

4 who has since died, Wes somebody, who actually

5 turned us onto this whole idea.  But, no, she just

6 was on her own.

7    Q.   And what was her background before she

8 did these trainings?

9    A.   I think she was involved in like a, you

10 know, like an advocate for maybe women's issues or

11 something.  I can't exactly remember what, but she

12 kind of came at this thing as an advocate?

13    Q.   Okay.  Would you say she is more aligned

14 with the Democratic side of politics in the spectrum

15 or the Republican side or --

16    A.   Anita was a flaming liberal.  In fact, we

17 had a lot of disputes with her because she was way

18 to the kind of politically moral line with the, you

19 know --

20    Q.   To the left of the political --

21    A.   Yeah.

22    Q.   The Old Democratic regime?

23    A.   Right.

24    Q.   Very good.  And this is a draft memo

25 dated 8/31.  Do you know if there was any kind of

## Page 203

1 final memo that was followed up with -- that

2 followed this or not?

3    A.   No.  I don't know.  I mean, to tell you

4 the truth, we are not like a real formal

5 organization.

6    Q.   Right.

7    A.   And so there wouldn't have been any

8 procedure that would have been followed to close

9 off.

10    Q.   Understand.  And I just want to reference

11 you to one reference that she makes here on the very

12 first page.

13    A.   Yes, sir.

14    Q.   One of the goals here is to build The New

15 Democrat brand.  Do you see that?  What is the New

16 Democrat brand?

17    A.   Well, I would go all the way back to the

18 very first time I talked about it.  It's always

19 built over where we came out on issues.  So we

20 wanted people to understand, you know, because

21 people always -- let me back up.

22        A lot of people wanted to call us

23 "Republican Light" or the "Corporate Democrats" or

24 the "Business Democrats."  We wanted our brand to

25 arise from the whole notion of modernizing

## Page 204

1 progressive politics.  So that was the point is if

2 we could go out and actually teach people what we

3 are really about instead of what they read about us

4 in the newspaper, show them how to apply it in the

5 work they are doing in their states, their

6 communities, that would by definition build the

7 brand because then there would be real live things

8 happening; that people would say this is The New

9 Democrat way of doing things.  And it would build

10 the brand.

11    Q.   And I think some of the references that

12 you have testified to that have been made regarding

13 the DLC, another one, if I may say if I recall

14 seeing was the Reverend Jesse Jackson I think once

15 referred to the DLC as the Democrats of the leisure

16 class.  Is that correct?

17    A.   He did.  I didn't testify to that but

18 that is true.

19    Q.   I just wanted to understand.  Because you

20 have been describing how other people viewed the

21 organization.

22    A.   Right.

23    Q.   And that's just another one that I think

24 the record will reflect is ascertainable because

25 it's been written down somewhere.  Okay.  Very good.

## Page 205

1    A.   Will must have told you that.  Didn't you

2 say earlier that Will testified?

3    Q.   Will had testified, but he didn't tell me

4 that one.

5    A.   Oh really?

6        MR BAUER:  You got that one on your own?

7        MR. MARTINEAU:  I got that one on my own.

8        THE WITNESS:  Well, unfortunately, that

9 means it's too easy to find.

10        MR. MARTINEAU:  Well, let's go to

11 Government's Exhibit 57, if you will?

12            - - -

13        (A document was marked as Government

14 Exhibit Number 57)

15            - - -

16        BY MR. MARTINEAU:

17    Q.   And can you identify that document for

18 me?

19    A.   This appears to be a memorandum to Tom

20 Sugar from Anne Rung who was the congressional

21 coordinator for the DLC.

22    Q.   Who is Tom Sugar?

23    A.   At the time, he was Evan Bayh's Chief of

24 Staff, Senator Evan Bayh of Indiana.

25    Q.   Senator Bayh is commonly considered to be

52 (Pages 202 to 205)

Chuck Alston                                                    February 10, 2006
Washington, DC

