William Marshall
Washington, DC

February 8, 2006

| Page 82 |
| --- |

1 parties throughout the world, particularly in
2 Europe, particularly in England, Britain, and
3 organized a series of dialogues, international
4 dialogues that went under the rubric of Third Way.
5 And we wanted to just adopt, you know, lay claim to
6 that rubric and thought we'd do that by renaming the
7 501(c)(3) Third Way Foundation.
8     Q.   And what do you mean by Third Way?  Just
9 explain what that means.
10     A.   Well, that means essentially that we were
11 looking for alternatives to the old left-right
12 debates in politics and looking for third ways,
13 looking for a new synthesis of policy that didn't
14 reflect either side of the old battles between left
15 and right.
16     Q.   Okay.  And I think you said there was an
17 international aspect or component to this?
18     A.   Yes.
19     Q.   And Tony Blair was very much involved in
20 that.  Is that correct?
21     A.   Right.  Um-hmm.
22     Q.   And President Clinton was involved in
23 advocating this kind third way approach; correct?
24     A.   Yes.
25     Q.   In domestic politics terms, is the third

| Page 83 |
| --- |

1 way equivalent to the concept of triangulation that
2 was often discussed during the Clinton presidency?
3     A.   No.
4     Q.   What was triangulation as you understood
5 it?
6     A.   Well, it was not my term, and it's not
7 one -- an idea that I, you know, embrace.  So it's
8 an invidious term used by critics of the Clinton
9 administration.
10     Q.   But the Third Way was to provide
11 alternatives to a liberal conservative left-right
12 either-or approach, as I understand it.  Is that
13 correct?
14     A.   It was to try to challenge orthodoxies
15 across the political spectrum and synthesize new
16 approaches.
17     Q.   Okay.  So I think the record is clear as
18 to what the structure is.  With respect to the Third
19 Way foundation, other than the change in the name,
20 was it the same entity as the Progressive
21 Foundation, Inc. that we've described here?
22     A.   Yes.
23     Q.   Same personnel that were involved in
24 that?
25     A.   Yes.

| Page 84 |
| --- |

1     Q.   Is that correct?  Okay.  And who
2 suggested that the foundation's name be changed from
3 the Progressive Foundation to Third Way Foundation?
4     A.   I don't recall.
5     Q.   Were you involved in that process?
6     A.   Yes.
7     Q.   Of changing -- okay.  What was your
8 involvement in that process?
9     A.   Just debate and discussion of it.
10     Q.   Who were you debating and discussing the
11 change with?
12     A.   The board, the foundation board.
13     Q.   Okay.  And was Mr. From part of that
14 discussion?
15     A.   Yes.
16     Q.   Any elected officials involved in that
17 discussion?
18     A.   Not with the board.  I mean I'm talking
19 about the board that had the legal -- had the right
20 to make that decision.
21     Q.   Okay.  All right.  Let's go back to this
22 document.  And I have some specific questions that
23 are related.  Now, I understand the document was
24 drafted by Mr. Alston; correct?  Do you see that?
25     A.   Yes.  It appears to be the case.  Yes.

| Page 85 |
| --- |

1     Q.   And it was directed to you and Mr. From;
2 correct?
3     A.   Um-hmm.  Yes.
4     Q.   Do you recall requesting Mr. Alston to
5 draft up a memo to propose this transfer that's the
6 subject of the memo?
7     A.   I don't recall.
8     Q.   Okay.  Do you know if Mr. From --
9     A.   I don't know.
10     Q.   Okay.  Good.  Let me just reference you
11 to a couple of statements here and see what you can
12 tell me about them.  You say -- the memo says at the
13 bottom, it makes reference to the recent growth of
14 the Progressive Foundation.  What do you attribute
15 to the growth of that foundation?
16     A.   I don't specifically recall.  I think
17 it's simply that we were able to envision it growing
18 and wanted it to.
19     Q.   Okay.  Let's look at another -- on the
20 second page of the memo.  There's a reference to, in
21 the last paragraph of the second full paragraph,
22 that says, "Moreover, the enhanced separation of the
23 think tank and advocacy operations will make it
24 easier to guard against subsidies --
25     A.   I am sorry.  Where are you?

22 (Pages 82 to 85)

William Marshall

February 8, 2006

Washington, DC

---

Page 86

1   Q.   Right here.
2   A.   Okay.  Thanks.
3   Q.   Just for the record, the memo states,
4   "Moreover, the enhanced separation of the think tank
5   and advocacy operations will make it easier to guard
6   against subsidies flowing the wrong way between the
7   organizations."  Do you see that?
8   A.   Yes, I do.
9   Q.   What do you understand is meant by the
10  separation of the think tank and advocacy operations
11  as used in the memo?
12  A.   Well, what I understand is that under IRS
13  provisions it is possible for the C(4) to subsidize
14  C(3).  And I'm not -- I'm not a lawyer, but that
15  whereas it's more problematic if the subsidy goes
16  the other direction.
17       So I think what this appears to be is an
18  argument that make it, you know, easier to guard
19  against, you know, running afoul of tax structure
20  here.
21  Q.   Very good.  And what is meant here, what
22  is your understanding as what is meant here by the
23  separation of the think tank and advocacy
24  operations?
25  A.   I think he simply means Al reached

---

Page 87

1   elected officials probably.
2   Q.   That's what the advocacy operations
3   references?
4   A.   It could be, I suppose.
5   Q.   You did not write this memo?
6   A.   I didn't write this memo.  No.
7   Q.   So the person who presumably would know
8   is Mr. Alston who wrote the memo.  Is that correct?
9   A.   Yes.
10  Q.   Let me refer you to the bottom page here
11  where it's under the heading "Implementation."  Do
12  you see that?
13  A.   Yes.
14  Q.   Paragraph 2 says, quote, "The DLC can and
15  may want to contract with PPI to produce certain
16  policy work.  PPI would henceforth bill the DLC for
17  this work."  Do you see that?
18  A.   I do.
19  Q.   Do you recall -- or strike that.  Did the
20  DLC contract with PPI to produce certain policy
21  work?
22  A.   I don't specifically recall an instance
23  when that happened, at this moment.
24  Q.   You don't.  Okay.  Now, I asked you
25  earlier about when some of the employees that were

---

Page 88

1   common to both organizations, like Mr. Alston
2   produced work under the heading of PPI that was
3   contained in the documents or the magazines produced
4   by the DLC.  Do you recall that?
5   A.   Yes.
6   Q.   When that happened, did the DLC
7   compensate PPI for that work that Mr. Alston in this
8   example did?
9   A.   Did the DLC compensate Mr. Alston for
10  what work?
11  Q.   Did the DLC compensate the PPI for the
12  policy work that Mr. Alston did in that example?
13  A.   I believe so.  The distinction here is
14  between what I take this to mean is that -- my
15  interpretation of this thing you asked me to comment
16  on is that the DLC says, okay, would you produce a
17  report on X, Y or Z.  And here's, you know, tell us
18  what you think it would cost to produce such report.
19  And here's the money for it.
20       That is what I'm saying I don't recall an
21  instance of.
22  Q.   Okay.  Do you recall whether as president
23  of the PPI you received funds, the PPI received
24  funds from the DLC as compensation for policy work
25  done by the PPI that was used by the DLC?

---

Page 89

1   A.   Yes.  I mean, again, according to the
2   time allotment that I mentioned earlier, that
3   wouldn't be true of me and others.
4   Q.   And so would that be in addition to the
5   compensation that the individual employee earned
6   from the particular entity that we described
7   earlier?
8   A.   I am sorry.  I'm lost here.
9   Q.   Well, you recall instances where the PPI
10  received funds from the DLC to compensate the PPI
11  for work that the PPI --
12  A.   No.  I'm sorry.  What I was referring to
13  there was what I've mentioned earlier was the
14  occasional amount of subsidy from DLC to PPI to just
15  meet our budget, not to compensate for particular
16  policy products.
17  Q.   So your testimony is you don't recall any
18  specific contract as referenced here?
19  A.   Right.
20  Q.   In which PPI received money from the DLC?
21  A.   For a specific policy product.  It just
22  didn't work that way, my recollection.
23  Q.   So then I'm clear, how did it work?
24  A.   Well, this is not -- this is in the
25  conditional.  This is something that could happen.

23 (Pages 86 to 89)

William Marshall                                                                February 8, 2006

Washington, DC

---

Page 90

1   According to this memo, it's something that didn't
2   happen, as far as I can recall.
3       Q.   So the best of your recollection this did
4   not -- this particular approach suggested in the
5   memo did not happen?
6       A.   The best of my recollection, you know, I
7   think that's right. I'd have to go back and review
8   everything we've done since then but I don't recall
9   an instance where this happened.
10      Q.   And one of the references here said that
11  PPI would henceforth bill the DLC for this work. Do
12  you see that?
13      A.   I do.
14      Q.   Do you recall whether in fact the PPI
15  billed the DLC for any kind of policy work?
16      A.   Well, again, I need to draw the
17  distinction between people's time being allotted.
18  And the contractual, you know, us contracting with
19  DLC to produce policy work. It's the latter that I
20  am saying I don't recall an instance of. And that's
21  how I understand this language.
22      Q.   Okay. So the best of your knowledge,
23  the -- you recall that employees were compensated on
24  a salary basis based on the allocation of their work
25  on those entities?

Page 91

1       A.   Yes.
2       Q.   But you don't recall any specific
3   situation where the PPI billed the DLC for policy
4   work that the PPI provided the DLC?
5       A.   No.
6       Q.   Okay. All right. Did you, after this
7   memo was written, did you have a meeting with
8   Mr. Alston and/or Mr. From to discuss this
9   particular proposed arrangement?
10      A.   I'm sure we discussed it in the context
11  of voting in the progressive, I mean in the
12  discussion of, you know, the Progressive Foundation
13  to make this happen.
14      Q.   You don't recall any specific -- you have
15  no specific recollection of a discussion concerning
16  this matter?
17      A.   No specific. I know we talked about it.
18  I couldn't give you chapter and verse when it
19  happened.
20      Q.   Well, subsequently I think you have
21  testified that the PPI was transferred to the
22  Progressive Foundation, later renamed the Third Way
23  Foundation. Is that correct?
24      A.   Yes.
25      Q.   So eventually it happened, from your

Page 92

1   understanding?
2       A.   Yes.
3       Q.   And that's the structure that exists
4   today, if I understand. Is that correct?
5       A.   Yes.
6       Q.   Now, I want to just ask you to make
7   reference here to paragraph 4. The very last page,
8   all the way to the end under implementation,
9   paragraph 4. There's a reference here to joint
10  marketing efforts, the statement joint marketing
11  efforts would need to be scrutinized carefully to
12  reflect that DLC and PPI now pursue different if
13  compatible missions. Do you see that?
14      A.   I do.
15      Q.   And it says the language must make it
16  clear that two organizations are doing their own
17  thing, albeit with the same people. Do you see
18  that?
19      A.   Um-hmm.
20      Q.   They can, however, still be described as
21  an affiliated think tank and action arm, the
22  difference being that PPI will now be a think tank
23  affiliated with the DLC, not the DLC's think tank.
24  Do you see that?
25      A.   Yes, I do.

