# Exhibit

# I

Explanation of Adjustments
Schedule 1-A

Democratic Leadership Council, Inc.                    52-1384530


**Issue:**

Whether the Democratic Leadership Council (DLC) failed to be described in I.R.C. 501(c)(4) in 1997 and 1998 because it primarily benefited affiliated New Democrat elected officials, with a secondary benefit to the Democratic party, rather than primarily benefiting the community as a whole.


**Facts:**

The Democratic Leadership Council, Inc. (hereafter "DLC") was organized in 1985. DLC was founded by prominent members of the Democratic Party. On DLC's Articles of Incorporation the DLC Directors are identified as Charles Robb, Senator Sam Nunn, and Congressman Richard Gephardt. Additionally one of the founders of DLC was then Arkansas Governor Bill Clinton.

DLC's Form 1024 (Application for Recognition of Exemption), dated November 8, 1985, states the DLC was founded by federal and state elected officials of the Democratic Party who were concerned with the direction of their party. In the Articles of Incorporation attached to the Form 1024, the purpose of the DLC is described as bringing about civil betterments and social improvements.

In response to Part III, Question 12 on the Form 1024 DLC states that all funds of DLC are devoted to the stimulation of public policy dialogue inside and outside the Democratic Party under the leadership of elected officials of the party. To accomplish this undertaking DLC organized certain task forces devoted to the promotion of public policy formulation and debate. These task forces were the task force of National Defense and Strategy and the task force on Economic Growth and Competitiveness. Members of these task forces included Democratic elected officials Senator Lloyd Bentsen, Senator Sam Nunn, Governor Bruce Babbitt, and Governor Bill Clinton among others.

Attached to the Form 1024 is a DLC publication from October 1985 entitled "Winning in the World Economy." This publication discusses the results of a Wharton School of Business study on international trade. However, the preface of this publication states:



EXHIBIT
Plaintiff's 8
3·30·06    JFW

USA1846

2

Democratic Party and the nation - the DLC's fundamental aim is to explore new ways to advance our party's traditional commitment to growth and opportunity, national strength and social justice. Our basic premise is that elected leaders - whose ideas and convictions have been tested at the polls - must work in concert to articulate a new Democratic vision for tackling the challenges of the 1980's and 1990's.

The publication further states:

While Democrats need not embrace every detail, we believe that the DLC's prescriptions, taken together, form a coherent strategy for putting America back on the offensive in international competition.

Whatever the causes, we believe the ECI's overall economic measures amply justify our conclusions that America, under a Republican administration, is being routed in world trade.

In sum, Republican fiscal and trade policies are turning America's winners-from basic industries to high tech enterprises, from farmers to manufacturing-workers into losers.

This publication concludes with the "Democratic Competitive Strategy" that recommends strategies Democrats should adopt. Although this publication was issued prior to the years under examination, it was an attachment to DLC's Form 1024 and indicated the type of publications intended to be produced by DLC from its founding.

DLC is financed by contributions from individuals and corporations. DLC also receives fees from people who attend its conferences. During 1997 and 1998, DLC's revenues totaled $3,515,742 and $3,632,301 respectively, primarily from contributions and dues.

To inform its members and the general public of its activities, DLC issued newsletters, magazines, and provided various articles on its website. These newsletters called the "DLC Update" and "The DLC Briefing" were issued approximately once a week. Additionally, DLC published a magazine known as "The New Democrat Magazine" which was published bi-monthly and in 1998 published two editions of the "Blueprint Magazine."

DLC also conducts annual conferences. DLC's 1997 and 1998

USA1847

3

annual conferences were held on October 27, 1997, and December 2, 1998, respectively. Speakers at the 1997 annual conference included prominent elected officials of the Democratic Party including President Clinton and Vice-President Gore, both of whom have had substantial involvement in DLC activities for many years, including President Clinton's involvement in the founding of DLC and serving as its Chairman. The 1998 annual conference included speakers such as Senator John Kerry (D-MA), Senator Bob Kerrey (D-NE) and Vice President Al Gore. During 1997, DLC also sponsored a monthly lunch series called the "Capital Hill Lunch Series." The lunch series brought DLC executives and members together with significant elected Democratic officials.

Despite DLC's assertion that it is not associated with the Democratic Party, it is interesting that the organization adopted DLC as its name. DLC claims the name was selected because it was founded by federal and state elected officials who are Democrats and who were concerned with the direction of policy debate within the Democratic Party. Individuals who formed DLC and members of DLC are referred to by DLC as "New Democrats."

Statements made by officers of DLC specifically identify the DLC with the Democratic Party. Below are examples of some of these statements:

Statements by the president of DLC during 1997 and 1998 Al From at the 1996 Policy Forum and Gala appearing on DLC's website in 1997:

> Our triumph is President Clinton's historic re-election victory, the culmination of an effort we have waged together for more than a decade to pick the Republican lock on the electoral college and to put and keep a new Democrat in the White House. We will celebrate that triumph with the President later today.

> We believed we could win the support of the American people, including the middle class, if we reconnected the Democratic Party with its real tradition...

> In short, we believed that Democrats should stand for opportunity, responsibility, community and empowering government, and we are confident that the voters would respond to that message.

Statements by DLC president Al From in the DLC Update, Tuesday, May 6, 1997:

4

Passing it in Congress with Democratic support is crucial to the future of our Party.

Only then can we as Democrats begin to deal with the second problem of reorganizing budget priorities to promote public investment.

But, if Democrats sabotage a balanced budget on the brink of its achievement by a Democratic President, much of the ground we have gained since 1992 achieving political parity with the Republicans will be rapidly lost as we once again get labeled as "tax and spend" liberals unfit to guard taxpayer's money.

All Democrats should support the President on this agreement. For our country, and for our party, it is a simple choice of either moving ahead or going back.

Statements by DLC president Al From during the May 27, 1997, DLC event televised on C-SPAN and appearing on The DLC Update on May 28, 1997:

...some Democrats oppose our party's tradition of supporting free and fair trade, and are again calling for protectionist measures...If the protectionist faction within the Democratic Party is successful, they could change the mix of policies that has brought one of the longest, most sustained periods of non-inflationary economic growth in American history. And likely reduce, not enhance, the opportunities to get ahead for hard working Americans to whom the Democratic Party must give a voice.

Statements by DLC president Al From on the DLC Website on October 17, 1997:

We are taking this unprecedented step because we believe the fast track debate offers Democrats a critical choice. We can continue on the path as the party of growth and opportunity into the new century; or we can reverse course and turn back to the special interest, protectionist-dominated politics of the 1970s and 1980s that left us in the political wilderness.

