# Exhibit J

Explanation of Adjustments
Schedule 1-A

Democratic Leadership Council, Inc.                    52-1384530

**Issue:**

Whether the Democratic Leadership Council (DLC) failed to be an organization under I.R.C. Section 501(c)(4) in 1999 because it primarily benefited affiliated New Democrat elected officials, with a secondary benefit to the Democratic Party, rather than primarily benefiting the community as a whole.

**Facts:**

The Democratic Leadership Council, Inc. (hereafter "DLC") was organized in 1985. DLC was founded by prominent members of the Democratic Party. On DLC's Articles of Incorporation the DLC Directors are identified as Charles Robb, Senator Sam Nunn, and Congressman Richard Gephardt. Additionally one of the founders of DLC was then Arkansas Governor Bill Clinton.

DLC's Form 1024 (Application for Recognition of Exemption), dated November 8, 1985, states the DLC was founded by Federal and State elected officials of the Democratic Party who were concerned with the direction of their party. In the Articles of Incorporation attached to the Form 1024, the purpose of the DLC is described as "bringing about civil betterments and social improvements."

In response to Part III, Question 12 on the Form 1024 DLC states that all funds of DLC are devoted to the stimulation of public policy dialogue inside and outside the Democratic Party under the leadership of elected officials of the party. To accomplish this undertaking DLC organized certain task forces devoted to the promotion of public policy formulation and debate. These task forces were the task force of National Defense and Strategy and the task force on Economic Growth and Competitiveness. Members of these task forces included Democratic elected officials Senator Lloyd Bentsen, Senator Sam Nunn, Governor Bruce Babbitt, and Governor Bill Clinton among others.

1


Plaintiff's 9
3-30-06  JFW

USA0913

Explanation of Adjustments
Schedule 1-A

Democratic Leadership Council, Inc.                     52-1384530

Attached to the Form 1024 is a DLC publication from October 1985 entitled "Winning in the World Economy." This publication discusses the results of a Wharton School of Business study on international trade. However, the preface of this publication states:

> The Council (DLC) is an unprecedented collaboration of elected Democrats at all levels: governors, senators, representatives, state legislators and mayors.
>
> Conceived as a catalyst for change - both within the Democratic Party and the nation - the DLC's fundamental aim is to explore new ways to advance our party's traditional commitment to growth and opportunity, national strength and social justice. Our basic premise is that elected leaders - whose ideas and convictions have been tested at the polls - must work in concert to articulate a new Democratic vision for tackling the challenges of the 1980's and 1990's.

The publication further states:

> While Democrats need not embrace every detail, we believe that the DLC's prescriptions, taken together, form a coherent strategy for putting America back on the offensive in international competition.
>
> Whatever the causes, we believe the ECI's overall economic measures amply justify our conclusions that America, under a Republican administration, is being routed in world trade.
>
> In sum, Republican fiscal and trade policies are turning America's winners-from basic industries to high tech enterprises, from farmers to manufacturing-workers into losers.

2

USA 0914

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**                      52-1384530

This publication concludes with the "Democratic Competitive Strategy" that recommends strategies Democrats should adopt. Although this publication was issued prior to the years under examination, it was an attachment to DLC's Form 1024 and indicated the type of publications intended to be produced by DLC from its founding.

DLC is financed by contributions from individuals and corporations. DLC also receives fees from people who attend its conferences. During 1999, DLC's revenues totaled $4,117,015, primarily from contributions and dues.

To inform its members and the general public of its activities, DLC issued newsletters, magazines, and provided various articles on its website. These newsletters called the "DLC Update" and "The DLC Briefing" were issued approximately once a week. Additionally, DLC published a magazine known as "The New Democrat Magazine" that was published bi-monthly and in 1999 published two editions of the "Blueprint Magazine."

DLC also conducts conferences. DLC's 1999 Annual Conference Leadership Dinner was held on October 13, 1999. The conference entitled "The Third Way: Progressive Governance for the 21st Century" was held on April 25, 1999. The DLC also sponsored the 1999 National Conversation on July 14, 1999. Speakers at these 1999 conferences included prominent elected officials of the Democratic Party including President Clinton, then Vice-President and 2000 Democratic Presidential Candidate Al Gore, and Senator and 2000 Democratic Vice-Presidential candidate Joe Lieberman, all of whom have had substantial involvement in DLC activities for many years, including President Clinton's involvement in the founding of DLC and serving as its Chairman.

