© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

people who have opposite points of view. Often you learn more about yourself doing the latter.

[118] As with KSC, one of the reasons Reinhardt administrators wanted to have the course taught on its campus was to raise the school's profile. However, Reinhardt sought to limit its involvement with the course due to concerns about the controversy over the course. Reinhardt's administration saw a distinction between the "course" and a broader political "project," as evidenced in a November 11, 1993 memorandum from Mr. Floyd Falany, Reinhardt's President, to Mr. Eisenach:

[119] First, there seems to be a "project", which is Renewing American Civilization, of which the "course" is a part. This distinction is blurred at times in the Project Overview. When you refer to the "project" it seems to imply a broader political objective (a non–welfare state). This is not to say that this political objective should be perceived as being negative, but it should, in fact, be seen as broader than and distinct from the simpler objective of the "course."

[120] Reinhardt saw the "project" as including the dissemination of the course outside Reinhardt's campus. Because of this concern, Reinhardt administrators agreed to be involved only in the actual teaching of the course on its campus. When Reinhardt's Executive Committee endorsed the course on October 27, it was understood that PFF would handle all of the fundraising, broadcasting (with the use of Reinhardt facilities), distribution of tapes/text/materials, and coordination with off–campus sites in connection with the course, and that Reinhardt would not be receiving donations on behalf of the course. Reinhardt rented its television production studios to PFF for disseminating the course, for the fee of $40,000, but all production and dissemination of Mr. Gingrich's portion of the course (the only part disseminated beyond the college) was handled by PFF. Reinhardt and PFF entered into a written agreement memorializing these terms on March 4, 1994.

III. Statements of Purpose for PFF and RAC Course

[121] In addition to PFF's activities and those of related organizations and individuals, we also consider it important to analyze the statements of purpose for PFF and for the PAC course, by PFF officials and others.

A. Official PFF Statements

[122] Statements in PFF's governing documents, filings with the IRS, educational and informational materials presented to the public, correspondence with members of the public, public statements, and internal documents stated exclusively exempt purposes and contained no statements of improper political purposes (such as to benefit Mr. Gingrich in his campaign for his Georgia congressional seat or to help the GOP gain a governing House majority) for producing or disseminating the RAC course or engaging in any of its other activities. Various brochures and other official PFF letters (e.g a September 21, 1994 letter from Mr. Eisenach on PFF stationery to Mr. Morton Kondracke, editor of Roll Call, in response to a negative series of articles by Roll Call) described PFF as a "non–partisan research and educational organization dedicated to creating a positive vision of the future founded in the historic principles of the American Idea." PFF's articles of incorporation stated several educational purposes, including the following:

1. Educating and spreading an understanding to the public about past achievements in American civilization and the role in America's progress of fundamental American principles such as individual freedom, civic virtue, technological advances, and personal integrity;

2. Establishing a public forum for the development and free intellectual exchange of ideas for the positive advancement of American society;

3. Engaging in nonpartisan analysis, research, and study of (i) the consequences of American policies and their impact on American progress and freedom and (ii) methods for the improvement and advancement of American society;

4. Conducting and sponsoring discussion groups and panels, communicating through papers, books, and other publications,

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

establishing forums to facilitate communication, sponsoring
conferences and symposia, and otherwise disseminating
information (including the results of the corporation's
nonpartisan analysis, research, and study) about ideas for
bringing about a positive American future.

[123] The articles also contained standard language prohibiting inurement and intervention in political campaigns.

B. Unofficial Statements of PFF's Officers and Directors

[124] A statement by Mr. Eisenach in an early July 1993 interview by the Kennesaw State Sentinel, KSC's school newspaper, acknowledged a possible but vague benefit to Mr. Gingrich from the RAC course:

[125] I don't know that there's a narrow political benefit to it. I think the benefit to him personally is-the benefit of understanding much better what direction he believes the country needs to go in and therefore being able to explain that much better in the political environment and hopefully being a better representative of the Sixth District and his larger role as a leader in the House. In terms of a narrow political benefit it is a pretty academic project. I mean the people who will be involved, there is no sort of natural, immediate like boy this is going to help people to vote for him or get people to — I will say one thing that I think — Newt is — most people when you tell them Newt has a Ph.D. in History and taught History for eight years before coming to Congress raise their eyebrows and say "Gosh I didn't know that." People don't understand that there is a big part of it which is a History professor and an intellectual who thinks about things and to the extent that people come to have a more rounded and complete view of who he is as a person, I think that can't hurt. Ultimately when you're running for election you're running on the basis of who you are as well as what you are and what you believe and what you're going to do and the more people can understand the wholeness of who you are as a person and at a minimum the better the chance they have voting the right way in the sense that more information is better and in Newt's case Newt's a pretty good person and this will be a way for people to understand more about why he is a good person but again I think it's all so vague that there's ... it comes back to what is the political benefit in the narrow sense in which people say what is the political benefit, I'm not sure there is one.

[126] Also, Mr. Hanser made a statement to the Ethics Committee that raises a question of PFF's purpose for its involvement with the course. He is cited at pp. 49-50 of the Ethics Committee Report as saying that the vision, language, and concepts of the RAC movement were being developed in the course, and that "a specific political end" is "one of the purposes, remember, for the course." However, it is not clear from the statement that the "purpose" referred to is PFF's purpose (as opposed to GOPAC's purpose or Mr. Gingrich's purpose). We note that without access to the complete Ethics Committee transcript of Mr. Hanser, we are unable to evaluate the context in which his statement was made.

C. KSC/KSCF Statements

[127] In a July 21, 1993 letter to Mr. John Gartland over KSC "Renewing American Civilization" Project letterhead, Mr. Eisenach described the goal of the RAC class in terms similar to those used by Mr. Gingrich (discussed below), but less explicitly partisan:

[128] Newt Gingrich asked me to send you some background information on the class he is teaching this Fall at KSC, "Renewing American Civilization." The goal of this project is simple: To train, by April 1996, 200,000+ citizens into a model for replacing the welfare state and reforming our government. The reality is that the current system will not be with us forever — it will be replaced. The question is how quickly that will happen — i.e. how quickly it is possible to get a citizens' movement in place, ready to make the needed changes.

[129] This same letter was mailed to Mr. Ralph Vinovich of the Tobacco Institute. An undated document entitled "Questions and Answers About the Progress & Freedom Foundation and Renewing American Civilization," apparently prepared by PFF as a press release sometime during its second fiscal year, stated as follows:

[130] Doesn't the phrase "recruit and train 200,000 citizen activists into a model for replacing the welfare state" (used by Mr. Eisenach in a fundraising letter) indicate that this is a political activity?

[131] No. "Recruiting" and "training" into a "model" is a long way from encouraging political activity. Indeed, "recruiting" students and "training" them into a "model" for understanding the world is precisely what colleges and universities do. The phrase "citizen activist" is hardly limiting, especially given the emphasis in the course on every American citizen's obligation to be an activist and participate in the democratic process.

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

[132] An August 10, 1993 letter from Mr. Gingrich to Mr. Richard Gilder on RAC letterhead stated the goal of the course in similar terms:

[133] The goal, over the course of the four years I'll be teaching the course, is to create a shared doctrine for perhaps a quarter-million citizen activists who will understand that our task is to renew American civilization, that we must replace (not repair) the welfare state and that they, as citizens, must take an active role in accomplishing that.

D. Statements by Mr. Gingrich and others

[134] Mr. Gingrich's notes from his December 18-19, 1992 meeting with Mr. Roberts contained his earliest known statements about the RAC course and its role in the PAC movement. Mr. Gingrich was to be at the center of developing and disseminating the message. Means to disseminate the message were to include a possible course, textbook, and radio or TV show. Continual refinement of the message after feedback from others was envisioned. The message was to be used by Republican candidates to win elections, with the ultimate goal to replace the welfare state with an opportunity society.

[135] In a March 29, 1993 memorandum entitled "Renewing American Civilization as a defining concept" directed to "Various Gingrich Staffs," Mr. Gingrich connected the PAC course with the political goals of the movement:

[136] I believe the vision of renewing American civilization will allow us to orient and focus our activities for a long time to come. At every level from the national focus of the Whip office to the 6th district of Georgia focus of the Congressional office to the national political education efforts of GOPAC and the re-election efforts of FONG we should be able to use the ideas, language and concepts of renewing American civilization. Virtually every person I talk to gets a copy of the January 25th Renewing American Civilization speech and a one-page outline of the course within applicable laws and House ethics rules. I want this to be systematized and routinized so automatically every audience I speak to and every meeting has some material on renewing American civilization and the course.

[137] In various descriptions of the course, Mr. Gingrich stated that his intention was to teach it over a four-year period. After each teaching of the course he intended to have it reviewed and improved. Mr. Gingrich's goals for the course were to have a final product developed by April of 1996; to have 200,000-plus activists trained in the course, with a common vision and commitment to renew America and replace the welfare state; to have these activists run for government office (including hospital and school boards) and work on campaigns; to have the media and the public discussing the course; and to have all Republican candidates using the same language and having the same goals. It was hoped that by 1996 the Republican Party, with RAC as its platform, would win the elections at all levels of government. The party would then be in a position to replace the welfare state with an opportunity society. These purposes are evident in the following speeches made, and letters and memoranda written, by Mr. Gingrich: the January 23, 1993 speech to the National Review Institute; the March 29, 1993 memorandum entitled "Renewing American Civilization as a defining concept"; a May 5, 1993 GOPAC letter to Neil Gagnon; a three-part document faxed from the Republican Whip's Office on May.13, 1993 entitled "Renewing America Vision," "Renewing America Strategies," and "Renewing American Civilization Our Goal"; a June 1993 training seminar for candidates on behalf of GOPAC at the Virginia Republican Convention; a GOPAC letter revised June 16, 1993 for Mr. Gingrich's signature; the "Whip Office Plan for 1994"; a GOPAC document entitled "Planning Assumptions for 1994"; a January 21, 1994 speech entitled "Renewing American Civilization: Our Duty in 1994 11 at the Republican National Committee Winter Breakfast; and a March 21, 1994 briefing paper for House Republicans entitled "RENEWING AMERICA: The Challenge for Our Generation."

