# Exhibit Q

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF COLUMBIA
 3       ---------------------------)
 4       DEMOCRATIC LEADERSHIP       )
 5       COUNCIL, INC.,              )
 6              Plaintiff,           )
 7          vs.                      )  No. 1:05-cv-1067(JGP)
 8       UNITED STATES,              )
 9              Defendant.           )
10       ---------------------------)
11                  -   -   -   -   -
12          The deposition of GEORGE TERRY SMITH was
13   taken on Thursday, March 30, 2006, commencing at
14   10:02 a.m., at the offices of Perkins Coie LLP,
15   607 Fourteenth Street, N.W., Washington, D.C.,
16   before Josett F. Whalen, Registered Merit
17   Reporter and Notary Public.
18                  -   -   -   -   -
19
20
21
22
23
24
25
```

Page 2

1    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF:
4        MARC E. ELIAS, ESQ.
5        EZRA W. REESE, ESQ.
6        ROBERT BAUER, ESQ.
7        Perkins Coie LLP
8        607 Fourteenth Street, N.W.
9        Washington, D.C. 20005-2011
10       (202) 434-1609
11       melias@perkinscoie.com
12
13
14   ON BEHALF OF THE DEFENDANT:
15       MICHAEL J. MARTINEAU, ESQ.
16       United States Department of Justice
17       Tax Division
18       P.O. Box 227
19       Ben Franklin Station
20       Washington, D.C. 20044
21       (202) 307-6483
22       michael.j.martineau@usdoj.gov
23
24
25

Page 3

1         I N D E X
2    DEPOSITION OF GEORGE TERRY SMITH
3         MARCH 30, 2006
4
5    EXAMINATION BY:            PAGE
6    MR. ELIAS                  4
7
8
9    EXHIBITS MARKED            PAGE
10   Number1                    33
11   Number2                    34
12   Number3                    59
13   Number4                    63
14   Number5                    67
15   Number6                    78
16   Number7                    102
17   Number8                    106
18   Number9                    116
19
20
21
22
23
24
25

Page 4

1    PROCEEDINGS
2        - - - - -
3    Whereupon --
4        GEORGE TERRY SMITH
5    a witness, called for examination, having been
6    first duly sworn, was examined and testified as
7    follows:
8        EXAMINATION
9    BY MR. ELIAS:
10       Q.  Revenue Agent Smith, my name is
11   Marc Elias. I am a partner with the law firm of
12   Perkins Coie. We represent the plaintiffs in
13   this matter, the Democratic Leadership Council.
14       I'm going to ask you a series of
15   questions today as part of a deposition.
16       You've been sworn in.
17       The court reporter is going to take
18   down a verbatim transcript of the questions I
19   ask, the answers you give, anything said by
20   counsel, so there are a couple of ground rules
21   that I just want to lay out at the beginning.
22       Number one, I will do my best to speak
23   slowly and clearly. I'm from New York, so I
24   don't always do that, and I'm cognizant of that,
25   so I'll try to articulate well.

Page 5

1        And I'll also do my best to make sure
2    that you get a chance to answer the questions
3    that I ask. In return, I'd just ask that you
4    not anticipate the questions I'm asking so that
5    the transcript reflects question, answer,
6    question, answer. Oftentimes in conversation
7    it's easy to jump in when you think you know
8    where the person is going, but it then creates,
9    frankly, a bit of a mess for the transcript, so
10   I would ask that you just let me finish the
11   question, you finish the answer, and we'll
12   proceed from there.
13       I would ask the same thing of counsel.
14   If there are objections or other things that
15   want to be said, we'll let the transcript read
16   clearly on those things.
17       MR. MARTINEAU: That's agreed. We'll
18   all speak slowly and make sure the reporter gets
19   it.
20       MR. ELIAS: You'll let us know as well
21   when your hands are tired and you need a break.
22       BY MR. ELIAS:
23       Q.  In addition to when the court
24   reporter's hands get tired, when you reach a
25   point that you want to take a break, just let

Page 6

```
 1  me know.  There are soft drinks and other
 2  things, facilities.  If you need to use a
 3  telephone, not a problem.  Just let us know
 4  when you need a break, and we'll arrange for
 5  that.
 6         If you don't understand a question I
 7  ask, I apologize in advance.  You work for the
 8  IRS; I don't.
 9         So if some of my terminology is not
10  precise or I'm not clear, just ask me to restate
11  the question or ask me to clarify the question.
12  I'll be happy to do so.  I ask only in return
13  that you make sure that you understand the
14  question I'm asking.
15         Does that all --
16    A.   If I'm not clear on something, do I
17  have the right to discuss it with Mike before I
18  answer?
19    Q.   Well, I'd prefer that you answer first
20  and then confer after giving an answer, but if
21  you then want to clarify an answer or come back
22  and amend your answer, that's fine.
23         MR. MARTINEAU:  If there's a question
24  about another entity where we have -- and I'm
25  not anticipating any questions, but there are
```

Page 7

```
 1  tax confidentiality issues and privileges.
 2         If there are concerns about tax
 3  confidentiality issues under section 6103(a) of
 4  the Internal Revenue Code of privileged matters,
 5  I will of course interpose an appropriate
 6  objection and may, if appropriate, direct the
 7  witness not to answer or consult with him to
 8  ensure that in answering the question he's
 9  answering it consistent with those legitimate
10  concerns.
11         BY MR. ELIAS:
12    Q.   And that's fine.
13         If you just don't understand what I'm
14  asking, I'd ask you just to talk to me about it
15  and answer the question before consulting with
16  counsel.
17         But if it relates to a privilege or an
18  issue of statutory confidentiality, of course
19  we'd expect that counsel is going to make sure
20  that the government's interests are protected.
21         MR. MARTINEAU:  Agreed.
22         BY MR. ELIAS:
23    Q.   Are you ready to proceed?
24    A.   Yes.
25    Q.   Great.
```

Page 8

```
 1         Have you ever been deposed -- let me
 2  start by asking for you to state for the record
 3  your full name and your position with the
 4  government.
 5    A.   My name is George Terry Smith, and I'm
 6  a revenue agent with the Internal Revenue
 7  Service.
 8    Q.   Have you ever been deposed before?
 9    A.   No.
10    Q.   Have you ever offered sworn testimony
11  in court?
12    A.   No.
13    Q.   Have you ever supplied an affidavit in
14  a court proceeding?
15    A.   Supplied -- meaning?
16    Q.   Have you ever signed an affidavit?
17    A.   Oh, no.
18    Q.   Do you have either any medical
19  conditions or taking any medication that would
20  prevent you from conducting this deposition or
21  answering questions?
22    A.   No.
23    Q.   Okay.  What did you do to prepare for
24  today's deposition?
25    A.   What did I do today?
```

Page 9

```
 1    Q.   No.
 2         What did you do before today or this
 3  morning to prepare?
