### Page 62

1  MR. MARTINEAU: The document says what
2  it says.
3  THE WITNESS: Yeah, it says what it
4  says. I'm not going to sit here and say it --
5  because there are certain caveats...
6  (Pause in the proceedings.)
7  Because some of this language in this
8  letter, like, for instance, that last
9  paragraph --
10  BY MR. ELIAS:
11  Q. Okay. Just so the record is clear, the
12  last paragraph begins, "Because you are not an
13  organization described in section 170(c)..."?
14  A. Right.
15  Q. Okay.
16  A. That may have been a caveat that was
17  put in there. I'm not sure, though, because
18  some of it is standard. Because there are
19  certain caveats that the agents can put on
20  letters that are standard.
21  Q. Fair enough.
22  A. But then there are some that would come
23  from, like I say, come from up above.
24  MR. MARTINEAU: Very good. Very good.
25  Thank you.

### Page 63

1  MR. ELIAS: I'm going to ask the court
2  reporter to mark as Plaintiff's Exhibit 4 a
3  document entitled Classification Record.
4  (Plaintiff's Deposition Exhibit
5  Number 4 was marked for identification.)
6  BY MR. ELIAS:
7  Q. Have you seen this document before?
8  A. No. But I like it.
9  Q. I'm sorry. I didn't hear that.
10  A. No. I like what's in it, though.
11  Q. What do you like about it?
12  A. The nature of allegations. That's
13  all.
14  Q. Because it's consistent with your
15  view.
16  A. Yes.
17  Q. Can you just -- I'm sorry. I asked --
18  you have not seen this --
19  A. I've never seen this one before.
20  Q. Have you seen documents of this nature?
21  If not this document, have you seen
22  classification records before?
23  A. Something like this document I think I
24  probably would see -- I've seen documents of
25  this nature before, but not if you're talking

### Page 64

1  about this particular entity.
2  Q. No.
3  What is a classification record? What
4  is this document used for?
5  A. Just what it's saying here. This is
6  something from my experience -- it says "nature
7  of allegations" -- is when a referral comes in
8  to the office.
9  Q. Okay. Referral into the office?
10  A. Into the IRS.
11  Q. The IRS.
12  A. The IRS. The IRS. The big system.
13  Q. From the outside?
14  A. From the outside.
15  Q. I got you.
16  A. From the outside. Or internally.
17  Q. Or internally?
18  A. Or internally. It could be outside.
19  And the nature of allegations, they
20  are looking at someone from probably what they
21  seen in the media or newspaper or whatsoever
22  and they come in and say, well, can you look at
23  this and see if it's worth going out and
24  looking at it. It's generated from anyone.
25  Who knows.

### Page 65

1  Q. I realize you haven't seen this before,
2  and if you don't know, we're just going to move
3  on.
4  Do you know -- by chance know -- the
5  last sentence of the allegation says, "This is a
6  grade 13 case."
7  A. Where you at?
8  Q. Under Nature of Allegation, the last
9  sentence.
10  A. Yes.
11  Q. It says, "This is a grade 13 case."
12  A. Yes.
13  Q. Do you have any idea what that means?
14  A. Tell him?
15  MR. MARTINEAU: You can tell him.
16  THE WITNESS: Oh. It's the level of
17  an agent's experience that probably should get
18  the case because the grades start from 5
19  through 13.
20  BY MR. ELIAS:
21  Q. And what grade are you?
22  A. 13.
23  Q. Okay. And in the bottom where it says
24  "years" --
25  A. Where you at?

Page 66

1      Okay.
2      Q.  Do you see that?
3      A.  Uh-huh.
4      Q.  Can you tell the court reporter what
5  that says?
6      A.  9612.
7      Q.  What does 9612 --
8      A.  Probably the year ending December 31,
9  1996.
10     Q.  You all seem to put 12 at the end of
11  all your years.
12         MR. MARTINEAU:  9612 --
13         (Discussion off the record initiated by
14  the court reporter.)
15         MR. MARTINEAU:  George, go ahead and
16  explain what 9612 is.
17         THE WITNESS:  9612 normally means the
18  year ending date for the accounting period or
19  the year that something was looked at.  It was
20  looked at the twelfth month of the year 1996.
21  When you say you go out and you do an audit, you
22  audit that particular year, 9612.
23         MR. ELIAS:  Can we take five minutes?
24         MR. MARTINEAU:  Absolutely.
25         (Recess)

Page 67

1         BY MR. ELIAS:
2      Q.  Let's talk a little bit about the
3  process of the audit of the DLC.
4         When did you first hear that you were
5  assigned to the DLC case?
6      A.  I mean, I don't know -- I can't name
7  the date, month and year.  If I could look at
8  that case chronology, I could give you a little
9  idea.
10     Q.  Which case chronology, because we --
11     A.  The 5464, the form on top.  I think
12  it's 5464.
13     Q.  This (indicating)?
14     A.  No.  Wait a minute.  Let me see.
15     Q.  This (indicating)?
16     A.  Yeah, that little thing.  That has a
17  little date on it.
18     Q.  I was going to ask about it anyway,
19  so...
20         MR. MARTINEAU:  Very good.
21         MR. ELIAS:  I'm going to ask the court
22  reporter to mark as Exhibit 5 what I have
23  recently learned is the 5464.
24         (Plaintiff's Deposition Exhibit
25  Number 5 was marked for identification.)

Page 68

1         BY MR. ELIAS:
2      Q.  Do you recognize this document?
3      A.  Yes.
4      Q.  What is it?
5      A.  It's a case chronology that we do each
6  day we do something to a particular case.  We
7  document the time, the date and what you've
8  done.
9      Q.  And this is a record kept in the
10  ordinary course of your duties?
11     A.  Yes.  It's a record that I keep in
12  my -- when I'm performing an audit.
13         However, this doesn't appear to be the
14  first page (indicating).
15     Q.  And you say that because?
16     A.  Because it says, "Begin to review
17  information on the CD-ROM..."  That's a CD-ROM
18  which I've gotten from you guys, so that
19  couldn't -- do you know what I mean?  The very
20  first day I was here.
21         MR. ELIAS:  I'll make a request, if you
22  have -- this is the copy I have.
23         MR. MARTINEAU:  This is the copy we
24  have.
25         THE WITNESS:  I shouldn't have said

Page 69

1  that.
2         MR. MARTINEAU:  No.  This is the copy
3  that we produced to you.  It's everything that
4  we have.  And he did apparently start reviewing
5  that CD-ROM, which I believe is of the Web site
6  that --
7         THE WITNESS:  That they gave me.
8         MR. MARTINEAU:  -- that they gave you
9  and you started your audit.
10        THE WITNESS:  Because we came out and
11  had a meeting of that nature prior to when all
12  this happened.
13        BY MR. ELIAS:
14     Q.  I notice at the top of the document,
15  as long as we have it, it says the year is
16  9912.
17     A.  Okay.
18     Q.  Some of the descriptions refer to
19  information that's from '98.
20     A.  So each year would have its own case
21  chronology, see?  And the first date might be on
22  the 9812, the first day I came out, because
23  that's when I initially started the audit.
24        Do you see what I'm saying?
25        For instance, when I audit the three

