IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:05-cv-1067 (JGP) |
| UNITED STATES, | ) ) | |
| Defendant. | ) | |

# United States Opposition to the Democratic Leadership Council's Motion for Summary Judgment

The Democratic Leadership Council seeks a refund of $20,083 in income taxes that it paid when the Internal Revenue Service revoked its tax exempt status for 1997, 1998, and 1999.  The Service determined that during those years the DLC primarily operated to benefit a private group:  individuals who might run for office, were running for elected office, or had been elected to office as Democrats, or particularly New Democrats.  The DLC filed a motion for summary judgment, and the United States opposes it.  The DLC's motion is founded on legal premises that are incorrect.  In addition, many of the material statements applied to those faulty legal arguments are in dispute.  Therefore, the DLC is not entitled to summary judgment under Rule 56.

1853728.6

-i-

# Table of Contents

1.    Summary of DLC's argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.    The DLC did not operate as an exempt
      entity during the years at issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    The DLC's proposed legal standard is incorrect . . . . . . . . . . . . . . . . . . 4

      B.    The DLC, not the United States, must
            establish unambiguous proof of its exempt status . . . . . . . . . . . . . . . 7

      C.    The evidence the DLC relies on is
            in dispute, inadmissible, or irrelevant . . . . . . . . . . . . . . . . . . . . . . . . 8

3.    The argument that the revocation of the
      DLC's exempt status was improperly
      retroactive has no place in a refund suit . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

-ii-

# Table of Authorities

## FEDERAL CASES

*Abrosini v. Labarrague*, 101 F.3d 129 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . 9

*Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140 (2d Cir. 1998) . . . . . . . 2

**American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989) . . 4, 6

*Anastasato v. Commissioner*, 794 F.2d 884 (3d Cir. 1986) . . . . . . . . . . . . . 18

*Commissioner v. Lake Forest, Inc.*, 305 F.2d 814 (4th Cir. 1962) . . . . . . . . . 4

*D'Avanzo v. United States*, 54 Fed. Cl. 183 (2002) . . . . . . . . . . . . . . . . . . . . 18

*Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . . . . 10

*Garity v. United States*, 1980 WL 1765 (E.D. Mich. May 20, 1980) . . . . . . 18

**Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*National Alliance v. United States*, 710 F.2d 868 (D.C. Cir. 1983) . . . . . . . 19

*R.E. Dietz Corp. v. United States*, 939 F.2d 1 (2d Cir. 1991) . . . . . . . . . . . . 18

*Ruth v. United States*, 823 F.2d 1091 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . 18

*Sidell v. Commissioner*, 225 F.3d 103 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . 18

**Stichting Pensioenfonds Voor De Gezohdheid, Geestelijke En Maatschappelijke Belangen v. United States*, 129 F.3d 195 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 16

*United States v. Janis*, 428 U.S. 433 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Virginia Professional Standards Review Foundation v. Blumenthal*, 466 F. Supp. 1164 (D.D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1 (Ct. Fed. Cl. 2001)   5, 17

-iii-

## FEDERAL STATUTES AND REGULATIONS

26 U.S.C. § 501(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

26 U.S.C. § 6110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

26 U.S.C. § 7422 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26 U.S.C. § 7428 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26 U.S.C. § 7805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Treas. Reg. §1.501(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1853728.6

-2-

Before detailing the matters on which the parties disagree, it is useful to note that they agree they have filed cross motions for summary judgment and not a trial on a stipulated record. As such, the court should consider each motion independently, drawing the inferences in favor of the non-moving party for each motion. *See, Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142-143 (2d Cir. 1998)(where parties agreed court could draw inferences from the evidence and forgo a trial under Rule 52, the parties waived the right to a trial).

**1.      Summary of DLC's argument.**

The DLC's memorandum makes two broad arguments. The first is that the DLC is tax exempt under 26 U.S.C. § 501(c)(4). The second is that Service's revocation should be reversed because of procedural flaws in the manner the revocation was done and the time it was issued.

