IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05-cv-1067 (JGP) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## Second Declaration of David A. Hubbert

I, David A. Hubbert, declare as follows:

1.      I am an attorney in the Department of Justice's Tax Division, and have been assigned to assist in representing the United States.

2.      I have access to the Tax Division's files in this case, as well as the discovery reponses the DLC provided during this case.

3.      In order to compile the documents that support the United States' motion for summary judgment, I have taken the actions described below.

4.      I copied the following exhibit that was attached to the deposition transcripts that are in the Tax Division's files for this case and attached them to this Declaration:

·      Exhibit 43, Memorandum from Doug Wilson to Holly Page dated November 4, 1998.  Alston dep. (DLC Ex. E) at pp. 171-175.

2

5.      Where the United States' opposition to the DLC's motion for summary

judgment has cited deposition testimony, I have copied the pages cited in each

deposition transcript, as well as the cover page through the oath.  The following

pages are attached to this Declaration:

·      Robert Engel Deposition, pages 1 - 4 and 12 - 14;

·      Charles Moskos Deposition, pages 1 - 4 and 16;

·      James M. Pinkerton Deposition, pages 1 - 4 and 20 - 22.


I declare under penalty of perjury that the foregoing is true and correct.

Dated August 14, 2006.

_/s/ David A. Hubbert_ _____
David A. Hubbert

NOV-12-1998  10:49    ASD Public Affairs                          P.02/04

| MEMORANDUM FOR: | Holly Page |
| --- | --- |
| FROM: | Doug Wilson |
| DATE: | November 4, 1998 |
| SUBJ: | DLC |

When we met for lunch late last month, you asked me to give you a 2-3 page summary of my thoughts regarding a DLC political strategy and outreach program. I've fine-tuned the following to take into account last night's very heartening election results (which I know will be the topic for discussion at tonight's dinner at Mark Penn's – and which I think reinforce many of the points outlined below). Please feel free to present this to Al at any time you think appropriate.

**BACKGROUND.** The Democratic Leadership Council has provided the policy messages and content upon which this Administration has built its program and electoral successes. On economics, welfare and crime in particular, the DLC has enabled the Administration not just to build upon the traditional Democratic base but to expand beyond that base to the vital, moderate center. Midterm election results validate key DLC messages and principles.

Here's what we can celebrate:

- DLC economic and welfare messages have turned the Democrats into the party of trust and choice for growing numbers of middle-class and upper-income voters who previously identified with Republicans on these issues;

- Moderates, while not yet completely "in from the cold", are a growing force in both parties

- The "L" word (liberal) has been replaced by the "E" word (extremist) as the term that can most hurt a candidate -- and the "E"s are primarily in the other party

Here's the work that lies ahead:

- We have no real bench, no real farm team. The kinds of men and women who would be ideal candidates to carry the New Democrat message and help us to

**DLC 01593**



EXHIBIT 43
Gov't
Feb. 10, 2006

12-Nov-98;10:35A

CA0157

build and strengthen the party are reluctant to run – the political environment is negative and the support system appears to be nil.

- We have not yet succeeded in integrating DLC policy and message components with operational components – from soup to nuts – that would enable us to build such a farm team in Congress and in state legislatures

- We have not fully succeeded in incorporating critical segments of the Democratic base – African-American and Hispanic communities in particular -- into our message development or delivery. Polls show both communities interested in and attracted to DLC messages on the economy, welfare, crime and education (as opposed to traditional Democratic social messages on these issues). The GOP can well be expected to follow George W. Bush's success in delivering these messages to these two constituencies.