**Page 206**

1  a New Democrat. Is that right?
2      A.  Yes, sir.
3      Q.  Now, under background, strike that. This
4  document is dated September 2, 1999. Do you see
5  that?
6      A.  Yes, sir.
7      Q.  And under "Background" the first sentence
8  says"The DLC in 1998 designed and tested a program
9  to teach elected officials and other rising
10  political leaders how to develop and articulate a
11  New Democrat governing agenda." Do you see that?
12      A.  Yes, sir.
13      Q.  And so this is a continuation of the DLC
14  leadership workshop in 1999 from what happened --
15  what took place in 1998; correct?
16      A.  Yes.
17      Q.  Okay. And it says, "The two-day
18  workshops are designed to teach the participants the
19  essentials of the New Democrat governing philosophy
20  and how to turn it into elective political --
21      A.  Effective.
22      Q.  -- Effective political messages and
23  policy --
24      A.  That was a Freudian slip.
25      Q.  Effective political messages and policy

**Page 207**

1  proposals relevant to their local issues. Do you
2  see that?
3      A.  Yes, sir.
4      Q.  Is that your understanding of what the
5  workshops was designed to teach?
6      A.  That's a pretty good summary. Yes.
7      Q.  Okay. Let's go to Number 58. Can you
8  just identify that document?
9                        - - -
10          (A document was marked as Government
11  Exhibit Number 58)
12                        - - -
13      A.  This appears to be Anita's response to
14  our request for revisions in the training program.
15      Q.  Okay. And she's making reference to
16  training sessions in Illinois, Washington state,
17  Texas and California. Is that correct?
18      A.  Yes.
19      Q.  And this is dated October 13 of 1999;
20  correct?
21      A.  Yes, sir.
22      Q.  On this next page, there's references to
23  governors' staffs and Senate and House staffs. Is
24  she referencing Democratic governor staffs here?
25      A.  I think so. I mean, I don't know if we

**Page 208**

1  ever actually pulled that one off, but I think that
2  that's what she would be referring to.
3      Q.  And the same on the House and Senate
4  staffs. Are we talking about Democratic House and
5  Senate staffs as she's referencing here?
6      A.  Well, I don't know what she was
7  referencing but, again, I don't think we ever -- I
8  don't know that we ever did that for the whole House
9  staff.
10      Q.  The leadership workshops were directed
11  towards the House staff on the Democratic side?
12      A.  If we did them, that would have been;
13  yes, sir.
14      Q.  Okay. Very good. Fair enough. Okay.
15  Can you just summarize for me your personal
16  involvement in the DLC leadership workshops? How
17  many did you participate in in 1998 and 1999?
18      A.  I did one in Pennsylvania. I did one in
19  Florida. In fact, I may have done two in Florida.
20  I can't remember. I know I did them at the National
21  Conversation in Indianapolis, whichever one we did
22  in Indianapolis. That may have been outside this
23  year. I know I did at least those three or four.
24      Q.  Okay.
25      A.  Beyond that, I just can't remember.

**Page 209**

1      Q.  What percentage, roughly I'm not going to
2  hold you to the number, of the DLC's budget let's
3  say in 1998, was spent on the DLC leadership
4  training workshops in, say, 1998?
5      A.  I don't know how many we did but our
6  return tells you what our budget was that year, so--
7      Q.  Let's look at that.
8      A.  And then I'll give you a guesstimate on a
9  percentage.
10      Q.  Let's look at 1998. That would be
11  Exhibit Number 33.
12      A.  Okay. Boy, that was a lean year.
13  Three-point-six is total revenue, total expenses,
14  three-point-four. Probably I would say maybe
15  between three and five percent, you figure like
16  that. I think the memorandum referenced that it was
17  costing us about 10,000 per, let's say in that first
18  year we got four of them off the ground, five of
19  them off the ground. You are talking 50K plus maybe
20  a little bit of expenses versus a $3.4 million
21  budget, so not much.
22      Q.  Did the participants in these leadership
23  workshops, did they have to pay to participate?
24      A.  You know, we had a debate about that. We
25  had a debate. Because early on, the answer is no.