Page 93

1       Q.   So when I asked you earlier if a fair
2   characterization of the two entities could be PPI
3   being an affiliated think tank and the DLC could be
4   considered an action or advocacy organization, is
5   that a fair characterization of those two
6   organizations?
7       A.   Well, it doesn't say anything about
8   advocacy here. I think what this refers to here is
9   just keeping the legal boundaries between 501(c)(3)s
10  and 501(c)(4)s clear.
11      Q.   The 501(c)(3) would be the affiliated
12  think tank that's referenced in here?
13      A.   Right.
14      Q.   And then the action arm referenced here
15  would be the 501(c)(4)?
16      A.   Presumably that's what he means.
17      Q.   Okay. And the final point here is that
18  the PPI would be the, if I understand, the
19  affiliated think tank of the DLC but not under the
20  DLC per se; correct?
21      A.   Correct.
22      Q.   Because the PPI would then be under
23  Progressive Foundation later renamed Third Way
24  Foundation?
25      A.   Right.

---

24 (Pages 90 to 93)

William Marshall                                                February 8, 2006
Washington, DC

Page 94

1    Q.  Okay.  Now, let's focus just for a few
2  minutes on the Progressive Policy Institute.  And
3  let's go to Number 9.  Can you -- I have two
4  documents under Number 9.  And I want to know if you
5  could identify these documents for me.
6              - - -
7        (A document was marked as Deposition
8  Exhibit Number 9)
9              - - -
10    A.   These appear to be staff lists for PPI,
11  without a date.  So I don't know when, but clearly
12  from the names sometime in the mid '70s to late
13  '70s, I guess.
14    Q.   Late '70s?
15    A.   Sorry, late '90s.
16    Q.   I will represent to you that these
17  documents were produced to the Justice Department by
18  the DLC in response to our document production
19  request pertaining to the years '97, '98 and '99.
20    A.   Right.  Right.
21    Q.   Does this look like a fair representation
22  who the players were in the Progressive Policy
23  Institute during those years?
24    A.   Some of them.
25    Q.   And just look at the first document.  You

Page 95

1  are listed of course as president of the PPI?
2    A.   Yes.
3    Q.   And then there are, one, two, three,
4  four, five, six seven, eight substantive projects as
5  I understand it.  Is that correct?
6    A.   That's what it shows.  Yeah.
7    Q.   And then each one of those projects
8  policy projects, economic, environmental, domestic
9  health care, trade, foreign policy defense,
10  education, technology, there are individuals listed
11  as being involved with those projects; correct?
12    A.   Right.
13    Q.   Are those individuals all full-time
14  employees of the PPI or are they contributing to the
15  project?  What is their relationship to those
16  projects?
17    A.   These were full-time PPI employees.
18    Q.   So they were paid from PPI's budget then;
19  correct?
20    A.   Yes.
21    Q.   So none of these people were contributing
22  to these projects.  They were in fact PPI employees?
23    A.   Yes.
24    Q.   Okay.  So these projects, is it fair to
25  say were sort of -- this document outlines sort of

Page 96

1  the substantive policy projects that PPI was
2  focusing on during these particular years.  Is that
3  correct?
4    A.   Yes.
5    Q.   And these individuals all generated
6  policy-oriented documents with respect to each one
7  of these subject areas.  Is that correct?
8    A.   Yes.
9    Q.   And you were the director of that
10  particular project; correct?
11    A.   Yes.
12    Q.   Okay.  And there are no individuals here
13  from the DLC that are reflected on this particular
14  documents.  Is that correct?
15    A.   Correct.
16    Q.   Now let's look at the next document in
17  this same exhibit.  And can you just identify that
18  document?
19    A.   This is a staff list, people -- a list of
20  people working at PPI.
21    Q.   Okay.  And are those individuals on this
22  particular list, are they all full-time PPI
23  employees?
24    A.   They were.
25    Q.   Okay.  And again, each has a certain area

Page 97

1  of subject matter responsibility associated with it
2  as reflected here; correct?
3    A.   Yes.
4    Q.   And there are no DLC employees reflected
5  on this particular document?
6    A.   No.
7    Q.   As being in charge of that?
8    A.   No.
9    Q.   Okay.  Need a break, one minute.
10              - - -
11        (Recessed at 11:32 a.m.)
12        (Reconvened at 11:38 a.m.)
13              - - -
14        BY MR. MARTINEAU:
15    Q.   Mr. Marshall, I want to refer you to
16  Exhibit 10.  Could you identify that document for
17  me?
18              - - -
19        (A document was marked as Deposition
20  Exhibit Number 10)
21              - - -
22    A.   That is the cover of The New Democrat
23  Magazine.
24    Q.   And that is dated September-October 1998;
25  correct?

25  (Pages 94 to 97)

William Marshall

February 8, 2006

Washington, DC

## Page 98

1   A.   Correct.
2   Q.   And what is The New Democrat Magazine?
3   A.   Well, it was a magazine published by the
4   Democratic Leadership Council.
5   Q.   And you say it was. Is that magazine no
6   longer published by the DLC?
7   A.   Correct.
8   Q.   When did the DLC stop publishing The New
9   Democrat Magazine?
10   A.   I can't exactly recall. It was three,
11   four years, five, I'm sorry. It was 2002, in that
12   area but I can't exactly recall.
13   Q.   Early 2001, 2002?
14   A.   I'm sorry. I can't remember what the
15   actual date it stopped publishing but it was in the
16   last four or five years, I guess.
17   Q.   And do you know why the DLC stopped
18   publishing The New Democrat Magazine?
19   A.   Well, the Blueprint Magazine superseded
20   it.
21   Q.   Okay. Very good. Now, I want to
22   reference you to the first page of, just for the
23   record, of just New Democrat Magazine that's titled
24   "GOP, Not Ready for Prime Time." Do you see that?
25   A.   Correct.

## Page 99

1   Q.   And it indicates on here some of the
2   articles that are contained in the magazine. Do you
3   see that?
4   A.   Yes.
5   Q.   And the first one is called, entitled
6   "Why the Republicans Can't Govern."
7   A.   Correct.
8   Q.   Do you see that? And I guess the authors
9   are the editors. Is that correct?
10   A.   Yes.
11   Q.   And then Ed Kilgore has an article called
12   "Wayward Christian Soldiers." Do you see that?
13   A.   Yes.
14   Q.   And who is Ed Kilgore?
15   A.   Ed Kilgore is an employee of the DLC.
16   Q.   And then there's another article on the
17   front page referenced "Why They Might Still Win It
18   All," written by Chuck Alston. Do you see that?
19   A.   Yes.
20   Q.   And Chuck Alston is who?
21   A.   Chuck was an employee of DLC.
22   Q.   Okay. Let's look at the table of
23   contents for The New Democrat for this particular
24   year. On page 13, Mr. Alston has an article called
25   the "Democrat's Y2K Problem." Do you see that?

## Page 100

1   A.   Yes.
2   Q.   Why the Republicans might still win it
3   all. Do you see that?
4   A.   Yes I do.
5   Q.   Now, when Chuck Alston wrote that
6   article, was he writing that article as an employee
7   of the PPI or as an employee of the DLC?
8   A.   I would say DLC. At some point Chuck was
9   editor of this magazine. I don't recall. Let's
10   see. He was editor, no, Editor in Chief. Yeah.
11   Q.   Well --
12   A.   It was the DLC magazine and he was
13   working I assume in his capacity.
14   Q.   Well --
15   MR. BAUER: If you look at page 04316.
16   MR. MARTINEAU: Right. That's what we
17   are going to reference.
18   MR. BAUER: Oh, I'm sorry.
19   BY MR. MARTINEAU:
20   Q.   Thank you. Let's look at what the
21   structure of The New Democrat Magazine is. The
22   publisher was Al From; correct?
23   A.   Correct.
24   Q.   And then the editor-in-chief was Chuck
25   Alston; correct?

## Page 101

1   A.   Correct.
2   Q.   And you were on the editorial board.
3   A.   Right.
4   Q.   In fact, you were chairman of the
5   editorial board?
6   A.   Correct.
7   Q.   What was your responsibilities as
8   president of the PPI for the -- as chairman of the
9   editorial board for the magazine?
10   A.   Well, they had basically to brainstorm
11   issues and ideas for issues. The cover package
12   might be what articles might be commissioned.
13   Q.   Okay. Now, from whose budget was The New
14   Democrat Magazine published?
15   A.   DLC.
16   Q.   Okay. And was the -- do you know who The
17   New Democrat Magazine was distributed to?
18   A.   It was distributed to friends,
19   supporters, a wide network of people interested in
20   the DLC.
21   Q.   Was it distributed to new, so-called New
22   Democratic elected officials?
23   A.   I believe it was.
24   Q.   Okay. And, you know, if I understood you
25   earlier, you testified that some DLC employees

26 (Pages 98 to 101)

William Marshall                                                                February 8, 2006

Washington, DC

Page 102

1  performed work for the PPI. Is that correct?
2      A.   Well, they did double duty.
3      Q.   They did double duty. If a person was
4  working for PPI, okay, and doing like an article or
5  a policy analysis, where would that policy analysis
6  be published?
7      A.   If somebody was working for PPI.
8      Q.   Yes, sir.
9      A.   Well, we would presumably publish their
10  material but they also publish in other magazines,
11  outside magazines, journals, policy journals,
12  newspapers, magazines obviously, this one.
13      Q.   Okay. So there are instances then where
14  an employee who is working for PPI, getting paid for
15  PPI, publishes or writes an article and that article
16  is in fact published in, say, The New Democrat?
17      A.   Yes.
18      Q.   A DLC publication?
19      A.   Yes.
20      Q.   Is that correct?
21      A.   Yes.
22      Q.   Do you know in this particular case if
23  Mr. Alston wrote this particular article as an
24  employee of PPI and it was published here in the DLC
25  magazine?