Statements by DLC President Al From in a DLC news release dated October 17, 1997:

USA1849

5

Granting a Democratic president fast track authority is the right vote for Democrats. We spent the 1980s in the political wilderness, in large part because the American people lost confidence in our ability to manage the economy. Now President Clinton has changed that. He has made the Democratic Party once again the party of prosperity, the party that can be trusted to create jobs, restore upward mobility, and increase incomes. Do Democrats really want to undercut one of the pillars of his successful economic strategy? Do we really want to risk losing the trust in our economic stewardship it took so long for us to restore?

This statement continues:

But our ad does provide a rallying point for the vast majority of rank-and-file Democrats who want to see this Democratic President continue to succeed and who do not want to go back when special interest groups dictated policy to Democratic elected officials, at the expense of the national interest and our party's political fortunes.

Statements by DLC president at DLC's 1997 Annual Conference:

For our country, the big question is whether America will shape the new global economy or retreat into protectionism and economic isolation. For our party, the question is whether Democrats are going to be a force for economic progress--under President Clinton's leadership--or will instead heed his opponents and become a bulwark of economic reaction and defeatism.

Statements by DLC president Al From at the Democratic Nucleus Club on April 20, 1998:

In 1985, a small band of New Democrats--including a young governor from Arkansas and a freshman Senator from Tennessee--formed the Democratic Leadership Council to redefine our party. We believed it was essential to reversing our party's fortunes in presidential elections and building a New Democratic majority in national politics.

We defined the odds by electing a New Democrat president. We have shown that by governing as a New

USA1850

6

Democrat, a Democratic president can be re-elected. And we've established a new reality of American politics--that New Democrats beat Republicans. The problem is Republicans still usually beat old Democrats.

If we want to stop the Republican surge, we should take a long look at the one level of American politics in which Democrats are building a strong advantage: the presidential level where the New Democrat philosophy is creating a new, growing coalition of Americans supporting progressive policies.

Statements by DLC president Al From at the 1998 DLC Annual Conference:

We gather this morning at a time of great triumph, of great opportunity, and of great challenge for the New Democrat Movement.

Our triumph is the New Democrats, led by President Clinton and Vice President Gore, have redefined the center of American politics and in doing so we've also redefined our party.

Let me be very clear about why we're here and what the DLC is about. Our mission is to ensure that the New Democratic politics that has dominated our party for the last six years continues to be the defining politics for the Democratic Party and for our country after President Clinton leaves office in 2001.

Statements by DLC Chairman during 1997 and 1998 Senator Joe Lieberman at the 1996 Policy Forum and Gala on the 1997 DLC Website:

And we have for good reason to hope that the Democratic Party will continue on a path that makes it, once again, the majority party of this American democracy.

That's why we're here today. The DLC wanted to help elect a Democrat President, and we did so...twice!

We're looking forward to the new millennium, and we want to bring the Democratic Party around to the fact

7

that change is inevitable, change is good, and we must change or we will lose.  Ours is fast becoming the party of innovation and fresh ideas.

And so I challenge those Democrats who have not been with us in our long march to change the party and our government--it is never too late to join this journey.

Statements by DLC Chairman Senator Joseph Lieberman during the May 27, 1997, DLC event televised on C-SPAN, and appearing on The DLC Website on May 28, 1997:

We are here to call on our fellow Democrats in both chambers to vote for MFN, not because it is good for China, but because it is good for America; and not because it is good for American business, but because it is good for Americas' workers and consumers.

Statements by DLC Chairman Senator Joseph Lieberman at the 1998 DLC Annual Conference:

This is a special annual conference for the DLC.  In some measure, I think we could say that we are happily, proudly to celebrate our success; six years of new Democratic policies that have produced an unprecedented time of growth and good life for the American people.

The entire Democratic party, I think it is fair to say is catching on and catching up to the powerful new Democratic message of the Clinton-Gore Administration, and that is why we did so well, unexpectedly well, in the elections less than a month ago.

And it is to lay out a challenge to our party, to our country, and to ourselves.  The new Democratic record, which was built on bedrock American values and innovative programs to realize these values, has given Democrats new credibility to govern.

Statements in the 1997 DLC Updates:

From a political point of view, identifying the Democratic Party with broad economic growth through the private sector has always been a key element of the New Democratic strategy, critical to our efforts to reach out to middle-class Americans leery of government income redistribution schemes.  (May 13, 1997)

USA1852

8

Framing remarks by DLC Chairman Sen. Joe Lieberman and DLC President Al From will lead into morning panels examining two critical issues for Democrats.  (October 15, 1997)

New Democrats should make sure every Democratic Member of Congress knows which loyalty they should respect. (November 4, 1997)

The bottom line for New Democrats is that the modernization of the Democratic Party, and of the progressive tradition, is not an accomplished fact, despite all the ground we've won. Engaging Democrats, and the American people, in an intensified debate on the challenge of shaping the New Economy in the national interest is an opportunity we should welcome. A new pro-trade coalition based on equipping Americans with the tools they need to succeed can and must be built, within the Democratic Party and throughout the country.  (November 13, 1997)

Statements in the 1998 DLC Updates:

New Democrats should let Senate Democrats know that a reflexive interest group reaction to this measure is not acceptable.  Auto Choice gives Democrats a chance to do the right thing, helping the right people who need the most help, and incidentally making it clear that no interest group can tell Democrats or insurance company consumers they have no choice but to toe the line and pay the costs.  (September 11, 1998)

Understanding how poorly prepared Republicans are to the task of governing should help "energize" New Democrats to keep up the fight for a governing philosophy that the American people still clearly support.  (September 11, 1998)

We encourage state-level New Democrats to examine state tax and economic development policies to determine if there are similar ways to encourage broad-based non-discriminatory incentives for worker training ad innovation incentives.  It's also a useful issue for challenging those Republicans at every level... (July 31, 1998)

The premise of the National Conversation was that the

USA1853

9

New Democrat movement has reached a key turning point.
Ideas incubated by the DLC and the Progressive Policy
Institute have helped the Clinton-Gore
administration... (June 8, 1998)

Politically, the case for a real veto threat, and a
real veto, is even stronger.  Some timorous souls are
advising the President against a veto on grounds that
it might be overridden, damaging the President's
prestige in Washington.  Maybe so, but it's a small
price to pay for the enhanced prestige it would gain
the President and Democrats in the country at large.
(May 15, 1988)

DLC admits that Democrats, including prominent elected
officials who are members of DLC, believe that DLC's activities
have strengthened the Democratic Party and the party's appeal.

During 1997 and 1998, DLC employed pollster Mark Penn & his
company Penn & Schoen Associates, to conduct polls on DLC's
behalf.  The results of these polls were published in October
1997 in a DLC publication called "The New Democratic Electorate"
and the January/February 1998 issue of the "New Democrat."  In
the 1997 poll, the forward to the publication by the president of
DLC states the poll demonstrates that President Clinton's New
Democratic policies are extremely popular with Democrats.  The
forward concludes by stating:

That's good news for the Democratic Party.  For it
confirms what New Democrats have always believed-that
what's right for the country substantively is right for
the Democratic Party politically.