Despite DLC's assertion that it is not associated with the Democratic Party, it is interesting that the organization adopted the "Democratic" Leadership Council as its name. DLC claims the name was selected because it was founded by federal and state elected officials who are Democrats and who were concerned with the direction of policy debate within the Democratic Party. Individuals who formed DLC and members of DLC are referred to by

3

Explanation of Adjustments
Schedule 1-A

Democratic Leadership Council, Inc.					52-1384530

DLC as "New Democrats."

Statements made by officers of DLC in 1999, specifically identify the DLC with the Democratic Party. Below are examples of some of these statements:

> Statement by DLC Chairman Senator Joe Lieberman during the 1999 DLC Annual Conference on October 14, 1999:
>
>> ...but also did it in a way that created a broad new political consensus within our own Democratic Party around ideas of fiscal responsibility and pro-economic growth, understanding that that means working with and being pro-business...
>
> Statement by DLC Chairman Senator Joe Lieberman in the October 18, 1999, DLC Update:
>
>> And just as America is well positioned to compete technologically in this shrinking world, so too, I believe, is the New Democratic movement well positioned to bring our party and our country to new common, constructive ground on this question.
>
> Statements by DLC President Al From during the 1999 DLC Annual Conference on October 14, 1999:
>
>> We began this decade hoping to end the Democratic Party's losing streak in presidential politics. We end it with a New Democratic president finishing his second successful term, and with our sights set on returning a transformed Democratic Party to its rightful place as the majority party in American Politics.
>>
>> After all we went through to modernize our party, we are not about to sit idly by and let the Republicans reclaim the vital center on the cheap.
>>
>> In the 1990s the New Democrats reversed our party's fortunes in presidential elections. Now we must set our sights on making a modernized Democratic party the

4

USA 0916

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**                       52-1384530

>
> majority party in America once again. Let's make the
> 21st Century the New Democratic century.
>
> We can do that if we keep our sights set on the future,
> we know that if we let our memories outweigh our hopes,
> then we will become the old. That will not happen,
> because we will not allow it to happen. It is the
> destiny of this New Democratic movement to remain young
> forever. The vital center starts here.

Statements by DLC president Al From during the July 14,
1999, DLC event "1999 National Conversation":

> ...we have reconnected our party with real legacy of
> Franklin Roosevelt, his thirst for innovation. We are a
> party that believes in activist government.

Statements on the DLC Website in 1999:

> The DLC's 1999 Annual Conference held Thursday, October
> 14th, at the Omni Sheraton Hotel in Washington, D.C.,
> highlighted strong Democratic support for an agenda
> that joins U.S. efforts to expand markets abroad with a
> domestic agenda that expands the winner's circle of the
> global economy's beneficiaries at home. (October 14,
> 1999)
>
> New Democrats should be proud of our leadership in
> moving our party and our country forward towards the
> challenge of the 21st century. (October 14, 1999)
>
> That's what the new Democratic movement and the DLC are
> all about. We are dedicated to tackling new challenges
> with new ideas that are anchored in our party's first
> principles. We want every Democrat involved in our
> movement, because every Democrat has an obligation to
> help keep our party's heritage vital. (Remarks by Al
> From dated April 22, 1999)
>
> So what I hope I'll do tonight is to try to tell you
> how to give the voters a compelling reason to vote
> Democrat. (Remarks by Al From dated March 13, 1999)

5

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**                              52-1384530

> We need to build a new majority, a New Democratic majority, because we are not going to do any of things if we don't get elected. So we've got to elect Democrats. (Remarks by Al From dated March 13, 1999)
>
> Today, the DLC is at the intellectual and political center of the New Democratic movement. We develop and promote ideas—and we shape political strategies. (Remarks by Al From dated January 13, 1999)
>
> In 1999, the DLC has a very clear mission: to ensure that the New Democratic politics that has dominated our party for the last six years, continues to be the defining politics for the Democratic Party and for our country after President Clinton leaves office in 2001. (Remarks by Al From dated January 13, 1999)

In each 1999 edition of the DLC magazine "The New Democrat," DLC president Al From authored a short essay known as the "Political Memo". Some of the statements in these essays include:

> The President (Clinton) best summarized our progress in his speech to the DLC last December. These words – opportunity, responsibility, community – came to identify and embody a new approach to government and politics, trying our oldest, most enduring values to the Information Age," he said. "We said we were New Democrats, and we called our approach the Third Way." (May/June 1999)
>
> Pundits are already handicapping the election, and Bush has a significant lead in the early polling. It's far too early to take those numbers too seriously. The early polls clearly understate Gore's strengths and overstate Bush's…The best way for Vice President Gore to reverse his standing in the early polls is to hammer away with the New Democratic message. (July/August 1999)

6

**Explanation of Adjustments**
**Schedule 1-A**

**Democratic Leadership Council, Inc.**                           52-1384530

> America is strong today because President Clinton had the vision and the courage to put so many New Democratic ideas into action-ideas that are making this a better, safer, and more prosperous country. New Democratic ideas shaped by the DLC and our affiliated think tank, the Progressive Policy Institute, have transformed the Democratic party…We succeeded because we offered new and innovative ways to further our party's cherished values and highest ideals…We made the 1990's the New Democratic decade. Let's make the 21st century the New Democratic century. We can do it if we keep our sights set on the future…It is the destiny of this New Democratic movement to remain young forever. The vital center starts here.  (November/December 1999).

In addition, in 1999, the DLC launched the DLC Leadership Workshops. The workshops are seminars designed to teach State and local officials "the essentials of the New Democratic governing philosophy and how to turn it into effective political messages and policy proposals relevant to local issues."

Finally, key Democratic elected officials not only founded the DLC, key Democratic officials also consistently held its Chairmanship, we note that the national ticket of the Democratic party for the last three elections included only officials prominently affiliated with DLC. President Clinton, the successful Democratic candidate for President in 1992 and 1996, was a founder of DLC and served as its Chairman. Al Gore, the Democratic Vice Presidential candidate in 1992 and 1996 and the Democratic Presidential candidate in 2000 was an active member of the DLC. Senator Joseph Lieberman, the Democratic Vice Presidential candidate in 2000 served as Chairman of the DLC.

7

Explanation of Adjustments
Schedule 1-A

Democratic Leadership Council, Inc.                52-1384530

Law:

Organizations described in section 501(c)(4) include organizations not organized for profit but operated exclusively for the promotion of social welfare. Treas. Reg. 1.501(c)(4)-1(a)(2)(i) states that an organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. Primarily benefiting a private group, instead of the community as a whole, causes an organization not to be operated exclusively to promote social welfare and, therefore, not to be described in section 501(c)(4). Determining whether an organization primarily benefits a private group or the community as a whole requires a balancing of any benefits an organization provides to a private group against the benefits provided to the community.

The amount and type of benefit to select individuals that may be provided by organizations otherwise described in section 501(c)(4) has often been considered in the context of member benefits. One focus is on the benefit to members receiving goods and services in their personal capacity. The Fourth Circuit Court of Appeals held that an organization providing housing on a cooperative basis did not exclusively promote social welfare as defined in section 501(c)(4) because it benefited a private group of individuals, not the community as a whole. <u>Commissioner v. Lake Forest, Inc.</u>, 305 F.2d 814 (4th Cir. 1962).

In Rev. Rul. 73-306, 1973-2 C.B. 179, an organization representing only member-tenants of an apartment complex is not described in section 501(c)(4) because it is operated essentially to benefit its members and is not primarily engaged in activities for the common good and general welfare of the community.[1]

---

[1] In contrast, Rev. Rul. 80-206, 1980-2 C.B. 185, concludes that an organization promoting tenants' rights in a community qualifies for exemption under section 501(c)(4) because it promotes the common good and general welfare of the community. Rev. Rul. 80-206 characterizes the activities of the organization in Rev. Rul. 73-306 as directed primarily toward benefiting its member-tenants.

8

USA 0920

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**                52-1384530

Cooperative-type organizations allowing members to purchase groceries on a cooperative basis discussed in Rev. Rul. 73-349, 1973-2 C.B. 179, or to exchange personal services with other members discussed in Rev. Rul. 78-132, 1978-1 C.B. 157, are not exempt under section 501(c)(4) because they are operated primarily for the benefit of members. Balanced against member benefits, any community benefits provided by these organizations are not sufficient to meet the requirement that a section 501(c)(4) organization be operated primarily for the common good and general welfare of the community.