[138] However, Mr. Gingrich also expressed goals for the course other than mere partisan political goals. For example, the course itself indicates that the goal is to renew American civilization, not elect a Republican majority, and that individual effort rather than government reform is the primary means of achieving this goal. Some of the course content is directed toward improving the effectiveness of individuals in their daily lives, such as teachings on leadership, personal strength, time management, entrepreneurship, and quality. A RAC "Mission Statement" drafted by Mr. Gingrich and attached to the agenda for the February 15, 1993 GOPAC meeting discussed above stated that:

[139] We will develop a movement to renew American Civilization using the 5 pillars of 21st Century Freedom so people understand freedom and progress is possible and their practical, daily lives can be far better. . . . Renewing American Civilization must be communicated as an intellectual-cultural message with governmental-political consequences.

[140] Similarly, in a February 20, 1995 New York Times article, Mr. Gingrich was quoted in an interview discussing the course as follows:

[141] It's not narrowly partisan, it's not narrowly electoral, but it is political in the best sense of a free society.

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

The current political process is so sick that attempting to talk in a serious way for 20 hours with an earned Ph.D. is automatically dragged into the mud.

[142] While Mr. Gingrich made a number of statements expressing a partisan political purpose for his creating the RAC movement and teaching the RAC course, none appear to have been made as a representative of PFF. Mr. Gingrich made no mention in the RAC courses of elections or of voting for any particular agenda as a way to renew American civilization. There is evidence that he told a student in an after-class discussion that voting for candidates that hold his views is one way to replace the welfare state, but he did not make such statements during class time.

[143] Other people associated with GOPAC also made statements indicating politically partisan purposes for the RAC course. In a June 21, 1993 letter that Ms. Prochnow sent to Charter Members, she stated:

[144] As the new finance director, I want to introduce myself and to assure you of my commitment and enthusiasm to the recruitment and training of grassroots Republican candidates. In addition, with the course Newt will be teaching in the fall — Renewing American Civilization-I see a very real opportunity to educate the American voting population to Republican ideals, increasing our opportunity to win local, state and Congressional seats.

[145] In a January 3, 1994 letter, however, Ms. Prochnow stated a less partisan purpose for the RAC message:

[146] As we begin the new year, we know our goals and have in place the winning strategies. The primary mission is to elect Republicans at the local, state, and congressional level. There, also, is the strong emphasis on broadcasting the message of Renewing American Civilization to achieve peace and prosperity in this country.

E. Relationship of Mr. Gingrich and GOPAC to PFF

[147] Mr. Gingrich held no governing role within-PFF. He also received-no financial compensation in providing services to PFF. Mr. Gingrich's role with PFF was listed as "Creator and Presenter" of RAC on "Renewing American Civilization, a Project of Progress & Freedom Foundation" letterhead, which PFF apparently was using at least as early as March 21, 1994.

[148] Mr. Eisenach described Mr. Gingrich's relationship with PFF as follows, in a June 21, 1995 press release responding to House Minority Whip David Bonior's "assaults" on PFF:

[Mr. Gingrich] is not and has never been a board member, officer or employee of the foundation. He was not aware of plans to create the foundation until after they were well advanced; did not participate in key planning meetings leading to its creation; has never served in any official capacity with the Foundation; did not review or participate in the development of its application to the IRS for tax exempt status or other key founding documents; did not participate in the selection of or make recommendations for membership on its founding board of directors; was not consulted on the naming of new board members; has not, with the exception of his Renewing American Civilization project, participated in fundraising activities; and, he has always understood the Foundation to be an independent entity, created for the non-partisan research and educational purposes stated in its application for tax exempt status and subsequent IRS filings. Mr. Gingrich plays no role whatsoever in directing the Foundation's activities, which are overseen by an independent board of seven distinguished private citizens. Indeed, with the exception of Mr. Eisenach, none of its 25 full-time staff have ever worked for or been professionally associated with GOPAC, which he formerly chaired. The Foundation does not believe that Mr. Eisenach's previous professional association with Mr. Gingrich should disqualify him from undertaking the research and educational activities that have been the dominant focus of his career.

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

[149] Mr. Eisenach, on PFF letterhead, gave similar responses to several news articles that described PFF as dominated by Mr. Gingrich and serving his partisan purposes, such as the September 21, 1994 letter to Roll Call:

> I decided to found PFF in October 1992. My own background . . .
> (is] as much in the world of ideas as in the world of politics,
> and I believed then, and still believe, that a new set of ideas
> was needed to reshape American public policy. In November 1992,
> I talked with my Hudson Institute colleague, Dr. George A. (Jay)
> Keyworth (former White House Science Advisor) about serving as
> its chairman, and he agreed to do so. Jay's and my
> conversations, our discussions with the eventual members of the
> board of directors and our final decision to go forward Ell
> preceded any discussions with Mr. Gingrich by me or anyone else.
> It should be noted that, while Roll Call's series was generally
> factual in the narrow sense, it was explicitly incorrect in
> stating that Jay was a close associate of Mr. Gingrich's or had
> ever campaigned for his re-election . . . . (PFF] was created as,
> and remains, a non-partisan, not-for-profit research and
> educational institution dedicated to creating a positive vision
> of the future founded in the historical principles of the
> American idea. Among those who have participated in our
> activities are well-known Democratic figures such as White House
> staffers Bill Galston and Elaine Kamarck, DLC'er Robert Shapiro,
> Communitarian movement leader Amitai Etzioni and AEI Scholar Ben
> Wattenberg . . . we explicitly believe that neither of the two
> parties yet understands or represents the ideas needed for
> America's future success . ..., PFF has no connection with GOPAC
> or with Mr. Gingrich's other partisan activities. We don't share
> lists or coordinate fundraising; we don't share staff (I am the
> only former GOPAC employee at PFF); we don't give them advice
> and they don't offer advice to us. We explicitly do not expend
> resources to promote Mr. Gingrich or Renewing American
> Civilization to Republican groups; if GOPAC wants the video tape
> series, it pays for it like anyone else . . . . The larger issue
> here is whether a political leader can, in the 1990s, undertake
> to develop a set of ideas within an academic framework and,
> having done so, advocate those ideas in his political life.

[150] Similarly, a January 24, 1995 Associated Press article quoted Mr. Bill Myers, a PFF Vice President, on the subject:

> "There's clearly an association between PFF and the speaker, but
> it's not a formal relationship," said Bill Myers, a vice-
> president. "The speaker is a friend, but any characterization of
> PFF as Newt Gingrich's think tank is just plain wrong" . . . .
> Myers said the foundation is "absolutely nonpartisan" and is
> "looking to the future with a coalition that is broad
> ideologically and in no way partisan." As proof, he cited the
> attendance of feminist leader Betty Friedan at a recent
> workshop.

[151] Mr. Gingrich and PFF shared a common set of ideas. An August 2, 1993 memorandum from Mr. Eisenach to Mr. Gingrich, with copies to Mr. Gaylord and Mr. Hanser, indicated that Mr. Eisenach and Mr. Gingrich held the common vision of developing the ideas for replacing the welfare state and nurturing the growth of thinkers and practitioners to contribute to the ideas and carry them into the public discussion, and that this vision was formed in late 1992 and was the

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

basis for establishing PFF. Mr. Eisenach, in a June 2, 1994 letter on PFF letterhead, described PFF as "trying to build an intellectual basis and a cadre of supporting spokesmen for the set of ideas Newt represents." The introduction by Mr. Eisenach and Mr. Hanser to the RAC course book contained similar thoughts.

[152] Mr. Gingrich also asserted sole ownership of the copyright to the RAC course lectures prepared with the assistance of PFF, although he claimed no royalties from sales of the course lecture tapes. A January 5, 1995 agreement between PFF and Mr. Gingrich provided that he owned all rights in the RAC course lectures and that, without compensation, he granted to PFF all rights in the videotapes of the lectures. While he reserved his rights to the lectures in printed form in the agreement, he also told the participants in the 1995 course that the lecture transcripts were freely available on PFF's web site, and that they were copyrighted merely to prevent someone else from asserting a copyright.

ANALYSIS

[153] The request for technical advice from the Key District Office ("KDO") essentially raised three reasons for determining that PFF was not described in *section 501(c)(3)*: 1) private benefit or substantial nonexempt purpose to benefit private interests, 2) political campaign intervention, and 3) inurement. In order to determine whether there was more than incidental private benefit or substantial nonexempt purpose, we need to consider the scope and nature of all the organization's activities in order to weigh the favorable and unfavorable evidence. Consequently, we discuss the evidence regarding whether PFF was operated for educational purposes to assist in determining whether there was more than an incidental private benefit or a substantial nonexempt purpose. In our analysis, we will consider: 1) whether PFF was operated for educational purposes, 2) whether PFF provided more than insubstantial ben6fits to private interests or had a substantial nonexempt purpose to benefit private interests, 3) whether PFF intervened in political campaigns, and 4) whether PFF's net earnings inured to the benefit of any private shareholder or individual.