 4    A.   Just looked over the work papers that I
 5  had submitted to the service at the completion
 6  of the audit.
 7    Q.   Anything else?
 8    A.   No.
 9    Q.   Did you meet with anyone or talk to
10  anyone?
11    A.   I discussed it with Mike (indicating).
12    Q.   With --
13         MR. MARTINEAU:  Mr. Martineau, counsel
14  for the government.
15         MR. ELIAS:  Thank you.
16         BY MR. ELIAS:
17    Q.   Other than Mr. Martineau, did you talk
18  to anyone?
19    A.   No.
20    Q.   Did you talk to a supervisor about it?
21    A.   No.  Because the supervisor I have is
22  new and she had no idea what was going on.
23    Q.   What about coworkers?
24    A.   No.  I spoke with coworkers, but
25  everybody was curious what questions you guys
```

Page 10

1  were going to ask.
2  Q. And what did you tell them?
3  A. Who knows.
4  Q. You mentioned that you looked at the
5  work papers that you had submitted.
6     Could you describe to me -- we're going
7  to go over some, but if you could describe to me
8  in general terms what they were.
9  A. Well, I looked at the form -- case
10 chronology, Form 5464. I believe that's the
11 correct number. I looked at the Form 5773 and I
12 looked at the 30-day letter that was issued to
13 the organization.
14 Q. The 38 letter?
15 A. Right. I looked at the revenue agent's
16 report to -- the 30-day revenue agent's report
17 that was issued to the organization.
18 Q. Okay. Let's just take these in order
19 since, like the court reporter, I'm not wholly
20 familiar with all of the internal paperwork of
21 the IRS.
22    The Form 5404 is --
23 A. 5464.
24 Q. I'm sorry -- is a case chronology?
25 A. Yes.

Page 11

1  Q. The Form 5773, what is that?
2  A. It's a summary of the items you look at
3  during the audit.
4  Q. And the -- did you say 38 letter?
5  A. The 30-day letter.
6  Q. 30-day letter?
7  A. Or the revenue agent's report.
8  Q. And that's --
9  A. That's what gives you the facts, law
10 and conclusion of the audit.
11 Q. Anything else?
12 A. No.
13 Q. Did you look at the original Form 1024?
14 A. Yes. Yes. Well, I looked at what was
15 supplied to me, what I had in the office.
16 That's all.
17 Q. Which would have included the 1024.
18    Would it have included a CD-ROM of --
19 A. No. The CD-ROM is something I looked
20 at years ago, when I originally started the
21 audit.
22 Q. What else other than the 1024?
23 A. Just the 1024.
24    I guess what we call -- I guess you all
25 call them interrogatories or something that you

Page 12

1  guys submit.
2  Q. Interrogatories.
3  A. Interrogatories, I looked at a few of
4  those.
5  Q. Did you -- have you reviewed any of
6  the deposition transcripts taken in this
7  matter?
8  A. No.
9  Q. So have you --
10 A. "Depositions" meaning?
11 Q. There have been other depositions of
12 witnesses.
13 A. Oh, no.
14 Q. So you haven't seen any of the
15 deposition transcripts?
16 A. No.
17 Q. With the exception of Mr. Martineau,
18 has anyone described to you what's contained in
19 the depositions?
20 A. No.
21 Q. Can you give me just a brief -- I don't
22 need exhaustive -- just a brief background of
23 your educational background, when you joined the
24 IRS, what positions you've held?
25 A. I went to college in Maryland, went to

Page 13

1  Morgan State University, and I graduated in 1978
2  with a BS in accounting.
3     I started working for the IRS in
4  January of 1987. And my position with the
5  service has been, since I've started, a revenue
6  agent, specifically for nonprofits, exempt
7  organizations.
8     And in doing that, I have done what we
9  call I guess working on the determination side,
10 which is looking at 1023 and 1020 applications
11 for approval. And other than that, I just audit
12 the 990s, which is the returns that nonprofits
13 sign, I mean, complete.
14 Q. Now, in this instance, you were
15 auditing for a determination of whether the DLC
16 acted within its tax-exempt status?
17 A. I wasn't auditing for the determination
18 because the determination had already been made,
19 because they already received their tax
20 exemption.
21    So when I came out to do the audit, I
22 was conducting a financial and a compliance
23 audit.
24 Q. And is that something that -- you said
25 that you are on the determination side.

4 (Pages 10 to 13)

Page 14

1  Is that something that you normally do
2  as part of your job function?
3      A.  No.  The determination -- when I said
4  "determination," it's like when you spoke of the
5  1024.  When an applicant fills out a 1024, they
6  submit it to the service, and we have to make a
7  determination on that particular application to
8  determine whether or not they qualify for
9  exemption, so that's a totally different
10 function from when I go out and do an actual
11 audit.
12     Q.  Right.  And I guess I'm trying to ask,
13 what percentage of your work is on the
14 determination side versus on the compliance and
15 financial audit side?
16     A.  I don't understand the question
17 because, like I said before, when I come out and
18 do the audit, the determination has been made,
19 so when I come out, I'm doing a financial and
20 what I consider a compliance audit.
21     Q.  Let me -- I'm not being clear.  I guess
22 what I'm asking is, what percentage of your
23 caseload, of your workload, of the time you
24 spend in a month or a year is spent reviewing
25 1024s or 990s versus conducting financial and

Page 15

1  compliance audits where there has already been a
2  determination of tax-exempt status but you're
3  conducting the kind of audit that you did in
4  this case?
5      A.  A hundred percent goes on doing
6  financial audits of 990s.
7      Q.  Okay.  So you do not review incoming
8  1024s to determine whether --
9      A.  No more, no.
10     Q.  No more?
11     A.  No more.
12     Q.  Okay.  When did that change?
13     A.  That's something I did for about
14 basically the first year, just so you can have
15 an understanding --
16     Q.  I got it.
17     A.  -- of what's on the 1023 and 1024
18 application.
19     Q.  So you did that in '87-88?
20     A.  That's right.  That's it.
21     Q.  And since then, you've been doing the
22 financial compliance audits?
23     A.  That's it.  Exactly.
24     Q.  I realize this is only a guess, but if
25 you had to guess, how many financial and

Page 16

1  compliance audits do you think you've done in
2  the 18 years?  Hundreds?  Dozens?  Thousands?
3      MR. MARTINEAU:  Don't speculate.  Just
4  give your best guesstimate.
5      THE WITNESS:  I would say at least a
6  hundred.
7      BY MR. ELIAS:
8      Q.  Okay.  That's fine.
9         So a lot?
10     A.  A lot, yeah.  It depends on the size of
11 the audit.  You know, some ones you can do in a
12 week or so and some like this take years.
13     Q.  This was a long audit?
14     A.  Oh, it was going on for years, about
15 two, three years.