Page 70

1  years, each year would have its own case
2  chronology, its own -- the records are kept
3  independently.
4       So the first time, the first time I
5  initially started is probably on the 9812 case
6  chronology.
7       Q. Let me ask you about -- if you turn to
8  page 7 --
9       A. Because I do believe 9912 is the last
10 year we audited; right?
11      Q. Correct.
12      A. So this is the last CD-ROM I looked
13 at.
14      Okay. Which one?
15      Q. Page 7.
16      A. Okay.
17      Q. Can you just read to yourself -- you
18 don't have to read it aloud -- the last entry,
19 the one that says --
20      A. 6-5-02?
21      Q. Yes.
22      (Pause in the proceedings.)
23      Do you have any recollection of what
24 this entry refers to?
25      A. Yes. It was everything that I put on

Page 71

1  computer was destroyed.
2       Q. Okay.
3       A. All the inputs I made, all the entries
4  I made, all the typographical things that I put
5  on a particular document was lost.
6       Q. And would that include the prior case
7  chronologies?
8       A. Would that include? No. It's
9  probably this one year's. I can't recall.
10 It's so long ago. It's just like I had to type
11 it all over.
12      Q. I'm only asking because I don't think
13 we have a case chronology for '98 or '97.
14      MR. MARTINEAU: There's another case
15 chronology that I think you have.
16      THE WITNESS: Because each year should
17 have its own, you know, all three years, should
18 have its own.
19      MR. MARTINEAU: I can represent that
20 I've given over everything that was provided to
21 me.
22      THE WITNESS: The original entry was
23 probably on the 9812, the first year that we
24 started the audit, or '97, whatever the first
25 year was.

Page 72

1       BY MR. ELIAS:
2       Q. Does this help you place the date or
3  not of when you think you first heard that you
4  were being assigned to the DLC matter?
5       A. It's -- the first date is -- I would
6  think that I probably started June of '01 -- I'm
7  just speculating -- of '01, something like that.
8  I know it was the summertime when it was started
9  because that's when we started getting the
10 information.
11      Q. What would have -- how would you have
12 begun -- not how would you have. How did you
13 begin?
14      A. What do you mean?
15      Q. In other words, when you got assigned
16 the case, what did you do?
17      A. Oh. When I got assigned the case, I
18 looked at the articles we had on the case,
19 reviewed them, and then I made -- contacted the
20 organization, requested for an examination.
21      Q. Do you remember who you dealt with?
22      A. Within your organization?
23      Q. Yeah.
24      A. It was -- Cathy-somebody, a young lady
25 out of New York.

Page 73

1       Q. Okay.
2       A. I forget her last name.
3       Q. Cassie Lichner?
4       A. Yeah, Cassie Lichner. A little short
5  young lady from out of New York.
6       Q. And do you recall, when you began, were
7  you auditing a particular tax year or...
8       A. When we came out, I think we started
9  out with '97, '98, '99. I think it was three
10 years we looked at. It was three years.
11      Q. So you started by looking at all three
12 years?
13      A. Well, you know, one at a time.
14      Q. And is that typical that you'll pull
15 three years versus two years versus one year
16 versus five years?
17      A. No. Because normally you do one --
18 well, you start with one of course, and based on
19 what you find in that one year, the manager will
20 make a determination whether we're going to open
21 up another year or whatever.
22      Q. Did you investigate all three years the
23 same?
24      I mean, in other words -- let me back
25 up. Strike that.

## Page 74

1    Q. Did you investigate the all three --
2 the all three years at once or did you
3 investigate them sequentially?
4    A. Sequentially.
5    Q. So first --
6    (Discussion off the record initiated by
7 the court reporter.)
8    BY MR. ELIAS:
9    Q. Did you investigate them at the same
10 time or sequentially?
11    A. Sequentially.
12    Q. And did you spend relatively the same
13 amount of time with each three years or more
14 with the first years than later years or...
15    A. Well, when you start the audit,
16 initially it's going to take up most of the time
17 because you have to do the one year and then you
18 know what you're looking for and looking at it
19 gets easier, so I guess most of the time would
20 have been on the first year.
21    Q. Do you have any estimate on how much
22 time you spent on the audit?
23    A. No. The audit lasted for about two or
24 three years, and when I was doing it, it was one
25 of my -- it was one of my pet peeves, so...

## Page 75

1    Q. Why so?
2    A. Because I was looking at three years,
3 and we were concentrating on the issues to see
4 if we had an issue with it or not.
5    Q. Is it fair to say this was a very
6 thorough audit?
7    A. No. It couldn't be -- it wasn't as
8 thorough as we wanted it to be because you guys
9 were not forthcoming with information.
10    Q. By "you guys," just so that we're
11 clear, who's the "you guys"?
12    A. DLC and their law firm would not give
13 us what we wanted.
14    Q. And what was that? What didn't they
15 give you that you want?
16    A. Well, I don't have the IDRs here, but
17 when I was looking through here, you can tell I
18 put in here somewhere DLC would not give up the
19 information that we needed to review. The only
20 thing I got from you guys were CD-ROMs.
21    Q. But there must have been a lot of
22 material on the CD-ROMs.
23    A. Exactly. But that's all I got. That's
24 all you would give me. Anything I asked for, it
25 was too burdensome, it was this, it was that, it

## Page 76

1 was too cumbersome, we don't have time.
2 Anything we looked for financially -- it wasn't
3 one of the best audits I was on. That's why it
4 took that much time.
5    Q. But you spent 400 hours --
6    A. Correct.
7    Q. -- reviewing materials.
8    A. Right.
9    Q. So you got a lot of materials.
10    A. Of CD-ROM, yeah.
11    Q. But there must have been a lot of them
12 because it took you 400 hours to review them
13 all.
14    A. Three years. 400 hours is not a lot
15 when it's three years. Break it down each year.
16 150 each year or so.
17    Q. I'm not questioning whether it should
18 have taken you longer or shorter. CD-ROMs can
19 hold a lot of documents and --
20    A. It was boring reading.
21    Q. Boring?
22    A. Reading, yes.
23    Q. Is part of the reason why it was
24 boring because essentially you had been
25 directed going in as to what the outcome was

## Page 77

1 going to be?
2    A. No.
3    MR. MARTINEAU: Objection.
4    THE WITNESS: No. Boring was the
5 issue, the material that you're reading.
6    BY MR. ELIAS:
7    Q. Had you been told at the outset what
8 issue you were going to find?
9    A. No.
10    Q. Can I just refer back to Exhibit 4.
11 Would you take a look at that.
12    A. Yes.
13    Q. Does this document suggest that the IRS
14 before the audit had come to a position as to
15 what --
16    A. No, it doesn't because you don't know
17 where this came from.
18    I mean, it comes into the IRS, but it
19 could be coming from Joe Blow off the street.
20 And a lot of times when we get referrals, as we
21 consider them, they have no merit to them.
22    Q. Does the "received from" tell you
23 anything about where it came from?
24    A. Where you at? Where you see that?
25    Q. On the top of the form on the

Page 78

1 right-hand side.
2  A. Received date?
3  Q. No. Above that.
4  A. Received from?
5     That's somebody within the service I
6 guess.
7  Q. So does that --
8  A. But it doesn't -- it says "CP:E:EO."
9 When the referral probably came in, it was
10 probably sent to the EO division, EO meaning
11 exempt organizations division. That's all.
12     MR. ELIAS: Let's mark for
13 Exhibit 6...
14     (Plaintiff's Deposition Exhibit
15 Number 6 was marked for identification.)
16     BY MR. ELIAS:
17  Q. Do you recognize this document?
18  A. Yes.
19  Q. Can you tell us what it is?
20  A. This document here is an outline of the
21 activities that we are going to look at or we
22 would like to look at. And it goes -- if you
23 have the Form 5773 over there -- the 5773. No.
24 That's the 5772. I don't think we had that one
25 out yet.