The first argument that the DLC was tax exempt during the years at issue is set up in three parts: a legal standard for considering whether the DLC is tax exempt, the purported burden of proof, and a recitation of the evidence the DLC believes is undisputed and supports judgment in its favor. The DLC articulates the legal standard for determining if an organization's primary purpose is conferring a private benefit in two ways. On page 13 of its memorandum the DLC states, "A publicly-devoted endeavor, one focused on policy promotion, may arise in the political context and be influenced by associations with particular political parties." On page 23, the DLC puts the standard this way, "an organization avoids excessive

1853728.6

-3-

private benefit to a political party or elected officials by operating independently of formal party structures, in pursuit of issues rather than partisan gain." The DLC then asserts the United States has a "heavy burden" in showing that the DLC is not entitled to a refund. Finally, the DLC proffers a good deal of evidence, including the opinions of three individuals, and concludes that the evidence as applied to the standards it has articulated supports a conclusion it was tax exempt during the years at issue as a matter of law.

The second argument contends that because the DLC was notified of the examination in 1999, its exempt status could not be revoked for 1997, 1998, and 1999 unless the Service demonstrated the DLC was operating in a manner other than that stated in its application for exempt status. Citing the testimony of a revenue agent, the DLC argues there was no such finding, and the "retroactive" revocation was improper.

In both arguments, the legal premises supporting the arguments are incorrect. When those premises are withdrawn, the DLC's arguments for summary judgment fall. Moreover, many of the material facts used to support the arguments are in dispute. When those facts are withdrawn from consideration, the DLC is not entitled to summary judgment.

-4-

## 2. The DLC did not operate as an exempt entity during the years at issue.

### A. *The DLC's proposed legal standard is incorrect.*

In the government's motion for summary judgment, we argued that the standard to determine the DLC's tax exempt status during the years at issue was whether the DLC's activities and primary purpose were to benefit a private group as opposed to the community as a whole. That test flows from the statute, Treasury regulations, and decisions in *Commissioner v. Lake Forest, Inc.*, 305 F.2d 814 (4th Cir. 1962), and *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), among others. The Treasury Regulations under Section 501(c)(4) require that a "social welfare" organization "promot[e] in some way the common good and general welfare of the people of the community." Treas. Reg. §1.501(c)(4)-1(a)(2). This mandate for common good and general welfare prohibits §501(c)(4) organizations from having a primary purpose of conferring private benefits on a group. In *Lake Forest* the Fourth Circuit reasoned that private benefits are conferred even if anyone can join the organization to get benefits available to members. In *American Campaign Academy* the court held that private benefits are conferred when activities are undertaken with a partisan purpose, even if the immediate activity directly educates individuals. The DLC, however, argues the private benefit analysis is reduced to whether an organization operates "independently" from political parties and pursues policies. (*See* Memorandum of Points and Authorities

-5-

in Support of Plaintiff's Motion for Summary Judgment at pp. 13 and 23.)  This is the law that the DLC contends entitles it to summary judgment.

The DLC derives its legal standard by reviewing Technical Advice Memoranda issued to other organizations.  (*See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at pp. 12-16.) Those TAMs were issued to particular taxpayers, and released to the public under 26 U.S.C. § 6110 in redacted form.  While we object to the DLC's analysis of the TAMs, there is no reason to dwell on the point because in 26 U.S.C. § 6110(k)(3) Congress mandated that TAMs "may not be used or cited as precedent."[1]  But that is just the use the DLC seeks here, and the TAMs cannot serve as support for the DLC's proposed legal standard.  *Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1, 12 (Ct. Fed. Cl. 2001)("Private letter rulings and technical advice memoranda, in accordance with section 6110(k)(3) of the Code may not be used or cited in any precedential way and thus, *a fortiori*, may not be used to support, in any fashion, an argument that one interpretation of the Code is more authoritative than another.").

To be fair, the DLC's discussion addresses the *American Campaign Academy* decision that the government also cited.  (*See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at pp. 14-15.)

---

[1]      Section 6110(k)(3) refers to "written determination," which is defined in § 6110(b)(1)(A) to include "a ruling determination letter, technical advice memorandum, or Chief Counsel advice."