**GOALS**. A DLC political outreach program should NOT try to duplicate, replace or supplant what goes on at the DNC. Instead, we should focus on how we can most effectively implement the next logical steps in DLC development:

- Identifying, encouraging men and women who are respected and influential members of their community to run for state and national legislative and administrative offices as Democrats carrying the New Democrat messages

- Supporting Al From and all other national DLC leaders in keeping New Democrat messages prominently in the national political debate, and taking the messages to communities and candidates throughout the country

- Sharpening and integrating a few key DLC message points on major policies (economy, Social Security, welfare, crime, education, defense, health, environment) into candidate recruitment and training sessions – and continuing such *practically usable* policy support on a regular basis, from beginning (decision to run) to end (election night)

- Identifying and integrating new sources of financial support into this outreach program effort, making sure current, new and potential donors *can see the results* of targeted efforts in which they are asked to partner

- Developing measurable standards of achievement at agreed-upon stages: In 2000, 2002 and 2004, $x$ number recruited, $y$ number elected, $z$ percentage increase in the Democratic vote in a particular district as a result of the DLC themes and messages conveyed. There should be a slow but steady increase in each category over the next three election cycles.

**DLC 01594**

12-Nov-98 10 35A

CA0158

Holly, as I have discussed with you and Al often, I believe the keys to a successful DLC political outreach program are the following:

- Keep it simple, small and focused
- Enable it to tap all the key parts of the DLC -- AI, staff, communications, policy -- *to maximize the strengths of each*
- Make it a credible addition to, not a substitute for, party political programs -- but *give it credibility* (which it will have if it has AI's support)
- Don't let it become embroiled in larger, day-to-day office "crises" -- let it remain focused on candidate encouragement, training and support (both policy support and "ground troop" support from the growing numbers of young people who identify with the DLC and are looking for tangible ways to contribute)
- AI should deal at the highest levels of politics and the media to keep the DLC as a major factor in party development and national policy debate, and to mobilize party leaders on our behalf -- *but the political outreach program should carefully develop and target the ways in which we use AI and our other national leaders in Congress, at the White House and in the country* to maximize their limited time; provide feedback on their successes in helping us; and make them want to "come back for more"
- Ditto with donors to such an outreach effort

Finally -- we talked about a timeline for development. I see such a timeline in three stages, corresponding to the presidential elections in 2000 and 2004 and the mid-term elections in 2002. Once we review last night's results at greater length -- with Mark Penn and other templates -- we can establish a targeting program for districts, recruitment and resource allocation. We need to prioritize our resource allocation, but we need to do so on the basis of where we are most likely to *initially succeed* (in 2000) and to *expand and build on those successes* (in 2002 and 2004).

That's my 3 pages. It's a springboard. Cheers.

**DLC 01595**

00001

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3 - - - - - - - - - - - - - - - x

4 DEMOCRATIC LEADERSHIP COUNCIL,  :

5 INC.,                  :

6          Plaintiff,    : No.1:05-cv-1067

7          vs.           : (JGP)

8 UNITED STATES,              :

9          Defendant.   : PAGES 1 - 31

10 - - - - - - - - - - - - - - - x

11              March 29, 2006

12              Washington, D.C.

13      Deposition of ROBERT ENGEL, held at the

14 offices of Perkins Coie, 607 14th Street, Northwest,

15 Suite 800, Washington, D.C., commencing at 2:03

16 p.m., Wednesday, March 29, 2006, before Elizabeth

17 Mingione, Notary Public.

18

19

20

21

22

23              **Engel, Robert   3-29-2006**              **Page 1**

00002

1  A P P E A R A N C E S   O F   C O U N S E L:

2  ON BEHALF OF THE UNITED STATES:

3          MICHAEL J. MARTINEAU, ESQUIRE

4          U.S. DEPARTMENT OF JUSTICE

5          P.O. Box 227

6          Ben Franklin Station

7          Washington, D.C. 20044

8          (202) 307-6483

9

10  ON BEHALF OF THE DEMOCRATIC LEADERSHIP COUNCIL,

11  INC.:

12          EZRA W. REESE, ESQUIRE

13          PERKINS COIE

14          607 Fourteenth Street, N.W., Suite 800

15          Washington, D.C. 20005-2011

16          (202) 628-6600

17

18

19

20

21

22

23                      **Engel, Robert   3-29-2006**                    **Page 2**