53 (Pages 206 to 209)

Chuck Alston                                                    February 10, 2006
Washington, DC

| Page 210 | Page 212 |
|---|---|

**Page 210**

1  Because we wanted people -- nobody was going to pay
2  for something that was unknown.
3      And we were asking them to give up their
4  time, because you understand our purpose was that we
5  are trying to inculcate people to think like we do.
6  It's not like they are beating our door down, in the
7  early days, although later on it might have been
8  different.
9      So the answer would have been, no, I know
10  we did not. Then we debated whether we should make
11  them do that because we began to have a problem with
12  them staying all day. And then we thought, well,
13  maybe if they had a little skin in the game. But it
14  wasn't like a Dale Carnegie course where you pay
15  $250 and then you get the day-long session, because
16  that kind of would reverse things.
17      We were trying to teach them to think
18  like us. And the more barriers you raise to that,
19  the less progress you are going to make. This is
20  kind of -- I always saw it same as, you know, for
21  the most part the most of our products were always
22  give-aways.
23      Q.  So as far as you know, the participants
24  did not have to pay to participate?
25      A.  I think we experimented. To be honest, I

**Page 211**

1  think we experimented at some point to say maybe you
2  have got to pay 100 bucks or something like that.
3  But it was not a consistent policy and it was not
4  applied consistently.
5      Q.  So these workshops would be financed out
6  of the DLC budget?
7      A.  Yes, sir.
8      Q.  Now, you have testified about 1998. Just
9  for the record, can we do the same about 1999, an
10  estimate of how much --
11      A.  It would have been certainly less than
12  five percent of the budget, probably somewhere
13  around two or three as before.
14      Q.  Okay. Very good. Did Mr. From --
15              - - -
16          (Discussion off the Record)
17              - - -
18      BY MR. MARTINEAU:
19      Q.  With respect to the DLC leadership
20  workshops that you have been testifying about, did
21  Mr. From himself personally participate in these
22  workshops?
23      A.  No.
24      Q.  Did he come to the workshop and speak?
25      A.  He might have. But they were pretty, you

**Page 212**

1  know, the answer is, no. That's not the way Al
2  would choose to spend his time.
3      Q.  Okay. Fair enough. Let's shift gears
4  now.
5      A.  Okay.
6      Q.  Just a few more documents that I want to
7  show you. Just for identification purpose, Number
8  59, take your time and go to Number 59.
9              - - -
10          (A document was marked as Government
11  Exhibit Number 59)
12              - - -
13      A.  Okay.
14      Q.  And I just want -- you have testified
15  earlier about the web site development?
16      A.  Yes, sir.
17      Q.  Of the DLC and PPI. Can you just
18  identify this document for me?
19      A.  Wow. This is good.
20      Q.  First of all, have you seen this document
21  before?
22      A.  I believe I have. Yes.
23      Q.  And, for the record, it's dated 7/21 --
24      A.  It's the New Democrat Online Business
25  Plan dated 7/21/99. Appears to have been written by

**Page 213**

1  Debbie Cox, which would have made sense, although
2  she probably -- or printed out by Debbie Cox. I
3  don't know who actually wrote it because I think it
4  probably has many authors.
5      And it appears to be in fact what it
6  purports to be, which is a business plan for the web
7  site.
8      Q.  Okay.
9      A.  And we would have needed this probably
10  because we were probably out trying to -- probably
11  trying to raise money. Now, I haven't reread this
12  to tell you it all happened or not.
13      Q.  Okay.
14      A.  That I do not know.
15      Q.  Okay. Well, I think there's a reference
16  here to the site, www.dlcppi.org. Do you see that?
17      A.  Yes.
18      Q.  Is that the web site that --
19      A.  That was the web site -- I'm sorry.
20  Finish your question.
21      Q.  Was that the web site that resulted from
22  the on-line plan?
23      A.  Well, that web site already existed.
24  What we did was we overhauled it. In other words,
25  one day we flipped the switch, and the old one went

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                    Washington, DC  20005

Page 214

1 away and the new one appeared.
2    Q.   Well, I understood you earlier, and I
3 want to make sure I understand, I thought there were
4 two separate web sites?
5    A.   There are today.
6    Q.   There are today?
7    A.   There were not then.
8    Q.   There were not then?
9    A.   Right.
10    Q.   It was just the one joint web site at
11 that point?
12    A.   Right.  It was called -- PPI had its
13 own -- has always had its own web site.  Let me get
14 this straight.  Let me draw it for you.
15    Q.   Yeah.
16    A.   When we first started this, it was
17 dlcppi.org, because when we first went on the web,
18 if you'll recall, PPI was part of DLC.  So it did
19 that.  The foundation had no web presence.  So
20 that's the way we did it.
21        And we, you know, then when the
22 organizations decided to split, we had a problem
23 because suddenly one went to the C3, one is at the
24 C4, and yet they, you know, had this address.  So
25 then we had to start allocating everybody's time.