Page 103

1      A.   Well, again, Chuck was the
2  editor-in-chief as a DLC employee of the DLC
3  magazine.
4      Q.   Okay. So is it fair to say that from
5  your knowledge that at least some of the content of
6  the -- of The New Democrat Magazine was generated by
7  people working for the PPI?
8      A.   Yes.
9      Q.   Okay. How was it determined which
10  article or articles that were generated by people
11  working for the PPI would be published in the DLC
12  New Democrat Magazine?
13      A.   Well, the editorial board would make
14  these, you know, decisions.
15      Q.   All right. Do you recall where the DLC
16  would come to you, Mr. Marshall, as president of
17  PPI, and say we want to do -- we need an article
18  written about a certain subject area and we want the
19  PPI to generate the article, and we are going to put
20  it in our particular magazine?
21      A.   Yes. That happened.
22      Q.   Give me an example that you know that
23  that happened.
24      A.   Well, the most recent issue of the DLC
25  Blueprint, they asked me to write a piece, which I

Page 104

1  did. And I write a column for it as well.
2      Q.   And what was the subject matter of that?
3      A.   Iraq and the political picture there.
4      Q.   Okay. And okay. Very good. All right.
5  So you, if I understand, as editor, chairman of the
6  editorial board of the DLC -- of the PPI -- strike
7  that. You as president of the PPI have also a
8  responsibility to serve as chairman of the editorial
9  board of the DLC magazine?
10      A.   Well, this is defunct now. But at that
11  time I did.
12      Q.   At that time. Okay. Very good. Now, if
13  you look under the small print here, it indicates
14  that The New Democrat, which is this magazine, is
15  published six times a year by the DLC. And it says
16  down in that paragraph the ideas and views discussed
17  in this publication do not necessarily represent
18  official positions of the DLC or its members. Do
19  you see that?
20      A.   Yes, I do.
21      Q.   And is it a fair statement that that
22  disclaimer is there because some of the contents of
23  this magazine comes from outside of the DLC?
24      A.   Yes.
25      Q.   And some of that content comes from the

Page 105

1  PPI as you have just described; correct?
2      A.   Yes.
3      Q.   And some of it comes from outside
4  individuals. Is that correct?
5      A.   Yes.
6      Q.   And some of those individuals are elected
7  officials as well?
8      A.   Sometimes.
9      Q.   Who contribute articles; correct?
10      A.   Yes.
11      Q.   And others are, you know, policy people,
12  independent people who contribute to the magazine.
13  Is that correct?
14      A.   Yes.
15      Q.   In this particular edition, there was a,
16  if you look at the previous page, 4315, Senator
17  Kerry of Massachusetts contributed an article to
18  this.
19      A.   Yes.
20      Q.   Was Senator Kerry, do you know would he
21  be compensated for submitting such an article?
22      A.   No.
23      Q.   Did the, well, strike that. The public
24  officials would like to get their materials in to
25  magazines to give them as much distribution as they

27 (Pages 102 to 105)

William Marshall

February 8, 2006

Washington, DC

| Page 106 |
|---|

1 can, I would imagine, arguably?
2     A.   Arguably.
3     Q.   Okay.  Good.  Now, one of the departments
4 of The New Democrat Magazine here, page 20,
5 political memo.  Do you see that?
6     A.   Um-hmm.
7     Q.   Now, if we look at that, political memo
8 appears to be a regular opinion feature written by
9 Al From.  Do you see that?
10     A.   Yes.
11     Q.   Now, when Mr. From writes this particular
12 article, is he wearing his DLC hat or is he wearing,
13 working as a PPI member?
14     A.   Well, you know, he's just who he is.  I
15 don't think he's wearing any hat except the author
16 of this political memo for the magazine.
17     Q.   Okay.  Very good.  Let's go to the
18 next -- I just want to make sure that Number 11, can
19 you just -- you have before you Government Exhibit
20 Number 11?
21     A.   Yes.
22     Q.   Can you describe that?
23            - - -
24         (A document was marked as Deposition
25 Exhibit Number 11)

| Page 107 |
|---|

1            - - -
2     A.   It's another New Democrat dated
3 January-February 1999.
4     Q.   Okay.  And that is entitled "The GOP on
5 Trial;" correct?
6     A.   Correct.
7     Q.   Now, here again there is a, under the
8 table of contents, there is an article that is
9 written by President Clinton; correct?
10     A.   Yes.
11     Q.   This was January/February, Bill Clinton
12 is the author; correct?
13     A.   Correct.
14     Q.   And he was President of the United States
15 at that point in time?
16     A.   He was.  It may be a speech.  I haven't
17 looked at this.
18     Q.   Okay.
19     A.   It may simply be an excerpt from a
20 speech.
21     Q.   Okay.  And the subheading here says, "New
22 Democrats Are Offering the People a New Choice
23 Rooted in Old Values;" correct?
24     A.   Correct.
25     Q.   Now, do you recall whether the President

| Page 108 |
|---|

1 was solicited to write this article?  How did this
2 article get published in this magazine?
3     A.   What generally happens, I don't recall in
4 this specific case, what generally happened was that
5 we'd look at a speech and say this could be turned
6 into an article.
7     Q.   Okay.  And then when you say "we," who is
8 "we"?
9     A.   The editorial board.
10     Q.   Okay.  And then what happens after that?
11 Do you have to --
12     A.   Somebody has to get permission from the
13 White House to do it.  And I don't know how that
14 happened.
15     Q.   Do you recall whether you personally took
16 a speech and then crafted it into an article to be
17 published in the magazine?
18     A.   Personally, no, I didn't do that.
19     Q.   Well, let's look at something that it
20 appears you personally did, a number on page 11 of
21 The New Democrat.  There's an article by you called
22 "A Green Bargain in Social Security."  Do you see
23 that?
24     A.   I do.
25     Q.   Do you recall writing that particular

| Page 109 |
|---|

1 article?
2     A.   I do.  Yes.
3     Q.   And it's called "Renegotiating the Social
4 Compact with America's Senior Citizens and Workers?"
5     A.   Yes.
6     Q.   Now, you were president of PPI when you
7 wrote this article; correct?
8     A.   Correct.
9     Q.   And you submitted this article to the New
10 Democrat as president of PPI; correct?
11     A.   Well, I submitted it because they wanted
12 an article on social security.
13     Q.   Right.
14     A.   So I don't really understand the
15 formulation.  It doesn't make any sense to me.
16     Q.   Well, you were asked to write this
17 particular article?
18     A.   Yes.
19     Q.   About social security?
20     A.   Or I may have proposed it, actually.  I
21 think I probably proposed this one.  This is one
22 they probably didn't ask for.
23     Q.   Didn't ask for, and you proposed it?
24     A.   If I'm not mistaken, yes.
25     Q.   And then it was published by the DLC in

1111 14th Street, NW Suite 400                    Alderson Reporting Company                    Washington, DC 20005
                                                         1-800-FOR-DEPO

William Marshall

February 8, 2006

Washington, DC

Page 110

1  the DLC magazine; correct?
2      A.   Yes.
3      Q.   And here again there's another political
4  memo that was drafted up by Mr. From?
5      A.   Right.
6      Q.   As president of the DLC; correct?  That's
7  what it says.  Is that correct?
8      A.   It's correct that it's an article by Al
9  From.
10     Q.   Okay.  Well, look at the end of the
11  article and see what it says.  It goes back to the
12  other page, I think.
13     A.   Sure.  It says Al From is president of
14  the Democratic Leadership Council.
15     Q.   Okay.  Very good.  Lease go to Exhibit
16  Number 12.
17          - - -
18          (A document was marked as Deposition
19  Exhibit Number 12)
20          - - -
21          BY MR. MARTINEAU:
22     Q.   You have Exhibit Number 12 before you
23  Can you identify that document for me?
24     A.   That is a cover of Blueprint Magazine,
25  Winter 1998.

Page 111

1      Q.   Okay.  And do I understand you correctly
2  that, well, what was Blueprint Magazine?
3      A.   This was a new journal that DLC launched
4  right about this time.  It was line 2, so it would
5  have been right about this time.
6      Q.   Did the Blueprint Magazine displace The
7  New Democrat Magazine?
8      A.   Later.
9      Q.   Later it did?
10     A.   Um-hmm.
11     Q.   I see.  Would that have been after the
12  year 1999?
13     A.   Again, I'm sorry, I cannot recall exactly
14  when the New Democrat went out of business.
15     Q.   Now look at page 5409.
16     A.   Um-hmm.
17     Q.   And the Blueprint, the publisher was
18  listed at Al From; correct?
19     A.   Correct.
20     Q.   And the contributing editors were Will
21  Marshall is one; correct?
22     A.   Correct.
23     Q.   And Chuck Alston; correct?
24     A.   Right.
25     Q.   And Holly Page; correct?

Page 112

1      A.   Correct.
2      Q.   Who is Holly Page?
3      A.   Holly Page is a vice president of the
4  DLC.
5      Q.   Okay.  Now, what was your responsibility
6  as a contributing editor to the DLC, Mr. Marshall?
7      A.   Well, as a contributing editor to
8  Blueprint, and the responsibility was to brainstorm
9  ideas, think about what should go in the magazine,
10  and occasionally contribute myself.
11     Q.   Okay.  All right.  So you were --
12     A.   Do some editing.
13     Q.   You were worked then presumably with
14  Mr. From and the other contributing editors to
15  decide the content of a particular editions of the
16  Blueprint Magazine.  Is that correct?
17     A.   Yes.
18     Q.   And some of the content of the magazine,
19  is it fair to say, would come from articles written
20  by PPI employees.  Is that correct?
21     A.   Sometimes.
22     Q.   Okay.  And some of it would be written by
23  employees of the DLC.  Is that correct?
24     A.   Sometimes.  Yes.
25     Q.   And sometimes the content would be from

Page 113

1  third outside sources.  Is that correct?
2      A.   Yes.
3      Q.   Including elected officials.  Is that
4  correct?
5      A.   Yes.
6      Q.   Including Democrat elected officials.  Is
7  that correct?
8      A.   Right.
9      Q.   Do you recall any instance when a
10  Republican-elected official sought to contribute an
11  article to the Blueprint Magazine?
12     A.   Interesting.  I'm not certain.  I know
13  Republicans did.  But the Republican-elected
14  official, I'm trying to remember whether we had a
15  Jack Kemp or a Newt Gingrich piece in the magazine.
16  It's quite possible.  And frankly I'm just drawing a
17  blank on it.  I would have to go back and talk to
18  folks and try to refresh my memory.
19     Q.   And same question with respect to The New
20  Democrat Magazine, do you specifically remember any
21  Republican-elected official submitting an article to
22  be published in that magazine?
23     A.   I don't know whether we published a
24  Republican-elected official in there or not.  Again,
25  I'd have to go back --

29 (Pages 110 to 113)

William Marshall                                                February 8, 2006
Washington, DC

---

Page 114

1   Q.   So you don't know?
2   A.   I can't recall.
3   Q.   Good.  Let's go to Exhibit 13.
4          - - -
5          (A document was marked as Deposition
6   Exhibit Number 13)
7          - - -
8          BY MR. MARTINEAU:
9   Q.   You have before you what's been marked as
10  Exhibit 13.  Can you --
11  A.   It's called The Idea Book, A Reference
12  Manual for New Democrats, DLC 1998.
13  Q.   What is The Idea Book?
14  A.   Well, this is a DLC product that in this
15  case obviously contains -- I'll have to look at this
16  because I don't remember.
17  Q.   Take your time.
18  A.   Do you want me to tell you what's in this
19  one?
20  Q.   Yes.
21  A.   What's in this one is a credo.
22  Q.   For New Democrats?
23  A.   Yes.
24  Q.   That's on page 5223.
25  A.   A New Democratic featuring remarks of the

---

Page 115

1   DLC president, Al From, which is a speech.
2   Q.   Take your time.  That's on 5225.
3   A.   Right.  And then a series of talking
4   points on various issues.
5   Q.   Okay.  Mr. Marshall, what was the source
6   of the content of The Idea Book, the reference
7   manual for New Democrat?
8   A.   Well, a lot of these ideas we developed
9   at PPI and at DLC.  I can't say all of them because
10  I haven't read all this.
11  Q.   But some of the content of The Idea Book
12  was generated by and produced by the PPI.  Is that
13  correct?
14  A.   Yes.
15  Q.   Now, when Mr. From is referenced in here,
16  it gives a speech, let's reference his remarks to
17  the Democratic Nucleus Club on April 20, 1998, in
18  Phoenix.  Do you see that?
19  A.   Yes.
20  Q.   Does Mr. From, to your knowledge, did he
21  write his own speeches or did someone write his
22  speeches for him or in conjunction with him?
23  A.   All of the above.  He wrote some.
24  Sometimes he had a speech writer provide help.  And
25  in the end I think Al mostly does his own speech