DLC states the purpose of the poll was to "understand and
analyze the opinions of people who identify themselves with the
Democratic Party to utilize in DLC's issue development."  DLC
claims the publication containing the poll results was posted on
DLC's website and handed out at DLC events.

The January 23, 1998, DLC Update, describes the 1998 survey
as a poll by presidential and DLC pollster Mark Penn that shows
New Democrats are not moving away form the base of the Clinton-
Gore message but are moving rapidly and decisively "towards us."

In each 1997 and 1998 edition of the DLC magazine "The New
Democrat," DLC president Al From authored a short essay known a

10

the "Political Memo".  Some of the statements in these essays
include:

> If we want the new progressive movement in world
> politics as symbolized by the New Democrats and New
> Labour to prevail, we must win not just political
> power, but the battle of ideas.  (November/December
> 1997)

> There is plenty of other evidence of our (New
> Democrats) impact as well, not the least of which was
> President Clinton's election and re-election on New
> Democrat themes... There are fights New Democrats have
> to win.  The future of our movement and the legacy of
> the first New Democrat President are at stake.
> (May/June 1997)

> The key to building a Democratic majority is for
> Democratic candidates at all level to emulate the
> President's New Democrat formula... The Democratic
> formula for victory in 2000 should be the same as the
> formula for victory in 1998.  If we rally a broad,
> multiracial coalition around New Democrat ideas and
> themes, energize our core supporters to turn out, and
> use organizational strength of important forces like
> organized labor, we will not only hold on to the
> presidency but reclaim control of both houses of
> congress.   (November/December 1998).

> Democrats are unlikely to complete the trek back to
> majority status this year, but they can make solid
> gains if they learn from the President's experience in
> winning back the White House after a long Democratic
> losing streak.  Here are five simple rules that all
> Democrats should follow... Returning to majority
> status will be a long journey for Democrats.  But if we
> have the discipline and perseverance to heed these five
> rules - even when expediency beckons another course - I
> have no doubt we will outlast the Republican's short-
> term incumbency edge and complete the journey.
> (July/August 1998)

> For the first time since the 1970's the Democratic
> electorate in presidential elections is growing.  We're
> once again the party of young people.  We once again
> represent young families who don't look to government
> to solve their problems, but instead ask the government
> to help them be better parents and citizens.  (May/June

USA1855

11

1998)

> In sum, the best way for Democrats to further our
> enduring values in the Information Age is to promote
> New Democrat ideas and govern as New Democrats... The
> best way to be a true Democrat is to be a New Democrat.
> That's the bottom line. (January/February 1998)

In addition to the newsletters, magazine and website, DLC also released a television advertisement in 1997 to support an issue, known as "Fast Track." Specifically, DLC advocated Congress allowing President Clinton "Fast Track" authority during trade negotiations. This would allow the President, to conduct trade negotiations without the fear of Congress changing any agreements, although Congress could veto the negotiated trade agreement altogether. In a press conference discussing the television advertisement aired in October 1997, DLC president Al From stated:

> We are undertaking it because we believe that granting
> the President fast track authority is right: right for
> our country and right for the Democratic Party. (The
> DLC Update, October 21, 1997)

In addition to the evidence that DLC identified itself with the Democratic Party, and was founded by key Democratic elected officials and that its Chairmanship was consistently held by elected Democratic officials, we note that the national ticket of the Democratic party for the last three elections included only officials prominently affiliated with DLC. President Clinton, the successful Democratic candidate for President in 1992 and 1996, was a founder of DLC and served as its Chairman. Al Gore, the Democratic Vice Presidential candidate in 1992 and 1996 and the Democratic Presidential candidate in 2000 was an active member of the DLC. Senator Joseph Lieberman, the Democratic Vice Presidential candidate in 2000 served as Chairman of the DLC.

**Law**

Organizations described in section 501(c)(4) include organizations not organized for profit but operated exclusively for the promotion of social welfare. Treas. Reg. 1.501(c)(4)-1(a)(2)(i) states that an organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. Primarily benefiting a private group, instead of the community as a whole, causes an organization not

USA1856

12

to be operated exclusively to promote social welfare and, therefore, not to be described in section 501(c)(4). Determining whether an organization primarily benefits a private group or the community as a whole requires a balancing of any benefits an organization provides to a private group against the benefits provided to the community.

The amount and type of benefit to select individuals that may be provided by organizations otherwise described in section 501(c)(4) has often been considered in the context of member benefits. One focus is on the benefit to members receiving goods and services in their personal capacity. The Fourth Circuit Court of Appeals held that an organization providing housing on a cooperative basis did not exclusively promote social welfare as defined in section 501(c)(4) because it benefited a private group of individuals, not the community as a whole. Commissioner v. Lake Forest, Inc., 305 F.2d 814 (4th Cir. 1962).

In Rev. Rul. 73-306, 1973-2 C.B. 179, an organization representing only member-tenants of an apartment complex is not described in section 501(c)(4) because it is operated essentially to benefit its members and is not primarily engaged in activities for the common good and general welfare of the community.[1] Cooperative-type organizations allowing members to purchase groceries on a cooperative basis discussed in Rev. Rul. 73-349, 1973-2 C.B. 179, or to exchange personal services with other members discussed in Rev. Rul. 78-132, 1978-1 C.B. 157, are not exempt under section 501(c)(4) because they are operated primarily for the benefit of members. Balanced against member benefits, any community benefits provided by these organizations are not sufficient to meet the requirement that a section

---

[1] In contrast, Rev. Rul. 80-206, 1980-2 C.B. 185, concludes that an organization promoting tenants' rights in a community qualifies for exemption under section 501(c)(4) because it promotes the common good and general welfare of the community. Rev. Rul. 80-206 characterizes the activities of the organization in Rev. Rul. 73-306 as directed primarily toward benefiting its member-tenants.

USA1857

13

501(c)(4) organization be operated primarily for the common good and general welfare of the community.

Another focus in section 501(c)(4) cases is on the benefit to members in their professional capacity from receiving related goods and services or from providing related goods and services. In Contracting Plumbers Cooperative Restoration Corp. v. United States, 488 F.2d 684 (2d Cir. 1973), cert. denied, 419 U.S. 827, 685, 687 (1974), the Court of Appeals held that an organization assisting member plumbers in their profession by repairing the cuts they made in city streets was not exempt under section 501(c)(4). The court concluded that the organization was not primarily devoted to the common good because it provided substantial benefits to its private members that were different than those benefits provided to the public. The basis for this holding was 1) the plumbers' apparent business interest in forming the organization, 2) the mutual aid purpose of the organization indicated in its bylaws, 3) the substantial member benefits evidenced because the organization provided members better services at cheaper prices than would have been eventually charged by the city while providing no services to nonmembers, and 4) the receipt by members of economic benefits precisely to the extent they used and paid for the organization's services.[2] Id. at 686-687.