    Another focus in section 501(c)(4) cases is on the benefit to members in their professional capacity from receiving related goods and services or from providing related goods and services. In Contracting Plumbers Cooperative Restoration Corp. v. United States, 488 F.2d 684 (2d Cir. 1973), cert. denied, 419 U.S. 827, 685, 687 (1974), the Court of Appeals held that an organization assisting member plumbers in their profession by repairing the cuts they made in city streets was not exempt under section 501(c)(4). The court concluded that the organization was not primarily devoted to the common good because it provided substantial benefits to its private members that were different than those benefits provided to the public. The basis for this holding was 1) the plumbers' apparent business interest in forming the organization, 2) the mutual aid purpose of the organization indicated in its bylaws, 3) the substantial member benefits evidenced because the organization provided members better services at cheaper prices than would have been eventually charged by the city while providing no services to nonmembers, and 4) the receipt by members of economic benefits precisely to the extent they used and paid for the organization's services.[2] Id. at 686-687.

---

   [2] The court used the last reason to distinguish this case from Monterey Public Parking Corporation v. United States, 321 F. Supp. 972 (N.D. Cal. 1970), aff'd, 481 F.2d 175 (9th Cir. 1973).

9

USA 0921

## Explanation of Adjustments
## Schedule 1-A

Democratic Leadership Council, Inc.                    52-1384530

   In Rev. Rul. 79-316, 1979-2 C.B. 228, benefits provided to members in their professional capacity by a spillage control organization do not preclude its exemption under section 501(c)(4). The spillage control organization was created to prevent liquid spills within a city port area and to develop a program for the containment and cleanup of liquid spills that do occur. When cleaning up spills, the organization charges both members and nonmembers only for the cost of labor, supplies, and equipment, and charges the U.S. Coast Guard only for labor when cleaning up spills of unknown origin. The organization benefits the entire community by protecting marine life and shore front property. Nonmembers who ship and store liquids in the port area, as well as members, benefit because the organization charges nonmembers the same price as members for cleanup services, prevents deterioration of the port community, aids compliance with applicable state law, and lowers port area insurance rates. Rev. Rul. 79-316 concludes that the organization primarily benefits the community while only incidentally benefiting members.

   In another case, the courts considered whether benefits provided to member-businesses by Monterey Public Parking Corporation ("MPPC") precluded exemption under section 501(c)(3) and section 501(c)(4). A California district court held that MPPC was exempt under section 501(c)(4) (and section 501(c)(3)), and the Ninth Circuit Appeals Court affirmed their decision. <u>Monterey Public Parking Corporation v. United States</u>, 321 F. Supp. 972 (N.D. Cal. 1970); <u>aff'd</u>, 481 F.2d 175 (9th Cir. 1973). The district court described MPPC as formed to construct and operate a needed public automobile off-street parking facility in a downtown area, which many felt, the government could not afford to construct itself. The court also found that the public, businesses, or private persons could buy validation stamps allowing the rental of parking spaces for seven cents per hour, while cash rates were more expensive. Based on these findings of fact, the court held that the organization was entitled to exemption under section 501(c)(3) and section 501(c)(4) because the city was the primary beneficiary of the parking lot.[3]

---

   [3] In arriving at this conclusion, the court ignored the government's argument that operating a commercial enterprise

10

Explanation of Adjustments
Schedule 1-A

Democratic Leadership Council, Inc.                    52-1384530

The court concluded that the benefit to organizers was indistinguishable from that which inured to the entire community.

In Rev. Rul. 78-86, 1978-1 C.B. 152, we state that the Service will not follow the 9th Circuit's decision in the <u>Monterey Public Parking Corporation</u> case. This revenue ruling indicates that when merchants join together to encourage the public to patronize their stores by providing parking for their customers at a reduced rate,[4] then the benefit to the merchants precludes exemption under section 501(c)(4) and section 501(c)(3).[5] In contrast to the district court's finding that anyone could purchase discount parking validation stamps, Rev. Ruling 78-86 states that participating merchants could purchase parking validation stamps for their customers that cost the merchants $.18 per hour of parking while the public paid $.25 per hour.