I. Educational

[154] *Section 501(a) of the Internal Revenue Code* exempts from taxation organizations described in *section 501(c)*.

[155] *Section 501(c)(3)* describes organizations organized and operated for charitable and educational purposes.

[156] *Section 1.501(c)(3)–1(d)(3)(i) of the Income Tax Regulations* provides that the term "educational" relates to—

a. The instruction or training of the individual for the purpose
   of improving or developing his capabilities; or

b. The instruction of the public on subjects useful to the
   individual and beneficial to the community.

[157] An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.

[158] *Section 1.501(c)(3)–1(d)(3)(ii) of the regulations* sets forth examples of organizations that are educational if they otherwise meet the requirements of *section 501(c)(3) of the Code*, including (Example (2)) an organization whose activities consist of presenting public discussion groups, forums, panels, lectures, or other similar programs (including radio and television programs), and (Example (3)) an organization which presents a course of instruction by means of correspondence or through the utilization of television or radio.

[159] *Rev. Proc. 86–43, 1986–2 C.B. 729,* states the criteria used to determine whether an organization's advocacy of a particular viewpoint or position is educational under *sections 501(c)(3) of the Code* and *1.501(c)(3)–1(d)(3) of the regulations*. Although the Service renders no judgment as to the viewpoint, the Service will look to the method used by the organization to develop and present its views. The method is not educational if it fails to provide a factual foundation for the viewpoint being advocated, or a development from the relevant facts that would materially aid a listener or reader in a learning process. The presence of any of the following factors in the presentations made by an organization is indicative that the method used by the organization to advocate its viewpoints is not educational:

1. The presentation of viewpoints unsupported by facts is a
   significant portion of the organization's communications.

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

2. The facts that purport to support the viewpoints are
   distorted.

3. The organization's presentations make substantial use of
   inflammatory and disparaging terms and express conclusions
   more on the basis of strong emotional feelings than of
   objective evaluations.

4. The approach used in the organization's presentations is not
   aimed at developing an understanding on the part of the
   intended audience or readership because it does not consider
   their background or training in the subject matter. There may
   be exceptional circumstances, however, where an
   organization's advocacy may be educational even if one or
   more of the listed factors are present. The Service will look
   to all the facts and circumstances to determine whether an
   organization may be considered educational despite the
   presence of one or more of such factors. Even if the
   organization's advocacy is educational, the organization must
   still meet all other requirements for exemption under section
   501(c)(3), including not violating the restrictions on
   influencing legislation and intervening in political
   campaigns.

[160] In *Nationalist Movement v. Commissioner, 102 T.C. 558 (1994),* the Tax Court concluded that *Rev. Proc. 86–43* was not unconstitutionally vague or overbroad on its face and used the *Rev. Proc. 86–43* standards to determine whether the organization .at issue was educational.

[161] As discussed below, in accordance with section 1.501(c)(3)–1(d)(3)(i) of the regulations, we conclude that PFF's activities are educational because these activities instruct the public on subjects useful to the individual and beneficial to the community, and the activities instruct individuals for the purpose of improving their capabilities. During the year at issue, the RAC course and the related book of readings were the primary means through which PFF educated the public., The RAC course taught five pillars of American civilization (the historic lessons of American civilization; personal strength, entrepreneurial free enterprise; the spirit of invention and discovery; and quality as defined by Deming); and applied these pillars to four substantive areas (the Third Wave Information Age; creating American jobs in the world market; replacing the culture of violence and poverty with a culture of productivity and safety; and citizenship and community in 21st century America). Two of three RAC courses discussed the substantive area of health instead of a separate section on the Third Wave. The course book discussed similar topics.

[162] The topics discussed in the RAC course and course book instructed the public about American civilization. The course and the course book provided historical information leading to theories on how Americans as individuals and America as a country have functioned in the past and could best proceed in the future, including under a theory regarding the Third Wave Information Revolution. PFF provided instruction regarding the applicability of these broad theories to current American society in general and to the every day life of individual Americans. The RAC course addressed how these principles of American civilization would be applicable to all spheres of American life. Mr. Gingrich, who taught the course, discussed in his role as class professor how he used the class principles to manage his own life.

[163] Our detailed consideration of the content of the course and related course materials indicates that they satisfy the educational criteria set forth in section 1.501(c)(3)–1(d)(3). The material presented a sufficiently full and fair exposition of the pertinent facts sufficient to permit the public to form an independent opinion or conclusion. Moreover, the material complied with the criteria set forth in *Rev. Proc. 86–43* by including the necessary factual basis for viewpoints expressed. In addition, the material did not present viewpoints unsupported by facts, did not use distorted facts, did not make substantial use of inflammatory and disparaging terms, and did not express conclusions on the basis of strong emotional feelings, nor did it fail to consider the audience's background.

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

[164] The course lectures provided a full and fair exposition of the pertinent facts behind the pillars of American civilization and applications of these pillars by relying on substantial facts from American history and American culture past and present. The course discussed the connection of these facts to American civilization, and the impact these facts have had on individuals and American society as a whole. For example, the RAC course provided examples of Persons exhibiting personal strength, entrepreneurial free enterprise, and the spirit of invention and discovery. The course also provided examples of societal values, institutions, and broad government policies currently discouraging these qualities.

[165] The facts provided in the RAC course permitted individuals or the public to form an independent opinion or conclusion about the validity of the pillars and the applications. From the facts given, persons could reach different conclusions about how the course principles should be applied in the lives of individuals, institutions, or in government policy. For example, the public policy application of the qualities exhibited by persons given as examples of personal strength, entrepreneurial free enterprise, and the spirit of invention and discovery could be independently determined by the audience.

[166] In the numerous facts from American history and American culture used in the lectures to support the opinions expressed in the RAC course, we have found no obvious distortions. The material did not use terms that would be considered inflammatory or disparaging. Throughout the course lectures, principles were presented based on historical facts and studies and not on emotional feelings. The course was appropriate for the intended audience of college students and the general public because the concepts were basic enough for the general public to understand but had sufficient depth for study in a college setting.

[167] In addition to the RAC course lectures themselves, the credentials and expertise of the RAC course teachers and reviewers indicated the educational nature of the RAC course. Mr. Gingrich holds a Ph.D. in Modern European History from Tulane University and, prior to his Congressional career, taught history at West Georgia College for seven years. Mr. Eisenach, who was significantly involved in the content of the course, also holds a Ph.D. and has taught at several major universities and worked at several established public policy think tanks. The numerous scholars mentioned earlier in this memorandum as co-teaching or contributing to the review of the content of the course, as well as the college professors who co-taught the RAC course with Mr. Gingrich, also were indicative of the educational nature of the RAC course.

[168] The class reading list, although it varied in the several classes co-taught by Mr. Gingrich, also demonstrated the educational nature of the class. The reading list included numerous social science materials including several written by current Democratic office holders. The RAC course readings that PFF published and were part of the RAC course reading list were similar to the RAC course lectures in content.

[169] The RAC course lectures and RAC course reading materials did not indicate support for specific legislative proposals, although they occasionally advocated broad changes in social policy, some of which would likely require legislative action to be fully effectuated. The RAC course lectures and RAC course reading materials did not favor or oppose candidates for public office within the four corners of the material. Later in this technical advice, we address whether PFF's involvement in the RAC course otherwise constituted an intervention in a political campaign.

II. Private Benefit or Substantial Nonexempt Purpose

[170] The KDO concluded that PFF provided more than incidental private benefit to Mr. Gingrich, GOPAC, and other Republican entities, individuals, and interests; that PFF was not operated exclusively for exempt purposes; and that PFF was operated for substantial nonexempt political and private purposes. Any benefit to GOPAC could also be an indirect benefit to Republican candidates assisted by GOPAC. Although not specifically stated in the request for technical advice, any private benefit provided would most likely arise from helping the benefited persons and organizations to develop and disseminate a message for use in partisan political activities.

[171] In addressing the issue of whether PFF served private interests in a manner inconsistent with its tax exempt status and had the nonexempt purpose to benefit private interests, we will consider the following: A. private benefit must be incidental and not a substantial purpose of the organization, B. case law involving private benefit, C. comparison of the facts in *PFF and American Campaign Academy v. Commissioner, 92 T.C. 1053 (1989)* (ACA), D. relevance of activity and purpose to exempt status, E. factors used to determine private benefit or substantial nonexempt purpose to benefit private interests, and F. application of factors.

A. Private Benefit Must Be Incidental and Not a Substantial Purpose
   of the Organization

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

[172] *Section 1.501(c)(3)–1(a)(1) of the regulations* provides that an organization described in *section 501(c)(3)* must be organized (the organizational test) and operated (the operational test) exclusively for charitable purposes. Under the organizational test in *section 1.501(c)(3)–1(b)(1) of the regulations,* an organization is organized exclusively for charitable purposes if its articles of organization limit the purpose of the organization to exempt purposes and do not expressly empower the organization to engage in more than insubstantial activities that do not further exempt purposes. Under the operational test in section 1.501(c)(3)–1(c)(1) of the regulations, an organization is operated exclusively for exempt purposes only if it engages primarily in activities which accomplish exempt purposes and has no more than insubstantial activities that do not further exempt purposes. In *Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279 (1945),* the court held that the presence of a single nonexempt purpose, if substantial in nature, destroys an organization's exemption, regardless of the number or importance of exempt purposes.