16     Q.  Did your title change during that time
17 period or were you a revenue agent --
18     A.  No.  Once I came in the door, I was a
19 revenue agent.
20     Q.  And what are your current duties?  Is
21 it still compliance -- still financial
22 compliance audits?
23     A.  Yes.
24     Q.  Tell me a little bit about, during the
25 time period in question -- and let's just talk

Page 17

1  about that for a second.
2         During the -- when did your audit
3  begin?
4      A.  I would have to look at a case
5  chronology to see the date of it.  I can't
6  speculate.
7      Q.  You mentioned you have a new
8  supervisor.
9      A.  Right.
10     Q.  Who was your last supervisor?
11     A.  A fellow by the name of Wayne Hampel
12 H-A-M-P-E-L.
13     Q.  And what was his title?
14     A.  He was the manager, group manager.
15     Q.  And how long was he in that position?
16     A.  I couldn't tell you.  He was my
17 manager for like five years or so, so prior to
18 that, he was a manager somewhere else, you
19 know.
20     Q.  And do you know who his supervisor
21 was?
22     A.  At the time.  The fellow is deceased
23 now.  I can't remember his name.  But when he
24 left, the new area manager's name is
25 Joanne Darling, let's say "Joanne Darling."

Page 18

1   Q. And what is her title or position?
2   A. She was like area manager of I think
3   from, say, New Jersey to South Carolina. She's
4   area regional manager.
5   Q. And these are all within the -- within
6   what division? Where in the IRS are you?
7   A. We're what we call TE/GE, tax exempt.
8   Q. This is all with?
9   A. TE/GE, tax exempt organization.
10   Q. With respect to the DLC audit, were
11   there any other either coworkers or subordinates
12   who you worked with on the audit?
13   A. When I first started, I had another
14   agent by the name of Daniel Rose who was working
15   the case with me.
16   Q. Daniel Rose?
17   A. Uh-huh, Daniel Rose.
18       And we were -- I was also assisted
19   by -- who was it? -- Mark Hulse, which is an
20   attorney out of New York.
21   Q. He's also with the IRS?
22   A. Yes. District counsel I believe.
23       District counsel I believe.
24   Q. Would his area cover the, if you know,
25   the same geographic area as the

Page 19

1   New Jersey-South Carolina area?
2   A. I don't know.
3   Q. You don't know?
4   A. I don't know.
5   Q. Other than -- when did Daniel Rose drop
6   off of the DLC audit?
7   A. He didn't really play a big part. He
8   just started initially on the audit, you know,
9   because he, you know, had his own casework to do
10   and he was just assisting me when I first
11   started.
12       So I mean, he would just review certain
13   documents periodically as I asked him to look at
14   this or look at that, you know, just to get an
15   opinion. He wasn't like on the case heavily
16   like I was.
17   Q. Other than Mr. Rose and Mr. Hulse, who
18   else did you have discussions with regarding the
19   DLC audit?
20   A. The area manager of course.
21   Q. Which would have been --
22   A. Well, Joanne Darling.
23   Q. Joanne Darling, right.
24   A. I'd say Mark Hulse. My group manager
25   of course, Wayne Hampel. And from time to time

Page 20

1   I would speak with different attorneys who would
2   come in from the national office.
3   Q. Do you remember who?
4   A. I don't remember their names.
5   Q. The national office in D.C.?
6   A. Right, the national office in D.C.
7   Q. And is that again -- it's an ignorant
8   question, but is it the national office within
9   the exempt branch or is it the national office
10   above the exempt branch?
11   A. I don't know what the parameters are.
12   They might be with exempt and tax division. I
13   don't know. We use them as consultants when
14   we're not clear on certain issues.
15   Q. Tell me a little bit about your
16   understanding about section 501(c)(4)
17   organizations.
18   A. My understanding of (c)(4)
19   organizations for the most part is that they are
20   supposed to, let's say, they're supposed to
21   partake in social programs for a particular
22   community, for the benefit of a particular
23   community.
24   Q. What can't they do?
25   A. See, that's a hard question to ask

Page 21

1   because I have to ask -- first see what they're
2   doing. I'm just not going to speculate and say
3   what someone can't do when I don't know what
4   you're doing.
5   Q. As I understand it, there is a
6   restriction on, for example, political
7   intervention by 501(c)(4) organizations or at
8   least political intervention over a certain
9   amount, certain -- above a certain threshold.
10       Can you describe what that restriction
11   is?
12   A. What are you saying is political
13   intervention?
14   Q. I don't know. I'm asking you.
15   A. Well, from what I gather, political
16   intervention, what we're saying is that they're
17   not supposed to partake directly in
18   intervention with an elected official becoming
19   elected in a political office, no direct
20   participation.
21   Q. In the electoral process or in the
22   government process?
23   A. In the electoral process I would think,
24   unless -- like vote for George, things of that
25   nature.

6 (Pages 18 to 21)

Page 22

1   Q. What about, as I understand it, the
2   DLC -- ultimately, the reason why we're here,
3   the controversy stems from a belief that it
4   confers private benefit.
5       What is the -- in general, just at the
6   general level, what is your understanding as to
7   the prohibition on conferring a private
8   benefit?
9   A. If I understand your question
10  correctly, the private benefit that the --
11  where -- for what we still stated in our
12  letter?
13  Q. At this point I'm not talking about
14  just the DLC. I'm just trying to understand
15  what these terms mean and sort of how -- when
16  the IRS, when a revenue agent, is looking at an
17  organization and trying to determine whether it
18  is or is not conferring a private benefit kind
19  of what are the parameters, the general
20  parameters. We're going to talk specifically
21  about the DLC in a few minutes.
22  A. We're saying that the activities of an
23  organization should not be curtailed to have
24  benefited in just that particular part, that
25  particular organization or members of that

Page 23

1   organization. It should benefit the entire
2   universe as a whole or the entire community, not
3   one particular group or individuals.
4   Q. This may be a stupid question, but
5   don't all organizations at some level benefit
6   their members?
7   A. No. I can't say that.
8   Q. So there can be no private benefit?
9   A. I'm not going to say there can't be any
10  private benefit.
11      I mean, because of course there are
12  some things that organizations do that are going
13  to benefit members, but that shouldn't serve as
14  their main purpose of operation.
15  Q. So it's the main purpose that is what
16  determines this?
17  A. It's -- I'm not going to say it's
18  their main purpose. What we look at and judge
19  and see is a large percentage of what they're
20  doing.
21  Q. I'm sorry.
22  A. A large percentage of what they're
23  doing.
24  Q. A large percentage. Okay.
25      And do you have a threshold for what is

Page 24

1   considered large? 10 percent? 50 percent?
2   70 percent?
3   A. No. I'm not going to sit here and say
4   that because then I've got to identify how much
5   are doing this and that. That's not something I
6   can do.