Page 79

1     No. It's a standard form, an IRS form,
2 you know, something like this (indicating). It
3 looks something like this.
4     MR. MARTINEAU: Like a cover sheet
5 you're talking about?
6     THE WITNESS: No.
7     For instance, it sets forth -- it's
8 your audit plan.
9     Like, for instance, it's here, like A,
10 where it says "X statute of limitations," on
11 that 5773 form it will tell you the date -- this
12 goes back to that. This refers to that. This
13 refers you to section A, question 1 on the 5773
14 form.
15     BY MR. ELIAS:
16  Q. Okay.
17  A. And explain when the statute -- see
18 "determination application"? If you look at
19 A-4, you go back to that 5773 form and it tells
20 you, explains what went on there. This is more
21 or less an audit guide.
22  Q. Oh. Next page?
23  A. It's on there? Right. There you go.
24  Q. So is it fair to say that this -- that
25 Exhibit -- what is this? 6?

Page 80

1  A. Is this going to be 6 (indicating)?
2  Q. Have we not marked it yet?
3     (Discussion off the record initiated by
4 the court reporter.)
5     BY MR. ELIAS:
6  Q. Is it fair to say that Exhibit 6 then
7 is actually two different forms attached to one
8 another?
9  A. I don't understand the question.
10  Q. Exhibit 6 in its entirety is both
11 Form 5772 and 5773?
12  A. No. One is your audit guideline,
13 outlines, guidelines, and 5773 explains on which
14 you did.
15  Q. Correct.
16  A. Correct.
17  Q. So what this exhibit is is two
18 different forms stapled together?
19  A. Right. Exactly.
20  Q. Are both of these forms forms that you
21 would complete in the ordinary course of your
22 job?
23  A. Yes. With every audit.
24  Q. And maybe you can take a quick look at
25 them. We're going to go through them in

Page 81

1 detail, so I don't need you to read them in
2 their entirety at this point if you don't want
3 to, but could you just take a quick look and
4 tell me whether in fact these are forms you
5 prepared.
6  A. Yes, they are.
7  Q. If we can start with the 5772?
8  A. Uh-huh.
9  Q. I see there are a number of checked
10 boxes or Xs.
11     Do you see that?
12  A. Yes.
13  Q. Okay. What is the significance of an X
14 being in one of those boxes?
15  A. It tells you that we looked at that
16 particular item.
17  Q. Okay.
18  A. For instance, we looked at A, item 4,
19 determination of application. It says that we
20 looked at that.
21     For instance, A-5, it says we looked at
22 the articles of incorporation.
23  Q. So you looked at the documents we've
24 previously --
25  A. Right.

Page 82

1  Q. -- looked at?
2  A. Right.
3  Q. That being the 1024 and the
4  attachments?
5  A. Right.
6  Q. What about in section B, compliance
7  examination? This says you looked at the
8  organization history?
9  A. Yes. Well, we looked at the activities
10 and made a narrative of the history. I can't
11 say we looked at the entire history of the
12 organization.
13 Q. Number 2, interviews and follow-up
14 interviews?
15 A. Uh-huh.
16 Q. Did you conduct interviews in this
17 case?
18 A. Limited ones. Yes.
19 Q. Of who?
20 A. I don't remember.
21    Al Fromm, I think he was the only one
22 we did interview, I do believe.
23 Q. Did you examine the minutes of the
24 organization?
25 A. Wait a minute.

Page 83

1     (Pause in the proceedings.)
2     Yes. If they gave us the minutes, we
3  examined the minutes. Yes.
4  Q. You looked at the publications of the
5  organization?
6  A. Yes. The only publications I would
7  think at that point would be what was on the
8  Web. If they didn't give us any -- no. Wait.
9  They gave us a few books. Yeah.
10 Q. Did you read the books?
11 A. I didn't read the whole book; I just
12 looked through it.
13 Q. You looked at the legislative
14 activities?
15 A. If there's a check there, we
16 questioned them about the legislative
17 activities. Yes.
18 Q. And you questioned about the political
19 activities?
20 A. If there's a check there in something
21 we questioned about political activities, yes.
22 Q. Okay.
23 A. I mean, we probably asked the question,
24 and they didn't answer it. Because we would
25 send out what we call an IDR, an information

Page 84

1  request, requesting certain information, but
2  they would not, you know, put nothing on paper
3  for us to review.
4  Q. When you turn to the next page, which
5  is the first page of Form 5773 -- is that
6  correct?
7  A. Yes.
8  Q. -- if you read the procedures, the
9  preaudit comment -- the second preaudit
10 comment?
11 A. Uh-huh.
12 Q. Do you see that, "Review application's
13 activities, programs and structure originally
14 proposed with those in actual practice during
15 the examination period"?
16 A. Excuse me?
17 Q. Do you see where it says, "Review
18 application's activities, programs and structure
19 originally proposed with those in actual
20 practice during the examination period"?
21 A. Yes.
22 Q. And what was your comment under
23 Procedures and Conclusions?
24 A. "Per review of the 1024
25 application" --

Page 85

1     MR. MARTINEAU: I'll just note that the
2  document speaks for itself. If you want him to
3  read it, he can read it, but the document states
4  what it states.
5     BY MR. ELIAS:
6  Q. So is it fair to say that at the time
7  you reviewed the 1024 originally you thought
8  there was nothing unusual about it?
9  A. Right.
10 Q. And that its activities were within the
11 guidelines of --
12 A. Of (c)(4).
13 Q. Of (c)(4).
14    And if we can turn to the next page.
15    Do you see the middle entry that says,
16 "Preaudit comments: Review the bylaws to
17 determine officer's and internal methods of
18 governing the organization"?
19 A. Uh-huh.
20 Q. And can you read for the record the
21 procedures and conclusions.
22 A. "Per review of the bylaws, nothing
23 unusual was noted, the bylaws" --
24    MR. MARTINEAU: I'll just interject
25 that the document speaks for itself. If you

### Page 86

1  want Mr. --
2      BY MR. ELIAS:
3      Q. Okay. Why don't I read it and you can
4  tell me if I'm reading it correctly.
5          It says, "Per review of the bylaws,
6  nothing unusual was noted, the bylaws explained
7  the purposes, objectives and operational
8  activities of the organization."
9          Was that your conclusion at the time?
10     A. Uh-huh.
11     MR. MARTINEAU: You need to say "yes."
12     THE WITNESS: Yes.
13     MR. MARTINEAU: Thank you, George.
14     BY MR. ELIAS:
15     Q. The next entry says to verify the
16 date -- I'm sorry -- "Verify date and location
17 of IRS office that issued the letter. Check for
18 any caveats which may impact on the
19 examination."
20         Do you see that?
21     A. Yes.
22     Q. And I'm not going to read this since,
23 as your counsel points out, it speaks for
24 itself.
25         Does this refresh your recollection

### Page 87

1  or -- strike that.
2          Does this refresh your recollection as
3  to whether or not there were any caveats in the
4  letter?
5      A. It goes directly with what I said to
6  you when you showed me the letter, that it
7  appeared to me that last entry was a caveat.
8      Q. Is that the only caveat?
9      A. That's the only one that I noted.
10 Yes.
11     Q. Okay. On the next page, it's under
12 preaudit comments, the middle. It says, "If
13 previously examined obtain RAR and closing
14 letter."
15     A. Where you at?
16     Q. Okay what is an RAR?
17     A. The revenue agent's report, the letter
18 that I send out to you guys that explains the
19 issues, law and conclusion.
20     Q. What's a closing letter?
21     A. That would -- well -- RAR and closing
22 letter.
23         Well, after the report, you get that
24 report, then there's a final letter that goes
25 out to the organization. Because after I send

### Page 88

1  you the 30-day letter and you disagreed with
2  what was in the letter, then there's going to
3  have to be another closing letter that come at
4  the end of the audit.
5          I don't think we've got to the end of
6  the audit as of yet.
7      Q. What is a Form 5546?
8      A. That's an internal document which
9  explains -- it just has checks and balances
10 telling us what the status of the organization,
11 if they've ever been audited before, things of
12 that nature. It's just something that's
13 internal.
14     MR. ELIAS: I would request production
15 of that.
16     MR. MARTINEAU: If it was in the file,
17 we've given it to you.
18     THE WITNESS: And sometimes -- all
19 cases don't have them. Like I say, it's the
20 government.
21     BY MR. ELIAS:
22     Q. In this case, though, there would have
23 been one; right, because you noted that you
24 reviewed it?
25     A. Yes.