-6-

But the DLC's analysis of the decision is limited to a general description of the holding.  A full reading of the decision shows the *American Campaign Academy* court correctly rejected the DLC's proposed legal standard that lets an organization confer private benefits on individuals or political parties as long as the organization works "independently" and pursues policies.  In the *American Campaign Academy* the organization was educating individuals—an exempt activity—but was doing so with the purpose of ultimately benefitting the Republican Party when the individuals were better campaign workers for Republican candidates.  Although the Academy was dominated by Republicans, the Tax Court did not find the organization was dominated or controlled by the Republican Party.  *Cf. American Campaign Acad. v. Commissioner*, 92 T.C. at 1070.  In *American Campaign Academy*, the Academy argued that the secondary benefits its school conferred on Republican candidates were "happenstance."  The Tax Court rejected the argument not only because there was "no compelling authority in support of [the Academy's] contention that nonincidental benefits must be controllable by the organization," but also because secondary benefits that advanced a substantial purpose of the organization have to be attributed to the organization.  *American Campaign Acad.*, 92 T.C. at 1078.  Under the DLC's proposed standard, however, the Academy could remain tax exempt and prepare campaign operatives who would work only for Republican campaigns if it did so "independently."  Independent actions—whether educating campaign professionals or developing policies—can impart considerable

1853728.6

-7-

benefits to "secondary" parties. As such, the standard would allow organizations

with a primary purpose of something other than the common good or general

welfare to remain tax exempt. The DLC's proposed standard is simply too narrow,

and not supported by the statute or precedent.[2]

**B.    The DLC, not the United States, must establish unambiguous proof of its exempt status.**

After setting up a legal standard unsupported by the statute or case law, the

DLC then states that the "Government has a heavy burden to claim that the DLC is

not tax exempt under Section 501(c)(4)." (*See* Memorandum of Points and

Authorities in Support of Plaintiff's Motion for Summary Judgment at p 17.) To the

extent the DLC is suggesting that the Government carries the ultimate burden of

proof in this case, it is wrong. The Court of Appeals for the District of Columbia

Circuit held in a refund suit arising out of revoking a labor organization's tax

exemption that the "taxpayer must 'unambiguously' prove entitlement to an

exemption." *Stichting Pensioenfonds Voor De Gezohdheid, Geestelijke En*

---

[2]    On page 24 in footnote 2 of its memorandum, the DLC argues that the *American Campaign Academy* has no application to this case because the Tax Court was addressing exempt status under § 501(c)(3) and this case involves exempt status under § 501(c)(4). As we explained in our memorandum supporting the United States motion for summary judgment on page 34, there is no reason that defining private benefit would differ based on the statutory exemption. Both provisions prohibit organizations that are not in the public's interest. What differs, is the amount of non-exempt (or in this case private benefit) activity an organization may engage in. But the analysis of what constitutes activity to benefit a private group is the same.

-8-

*Maatschappelijke Belangen v. United States*, 129 F.3d 195, 197 (D.C. Cir. 1997).

The DLC's responsibility to provide unambiguous proof that it is entitled to exempt

status under § 501(c)(4) is no burden on the United States. And the DLC's

suggestion to the contrary is incorrect.

## C.    *The evidence the DLC relies on is in dispute, inadmissible, or irrelevant.*

The DLC then reviews evidence on pages 17 to 24, arguing that it is both

undisputed and supports a conclusion that as a matter of law the DLC is tax

exempt. Much of the evidence, however, is disputed and irrelevant to the actual

issue before the court, whatever its relevance to the limited legal standard

suggested by the DLC. We will review the evidence in turn, incorporating the more

detailed objections in the United States Statement of Genuine Issues of Material

Facts in Opposition to DLC's Motion for Summary Judgment.

The DLC starts its analysis of the evidence with the point that "Democratic"

is part of its name. (*See* Memorandum of Points and Authorities in Support of

Plaintiff's Motion for Summary Judgment at pp. 17-18.) The fact is self-evident,

and neither dispositive nor irrelevant. Similar to the founders of the organization,

what its activities have been, and what its leaders have said the purpose of those

activities are, it is simply one of the facts and circumstances to be considered.

Therefore, while "Democratic" is in the DLC's name, it has no special import beyond

being a fact to consider with all the evidence.