00003

1          C O N T E N T S

2  WITNESS:  ROBERT ENGEL

3  EXAMINATION BY:                          PAGE

4  Mr. Martineau ................................... 4

5  Mr. Reese ...................................... 28

6

7

8  EXHIBITS

9  NUMBER          DESCRIPTION                    PAGE

10

11  160   Written Testimonoy of James  ............... 7

12       Pinkerton

13

14

15              - - -

16

17

18

19

20

21

22

23          **Engel, Robert   3-29-2006                Page 3**

00004

1          P R O C E E D I N G S

2   Whereupon,

3               ROBERT ENGEL,

4          having been first duly sworn by

5          Elizabeth Mingione, a Notary Public

6          within and for the District of Columbia,

7          was examined and testified as follows:

8               - - -

9          DIRECT EXAMINATION CONDUCTED

10         BY MR. MARTINEAU:

11   Q.   Afternoon, Mr. Engel.

12   A.   Good afternoon.

13   Q.   Mr. Engel, I'm Mike Martineau from the

14   Department of Justice.  I represent the United

15   States in this case.

16        Have you ever had your deposition taken

17   before, sir?

18   A.   Yes.

19   Q.   So you know the drill.  We'll make sure

20   we don't talk over each other so our court reporter

21   can take our questions and answers down.

22   A.   Absolutely.  Happy to.

23   Q.   Very good.  Mr. Engel, where are you **2006**          **Page 4**

00012

1 document for the DLC?

2     A.   Right.  I would think it's just my

3 experience in being involved in Democratic party

4 politics since 1982.

5     Q.   All right.  Now, have you ever served as

6 an expert witness before in a case?

7     A.   Not that I know of.

8     Q.   Have you ever been qualified by a court

9 as an expert before?

10     A.   Probably not.

11     Q.   Now, so is it fair to say that the bases

12 for the written testimony submitted here is your

13 experience in the various positions that you have

14 held in the Democratic party and those particular

15 entities that you described earlier?

16     A.   Yes.

17     Q.   Have you ever written or published an

18 article about the Democratic party in your course of

19 your career?

20     A.   Not published, no.

21     Q.   Okay.  In drafting this particular

22 written testimony, did you conduct any analysis of

23 the Democratic party for purposes of this particular

**Page 12**

00013

1    Q.   So you wrote this testimony based on the

2  knowledge that you had acquired in those positions

3  you testified before?

4    A.   Yes.

5    Q.   Correct?

6    A.   Absolutely.

7    Q.   Mr. Engel, what is your understanding of

8  what the DLC is and what its mission is?

9    A.   I'm unclear of what the DLC's mission

10  truly is and how they operate at times.

11    Q.   Okay.  In preparation of this particular

12  written testimony, then I take it you did not

13  undertake an investigation of the activities --

14    A.   Right.

15    Q.   -- of the DLC for the years '97 --

16    A.   Right.

17    Q.   -- '98 and 1999?

18    A.   Right.

19    Q.   Is that a fair statement?

20    A.   Absolutely.

21    Q.   And you have not reviewed the books and

22  records of the DLC at that particular time?

23    A.   No.          **Engel, Robert   3-29-2006          Page 13**

00014

1    A.   No, or at any time.

2    Q.   Do you know Al From, who Al From is?

3    A.   I do know who Al From is.  Yes.

4    Q.   Who is Al From?

5    A.   Al From is the director of the DLC.

6    Q.   And how do you know Al From?

7    A.   I know Al From from the DLC in terms of

8 knowing that he was the director.  I believe he

9 comes out of Democratic Party Politics before he was

10 at the DLC.  I think he's been at the DLC for a long

11 period of time.  I can't say how long.

12        But when I think of the DLC, I know that

13 I think of Al From's name.

14    Q.   Certainly.  And when did you first meet

15 Al From?

16    A.   I probably did not meet Al From -- I have

17 met him, and I think I met him in 1998, excuse me,

18 1995.

19    Q.   Okay.  And what was the context in which

20 you met Mr. From in 1995?