Page 215

1 And the web address -- because just like the same
2 way they shared an office and they each shared some
3 of the rent, well, we had to begin doing that with
4 the web site.
5        They have since, you know, PPI had its
6 own home page, www.ppionline.  And DLC kept the old
7 DLCPPI for awhile.  And now they've gotten rid of
8 the PPI and it's just DLC.ORG.  It was always a
9 terrible problem we had with people not knowing
10 which brand was where, as you've seen from the
11 memorandums.  So that was the attempt to clarify it.
12    Q.   Okay.  Good.  Now this makes reference to
13 a cost estimate of one year, $424,000.  Do you see
14 that on the front page?
15    A.   And that would have been, right, that
16 included development costs.
17    Q.   Did the DLC go out and try to raise money
18 to finance this?
19    A.   In fact, we did.
20    Q.   Okay.  And how did you go about doing
21 that?
22    A.   I asked Rutt Bridges for the money.
23    Q.   Who is that individual?
24    A.   Rutt is a guy who made a gazillion
25 dollars in the oil field software business.  And I

Page 216

1 remember because I did it up here at the Hilton at
2 Connecticut and, not the Hilton, the Omni, Omni
3 Shoreham.  And Debbie and I did it together.
4    Q.   Did he end up making the contribution?
5    A.   He did.
6    Q.   For the full amount of the --
7    A.   He did.  Yes, he did.  Great story.
8    Q.   Let's go to Government's Exhibit 60.
9          - - -
10        (A document was marked as Government
11 Exhibit Number 60)
12          - - -
13        BY MR. MARTINEAU:
14    Q.   Now, I think that I made reference
15 earlier, and you testified earlier -- or maybe you
16 didn't.  Can you just identify Number 60 for us?
17    A.   Yeah.  This does not -- no, I can't.
18 It's not our document.
19    Q.   Okay.  Where did this document come from;
20 do you know?
21    A.   It appears to have originated from the
22 House of Representatives.
23    Q.   Okay.  And the group is The New
24 Democratic Coalition Members.  Is that what this is?
25    A.   Yes.

Page 217

1    Q.   So and The New Democrat Coalition is
2 referenced on page 00205.  There's a membership list
3 there.  Is that correct?
4    A.   00205?
5    Q.   Yeah, it's the last page there.
6    A.   Okay.
7    Q.   So this document, to your understanding,
8 was generated actually from the Hill, from The New
9 Democrat Coalition on the Hill?
10    A.   Yes.
11    Q.   And Congressman Dooley is the chairman of
12 that?
13    A.   He is.
14    Q.   And why would this particular document be
15 -- or was it forwarded to the DLC?
16    A.   Probably because they wanted us to know
17 what they were doing.  But that's probably.  I don't
18 know whose computer it came from or who had it or
19 what their intentions were.
20    Q.   So this document here, the message of the
21 week, if you will, is from the Hill to the DLC,
22 rather than in reverse?
23    A.   Yes.  And believe me it wasn't to tell us
24 what do.  Whoever got this was just being kept
25 apprised.

55 (Pages 214 to 217)

Page 218

1    Q.   Very good. And then a couple more
2  documents. Number 61, can you just identify that
3  document?
4              - - -
5       (A document was marked as Government
6  Exhibit Number 61)
7              - - -
8    A.   Yes. This appears to be the kind of
9  fundraising literature for our annual conference and
10 dinner.
11   Q.   And this is 1997?
12   A.   Yes, sir.
13   Q.   And if you look on page 10308, if you
14 wanted to participate, as I understand from your
15 earlier testimony, DLC was raising funds from these
16 various organizations based on 10,000, 20,000,
17 50,000 --
18   A.   Yes. What you had to do, this entitled
19 you to a whole year's membership. This is not
20 $50,000 to come to the event. But it would, as this
21 indicates, if you joined at that level, these are
22 the privileges it gave you for that specific event.
23          Then you would also be invited to a
24 series of programming for the next year.
25   Q.   Okay.