---

Page 116

1   writing but it's all of the above.
2   Q.   Did the PPI assist Mr. From in drafting
3   up any of his speeches based on your recollection?
4   A.   No.  He may have asked me to look at
5   something, or somebody else to look at a speech and
6   offer comments.  But I don't recall ever drafting
7   one of his speeches.
8   Q.   But the PPI or people who worked for the
9   PPI were perhaps consulted on with respect to some
10  of these --
11  A.   It's possible.  I can't say -- I know I
12  was.  I can't say anybody else was.
13  Q.   Well, let's reference yourself.
14  A.   Right.
15  Q.   What would your role be when Mr. From
16  would come to you saying I'm proposing a speech,
17  will you take a look at this.  How did that work?
18  A.   It just, you know, getting my feedback
19  and I'd read it and tell him strengths, weaknesses,
20  make recommendations.
21  Q.   So it's fair to say you, Mr. Marshall,
22  participated to some extent in the drafting of the
23  speeches that Mr. From gave as the president of
24  the --
25  A.   No.  I didn't really participate in

---

Page 117

1   drafting.  I was one of many people asked to react
2   to drafts that other people generated.
3   Q.   And did you make comments back to
4   Mr. From after you read his draft of it?
5   A.   Sometimes, yes; sometimes, no.
6   Q.   But you recall that you did that on
7   certain occasions?
8   A.   Sometimes, yes.
9   Q.   And is it fair to say that was part of
10  the process that Mr. From engaged in when he was
11  proposing a speech?
12  A.   Not really.  You know, I mean, he
13  sometimes he did, sometimes he didn't, depending on
14  whether he thought he needed help.
15  Q.   Very good.  With respect to this
16  particular document, the talking points, who -- do
17  you know who prepared the talking points?
18  A.   I don't know who did it.  It was a DLC
19  document.  I don't know who in their shop did it.
20  Q.   So you are saying that the PPI -- did the
21  PPI have a role in preparing the talking points for
22  The Idea Book published by the DLC?
23  A.   I don't know.  And I don't think PPI wrote
24  this.  They didn't write this.  So the question is
25  did they help somebody else.  And the answer is it's

---

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
                                        1-800-FOR-DEPO

William Marshall                                                    February 8, 2006
                              Washington, DC

Page 118

1   possible. I don't know.
2       Q.   It's possible that they could have -- PPI
3   personnel could have been asked to look at --
4       A.   Quite possible that somebody who put
5   together the section relevant to their expertise
6   would ask them, Hey, do you think that looks good,
7   or what do you think.
8       Q.   Okay. Fair enough. Let's go to the next
9   document. You have a document which has been marked
10  as Exhibit Number 14. Can you identify that
11  document?
12                        - - -
13          (A document was marked as Deposition
14  Exhibit Number 14)
15                        - - -
16      A.   Well, it's a DLC Update.
17      Q.   What is a DLC Update?
18      A.   As I recall, it is a series of updates
19  sent out to DLC. I don't -- I wasn't really much
20  involved in it and I don't know much about it.
21      Q.   Good. From whose budget then --
22      A.   DLC.
23      Q.   DLC's budget. This is a DLC production?
24      A.   Right.
25      Q.   Do you recall if the PPI was consulted

Page 119

1   with regard to any of the content of this particular
2   topic?
3       A.   Could well have been.
4       Q.   Similar to the other situation you have
5   described?
6       A.   Yes.
7       Q.   Let's identify some other, what were some
8   other publications. The next one is on page -- is
9   Exhibit 16. Do you see that?
10                        - - -
11          (A document was marked as Deposition
12  Exhibit Number 16)
13                        - - -
14      A.   Yes.
15      Q.   Just for the record, identify that
16  particular document.
17      A.   I can't quite see what it says on top,
18  DLC something. DLC -- I can't read that top. Has
19  anybody else got that?
20          MR. BAUER: Looks like DLC briefing.
21          THE WITNESS: 15 or 14?
22          MR. BAUER: What are you on?
23          THE WITNESS: I'm on 15.
24          MR. MARTINEAU: We are on 16 now.
25          THE WITNESS: Oh, you are on 16. Sorry.

Page 120

1   DLC Talking Points.
2           BY MR. MARTINEAU:
3       Q.   Okay. Can you identify what this
4   document is?
5       A.   It's Talking Points issued by DLC.
6       Q.   This is a DLC publication then?
7       A.   Yes.
8       Q.   So it would come out of the budget of the
9   DLC; correct?
10      A.   Yes.
11      Q.   Do you recall if the DLC would consult
12  with the PPI concerning any of the content of this
13  document?
14      A.   It's possible. You know, PPI products
15  are in the public domain. So, you know, a DLC
16  person sits down and says, I've got to write
17  something on welfare; and they take something that
18  PPI had done and they do talking points from it.
19          Do they talk to the actual author of it.
20  Sometimes, yes; or sometimes, no, I suspect.
21      Q.   So it's fair to say that some of the
22  content of, for example, the DLC talking --
23      A.   Yes.
24      Q.   Let me finish the question -- may come
25  from PPI documents or work. Is that right?

Page 121

1       A.   Absolutely.
2       Q.   Let's go to Number 17.
3                        - - -
4           (A document was marked as Deposition
5   Exhibit Number 17)
6                        - - -
7           BY MR. MARTINEAU:
8       Q.   Do you see that document there?
9       A.   Yes.
10      Q.   Can you identify that?
11      A.   It's called the DLC Fax.
12      Q.   What is the DLC Fax? Is it a DLC
13  document or a PPI production?
14      A.   It's a DLC document.
15      Q.   And is it fair to say that some of the
16  content of this document may have come from PPI
17  publications or PPI work as you have already
18  testified to?
19      A.   Yes.
20      Q.   Okay. But this is a DLC document coming
21  from the DLC budget to the best of your knowledge?
22      A.   Right. Yes.
23      Q.   Okay. Let's go to Number 18.
24                        - - -
25          (A document was marked as Deposition

31 (Pages 118 to 121)

William Marshall                                                              February 8, 2006

Washington, DC

Page 122

1  Exhibit Number 18)
2            - - -
3        BY MR. MARTINEAU:
4    Q.   Do you see that document?
5    A.   Yes, Idea of the Week.
6    Q.   Is this a DLC document or a PPI document?
7    A.   DLC.
8    Q.   Is it fair to say similarly that some of
9  the content of the idea of the week may have come
10 from publications of PPI work?
11   A.   It's fair to say that generally.  I'm not
12 sure about this particular case.  I don't think this
13 was something that came from PPI, but in any case,
14 sometimes I'm sure it did.
15   Q.   Very good.  Let's look at Number 19.
16           - - -
17       (A document was marked as Deposition
18 Exhibit Number 19)
19           - - -
20       BY MR. MARTINEAU:
21   Q.   Can you identify that document?
22   A.   It says, Monthly State Leadership Update,
23 May 1995.
24   Q.   Is that a DLC product or a PPI product?
25   A.   It looks like a DLC product.

Page 123

1    Q.   And do you know what this product was
2  intended for?
3    A.   It appears to be something that went out
4  to state leaders, an update on DLC activities.
5    Q.   Is any, well, strike that.  Let's go to
6  Number 20.
7            - - -
8        (A document was marked as Deposition
9  Exhibit Number 20)
10           - - -
11       BY MR. MARTINEAU:
12   Q.   Can you identify Number 20?
13   A.   It's a DLC news release.
14   Q.   And it relates to the Penn Poll.  Do you
15 see that?
16   A.   Yes, I do.
17   Q.   With respect to Cold War attitudes?
18   A.   Um-hmm.
19   Q.   First of all, is this document, this news
20 release, a DLC document or a PPI product?
21   A.   DLC.
22   Q.   In this particular instance, there's a
23 reference to the Penn Poll.  Do you see that?
24   A.   I do.
25   Q.   Did the, first of all, are you familiar

Page 124

1  with the Penn Poll in this particular area?
2    A.   Yes, vaguely.  I don't remember all the
3  details but I remember the poll.
4    Q.   Was PPI involved in the generating of
5  that poll by Mark Penn and his firm?
6    A.   Well, it's a DLC poll.  I sometimes was
7  consulted, and probably was on this one since it's a
8  subject I'm supposed to know something about.
9    Q.   When you say you were consulted, how were
10 you consulted?
11   A.   Well, what kinds of things should we ask
12 about, you know.  Most polls have sort of a
13 strategy.  And you try to think of what this one
14 should have and what we are trying to probe for,
15 what kind of public attitude we are trying to probe
16 for.
17   Q.   And what was the purpose of the DLC
18 taking a poll, let's say on the post war security
19 issues?
20   A.   To get a better understanding of public
21 opinion on foreign policy and security issues.
22   Q.   And then when the DLC would get that
23 better understanding of the results of the polls,
24 then what would they do with that polling results?
25   A.   Well, they published them and make

Page 125

1  arguments related to the kind of policy changes that
2  they thought flowed from the analysis of public
3  opinion.
4    Q.   Were you consulted, Mr. Marshall, about
5  the polling questions and the content of the polls
6  that Mr. Penn conducted?
7    A.   Sometimes.
8    Q.   You were.  Okay.  And did you participate
9  in any briefings with Mr. Penn and/or Mr. From
10 concerning the results of the polls?
11   A.   Sometimes I did.  Yes.
12   Q.   Okay.  And when you engaged in these
13 briefings, were these press briefings that you were
14 involved with?
15   A.   Yes.
16   Q.   Okay.  And where were the results of
17 these polls disseminated to, do you know?
18   A.   Well, to everybody.  To the whole
19 political world in Washington but also obviously
20 outside of the country.
21   Q.   All right.  Is it your understanding that
22 the DLC -- strike that.  Who financed these polls,
23 to your understanding, that Mr. Penn carried out?
24   A.   DLC.
25   Q.   Did the PPI ever contract with Mr. Penn

32 (Pages 122 to 125)

William Marshall                                                    February 8, 2006
Washington, DC

Page 126

1  or any other pollster to conduct a public opinion
2  poll?
3      A.  I don't recall, since most overwhelmingly
4  the polls were contracted at DLC, if I'm not
5  mistaken. But I'm wondering if in the past 20 years
6  there's some exception to that, but in general.
7      Q.  But you don't recall specifically where
8  the PPI engaged Mr. Penn or anyone else to conduct a
9  poll for PPI?
10     A.  Well, no, I don't recall.
11     Q.  Okay.  Now, let's look at Exhibit 21.
12  Can you identify that document?
13          - - -
14      (A document was marked as Deposition
15  Exhibit Number 21)
16          - - -
17     A.  Yes.  That's a PPI policy brief on
18  teacher shortage.
19     Q.  And that's dated February 1998; right?
20     A.  Right.
21     Q.  And this document I take it was generated
22  by the Progressive Policy Institute?
23     A.  Yes.
24     Q.  There's no input in this document from
25  the DLC?