In Rev. Rul. 79-316, 1979-2 C.B. 228, benefits provided to members in their professional capacity by a spillage control organization do not preclude its exemption under section 501(c)(4). The spillage control organization was created to prevent liquid spills within a city port area and to develop a program for the containment and cleanup of liquid spills that do occur. When cleaning up spills, the organization charges both members and nonmembers only for the cost of labor, supplies, and equipment, and charges the U.S. Coast Guard only for labor when cleaning up spills of unknown origin. The organization benefits the entire community by protecting marine life and shore front property. Nonmembers who ship and store liquids in the port area, as well as members, benefit because the organization charges nonmembers the same price as members for cleanup

---

[2] The court used the last reason to distinguish this case from Monterey Public Parking Corporation v. United States, 321 F. Supp. 972 (N.D. Cal. 1970), aff'd, 481 F.2d 175 (9th Cir. 1973).

USA1858

14

services, prevents deterioration of the port community, aids
compliance with applicable state law, and lowers port area
insurance rates.  Rev. Rul. 79-316 concludes that the
organization primarily benefits the community while only
incidentally benefiting members.

In another case, the courts considered whether benefits
provided to member-businesses by Monterey Public Parking
Corporation ("MPPC") precluded exemption under section 501(c)(3)
and section 501(c)(4).  A California district court held that
MPPC was exempt under section 501(c)(4) (and section 501(c)(3)),
and the Ninth Circuit Appeals Court affirmed their decision.
Monterey Public Parking Corporation v. United States, 321 F.
Supp. 972 (N.D. Cal. 1970); aff'd, 481 F.2d 175 (9th Cir. 1973).
The district court described MPPC as formed to construct and
operate a needed public automobile off-street parking facility in
a downtown area, that many felt, the government could not afford
to construct itself.  The court also found that the public,
businesses, or private persons could buy validation stamps
allowing the rental of parking spaces for seven cents per hour,
while cash rates were more expensive.  Based on these findings of
fact, the court held that the organization was entitled to
exemption under section 501(c)(3) and section 501(c)(4) because
the city was the primary beneficiary of the parking lot.[3]  The
court concluded that the benefit to organizers was
indistinguishable from that which inured to the entire community.

In Rev. Rul. 78-86, 1978-1 C.B. 152, we state that the
Service will not follow the 9th Circuit's decision in the
Monterey Public Parking Corporation case.  This revenue ruling
indicates that when merchants join together to encourage the
public to patronize their stores by providing parking for their
customers at a reduced rate,[4] then the benefit to the merchants
precludes exemption under section 501(c)(4) and section
501(c)(3).[5]  In contrast to the district court's finding that
anyone could purchase discount parking validation stamps, Rev.

_____

[3]  In arriving at this conclusion, the court ignored the
government's argument that operating a commercial enterprise
constitutes a per se bar to exemption under section 501(c)(4).

[4]  Rev. Rul. 78-86 also stated that the names of
participating merchants were advertised by printing them on
parking vouchers and on signs at the parking facility.

[5]  Moreover, carrying on a business with the general public
in a manner similar to for-profit organizations precludes
exemption under section 501(c)(4).

15

Rul. 78-86 states that participating merchants could purchase parking validation stamps for their customers that cost the merchants $.18 per hour of parking while the public paid $.25 per hour.

In contrast to Rev. Rul. 78-86, Rev. Rul. 81-116 concludes that an organization with a broad based membership that provides and maintains free off-street parking to anyone visiting the downtown business district qualifies for exemption under section 501(c)(4). This organization promotes social welfare by relieving congested parking conditions in the downtown area and providing free parking without using public funds. Inclusion of local merchants, businessmen, churches, civic organizations, and other interested individuals and organizations in the organization's membership indicates that the organization does not operate for the benefit of its members. Moreover, Rev. Rul. 81-116 notes that the organization does not benefit members because they are not favored by the manner in which the parking lots are located, nor are parking spaces reserved for the members, their tenants, or their customers.

Benefit to members is a key factor precluding the exemption under section 501(c)(4) of an individual practice association ("IPA").[6] Rev. Rul. 86-98, 1986-2 C.B. 74. The IPA in Rev. Rul. 86-98 negotiates agreements with HMOs on behalf of member physicians under which its members provide medical services to HMO member patients. The agreements also require the IPA to perform necessary administrative claims services.[7] Rev. Rul. 86-98 concludes that the primary IPA beneficiaries are its member-physicians rather than the community as a whole. The IPA benefits member-physicians by functioning like a billing and collection service, and a collective bargaining representative for them. Moreover, the IPA does not benefit the community by providing HMO patients access to otherwise unavailable medical care, and does not provide care below the customary and reasonable charges of members in their private practices.

---

[6] Another key factor precluding exemption is the similarity of IPAs to for-profit organizations.

[7] The HMOs pay the IPA a capitation amount based on the number of HMO subscribers entitled to receive medical services from the IPA. Then, the IPA reimburses member physicians on a fee-for-service basis according to a fee schedule minus a withhold (that can be used to cover any IPA deficit at the end of the year).

USA1860

16

The above cases and rulings confirm the principle established in the section 501(c)(4) regulations that organizations described in section 501(c)(4) must primarily promote the common good and general welfare of the people of the community as a whole rather than benefit select individuals such as members. A sufficient amount of benefit to select individuals will preclude an organization that would otherwise qualify from being described in section 501(c)(4).

The above discussion provides several examples of the select groups of individuals that may not be primarily benefited by organizations claiming to be described in section 501(c)(4). A select group may exist only by virtue of membership in the organization, such as the grocery or personal service cooperative in Rev. Rul. 73-349 and Rev. Rul. 78-132. A select group may also relate to members' professional interests[8] such as the plumbers in Contracting Plumbers, the merchants in Monterey Public Parking, or the physicians in Rev. Rul. 86-98.

When determining whether the benefit to select individuals precludes exemption because the organization does not primarily promote social welfare, the Service must first identify the benefits to select individuals. Then the Service must balance an organization's benefits to the community as a whole against its benefits to the select individuals. In the above section 501(c)(4) cases regarding organizations benefiting members in their professional capacity, public benefit resulted from providing services that generally benefited the public (repairing cuts in city streets, preventing and cleaning up liquid spills, negotiating contracts to provide medical services, and providing downtown parking). The benefit to select individuals in these cases resulted from the organization directly serving members in their professional capacity by providing them goods and services (cut repair, spill cleanup, and contract negotiations) or indirectly serving members by providing the public goods and services (downtown parking).