In contrast to Rev. Ruling 78-86, Rev. Ruling 81-116 concludes that an organization with a broad based membership that provides and maintains free off-street parking to anyone visiting the downtown business district qualifies for exemption under section 501(c)(4). This organization promotes social welfare by relieving congested parking conditions in the downtown area and providing free parking without using public funds. Inclusion of local merchants, businessmen, churches, civic organizations, and other interested individuals and organizations in the organization's membership indicates that the organization does not operate for the benefit of its members. Moreover, Rev. Rul. 81-116 notes that the organization does not benefit members because they are not favored by the manner in which the parking lots are located, nor are parking spaces reserved for the members, their tenants, or their customers.

---

constitutes a per se bar to exemption under section 501(c)(4).

[4] Rev. Rul. 78-86 also stated that the names of participating merchants were advertised by printing them on parking vouchers and on signs at the parking facility.

[5] Moreover, carrying on a business with the general public in a manner similar to for-profit organizations precludes exemption under section 501(c)(4).

11

USA 0923

**Explanation of Adjustments**
**Schedule 1-A**

**Democratic Leadership Council, Inc.**　　　　　　　　52-1384530

　　Benefit to members is a key factor precluding the exemption under section 501(c)(4) of an individual practice association ("IPA").[6] Rev. Ruling 86-98, 1986-2 C.B. 74. The IPA in Rev. Ruling 86-98 negotiates agreements with HMOs on behalf of member physicians under which its members provide medical services to HMO member patients. The agreements also require the IPA to perform necessary administrative claims services.[7] Rev. Ruling 86-98 concludes that the primary IPA beneficiaries are its member-physicians rather than the community as a whole. The IPA benefits member-physicians by functioning like a billing and collection service, and a collective bargaining representative for them. Moreover, the IPA does not benefit the community by providing HMO patients access to otherwise unavailable medical care, and does not provide care below the customary and reasonable charges of members in their private practices. The above cases and rulings confirm the principle established in the section 501(c)(4) regulations that organizations described in section 501(c)(4) must primarily promote the common good and general welfare of the people of the community as a whole rather than benefit select individuals such as members. A sufficient

---

[6] Another key factor precluding exemption is the similarity of IPAs to for-profit organizations.

[7] The HMOs pay the IPA a capitation amount based on the number of HMO subscribers entitled to receive medical services from the IPA. Then, the IPA reimburses member physicians on a fee-for-service basis according to a fee schedule minus a withhold (that can be used to cover any IPA deficit at the end of the year).

USA 0924

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**               52-1384530

amount of benefit to select individuals will preclude an organization that would otherwise qualify from being described in section 501(c)(4).

The above discussion provides several examples of the select groups of individuals that may not be primarily benefited by organizations claiming to be described in section 501(c)(4). A select group may exist only by virtue of membership in the organization, such as the grocery or personal service cooperative in Rev. Rul. 73-349 and Rev. Rul. 78-132. A select group may also relate to members' professional interests[8] such as the plumbers in <u>Contracting Plumbers</u>, the merchants in <u>Monterey Public Parking</u>, or the physicians in Rev. Rul. 86-98.

When determining whether the benefit to select individuals precludes exemption because the organization does not primarily promote social welfare, the Service must first identify the benefits to select individuals. Then the Service must balance an organization's benefits to the community as a whole against its benefits to the select individuals. In the above section 501(c)(4) cases regarding organizations benefiting members in their professional capacity, public benefit resulted from providing services that generally benefited the public (repairing cuts in city streets, preventing and cleaning up liquid spills, negotiating contracts to provide medical services, and providing downtown parking). The benefit to select individuals in these cases resulted from the organization directly serving members in their professional capacity by providing them goods and services (cut repair, spill cleanup, and contract negotiations) or indirectly serving members by providing the public goods and services (downtown parking).

One factor indicating whether an organization primarily benefits a private group rather than the community as a whole is whether an organization=s activities focus on or provide significant (or exclusive) benefits to the private group that are not provided to others. In <u>Contracting Plumbers</u>, the

---

[8] Providing services to members in their professional capacity also raises issues of whether the organization is operating similar to for-profit organizations. See Rev. Rul. 86-98 (IPAs similar to for-profit corporations).

13

USA 0925

**Explanation of Adjustments**
**Schedule 1-A**

**Democratic Leadership Council, Inc.**                          52-1384530

organization primarily benefits members because it provides "substantial and different" benefits to the public and to members. This organization provides member plumbers services to the extent that they use and pay for them and it provides no services to nonmembers. The organization in <u>Contracting Plumbers</u> also provides members better services at cheaper prices than would have been charged by the city.