[173] Section 1.501(c)(3)–i(d)(1)(ii) of the regulations provides that an organization is not organized or operated exclusively for exempt purposes unless it serves a public rather than a private interest. Thus, an organization must establish that it is not organized or operated for the benefit of private interests, such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled by such private interests. In ACA, the Tax Court determined that the private interests served in section 1.501(c)(3)–1(d)(1)(ii) are not limited to the private shareholders or individuals (insiders with a personal and private interest in the organization's activities) benefited in cases of inurement discussed in section 1.501(c)(3)–1(c)(2). Rather, the Tax Court concluded that the private interests benefited under section 1.501(c)(3)–1(d)(1)(ii) may include disinterested persons. *ACA, 92 T.C. at 1069.* The Tax Court in ACA also stated that an organization described in *section 501(c)(3)* could confer only incidental benefits on disinterested persons without being in danger of serving private interests. *ACA, 92 T.C. at 1069.*

B. Case Law Involving Private Benefit

[174] Like PFF, ACA involved the issue of whether an organization was not described in *section 501(c)(3)* because it served more than incidentally private interests of one political party's entities and/or candidates. In ACA, the Tax Court held that an organization primarily conducting a school to train political campaign professionals was not described in *section 501 (c)(3). ACA, 92 T.C. at 1079.* The Tax Court concluded that the organization operated substantially for the benefit of Republican entities and candidates, even though the primary beneficiaries of the organization's activities were the students themselves. *Id. at 1078.* The Tax Court added that Republican entities and candidates were private interests and not representative of the community at large, even though millions of people were members of the Republican Party. *Id. at 1076.*

[175] The American Campaign Academy was an outgrowth of the activities of the National Republican Congressional Committee ("NRCC") in training campaign professionals. The incorporator was the General Counsel of the NRCC. *Id. at 1056.* One of the three initial directors (Mr. Joseph Gaylord) was Executive Director of the NRCC, and another was a member of the Republican National Committee. Id. Two of the organization's six full-time faculty were previously involved in the NRCC training program. The NRCC contributed some physical assets. Id. The organization had no formal placement program for graduates but did offer informal assistance. *Id. at 1057.* Training materials were developed by the organization's own faculty rather than the NRCC. Id. While applicants were not required to formally declare their political affiliation, such affiliation was often apparent from the campaign experiences and political references contained in the application. *Id. at 1058.* The curriculum presented a considerable body of knowledge to be learned in the 10–week, full-time program. *Id. at 1059.* Some of the course material focused on Republican candidates and entities ("How some Republicans have won Black votes," IINRCC/RNC/State Party naughtiness," and "Use of GOP allies"), with no comparable studies of other political parties. Id. The National Republican Congressional Trust provided the exclusive funding for the organization. *Id. at 1061.* The organization was unable to demonstrate that any–of its graduates worked for candidates other than Republican candidates. Id.

[176] When determining the purpose of the organization, the court in ACA stated that:

The operational test examines the actual purpose for the organization's activities and not the nature of the activities or the organization's statement of purpose. Kentucky Bar *Foundation v. Commissioner, 78 T.C. 921, 923–924 (1982).* In testing compliance with the operational test,. we look beyond the four corners of the organization's charter to discover "the

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

actual objects motivating the organization and the subsequent conduct of the organization." Taxation with Representation v. United States, 585 F2d 1219, 1222 (4th Cir. 1978), citing Samuel *Friedland Foundation v. United States, 144 F. Supp. 74, 85* (D.N.J. 1956); Christian Manner International v. Commissioner, *71 T.C. at 668.*

*ACA, 92 T.C. at 1064.*

[177] Due to the importance of ACA, we consider below the cases relied on by the Tax court in ACA to provide guidance on how to determine the purpose of an organization. We also mention some cases cited in the cases that ACA cites. Our consideration includes not only general statements about determining purpose but the actual factors considered by each court in determining purpose.

[178] In *Kentucky Bar Foundation v. Commissioner, 78 T.C. 921, 923–924 (1982),* the Tax Court stated, as noted in ACA above, that, "The proper focus is the purpose or purposes toward which the activities are directed (*B.S.W. Group, Inc. v. Commissioner, 70 T.C. at 923)),* and a mere statement of that purpose is not determinative." *Kentucky Bar Foundation, 70 T.C. at 923.* The Tax Court determined the purpose for the Kentucky Bar Foundation's activities by determining the nature of the activities conducted at the bar center which the Foundation was raising funds to construct. *Id. at 924.* The Kentucky Bar Foundation (as distinguished from the Kentucky Bar Association) had the principal activity of raising funds to construct the bar center. Id. The Tax Court concluded that the Foundation furthered charitable, purposes because the activities to be conducted at the center (a continuing legal education program, a public law library, publication of the Kentucky Bench and Bar, a Client Security Fund, an Inquiry Tribunal, a Fee Arbitration Plan, and a Lawyer Referral Service) were intended to benefit the public, not to promote, protect and enhance the legal profession (the substantial nonexempt purpose stated by the government). *Id. at 930.* Any nonexempt purpose was insignificant and tenuous according to the Tax Court. Id.

[179] In Kentucky Bar Foundation, the Tax Court focused specifically on whether the operation of several disputed bar center activities (a Client Security Fund, an Inquiry Tribunal, a Fee Arbitration Plan, and a Lawyer Referral Service) furthered charitable purposes. *Id. at 924.* When considering the lawyer referral service, the Tax Court considered formal stated purposes of the activity and whether operations were consistent with these purposes. *Id. at 925.* The Tax Court also reported the statement of purpose in the Foundation's articles. Id. at 922. Purpose statements, however, did not include informal statements of Foundation officers or directors or of persons or other organizations associated with the Foundation. Moreover, no mention was made of any connection between the Kentucky Bar Association and the Kentucky Bar Foundation (i.e., overlapping personnel, facilities, whether the Bar had considered building the bar center themselves). The Kentucky Bar Association was a *section 501(c)(6)* organization created to benefit the common business interests of the members of the legal profession. The Tax Court, however, did state that the Foundation's activities resulted from the responsibility of the bar association to maintain public confidence in the legal system. Id. at 930.

[180] As noted above, the Tax Court in Kentucky Bar Foundation cited *B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352 (1978)* when stating that the focus is on the purpose of the activities. *Kentucky Bar Foundation, 70 T.C. at 923.* In B.S.W. Group, Inc., the Tax Court considered an organization that provided consultants to perform basic and applied research for clients (tax–exempt organizations and not–for–profit organizations) primarily in rural–related policy and program development. Id. at 353–355. The Tax Court concluded that B.S.W. was not described in *section 501(c)(3)* because the administrative record indicated that its primary purpose was the conduct of an ordinary commercial consulting enterprise in competition with other commercial firms. Id. at 361. In making its determination of purpose, the Tax Court considered "factors such as the particular manner in which an organization's activities are conducted, the commercial hue of those activities, and the existence and amount of annual or accumulated profits." Id. at 357. When noting some reluctance regarding its conclusion, the Tax Court noted that there was no indication in the record that the organization's officers had personal motives different from the stated purposes of the organization. Id. at 361.

[181] As support for the proposition that "in testing compliance with the operational test, we look beyond the four corners of the organization's charter to discover the actual objects motivating the organization and the subsequent conduct of the organization,'" the Tax Court cited Taxation with *Representation v. United States, 585 F2d 1219, 1222 (4th Cir. 1978)* (TWR) which cited *Samuel Friedland Foundation v. United States, 144 F. Supp. 74, 85 (D.N.J. 1956).* These cases, however, stated that a court may look beyond the organizing documents to extrinsic evidence in order to test compliance with the organizational test (not the operational test applicable in PFF and in ACA). Moreover, TWR did

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

not apply this organizational test because the main issues in the case were constitutional questions regarding applicable regulations. TWR, 585 at 1219. The court in Samuel Friedland Foundation applied the organizational test in order to allow an organization with articles that gave overbroad powers to organization trustees to nevertheless meet the organizational test because the Foundation promoted the charitable purposes of medical care, education, and research. *Samuel Friedland Foundation, 144 F. Supp. at 84, 85, 88*. While specific facts were not given to support conclusions about charitable purpose regarding the Samuel Friedland Foundation, the general facts recited in the opinion concerned the founder's motivation, the organizational documents and the organization's activities. *Id. at 77–83*. The Tax Court in ACA cited *Christian Manner International v. Commissioner, 71 T.C. 661, 668 (1979)* to support the proposition that in applying the operational test, we should look beyond the organization's charter to discover "the actual objects motivating the organization." *ACA, 92 T.C. at 1064*. In Christian Manner International, the Tax Court looked beyond the organization's charter and any avowed purpose of the organization's president Smith to consider whether "the activities engaged in by [the organization] were directly related to the accomplishment of those purposes." *Christian Manner International, 71 T.C. at 661*. Based on this consideration of the organization's activities, the Tax Court concluded that "the actual purpose for the organization of petitioner was to publish Smith's books," not the broader charitable purposes stated in the organization's articles and by Smith. Id. Moreover, a substantial part of the organization's activity was in furtherance of a purpose to benefit Smith personally and was commercial in nature. *Id. at 670*. The books were priced (or given away in return for a sufficient contribution) to return a profit, and the book distribution and marketing were consistent with standard commercial practices. Id.