7   Q. That was a question.
8   A. That's something I can't do.
9   Q. Do you as part of the audit try to
10  determine the percentage of activity that an
11  organization is doing?
12  A. No. That's something, I mean, I can't
13  do, sit down and say, well, you're doing this
14  more than you're doing that. I look at the
15  activity as a whole and base my opinion on
16  that.
17  Q. So you don't look at, for example, when
18  you're auditing, you don't look at the budget
19  line items and say okay, you spent three million
20  dollars in total and fifty thousand went to this
21  and a million went to that and use that as a
22  guide?
23  A. No. Because a lot of times with these
24  nonprofits their budgets are not outlined like
25  that. Depending on the size of the organization

Page 25

1   determines how -- how the -- I guess the
2   activity is going to be budgeted from a
3   financial standpoint.
4   Q. But if an organization had a budget
5   that was broken out that way, I'm just asking
6   whether that's relevant, whether the percentage
7   of money spent on one program or another is
8   something you consider or whether it's just not
9   relevant even if you had the information.
10  A. It can be relevant, but that's not
11  something that I go in and look at. I don't go
12  in an audit and say, well, this is what you
13  budgeted for for X, Y and Z and this is what you
14  spent for this, so this tells me what you're
15  doing. That's not how I look at it.
16  Q. Let me start by just seeing if I
17  understand what you've said, so tell me if this
18  is not a fair characterization.
19      I think you said a 501(c)(4) needs to
20  benefit the entire community rather than just
21  its own members.
22  A. Right.
23  Q. Okay. Is benefiting republicans or
24  democrats benefiting the entire community or is
25  that benefiting just its own members?

7 (Pages 22 to 25)

**Page 26**

1    A. I don't know. It depends on what
2 they're doing.
3       I don't understand the question.
4    Q. Okay. Is there -- when you're
5 conducting a financial and compliance audit,
6 does the name of the organization factor in to
7 whether it's conferring a private benefit?
8    A. No. Not for me.
9    Q. What about if it's founded by elected
10 members of the House or Senate or at the state
11 or local level?
12    A. Repeat the question.
13    Q. I read in the newspaper Senator McCain
14 founded an organization. I think it's called
15 the Reform Institute. You read in the
16 newspaper about various elected officials
17 involved in forming various 501(c)(4)
18 organizations.
19       Is the fact that an elected official
20 is involved in the forming of the 501(c)(4)
21 organization, is that something that goes into
22 your review of the facts as to whether there's
23 a private benefit?
24    A. No.
25    Q. What if there are elected members on

**Page 27**

1 the board of directors?
2    A. That -- no. Not totally, no. It's not
3 just the board of directors. It's the entire
4 membership of the organization.
5    Q. Okay. Well, tell me about that.
6       So if the membership of the
7 organization is partisan, then that is
8 relevant?
9    A. Relevant as far as us going out there
10 and conducting an audit or the activity?
11    Q. No. When you're conducting the audit.
12 You're already in there and you're looking at
13 stuff and you come across an organization that
14 has a membership that is comprised
15 predominantly or exclusively of one political
16 party.
17    A. I guess it becomes relevant, but then
18 you also have to look at the activities, too,
19 not just who's on the membership listing.
20    Q. Why is that?
21    A. Because the activities tell you what
22 they're doing; just looking at the membership
23 doesn't.
24    Q. And is private benefit based on the
25 membership or on the activities?

**Page 28**

1    A. On the activities.
2       MR. ELIAS: We can go off the record
3 for a second.
4       (Discussion off the record.)
5       BY MR. ELIAS:
6    Q. Tell me a little bit about how an
7 organization that wants to obtain an exemption
8 under section 501(c)(4) goes about doing that.
9    A. By filling out the 1024 application.
10    Q. And sending it to?
11    A. Sending it in to the determination
12 phase of the IRS.
13    Q. And I know you said you worked in that
14 division at least briefly.
15       Can you tell me just generally what
16 they're looking at?
17    A. They're looking at the activities of
18 the organization, the purpose of what they're
19 going to be doing, the type of programs that is
20 going to be conducted by the organization.
21    Q. So are they looking at basically the
22 same kinds of things that you're looking at when
23 you do your financial compliance audits?
24    A. Yes. For the most part. Seeing what
25 you're going to do, how you're going to operate,

**Page 29**

1 how you're going to do it.
2    Q. Are there any differences?
3    A. In what?
4    Q. In what they're looking at versus
5 what --
6    A. No. Because what they're looking at is
7 what I'm supposed to be doing. It's based on
8 what you put on the application, are you really
9 doing what you're saying you're going to be
10 doing.
11    Q. So in some sense your audit is
12 confirming what the organization told the IRS
13 in the beginning what they were going to be
14 doing.
15    A. Right.
16    Q. And what is the -- if the IRS approves
17 you, gives you -- approves that you're a
18 501(c)(4), you get a letter; is that right?
19    A. Yes.
20    Q. What's the -- what does that mean?
21    A. That you've been granted exemption
22 under the particular exempt status that you
23 applied for.
24    Q. And does that mean that if you then do
25 the activity you described that you are --

## Page 30

1 you're legally in the clear?
2    A.  I guess until we find out otherwise.
3    Q.  This is an important point I just want
4 to understand because it's actually one of the
5 things that I find confusing about this that I'm
6 educating myself on.
7         If when you do your job, when you do
8 your compliance and financial review audit, if
9 you find that an organization did what it said
10 in an application it was going to do, is that
11 the end of the story, or can there still be a
12 determination that it's not acting within
13 section 501(c)(4)?
14    A.  Say that again.
15    Q.  If you look at -- if you conduct an
16 audit and you look at its application, the
17 1024 of the organization, and it turns out they
18 did exactly what they said they were going to do
19 in the manner in which they said they were going
20 to do it --
21    A.  Right.
22    Q.  -- is that the end of the story, or can
23 you still recommend that their tax-exempt status
24 be revoked?
25         MR. MARTINEAU:  I'm just going to

## Page 31

1 object.  To the extent you're asking him for a
2 legal conclusion, I object.  To the extent
3 you're asking him for an understanding of the
4 factual way the process works, you may answer.
5         MR. ELIAS:  Right.
6         MR. MARTINEAU:  You're speaking as
7 a --
8         BY MR. ELIAS:
9    Q.  I'm not asking you to reply to the
10 law.
11        I just want to know, in your
12 experience, as a factual matter, do you look at
13 it and say, I may not think this is exempt, but
14 they got exempt status on this application, and
15 that's what they're doing or do you -- as a
16 factual matter, not as a legal matter, as a
17 factual matter, you may say, No, I may want to
18 disagree with the fact that they ever approved
19 this.