### Page 89

1          Now, too, now --
2      Q. I'm sorry. She needs to hear. Was
3  that a yes? What is it?
4      A. It's a yes.
5          Can I make something clear?
6      Q. Absolutely. I thought you said yes,
7  but I just want to make sure the court
8  reporter --
9      A. Now, that document could have been
10 associated with the first year that we audited,
11 which was what? '97? Because, see, what you
12 guys need to understand, this document here is
13 just for one year (indicating).
14     Q. Right.
15     A. It doesn't have all, you know --
16     Q. I understand. I'm just trying to
17 understand whether the document exists.
18     A. But it could be, like I'm saying, if
19 it's this, it might be associated with that '97
20 year, you know, and not included with the other
21 ones, '99, '98 --
22     Q. But you agree that the Examination
23 Return Charge-Out Form 5546 existed at the time
24 you wrote this.
25     A. I do believe. Three years ago, it

Page 90

1  probably did. I don't know. I can't swear to
2  it.
3      Q. If you turn to -- it's USA 1066 at the
4  bottom, is the Bates stamp number.
5          (Pause in the proceedings.)
6      A. Can I --
7      Q. Yeah.
8      A. -- just say something?
9          You was asking me -- it says here, "On
10 April 18, 2000, an opening meeting was held at
11 the organization's POA."
12         That probably was here. That gives
13 you a better idea of when this thing first
14 started.
15     Q. Okay. That's very useful. Thank you
16 actually.
17         So you think that you were assigned
18 this case sometime shortly before April of
19 2000?
20     A. Right. Because, I mean, this says this
21 is an opening meeting that was held with the
22 organization.
23     Q. I got it. That makes sense.
24         (Pause in the proceedings.)
25         MR. MARTINEAU: Let him ask the

Page 91

1  question.
2          THE WITNESS: I was just reading the
3  thing.
4          MR. MARTINEAU: Sure.
5          BY MR. ELIAS:
6      Q. The entry above that where it describes
7  the procedures and conclusions?
8      A. Uh-huh.
9      Q. That paragraph, were those your
10 conclusions about the DLC?
11     A. No.
12     Q. Okay. Where was that taken from?
13     A. Probably from documents that I was
14 reviewing. Nothing here is nothing that I made
15 up.
16     Q. I'm not suggesting you made anything
17 up.
18     A. Nothing here I made up. It's factual
19 stuff I got off documents received from the
20 organization.
21     Q. So this is -- this is your summary of
22 the documents received?
23     A. Right. Probably from something I
24 probably reviewed. Yes.
25     Q. Then the next page, under

Page 92

1  Current Activities, do you see that?
2      A. Yes.
3      Q. Okay. You have to answer verbally.
4  Otherwise, she doesn't get it down, and I don't
5  go forward.
6      A. Yes.
7          I'm sorry.
8      Q. Based on your review, were these six
9  items the DLC's current activities for the tax
10 years in question?
11     A. These were the activities that I
12 probably got off, again, from documents, from
13 reviewing.
14         Again, DLC was not forthcoming and
15 really wanted to speak to me, so everything I
16 got was from my own review of their documents.
17     Q. Right.
18         But this is what you, from that
19 review, determined their current activities to
20 be?
21     A. If that's what was stated there, yes.
22     Q. Would you turn to page 1069.
23         There is a parenthetical at the end of
24 that paragraph that says, "This may be true" --
25 it says "ture," but I assume that's a typo --

Page 93

1  "This may be true, however, one must always keep
2  in mind the persons that created this
3  organization."
4      A. That's part of my little comment that I
5  put in.
6      Q. Okay. What did you mean to suggest by
7  that comment?
8      A. Meaning, after I looked at their
9  activities, like I said -- let me just read it
10 there before I answer your question.
11         MR. MARTINEAU: I just want to say that
12 this has to be read again in the context of the
13 document. The entry speaks for itself.
14         With that understanding, go ahead and
15 read it and respond to it.
16         BY MR. ELIAS:
17     Q. Please, read as much of the
18 document --
19         MR. MARTINEAU: Read the comments that
20 you made and explain --
21         THE WITNESS: I just --
22         MR. MARTINEAU: Absolutely. Take your
23 time.
24         (Pause in the proceedings.)
25         THE WITNESS: Okay. That statement

Page 94

1  goes along with this -- with how I finished up,
2  and I said, "Per review of the articles, we
3  have determined that some of the activities may
4  be political and benefiting the members."
5  Okay?
6       So what I'm saying, everything that I
7  mentioned up top is true. However, to a
8  degree, I probably was -- had in my mind that
9  there was some type of private benefit being
10 given or in favor of the members of this
11 organization.
12      BY MR. ELIAS:
13 Q.  And that was because of who created the
14 organization?
15 A.  No, it was not because who created the
16 organization. It was based on the documents
17 that I reviewed and the activities that they
18 were performing.
19 Q.  I guess what I'm asking is: Why must
20 one always keep in mind the persons that created
21 the organization?
22 A.  It's what I had in my mind. It's the
23 way I thought when I wrote this document.
24 Q.  Was that the who --
25 A.  And when --

Page 95

1  Q.  What was in your mind -- go ahead.
2  A.  Taking that as kind of looking at who
3  created it is because it was created by a
4  particular political party. Okay? And that's
5  why I'm saying the activities are benefiting a
6  particular party.
7       This organization wasn't made up of --
8  including everybody in the universe. It was
9  people of like-minded.
10 Q.  So I just want -- I'm just trying to
11 understand this. Okay? So forgive me. I'm not
12 trying to be difficult. I'm just trying to
13 understand this.
14      Is what you're saying is that it was in
15 fact your conclusion that the DLC never
16 intervened in political campaigns and had not
17 endorsed candidates?
18 A.  Definitely.
19 Q.  And have not made contributions to
20 candidates?
21 A.  Based on what they told me.
22 Q.  That they had not expressly advocated
23 the election or defeat of any candidate.
24 A.  Correct.
25 Q.  That they had not attempted to

Page 96

1  influence the opinions of voters concerning any
2  candidates for office by rating or evaluating
3  candidates or by any similar means of
4  persuasion.
5  A.  Correct.
6  Q.  But that in light of who created the
7  organization, it still created a private
8  benefit?
9  A.  I didn't say that.
10     MR. MARTINEAU:  That question has been
11 asked and answered. He's already explained his
12 analysis. If you want to restate the
13 question --
14     THE WITNESS:  I didn't say that.
15     BY MR. ELIAS:
16 Q.  How would you put it?
17 A.  Put what?
18     Repeat the question.
19 Q.  How would you say, if all of those
20 things are true, that who created the
21 organization becomes relevant? Why is that an
22 important factor?
23 A.  It's not who --
24     MR. MARTINEAU:  Again, I'll just say
25 that's been asked and answered.