-9-

The DLC then proffers the opinions of three witnesses to the effect that the DLC did not provide any benefit to the Democratic Party, they did not feel their reputation was put at risk because the DLC was not a "partisan" organization, and the DLC was not motivated by "partisanship and electioneering." As we explained in our statement of the facts in dispute, these opinions should either be excluded from evidence or disregarded for purposes of summary judgment because they are at issue.[3] The opinions of Engel, Moskos, and Pinkerton were based exclusively on their own experiences, and each admitted he did not investigate or fully understand the DLC's activities during the years at issue before coming to an opinion. (*See United States Statement of Genuine Issues of Material Facts in Opposition to DLC's Motion for Summary Judgment*, at pp. 13 to 17.) The reliability for the method in which each opinion was reached is impossible to measure. The individuals testified that they had experience with the DLC, had no need for further investigation, and knew what they knew. But opinions of that nature are not admissible. *Abrosini v. Labarrague*, 101 F.3d 129, 132-134 (D.C. Cir. 1996)(the basis of an expert's opinion must be evident, and then the court should weigh whether the method is reliable and if the testimony will assist the fact finder); *Groobert v. President and Directors of Georgetown College*, 219 F.Supp.2d 1, 5 (D.D.C. 2002)(while opinions based on personal experience are allowed, the opinion

---

[3]      *See* United States Statement of Genuine Issues of Material Facts in Opposition to DLC's Motion for Summary Judgment, at pp. 14 to 18.

-10-

must be more than "subjective belief or unsupported speculation"), *citing, Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).

Even if the opinions were based on a reliable analysis, they do not assist the court. The opinions do not address the issue whether the DLC conferred a private benefit on individuals running for elected office as Democrats or New Democrats. Rather, the opinions address the DLC's relationship to the Democratic Party or the Democratic National Committee and how the witnesses believe the public perceives the DLC. But the Government has not argued that the DLC's private benefit was directed solely to the Democratic National Committee or Democratic Party. Instead, we have argued that a private benefit was conferred on individuals running for elected office as Democrats or New Democrats. The opinions are irrelevant to that issue.

The DLC next recounts its policy work; work the United States has not denied or argued did not exist. (*See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at pp. 19-20.) We note, however, that the DLC did not fix any of the policies discussed on pages 19 and 20 of its DLC's brief to a specific time or year. Without knowing when those policies were at issue, it is just speculation on whether they have any impact on the years at issue, 1997, 1998, and 1999. Accepting the statements as relevant for purpose of argument, the DLC's premise in noting them is that the DLC would not work with Republicans if it was only interested in electing Democrats. (*See* Memorandum of

-11-

Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at p.

19.)  That argument, however, begs the question because the conclusion is imbedded

in the premise.  And statements like the DLC "partners with any and all elected

officials who support it on a particular policy initiative" are clearly in dispute.  (*See*

Memorandum of Points and Authorities in Support of Plaintiff's Motion for

Summary Judgment at p. 21.)

The argument is also wrong for a more subtle reason.  The DLC repeatedly

proclaimed during the years at issue that it was seeking to advance its policies at a

time when the Democratic Party was the minority party.  The DLC's activities were

designed to create a centrist approach to politics and policies.  Never working with

members of other parties but only with the minority party, would consign the DLC

to policies out of the center.  And so the DLC did in some circumstances work with

members of other parties to advance certain policies.  But these limited instances on

this record do not establish that the DLC's primary purpose was advancing its

policies without regard to their electoral effect.  The DLC often said during the

years at issue that its activities were aimed at electoral success for individuals

running as Democrats or New Democrats; occasionally working with members of

other parties was a part of that purpose.

There are a number of examples in the record of the way the DLC actually

saw its activities working towards its primary purpose.  In a May 1997 *DLC*

*Update*, Al From, the DLC's president, wrote about the DLC's pollster determining

-12-

that it would benefit candidates running as Democrats to adopt the DLC's balanced

budget policy.  After relating comments by a newly elected Democratic Member of

Congress who wanted a budget deal to be reached between President Clinton and

Republican congressional leaders, From said this:

> This Congresswomen is not alone.  Pollster Mark Penn
> recently asked voters about the budget deal.  He asked
> people whether they would vote to reelect a Democrat to
> Congress if he or she voted for a budget deal.  A majority–
> 52 percent to 42 percent – said yes.  Next he asked if they
> would reelect a Democrat who voted against the budget
> deal.  Thirty-four percent said yes, while 41 percent said
> no.