21    A.   It was -- I'll give you the whole

22 context.  After the 1994 elections, which was an

23 election on which the Democrats lost the House of 6        **Page 14**

00001

1        IN THE UNITED STATES DISTRICT COURT FOR THE

2              DISTRICT OF COLUMBIA

3

4  DEMOCRATIC LEADERSHIP        )
   COUNCIL, INC.,              )
5                      )
          PLAINTIFF,    )
6                      )
     VS.              )    NO. 1:05-CV-1067 (JGP)
7                      )
   UNITED STATES,          )
8                      )
          DEFENDANT.    )
9  _____)

10

11

12          THE DEPOSITION OF CHARLES MOSKOS, TAKEN ON

13    BEHALF OF THE DEFENDANT, AT 1620 26TH STREET, SIXTH

14    FLOOR, SANTA MONICA, CALIFORNIA, AT 2:00 P.M.,

15    WEDNESDAY, MARCH 22, 2006, BEFORE SHERYL WILLIAMS,

16    CERTIFIED SHORTHAND REPORTER NO. 7453, PURSUANT TO

17    NOTICE.

18

19

20

21

22

**Moskos, Charles  3-22-2006          Page 1**

00002
1  APPEARANCES:

2  FOR PLAINTIFF:

3  PERKINS COIE LLP
   BY:  ROBERT BAUER, ESQ.
4  607 14TH STREET NW
   SUITE 800
5  WASHINGTON, D.C. 20005
   (202) 434-1602
6
   FOR DEFENDANT:
7
   U.S. DEPARTMENT OF JUSTICE
8  BY:  MARTIN J. MARTINEAU, ESQ.
   555 4TH STREET NW
9  ROOM 6122
   WASHINGTON, D.C. 20001
10  (202) 307-6483

11

12

13

14

15

16

17

18

19

20

21

22
                    **Moskos, Charles  3-22-2006**              **Page 2**

00003

1                    I N D E X

2 WITNESS            EXAMINATION            PAGE

3 CHARLES MOSKOS        BY MR. MARTINEAU        4

4                BY MR. BAUER

5

6

7                EXHIBITS

8 DEFENDANT'S                    PAGE

9    157    NOTICE OF DEPOSITION        4

10    158    WRITTEN TESTIMONY OF CHARLES
            MOSKOS            9

11

12

13

14

15

16

17

18

19

20

21

22

23            **Moskos, Charles  3-22-2006            Page 3**

00004

1    SANTA MONICA, CALIFORNIA, WEDNESDAY, MARCH 22, 2006

2              2:00 P.M.

3              -O0O-

4              CHARLES MOSKOS,

5 CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING BI

6 ADMINISTERED AN OATH IN ACCORDANCE WITH C.C.P. SECTION

7 2094, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

8

9              EXAMINATION

10 BY MR. MARTINEAU:

11    Q.  MR. MOSKOS, WOULD YOU STATE YOUR NAME.

12    A.  CHARLES MOSKOS.  CALLED CHARLIE.  AND PROFESSOR

13 EMERITUS AT NORTHWESTERN UNIVERSITY NOW LIVING IN SANTA

14 MONICA PART OF THE YEAR.

15    Q.  VERY GOOD.  NICE TO MEET YOU, PROFESSOR.

16    A.  SAME HERE.

17    Q.  YOU'RE APPEARING HERE TODAY PURSUANT TO THE

18 SUBPOENA AND THE NOTICE OF DEPOSITION THAT WAS SERVED O

19 YOU IN THIS CASE?

20    A.  CORRECT.

21    Q.  AND I HAVE A COPY OF THAT THAT I'D LIKE TO MAKE

22 PART OF THE RECORD OF THE CASE, AND THAT WOULD BE EXHIBI

23 NO. 157.          **Moskos, Charles  3-22-2006**          **Page 4**

00016

1    Q.  NOW, LET'S LOOK AT THE VERY FIRST INTRODUCTORY

2   PARAGRAPH WHERE IT STATES HERE, IT SAYS WHAT YOUR CURREN

3   ADDRESS IS.  IT SAYS YOU HAVE BEEN ASKED TO PREPARE EXPERT

4   OPINIONS AND PREPARE EXPERT TESTIMONY REGARDING THE

5   ACTIVITIES OF THE DLC DURING CALENDARS YEARS 1997, 1998 AND

6   1999.