Page 219

1    A.   We just didn't find single-event
2  fundraising to be effective. Plus that would have
3  been an expensive stake.
4    Q.   Right. 10311, there's a leadership
5  dinner attendees. Do you see that?
6    A.   Yes, sir.
7    Q.   And are these individuals all members of
8  the DLC?
9    A.   Boy, this would have been, well, let me
10 look. Hang on.
11   Q.   Take your time.
12   A.   Yes. This appears to be contributors and
13 other guests, Members of Congress, administration
14 officials. I see, you know, government affairs
15 guys, so clearly it was, you know, donors. So, yes.
16 This would have --
17   Q.   With regard to elected officials, did any
18 Republican-elected officials attend the leadership
19 dinner and conference?
20   A.   To my knowledge, no, sir.
21   Q.   Would that be true here in 1997 and 1998
22 and 1999?
23   A.   Elected officials?
24   Q.   Yes, sir.
25   A.   To my knowledge, no, sir.

Page 220

1    Q.   For all three years?
2    A.   Yes, sir.
3    Q.   Let's go to Number 62. Now, can you just
4  identify this document for me?
5              - - -
6       (A document was marked as Government
7  Exhibit Number 62)
8              - - -
9    A.   It looks like a -- looks like we are
10 asking -- this is this is the response form to see
11 if they are coming to the DLC retreat.
12   Q.   This is the retreat in New Orleans that
13 we referenced earlier in your testimony?
14   A.   Yes, sir.
15   Q.   And there's a reference here to a DLC
16 charter plane. Do you see that?
17   A.   Yes, sir.
18   Q.   Did the DLC provide a charter for people
19 in Washington to go down to New Orleans to
20 participate?
21   A.   Exactly.
22   Q.   Did elected officials take that charter
23 to get down there?
24   A.   Many did. Yes, sir.
25   Q.   Were there any Republican-elected

Page 221

1  officials that you know of that attended this
2  particular meeting?
3    A.   Not to my knowledge. No, sir.
4    Q.   All the elected officials were Democrats?
5    A.   To my knowledge. Yes, sir.
6    Q.   And did those Democrat-elected officials
7  also take the charter down to New Orleans?
8    A.   Many of them did. Yes, sir. Not all of
9  them.
10   Q.   Did they have to pay for that or is that
11 something DLC financed the charter?
12   A.   DLC financed.
13   Q.   Very good. And this particular
14 individual here, I couldn't quite tell the name,
15 looks like a Member of Congress; I could be wrong.
16 Do you know who that is?
17   A.   Harold Ford, Junior.
18   Q.   Oh, that's Harold Ford, Junior. Okay.
19 He's a Democrat; right?
20   A.   Otherwise known as Junior.
21   Q.   And he's a congressman from Memphis area.
22 Is that correct?
23   A.   Yes, sir.
24   Q.   Democratic congressman?
25   A.   Yes, sir.

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400                                    Washington, DC  20005

Chuck Alston

Washington, DC

February 10, 2006

---

## Page 222

1    Q.  Very good.  And then I think this is the
2  last -- I believe this is the last document I have,
3  Number 63.  Can you identify this document for me?
4         - - -
5         (A document was marked as Government
6  Exhibit Number 63)
7         - - -
8    A.  This would have been part of our effort
9  to find out what people think of the stuff we were
10  giving them.
11    Q.  Okay.  Now this is dated August 11, 1999;
12  correct?
13    A.  Yes, sir.  It's the DLC PPI Product
14  Survey Summary.  It appears to be a summary of a
15  feedback survey we gave to attendees at the National
16  Conversation to determine if they were using our
17  products
18    Q.  I see.  All right.  And so this
19  represents like a compilation of the respondents who
20  attended the National Conversation?
21    A.  Yes, sir.
22    Q.  As far as you are -- okay.  Very good.
23  That's all the questions I have on direct.  Thank
24  you.
25    MR. BAUER:  Excellent.  Why don't we take

---

## Page 223

1  a three-minute break, not longer than that.  And we
2  will probably have a couple of additional questions
3  on our side.  And that will be the end of that.
4         - - -
5         (Recessed at 2:06 p.m.)
6         (Reconvened at 2:17 p.m.)
7         - - -
8      CROSS-EXAMINATION CONDUCTED
9      BY MR. REESE:
10    Q.  We will do this quickly.  Mr. Alston,
11  I'll start out with a softball.  Why does DLC and
12  how does DLC use legislative officials?
13    A.  DLC, they are the ones who make the laws.
14  So, plain and simple, if you really are about
15  changing the direction of the country, and you have
16  a vision where it wants to go, there's not but one
17  way to get it there.  And that's to have the
18  national policy comport with what your views are.
19  So if you are going to ultimately prevail, that's
20  the arena you need to be in.
21    Q.  Why does DLC spend some of its energy
22  training and supporting the next generation of New
23  Democrat officials?
24    A.  Well, as I think I explained to counsel
25  earlier, you have to intervene with people early in