Page 127

1      A.  Not -- none that I can recall.
2      Q.  Okay.  And the cost of producing this
3  document then would have been borne to your
4  knowledge by PPI.  Is that correct?
5      A.  Yes.
6      Q.  And how often was the policy briefing
7  generated by PPI?  How often was that put out?
8      A.  As necessary.  As products became
9  available so you would have, you know, some months
10  where you put out a lot, some months would be
11  leaner. But a steady flow is what we aim for.
12     Q.  Let's go to the next document, Exhibit
13  22.  Can you identify that document for me?
14          - - -
15      (A document was marked as Deposition
16  Exhibit Number 22)
17          - - -
18     A.  Yes.  That's a backgrounder on Medicare
19  by PPI.
20     Q.  And that's a PPI document?
21     A.  Yes.
22     Q.  And the author there is David Kendall;
23  correct?
24     A.  Right.
25     Q.  Is he a PPI employee?

Page 128

1      A.  Yes.
2      Q.  All right.  And this is another kind of
3  -- a product that, the backgrounder, that the PPI
4  itself publishes?
5      A.  Yes.
6      Q.  And it would be an educational
7  organization under C(3), that's a perfectly
8  appropriate type of document for you to generate;
9  correct?
10     A.  I think so.
11          MR. BAUER:  Presence of the government
12  here.  So our position is, fully legal.
13          MR. MARTINEAU:  Very well.
14          BY MR. MARTINEAU:
15     Q.  I want you to look at Government's
16  Exhibit 23.  Can you identify that for me, that
17  document for me?
18          - - -
19      (A document was marked as Deposition
20  Exhibit Number 23)
21          - - -
22     A.  I don't know what this is.
23     Q.  Okay.  It's entitled, just for the
24  record, DLC PPI, 1997 Policy Ideas.  Do you see
25  that?

Page 129

1      A.  Ninety-nine.
2      Q.  1999 policy ideas.
3      A.  Policy book. Okay.
4      Q.  Now, there's a letter here dated February
5  10, 1990, signed by yourself and Mr. From; correct?
6      A.  Yes.  Yes.  Policy book.  Right.
7      Q.  And do you know -- strike that.  What was
8  the source of the content of this particular policy
9  ideas booklet published in 1999?
10     A.  A lot of it was PPI.
11     Q.  Very good.  And do you see where on page
12  4394 that in the joint letter by you and
13  Mr. Marshall it states, quote, "We are pleased to
14  provide you with a book of policy ideas for the
15  Democratic Leadership Council, DLC, and its
16  affiliated think tank --
17     A.  Yes.
18     Q.  -- the Progressive Policy Institute, PPI.
19  Do you see that?
20     A.  Yes, I do.
21     Q.  And it further states that the notebook
22  includes some of the most innovative policy work
23  that drives the, quote, third way thinking, that is
24  reshaping progressive policies throughout the world.
25  Do you see that?

33 (Pages 126 to 129)

William Marshall                                                    February 8, 2006

Washington, DC

| Page 130 |
| --- |

1    A.   Yes, I do.
2    Q.   Do you know who were the recipients of
3  this policy book?  To whom was it distributed?
4    A.   Yeah, I'm sorry, I don't recall the
5  distribution of this.
6    Q.   Do you recall participating in working on
7  this particular project?
8    A.   I personally didn't do much on it.  It
9  looks like it's a compilation of stuff that we had
10  already done or someone, you know, executive
11  summaries from PPI products.  So I have -- that's
12  all I can recall about it.
13    Q.   Well, if you look at sort of the table of
14  contents -- and I didn't print out the entire
15  book -- there's eight different subject areas.
16    A.   Right.
17    Q.   And those are eight subject areas that
18  are the focus of the PPI; correct?
19    A.   Well, we covered those areas.  Yeah.
20    Q.   When I showed you an earlier document
21  with individuals in area responsibilities correspond
22  to that; correct?
23    A.   Yes.
24    Q.   And this is PPI policy content enclosed
25  in the document.

| Page 131 |
| --- |

1    A.   Well, I don't have all the content here.
2  I know a lot of it is PPI.  There may be some other
3  stuff in there, I just -- not having it all in front
4  of me, I can only tell you that some of it, probably
5  a lot of it is PPI.
6    Q.   Very well.  Go to the next document,
7  Number 24.  Can you identify that document?
8         - - -
9         (A document was marked as Deposition
10  Exhibit Number 24)
11         - - -
12    A.   This is an executive summary of a PPI
13  document, The New Economy Index.
14    Q.   And this would be published pure -- this
15  is a PPI product?
16    A.   Yes.
17    Q.   Comes from PPI's budget?
18    A.   Yes.
19    Q.   And Mr. Atkinson and Mr. Court are two
20  individuals who work for PPI; correct?
21    A.   Yes.  Mr. Court works for both PPI and
22  DLC now.  Right.
23    Q.   And Mr. Atkinson, he worked --
24    A.   PPI.
25    Q.   Exclusively for PPI; correct?

| Page 132 |
| --- |

1    A.   Right.
2    Q.   Now, did these, the PPI products, let's
3  just focus on those, when those are distributed, are
4  those distributed free of charge or do people have
5  to pay to get those products?
6    A.   Usually free of charge.  Every now and
7  then we'll sell something that was expensive.  It
8  could be that this was one that you had to fork out
9  a few dollars for.  Most of our stuff is free, just
10  publicly distributed.
11    Q.   And when you say publicly distributed,
12  who are you referring -- what are you referring to?
13    A.   Well, we put it on our web site, so it's
14  generally available to the whole world.  We'll mail
15  it to communities of interest, members of Congress,
16  press, media, other think tanks and policy wonks.
17    Q.   All right.  Let's go to the next
18  document.  And I just pulled out here, this appears
19  to be -- can you identify this document for me?
20         - - -
21         (A document was marked as Deposition
22  Exhibit Number 25)
23         - - -
24    A.   Well, it looks like a piece by me.
25    Q.   And you are writing in this obviously as

| Page 133 |
| --- |

1  president of PPI; correct?
2    A.   Yes.
3    Q.   Okay.  Do you get paid for writing this
4  piece?
5    A.   They probably, yeah, papers normally pay
6  you.
7    Q.   Do you solicit that to write the article
8  or does the newspaper come to you?
9    A.   Usually they come to you.  I think that's
10  what happened here but I am not 100 percent sure.
11  It could have been that one of our press people
12  contacted them.
13    Q.   Approximately how much do you get paid
14  for writing an editorial?
15    A.   It varies by papers.  You know it's
16  usually a token 150 or 250 bucks, something like
17  that.
18    Q.   Okay.  Let's look at Exhibit 26.  Can you
19  identify that document for me?
20         - - -
21         (A document was marked as Deposition
22  Exhibit Number 26)
23         - - -
24    A.   It appears to be a memo to me from John
25  Hasselmann.

William Marshall                                                    February 8, 2006
Washington, DC

Page 134

1   Q.   Who's John Hasselmann?
2   A.   John used to work at the DLC.
3   Q.   What was his area of responsibility?
4   A.   John was field. He worked in the field
5   department as we called it down there at DLC.
6   Q.   Would that be similar to like state
7   activity?
8   A.   Yes.
9   Q.   He was trying to build state chapters.
10  Is that correct?
11  A.   You know, I'm not sure about that. I
12  know that he was trying to build support for our
13  work in the states.
14  Q.   And the subject matter of the memo he
15  wrote to you was talking points and state activity,
16  slash, DLC effort. Do you see that?
17  A.   Yes.
18  Q.   Why would Mr. Hasselmann who works for
19  DLC be writing a memo to you about DLC activities?
20  A.   Well, clearly I'm involved in this one.
21  It says, "Thanks for agreeing to appear in Richmond
22  Thursday." So, you know, there are events, public
23  fora around the country that they would have, and
24  they would invite me and others to participate in.
25  Q.   Okay. So do you recall appearing at this

Page 135

1   event in Richmond?
2   A.   I have a vague recollection. I'm trying
3   to remember. I've done several Richmond events, so
4   I'm trying to remember exactly what this one was,
5   but vaguely recall it.
6   Q.   Okay. Now, there's a reference on the
7   next page to training and the Legislative Advisory
8   Board. Do you know what that is a reference to,
9   sir?
10  A.   Let's see. It's a reference to the DLC
11  Leadership Training Program.
12  Q.   Okay. Was the PPI involved in the DLC's
13  Leadership Training Program?
14  A.   No.
15  Q.   They weren't. Okay. Now, there's
16  another reference here to the National Conversation?
17  A.   Yes.
18  Q.   What is the National Conversation?
19  A.   That's an annual event that DLC puts on
20  that features state and local leaders and
21  innovators.
22  Q.   Was the PPI involved in the National
23  Conversation event put on by the DLC?
24  A.   Yes. Usually I would be involved. Some
25  others would be invited to speak on their topics.

Page 136

1   Q.   Okay. And it says here that -- made
2   reference to John Hasselmann in the DLC field
3   department. Do you see that, this last sentence
4   there?
5   A.   The last sentence of -- of the whole
6   document?
7   Q.   Yes.
8   A.   Sorry. Yes. I see it.
9   Q.   Now, does John Hasselmann still work for
10  the DLC?
11  A.   No, he doesn't.
12  Q.   Do you know where he works now?
13  A.   I am sorry. I don't know where he works
14  now.
15  Q.   Now I want to have marked Exhibit Number
16  27, this document here, which I believe you have.
17  It's a June 1, 1998 printout from the PPI's web
18  site.
19          - - -
20      (A document was marked as Deposition
21  Exhibit Number 27)
22          - - -
23      BY MR. MARTINEAU:
24  Q.   Is this document here a fair
25  representation of the PPI's web site at that

Page 137

1   particular point in time?
2   A.   Yes.
3   Q.   Okay. Now, the address at the bottom is
4   www.ppionline.org. Do you see that?
5   A.   I do.
6   Q.   I take it that the costs associated with
7   the web site were borne by PPI. Is that correct?
8   A.   I believe so. Yes.
9   Q.   Well, did the PPI and the DLC in 1998
10  have separate web sites or did they have a joint web
11  site?
12  A.   Well, we have separate web sites that are
13  linked. You can click easily between them. And I
14  think that was the case. Ever since we got this
15  web -- we developed a good expense, you know, this
16  web sites, they have been separate pages.
17  Q.   Well, if you went to the web site today
18  -- strike that. What is the web site today to
19  obtain PPI web material?
20  A.   PPI on line dot ORG.
21  Q.   Do you recognize the address DLC.PPI.ORG?
22  A.   Yes.
23  Q.   Is that a -- what site is that?
24  A.   Well, it was the generic address for most
25  people who work at either entity. In other words,

35 (Pages 134 to 137)

## Page 138

1 mine was W Marshall at DLC dot PPI. It's changed
2 but that's what it was.
3    Q.   Well, today in 2006, does DLC and PPI
4 have a joint web site or do you have --
5    A.   Separate web sites?
6    Q.   Separate web sites. Okay. Okay. All
7 right.
8    A.   I mean there's -- they take you -- they
9 are backed by the some content.
10    Q.   All right. Okay. All right. Does PPI
11 publish its own content on its web site or is there
12 a third party that does that? How do your content
13 get published on your web site?
14    A.   Both. Sometimes we put up content,
15 sometimes we ask others to do that.
16    Q.   Okay. Now, just for the record, 28, 29
17 and 30 are the three Forms 990; correct? Yup, 28,
18 29 and 30.
19       Just so I understand, Mr. Marshall, the
20 PPI is a tax-exempt entity under 501(c)(3) of the
21 code; correct?
22    A.   Correct.
23    Q.   And your focus is on educational and
24 research activities; correct?
25    A.   Correct.