One factor indicating whether an organization primarily benefits a private group rather than the community as a whole is whether an organization's activities focus on or provide significant (or exclusive) benefits to the private group that are not provided to others. In Contracting Plumbers, the

---

[8] Providing services to members in their professional capacity also raises issues of whether the organization is operating similar to for-profit organizations. See Rev. Rul. 86-98 (IPAs similar to for-profit corporations).

USA1861

17

organization primarily benefits members because it provides substantial and different benefits to the public and to members. This organization provides member plumbers services to the extent that they use and pay for them and it provides no services to nonmembers.  The organization in Contracting Plumbers also provides members better services at cheaper prices than would have been charged by the city.

In Rev. Rul. 79-316, the spillage control organization primarily benefits the community because it works to prevent oil spills by members and nonmembers, charges members and nonmembers the same price for cleanup services, provides cleanup services that were not commercially available or feasible, and charges the U.S. Coast Guard a reduced rate when cleaning up spills not paid for by the responsible party.  Rev. Rul. 78-86 concludes that the parking organization primarily benefits merchant members by providing them parking vouchers for their customers at a lesser price than the public pays for parking and by listing the names of the merchants on parking vouchers and on signs at the parking facility.

The parking organization in Rev. Rul. 81-116 primarily benefits the community because it maintains free off-street parking to anyone visiting the downtown business district, members are not favored by where the parking lots are located, nor are parking spaces reserved for the members, their tenants or their customers.

The IPA in Rev. Rul. 86-98 that operates primarily to benefit member physicians only provides contracting and administrative claims services to member physicians.  The IPA does not benefit the community by providing HMO patients access to otherwise unavailable medical care, and does not provide care below the customary and reasonable charges of members in their private practices.

A second factor indicating whether an organization is primarily benefiting a private group or the community as a whole is who creates the organization.  For example, the creators of the organization in Contracting Plumbers are plumbers, and the creators of the organization in Rev. Rul. 78-86 are the merchants in the business district.  The street repairs and parking facilities in these cases directly benefit the creators.  The fact that these organizations are created only by persons who will directly benefit is an indication that the organization is primarily benefiting the private group.

USA1862

18

A third factor indicating whether an organization is primarily benefiting a private group or the community as a whole is whether a select group make up the primary membership of the organization. For example, members consist only of New York City plumbers in Contracting Plumbers, local downtown businesses in Rev. Rul. 78-86 , and licensed physicians who actively practice medicine and are members of a specified county medical society in Rev. Rul. 86-98. Including members from outside of the professional group assisted is a characteristic of primarily benefiting the community. This broader membership is a factor in exemption for the spillage control organization in Rev. Rul. 79-316 and the parking organization in Rev. Rul. 81-116. The exempt spillage control organization members include business firms that store or ship liquids in the port area and two government instrumentalities which operate port terminal facilities. The city fire department and the U.S. Coast Guard are associate members of the spillage control organization. In Rev. Rul. 81-116, the exempt parking organization membership includes local merchants and businessmen, churches, civic organizations, and other interested individuals and organizations.

A fourth factor indicating whether an organization is primarily benefiting a private group or the community as a whole is control of the organization. Sharing of control by the professional group members benefited with outside persons representative of the community as a whole is a characteristic of organizations described in section 501(c)(4). In Rev. Rul. 86-98, the nonexempt organization's membership elects an executive committee that manages the organization's activities. The organization's bylaws require that a majority of this executive committee be members. Contracting Plumbers only states that the nonexempt plumbers organization operates in coordination with the Department of Highways. Rev. Rul. 79-316 indicates that the exempt spillage control organization is governed by a board that represents their diverse members but not associate members. The spillage control organization also works under the supervision of the Coast Guard when cleaning up oil spills.

A fifth factor in determining whether an organization primarily benefits a private group rather than the community as a whole is whether the private group benefited provides the primary resources for the organization. The member plumbers fund the nonexempt organization in Contracting Plumbers by paying for the repair services individual members receive. The income of the nonexempt IPA in Rev. Rul. 86-98 is derived from its contracts governing member physician services to HMOs. In Rev. Rul. 78-86, most of the nonexempt parking organization's income was derived

USA1863

19

from the sale of parking stamps to participating merchants. The exempt parking organization in Rev. Rul. 81-116 receives income from contributions and membership dues. The exempt spillage control organization in Rev. Rul. 79-316 raises funds by charging members dues based on the quantity of spillable liquid each member stores or ships in the port area, charging for part or all of the cost of spill cleanups.

In summary, the factors relevant to determine whether for purposes of section 501(c)(4) an organization primarily benefits a private group, rather than the community as a whole, include whether a private group: 1) is the focus of or receives significant (or exclusive) benefits from the organization's activities, 2) creates the organization, 3) makes up the primary membership of the organization, 4) controls the organization, and 5) provides the primary resources for the organization.

Treas. Reg. 1.501(c)(4)-1(a)(2)(i) indicates that an organization described in section 501(c)(4) must primarily benefit the community and not primarily benefit a private group. Treas. Reg. 1.501(c)(3)-1(c)(1) provides that an organization described in section 501(c)(3) must engage primarily in activities which accomplish exempt purposes. Accomplishing exempt purposes under section 501(c)(3) requires that no more than an insubstantial amount of an organization's activities further nonexempt purposes. The Supreme Court concluded that the presence of a single substantial non-charitable purpose precludes exemption regardless of the number or importance of charitable purposes. Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279, 283 (1945). Treas. Reg. 1.501(c)(3)-1(d)(1)(ii) provides that furthering exempt purposes requires serving a public rather than a private interest. Consequently, an organization described in section 501(c)(3) may not substantially benefit private interests.

In American Campaign Academy v. Commissioner, 92 T.C. 1053 (1989) (ACA), the Tax Court concluded that an organization which ran a school to train campaign professionals was not described in section 501(c)(3) because it conferred substantial private benefits on Republican entities and candidates. An organization described in section 501(c)(4) may not primarily benefit a private group, but an organization described in section 501(c)(3) must meet the more difficult standard of not providing a substantial benefit to private interests.

Rev. Rul. 75-286, 1975-2 C.B. 210, illustrates that more benefit may be provided to a private group under section 501(c)(4) than under section 501(c)(3). Rev. Rul. 75-286

concludes that an organization with membership restricted to residents and business operators of a city block that works in cooperation with the local government to preserve and beautify public areas in the block is described in section 501(c)(4), but not in section 501(c)(3). The organization is described in section 501(c)(4) because it primarily benefits the community. However, the organization is not described in section 501(c)(3) because the restricted membership and limited public area improved serve the private interests of its members.