   In Rev. Rul. 79-316, the spillage control organization primarily benefits the community because it works to prevent oil spills by members and nonmembers, charges members and nonmembers the same price for cleanup services, provides cleanup services that were not commercially available or feasible, and charges the U.S. Coast Guard a reduced rate when cleaning up spills not paid for by the responsible party. Rev. Rul. 78-86 concludes that the parking organization primarily benefits merchant members by providing them parking vouchers for their customers at a lesser price than the public pays for parking and by listing the names of the merchants on parking vouchers and on signs at the parking facility.

   The parking organization in Rev. Rul. 81-116 primarily benefits the community because it maintains free off-street parking to anyone visiting the downtown business district, members are not favored by where the parking lots are located, nor are parking spaces reserved for the members, their tenants or their customers.

   The IPA in Rev. Rul. 86-98 that operates primarily to benefit member physicians only provides contracting and administrative claims services to member physicians. The IPA does not benefit the community by providing HMO patients access to otherwise unavailable medical care, and does not provide care below the customary and reasonable charges of members in their private practices.

   A second factor indicating whether an organization is primarily benefiting a private group or the community as a whole is who creates the organization. For example, the creators of the organization in <u>Contracting Plumbers</u> are plumbers, and the creators of the organization in Rev. Rul. 78-86 are the merchants in the business district. The street repairs and parking facilities in these cases directly benefit the creators. The fact that these organizations are created only by persons who

14

USA 0926

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**                    52-1384530

will directly benefit is an indication that the organization is primarily benefiting the private group.

A third factor indicating whether an organization is primarily benefiting a private group or the community as a whole is whether a select group make up the primary membership of the organization. For example, members consist only of New York City plumbers in <u>Contracting Plumbers</u>, local downtown businesses in Rev. Rul. 78-86, and licensed physicians who actively practice medicine and are members of a specified county medical society in Rev. Rul. 86-98. Including members from outside of the professional group assisted is a characteristic of primarily benefiting the community. This broader membership is a factor in exemption for the spillage control organization in Rev. Rul. 79-316 and the parking organization in Rev. Rul. 81-116. The exempt spillage control organization members include business firms that store or ship liquids in the port area and two government instrumentalities that operate port terminal facilities. The city fire department and the U.S Coast Guard are associate members of the spillage control organization. In Rev. Rul. 81-116, the exempt parking organization membership includes local merchants and businessmen, churches, civic organizations, and other interested individuals and organizations.

A fourth factor indicating whether an organization is primarily benefiting a private group or the community as a whole is control of the organization. Sharing of control by the professional group members benefited with outside persons representative of the community as a whole is a characteristic of organizations described in section 501(c)(4). In Rev. Rul. 86-98, the nonexempt organizations membership elects an executive committee that manages the organization=s activities. The organization=s bylaws require that a majority of this executive committee be members. <u>Contracting Plumbers</u> only states that the nonexempt plumbers' organization operates in coordination with the Department of Highways. Rev. Rul. 79-316 indicates that a board that represents their diverse members but not associate members governs the exempt spillage control organization. The spillage control organization also works under the supervision of the Coast Guard when cleaning up oil spills.

A fifth factor in determining whether an organization

15

USA 0927

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**                         52-1384530

primarily benefits a private group rather than the community as a whole is whether the private group benefited provides the primary resources for the organization. The member plumbers fund the nonexempt organization in Contracting Plumbers by paying for the repair services individual members receive. The income of the nonexempt IPA in Rev. Rul. 86-98 is derived from its contracts governing member physician services to HMOs. In Rev. Rul. 78-86, most of the nonexempt parking organization=s income was derived from the sale of parking stamps to participating merchants. The exempt parking organization in Rev. Rul. 81-116 receives income from contributions and membership dues. The exempt spillage control organization in Rev. Rul. 79-316 raises funds by charging members dues based on the quantity of spillable liquid each member stores or ships in the port area, charging for part or all of the cost of spill cleanups.

In summary, the factors relevant to determine whether for purposes of section 501(c)(4) an organization primarily benefits a private group, rather than the community as a whole, include whether a private group: 1) is the focus of or receives significant (or exclusive) benefits from the organization=s activities, 2) creates the organization, 3) makes up the primary membership of the organization, 4) controls the organization, and 5) provides the primary resources for the organization.