[182] *Rev. Rul. 80–278, 1980–2 C.B. 175,* reflects the focus in Christian Manner international on determining whether an organization has a charitable purpose and whether the organization's activities are related to accomplishing these purposes. *Rev. Rul. 80–278* concludes that in determining whether an organization's activities are consistent with exemption under *section 501(c)(3)* (i.e., whether it meets the operational test in section 1.501(c)(3)–1(c)), the Service will rely on the following three–part test:

  1. The purpose of the organization is charitable;

  2. the activities are not illegal, contrary to a clearly defined and established public policy, or in conflict with express statutory restrictions; and

  3. the activities are in furtherance of the organization's exempt purpose and are reasonably related to the accomplishment of that purpose.

[183] In determining whether private benefit was incidental or a substantial nonexempt purpose, the Tax Court in ACA considered the functioning of ACA itself (i.e., admission panel, applicants, graduates, biased course titles, operation of campaign school) and its connections with Republican party entities and candidates (i.e., take–over of party program, overlapping founders and directors, funding). The importance of the evidence of private benefit from within the organization itself was evident in Kentucky Bar Foundation where the Tax Court did not consider the connection of the Foundation to the Bar Association as a possible indication of private benefit once the court concluded that the activity of the Foundation itself did not serve private benefit. Moreover, the focus of any private benefit inquiry in the cases considered above, other than ACA, was on the organization at issue and not on related organizations. ACA appears to be an unusual case in that it considered factors outside of the organization in ' addition to the activities of the organization. However, as we will discuss below, there was a substantial reliance on the activities of the organization in ACA when deciding that case.

[184] In light of the larger body of case law, however, we conclude that this evidence of association with outside entities should generally be considered as additional evidence of private benefit in cases where there is already evidence of private benefit in the activities of the organization at issue. In addition to requiring that an organization's stated purpose be charitable or educational, our primary inquiry (as discussed in Christian Manner International and in *Rev. Rul. 80–278*) is to determine whether the organization's activities are directly related to the accomplishment of the exempt purposes stated in the organization's charter. Statements made by an organization's officers and directors on behalf of the organization are also relevant. The Tax Court in B.S.W. Group, Inc. suggested that it might have considered evidence regarding whether the organization's officers and directors had personal motives–different from the stated purposes of the organization.

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

*B.S.W. Group, Inc., 70 T.C. at 361.*

### C. Comparison of the Facts in PFF and ACA

[185] An important part of our private benefit analysis is addressing whether the facts in this case are similar to those in ACA. As we have already noted, ACA was a recent case also involving the issue of whether an organization was not described in *section 501(c)(3)* because it had the purpose of serving and served more than incidentally the private interests of one political party's entities and candidates. The KDO relied on ACA as a major basis for the conclusion that PFF violated the private benefit restriction for *section 501(c)(3)* organizations. We believe that a careful reading of the facts in ACA and this case indicate that the facts of PFF's case are clearly distinguishable from those of ACA.

[186] We believe that the court relied in ACA on six factors in that case to conclude that ACA served the private benefit of the Republican party. We address these six factors below. First, the court determined that ACA's program was 'an outgrowth of a program operated by an official Republican Party organization, the NRCC–In comparison, in certain respects, the RAC course was, at least in part, an outgrowth of programs sponsored by GOPAC. GOPAC had earlier operated AOW itself and had ALOF operate a later program entitled ACTV. Both of these predecessor projects bear a subject matter similarity to the RAC course, but the RAC course was a significant expansion and development of the earlier ideas. The ACA course much more closely resembled its predecessor. Second, the court noted that key founders of ACA and two of its three directors had strong ties to the Republican party. In comparison, Mr. Eisenach (PFF's incorporator, director and president) was not a GOPAC officer for most of the 9403 tax year. He had close ties to Mr. Gingrich, a Republican elected official, who taught the RAC course. Two of PFF's five directors (Mr. Keyworth and Mr. Conner) had no formal affiliation with GOPAC or Mr. Gingrich. Third, ACA's activities were funded exclusively and directly by the National Republican Congressional Trust. PFF was not funded by Republican party organizations. while some funds came from organizations and individuals who had supported GOPAC in the past, most funds did not. Funds came from a broad group of foundations, businesses, and individuals. Fourth, the court believed that ACA admission panel members were Republicans, that the political affiliation of applicants could be deduced from their applications, and that graduates served on the campaigns of Republican candidates. The goal of ACA was specifically promoted only by educating the students who came to its campaign school to be campaign managers for Republican candidates. In contrast, the RAC course was taught at established colleges and universities where admission to the course was unrestricted. In addition, the file indicates that the distribution of the course and the course book by PFF was widespread and not narrowly targeted to Republican organizations. To the extent that distribution was focused generally on conservative organizations, such distribution is not the same as distribution to Republican organizations. Fifth, the court emphasized that ACA's curriculum included several courses with titles clearly related to, and biased towards, the Republican Party. We find that the RAC course material through our careful consideration of the four corners of its content, was not biased toward a political party or candidates for elective public office. Sixth, ACA's primary activity was to operate a campaign school to train political campaign professionals, and 90 percent of its funding was spent to operate the school. PFF had, from its inception, a broader range of activities. In addition to being distributed to the general public, the RAC course was taught at a number of established colleges and universities with much broader courses of study and student bodies than ACA. Based on the above analysis, we believe the facts in this case are distinguishable from the facts in ACA in at least the last four of the above six factors. While Mr. Eisenach had a recent background as a GOPAC official, he also had an extensive background as a federal official in several different agencies, as a think tank scholar, and as a university professor. PFF's many projects since its inception have been consistent with its stated educational purposes and with the background and beliefs of its founder. In contrast, ACA never had activities beyond the one activity that the court found to result in private benefit. Further, PFF in its other projects and endeavors appears to have been operating in a manner fully consistent with its *section 501(c)(3)* purpose. In summary, the facts of ACA, as found by the Tax Court, indicate that the American Campaign Academy was an organization with the limited purpose of conducting a campaign school that admitted only Republicans, who after graduation worked exclusively for Republican campaigns. The Court further found that these Republican students were taught a curriculum that was biased towards Republicans in a school that was funded exclusively by a Republican party organization. In contrast, PFF is an organization whose educational materials, viewed in isolation, do not favor a political party, and whose activities were broadly funded, were consistent with its stated exempt purposes, were scholarly in nature, and were broadly distributed and/or taught in general–curriculum colleges and universities. The differences we conclude to be most significant are the educational, unbiased educational nature of the four corners of the course content, the broad scope of the universities conducting the course and the distribution of the course by PFF to a broad section of the public in its original unbiased educational form. In addition the qualifications of the people involved in preparing, presenting and reviewing the course are also important. While we believe that the

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

PFF case is distinguishable from the ACA case, that does not end our discussion because ACA was only one example of private benefit.

### D. Relevance of Activity and Purpose to Exempt Status

[187] In the ACA case, ACA benefited the Republican Party by running a campaign school. Here PFF is alleged to have benefited the Republican Party by promoting principles of American civilization (i.e., an idea). Under this argument, the benefit to the Republican Party would result from having the principles taught in the RAC course and then used by GOPAC and Mr. Gingrich in their political activities outside of PFF.

[188] The RAC course has also been described as an attempt to start a movement centered around the ideas taught in the class. Although it has been argued that the desire to start a movement implies a purpose to benefit private interests, we note that many movements in America are represented by different organizations committed to a certain idea. These movements are often represented by related exempt organizations that may, for example, include one or more organizations described in *section 501(c)(3)*, *section 501(c)(4)*, and *section 527*. These movements include the civil rights movement, the family values movement, the women's movement., the environmental movement, and many others. While these movements center around a unifying principle and purpose (such as environmental preservation), the movements often have several components which are conducted by separate but related organizations described in the different Code sections. For example, a *section 501(c)(3)* organization may educate the public regarding the basic principles of the movement, a *section 501(c)(4)* organization may lobby for legislation calculated to promote these basic principles, and a *section 527* organization may support political campaigns of candidates who support the movement's principles. These organizations, like all exempt organizations, are treated separately as long as they are separately incorporated, take great care that the recordkeeping between the different categories of organizations is separate, and are careful that the activities of each fall within the scope of permissible activities for their separate Code sections. Generally, the same people may serve on the boards of directors of the different organizations and the same employees can divide their time between the organizations as long as their time is appropriately allocated between the organizations based on the nature of the activities they are working on for the respective organizations.

[189] Service practice in administering these Code sections was noted in a prominent manner by the Supreme Court in upholding the constitutionality of the *section 501(c)(3)* restriction on lobbying activity by *section 501(c)(3)* organizations in *Regan v. Taxation With Representation of Washington, 461 U.S. 540 (1983)*. Organized to promote the public interest in federal taxation, Taxation With Representation of Washington ("TWRII") was formed to take over two organizations with the same goals. *Id. at 543*. These two organizations consisted of a *section 501(c)(3)* organization that published a journal and engaged in litigation, and a *section 501(c)(4)* organization that lobbied. Id. The Supreme Court concluded that the lobbying restriction in *section 501(c)(3)* does not violate First Amendment rights of a *section 501(c)(3)* organization, in part, because lobbying may still be done by a related *section 501(c)(4)* organization. *Id. at 544*. The Supreme Court noted that TWR could still obtain tax-deductible contributions for its nonlobbying activity by returning to the dual structure that it had used in the past (i.e., a *section 501(c)(3)* organization and a *section 501(c)(4)* organization). Id.