20   A.  Well, if I go out there and they're not
21 doing what they're supposed to be doing, what
22 they identified in the application, or if
23 they're not following the guidelines of a
24 501(c)(4), I can make a recommendation that the
25 organization's status be revoked.

## Page 32

1    Q.  I guess what I'm asking, though, say
2 they are doing what they said they were going to
3 do in their application, but in your judgment
4 that activity is either a private benefit or is
5 political intervention or is not social welfare,
6 but they're doing exactly what they said they
7 were going to do in the application, what would
8 you do then?
9    A.  If they're doing exactly what they said
10 they were going to be doing and if it's within
11 the guidelines, I'll give them a favorable
12 exemption -- I mean favorable --
13    Q.  But say it's not within the guidelines
14 of what you understand -- say you disagree, that
15 the application never should have been granted,
16 the exemption should have never been granted
17 because you look at the facts and say this is
18 political intervention or this is a private
19 benefit.
20    A.  What do I do?
21    Q.  Yeah.
22    A.  Discuss it with my manager and
23 counsel.
24        MR. ELIAS:  Okay.
25        (Recess)

## Page 33

1         (Plaintiff's Deposition Exhibit
2 Number 1 was marked for identification.)
3         BY MR. ELIAS:
4    Q.  I'm showing you a copy of Plaintiff's
5 Exhibit Number 1.
6         Do you recognize this document?
7    A.  Yes.  I think I seen it this morning.
8    Q.  And if you can turn to the third page,
9 do you see that this is a subpoena to you for
10 your deposition today?
11   A.  Yes.
12   Q.  And if you turn to the last page, am I
13 correct that this is a list of documents that
14 you were to produce pursuant to that subpoena?
15   A.  Yes.
16   Q.  Okay.  Have you had a chance to read
17 it?
18   A.  I was just reading it over.
19        Okay.
20   Q.  What did you do to comply with this
21 subpoena?
22   A.  I gave -- to comply with this, I gave
23 all the documents I had to Mike, anything --
24 actually, once I completed the audit, all the
25 documents I had when I closed the case out was

Page 34

1  forwarded to our review staff in Dallas. I
2  think they gave them to Mike or whatever.
3       Q. So with respect to number 1, all
4  documents in your possession relating to the
5  DLC that have not already been produced, you're
6  saying you don't have any documents you haven't
7  already turned over to the Department of
8  Justice.
9       A. No.
10      Q. With respect to number 2 -- I asked you
11 this at the beginning, but I'll just ask you
12 again -- you haven't offered any testimony in
13 depositions or affidavits, so there weren't any
14 to turn over it sounds like.
15      A. No. Other than this deposition here,
16 no.
17      MR. MARTINEAU: Okay. That's it.
18      MR. ELIAS: Let me hand to the court
19 reporter and I'll give a copy to your counsel
20 of what will be marked as Plaintiff's
21 Exhibit 2.
22      (Plaintiff's Deposition Exhibit
23 Number 2 was marked for identification.)
24      BY MR. ELIAS:
25      Q. Do you recognize this document?

Page 35

1       A. Yes.
2       Q. What is it?
3       A. The 1024, Application for Recognition
4  of Exemption.
5       Q. You've seen this before?
6       A. Seen what?
7       Q. This document.
8       A. Yes.
9       Q. When did you first see it?
10      A. Last Friday.
11      Q. Last Friday?
12      A. Yes, last Friday.
13      Q. When you were preparing for the
14 deposition?
15      A. Right.
16      Q. Is this something you would have seen
17 at the time of your financial and compliance
18 review and audit?
19      A. No. Not unless the organization has a
20 copy. If I didn't request a copy through the
21 service, I would not have seen this.
22      Q. So as part of your Internal Revenue --
23 your audit, you wouldn't automatically get a
24 copy of the 1024?
25      A. Not unless you request it.

Page 36

1       Sir, you're dealing with the
2  government. You might get it; you might not.
3       Q. Sounds like the government to me.
4       MR. MARTINEAU: I object to that
5  comment by counsel.
6       MR. ELIAS: Except present company
7  excluded.
8       MR. MARTINEAU: We'll make sure that
9  that's highlighted in the record.
10      MR. ELIAS: I didn't mean you.
11      MR. MARTINEAU: Very fair.
12      BY MR. ELIAS:
13      Q. We're going to walk through this
14 document, so -- it's not Bates-stamped. Great.
15 Or is it? No.
16      Okay. We'll hopefully track the pages
17 along together.
18      MR. MARTINEAU: Fair enough.
19      BY MR. ELIAS:
20      Q. First of all, when you looked at this
21 document last Friday -- or if you want to take
22 time now, you can look at it again -- is there
23 anything about this application that, as
24 someone with a lot of experience having
25 reviewed a lot of 1024s and organizations --

Page 37

1  that's my characterization -- that you find
2  unusual?
3       A. No. Because the -- actually the copy I
4  had appeared to be incomplete to me. Like I
5  said, it was a government copy. You know, it
6  didn't have all the questions -- it wasn't this
7  detailed. The copy that I had was not this
8  detailed. It didn't have --
9       Q. Why don't we take a few minutes here
10 and let you -- I'm not going to ask you to read
11 the whole thing, but since you actually haven't
12 seen this copy, let's take a minute and let you
13 at least flip through it so you familiarize
14 yourself that you at least know what is in it
15 before we talk about it.
16      MR. MARTINEAU: Okay. Take a look.
17      MR. ELIAS: Why don't we go off the
18 record for a minute.
19      (Discussion off the record.)
20      BY MR. ELIAS:
21      Q. Have you had a chance to --
22      A. Yeah.
23      Q. Okay. Let me ask you now, are there
24 any things about the application -- we'll go
25 through it in detail, so I'm not asking you to

10 (Pages 34 to 37)

George T. Smith  
Washington, DC  
March 30, 2006

Page 38

1  focus on anything in specific -- is there
2  anything about the application itself that looks
3  unusual or out of the ordinary?
4    A.  No.
5    Q.  If you'd turn to page -- it's actually
6  the attachment to the 1024, the articles of
7  incorporation and bylaws.  Right
8  there (indicating).
9       Just so that the record is clear, it
10 says at the top of the page "Attachment to
11 Form 1024, Part II"; is that correct?
12   A.  Yes.
13   Q.  Is it standard for an applicant to
14 submit a copy of their bylaws and articles of
15 incorporation?
16   A.  Yes.  It's part of the application
17 requirements.  Yes.
18   Q.  If you turn two more pages, and again
19 just so the record is clear, this has a date
20 stamp in the bottom that says "filed March 4,
21 1985."
22      Do you see that?
23   A.  Uh-huh.
24   Q.  And it says at the top "Articles of
25 Incorporation of Democratic Leadership Council,

Page 39

1  Inc."
2       Do you see that?
3    A.  Yes.
4    Q.  The name of the organization at the
5  time that its application was submitted was the
6  Democratic Leadership Council, Inc.; is that
7  correct?