Page 97

1       Go ahead, George.
2       BY MR. ELIAS:
3  Q.  Go ahead.
4  A.  I'm not saying who. As indicated when
5  we spoke earlier when we was going through the
6  1024 application, I indicated to you earlier I
7  had a problem with it was just individuals of a
8  political party. I don't care if Joe Blow
9  created the organization.
10 Q.  It's just Joe Blow was a democrat and
11 all the other people were democrats.
12 A.  Right.
13 Q.  It's that all the people who were
14 involved in the creation were from the same
15 political party.
16     MR. MARTINEAU:  Are you talking about
17 in this particular instance?
18     MR. ELIAS:  Yes.
19     THE WITNESS:  Repeat it.
20     BY MR. ELIAS:
21 Q.  Am I correct in summarizing that what
22 caused you concern was that all of the people
23 involved in creating the organization were
24 democrats?
25 A.  Right. Right. And all of the

Page 98

1  activities were participants of the
2  Democratic Party.
3      Q. The party or individuals who were
4  democrats?
5      A. Well, individuals that was democrats.
6      Q. Okay. Did you, in your review, find
7  evidence that the Democratic National Committee
8  or the institutional Democratic Party
9  participated in these activities?
10     A. No. I didn't see that.
11         (Pause in the proceedings.)
12         MR. ELIAS: Could we go off the record
13 for one minute.
14         (Discussion off the record.)
15         BY MR. ELIAS:
16     Q. What was the result of your
17 investigation? What was the conclusion of your
18 audit?
19     A. I do believe we proposed revocation.
20     Q. Who did you propose it to?
21     A. To DLC I guess.
22     Q. I'm sorry.
23         Who did you personally propose it to
24 within the IRS?
25     A. Who did I? Oh --

Page 99

1      Q. In other words, I assume you don't
2  alone revoke. I assume you send it to someone.
3      A. We had a meeting. I had a meeting with
4  district counsel and my manager and the area
5  manager, and on the basis of the material we
6  reviewed and examined, we came to the
7  conclusion that their exempt status should be
8  revoked.
9      Q. Was there any disagreement in that
10 meeting?
11         MR. MARTINEAU: I would object to the
12 extent that counsel participated in that
13 meeting.
14         You cannot disclose attorney-client
15 discussions.
16         He indicated he makes a recommendation
17 I believe to the appropriate officials, and a
18 decision was made.
19         THE WITNESS: Right.
20         BY MR. ELIAS:
21     Q. Did counsel participate in that
22 meeting?
23     A. Yes.
24     Q. Which counsel?
25     A. District counsel, the area manager and

Page 100

1  the national office. You guys (indicating)? I
2  don't know who makes up the national office.
3  The lawyers from the national office.
4      Q. Is Joanne Darling a lawyer?
5      A. A lawyer?
6      Q. Yes.
7      A. I wouldn't know that. She's the area
8  manager.
9      Q. She's not counsel?
10     A. She's the area manager.
11     Q. What about Wayne -- what's Wayne's last
12 name?
13     A. Hampel.
14     Q. -- Hampel?
15     A. No, he's not a lawyer. He's no longer
16 with us.
17     Q. Did you have conversations with Wayne
18 where counsel were not present, about this
19 matter?
20     A. Sure. He's my manager.
21     Q. Okay. And what were those
22 conversations?
23     A. I can't recall way back then.
24     Q. Do you recall whether he expressed any
25 doubt about the legal theory --

Page 101

1          MR. MARTINEAU: He was asked and
2  answered. He said he doesn't recall.
3          THE WITNESS: I can't recall what he
4  specifically said.
5          The final conclusion was made when we
6  had a group meeting with district counsel,
7  national office and headquarters and everybody
8  else.
9          BY MR. ELIAS:
10     Q. Right. And I'm not asking about the
11 final decision.
12         Do you recall whether in this specific
13 conversation -- and I understand you don't
14 recall the specific conversation -- do you
15 recall generally that Mr. Hampel --
16     A. If Mr. Hampel -- if the meeting was
17 above Mr. Hampel, it appears to me that he was
18 not really solid on what the final conclusion
19 should be without some assistance.
20     Q. Is it fair to say that he disagreed
21 with your conclusion?
22     A. I can't say that.
23     Q. Did he ever manifest disagreement with
24 you?
25     A. No. We worked as a team together.

26 (Pages 98 to 101)

Page 102

1    Q. What about Joanne Darling?
2    A. What about her? What's the question?
3    Q. Did you ever discuss with her whether
4  or not revocation was appropriate?
5    A. She was in on the --
6    Q. Other than in the -- I'm trying
7  desperately here not to get into the meeting
8  where the lawyers are.
9    A. Well, Joanne Darling is not here
10 per se, so when she participated, it would be on
11 a group thing.
12   Q. Okay. I'm going to show you what I'm
13 going to have marked as Plaintiff's Exhibit 7.
14       (Plaintiff's Deposition Exhibit
15 Number 7 was marked for identification.)
16       BY MR. ELIAS:
17   Q. And just so the record is clear, this
18 is Bates-numbered USA 1764; is that correct?
19       Do you see that in the bottom
20 right-hand corner (indicating)?
21   A. Oh, okay.
22   Q. Do you see that number?
23   A. Yes.
24       Yes, I got it.
25   Q. Okay. Is this your handwriting?

Page 103

1    A. No, sir.
2       Can I read it?
3    Q. Yes.
4    A. It's the first time I've seen it.
5    Q. Right. Because if it was your
6  handwriting --
7       MR. MARTINEAU: Well, he just asked you
8  if this is your handwriting, and you said no, so
9  let him ask you another question then.
10      BY MR. ELIAS:
11   Q. Why don't you review the document and
12 let me know if you recognize it or its
13 contents.
14   A. Okay.
15      (Pause in the proceedings.)
16   Q. Do you recognize the document?
17   A. No. I've never seen it before. I
18 didn't participate in this.
19   Q. From its context, can you -- do you
20 have an opinion as to who Roger is?
21   A. Yes. He's a reviewer down in Dallas.
22   Q. And was he reviewing part of the DLC
23 matter?
24   A. I guess that's -- when I closed the
25 case out, that's where I sent it, to his group.

Page 104

1    Q. Do you know what Roger's last name is?
2    A. I sure don't.
3       I mean, I can get you that. I don't
4  know his last name.
5    Q. Could it be Roger Greening?
6    A. That's it.
7    Q. What's in Cincinnati?
8    A. That's where -- well, you know, of
9  course we've got IRS --
10   Q. Everywhere?
11   A. -- everywhere. But that's where our
12 documents go when we close a case. Like when
13 you send your 1024 application and they
14 microfiche it and stuff, everything is kept up
15 there in Cincinnati now.
16   Q. I take it you don't know -- or do
17 you -- well, let me back up.
18      Do you have an opinion as to or view
19 as to what is meant by "I said I had discussed
20 this with Mark Hulse said the taxpayer was
21 correct"?
22   A. I wasn't a part of the document, so I
23 don't know what they're talking about.
24   Q. There are several references in here to
25 rep or reps.