Hubbert Declaration, MSJ Ex. 8, p. 2.  From's message from the DLC is not that the

budget deal under consideration was good policy.  Rather, the message was that it

made good electoral sense **_for Democrats_** to side with the DLC's preferred position.

Another example is seen in "Talking Points" of From's DLC press conference

following the November 1998 elections.  Hubbert Declaration Appendix 2, MSJ

Ex 9.  The Points included a statement to the effect that Democrats with a

moderate message could win in "areas where Republicans were thought to have a

lock."  This statement— and the many others like it we described in our

memorandum supporting the Unites States motion for summary judgment—show

that the DLC was not actively seeking to have candidates from all parties use all of

its policies for all purposes.[4]  Rather, the DLC during the years at issue consistently

---

[4]    _See, e.g.,_ Hubbert Declaration Appendix 1, Part 3, Ex. 113 p. 7

(continued...)

-13-

referred to its activities and efforts to create policies that individuals could use to be elected to office as New Democrats or Democrats. Instances of working with Republicans to advance particular policies, even if they occurred during the years at issue, do not show the primary purpose of the DLC's activities was otherwise.[5]

The DLC reviews another group of documents and testimony to suggest that it is not a "service organization" providing benefits requested by particular legislators, but is instead a policy organization. (*See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at p. 21-22.) Again, this contention does not address the Government's argument, or establish why the DLC is entitled to summary judgment. We do not argue that the DLC took orders from legislators or the Democratic Party. We contend, instead, that the DLC's activities had the purpose of benefitting individuals who were running for

---

[4](...continued)
(emphasis added)("Now our challenge is to carry our successes forward with the next generation of New Democrat ideas put into action by the next generation of New Democrat leaders. If we meet that challenge, we can both shape the next politics in our country and **make the Democratic Party our nation's dominate political party again**. That is our hope, that is our goal, that is the end toward which we will work relentlessly in the Democratic Leadership Council and the Progressive Policy Institute. And, we're going to accomplish it.").

[5]      The United States agrees with the DLC's statement that in this case the Government is not arguing that the DLC directly intervened in elections to an extent that the intervention constituted its primary purpose. The United States is asserting a private benefit argument, not a political intervention argument on this record and for these years.

-14-

office as New Democrats or Democrats.  To that extent, the service organization

evidence is irrelevant.

To the extent whether the DLC provided benefits to the particular groups of

legislators is relevant, however, the facts are in dispute.  From wrote in 1998 in a

memorandum to the DLC's Trustees (Hubbert Declaration, Ex. 107, p. 5):

> At the Congressional level, we are working closely with
> members of the New Democrat Coalition in the House,
> who increasingly look to us for ideas and guidance on
> major issues.  The emergence of the NDC is a major
> political development in Washington and our ability to
> arm it with good ideas has made it all the more
> formidable.  NDC members are engaged in a number of
> the PPI projects and work particularly closely with PPI
> scholars. Through the DLC Congressional outreach effort,
> we are making a concerted effort to engage promising
> young NDC members in our efforts.

While we are not generally arguing the DLC is a service organization, to the extent

the issue is relevant, the facts are in dispute.

The DLC also argues that its leadership workshops, attended only by

Democrats in state and local offices, was an exempt activity and the secondary

benefits it conferred irrelevant.  (*See* Memorandum of Points and Authorities in

Support of Plaintiff's Motion for Summary Judgment at p. 22.)  Proving that the

DLC created and advocated for policies—like the American Campaign Academy

that educated campaign workers—does not resolve the issue whether the DLC's

activities had the primary purpose of benefitting certain candidates for office.  For

this reason, the DLC's efforts to explain away its leadership schools during the

-15-

years at issue are ineffective.  As we detail in the memorandum in support of the

United States motion for summary judgment (pages 17-22), the leadership

workshops were designed to train individuals how to use and articulate the DLC's

general policies.  Only Democrats attended these conferences.  When viewed with

other efforts to put the DLC's policies into the hands of potential candidates

through the *DLC Idea Book* and an orientation for incoming Democratic House

members, the purpose of the DLC's activities is evident.[6]  As the DLC's leaders said,

they were seeking electoral success for individuals who used their policies.