7    A.  YES.

8    Q.  HAVE YOU IN THE PREPARATION OF YOUR WRITTEN

9   TESTIMONY CONDUCTED AN INVESTIGATION OF ALL OF THE

10  ACTIVITIES OF THE DLC IN THOSE PARTICULAR YEARS?

11   A.  PROBABLY NOT.  NOT ALL THE ACTIVITIES I WOULD

12  SAY.  I'M ON THE BOARD WITH MARK MCGEE AND WILL MARSHAL

13  WROTE A LOT OF NATIONAL SERVICE PROPOSALS.  BUT I WOULD S

14  THAT BROADLY SPEAKING I WAS -- I KNEW WHAT ALL THE DLC W/

15  DOING, BUT WHEN IT CAME TO NITTY-GRITTY SMALLER DETAILS,

16  NO.

17   Q.  FAIR ENOUGH.  ARE YOU BEING COMPENSATED FOR THE

18  SUBMISSION OF THIS PARTICULAR WRITTEN TESTIMONY?

19   A.  NO.

20   Q.  NOW, I ASKED YOU IF YOU HAD EVER APPEARED AS AN

21  EXPERT WITNESS OTHER THAN APPEARING BEFORE A CONGRESSIO

22  COMMITTEE, BUT IN A COURT CASE, AND YOU SAID YOU HAVE NOT

23   A.  CORRECT.  **Moskos, Charles  3-22-2006**          **Page 16**

00001

1    IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - - - - x

4  DEMOCRATIC LEADERSHIP COUNCIL, :

5  INC.,                      :

6          Plaintiff,    : No.1:05-cv-1067

7       vs.              : (JGP)

8  UNITED STATES,              :

9          Defendant.   : PAGES 1 - 48

10  - - - - - - - - - - - - - - - - x

11                 March 29, 2006

12                 Washington, D.C.

13      Deposition of JAMES M. PINKERTON, held at the

14  offices of Perkins Coie, 607 14th Street, Northwest,

15  Suite 800, Washington, D.C., commencing at

16  a.m., Wednesday, March 29, 2006, before Elizabeth

17  Mingione, Notary Public.

18

19

20

21

22

23                 **Pinkerton, James M.  3-29-2006**          **Page 1**

00002

1  A P P E A R A N C E S   O F   C O U N S E L:

2  ON BEHALF OF THE UNITED STATES:

3          MICHAEL J. MARTINEAU, ESQUIRE

4          U.S. DEPARTMENT OF JUSTICE

5          P.O. Box 227

6          Ben Franklin Station

7          Washington, D.C. 20044

8          (202) 307-6483

9

10  ON BEHALF OF THE DEMOCRATIC LEADERSHIP COUNCIL,

11  INC.:

12          ROBERT F. BAUER, ESQUIRE

13          EZRA W. REESE, ESQUIRE

14          Perkins Coie

15          607 Fourteenth Street, N.W., Suite 800

16          Washington, D.C. 20005-2011

17          (202) 628-6600

18

19

20

21

22

23              **Pinkerton, James M.  3-29-2006              Page 2**

00003

1           C O N T E N T S

2   WITNESS:  JAMES M. PINKERTON

3   EXAMINATION BY:                     PAGE

4   Mr. Martineau ............................... 4, 44

5   Mr. Reese ...................................... 31

6   Mr. Bauer ...................................... 37

7           DEPOSITION EXHIBITS

8           JAMES M. PINKERTON

9   NUMBER          DESCRIPTION          PAGE

10  159   Written Testimony of James P.  ........ 9

11      Pinkerton

12

13

14           - - -

15

16

17

18

19

20

21

22

23          **Pinkerton, James M.  3-29-2006          Page 3**

00004

1          P R O C E E D I N G S

2  Whereupon,

3          JAMES P. PINKERTON,

4          having been first duly sworn by

5          Elizabeth Mingione, a Notary Public

6          within and for the District of Columbia,

7          was examined and testified as follows:

8              - - -

9          DIRECT EXAMINATION CONDUCTED

10          BY MR. MARTINEAU:

11    Q.    Morning, Mr. Pinkerton.

12    A.    Morning.

13    Q.    I'm Mike Martineau from the Department of

14  Justice.  Have you ever had your deposition taken

15  before, sir?