---

## Page 224

1  their political career.  That's the conclusion that
2  I drew from my experience here in the mid '90s when
3  I was helping to form this idea.  And that is by the
4  time someone was 40, 45 years old, and they came to
5  Congress, they had 20 or 25 years of political
6  experience under their belt.
7         And if you are a, you know, you are going
8  to have gotten your ideas from mostly special
9  interest groups or, you know, interest groups, those
10  people were often opposed to the things that we
11  wanted to see happen in the country, and I mean
12  interest groups on both the left and the right.
13         And our feeling was if we didn't come up
14  with a way to put our ideas and messages in front of
15  people earlier in their career and demonstrate to
16  them that they could make successful policy, and
17  therefore be successful politicians by doing this,
18  that we were never going to get the kind of people
19  once they came to Washington that saw the world the
20  way we did.
21         And so that's why we developed all of
22  these devices that we've been talking about, the
23  national conversation, the training programs, all of
24  this was to teach people our way of thinking earlier
25  in their political career.

---

## Page 225

1    Q.  Do New Democrat officials have to agree
2  with DLC's position 100 percent in order to be
3  considered New Democrat officials?
4    A.  No.  In fact, it's funny, we actually
5  struggle with that.  I'll never forget we had this
6  thing that we called the matrix, or somebody called
7  the matrix, but we tried to see if there was some
8  way you could do an X axis and a Y axis and have,
9  you know, if you are a New Democrat you have to be
10  in all these boxes.
11         And we found that, A, even Bill Galston,
12  who's a professor at the University of Maryland came
13  up with this idea, and you couldn't come up with
14  anything that universally worked because the reality
15  is that members also have to reflect their
16  districts.  And politicians also have to reflect
17  their constituencies.
18         And so they might be with you on 65 or 70
19  percent of things, but on 30 percent of things they
20  just say, I can't go there.  If I do that, I won't
21  get elected, so I can't do it your way Chuck.  So
22  our advice was not always the best political advice
23  as they saw it.
24         So, no, if we would have done that, I
25  used to say we have to spend more time drawing a

---

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                    Washington, DC  20005

Chuck Alston                                                    February 10, 2006

Washington, DC

**Page 226**

1  bigger circle and getting people in it, because if
2  we keep defining membership so narrowly, then nobody
3  will be a New Democrat.
4      Q.  How did DLC treat legislatures who were
5  with you on some issues but not against you on
6  others?
7      A.  Well, the point was to get stuff done.
8  Take a guy like, here's two examples, take a guy
9  like George Miller; two or three examples, now I
10  think of it.  This would have been when you remember
11  the example I was telling you earlier about Sandy
12  Cress and "No Child Left Behind," for whatever
13  reason George Miller, who's a very liberal Democrat
14  from the Bay area, Richmond County and the Oakland
15  Bay area, I mean, San Francisco Bay area, on this
16  issue, he came down hard on our side of the line.
17  On the 3Rs, "No Child Left Behind," which is there
18  needed to be more accountability of the educational
19  system.
20      And so we did everything possible we
21  could to help him, you know, move that legislation.
22  I mean information, have our policy experts at his
23  call.  The same when these guys in the Senate,
24  Breaux and Olympia Snow, who is a Republican,
25  founded the Centrist Coalition.  I mean, the

**Page 227**

1  Centrist coalition in the Senate was very consistent
2  with a lot of the way we saw things.
3      So, you know, if they wanted Rotherham to
4  talk about education or David Kendall to talk about
5  health policy, you know, we were Johnny-on-the-spot
6  supplying them to speak or do policy or feed them
7  memos, whatever they needed, simply because they
8  were consistent with where we were on the issue.
9      Same with I guess McCain would be another
10  example.  We wrote -- we are very big believers in
11  global warming, but we are also big believers in
12  market-based systems for delivering results.
13      So we have this idea for what we call a
14  cap and trade system of -- we are a wonks -- a cap
15  and trade system for carbon emissions.  And as we
16  expanded the thinking, it became the
17  McCain-Lieberman bill, and then of course McCain on
18  national service.  He's a huge proponent of national
19  service.  And, in fact, he and Bruce Reed are pals.
20  So we worked with him on national service.
21      And I -- you guys are going to have to
22  check the record, but I swear to you I think
23  somewhere -- and it may have been before this period
24  that's under question here, that it was useful to us
25  to do something with Gingrich.  And we did an event