## Page 139

1    Q.   Okay. I don't have any further questions
2 on direct. If you have questions?
3       MR. BAUER: Yeah. And I'll be brief. If
4 you want to take -- are you comfortable? And we
5 won't go longer than one o'clock. How does that
6 sound?
7       Okay. Let's take a five-minute break.
8       - - -
9       (Recessed at 12:21 p.m.)
10       (Reconvened at 12:35 p.m.)
11       - - -
12       CROSS-EXAMINATION CONDUCTED
13       BY MR. BAUER:
14    Q.   Mr. Marshall, I just want to take you
15 through a couple of points that Mr. Martineau
16 covered in his direct, so we have a record that's as
17 clear on these points as possible. And I should
18 just probably open by saying of course we'll also
19 want to make sure that we get a copy of the
20 transcript and can review it.
21       And Mr. Marshall can determine that it
22 captures precisely what he's meant to testify here
23 today, and he'll sign it.
24       MR. MARTINEAU: He absolutely has a
25 chance to read and sign his deposition.

## Page 140

1       MR. BAUER: Very good.
2       BY MR. BAUER:
3    A.   First of all, let's talk for a second
4 about the early days and DLC's attempt to reach out
5 and find a constituency for its work. You mentioned
6 that among those that were approached, elected
7 officials were included in that community.
8       Can you talk about the significance of
9 elected officials to the DLC program? There's been
10 an emphasis in the questions up to this point about
11 some of the concerns that Democrats had that they
12 were developing policies or might even be lacking
13 policies with broad public appeal, and that the
14 policy discussions and thinking in the party had
15 become stagnant.
16       But from a DLC operational and strategic
17 perspective, given the policy emphasis of the
18 organization, what was the significance of reaching
19 out to elected officials in particular? Can you
20 elaborate on that somewhat?
21    A.   Yeah. We thought it very important to
22 amplify the voice of the elected officials or create
23 a space where their voices would carry farther
24 because in the debates, and is particularly true in
25 the 1984 presidential debate, the interest groups

## Page 141

1 had play played such a key role in defining the
2 Democratic party's agenda in ways that was damaging
3 to a lot of Democrats.
4       And so we wanted to -- we, our view was
5 that elected officials representing broader
6 constituencies should play a larger role in defining
7 what the party that they -- under whose banner they
8 ran stood for. And so we were particularly keen to
9 get a large group of these elected officials
10 together to sort of reassert the views of people who
11 have to run -- to appeal to broad swaths of the
12 electorate, you know, thinking that would create a
13 kind of ballast in a push for new thinking in a
14 party that seemed to be stuck on some themes that
15 were vigorously defended by these interest groups.
16    Q.   So in that sense was it fair to say that
17 rather than there being simply an audience and part
18 of the audience for policy, they served an
19 amplification function to reach the larger public?
20 The elected officials could help you articulate the
21 policy messages that you were interested in?
22    A.   True. We didn't have a lot of money.
23 And we didn't at the time have a big magazine. And
24 we lacked ways to get our message, to broadcast our
25 message. And the elected officials of course,

36 (Pages 138 to 141)

William Marshall                                                February 8, 2006

Washington, DC

Page 142

1  having bullet pulpits, became a critical part of our
2  marketing plan. We thought that through the medium
3  of elected officials who agreed on the basic
4  analysis of what had gone wrong in the political
5  world and roughly agreed with some or many of the
6  ideas about how we would fix that situation, when
7  they talked about them in public, they could get a
8  bigger, wider audience than we could, including from
9  the media.
10      So it was very important for us to win
11 champions for the ideas that could then take them
12 into these wider arenas and popularize the
13 discussion of the ideas that we were developing.
14     Q.  And in keeping with the policy focus, is
15 it fair to say that by approaching elected officials
16 and by hoping to have a policy process bypass the
17 special interests, as you described them, this was
18 an attempt in a sense to depoliticize the policy
19 discussions so that the policy debate could avoid
20 the, I don't know, I shouldn't say contaminating
21 effect, but avoid being dragged down into pure party
22 politics per se?
23     A.  That's right. We were trying to
24 transcend that interest group driven politics which
25 we thought was producing bad outcomes politically

Page 143

1  and in governance terms, and try to write what we
2  called a sort of national purpose, progressivism,
3  reformism. So we again were looking at elected
4  officials as people who have to mediate among all
5  these interest groups and competing interests and
6  come up with something that serves a broader public
7  interest.
8      Q.  And you mentioned here, for example, or
9  we discussed here in some of the documents some
10 attention to how the electorate was expressing
11 itself, specifically with example to polling. Was
12 that polling a means of continuously rechecking the
13 partisan alignment in the electorate or a means of
14 essentially taking the measure of the public's
15 position on policy questions?
16     A.  Well, it was really trying to understand
17 what the public is telling us when they vote as they
18 do.
19     Q.  Telling you on what issues?
20     A.  On the issues, in other words, we were
21 not interested in things on who spends more on
22 advertising and who has more get out the vote and
23 that sort of stuff. We never paid attention to that
24 because we were an idea centered operation.
25     And so we wanted to know what is it about

Page 144

1  the aggressive message and ideas and policies that
2  either attracted or repelled people, and
3  particularly people who would -- who had been
4  flocking toward the conservative banner in recent
5  decades. So it was to try to tease out their policy
6  preferences but also their feelings about parties
7  and leaders.
8      Q.  We also spoke, or you testified earlier
9  that there was no relationship between the DLC in
10 its early days or for that matter to your knowledge
11 since, I think you have spoke since, between the DLC
12 and the Democratic National Committee. And let me
13 just see if we can tease that out.
14     Did you include the Democratic National
15 Committee in any formal sense as an institution, as
16 an arm of the party in your policy deliberations or
17 formulation?
18     A.  No. We really didn't. In fact, the
19 history is one of I guess there's some hostility
20 there, you know, on the part of the institutional
21 Democratic party and certainly the DLC toward the
22 DLC. When we first started, at least, let us say
23 the attitude was not a welcoming one.
24     And so, you know, but we never had any
25 institutional relationship with the DNC. And in

Page 145

1  fact they saw us as in some respects challenging, I
2  think, to -- in an unwelcome presence in the
3  debates.
4      Q.  But the DNC, to your knowledge, would
5  vigorously dispute any suggestion that the DLC was
6  an arm of the institutional Democratic party?
7      A.  Yeah. I'm certain that they would not
8  embrace that idea.
9      Q.  One other issue that I wanted to have you
10 testify to further following up on some questions
11 asked by Mr. Martineau has to do with the DLC's role
12 in what has periodically been referred to here as an
13 action organization. Let me see if I can break that
14 out a little bit and have you testify to some
15 component pieces of that.
16     First of all, as an action organization
17 did you mean, for example, that DLC would advocate
18 political party positions or advocate policy
19 positions if action is meant to be advocacy? If
20 it's meant to be advocacy, what kind of advocacy are
21 we talking about.
22     A.  Ideas, philosophy of governing, that's
23 what DLC has been navigating for. But certainly the
24 DLC, you know, has taken strong stands on issues
25 like trade, you know, where they've gone out and

37 (Pages 142 to 145)

William Marshall

February 8, 2006

Washington, DC

Page 146

1  organized and tried to engage in the debates about
2  trade versus protections.
3      Q.    Would that have included lobbying?
4      A.    Yes, it did.  And they generally the DLC
5  did more of that kind of action, sort of the
6  political advocacy for its ideas in that arena, and
7  around the country.  They are the ones who were out
8  there on the road more often than not, traveling
9  around and trying to convey the message to a wider
10  audience, PPI, mostly his stayed at home and did its
11  policy work.  And we got called to participate in
12  those road shows, but that's not what we put on.
13      Q.    Okay.  And in addition to that, let's
14  talk a little bit more about some of the supporters
15  of DLC outside the community of elected officials.
16  You mentioned that those supporters might include
17  for the particular progressive politics that PPI and
18  DLC were developing, moderates and independents.
19  Can you give an example of any moderate Republican
20  arm or organization or set of interests that might
21  have been included in the DLC PPI dialogue?
22      A.    Well we, particularly in the mid '90s,
23  and I think during the period of time that's
24  relevant here, PPI worked closely with the Main
25  Street Partnership which was a group of moderate

Page 147

1  Republicans, Amo Houghton and Jim Greenwood and
2  other moderate Republican members were the
3  principals behind it, but it was broader than that.
4          Anyway, they were interested as we were
5  in modernizing environmental management,
6  environmental policy.  And so we worked together to
7  develop next generation environmental policies, as
8  we called them, and did programming, you know, up on
9  the Hill and elsewhere around this idea which was
10  bipartisan, had people from both parties
11  participate, members from both parties
12  participating.
13          We did several -- this may, I think, I
14  don't know if this falls within the time period,
15  we've done several collaborations with Hudson
16  Institute, generally recognized as being on the
17  right of the political spectrum, on national service
18  and other issues but principally national service.
19          We've worked closely with Senator McCain
20  and Senator Bayh to help them as they thought about
21  legislation that they were introducing.  We've
22  worked with the Empower America Group which was, I
23  don't know if it's still going, to be honest with
24  you, but in those days Bill Bennet and Jack Kemp
25  were the principals of it.