The facts used in ACA to determine the campaign school conferred substantial private benefits on Republican entities and candidates under section 501(c)(3) are consistent with the factors that indicate benefit to private interests, rather than the community as a whole, under section 501(c)(4). With regard to its creation, the organization was incorporated by the General Counsel of the National Republican Congressional Committee (NRCC), and was an outgrowth of a program run by the NRCC. With regard to control, the organization had two of three initial directors with significant ties to the Republican party (an executive director of NRCC and a Republican National Committee member). With regard to focus and receipt of benefits, the organization had several courses focusing on topics related to the Republican Party and none focused on the Democratic Party, appeared to have had a substantial number of admissions panel members who were Republican, and had graduates who appeared to serve exclusively on the campaigns of Republican candidates.

With regard to resources, the National Republican Congressional Trust exclusively funded the organization and the NRCC contributed some physical assets to the organization. ACA illustrates the consideration of the factors applicable to both sections 501(c)(3) and 501(c)(4) in a situation where there is benefit to a political party.

While the amount of benefit that may be provided under section 501(c)(4) is greater than the amount provided under section 501(c)(3), factors indicating benefit to a private group under section 501(c)(4) or to a private interest under section 501(c)(3) are similar. As discussed above, these factors involve creation, membership, control, focus or benefits, and resources. In addition, ACA and Lake Forest conclude that benefiting a large number of people is not sufficient to prove benefit the community at large. Lake Forest concludes that affecting a large physical area is also not sufficient.

USA1865

21

## Legal Analysis

The factors relevant to determine whether for purposes of section 501(c)(4) an organization primarily benefits a private group, rather than the community as a whole, include whether a private group: 1) is the focus of or receives significant (or exclusive) benefits from the organization's activities, 2) creates the organization, 3) makes up the primary membership of the organization, 4) controls the organization, and 5) provides the primary resources for the organization. We consider these factors with regard to the DLC below.

### 1) is the focus of or receives significant (or exclusive) benefits from the organization's activities:

The DLC primarily benefits New Democrat office holders affiliated with the DLC and has secondarily benefited the Democratic Party. The DLC benefits New Democrat office holders by helping them to continue and advance their political careers. The DLC has also benefited the Democratic Party by assisting New Democrat elected officials in their political careers and ultimately helping the Democratic Party to recapture the White House through the election of New Democrats prominent in the DLC to the office of President and Vice President. The DLC works with New Democrat elected officials to create an ideological message (or political platform) for use by New Democrats involved in the DLC and to identify New Democrats with this message. This message developed by DLC for Democratic elected officials affiliated with DLC is characterized by DLC as an alternative to the traditional left-right debate between liberal Democrats and conservative Republicans.

The DLC primarily benefits a select group of individuals in their professional capacity. This select group primarily consists of New Democrat office holders affiliated with the DLC. The DLC benefits affiliated New Democrat office holders by helping them to continue to win elections and, thereby, to continue their political careers. The electoral prospects of affiliated New Democrats are strengthened because of direct benefits from receiving services themselves and indirect benefits from DLC disseminating information tailored to furthering their political careers to the public.

The affiliated politicians benefit when the DLC helps them to develop an ideological message, to generate public support for their positions and themselves, and to move the Democratic party

USA1866

toward their moderate position.  Sharing resources, discussing among themselves, and disseminating information to the public allowed the affiliated politicians to develop an ideological message through the DLC and to generate public support for their positions and themselves.  Developing ideological messages and generating this support directly enhances their reelection chances and their possible advancement to higher office, all furthering the professional political careers of office holders affiliated with the DLC.  Public dissemination of this message by the DLC and the combined political clout of these politicians helped move the Democratic party toward the moderate position of the New Democrats affiliated with the DLC.

The DLC has secondarily benefited the Democratic Party by working with New Democrat elected officials to craft an ideological message that helped New Democrats affiliated with the DLC to recapture the White House and succeed in office.  The word Democrat in the name of the DLC also indicates the focus of the organization on the Democratic Party.  The DLC has changed over time from an organization seeking to move the Democratic Party toward a more moderate position to an organization that expresses the dominant position of the Democratic Party.  DLC officers and members have become the top elected officials and candidates of the Democratic Party.  The United States President Bill Clinton and Vice President Al Gore from 1992 until 2000 were associated with the DLC and the Democratic Presidential Candidate Al Gore and Vice Presidential Candidate Joe Lieberman in the 2000 election were from the DLC.  Bill Clinton was formerly DLC Chairman when he was Governor of Arkansas and was involved in the founding of the DLC.  Joe Lieberman was DLC Chairman.  Al Gore was an active member of the DLC.

The DLC works with New Democrat elected officials to create an ideological message (also a political platform) for New Democrats and to identify New Democrats with this message.  This focus permeates the DLC's activities.  The DLC's material identifies the DLC with New Democrats and the Democratic Party, indicates that it is working to improve the Democratic Party, portrays Democrats as its target audience, and favorably portrays New Democrats, especially, during the years at issue, President Clinton, a DLC founder and former Chairman.  The DLC credits its message with the electoral successes of New Democrats and the Democratic Party.

The 1997 DLC Web site describes the DLC as a national voice that is reshaping American politics my moving beyond the old left-right political debate. Under the leadership of co-founder and President Al From, the DLC is helping to rebuild a new Democratic

23

majority ready for the challenges of the Information Age.

The 1997 DLC Web site reprinted the beginning of John Hale's article in the Political Science Quarterly entitled AThe Making of the New Democrats. The article concludes that the story of the New Democrats is, in large part, the story of the [DLC], an unofficial party organization of elected Democrats.   The article also noted that the DLC's goal was to move the National Democratic party toward the political center in order to break the Republican hold on the White House and it succeeded in making Bill Clinton a more appealing and successful presidential candidate.  With regard to how the DLC benefits New Democrat elected officials, the article states that unofficial groups that focus on party policy serve the needs of the party's elected officials by providing them with much-needed policy ideas and analysis that individual politicians lack the means to generate for themselves.

The DLC activity includes newsletters, magazines, annual conferences, lunch series, commissioning surveys, and maintaining a web site.  The web site makes available information such as DLC newsletters, copies of the DLC magazine, selected newspaper articles, survey information, speeches of New Democrat office holders, book notes, PPI (DLC's affiliated section 501(c)(3) organization) documents, documents from state DLCs, and other information on the DLC and PPI. Some information was not created in 1997 or 1998 but was posted on the web site in 1997 and 1998.

The DLC magazine "The New Democrat" has articles on various topics.  These are written by DLC and PPI staff and by some who were not employees.  These non-employee authors include Democratic Mayor of Milwaukee John O. Norquist, New Democrat Kathleen Townsend Lt. Gov. of Maryland, former Democratic Senator Bill Bradley, Senator Bob Kerrey (D-NE), former Chairman of the Michigan Democratic Party Morley Wingrad, Congressman Marty Meehan (D-MA), Democratic State Representative Antonio R. Riley of Wisconsin, Senator and DLC Chairman Joseph Lieberman (D-CT), New Democrat and former Congressman Timothy J. Penny, Senator John Breaux (D-LA), Senator John Kerry (D-MA), and Congressman Jim Moran (D-VA).