Treas. Reg. 1.501(c)(4)-1(a)(2)(i) indicates that an organization described in section 501(c)(4) must primarily benefit the community and not primarily benefit a private group. Treas. Reg. 1.501(c)(3)-1(c)(1) provides that an organization described in section 501(c)(3) must engage primarily in activities which accomplish exempt purposes. Accomplishing exempt purposes under section 501(c)(3) requires that no more than an insubstantial amount of an organization=s activities further nonexempt purposes. The Supreme Court concluded that the presence of a single substantial non-charitable purpose precludes exemption regardless of the number or importance of charitable purposes. Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279, 283 (1945). Treas. Reg. 1.501(c)(3)-1(d)(1)(ii) provides that furthering exempt purposes requires serving a public rather than a private interest. Consequently, an organization described in section 501(c)(3) may not substantially benefit private interests.

In American Campaign Academy v. Commissioner, 9 T.C. 1053

16

USA 0928

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**          52-1384530

(1989) ("ACA"), the Tax Court concluded that an organization which ran a school to train campaign professionals was not described in section 501(c)(3) because it conferred substantial private benefits on Republican entities and candidates. An organization described in section 501(c)(4) may not primarily benefit a private group, but an organization described in section 501(c)(3) must meet the more difficult standard of not providing a substantial benefit to private interests.

Rev. Rul. 75-286, 1975-2 C.B. 210, illustrates that more benefit may be provided to a private group under section 501(c)(4) than under section 501(c)(3). Rev. Rul. 75-286 concludes that an organization with membership restricted to residents and business operators of a city block that works in cooperation with the local government to preserve and beautify public areas in the block is described in section 501(c)(4), but not in section 501(c)(3). The organization is described in section 501(c)(4) because it primarily benefits the community. However, the organization is not described in section 501(c)(3) because the restricted membership and limited public area improved serve the private interests of its members.

The facts used in ACA to determine the campaign school conferred substantial private benefits on Republican entities and candidates under section 501(c)(3) are consistent with the factors that indicate benefit to private interests, rather than the community as a whole, under section 501(c)(4). With regard to its creation, the organization was incorporated by the General Counsel of the National Republican Congressional Committee ("NRCC"), and was an outgrowth of a program run by the NRCC. With regard to control, the organization had two of three initial directors with significant ties to the Republican Party (an executive director of NRCC and a Republican National Committee member). With regard to focus and receipt of benefits, the organization had several courses focusing on topics related to the Republican Party and none focused on the Democratic Party, appeared to have had a substantial number of admissions panel members who were Republican, and had graduates who appeared to serve exclusively on the campaigns of Republican candidates.

With regard to resources, the National Republican

17

USA 0929

Explanation of Adjustments
Schedule 1-A

**Democratic Leadership Council, Inc.**                     52-1384530

Congressional Trust exclusively funded the organization and the NRCC contributed some physical assets to the organization. ACA illustrates the consideration of the factors applicable to both sections 501(c)(3) and 501(c)(4) in a situation where there is benefit to a political party.

While the amount of benefit that may be provided under section 501(c)(4) is greater than the amount provided under section 501(c)(3), factors indicating benefit to a private group under section 501(c)(4) or to a private interest under section 501(c)(3) are similar. As discussed above, these factors involve creation, membership, control, focus or benefits, and resources. In addition, ACA and Lake Forest conclude that benefiting a large number of people is not sufficient to prove benefit the community at large. Lake Forest concludes that affecting a large physical area is also not sufficient.

**Legal Analysis:**

The factors relevant to determine whether for purposes of section 501(c)(4) an organization primarily benefits a private group, rather than the community as a whole, include whether a private group: 1) is the focus of or receives significant (or exclusive) benefits from the organization=s activities, 2) creates the organization, 3) makes up the primary membership of the organization, 4) controls the organization, and 5) provides the primary resources for the organization. We consider these factors with regard to the DLC below.

**1) is the focus of or receives significant (or exclusive) benefits from the organization's activities:**

The DLC primarily benefits New Democrat office holders affiliated with the DLC and has secondarily benefited the Democratic Party. The DLC benefits New Democrat office holders by helping them to continue and advance their political careers. The DLC has also benefited the Democratic Party by assisting New Democrat elected officials in their political careers and ultimately helping the Democratic Party to recapture the White

House through the election of New Democrats prominent in the DLC

18

USA 0930