Footnote 6 of the majority opinion stated that:

[190] TWR and some amici are concerned that the IRS may impose stringent requirements that are unrelated to the congressional purpose of ensuring that no tax-deductible contributions are used to pay for substantial lobbying, and effectively make it impossible for a *section 501(c)(3)* organization to establish a *section 501(c)(4)* lobbying affiliate. No such requirement in the Code or regulations has been called to our attention, nor have we been able to discover one. The IRS apparently requires only that the two groups be separately incorporated and keep records adequate to show that tax-deductible contributions are not used to pay for lobbying. This is not unduly burdensome. *Id. at 544-545*.

[191] The three-judge concurring opinion written by Justice Blackmun went further and concluded that this Service practice is essential to upholding the constitutionality of the *section 501(c)(3)* restriction on substantial lobbying. At page 552, Justice Blackmun stated that "in my view the result under the First Amendment depends entirely upon the Court's necessary assumption – which I share – about the manner in which the Internal Revenue Service administers section 501.*11 Id. at 552*. Justice Blackmun continued by stating that:

[192] A *section 501(c)(3)* organization's right to speak is not infringed, because it is free to make known its views on legislation through its *section 501(c)(4)* affiliate without-losing tax benefits for its nonlobbying activities.

[193] Any significant restriction on this channel of communication, however, would negate the saving effect of *section*

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

*501(c)(4). Id. at 553.*

[194] The request for technical advice indicated a concern with the connections between GOPAC (a *section 527* organization) and PFF (a *section 501(c)(3)* organization). While a *section 501(c)(4)* organization may set up a *section 527* organization, a *section 501(c)(3)* organization may not. GOPAC (the *section 527* organization) existed before PFF (the *section 501(c)(3)* organization). Moreover, while some persons associated with GOPAC (and some persons not associated with GOPAC) created PFF, GOPAC itself did not create PFF. PFF also quickly established itself as an organization fully independent from GOPAC. In addition, the name of the *section 527* organization (GOPAC) and the name of the *section 501(c)(3)* organization (PFF) were very distinct from each other. Also, the available materials do not evidence coordination between PFF and GOPAC (in furtherance of purposes impermissible for a *section 501(c)(3)* organization) sufficient to taint PFF's activities with regard to the RAC course.

[195] In addition to close personnel affiliations, such affiliated organizations may share similar basic ideas. The *section 4911* lobbying regulations address how educational documents may be used in different ways by these types of organizations. Section 56.4911–2(b)(2)(v) sets forth rules regarding the preparation and distribution of educational materials by a *section 501(c)(3)* organization that are later used either by the *section 501(c)(3)* organization itself, or by an affiliated *section 501(c)(4)* organization for lobbying. While the lobbying rules are not directly applicable to PFF in this context, we note that the underlying principles in section 56.4911–2(b)(2)(v) allow a *section 501(c)(3)* organization to make a substantial distribution of educational material even though this same material may also later be used in connection with lobbying without the *section 501(c)(3)* organization being charged with a lobbying expenditure. Section 56.4911–2(b)(2)(v) concludes that an "advocacy communication" (one that advocates a position on specific legislation but does not contain a direct encouragement to action) is not lobbying, even if later accompanied by a direct encouragement to action on the legislation, if the primary purpose in undertaking the advocacy communication was not for lobbying. Section 56.4911–2(b)(2)(v)(E) sets out a safe harbor on primary purpose if, prior to or contemporaneous with the lobbying, the organization makes a substantial nonlobbying distribution.. In this case, the facts show that PFF was involved in the presentation of an educational course that was widely distributed by PFF separate from any lobbying or political message by Mr. Gingrich or GOPAC.

E. Factors Used to Determine Private Benefit or Substantial Nonexempt
Purpose to Benefit Private Interests

[196] We consider all the facts and circumstances when determining whether there was private benefit, with particular emphasis on the activities of the organization and whether the activities were in furtherance of the organization's exempt purpose and were reasonably related to the accomplishment of that purpose in accordance with *Rev. Rul. 80–278.* The context surrounding PFF also presents many statements of purpose that we will next address regarding their relevance in determining the actual purpose of PFF. In ACA, the Tax Court considered the activities of the organization and also of other organizations and persons when determining purpose. The context in which PFF was formed and operated is illuminated by purpose statements of PFF and of other organizations and persons. Because of the many statements and activities that tend to show the purposes of persons related to this case, we have created the following outline to help consider these purpose statements and activities in light of their relative importance:

1. Statements

[197] (a) Official PFF statements (intended for public consumption) including:

o Articles of incorporation

o Bylaws

o Forms 1023 and 990

o Correspondence by officers, directors or other authorized
  persons on PFF stationery

o publications and activities

[198] (b) Unofficial statements by PFF's officers and directors including:

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

o Internal memos

o Ethics Committee Investigation depositions

[199] (c) Statements by organizations and individuals (except PFF officers and directors) affiliated with PFF including:

o Mr. Gingrich (as Congressman or as GOPAC chairman versus as RAC course professor)

o GOPAC

o KSCF

o ALOF

[200] In determining an organization's purposes from the above described categories of statements, we believe that Category 1.(a) contains the most compelling statements, with category 1.(c) containing the statements of least relevance.

2. Activities

(a) PFF itself:

o Development of book for RAC course

o Distribution of RAC course

o Refinement of RAC course

o Production of Progress Report television show

o Sponsoring of conference

o Other: Holding of brown bag lunch and initiation of future projects

(b) Related individuals and organizations (i.e., the context):

o Concurrent activities of related individuals (such as Mr. Gingrich) and organizations (such as GOPAC)

o Earlier AOW and ACTV television programs

[201] For purposes of determining an organization's purposes from we believe that Category 2.(a) contains the most compelling evidence, with Category 2.(b) containing evidence that is relevant when it is part of a combination of evidence similar to the ACA case.

F. Application of Factors

1. Statements

a. PFF

[202] The official PFF statements (i.e., Articles, Bylaws, Forms 1023 and 990, correspondence by officers, directors or other authorized persons on PFF stationery, publications, and less formal communications) stated that PFF's purpose were charitable and educational. Moreover, we do not have evidence that Mr. Gingrich, while teaching the class, stated that PFF or the class were intended to benefit Republican politicians or the Republican party.

[203] Moreover, on a contemporaneous basis, PFF formally denied (through letters from PFF or its attorneys)

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

allegations of a political purpose. One example is the letter responding to an article in Roll Call.

b. Unofficial Statements by PFF Officers and Directors

[204] We do not have unofficial statements by PFF's officers and directors (internal memos, unofficial statements of officers and directors) evidencing a purpose to benefit private interests. We have considered a number of quotes from depositions of key figures reported in the Ethics Committee Report but have not been allowed access to the complete deposition. Only one quote raises a question of improper purpose, and we were unable to examine the quote in context without the complete deposition.

c. Affiliated Organizations and Individuals

[205] We have no statements from organizations and individuals affiliated with PFF that the purpose of PFF was to benefit Republican entities. There are, however, statements by affiliated organizations and individuals that the RAC concept and the course would be used to benefit Republican politicians and entities. The allegation that PFF's purpose was primarily to benefit Mr. Gingrich and other Republicans is based primarily on the fact that Mr. Gingrich in his position in the House or as GOPAC chairman made numerous statements concluding that the PAC concept should be a focal point for Republican activities and that he was teaching the course, at least in part, to get Republicans elected to office. In addition, several GOPAC letters indicated that GOPAC intended to use the RAC concept for political purposes.

[206] At the same time, Mr. Gingrich was emphasizing that the renewal of American civilization needed to be much broader than simply a political renewal. In his January 25, 1993 speech to the House, Mr. Gingrich stated that the renewal needed to be cultural, societal, educational, economic, governmental, and political.

[207] Writing on behalf of KSCF, Mr. Eisenach stated that the goal of the course was to train 200,000 citizens into a model for replacing the welfare state and reforming our government. Mr. Gingrich, as an officer of GOPAC, often mentioned arousing 200,-000 activists in connection with the RAC course. He sometimes said that these persons would run for office but at other times mentioned the 200,000 activists without discussing their running for office. The many different references to training 200,000 citizens do not make it clear whether these citizens were simply to adopt the RAC principles or were to run for office. Moreover, Mr. Eisenach did not make similar statements on behalf of PFF.

1. Activities

a. PFF

[208] PFF's involvement with distribution and refinement of the RAC course did not indicate a purpose of benefiting private interests because the course itself and the book were not biased toward particular politicians, or a particular party. As discussed above, the RAC course and the course book were educational in content. In the RAC course, the overwhelming number of positions advocated in the course were very broad in nature and often more applicable to individual behavior or behavioral changes in society as a whole than to any "political" action. For example, the lecture on quality was much more directly applicable to individual behavior than political action and would be difficult to attempt to categorize in political terms. Another example is the lecture on personal strength where again the focus was on individual behavior. In fact, this lecture placed some focus on the personal strength of individual ' Democrats who likely would not agree with Mr. Gingrich on his political views expressed in forums outside of his RAC course teaching. Even in the lectures that had a partial focus on broadly defined changes in political activity, such as less government and government regulation, there was also a strong emphasis on changes in personal behavior and non-political changes in society as a whole. Moreover, the RAC course content does not direct its audience to specific applications of its content in the political arena. For example, an acceptance of the importance of personal strength in American civilization does not indicate whether welfare should be totally ended or simply restructured. If restructured, the form of the restructuring would not be clear.