8    A.  That's -- I guess.
9       MR. MARTINEAU:  That's what the
10 document says?
11      THE WITNESS:  That's what the document
12 says, yes.
13      BY MR. ELIAS:
14   Q.  Is there anything in your audit that
15 suggested contrary?
16   A.  No.
17      Contrary to the name?
18   Q.  Yeah.
19   A.  No.
20   Q.  In the bottom of page -- of that page,
21 that last paragraph, it says, "This corporation
22 is organized primarily for the purpose of
23 bringing about civil betterments and social
24 improvements."
25      Do you see that?

Page 40

1    A.  Uh-huh.
2    Q.  Is that, in your experience, is that a
3  permissible description of a 501(c)(4)
4  organization?
5       MR. MARTINEAU:  Here again he's
6  speaking based on his experience and not as a
7  legal matter.
8       THE WITNESS:  From based on my
9  experience, this is what -- this is standard
10 language that would come in for a (c)(4).
11      But you know, if I was doing the
12 application, I would probably ask crazy
13 questions and ask them a simple question and say
14 what is civil betterments, because I really
15 don't understand what it is, if I was doing this
16 application.
17      BY MR. ELIAS:
18   Q.  If you were reviewing the application?
19   A.  Right, right.
20      Tell them to explain to me what is
21 civil betterments.  I don't know what it is.  I
22 still don't.  I would ask them to explain that
23 to me so that would give me a better
24 understanding of just what they're going to be
25 doing.

Page 41

1    Q.  Do you think in this case they should
2  have done that?
3    A.  I'm not going to second-guess who would
4  have approved it.
5    Q.  But you would have done it.
6    A.  I would have done it, yes.
7    Q.  Is the next sentence also standard
8  language or is that --
9    A.  Which one?  That's the activities of
10 corporation -- you read it.
11   Q.  "The activities of this corporation
12 shall not include direct or indirect
13 participation or intervention in political
14 campaigns..."
15   A.  That's not really something that I seen
16 that was standard for a (c)(4), but it's
17 something that you would definitely see in a
18 (c)(3), because a (c)(4) are permissible to do a
19 certain amount of political activities or
20 legislation activity, things of that nature.
21      This is not standard language for me,
22 from my experience, for the year that I done
23 it, or when I'm doing audits, this is not
24 something I normally see in a (c)(4)'s
25 application.

11 (Pages 38 to 41)

Page 42

1   Now, in (c)(3) it's standard law,
2   language.
3   Q. Did anything in your audit -- did you
4   find anything in your audit inconsistent with
5   that, that statement?
6   A. Which statement?
7   Q. "The activities of this corporation
8   shall not include direct or indirect
9   participation or intervention in political
10  campaigns on behalf of or in opposition to any
11  candidate for public office."
12  A. I wish I would have seen that. I
13  didn't see any of that.
14  Q. You wished you would have seen that?
15  A. That would have made my life easy.
16  Q. In what respect?
17  A. If they had done that in that respect
18  they would have done something that they said
19  they would not do if I would have saw something
20  like that.
21  Q. Is it fair to say in general what you
22  found was that the DLC was in fact doing what
23  they originally said they were going to do?
24  MR. MARTINEAU: I object to the
25  sentence when you said "in general."

Page 43

1   But you may answer the question.
2   THE WITNESS: Repeat the question.
3   MR. ELIAS: Okay. Read it back.
4   (The record was read as follows:)
5   "QUESTION: Is it fair to say in
6   general what you found was that the DLC was in
7   fact doing what they originally said they were
8   going to do?"
9   MR. MARTINEAU: Same objection.
10  You may answer.
11  THE WITNESS: Well, I don't know how to
12  answer that question.
13  You're saying, when I went out and
14  looked at their activities, did it comply with
15  what was in the -- what was in the articles of
16  incorporation?
17  BY MR. ELIAS:
18  Q. Yes.
19  A. Were they in fact doing that?
20  Q. Yes.
21  A. I would say that they were doing that,
22  what they said they was doing, they were doing
23  that.
24  Q. Okay. And specifically did you find
25  any activities that they were engaged in that

Page 44

1   were inconsistent with what they described as
2   their activities would be in their application
3   for recognition and exemption?
4   A. Okay. Repeat the question one more
5   time.
6   MR. ELIAS: Why don't you read it
7   back.
8   THE WITNESS: Read it back.
9   (The record was read as follows:)
10  "QUESTION: And specifically did you
11  find any activities that they were engaged in
12  that were inconsistent with what they described
13  as their activities would be in their
14  application for recognition and exemption?"
15  THE WITNESS: No. I would not say --
16  didn't see any activities that they would --
17  that they were not doing as they stated in the
18  exempt -- in their articles of incorporation.
19  BY MR. ELIAS:
20  Q. Okay. Can you flip to page -- it's cut
21  off a little bit, but it's actually page 3.
22  Yeah, that's the one (indicating).
23  And again, I'm just going to read this
24  so the record will reflect this.
25  This is the page that has article 9,

Page 45

1   article 10 and article 11; is that correct?
2   A. Uh-huh.
3   Q. Okay.
4   The article 9 sets forth the initial
5   board of directors; is that correct?
6   A. Yes. I guess so.
7   Q. Do you know who the
8   Honorable Charles Robb is?
9   A. No.
10  Q. Do you know who the Honorable Sam Nunn
11  is?
12  A. No.
13  Q. Do you know who the
14  Honorable Richard A. Gephardt is?
15  A. No.
16  I've heard the names, but I don't know
17  them.
18  Q. So you're not aware that all three of
19  those individuals were democratic elected
20  officials?
21  A. No. I wasn't aware. I will be honest
22  and say I knew -- I have heard of the name
23  Gephardt.
24  Q. Right.
25  A. I'm familiar with that name.

12 (Pages 42 to 45)

Page 46

1   Q. I'm sure he'd be happy since he ran for
2   president.
3   A. Right.
4       The other two, Nunn and Charles Robb,
5   I'm not familiar with. I have heard Gephardt
6   before.
7   Q. Do you see their addresses were listed
8   as the State Capitol, the United States Senate
9   and the U.S. House of Representatives?
10  A. That's the address that's on the
11  application. I see that, yes.
12  Q. If you had been the one reviewing this
13  application, would it cause you any concern to
14  see that the three initial directors were listed
15  with addresses that were the Senate, the
16  House of Representatives, and the State Capitol
17  of Richmond?
18      MR. MARTINEAU: Again, I want to make
19  sure he's speaking for himself as a revenue
20  agent.
21      He may answer the question.
22      THE WITNESS: If it was me personally
23  looking at it?
24      BY MR. ELIAS:
25  Q. Yes.

Page 47

1   A. It's just an address.
2   Q. So it wouldn't have caused you
3   trouble?