Page 105

1    A. Again, I wasn't a part of the
2  document.
3    Q. I understand. I'm just --
4    A. I don't know who they're referring to.
5    Q. I understand.
6       Within the IRS, is "rep" a common
7  abbreviation for anything?
8    A. Not to my knowledge.
9       I mean, a rep could be the
10 representative, the lawyer. I don't know in
11 this context who they're referring to.
12   Q. Okay. I'm just asking if you know.
13   A. Like I say, this wasn't my document.
14      MR. MARTINEAU: Put it over
15 there (indicating).
16      BY MR. ELIAS:
17   Q. I understand.
18      Part of my -- why we take depositions
19 is because we don't know a lot of this, so I'm
20 not trying to frustrate you and I'm not trying
21 to suggest you know stuff. I'm just asking
22 because you may look at me like, you idiot, of
23 course "rep" means, you know, XYZ, you know, and
24 that's the standard vernacular.
25      So I'm just trying to ask questions to

27 (Pages 102 to 105)

Page 106

1  get your answers. I'm not trying to insinuate
2  that you wrote the document or know about it.
3      MR. MARTINEAU: Fair enough. Move on.
4      We're moving on.
5      MR. ELIAS: I'll have marked by the
6  reporter as Plaintiff's Exhibit 8...
7      (Plaintiff's Deposition Exhibit
8  Number 8 was marked for identification.)
9      THE WITNESS: Can I speak with him
10 outside for a minute?
11     MR. ELIAS: Sure.
12     (Witness and counsel confer.)
13     (Recess)
14     (Whereupon, Mr. Bauer was present for
15 the proceedings.)
16     BY MR. ELIAS:
17  Q. I'm going to hand you -- it's already
18 been marked. Great.
19     Can you tell me what Plaintiff's
20 Exhibit 8 is?
21  A. Would this be a copy of the 30-day
22 letter? Yes, it looks like it is.
23     It's a copy of the 30-day letter.
24  Q. So just so the record is clear, this is
25 a copy of --

Page 107

1   A. The 30-day letter or I believe the
2  revocation letter.
3   Q. 30-day letter?
4   A. You call it a 30-day letter because a
5  lot of times, when we send it out, the taxpayer
6  has 30 days to respond. That's what we call it,
7  a 30-day letter. But technically I think it's a
8  revenue agent's report. In-house we say 30-day
9  letter because, like I say, you have 30 days to
10 respond.
11  Q. So this is prepared -- this was
12 prepared by you?
13  A. No, sir.
14  Q. Who was it prepared by?
15  A. Mark Hulse.
16  Q. Did you play a role in preparing this?
17  A. Yes.
18  Q. What role did you play?
19  A. He worked with me on the case, and I
20 was the one who would send him the documents for
21 review. After I looked at something, then he
22 would look at it or whatever.
23  Q. Were you responsible for drafting any
24 of the text?
25  A. No. He did the whole thing.

Page 108

1   Q. Were you responsible for reviewing it?
2   A. Yes. My manager reviewed it, and then
3  after he reviewed it, he gave -- issued me a
4  copy, and we sat back and talked about it.
5   Q. Did you and your manager talk about
6  it?
7   A. Yes.
8   Q. And what did you say? What did you
9  talk about?
10  A. How did I feel with the decision that
11 we had arrived to, was I comfortable with it.
12  Q. And what did you say?
13  A. I said yeah.
14  Q. And was your manager comfortable with
15 it?
16  A. I can't speak for him.
17  Q. Did he say anything that indicated one
18 way or the other?
19  A. No.
20  Q. I have a couple of specific questions
21 about it.
22     Would you turn to page 22.
23  A. Is it US -- what I got here?
24  Q. I'm sorry. It's 1867, is the Bates
25 stamp number.

Page 109

1      Do you see in the middle of the second
2  paragraph, the first full paragraph on the
3  page --
4   A. Starting with?
5   Q. -- do you see where it says, "The DLC
6  has changed over time"?
7   A. Yes.
8   Q. Okay. Feel free to read as much above
9  or below that as you need to to gather the
10 context, but I'm going to ask you a question
11 about that sentence, so tell me when you're
12 ready.
13     (Pause in the proceedings.)
14     Are you ready?
15  A. Uh-huh.
16  Q. Okay. Remember, you've got to
17 verbalize; otherwise, she can't --
18  A. Yes.
19  Q. Do you recall during your financial and
20 compliance audit what information you found that
21 supports the conclusion that, quote, the DLC has
22 changed over time from an organization seeking
23 to move the Democratic Party toward a more
24 moderate position to an organization that
25 expresses the dominant position of the

28 (Pages 106 to 109)

## Page 110

1  Democratic Party?
2     A. I can't answer that because, as I
3  indicated before, I didn't write the letter up.
4     Q. Right.
5        But you conducted the factual
6  investigation and forwarded the information to
7  Mark Hulse; right?
8     A. Right.
9     Q. Do you recall in your own review
10 whether you came across any information that
11 would support that?
12    A. I can't say that now.
13    Q. You can't say you came across anything
14 that said that?
15    A. Right. He may have seen things that I
16 didn't see.
17    Q. But you didn't see anything that said
18 that.
19    A. Right.
20    Q. I'm sorry.
21    A. No, I didn't see anything.
22    Q. Turning to page 29?
23    A. 29? What is it?
24    Q. I'm sorry. You're right.
25       1874.

## Page 111

1        I apologize.
2        Again, I'm going to ask you about the
3  second sentence of the first paragraph, but
4  feel free to read the entire paragraph or as
5  much of the document as you need to to feel
6  comfortable.
7        (Pause in the proceedings.)
8        Are you ready?
9     A. Uh-huh. The first paragraph you said;
10 right?
11    Q. Yeah.
12       The sentence that I wanted to ask you
13 about, for the record, reads as follows:
14       Corporate donors and some individual
15 donors made contributions of thousands of
16 dollars that were arguably intended to support
17 the policies and/or professional careers of new
18 democratic elected officials closely associated
19 with or running the DLC.
20       Do you recall whether during the course
21 of your compliance and financial audit what you
22 found that supports that sentence?
23    A. I don't quite understand what you're
24 asking.
25    Q. Okay. Fair enough.

## Page 112

1     Q. Did you interview any donors?
2     A. No.
3     Q. Did you attempt to interview any
4  donors?
5     A. No.
6     Q. Did you seek written information from
7  any donors?
8     A. No.
9     Q. What, if anything, did you do to
10 ascertain the intention that donors had when
11 they made their contributions?
12    A. Nothing.
13    Q. Okay. Do you have any idea then what
14 the factual basis of that is?
15    A. I'm looking at it myself. I -- I --
16 no.
17    Q. You're looking at it yourself and you
18 have no idea --
19       MR. MARTINEAU: It's been asked and
20 answered. He says he does not have any idea.
21       BY MR. ELIAS:
22    Q. Finally, can you turn to the last page.
23 It's USA 1875.
24       The paragraph that begins "We finally
25 note," do you see that?