The DLC then contends that it was not a partisan operation, and was willing

to support any legislator.  (*See* Memorandum of Points and Authorities in Support

of Plaintiff's Motion for Summary Judgment at p. 23.)  First, the DLC's statements

about working with Republicans on any policy at any time is disputed by

statements during the years about Republicans "pilfering" and "stealing" the DLC's

policies for their own gains.  (*See* United States Statement of Genuine Issues of

Material Facts in Opposition to DLC's Motion for Summary Judgment, at ¶¶ 31 and

34.)  And, in 1998, From wrote that the DLC should undertake its activities so that

its policies were as valuable as campaign contributions.  (*See* United States

Statement of Genuine Issues of Material Facts in Opposition to DLC's Motion for

---

[6]     *See* Hubbert Declaration, Appendix 1, Part 3, Ex. 114 p. 5 (DLC is
building a new political network that will help candidates who run on the "New
Democrat message" and is "expending considerable energy to find tomorrow's
leaders in our party...")

-16-

Summary Judgment, at ¶ 55.)  Second, the evidence as recited by the DLC is not fixed in time, and there is no way to know the extent to which the events the DLC relies on occurred during the years at issue, or in years for which its exempt status was not challenged.

Finally, the DLC ends its first argument with a discussion of other organizations who are tax exempt under § 501(c)(4).  (*See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at p. 23-24.)  The DLC does not make any specific argument from these statements and, as such, the evidence is irrelevant.  To the extent the DLC is foreshadowing an argument about disparate treatment, in the District of Columbia Circuit the argument does not state a claim for which relief can be granted.  *Stichting*, 129 F.3d at 200-201 (pension fund's claim that it should be granted relief because similar funds were treated differently does not state a claim); *see also* United States Statement of Genuine Issues of Material Fact, at p. 20.

In conclusion, the DLC's first argument that it is entitled to judgment as a matter of law on the merits lacks force.  The DLC starts with a legal standard that is unsupported by the statute, regulations, and relevant decisions, and is far too narrow.  The DLC crafted its standard from technical advice memoranda, but by statute they cannot be used to argue that any interpretation of the Internal Revenue Code is better than another.  Using this incorrect standard, the DLC then asserts—contrary to existing authority in this circuit—that the United States bears

-17-

a heavy burden, and sets forth several facts as applied to its standard.  But the

DLC's statement that it never did some things (*e.g.,* provide benefits to candidates)

or regularly did others (*e.g.*, worked with members of all parties) are belied by the

evidence.  Accordingly, the DLC is not entitled to summary judgment on its first

argument.

**3.    The argument that the revocation of the DLC's exempt status was
improperly retroactive has no place in a refund suit.**

The DLC makes a second argument that does not address the merits but

contends that the Service improperly retroactively revoked the DLC's tax exempt

status.  Based on this perceived procedural mistake, the DLC contends it is entitled

to summary judgment and a refund of tax.  This argument, however, must be

rejected for two reasons.  First, it fails to consider the nature of the suit the DLC

commenced.  This is a refund action, and the court reviews the merits of the claims

*de novo*.  As such, the retroactivity argument has no effect.  Second, to the extent

the argument can be heard in this case, the facts supporting the argument are in

dispute.

It is long-established that the analyses and conclusions of the Internal

Revenue Service at the administrative stage are irrelevant in determining whether

a taxpayer is entitled to a refund.  *Vons Companies, Inc. v. United States*, 51 Fed.