16    A.    No.  I don't think so.

17    Q.    Very good.  The way the process works is

18  I ask you the questions.  You give the answers.

19  I'll try to talk slow.

20    A.    I'll talk fast.

21    Q.    You'll talk fast.  Make sure we don't

22  talk over each other because our court reporter has

23  to take the testimony down. **on, James M.  3-29-2006          Page 4**

00020

1   -- this has been a good talk.  Can you kind of write

2   up what you have got here, what you have been

3   telling us.  And I said sure.

4       So I just went home and typed this up

5   and, you know, I sent it to them.  They sort of

6   reformatted it and, you know, put in all the LLPs

7   and all that kind of stuff but this is, you know,

8   '99 percent, I mean.

9   Q.   Very good.  Now, in preparing your

10  written testimony for this particular case, have you

11  conducted an analysis of the activities of the DLC

12  for the years 1997, 1998 and 1999?

13  A.   Have I conducted an analysis.  No.  I

14  have called upon my accumulated wisdom about how

15  think tanks worked, and I've asked myself have I --

16  were they a vital part of the vital center.  And I

17  asked myself that question.

18       Were they clearly looking to build

19  bridges with Republicans, conservatives on issues

20  ranging from welfare reform, to Iraq policy, to

21  global warming, to the minimum wage.  And the answer

22  was, yes.

23       I felt, I mean, when Al called me up, **3-29-2006**        **Page 20**

00021

1  Democrats.  That's very clear, I think, at their

2  great peril in terms of their standing inside the

3  Democratic party.  They have chosen a more

4  bipartisan Centrist intellectual-ideological

5  approach as opposed to pure partisanship.

6        So I felt very comfortable volunteering

7  to help.

8    Q.    So the answer to my question is that you

9  did not conduct an analysis at all?

10    A.    Well, yes, I did conduct an analysis, but

11  thank you for giving me a chance to clarify that.  I

12  did conduct an analysis.  It wasn't in a sense of

13  like point by point by point, but it was a review of

14  the intellectual climate of the late '90s.  I did do

15  that.

16    Q.    And your review was based on your

17  knowledge of those particular individuals and what

18  they do that we've already --

19    A.    Yes.

20    Q.    Okay.

21    A.    And on just a reflection on, you know, I

22  mean compare and contrast, as they said, you know,

23  like for example how does the DLC compare to the2006          **Page 21**

00022

1 mentioned. I said, yeah, they are in the mix in

2 terms of fair-minded centrism, comparable to them.

3    Q.    Mr. Pinkerton, are you familiar with the

4 Progressive Policy Institute?

5    A.    Yes.

6    Q.    What is the Progressive Policy Institute?

7    A.    The Progressive Policy Institute is an

8 offshoot of the DLC.

9    Q.    Okay. And what is -- is the Progressive

10 Policy Institute a tax exempt organization, to your

11 knowledge?

12    A.    Yes, it is.

13    Q.    Do you know under what provision of the

14 Internal Revenue Code?

15    A.    No, I don't.

16    Q.    What is the relationship between the DLC

17 and the Progressive Policy Institute?

18    A.    They are fellow entities in the same -- I

19 don't exactly know.

20    Q.    In writing your written testimony, did

21 you conduct an analysis of the activities of the

22 Progressive Policy Institute for the years 1997,

23 1998 and 1999?  **Pinkerton, James M.  3-29-2006**          **Page 22**

3

<u>CERTIFICATE OF SERVICE</u>

IT IS CERTIFIED that the foregoing SECOND DECLARATION OF DAVID A.

HUBBERT was caused to be served upon  plaintiff's counsel on the 15th  day of August,

2006, in accordance with the Court's ECF procedures, and by depositing a copy thereof

in the United States mail, postage prepaid, addressed as follows:

ROBERT F. BAUER, ESQUIRE
MARC E. ELIAS, ESQUIRE
EZRA W. REESE, ESQUIRE
Perkins Coie
607 Fourteenth Street, NW,
Suite 800
Washington, DC  20005-2011.
rbauer@perkinscoie.com

/s/ Pat S. Genis
PAT S. GENIS

181249.1