**Page 228**

1  with him.  And you would have to check it out, but
2  I'm pretty sure.
3      So the point is, don't mean to be
4  long-winded, but the point is that it's the ideas
5  there.  And the reason we mostly work with New
6  Democrats is those are the people who are most
7  likely inclined to see the world the way we do.  And
8  the reason it's more Democrats is because if it's a
9  progressive mission, even if it's modernization, you
10  go hunting where the ducks are.  And so those are
11  the people who are more likely to stand in service
12  of our idea for what we want to do.
13      Q.  Can you give an example of someone who is
14  mostly a New Democrat official but who is against
15  joining a particular issue?
16      A.  Yeah.  That happened on trade a lot.
17  These guys would get, you know, weak kneed.  I'll
18  tell you, shoot, even Ellen Tauscher.  Oh, yeah, boy
19  we got mad about that.
20      Ellen Tauscher, who was the Vice Chair of
21  the DLC voted against and kind of, you know, led
22  people against a couple of the trade deals.  And she
23  was actually on our name plate.  That was not good
24  at all, but it just happened.
25      Q.  What was DLC's relationship with Tauscher

**Page 229**

1  on that issue, seeing as how she was --
2      A.  It was difficult and it caused us no
3  unending grief with the business community.  And
4  there was another one too, there was one of the big
5  legal things, not asbestos, what's the other one
6  that's been out there.
7      MR. BAUER:  Bankruptcy reform.
8      A.  No.  Bankruptcy reform, there were
9  generally four.  It's the class action reform.  We
10  had taken a pretty aggressive stance on that at
11  certain points along the way.  And a lot of our
12  people ended up voting against that.  And it caused
13  us huge grief with the donor basis.  So it happens.
14      Q.  Did DLC work -- have occasion to work in
15  legislative coalitions with Democrats who were not
16  New Democrats?
17      A.  Yeah, that was the example I gave you
18  earlier about George Miller.  That's an example of,
19  you know, on trade, we worked with Charlie Randall
20  particularly on the African Trade Agreement.  And I
21  don't think anybody by any stretch of the
22  imagination would think of Charlie Randall as being
23  a New Democrat.
24      Q.  Did DLC work with Republicans on
25  legislative coalitions?

58  (Pages 226 to 229)

Chuck Alston                                                    February 10, 2006
Washington, DC

Page 230

1    A.  Yeah.  I think the one that springs to
2 mind was the one I was telling you about the
3 Centrist coalition.  That was purely -- the Senate
4 is very different from the House, but that was
5 purely a response to the politics of the divided
6 Senate.
7        Those guys figured out if they came
8 together as a coalition in the center, that they
9 could actually influence the direction of things.
10 And on a lot of those policies, you know, they
11 reflected where we were.  So we kind of would do
12 anything we could to help them.
13    Q.  You mentioned that you -- that DLC
14 provided speakers to the New Democrat caucus upon
15 request.  Did you provide speakers to any other
16 caucus upon request?
17    A.  I don't want to be a broken record, but
18 it would be the same thing with the Centrist
19 coalition or someone.  The point is if it was
20 serving our purpose, yes.  I mean, so if the request
21 came from the House Democratic caucus or the
22 Centrist caucus or anybody like that where it was
23 serving our purpose, we would supply a speaker.
24 Because it's -- our point was to advance our goals.
25    Q.  But to be clear, did the DLC in fact

Page 231

1 provide speakers?
2    A.  Oh, absolutely.  Yes.
3    Q.  And, for the record, the Centrist caucus
4 is made up of both Democrats and Republicans?
5    A.  It is.
6    Q.  Were there any people identified with the
7 Republican party who worked for DLC as staff?
8    A.  Oh, yeah, did you see the guy -- the
9 piece the other day about Marshall Whitman in the
10 Style Section, the most quoted person on the face of
11 the planet.  Well, we worked for heritage foundation
12 and John McCain, who's a Republican, and now he's
13 the Senior Counsel to the DLC.
14    Q.  Any others?
15    A.  Rob Atkinson, who is the director of --
16 and when he first came PPI was still part of DLC,
17 the director of the technology and new economy
18 project.  We hired him from -- stole him away from
19 governor I guess it was Lincoln Almond who was the
20 Republican governor of Rhode Island.
21    Q.  Okay.  Can you think of anybody else?
22    A.  Beyond those two, not right off the top
23 of my head.  No.
24    Q.  You mentioned I believe that Pinkerton
25 wrote a magazine.  Was that --