Page 148

1          And, let's see, what's his name, Mike
2  Gershan I think had the role and is now a
3  President's speech writers.  But in any case, they
4  were interested in third way thinking on education,
5  policy and social welfare issues.  And we had
6  overlapping interests.  And we talked to them, did
7  some programming with them.
8      Q.    And those products were all publicly
9  available?
10      A.    Yes.
11      Q.    If those products were -- and presumably
12  might have been, but it's up for you to say if you
13  have any specific knowledge, if those policy
14  products were embraced by modern Republican
15  candidates for public office, and used in their
16  campaign conceivably successfully in winning those
17  offices, would that have been a source of concern to
18  the Democratic Leadership Council and PPI?
19      A.    Well, I'd say that our main concern was
20  to see our ideas events, and to see them embraced.
21  You always hope that the people you are closest to
22  will embrace them.  But in any case, unlike other
23  think tanks that measure their output on terms of
24  how many offensive plays, we actually like to see
25  these ideas translated into governing reality in

Page 149

1  this country.  We are proud when that happens.
2      Q.    So you are pleased or the DLC is
3  perfectly prepared to have someone like, for
4  example, Senator McCain promote his national service
5  proposal?
6      A.    Absolutely.
7      Q.    And identify publicly, recognizing that
8  he is a leading Republican and conceivably a
9  candidate for President.
10      A.    Well, even more than pleased because, you
11  know, that is an idea that many Republicans identify
12  with Bill Clinton and, therefore, oppose it on
13  purely partisan grounds.  So when you have a
14  Republican embrace it, it widens the audience for
15  your ideas.
16      Q.    And in the course of developing its
17  education and foreign proposal, did DLC and PPI, one
18  or the other or both, have a hand in developing the
19  basic concepts of principals behind the "No Child
20  Left Behind Education Reform?"
21      A.    Absolutely.  In 1999, we started
22  conversations in fact with Bill Bennett, I think
23  Checker Finn, who is conservative, runs another
24  conservative think tank in town called the Thomas
25  Fordam Institute, was involved.  But certainly Bill

38 (Pages 146 to 149)

William Marshall

February 8, 2006

Washington, DC

Page 150

1  Bennett, and Senator Lieberman was there. And I
2  believe Senator Brownback was involved in the early
3  stages.
4        But let me not say that with 100 percent
5  certainty. I have to go back and check. But in any
6  case, we talked in a bipartisan way about the need
7  for breakthrough on the federal role in funding K
8  through 12 education. We developed a proposal
9  called the 3Rs bill, in '99/2000, that eventually
10  became the spine of the "No Child Left Behind Bill."
11        And the reason I know it is that Sandy
12  Cress, a Dallas Democrat whom Senator -- excuse me,
13  whom President Bush tapped to be his top idea guy on
14  education in the White House and to drive this
15  policy process on "No Child Left Behind," told me
16  that they embraced a lot of the architecture from
17  our plan and put it into the President's bill.
18        And that was a bill that moved in a
19  bipartisan way because in fact many Democrats had
20  been involved in the development of that idea that
21  we really generated back in the late '90s.
22        Q.  And once President Bush had adopted the
23  basic architecture proposal and promoted
24  successfully to Congress its adoption, and as I
25  recall also identified it as one of the achievements

Page 151

1  on which he went into re-election campaign, did the
2  DLC disavow that election reform?
3        A.  No, we didn't. We've had to defend it
4  even as a lot of Democrats turned against it because
5  it was seen as a signature Bush proposal. So we had
6  to sort of stand up and say, No, it's not right to
7  attack this bill. You can complain about the
8  funding level but don't attack the concept of the
9  bill which is right, because it insists that we
10  close the education achievement gap in this country.
11        Q.  Can I ask you to take a quick look at
12  Exhibit 10, I think it is, which is a copy of The
13  New Democrat that Mr. Martineau brought to your
14  attention in his direct examination. And I believe
15  if you count to the table of contents which is 4315
16  of Exhibit 10.
17        A.  Right.
18        Q.  Mr. Martineau brought to your attention
19  articles by Mr. Kilgore, Alston, and Senator Kerry.
20  There's also a book review published by James P.
21  Pinkerton identified under the books on page 25.
22  Can you tell us who James P. Pinkerton is?
23        A.  Yes. Jim is a Republican thinker who
24  knows -- I think he was the top domestic policy
25  staffer for Bush, first Bush 1 Administration. I

Page 152

1  may have the title not exactly right, but he was in
2  the domestic policy shop in the first Bush
3  Administration and was known as one of the more
4  innovative thinkers on the Republican side, somebody
5  that we've talked to and worked with down the years.
6        Q.  Okay. And I take it that there are other
7  examples, and I think you alluded to them in your
8  direct examination by Mr. Martineau, of Republicans,
9  if not elected officials, though there might have
10  been some, certainly Republicans well identified to
11  their party who would have been invited and welcome
12  to make contributions to the New Democrat and later
13  the Blueprint.
14        A.  I think so. I would have to go back and
15  verify. You know, I'm sure we had -- I know Jim
16  Pinkerton's been in there. So I know we've had
17  Republicans in there but how many, I can't recall
18  off the top of my head.
19        But we've done public programming with
20  Republican members of Congress, you know. But the
21  answer is, yes, in the magazines, but I just don't
22  know how many,
23        Q.  When you say public programming, so you
24  have put together events on policy issues and
25  featured Republican members?

Page 153

1        A.  Yes. Mark Kennedy, Republican of
2  Minnesota did a transportation forum with us, with
3  Earl Blumenauer a Democrat from Oregon. And we've
4  done McCain Bayh events on national service and
5  others.
6        Q.  Was there -- your events you mentioned to
7  Mr. Martineau or you testified in response to a
8  question by Mr. Martineau that you put your product
9  out in the public. This includes events as well as
10  publications?
11        A.  Correct.
12        Q.  Do you place a partisan screen on public
13  attendance under events?
14        A.  Not at all. We are happy to see a filled
15  room more than anything else.
16        Q.  Let me ask you an additional question
17  about, again a question, an additional question to
18  follow up on a question Mr. Martineau asked about
19  the nature of activities. You asked, or he asked
20  and you responded that the Democratic Leadership
21  Council didn't endorse candidates.
22        And I think you said, although we'll
23  check the record to make sure that I'm not
24  misstating this, that as a general rule you stayed
25  out of, as a legal understanding of what your

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
1-800-FOR-DEPO

William Marshall                                                February 8, 2006

Washington, DC

Page 154

1  organization was allowed to do and what by charter
2  it did do. You stayed out of elected politics.
3       I meant to ask you, when you said that
4  you didn't endorse candidate, is it also true that
5  you abstain from any other form of recognized
6  electoral intervention by mention, and you can
7  respond to each one, voter registration activities?
8    A.  No.
9    Q.  Funding them directly or indirectly?
10   A.  No.
11   Q.  Get-out-the-vote activities funded
12 directly or not directly?
13   A.  No.
14   Q.  Participation in the design of political
15 party advertisements in election cycles or at other
16 times?
17   A.  No. DLC has done some advertisements but
18 it hasn't --
19   Q.  Of its own?
20   A.  Yeah, but no --
21   Q.  But by political --
22   A.  No, no party or candidate --
23           - - -
24       (Discussion off the Record)
25           - - -

Page 155

1       BY MR. BAUER:
2    Q.  By political party you meant Democratic
3  national, senatorial or congressional campaign?
4    A.  No.
5    Q.  State party organizations?
6    A.  No.
7    Q.  Thank you. We talked a little bit about
8  PPI's role in the organizational scheme of things.
9  And I just wanted you to ask you some general
10 questions.
11       The first is to the extent that there are
12 tax and other legal issues associated with the
13 relationship of these various entities to one
14 another, have there been personnel inside the
15 organization who have been assigned the
16 responsibility to both monitor those issues,
17 coordinate with counsel and advise.
18   A.  Yes.
19   Q.  And over the period of time that we've
20 been discussing these issues, '97 to '99, who was
21 that individual or who were those individuals?
22   A.  That would have been Chuck for most, if
23 not all, of that period.
24   Q.  Chuck?
25   A.  Chuck Alston.

Page 156

1    Q.  So to the extent there would be questions
2  that would be asked about how precisely these legal
3  affairs and corresponding administrative procedures
4  were structured, that would be something that you or
5  others and anyone else who wanted to know about them
6  would turn to Chuck Alston for?
7    A.  Yes.
8    Q.  And you did not view that as something
9  that you would be deeply familiar with?
10   A.  Right.
11   Q.  As far as PPI is concerned, there's some
12 reference in the documents touched upon, I think
13 again in the exchange with Mr. Martineau, that
14 refers to branding. Is it fair to say or not fair
15 to say that one of PPI's roles, whatever
16 organizational form it assumed in any given time,
17 whether it was a project in one organization or a
18 project in another, was to remain the policy brand
19 of the type of policy, progressive policy analysis
20 that DLC and PPI were associated with?
21   A.  Yes.
22   Q.  And I believe this is my last question.
23 You testified that you've known Al From for a very
24 long period of time since the two of you worked
25 together with Gillis Long. And both of you, I take

Page 157

1  it you would agree, have been involved in policy
2  analysis in the Washington community for over that
3  entire period?
4    A.  Yes.
5    Q.  Do each of you periodically reserve the
6  right and indeed communicate the expectation that
7  you can speak out on issues in your personal
8  capacity and by no means at all times on behalf of
9  the organizations with which you are professionally
10 affiliated?
11   A.  Yes. We both do.
12   Q.  So can you give me an example of how you
13 might make that clear to an audience, even though
14 you are invited in your capacity as a very
15 well-known policy analyst?
16   A.  Well, you know, if I'm asked a question
17 typically in a speech somewhere, round table, and I
18 want to give what is a personal view, I make it very
19 clear that I'm here to talk about what Will Marshall
20 thinks on the topic at hand, not to offer an
21 institutional endorsement of any particular point of
22 view, either as a PPI endorsement or a DLC one, but
23 that I'm strictly speaking as myself. Because there
24 are issues that we haven't, you know, internally
25 discussed, agreed on, where you want to have the

40 (Pages 154 to 157)

William Marshall                                                    February 8, 2006
                              Washington, DC

## Page 158

1  ability to just give your own views without
2  committing anybody else to them.
3      Q.   And if you are invited to go to give an
4  address on issues that you have been involved with
5  over the years, professionally and personally, in
6  the field of policy analysis, do you believe that
7  you can make the decision to accept them as an
8  individual and not necessarily because in each
9  instance a particular institutional goal is served?
10     A.   Yes. And I try to make it clear, you
11 know, that I'm here as an individual and what I'm
12 saying should not be taken as ex cathedra
13 pronouncements by either of these entities.
14     Q.   And if you publish an article elsewhere,
15 for example, in the newspapers we discussed earlier
16 and your professional identification is listed, is
17 that meant to indicate that the views are those of
18 the organization or is that simply an identification
19 for identification purposes?
20     A.   Yeah, mostly that. And I sign --
21     Q.   Mostly which?
22     A.   I'm sorry. Mostly it's just my PPI
23 affiliation is listed for identification purposes
24 only, not as an institutional endorsement. Often I
25 sign letters on foreign policy, you know, questions

## Page 159

1  that where it's very clear that I am signing -- that
2  where I'm identified only for purposes of --
3  affiliated only for purposes of identification.
4      Q.   And to your knowledge would that be a
5  position, since the two of you were cofounders, and
6  the two of you have retained a high degree of
7  personal visibility in the community on these
8  issues, is that also your understanding of the
9  flexibility that Al From believes that he has?
10     A.   Yes. I mean I, again, he's exercised it
11 many times where he's made it clear that he's
12 speaking in some place on his own, in his own
13 capacity, not as the head of DLC.
14     Q.   And would that be also true of writings?
15     A.   Yes. I think so. I know it's true in my
16 case.
17     Q.   Very good. I think that's all the
18 questions that I have.
19          REDIRECT EXAMINATION CONDUCTED
20          BY MR. MARTINEAU:
21     Q.   Okay. I've got a few questions on
22 redirect. Mr. Marshall, Mr. Bauer directed some
23 questions to you about elected officials, and your
24 work with elected officials.
25          Is it true that the elected officials

## Page 160

1  that you worked with are primarily so-called New
2  Democrat elected officials?
3      A.   Primarily.
4      Q.   And you don't have any specific
5  recollection of working directly with Republican
6  elected officials?
7      A.   No, I do have such recollection.
8      Q.   Okay. But primarily the focus on the
9  elected officials to generate the broadest possible
10 voice for your views was the so-called New Democrat
11 elected officials. Isn't that correct?
12     A.   Well, we assumed that Democrats would be
13 most likely to embrace many of the ideas that we
14 developed and promulgate them but that's not always
15 the case but most likely the case.
16     Q.   And in that regard that you would, you
17 being the PPI and/or the DLC, would like to see
18 so-called New Democrat elected officials elected to
19 public office, New Democrat -- people who espouse
20 New Democratic principals elected to public office
21 so they can implement the policies that you are
22 developing over at PPI; correct?
23     A.   The term New Democrat is almost obsolete
24 these days. But the point is that we like to see
25 candidates who are I would say are "reform minded"