In addition, authors of articles in the "Blueprint" magazine introduced in 1998, include William Galston former Deputy Assistant for Domestic Policy for President Clinton, Elaine Kamarck, former Senior Policy Advisor for Vice President Gore, Mark Penn, pollster for President Clinton and Vice President Gore, Daniel Pink, former chief speech writer for Vice President

USA1868

24

Gore, Andrei Cherny, former chief speech writer for Vice President Gore, and Robert Litan, former Deputy Assistant attorney General and Associate Director of the Office of Management and Budget under President Clinton.

The 1997 and 1998 surveys commissioned by the DLC allowed the DLC to craft a message tailored to current Democratic voters, affirm the actions of its former Chairman President Clinton, affirm their existing positions, and consider campaign strategy supportive of New Democratic office holders affiliated with the DLC.  Consequently, the surveys would allow the DLC to provide a significant benefit to New Democrat office holders and also the Democratic Party.

The DLC commissioned pollster Mark Penn and his company Penn, Schoen & Berland Associates, Inc. to conduct surveys that considered the new demographics and attitudes of Democrat voters. Mark Penn is identified as President Clinton's pollster in the January 7, 1997 AThe DLC Update. These surveys included a poll and analyzed national election results. The surveys allowed the DLC to craft a New Democrat message that would be tailored to the demographics and attitudes of current Democratic voters. It noted that President Clinton's efforts have brought a new sense of optimism and confidence to the country, and they are transforming the Democratic Party. In a forward attached to the 1997 survey results, Al From (DLC President) remarked that the survey confirms that most self-identified Democrats today hold decidedly New Democrat views.

Al From also noted that the survey confirmed that what's right for the country substantively is right for the Democratic Party politically. As a result of 68 percent of Democrats saying that they look for answers in the political center, the survey notes that a Democrat vying for the presidency need no longer think in terms of running to the left in the Democratic primaries and then moving back to the political center which remains the most fertile territory in the general election.

The DLC newsletters identify the DLC with the Democratic Party, support President Clinton, and report on New Democrat activity.  The DLC newsletters identify the DLC with the Democratic Party.

The DLC newsletters support the work of one of its founders and its former chairman Bill Clinton as United States President. The January 7, 1997 ADLC Update notes that the failure of Democrats to retake Congress was heavily influenced by the lingering perception that congressional Democrats are not ready

USA1869

25

to follow the President. The same newsletter defends President
Clinton's proposals as practicable and popular. The March 11,
1997 DLC Update states that the President is trying to talk about
issues, but no one in Washington is listening. The DLC lobbied
for fast track authority for President Clinton, not just fast
track authority for a president as noted in the April 15, 1997
DLC Update.  The April 22, 1997 DLC Update laments that some in
the Democratic leadership attack the President when he tries to
act boldly.

The DLC newsletters report on New Democrat activity.  The
July 1, 1997 newsletter announced political appointments of state
DLC persons.  The March 11, 1997 DLC Update announced formation
of the New Democrat Coalition which consisted of 32 Democratic
Members of the House.  The Update states that the Coalition is
heeding the conclusion of presidential pollster March Penn that
congressional Democrats still suffer from the perception that
they have not followed Bill Clinton in replacing the old tax-and-
spend, big-government thinking of traditional liberalism with a
new approach. This is a conclusion reached in the study of
Democratic voters done for the DLC.

In answer to the question of how can the DLC help New
Democrats in Congress, the April 22, 1997 DLC Update reports that
the DLC began a weekly midweek issues fax called The DLC
Briefing, A New Democrat Perspective on the Issues from the
Democratic Leadership Council" that were aimed at providing New
Democrat language and political analysis on a variety of issues.
These DLC Briefings issued both in 1997 and 1998 are identified
as "a service providing a concise New Democrat perspective on
national issues that are of immediate interest to policymakers."
Each DLC briefing has the following sections: "What's Happening,"
"New Democrat Principles," "The Politics," and "Talking Points."
Some of the statements in these DLC Briefings include:

> Finally, New Democrats should oppose any effort to
> defer the fast track legislation through some short-
> term or "one agreement" grant of temporary negotiating
> authority.  (September 30, 1997)

> New Democrats should oppose such a preemptive strike,
> and wherever possible link Republican efforts to
> experiment with vouchers and other private - school
> choice options to the acceptance of the national
> standards that could make such experiments effective.
> (September 4, 1997)

USA1870

26

The key for New Democrats is to focus not on
perpetually maintaining decades-old labor laws, but
working on their overriding object: worker empowerment
(July 24, 1997)

New Democrats should support the Senate's decisions to
raise the retirement age of Medicare beginning in 2003
(supported by 12 Senate Democrats) and to apply any
affluence test for premiums (supported by 21 Senate
Democrats).   (June 27, 1997)

Democrats should fight to make the tax package an
instrument for positive social and economic policy, as
well as tax relief.  (June 12, 1997)

This budget agreement is critical to our country's
economic future, and crucial to the Democratic Party's
political future.  (May 8, 1997)

Submission of a balanced federal budget is a signal
accomplishment for the country, for Democrats, and for
the New Democrat movement... (February 10, 1998)

New Democrats should continue to push for a radically
simplified system in which all students can earn grants
(or work off loans) in exchange for service to the
community.  (April 1, 1998)


The 1997 and 1998 DLC annual conferences gave New Democrat
elected officials, many of whom are DLC officers and members, an
opportunity to develop and publicize the New Democrat ideological
message.  The web site publishes some of the speeches of DLC
officers and members who are elected Democratic officeholders.
There are several examples of speeches that clearly identify the
DLC with the Democratic Party.  In his opening remarks DLC
Chairman Senator Lieberman stated "[a]t our best, we, in the
Democratic Leadership Council, are the Democratic Party's Main
Street."  DLC's president Al From stated in his speech at the
1997 DLC annual conference that:

We have been instrumental to the success of our
nation's first two-term Democratic President since
Franklin Roosevelt.  We have become the prime source of
intellectual leadership and innovation for a political
party that once seemed hopelessly wedded to the status
quo.  We've begun to move the Democratic Party from the

USA1871

27

hard left and move it back into the vital center of American politics.

In sum, in the information age, the best way to further the enduring values of the Democratic Party is by promoting new Democratic ideas and governing as new Democrats. Governing as new Democrats not only furthers our party's most cherished values, but it works. As President Clinton and Vice-President Gore have shown, it works for our country and it works for the Democratic Party.

During the 1998 DLC conference the following statements were made by DLC president Al From:

We gather this morning at a time of great triumph, of great opportunity, and of great challenge for the New Democrat Movement.