[209] The Progress Report television snow discussed what the Republicans were doing in Congress but the programs were mainly focused on particular topics. The conference on "The Future of American Civilization", brown bag lunches and other projects begun in the 9403 tax year focused on public policy issues.

[210] The advertising and distribution of the RAC course and other PFF programs did not indicate private benefit. PFF advertised to and distributed the course material to colleges and universities in general. PFF also advertised and distributed the RAC course material to the general public without a focus on Republican groups.

b. Related Organizations and Individuals

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

[211] As discussed earlier, there were several organizations and individuals related to PFF. GOPAC, with Mr. Gingrich as General Chairman and Mr. Eisenach as Executive Director, had the stated goal of creating and disseminating a new vision for the Republican Party. This need for an organizing vision was also discussed in the Driving Realignment Conference held by the Republican Party in 1989.

[212] The RAC course appeared to some to be simply a later version of the ideas introduced in the earlier television programs AOW (conducted by GOPAC) and ACTV (conducted by ALOF). The triangle of American success in AOW and ACTV (consisting of entrepreneurial free enterprise, technological progress and innovation, and basic American values) evolved into the 5 pillars in RAC (lessons of American history, personal strength, entrepreneurial free enterprise, the spirit of invention and discovery, and quality as defined by Deming).

[213] Moreover, as discussed earlier, the RAC principles taught in the course were also used by Mr. Gingrich in GOPAC and in his position in Congress.

[214] The evidence indicates that persons related to GOPAC and to Mr. Gingrich created and governed PFF, although others unrelated to GOPAC and Mr. Gingrich were also on the PFF board.

[215] There was GOPAC involvement in the course in its early stages, mostly before PFF officially took over course distribution from KSCF and even before PFF's existence. A GOPAC employee was involved in fundraising for the course for two months when KSCF was fundraising for the course. In addition, GOPAC charter members considered course content during two meetings of GOPAC charter members.

[216] Organizations and individuals related to PFF, such as GOPAC and Mr. Gingrich, had stated an intention to create and disseminate a new vision for the Republican party. Projects such as AOW and possibly ACTV may be considered attempts at creating and disseminating a new vision. We do not have evidence, however, that these television shows expressly promoted the Republican party or Republican candidates. There were statements that Mr. Gingrich and others would use concepts from AOW and ACTV in the political sphere. The RAC course was a new vision without reference to the Republican party or Republican candidates. However, GOPAC and Mr. Gingrich used the course ideas in their political activities. There was GOPAC involvement in fundraising for and developing the course before PFF became fully involved with the course. The use by GOPAC and Mr. Gingrich of the RAC course concepts in their political activities, however, did not necessarily taint efforts by a separate organization (PFF) to broadly distribute an educational course that did not promote the Republican party or any Republican candidates.

G. Conclusions About More Than Incidental Private Benefit and
   Substantial Nonexempt Purpose

[217] The central problem in arguing that PFF provided more than incidental private benefit to Mr. Gingrich, GOPAC, and other Republican entities was that the content of the RAC course and the course book, which were PFF's major activities in its first tax year, were educational and, within the four corners of the materials, were not biased toward any of those who were supposed to be benefited. Moreover, the RAC course and course book were widely disseminated by PFF in its educational form. Neither the request for technical advice, nor the Ethics Committee Report argued that the course was not educational or that the course itself was biased. Moreover, the course and the course book were taught and developed by those with distinguished credentials in the field of education and/or in a particular subject. In addition to Dean Mescon and Ms. Minnix (co-teachers), Mr. Gingrich (co-teacher), Mr. Eisenach (intellectual development), and Mr. Hanser (intellectual development) all were present or former college professors with Ph.Ds. A wide range of persons (including Democrats) were asked to comment on the course material and were cited in the course as examples * of desired characteristics. During the RAC course, Mr. Gingrich favorably recognized current Democratic office holders Max Cleland and John Lewis as examples of personal strength.

[218] Although RAC principles could be used, in part, as a political party vision and could be a successor of an earlier philosophy in AOW, the RAC course can equally stand alone as educational in teaching principles applicable beyond the political arena through nonpolitical changes in personal and societal behavior. RAC principles were not in practice primarily of use only in campaigns. If they were, we would have reached a different conclusion in this case.

[219] The PAC course taught principles from American civilization that could be used by each American in everyday life whether the person is a welfare recipient, the head of a large corporation, or a politician. The class evaluations and letters indicated that people taking or viewing the class used the class principles for personal improvement.

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

[220] Without a bias in content and distribution, this case rests solely on the issue of operating for the impermissible purpose to benefit private interests, regardless of the content or distribution of the course. The question here has been raised because the argument is that Mr. Gingrich was using the principles of the course and mentioning the class in the political sphere (i.e., House speeches, memos to those in the House, GOPAC speeches, and GOPAC fundraising letters) and that Mr. Gingrich was saying in some forums that the RAC principles should be guiding principles for the Republican party.

[221] Mr. Gingrich's involvement in the RAC course and his public discussion of how the RAC concept should be a defining concept for the Republican party certainly raises serious concerns that make this a close case. While there is evidence that the content of the RAC course has been used in the political context by Mr. Gingrich, the issue is whether the use of an educational course for political purposes by its creator and teacher implies a substantial nonexempt political purpose (i.e., to benefit a certain political party or its candidates) attributable to all persons or organizations involved with the course.

[222] Use of the RAC concept by Mr. Gingrich in his political career (as House member and GOPAC chairman), however, does not necessarily jeopardize PFF's exempt status for several reasons. We believe that where the four corners of a course are educational and can be used in many non-political ways, an organization like PFF can maintain a separate educational purpose from those who utilize the material for political purposes. In this case, concepts in the course were applicable to individuals in their everyday life, whether or not the concepts had any use in politics. Moreover, even when Mr. Gingrich discussed the RAC concepts in the political sphere, as in a House speech, the concept was not linked to specific legislation or specific politicians. The facts show that the class was much more than a political platform. In the letter to Roll Call, Mr. Eisenach noted that the RAC concept encompassed more than the political sphere and noted that a central issue in this case was "whether a political leader can, in the 1990s, undertake to develop a set of ideas within an academic framework and, having done so, advocate those ideas in his political life."

[223] PFF was an independent organization in which Mr. Gingrich was not an officer or a director even though he was an important figure in the organization as a teacher, part-time host on the television program, and speaker at conferences. When Mr. Gingrich was functioning on behalf of the organization (i.e., teaching classes, hosting the television show, or speaking at conferences), he neither stated that the purpose of the RAC concept was to promote the Republican party nor specifically used the RAC concept to promote the Republican party, officials or candidates.

[224] Moreover, Mr. Eisenach did not, in his capacity as the President of PFF, state that the purpose of PFF was to benefit the Republican party or Republican candidates and did consistently deny allegations of such a purpose. In a September 1994 letter to Mr. Kondrake, Mr. Eisenach responded to a negative Roll Call article by stating that PFF was a non-partisan, educational institution with no connection to GOPAC or Mr. Gingrich's other partisan activities.

[225] On behalf of KSCF, Mr. Eisenach stated that the RAC course had the goal of training 200,000+ citizens into a model for replacing the welfare state. Mr. Eisenach had used the number 200,000 also with regard to training activists but without any clear pattern as to whether these activists would be elected officials. As a GOPAC spokesman, Mr. Eisenach spoke about testing the PAC message for use in legislative campaigns and congressional races. Mr. Eisenach's position as president of PFF, however, can be distinguished from his work at GOPAC, especially since the content of the course has clear nonpolitical educational purposes.

[226] Allocating the statements and activities of individuals among the positions that they do or have held is necessary to ascertain the purpose of each organization. Multiple organizations associated with movements especially take advantage of the ability to allocate the activities of the individuals involved among several organizations. Organizations involved in different aspects of a public policy subject often share personnel, office space, and supplies allocating the costs between them. While overlapping personnel in Republican party organizations and the school was considered one of several negative factors in ACA, the activities of overlapping employees can be appropriately allocated among separate organizations, particularly where the activities of the separate organizations stay within the parameters of appropriate activity for each organization.

[227] PFF was properly separated from GOPAC. The sharing of office space and employees by PFF with GOPAC was temporary and accounted for in bookkeeping.

[228] One argument raised about the RAC course and the Progress Report television show is that they provided Mr. Gingrich with an opportunity to increase his visibility and, therefore, his political career. Likewise, PFF-sponsored several writers who wrote books while working for PFF that would enhance their careers. For purposes of determining

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

private benefit, it is difficult to conclude that the benefit of greater visibility to a politician is fundamentally different than a similar benefit to any writer working for a think tank, particularly where, as here, the content of the course goes far beyond the political context. This benefit to those teaching classes and writing books sponsored by PFF was incidental to its educational purpose of educating the public about principles of American civilization and other topics. Consequently, any private benefit to the Republican party or Republican politicians was incidental. Similarly, the above analysis shows that PFF was not operated for substantial nonexempt purpose to benefit private interests.