4   A. And a lot of people have P.O. boxes. I
5   don't care what your address is.
6   Q. Okay. Fair enough.
7       We're going to skip a bunch more pages
8   in to where it says "Attachment to Form 1024,
9   Part III, Question 3."
10  A. Keep going back?
11  Q. Yeah, keep going.
12      Right there (indicating).
13      Do you see that it says "Attachment to
14  Form 1024, Part III, Question 3"?
15  A. Yeah, I do.
16  Q. And just so that the record is clear,
17  question 3 refers back to the actual 1023 form;
18  is that correct?
19  A. Yes. It says "Part III, Question 3" I
20  guess of the application?
21  Q. Right.
22  A. Right.
23  Q. And that -- maybe you can summarize,
24  if you can. If you can't, it speaks for
25  itself.

Page 48

1       But can you just summarize generally
2   what that question is asking for?
3   A. Where you at? Which? This
4   one (indicating)?
5   Q. It's there (indicating).
6       (Pause in the proceedings.)
7   A. So now that I read this here --
8   Q. I'm just asking for you to just
9   summarize for the record so that the record is
10  clear what it is that this -- what the question
11  was that this narrative was addressing.
12  A. It speaks for itself. It says, "Give a
13  detailed narrative description of the
14  organization's past, present and proposed future
15  activities..."
16  Q. Okay.
17  A. For the purpose for which I guess it's
18  going to operate.
19  Q. Why don't you take a few minutes to
20  read the three pages that answer this
21  question -- it's actually two pages and a
22  sentence and a footnote -- because then I'm
23  going to ask you specific questions about this,
24  but I want you to have an opportunity to read it
25  all in context so that I'm not taking anything

Page 49

1   out of context.
2       (Pause in the proceedings.)
3   A. Is this my copy here (indicating)?
4       I mean, could I underline something if
5   I wanted to?
6   Q. No. That's the -- that's the --
7   A. Okay.
8       MR. ELIAS: Do you want to give him
9   your copy to underline?
10      MR. MARTINEAU: Ask him questions, and
11  if he wants to look at mine and underline
12  something, he can.
13      (Pause in the proceedings.)
14      BY MR. ELIAS:
15  Q. Having read the answer to part III,
16  question 3, is there anything in what was
17  submitted by the DLC that, in your opinion, is
18  inconsistent with them operating under
19  section 501(c)(4)?
20      MR. MARTINEAU: Again, he's speaking
21  as a revenue agent, not giving a legal
22  analysis.
23      Go ahead. You may answer.
24      THE WITNESS: From my personal
25  perspective?

## Page 50

```
 1        MR. MARTINEAU: Yes, sir.
 2        THE WITNESS: From my perspective
 3   looking at the activities from what they
 4   submitted to me, I would say it's consistent
 5   with what it says here.
 6        BY MR. ELIAS:
 7     Q.  I'm sorry. Say that here again?
 8     A.  From the activities I was in to review,
 9   I would say the activities is consistent from
10   what they put in their, I guess -- in their
11   answer to question 3.
12     Q.  So when you reviewed what they had
13   actually done in 1997, 1998 and 1999, after the
14   fact, your after-the-fact review, the DLC's
15   activities during those three years were
16   consistent with what they told the IRS they
17   would be doing.
18     A.  Right.
19     Q.  And is there anything in what's
20   contained in these three pages that you believe
21   is not appropriate for a 501(c)(4) to do?
22        MR. MARTINEAU: Again, speaking for
23   yourself --
24        THE WITNESS: From my own perspective.
25        MR. MARTINEAU: Yes, sir.
```

## Page 51

```
 1        THE WITNESS: If I would have got this
 2   501(c)(4) application, I would just question
 3   what they got down here where it says
 4   "Current Activities," that says "first" and it
 5   says "presidential nominating procedures." I
 6   would just question what is that or what are you
 7   talking to about right there. You know, I would
 8   just question that, what are they talking about,
 9   how are you going -- what is the presidential
10   nominating procedures.
11        There was something else.
12        BY MR. ELIAS:
13     Q.  For example -- no. Go ahead.
14     A.  You can go ahead.
15     Q.  No. You please finish.
16        (Pause in the proceedings.)
17        So for example, in the first paragraph,
18   it says, "The Democratic Leadership Council was
19   organized in early" --
20     A.  Wait, wait. Where you at? At the
21   top?
22     Q.  Yeah -- "was organized in early 1985
23   by certain elected officials and others who
24   were concerned with the formulation of national
25   policy and with the direction of policy debate
```

## Page 52

```
 1   within the Democratic Party."
 2        Is that consistent with what your
 3   audit --
 4     A.  Yes.
 5     Q.  -- showed?
 6     A.  Sure.
 7     Q.  And is that, in your personal view,
 8   consistent with appropriate activity for a
 9   501(c)(4)?
10     A.  From my experience -- let me just read
11   this one more time.
12        (Pause in the proceedings.)
13        They're saying "formulation of a
14   national policy and with the direction of policy
15   debate within the Democratic Party."
16        I wouldn't say that's consistent -- I
17   would not say that's consistent with a (c)(4)
18   because typical (c)(4)s are not doing such
19   activities.
20     Q.  And do you think that that is
21   inconsistent because it confers a private
22   benefit, because it's political intervention?
23   Why is it -- what is it not -- what's wrong with
24   it?
25     A.  I'm saying that when I think of a
```

## Page 53

```
 1   (c)(4) and as an individual doing an audit and
 2   you go out and you're looking at activities, if
 3   you look at the definition, it says to -- when I
 4   conduct -- from my perspective from what a
 5   (c)(4) does, if you looked in the IRC code, it
 6   says promotion of social welfare benefits for a
 7   community. It says, you know, these
 8   organizations, these nonexempt organizations, is
 9   going to benefit a -- the organizations will
10   benefit a particular community.
11        I don't see that here. You know, when
12   you take a look at the definition of what they
13   say a (c)(4) should be or what they're going to
14   do. This is totally something else to me.
15   That's to me personally. To me personally. It
16   doesn't fit the description of a social welfare
17   organization. That's my personal, not the law.
18     Q.  If you go down to Current Activities,
19   do you see the first activity it describes?
20     A.  Read it to me.
21     Q.  "First, through task forces, composed
22   of elected officials and private citizens, it
23   has developed and is developing written policy
24   positions on the following issues," and then it
25   sets forth a bunch of issues.
```

14 (Pages 50 to 53)

George T. Smith                                                                                                   March 30, 2006
Washington, DC

Page 54

1   A. Uh-huh. And presidential nominating
2   procedures. That's the one -- I would have
3   questioned it if I had the application.
4   Q. Okay.
5   A. What is that? What are they doing? I
6   don't know.