## Page 113

1     A. Uh-huh.
2     Q. Again, I'm going to ask you about that
3  first sentence, but feel free to read as much of
4  it as you need to feel comfortable.
5        (Pause in the proceedings.)
6        Are you ready?
7     A. Yes.
8     Q. All right. Again so the record is
9  clear, the first sentence reads, "We finally
10 note that the fact that elected officials from
11 one named political party were dominant in the
12 creation, control and policies of the DLC are
13 the key factors in our conclusion that DLC is
14 not described in section 501(c)(4)."
15       Is that what it says?
16    A. Yes, that's what it says.
17    Q. In your view, were the key factors to
18 the conclusion to revoke the DLC's tax-exempt
19 status the fact that elected officials from one
20 party were dominant in the creation, control and
21 policies of it?
22    A. Repeat that one more time.
23    Q. Do you agree with this sentence? Were
24 those the key factors?
25       MR. MARTINEAU: You're asking about

Page 114

1  Revenue Agent Smith's view?
2       MR. ELIAS: Yes.
3       THE WITNESS: You're asking for my
4  personal view?
5       BY MR. ELIAS:
6    Q.  Your personal view.
7    A.  I will agree with it to a point where
8  I'm looking at the activities, were the
9  activities geared to be in favor of a political
10 party which gives benefits to the members of the
11 organization.
12   Q.  Okay. Let's take these one at a time.
13      We went through the 1024 and we saw the
14 organizational documents that related to the
15 creation, to its creation; is that correct?
16   A.  Correct.
17   Q.  Is it the fact that democrats and
18 democratic elected officials were dominant in
19 the creation of the organization, is that one of
20 the key factors in this?
21   A.  I'm not going to say -- I'm just going
22 to say it's because a political party that
23 created the organizations. It was not like
24 members across the board.
25   Q.  Not members of the party across the

Page 115

1  board?
2    A.  Right.
3    Q.  So you found evidence that the
4  Democratic National Committee or the
5  Democratic Party created the DLC?
6    A.  No. I found the members that was on
7  the 1023 application were democrats that created
8  the organization.
9    Q.  Right. So --
10   A.  And when I looked through the
11 membership booklet, everybody who was in the
12 booklet I had were democrats or its members.
13   Q.  And that was on the 1024?
14   A.  No. That was on information they gave
15 me.
16   Q.  I'm sorry. The creation of the
17 organization was on the 1024 --
18   A.  Right.
19   Q.  -- right?
20      The members -- the people creating the
21 organization were on the 1024?
22   A.  Yeah. We went over that.
23   Q.  Do you recall reviewing this sentence
24 at the time that this letter was issued, before
25 it was issued?

Page 116

1    A.  I read the entire letter over and over,
2  but I didn't pay that much attention to that one
3  sentence.
4    Q.  And did you view it as important
5  whether or not you agreed precisely with this
6  letter or did you view it as Mr. Hulse's letter
7  that --
8    A.  No. I reviewed it and came to the same
9  conclusion that he came with. Yes.
10   Q.  So you agree with everything in here.
11   A.  I'm not going to say I agree with
12 everything that's in the letter.
13   Q.  But you agree with the conclusion.
14   A.  With the conclusions. Yes.
15      MR. ELIAS: I'm going to have the court
16 reporter mark as Exhibit 9...
17      (Plaintiff's Deposition Exhibit
18 Number 9 was marked for identification.)
19      BY MR. ELIAS:
20   Q.  Do you recognize this document?
21   A.  I'm trying to see -- are they the same
22 thing?
23   Q.  I believe, but I'll leave it to you to
24 decide or opine, I believe this is for a
25 different tax year (indicating).

Page 117

1    A.  Okay. This is '99. Okay.
2    Q.  Do you recognize this document?
3    A.  Yes.
4    Q.  And what is it?
5    A.  This is the -- as indicated, the
6  revenue agent's report.
7    Q.  And this is -- who prepared this
8  document?
9    A.  Wayne -- Mark Hulse.
10   Q.  And it was also, as with the previous
11 one, reviewed by you?
12   A.  Yes.
13   Q.  Was your involvement in this one the
14 same as it was in the last one?
15   A.  Yes, sir.
16   Q.  I have only a couple questions on
17 this.
18      If you'd turn to page 20.
19   A.  20.
20      MR. MARTINEAU: What's the USA number
21 on that?
22      THE WITNESS: No. This one here is
23 numbered. This one has a number on it.
24      MR. ELIAS: It's Bates-numbered
25 USA 0932.

30 (Pages 114 to 117)

### Page 118

1  MR. MARTINEAU: Very good.
2  THE WITNESS: Can I ask a question?
3  MR. ELIAS: Yes.
4  THE WITNESS: This comes from
5  us (indicating)? This explanation (indicating)?
6  BY MR. ELIAS:
7  Q. Can you read the paragraph that begins
8  "Perhaps..."
9  A. Down at the bottom -- middle of the
10 page?
11 Q. Yeah.
12 (Pause in the proceedings.)
13 A. Okay.
14 Q. Do you -- did you at the time or do you
15 now believe that this is the best example of
16 activity that the DLC engages in that is not
17 consistent with section 501(c)(4)?
18 A. Let me read it again.
19 (Pause in the proceedings.)
20 Okay. Now, what's your question?
21 MR. ELIAS: Why don't you read it
22 back.
23 (The record was read as follows:)
24 "QUESTION: Did you at the time or do
25 you now believe that this is the best example of

### Page 119

1  activity that the DLC engages in that is not
2  consistent with section 501(c)(4)?"
3  THE WITNESS: That is not consistent
4  with 501(c)(4)?
5  BY MR. ELIAS:
6  Q. Right.
7  A. I'm not going to sit here and say this
8  is the best example, but this is one of the
9  examples that's indicating how the operational
10 activities of the organization works.
11 Q. So where it says that there is no
12 better example, can you think of a better
13 example than this of activity that you found
14 objectionable?
15 A. Not offhand, not at this particular
16 moment, no.
17 Q. Do you have any idea how much money the
18 DLC spent on their leadership workshops?
19 A. No. They wouldn't give me financial
20 information.
21 Q. So you don't know how much they spent
22 on the leadership --
23 MR. MARTINEAU: It's been asked and
24 answered.
25 Go ahead and answer it.

### Page 120

1  THE WITNESS: They wouldn't give me
2  financial information.
3  BY MR. ELIAS:
4  Q. I'm trying to get not whether they gave
5  you financial information but just whether or
6  not you know --
7  A. If they didn't give me it, I don't
8  know.
9  Q. So you don't know.
10 A. No.
11 Q. Okay. Would it matter to you if it
12 constituted less than a certain percentage of
13 their overall budget?
14 A. I think we went through that earlier.
15 No.
16 Q. It wouldn't matter.
17 A. No.
18 Q. So it doesn't matter if they spent
19 5,000 or 500,000.
20 A. I guess if -- you have to look at the
21 total overall picture of the income or the
22 expenditures that was spent I guess if you want
23 to look at it like that.
24 Q. And what percentage of their income
25 would be --

### Page 121

1  A. I don't know. I couldn't give a
2  percentage. I don't know.
3  Q. You don't know.
4  A. No.
5  Q. Are you familiar with the IRS
6  examination of the Ohio DLC?
7  A. I didn't have anything to do with that.
8  No.
9  Q. Are you aware of whether an examination
10 of the Ohio DLC --
11 A. I may have heard about it, but I had no
12 input on it whatsoever.
13 Q. What did you hear about it?
14 A. That they were just audited. That's
15 all.
16 Q. And did you hear what the conclusion
17 was of the audit?
18 A. No. No.
19 Q. Do you have any knowledge of whether
20 they maintained or didn't maintain their
21 tax-exempt status?
22 MR. MARTINEAU: Let me just assert
23 that the Ohio DLC has submitted a tax
24 confidentiality waiver in this particular case,
25 and consistent with that tax confidentiality

Page 122

1  waiver, he can testify if he knows anything
2  about it but not beyond the scope of such
3  waiver.
4       THE WITNESS: I know nothing about it.
5       MR. ELIAS: What was the last question
6  I asked?
7       (The record was read as follows:)
8       "QUESTION: Do you have any knowledge
9  of whether they maintained or didn't maintain
10 their tax-exempt status?"
11      THE WITNESS: The Ohio DLC?
12      BY MR. ELIAS:
13   Q. Right.
14   A. I don't know what the final outcome of
15 that examination was. I never got the file or
16 got into the file to find out. I don't even
17 know the person to ask.
18   Q. Do you ever recall any discussion
19 internal to the IRS, excluding the lawyers,
20 about the Ohio DLC matter?
21   A. None of the agents in my office worked
22 the case.
23   Q. So it didn't come up in the context of
24 this review?
25   A. It may have came up that they were