Cl. 1, 6 (Ct. Fed. Cl. 2001)("[T]his court's determination of plaintiff's tax liability

must be based upon the facts and merits presented to the court and does not require

-18-

(or even ordinarily permit) this court to review findings or a record of previously developed at the administrative level.").  In a refund suit, the taxpayer cannot merely point out that the Service's assessment "was erroneous in some respects;" rather, the taxpayer has the burden of proving it is entitled to a refund in the amount it claims.  *United States v. Janis*, 428 U.S. 433, 440 (1976).  Therefore, in a refund action, the court conducts a de novo review of the determination and assessment.  *R.E. Dietz Corp. v. United States*, 939 F.2d 1, 4 (2d Cir. 1991); *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir. 1987); *D'Avanzo v. United States*, 54 Fed.Cl. 183, 186 (2002).  Accordingly, a court will not look at the Service's reasoning behind its assessment or notice of deficiency.  *See, e.g., Anastasato v. Commissioner*, 794 F.2d 884, 886-87 (3d Cir. 1986).  Thus, courts consistently have held such information to be irrelevant, precluding it in both discovery and trial settings.  *See Sidell v. Commissioner*, 225 F.3d 103, 111 (1st Cir. 2000) (statements in internal Service memoranda concerning views of proposed regulations irrelevant); *Ruth*, 823 F.2d at 1094 (upholding restrictions against examining investigating agent or introducing Internal Revenue Service manual provisions concerning procedures); *Garity v. United States*, 1980 WL 1765 (E.D. Mich. May 20, 1980) (refusing to compel government to produce portions of Service documents containing opinions, mental impressions, conclusions and reasoning of Service employees).  But the DLC's retroactivity argument is premised on the agent's statements and conclusions

-19-

about the audit.  In a refund proceeding with a de novo standard of review, the evidence is irrelevant.

The DLC appears to have confused the manner in which determinations on exempt status are reviewed in declaratory judgment actions under 26 U.S.C. § 7428 with how refund suits are reviewed under 26 U.S.C. § 7422 and 28 U.S.C. § 1346. In a declaratory judgment action, the courts look to the record created by the Service in making the determination.  Generally, additional evidence is not considered.  *Virginia Professional Standards Review Foundation v. Blumenthal*, 466 F.Supp. 1164, 1167-1168 (D.D.C. 1979)(in action under § 7428, the court's review is limited to the administrative record); *see National Alliance v. United States*, 710 F.2d 868, 871 n. 6 (D.C. Cir. 1983)(7428 "has been construed as providing a more customary type of judicial review of the administrator's decision upon the administrative record").  But in a refund suit, the court considers whether the tax is owed using a de novo standard.  What the Service did or did not do is irrelevant. Accordingly, the evidence of what the agent thought, believed, or concluded should be disregarded.

To the extent the Court concludes the agent's thoughts and conclusions are relevant, Section 7805 is no impediment to the revocation in this case because the factual premise is wrong when all the evidence is considered.  The DLC argues that it was operating in complete conformity with its application for exempt status, and therefore any revocation could only be prospective.  The DLC does not, however, go

-20-

through all of the evidence about its activities during the years at issue and point to where they were described.  Instead, the DLC relies on the revenue agent's statements.  But the court's review is do novo, and it must look at the whole record. In doing so, the DLC's application did not, for example, state that the DLC would be seeking to create policies that were as valuable for candidates running as New Democrats as campaign contributions.  (*See* United States Statement of Genuine Issues of Material Facts in Opposition to DLC's Motion for Summary Judgment, at ¶ 55.)  And the DLC's application did not delineate as a purpose waging a decade-long effort to "pick the Republican lock on the electoral college..." (Hubbert Declaration, Appendix 1, Part 3 Ex. 111.)  Or that the DLC "wanted to help elect a Democrat President..."  (Hubbert Declaration, Appendix 2, MSJ Ex. 7.)  Nor did the DLC's application state as an activity stopping the Republicans from "pilfering" its policies and reclaiming the "political center on the cheap." (Hubbert Declaration, Appendix 1, Part 4 Ex. 118.)

Furthermore, the record lacks support that during the years at issue the DLC did all of the activities it described as part of its operations in its application.  For example, there is no evidence about task forces, town meetings, issue forums for businesses, or contracts for studies on specific issues during 1997, 1998, or 1999. (Hubbert Declaration, Appendix 1, Pltf Ex. 2 at pp. 23-24.)[7]  There is plenty of

---

[7]    The same exhibit is found at DLC Exhibit A, pages 24 - 25.