Page 232

1    A.  Oh, yeah.  I did earlier.
2    Q.  Pinkerton was a Republican?
3    A.  Yes.  Well, I think I've testified
4 earlier, he was the -- either the deputy or the
5 domestic policy director for Bush 41.
6    Q.  Were any of DLC's donors representative
7 Republicans?
8    A.  Oh, tons of them.  I can't tell you which
9 ones but all these government affairs guys and their
10 companies, yeah, many of them.
11    Q.  We talked a little about the distribution
12 of the magazine, and we had talked about the web
13 site.  Where -- who read the web site?
14    A.  Well, I can tell you one thing for
15 certain.  I do know that we were read by the White
16 House of both administrations, both Clinton and Bush
17 43.
18    Q.  How do you know that?
19    A.  Well, because you can track the, what do
20 you call it, the something dot EOB for executive
21 officer.  There was some way, because we used to --
22 it was a big sport.  We would kind of watch and
23 count, you know, and you don't know from House and
24 Senate designations because that doesn't indicate.
25 But when it's the White House, you know that the

Page 233

1 other party is doing it.
2    Q.  And this was covered some on direct, but
3 just to be clear, how was the -- was Mark Penn's
4 polling information distributed?  Who received it?
5    A.  I don't know because we made it all
6 universally available on the web site.  We gave it
7 out through the press.  We distributed it in the
8 magazines that went as we indicated to people in
9 both parties.
10        And when we did them in any form that was
11 other than the magazine, that would be made
12 available to anybody who called up and asked for it.
13 And, yeah, it's kind of universal.
14    Q.  If you would turn to Government Exhibit
15 32, which is the DLC's exempt organization return
16 from 1998.  If you would turn to the page marked
17 I'm sorry, 1997, if you turn to the page marked
18 USA-14, line 81A, you earlier testified that you did
19 not recall how the amount of political expenditure
20 was calculated.  Is that correct?
21    A.  No.  What I testified to is I did not
22 recall what the definition of political expenditures
23 was, but that I did recall that if I indicated none,
24 that it would have been the correct designation.
25    Q.  I'm going to show you a document to

                                    59 (Pages 230 to 233)

Chuck Alston

February 10, 2006

Washington, DC

---

Page 234

1  refresh your recollection.  If you would turn to
2  page 23 and read the marked section just to
3  yourself.
4      A.  Page 21?
5      Q.  Page 23, sorry, 21.  And just read the
6  marked section to yourself.
7           - - -
8      (The witness reviews a document)
9           - - -
10      BY MR. REESE:
11      Q.  Take as long as you need to read it.
12      A.  Yes.
13      Q.  Does that refresh your recollection?
14      A.  It does.
15      Q.  All right.  Now, could you tell me what
16  you now recall about that, about the calculation of
17  line 81A in the Form 990?
18      A.  Yes.  We don't engage in any electionary
19  or election-related activities, so we answered none.
20      Q.  Can you explain for me what the
21  definition of election activities would be?
22      A.  That's trying to advance the cause of
23  someone running for an elected office.
24      MR. REESE:  Do you have anything further?
25  No?  That's all we have.

---

Page 235

1      MR. MARTINEAU:  I don't think I have any
2  other questions for you.
3           - - -
4      (The deposition was concluded at 2:31 p.m.)
5           - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 236

1  UNITED STATES OF AMERICA  )
2                    ss:
3  DISTRICT OF COLUMBIA    )
4
5      I, CHUCK ALSTON, the witness
6  herein, having read the foregoing testimony of the
7  pages of this deposition do hereby certify it
8  to be a true and correct transcript.
9           - - -
10
11
12  _____
13           CHUCK ALSTON
14
15  Subscribed and sworn to before me
16
17  this _____ day of _____, 2006
18
19  _____
20  N O T A R Y   P U B L I C
21
22
23
24
25

---

60 (Pages 234 to 236)