## Page 161

1  elected because they are the folks who are more --
2  most open to the kind of ideas that we are trying to
3  sell.
4      Q.   And those ideas that you are trying to
5  sell were ideas that would primarily be adopted by
6  Democratic candidates rather than Republican
7  candidates. Isn't that correct?
8      A.   It happened that way primarily. But
9  again, as we discussed previously, there's occasions
10 when Republicans have embraced ideas.
11     Q.   Okay. And you indicated about in regard
12 to Mr. Bauer's questions about polling, one of the
13 goals of the polling was to find out what the policy
14 preferences of people were. Isn't that correct?
15     A.   Yes.
16     Q.   And one of the uses of that would be to
17 fashion policies that would appeal to the broadest
18 range of the public. Isn't that correct?
19     A.   Well, yeah. That would be appealing to
20 people who might otherwise not be drawn to
21 progressive causes.
22     Q.   And you wanted to promote those
23 progressive causes?
24     A.   Yes.
25     Q.   And the best way to promote those as you

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
                                          1-800-FOR-DEPO

William Marshall                                                    February 8, 2006

Washington, DC

Page 162

1  have testified was to have a person adopt those
2  views and be elected to public office; correct?
3      A.  Well, it was certainly one way, an
4  important way.
5      Q.  Because as you pointed out the elected
6  officials have the ability to have a broad voice in
7  articulating those particular points of view?
8      A.  Yes.
9      Q.  And one of the reasons you were focusing
10 on getting people elected was, as you say, because
11 of your flacking of the conservatives.  Isn't that
12 correct?
13     A.  Well, we weren't focused on getting
14 people elected, first of all.  And I don't quite
15 understand the second part of the question.
16     Q.  Well, you made reference to flacking the
17 conservatives.  What exactly did you mean there?
18     A.  Flacking the conservatives?
19     Q.  Yes, sir.  You don't recall?
20     A.  I'm sorry.  I don't -- there may be a
21 miscommunication.  I don't understand flacking the
22 conservatives.
23     Q.  Understand.  Now, Mr. Bauer made
24 reference to, for example, the institutional arms of
25 the Democratic party, such as the Democratic

Page 163

1  National Committee; correct?
2      A.  Yes.
3      Q.  And you indicated that at times DNC could
4  be considered hostile to the DLC and its activities.
5  Is that correct?
6      A.  Yes.
7      Q.  But the DNC would not be hostile to the
8  fact that a Democrat might be elected to office as a
9  so-called New Democrat.  Isn't that correct?
10     A.  Well, the DNC is in the business of
11 electing Democrats.  So we would by definition want
12 to see Democrats elected.  But the people, you know,
13 the DNC -- the people in the DNC aren't always happy
14 with the kind of ideas that we develop.  That's the
15 point.
16     Q.  And the other point is of course the DNC
17 is in the business of electing Democrats to public
18 office; correct?
19     A.  Right.
20     Q.  So to the extent that a candidate would
21 adopt your point of views and be able to get
22 elected, the DNC would not be hostile to that
23 particular outcome; would it?
24     A.  Well, the DNC folks argued that in fact
25 we were wrong, that adopting our ideas would not

Page 164

1  help Democrats be reelected.  And so there was an
2  argument about whether the ideas that we were
3  pushing were the right ones.
4      Q.  Right.  But the fact is that if in fact a
5  Democrat was elected running on, say, a New
6  Democratic ticket, the DNC would not be hostile to
7  having another Democrat elected, say to a member of
8  Congress; correct?
9      A.  Well, this is what happened in '92.  And
10 clearly, no, they want to see Democrats win the
11 White House.
12     Q.  1992 was my next point.  They were happy
13 that President Clinton and Vice President Gore --
14     A.  Presumably they were.
15     Q.  -- presumably happy.  Isn't that correct?
16     A.  Most of them were, I think.  Yes.  I
17 would hope so.
18     Q.  Now, you indicated that part of the role
19 of the PPI and the DLC was to advocate certain
20 ideas.  Now, another part that you made reference to
21 was the DLC going out on the road.  Isn't that
22 correct?
23     A.  Um-hmm.
24     Q.  Now, the PPI as you pointed out did not
25 go out on the road to advocate these policies.  I

Page 165

1  think that's what your testimony is?
2      A.  Well, sometimes we did, but mostly the
3  DLC's activities for policy idea advocacy were
4  intended at a broad national audience.  And so it
5  made no sense for them to stay here.  You know they
6  wanted to get out and spread the word all around the
7  country.  And they did.
8          And we would often be drawn into that,
9  invited to participate in that.  And they had the
10 bigger budget to do that.  And we were operating
11 more in the think tank in Washington; PPI was.
12     Q.  So it's fair to say that PPI as you have
13 just said was primarily based here -- or was based
14 here in Washington, and your focus was on
15 development of policy ideas, as you have testified
16 here today; and that DLC would take those ideas and
17 try to go out on the road and to disseminate those
18 ideas as broad as possible.  Is that fair?
19     A.  Well, they would develop ideas but they
20 would also take the ones that we developed and then
21 they would get them from other sources too,
22 sometimes elected official or somebody else would
23 have an idea they liked; they would embrace it and
24 then go out and try to get support for all of the
25 above.

42 (Pages 162 to 165)

William Marshall                                                                    February 8, 2006
Washington, DC

Page 166

1    Q.   That's right. And one of the ways that
2  they would get the support, and one of their
3  activities would be to try to recruit candidates to
4  run for public office, embracing these particular
5  ideas?
6    A.   No. No. They always looked -- that was
7  the -- you couldn't cross the line in the electoral
8  politics in any way. That was always the understood
9  imperative. So, no, they never would recruit
10 candidates.
11   Q.   Not recruit candidates wasn't the right
12 terminology. They would promote -- we are talking
13 about the DLC, they would go out into the field on
14 the road, disseminate these ideas; correct?
15   A.   Right.
16   Q.   Now, if someone who was contemplating
17 running for office then embraced those ideas and
18 then ran for public office, that would be a, from
19 the DLC's standpoint, a successful part of its
20 mission I take it then?
21   A.   It would make them happy if more and more
22 people running for office embraced their ideas.
23 Yes.
24   Q.   And if those people are then elected to
25 public office as so-called New Democrat elected

Page 167

1  officials, that would make the DLC happy as well?
2    A.   Yes.
3    Q.   Now, you also talked about the Main
4  Street, Republican Main Street Coalition?
5    A.   Partnership.
6    Q.   Okay. Now when you say we held events
7  with them, are you talking about PPI?
8    A.   PPI.
9    Q.   Not DLC?
10   A.   We, PPI, and the Main Street Partnership
11 struck up a partnership on environmental policies.
12 We did several.
13   Q.   That's what I understand.
14   A.   Things with them.
15   Q.   And so that was a PPI, slash, Main Street
16 Republican enterprise then; correct?
17   A.   Correct.
18   Q.   Same with respect to the Hudson Institute
19 that you referred to?
20   A.   Yes. I was talking about -- there may
21 have been -- undoubtedly there were DLC events but I
22 was talking about the PPI events.
23   Q.   That's right. And the same with the
24 Empower America that you were talking about PPI
25 events that you did with Empower America; correct?

Page 168

1    A.   I remember conversations with those
2  folks. It's possible that there was some public DLC
3  Empower America thing, but I would have to go back
4  and dredge that up off the top of my head.
5    Q.   But when you were answering
6  Mr. Bauer's --
7    A.   I was talking about conversations that I
8  had with them as we were working on education and
9  reform policy or social welfare policy is mostly
10 what I had in mind.
11   Q.   Good. Okay. Now, when you were talking
12 about in reference to branding, explain to me what
13 exactly you mean branding as it relates to the
14 activities of the PPI?
15   A.   Well, I'm not sure I completely grasp the
16 question. But what I mean is that PPI is branded as
17 a think tank. And so it operates in the world of
18 think tanks. You know we generally do
19 collaborations when we do them with other think
20 tanks. We compete in that idea marketplace, so that
21 we are often identified as a think tank.
22        And it's important for us that that is
23 sort of, you know, in terms of who the people we
24 would like to support us and people we would like to
25 raise money from, they understand that that is the

Page 169

1  universe that we are competing.
2    Q.   And did the DLC to your knowledge, did
3  DLC engage in any type of branding type projects or
4  process during 1997, 1998 and 1999?
5    A.   They did.
6        MR. BAUER: I'm not sure I understand the
7  question. I apologize.
8        MR. MARTINEAU: Well, I'm asking --
9        MR. BAUER: In what sense a branding
10 process?
11        BY MR. MARTINEAU:
12   Q.   Well, I'm asking what is the branding
13 process that you are describing there?
14   A.   Well, I don't -- all I know is that there
15 was a lot of talk about branding in those days. It
16 was a popular concept. And they had a consultant
17 come in and talk about it.
18        And I think they redesigned their logo as
19 simply a matter of trying to get more attention for
20 the institutions, you know. And so the question was
21 how to further promote the brand.
22   Q.   And you are talking, when you say "they"
23 you are talking about the DLC?
24   A.   Yeah.
25   Q.   So is it fair to say that we can properly

43  (Pages 166 to 169)

William Marshall                                                    February 8, 2006

Washington, DC

---

Page 170

1 characterize the PPI as an affiliated think thank of
2 the DLC?
3    A. Yes.
4        MR. MARTINEAU: I have no further
5 questions.
6              - - -
7    (The deposition was concluded at 1:10 p.m.)
8              - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 171

1  UNITED STATES OF AMERICA )
2              ss:
3  DISTRICT OF COLUMBIA    )
4
5        I, WILL MARSHALL, the witness
6  herein, having read the foregoing testimony of the
7  pages of this deposition do hereby certify it
8  to be a true and correct transcript, subject to the
9  corrections, if any, shown on the attached page.
10             - - -
11
12
13    _____
14        WILL MARSHALL
15
16  Subscribed and sworn to before me
17
18  this _____ day of _____, 2006
19
20  _____.
21
22
23
24
25

Page 172

1          C E R T I F I C A T E
2  UNITED STATES OF AMERICA )
3              ss:
4  DISTRICT OF COLUMBIA   )
5        I, ELIZABETH MINGIONE, Notary Public
6  within and for the District of Columbia do hereby
7  certify:
8        That the witness whose deposition is
9  hereinbefore set forth was duly sworn and that the
10  within transcript is a true record of the testimony
11  given by such witness.
12        I further certify that I am not related
13  to any of the parties to this action by blood or
14  marriage and that I am in no way interested in the
15  outcome of this matter.
16        IN WITNESS WHEREOF, I have hereunto set
17  my hand this _____ day of _____, 2006.
18
19
20    _____
21  My Commission Expires:
22  April 14, 2010
23
24
25

---

44 (Pages 170 to 172)