Our triumph is the New Democrats, led by President Clinton and Vice President Gore, have redefined the center of American politics and in doing so we've also redefined our party.

Let me be very clear about why we're here and what the DLC is about. Our mission is to ensure that the New Democratic politics that has dominated our party for the last six years continues to be the defining politics for the Democratic Party and for our country after President Clinton leaves office in 2001.

President Bill Clinton delivered the Keynote Address at the 1997 DLC Annual Conference. The October 30, 1997 DLC Update reported on the 1997 DLC Conference that President Bill Clinton cited his economic record as a signal New Democratic achievement and credit[ed] the DLC with a key role in developing his [New Economy] strategy. The DLC Update reported that several speakers were appealing for fast track trade negotiating authority for President Clinton. The Update also reported that presidential pollster Mark Penn spoke on the changing nature of the Democratic electorate. At the DLC Leadership Dinner following the conference, the Update noted that Vice President Al Gore thank[ed] the DLC for making it possible for Democrats to reconnect with the middle class.

Vice President Al Gore delivered the 1998 Keynote Address and stated that "[t]ogether with the DLC and the American electorate, we did what we promised - and that promise was

USA1872

ambitious."

## 2) creates the organization

The DLC Articles of Incorporation identify the DLC directors
as Charles Robb, Senator Sam Nunn, and Congressman Richard
Gephardt.  Arkansas Governor Bill Clinton was also a DLC founder.
The DLC's Form 1024 stated that the DLC was founded by federal
and state elected officials of the Democratic Party who were
concerned with the direction of their party.  These facts clearly
indicate that DLC was founded by prominent Democratic elected
officials.

## 3) makes up the primary membership of the organization

Although the DLC does not keep record of the political
affiliations of its members, the 1997 DLC web site, when
describing the DLC, states that A[o]ne in ten Democratic
legislators is now a member of the DLC.

In addition, the 1998 web site lists all the New Democrat
Senators in the United States Senate and identifies these
Senators as "Our friends in the Senate."

## 4) controls the organization

In 1997 and 1998, Senator Joe Lieberman (D-CT) was the DLC
Chairman and Governor Roy Romer (D-CO) was Vice Chairman.  In
1998, Roy Romer was also Chairman of the Democratic National
Committee (DNC).  With a Chairman who was a prominent New
Democratic elected official soon to be the Democratic Vice
Presidential candidate in 2000 and a Vice Chairman who was a
prominent New democratic elected official and Chairman of the
DNC, the primary organization of the National Democratic party,
there is little doubt that the DLC was controlled by New
Democratic office holders in 1997 and 1998.

The 1997 Survey commissioned by the DLC entitled The New
Democratic Electorate reported that prior to the 1997 DLC chair
Sen. Joseph Lieberman, past chairs include former U.S. Rep. Dave
McCurdy of Oklahoma, Sen. John Breaux of Louisiana, President
Bill Clinton, Sen. Sam Nunn of Georgia, Sen. Charles Robb of
Virginia, and House Minority Leader Richard Gephardt of Missouri.

5) provides the primary resources for the organization

In 1997 and 1998, the DLC received contributions from corporations and individuals, and also received fees from those who attended its conferences. Corporate donors and some individual donors made contributions of thousands of dollars that were arguably intended to support the policies and/or professional careers of New Democrat elected officials closely associated with or running the DLC. Most DLC contributions in these years were over $5,000 each and these contributions were mostly from corporations. The contributions of several donors were in the tens of thousands each, while some others had contributions of a hundred thousand dollars or more in 1997 and 1998.

Moreover, it is unclear whether fundraising contract lists were originally derived from New Democratic elected officials affiliated with the DLC. While the DLC reported that it did not obtain donor lists from elected officials in 1997, it is not clear that the DLC did not receive donor lists from these sources in earlier years. The Form 1024 (exemption application) provided that active member elected officials pay $1,000 and Board of Advisors members contribute $10,000 per year or assist the DLC in raising these funds. The Form 1024, however, also noted that 40% of the officeholders enlisting as members did not pay the $1,000 a year in dues. The Form 1024 provided that the dues of $1,000 a year were mainly intended to recruit public officials into DLC activities.

In addition, during 1997 and 1998, elected officials of the Democratic Party, or previous members of their staff, contributed articles to DLC's magazines, including: Democratic mayor of Milwaukee John O. Norquist, New Democrat Kathleen Townsend Lt. Gov. of Maryland, former Democratic Senator Bill Bradley, Democratic Senator Bob Kerrey, former Chairman of the Michigan Democratic Party Morley Wingrad, Congressman Marty Meehan (D-MA), Democratic State Representative Antonio R. Riley of Wisconsin, DLC Chairman Joseph Lieberman (D-CT), New Democrat and former Congressman Timothy J. Penny, Senator John Breaux (D-LA), Senator John Kerry (D-MA), Congressman Jim Moran (D-VA), William Galston former Deputy Assistant for Domestic Policy for President Clinton, Elaine Kamarck, former Senior Policy Advisor for Vice President Gore, Mark Penn, pollster for President Clinton and Vice President Gore, Daniel Pink, former chief speech writer for Vice President Gore, Andrei Cherny, former chief speech writer for Vice President Gore, and Robert Litan, former Deputy Assistant attorney General and Associate Director of the office

of management and Budget under President Clinton.

## Conclusion

Applying the factors derived from the cases analyzed, we conclude that the DLC primarily benefits affiliated New Democrat elected officials (and secondarily the Democratic Party) rather than the community as a whole. Although the DLC provides some benefit to the community by disseminating information and encouraging public debate, this benefit is outweighed by the primary benefit provided to New Democrat elected officials. Consequently, the DLC is not described in section 501(c)(4) because it is not operated exclusively to promote social welfare. The benefit to affiliated New Democrat elected officials (developing ideological message, moving the Democratic party toward their position, and generating public support for their positions and themselves, using the name of a specific political party (Democrat) in the organization's name); formation, control and membership by affiliated elected officials; and the source of resources indicate that the primary activity of the DLC is benefiting related New Democrat elected officials.

We finally note that the fact that elected officials from one named political party were dominant in the creation, control and policies of the DLC are the key factors in our conclusion that DLC is not described in section 501(c)(4). In contrast, organizations involved in public policy debate and legislative activities that are not created or controlled by elected officials of a named political party are often described in section 501(c)(4), even when their considerations are focused on issues also considered in the political arena. Also, the involvement of elected officials in the creation or activities of an organization does not preclude that organization from being described in section 501(c)(4) where the organization is primarily promoting the common good and general welfare of the people of the community rather than the professional interests of the elected officials and their political party.

Therefore, since the DLC did not operate exclusively to promote social welfare, and was not an organization described in section 501(c)(4), DLC should filed Forms 1120 for its 1997 and 1998 taxable years and reported the tax liability reflected on the Form 5278 enclosed.

USA1875