[229] In reaching our conclusion in this close case we placed heavy reliance on a number of factors that, if they had not been present, may well have altered our conclusion that PFF did not serve the private interests of Mr. Gingrich, the Republican party, or GOPAC interests more than incidentally. Included in these factors are the nonpartisan content of the RAC course; the inclusion of favorable emphasis on several non-Republican officeholders in the content of the course and the required readings for the course; the wide distribution of the RAC course by PFF in its educational format; the teaching of the RAC course in the regular curriculum at several established colleges; the prompt establishment of PFF as a broadly funded, fully separate entity from GOPAC; the background of founder Mr. Eisenach and others as college teachers and/or think tank scholars; and the activities of PFF aside from the RAC course, during and after the tax year, that were fully consistent with PFF's stated educational purposes.

III. Campaign Intervention

[230] *Section 501(c)(3)* requires that: an organization ' described therein not participate in, or intervene in (including the publishing or distributing of statements) any political campaign on behalf of (or in opposition to) any candidate for public office.

[231] *Section 1-501(c)(3)-1(c)(3)(iii)* of the regulations provides that an organization is an "action organization," and therefore not operated exclusively for exempt purposes, if the organization participates or intervenes, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office. The term "candidate for public office" means an individual who offers himself, or is proposed by others, as a contestant for an elective public office, whether such office be na6onal, s1tate, or local. Activities which constitute participation or intervention in a political campaign on behalf of or in opposition to a candidate include, but are not limited to, the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate.

[232] Section 1.501(c)(3)-l(d)(2) of the regulations provides that the fact that an organization, in carrying out its primary purpose, advocates social or civic changes or presents opinion on controversial issues with the intention of molding public opinion or creating public sentiment to an acceptance of its views does not preclude such organization from qualifying under *section 501(c)(3) of the Code* so long as it is not an "action" organization.

[233] *Rev. Rul. 78-248, 1978-1 C.B. 154,* ruled whether "voter education" publishing activities resulted in political campaign intervention in violation of *section 501(c)(3) of the Code,* in four situations. The Service stated that the determination depends on All the facts and circumstances of the case. Situations 3 and 4 resulted in intervention, whereas Situations 1 and 2 did not. In Situation 1, the organization annually prepared and made generally available to the public a compilation of voting records of all Members of Congress on major legislative issues involving a wide range of subjects — the publication contained no editorial opinion, and its contents and structure did not imply approval or disapproval of any Members or their voting records. In Situation 2, the organization in election years sent a questionnaire to all candidates for governor in a certain State that solicited a brief statement of each candidate's position on a wide variety of issues, and published the responses in a voters guide generally available to the public that did not evidence a bias or preference with respect to the views of any candidate or group of candidates. Situation 3 was like Situation 2 except that some questions evidenced a bias on certain issues. Situation 4 involved an organization primarily concerned with land conservation matters that published a compilation of incumbents' voting records on land conservation issues which was widely distributed among the electorate during an election campaign and contained no express statements in support of or in opposition to any candidate.

[234] *Rev. Rul. 80-282, 1980-2 C.B. 178,* amplifying *Rev. Rul. 78-248,* held that an organization's publication of a newsletter did not result in political campaign intervention in violation of *section 501(c)(3) of the Code.* one of the organization's activities was monitoring legislative, judicial, administrative, and other governmental activities of important social interest, and reporting them in a monthly newsletter distributed to interested members and others, who together numbered only a few thousand nationwide. The newsletter expressed the organization's views on a broad range of legislative, judicial, and administrative issues. In discussing a particular issue, the reader was sometimes encouraged

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

to contact various governmental officials to express his or her views on the issue. As soon as practical after the close of each congressional session, the organization published in its newsletter a summary of the voting records of all incumbent Members of Congress on selected legislative issues, with an expression of the organization's position on those issues. Each Member's votes were reported in a way which illustrated whether he or she voted in accordance with the organization's position on the issue. The newsletter was politically non-partisan, and did not contain any reference to or mention of any political campaigns, elections, candidates, or any statements expressly or impliedly endorsing or rejecting any incumbent as a candidate for public office. No mention was made of an individual's overall qualification for public office, nor was there any comparison of candidates competing with the incumbents in any political campaign. The voting records of all incumbents were presented and candidates for re-election were not identified. The newsletter pointed out the limitations of judging the qualifications of an incumbent on the basis of a few selected votes and noted the need to consider such unrecorded matters as performance on subcommittees and constituent service. Publication usually occurred after congressional adjournment and was not geared to the timing of any federal election. The newsletter was not targeted toward particular areas in which elections were occurring. The Service reasoned that while the format and content of the publication were not neutral, the case was distinguishable from Situations 3 and 4 of *Rev. Rul. 78-248* in that the publication was not widely distributed but only to the organization's normal readership, and no attempt was made to target the publication toward particular election areas or to time the date of publication to coincide with an election campaign.

[235] Intervention in a political campaign is determined from consideration of all the facts and circumstances. See Rev. Ruls. 78-248 and 80-282. For purposes of *section 501(c)(3)*, intervention in a political campaign may be direct or indirect, explicit or implicit. Considering all the facts and circumstances, we find that PFF did not intervene in a political campaign on behalf of (or in opposition to) Mr. Gingrich or any other candidate in contravention of *section 501(c)(3) of the Code* during the year at issue.

[236] One form of political intervention is publishing or disseminating statements on behalf of (or in opposition to) a candidate. Mr. Gingrich was certainly a candidate for re-election to his congressional seat as of the filing of his publicly-available F.E.C. statement of candidacy, if not sooner. A 501(c)(3) organization's dissemination of a speech by a candidate may result in political intervention, depending on a number of circumstances.

[237] One question is whether PFF's publication of statements by Mr. Gingrich was an endorsement of Mr. Gingrich's candidacy. Although the published statements were widely disseminated, placed Mr. Gingrich in a favorable light, set forth the tenets of his general philosophy (particularly, the proper role of government in American society) and some of his views on issues, and may have been beneficial to him as a candidate, PFF's participation in the RAC course and Progress Report did not constitute intervention in a political campaign. As discussed above the content of the RAC course was educational and never favored or opposed a candidate for public office. Mr. Gingrich was recognized as a professor of the colleges at which he taught the RAC course. While his status as a Congressman was mentioned during the course, his candidacy for re-election was not mentioned. Also of importance is the fact that PFF's dissemination of statements was not (1) timed to coincide with an election, or (2) narrowly targeted to Georgia's 6th District. Dissemination was an ongoing activity and was nationwide in scope. Although Mr. Gingrich was effectively running for House leadership roles (national positions) as well as Representative of Georgia's 6th District, such positions as the House Speaker, Minority Leader, and Whip are not "public offices" for 501(c)(3) purposes since they are not elected by the general public but by House members.

[238] We do not regard PFF's activities as benefiting any particular candidate, although it may be argued that the activities incidentally resulted in a benefit to Republican candidates at all levels of government to the extent that the general ideas taught in the RAC course were also used by GOPAC. There may be instances where a 501(c)(3) organization intervenes on behalf of multiple candidates by benefiting a political party or other political organization, as where it makes a financial contribution or disseminates explicitly partisan statements. In this case, however, consistent with our analysis regarding exempt purpose and private benefit, we find that PFF did not intervene on behalf of the candidates of the Republican party merely by promoting the RAC theme simultaneously with GOPAC or by carrying on activities similar to activities carried on by GOPAC in the past.

IV. Inurement

[239] *Section 501(c)(3)* requires that no part of the net earnings of an organization described therein inure to the benefit of any private shareholder or individual.

[240] Section 1.501(a)-1(c) of the Income Tax Regulations defines a "private shareholder or individual" as a person

© 1999, Tax Analysts, Tax Notes Today, FEBRUARY 5, 1999

having a personal and private interest in the activities of the organization.

[241] To determine that PFF's net earnings inured to the benefit of Mr. Gingrich, we must find both (1) that Mr. Gingrich was a "private shareholder or individual" (an insider) with respect to PFF, and (2) that PFF's net earnings inured to his benefit.

[242] Regardless of whether Mr. Gingrich was an insider, we find that PFF's net earnings did not inure to his benefit. Mr. Gingrich did not receive any salary or financial compensation from PFF (other than reimbursement of travel and other expenses related to his provision of services to PFF) for the services he provided as a creator and lecturer of the RAC course, co–host of the Progress Report, author of a chapter in the RAC course book, speaker at a PFF conference, and fundraiser. Thus, he volunteered his services. These services involved a substantial commitment of time and effort. PFF had legitimate reasons for accepting his services — as a former college history professor and a developer of the course ideas, Mr. Gingrich was highly qualified to provide such services. Any benefits derived by Mr. Gingrich from PFF (as discussed above, personal publicity, and publicity of the RAC themes also promoted by Mr. Gingrich in his campaign speeches and by GOPAC in its dissemination of materials) were not the kind of direct personal and financial–type benefits that have been held to constitute inurement of an organization's net earnings.

CONCLUSIONS

1. PFF was an educational, charitable organization described in
   *section 501(c)(3)*.

2. PFF did not serve the private interests of Mr. Gingrich,
   GOPAC, and Republican entities, individuals, and other
   private interests or otherwise have a substantial nonexempt
   purpose to benefit private interests.

3. PFF was not an "action" organization by reason of campaign
   intervention.

4. PFF's net earnings did not inure to the benefit of Mr.
   Gingrich.

[243] A copy of this technical advice memorandum is to be given to PFF. *Section 6110(j)(3) of the Internal Revenue Code* provides that it may not be used or cited as precedent.

*************** End of Document ****************