7   Q. If it was reforming the presidential
8   nominating process within the Democratic Party,
9   would that be a problem?
10  A. Explain to me what you just said. What
11  is the reforming the nominating process? I
12  don't understand that lingo.
13  Q. Let's look at the second one.
14      It says that it has sponsored and will
15  continue to sponsor town meetings and issue
16  forums for business, labor, civic, student and
17  other audiences around the country.
18      Anything there that would have caused
19  you a red flag?
20  A. No.
21      I mean, let me see.
22      (Pause in the proceedings.)
23  No.
24      Now, we're talking about from the
25  perspective if I was approving this

Page 55

1   application?
2   Q. Yeah.
3   A. I probably would have asked some simple
4   question how does this meet the qualifications
5   of a (c)(4), something simple like that.
6   Explain to me how is this creating social
7   welfare programs that is going to benefit the
8   community as a whole.
9   Q. On the next page, the third one is
10  holding regular bimonthly meetings in
11  Washington, D.C. to discuss policy matters.
12  A. That goes back to what we just were
13  speaking of.
14  Q. Fourth, contracts for studies on
15  specific issues.
16      Any concerns there? Would you have
17  asked further questions without raising red
18  flags?
19  A. No. Like I said, my thing would have
20  been just explain to me how this -- to me, to a
21  degree, it doesn't fit a (c)(4).
22  Q. The application doesn't.
23  A. Some of the activities.
24  Q. That are described in the application?
25  A. That's me personally. I'm not the law.

Page 56

1   I probably would have went to my manager and
2   said, Would you approve this? Because I would
3   have had problems. And of course they're going
4   to say, Approve it.
5   Q. Why do you say of course they'd say
6   that?
7   A. That's the way they usually do it.
8   Q. Do you see the next header, it says
9   "Relationship to the Democratic Party"?
10  A. Yes.
11  Q. Do you see -- maybe you should read
12  the -- that paragraph for the record.
13      "The Democratic Leadership Council is
14  so named because it was founded by federal and
15  state elected officials who are democrats and
16  who were concerned with the direction of policy
17  debate within their party, as well as within the
18  country as a whole."
19      Let's just stop there.
20      Do you believe that's consistent
21  with --
22  A. Definitely.
23  Q. You believe --
24      MR. MARTINEAU: Let him ask the
25  question.

Page 57

1       BY MR. ELIAS:
2   Q. Is that consistent with what activity
3   they engaged in?
4   A. Let me read it again.
5       (Pause in the proceedings.)
6       Yes, that's --
7   Q. That's consistent with?
8   A. What they're doing.
9   Q. With what they're doing?
10  A. Yes.
11  Q. And is that, in your view, consistent
12  with section 501(c)(4) status?
13  A. And I'm not the law.
14  Q. I understand.
15  A. From my perspective, that's when I
16  would have been concerned with the private
17  benefits of a particular party or a particular
18  group of individuals. Because they tell you
19  right there it's for the Democratic Party. And
20  from my understanding, that's not what a (c)(4)
21  is supposed to be formulated for. But who am I?
22  That's from my perspective.
23  Q. And the next sentence: "Through the
24  establishment of DLC, these officials and others
25  with similar interests and goals expected to

15 (Pages 54 to 57)

Page 58

1   improve the overall contribution of democratic
2   leaders, in the federal and state government, to
3   national policy debate, and to urge upon both
4   the party and the general public new and
5   innovative approaches to policy."
6        Is that consistent with what you
7   reviewed their actual activities to be?
8        A. Sure. Sure.
9        Q. And does it -- if you had reviewed the
10  application at the time, would that give you
11  cause for concern?
12       A. Sure. For me as the individual
13  reviewing it because it's telling you right
14  there it's for the benefit of a particular
15  party, a particular group of individuals.
16       Q. So is it fair to say that the DLC
17  accurately described the activity it was going
18  to engage in?
19       A. It sure is.
20       Q. Engaged in that activity?
21       A. It sure did.
22       Q. And that you simply don't agree that
23  the application should have been granted in the
24  first instance?
25       A. I would have, me personally, would

Page 59

1   have problems granting the exemption because to
2   me it's one-sided. It's telling you they're
3   for the benefit of a particular political group
4   of individuals and not for the universe as a
5   whole.
6        That's my perspective and what I
7   understand of what a (c)(4) is supposed to be
8   formulated for.
9        MR. ELIAS: Okay. Let's...
10       (Discussion off the record.)
11       MR. ELIAS: I'm handing to the court
12  reporter what will be marked as Plaintiff's
13  Exhibit 3.
14       (Plaintiff's Deposition Exhibit
15  Number 3 was marked for identification.)
16       BY MR. ELIAS:
17       Q. Do you recognize this document?
18       A. I've never seen this particular one,
19  but I recognize them, yes.
20       Q. What is it?
21       A. It's the -- let me read it first.
22       (Pause in the proceedings.)
23       It's the letter that was granted to
24  Democratic Leadership Council approving their
25  exemption.

Page 60

1        BY MR. ELIAS:
2        Q. Okay. Are these form letters?
3        A. Excuse me. What do you mean?
4        Q. Are these generally form letters?
5        In other words, they -- is the text in
6   these letters the same in all exemption letters,
7   or are they different?
8        A. No. Some letters are different. Some
9   people have what they call private ruling
10  letters where, you know, something specifically
11  will probably be documented in their letter.
12  This is I guess a standard form letter for a
13  501(c)(4).
14       Q. And to pick up on the point you just
15  made, does the IRS, if they have concerns or
16  questions about an organization, sometimes put
17  caveats in these letters?
18       A. Exactly. Yes.
19       Q. And explain that to me.
20       MR. MARTINEAU: Be careful when you
21  explain it you don't disclose any third-party
22  information of other entities.
23       THE WITNESS: Those type of letters are
24  not issued at my level. They'd be coming from
25  the district counsel or national office if the

Page 61

1   letter is going to be caveated.
2        BY MR. ELIAS:
3        Q. But just explain to me generically,
4   without specific taxpayer information, explain
5   to me what that means.
6        A. What does what mean?
7        Q. That it's caveated.
8        A. They're going to caveat the letter to
9   put something in the letter specifically
10  explaining what they can do and what they can't
11  do. But like I said, those type of letters are
12  not generated by a revenue agent of my status.
13  They would come from higher up.
14       Q. So this letter is not caveated.
15       MR. MARTINEAU: That's your --
16       Q. Is that correct?
17       MR. MARTINEAU: That's your question.
18  The letter speaks for itself.
19       BY MR. ELIAS:
20       Q. In your experience?
21       A. I can say from my experience in
22  knowing -- I know the young lady who granted
23  this exemption. I'm not going to sit here and
24  say it's not caveated or what because I don't
25  know all the standard language.

16 (Pages 58 to 61)