Page 123

1  audited or something, but we -- I didn't have
2  their, you know, final letter. I don't know
3  what the outcome there was.
4    Q. In your experience, having done
5  hundreds of audits in this nature, is it
6  relevant or -- strike that -- is it unusual for
7  a parent organization and a chapter of the same
8  organization to have different determinations
9  as to whether they qualify under
10 section 501(c)(4)?
11      MR. MARTINEAU: In answering this
12 question, be careful you don't disclose any
13 confidential information of third parties.
14      And to the extent it's asking for a
15 legal analysis, I would object.
16      MR. ELIAS: I didn't ask for a legal
17 analysis.
18      MR. MARTINEAU: I understand. I want
19 to make sure the record is clear.
20      THE WITNESS: Would you repeat the
21 question.
22      MR. ELIAS: Read it back.
23      (The record was read as follows:)
24      "QUESTION: In your experience, having
25 done hundreds of audits in this nature, is it

Page 124

1  relevant or -- strike that -- is it unusual for
2  a parent organization and a chapter of the same
3  organization to have different determinations
4  as to whether they qualify under
5  section 501(c)(4)?"
6       THE WITNESS: I'm not going to say it's
7  unusual. I guess each organization stand on its
8  own merits based on its activities. Because one
9  organization's activities could differ from the
10 other. If there's different activities of the
11 organization, they're going to get different
12 rulings.
13      BY MR. ELIAS:
14   Q. I didn't ask if it's possible. I asked
15 if it's unusual that --
16      MR. MARTINEAU: I think it's been asked
17 and answered.
18      BY MR. ELIAS:
19   Q. You can answer.
20   A. I don't know if it's unusual. I don't
21 know. Every audit stands on its own merit.
22      MR. ELIAS: Can we take a five-minute
23 break?
24      MR. MARTINEAU: Yes, sir.
25      (Recess)

Page 125

1       BY MR. ELIAS:
2    Q. Is there any restriction on your
3  ability to consult with or review the file of
4  another audit of a similarly situated --
5    A. Sure. Disclosure -- if it has nothing
6  to do with the organization --
7    Q. Let me back up.
8       If you had wanted to look at the
9  Ohio DLC audit file, could you have?
10   A. I probably -- if I go through the
11 proper channels.
12      In other words, I would have to ask my
13 manager. Then he would have to go up top, and I
14 guess they make that decision.
15   Q. Is that something you considered doing
16 in this case?
17   A. Excuse me?
18   Q. Is that something you considered doing
19 in this audit?
20   A. No.
21   Q. Plaintiff's Exhibits 8 and 9, I think
22 you referred to them as examiner reports?
23      MR. MARTINEAU: No. I think he
24 testified that they're revenue agent reports,
25 also known as 30-day letters.

32 (Pages 122 to 125)

Page 126

1    MR. ELIAS: Sorry. Correct.
2    Revenue --
3    MR. MARTINEAU: Revenue agent reports,
4    RARs.
5    BY MR. ELIAS:
6    Q. You're the revenue agent.
7    A. Right.
8    Q. Do you typically draft these?
9    A. Depending on the case.
10   Q. Why does it depend on the case?
11   A. Because on all cases you work on it
12   depends on who works on the case with you. It
13   depends on the issues of the cases. You're
14   assigned more help with certain cases than
15   others.
16       As I indicated to you earlier, when I
17   first started the examination, I had another
18   agent, Daniel Rose, working with me who had more
19   experience than I did. Then we got additional
20   help from the district counsel.
21   Q. So in what percentage of your audits do
22   you write the RAR versus someone else writing
23   it?
24   A. It depends how many people, like I
25   indicated. If I do the audit myself a hundred

Page 127

1    percent, I write the RAR report. If you get
2    assistance from the top, they write them for us
3    or in conjunction with us.
4    Q. Did Mr. Hulse work with you on the
5    audit?
6    A. He was here at all the meetings. Yes.
7    Every meeting I came to, except for the initial
8    ones, he attended.
9    Q. Let me probe that for a second.
10      What was his role?
11   A. I guess counsel.
12   Q. So he was there to provide you legal
13   advice?
14   A. Working with the case. Yes.
15   Q. Did you have an opportunity to visit
16   the DLC's headquarters?
17   A. Yes.
18      And Mr. Hulse went with me. He and I
19   visited it.
20   Q. And what did you do when you visited
21   it?
22   A. We met Al Fromm, and he gave us an
23   overview of the layout and he introduced me to
24   the members from -- what's -- PIP,
25   Progressive Policy Institute?

Page 128

1    Q. PPI?
2    A. PPI.
3       And we just sat down and had a casual
4    interview with him.
5    Q. Do you remember who from PPI you
6    interviewed?
7    A. No. I don't know the names. There
8    was about three or four guys. There was about
9    three individuals he introduced us -- me to
10   from PPI.
11   Q. Do you typically want to visit the and
12   do a tour of the --
13   A. Yes.
14   Q. And why is that?
15   A. Just to make sure it actually exists.
16   Because a lot of times we do audits, they bring
17   us here to these big, fabulous conference rooms,
18   and we never get a chance to go visit the entity
19   or the organization.
20      So to make sure it's actually there and
21   functioning, we do an on-site visit.
22   Q. And do you usually bring a lawyer with
23   you?
24   A. Again, depending on the audit.
25   MR. ELIAS: I have nothing further.

Page 129

1    MR. MARTINEAU: Okay. We have no
2    questions.
3       We do want to read and sign.
4    Thank you.
5       (Time noted: 1:02 p.m.)
6       (Reading and signature not waived.)

```
                                    Page 130
 1           CERTIFICATE OF DEPONENT
 2       I hereby certify that I have read and
 3   examined the foregoing transcript, and the same
 4   is a true and accurate record of the testimony
 5   given by me.
 6       Any additions or corrections that I feel
 7   are necessary, I will attach on a separate sheet
 8   of paper to the original transcript.
 9
10           GEORGE TERRY SMITH
11
12       I hereby certify that the individual
13   representing himself/herself to be the
14   above-named individual, appeared before me this
15         day of          , 2006, and
16   executed the above certificate in my presence.
17
18
19           NOTARY PUBLIC IN AND FOR
20
21   MY COMMISSION EXPIRES:
22
23
24
25
```

```
                                    Page 131
 1   DISTRICT OF COLUMBIA, to wit:
 2       I, Josett F. Whalen, before whom the
 3   foregoing deposition was taken, do hereby
 4   certify that the within-named witness personally
 5   appeared before me at the time and place herein
 6   set out, and after having been duly sworn by me,
 7   according to law, was examined by counsel.
 8       I further certify that the examination
 9   was recorded stenographically by me and this
10   transcript is a true record of the proceedings.
11       I further certify that I am not of
12   counsel to any party, nor an employee of
13   counsel, nor related to any party, nor in any
14   way interested in the outcome of this action.
15       As witness my hand and notarial seal
16   this 13th day of April, 2006.
17
18
19
20           JOSETT F. WHALEN
21              Notary Public
22   MY COMMISSION EXPIRES: 5-14-2010
23
24
25
```

34 (Pages 130 to 131)