-21-

evidence to put at issue whether the DLC operated in conformity with its application.  As such, the undisputed facts do not support the DLC's argument for summary judgment.

In addition, the Court must weigh the agent's testimony that he did not receive all the information that he requested in his examination.  In doing so, the revenue agent's testimony does not support the argument about what the revenue agent concluded.  In essence, the DLC argues that the revenue agent admitted that from his understanding the DLC operated in a manner consistent with its application.  Accordingly, the Service could not revoke its application retroactively.  The agent testified, however, that during his examination he did not have access to all of the information he requested.  Revenue agent Smith admitted the audit was not as complete as he wanted:

> Q.  Is it fair to say this was a very thorough audit?
>
> A.  No.  It couldn't be -- it wasn't as thorough as we wanted it to be because you guys were not forthcoming with information.
>
> Q.  By "you guys," just so that we're clear, who's the "you guys"?
>
> A.  DLC and their law firm would not give us what we wanted.
>
> Q.  And what was that?  What didn't they give you that you want?
>
> A.  Well, I don't have the [Informal Document Requests] here, but when I was looking through here, you can tell I put in here somewhere DLC would not give up the information that we needed to review.  The only thing I got from you guys were CD-ROMs.

-22-

Because the agent asked to opine about the extent to which the DLC's activities during the years at issue matched or differed from the activities described in the DLC's application for exempt status said he did not have the information he wanted about the DLC's activities, the statements must be considered to be at issue.

We expect that the DLC may argue on reply that the agent's testimony was nevertheless based on a lot of information. But revenue agent Smith addressed that point in his testimony when he said that although he received a lot of information to review—and did so for over 400 hours—it was not all of the information he wanted:

Q.  But there must have been a lot of material on the CD-ROMs.

A.  Exactly. But that's all I got. That's all you would give me. Anything I asked for, it was too burdensome, it was this, it was that, it was too cumbersome, we don't have time. Anything we looked for financially -- it wasn't one of the best audits I was on. That's why it took that much time.

Q.  But you spent 400 hours –

A.  Correct.

Q.  -- reviewing materials.

A.  Right.

Q.  So you got a lot of materials.

A.  Of CD-ROM, yeah.

1853728.6

-23-

The factual support for the DLC's argument is at issue, and for that reason, summary judgment is not appropriate.

As with the first argument, the second argument is based on a standard of review that does not apply to a refund suit.  In this action, the actions and beliefs of the examining agent are irrelevant.  Even if the agent's actions are considered, what he actually concluded and whether he had all the information he needed to draw the conclusions the DLC claims are in dispute.

**4.    Conclusion**.

The United States opposes the DLC's motion for summary judgment.  The motion should be denied, and the United States motion for summary judgment granted.

Dated:  August 15, 2006

Respectfully Submitted,

/s/ Pat S. Genis
PAT S. GENIS, #446244
DAVID A. HUBBERT
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, DC 20044
Phone/Fax: (202) 307-6390/514-6866
Email: pat.genis@usdoj.gov

OF COUNSEL:

KENNETH L. WAINSTEIN
United States Attorney

1853728.6

<u>CERTIFICATE OF SERVICE</u>

IT IS CERTIFIED that the foregoing UNITED STATES OPPOSITION TO THE

DEMOCRATIC LEADERSHIP COUNCIL'S MOTION FOR SUMMARY JUDGMENT

was caused to be served upon  plaintiff's counsel on the 15th  day of August 2006, in

accordance with the Court's ECF procedures, and by depositing a copy thereof in the

United States mail, postage prepaid, addressed as follows:


ROBERT F. BAUER, ESQUIRE
MARC E. ELIAS, ESQUIRE
EZRA W. REESE, ESQUIRE
Perkins Coie
607 Fourteenth Street, NW,
Suite 800
Washington, DC  20005-2011.
rbauer@perkinscoie.com



/s/ Pat S. Genis
PAT S. GENIS