IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05-cv-1067 (JGP) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## United States' Statement of Genuine Issues of Material Facts in Opposition to DLC's Motion for Summary Judgment

The United States submits this statement of those facts in the Democratic Leadership Council's statement of material facts for which there are genuine issues. Our objections are grouped into three categories: statements that in dispute; statments based on inadmissible opinion testimony; and, statements that are not relevant. The fact as stated in the DLC's statement of fact is set forth, with the corresponding evidence showing the statement is at issue or objectionable. The paragraph numbers are from the DLC's statement of facts.

### *Objections to statements in dispute.*

- 11.    On February 7, 1986, the IRS recognized DLC as an exempt organization under I.R.C. § 501(c)(4). The exemption letter included no caveats limiting DLC'S operations, other than a request that DLC notify the IRS if its "purpose, character, or method of operation change." (DLC Exemption Letter, *attached as* Exhibit C).

-2-

The United States objects to this statement to the extent it suggests that the only restriction on the DLC's activities was notifying the Service if its "purpose, character, or method of operation change."  Under the Internal Revenue Code, the DLC was a taxable entity if it did not qualify as tax exempt under § 501(c)(4). Those statutory restrictions do not need to be set forth in a letter recognizing tax exempt status.

- 19.    DLC'S proposals did not meet with much success, until George Bush was elected in 2000, and brought in a Texas school board member who had been a believer in the DLC system. He adopted DLC'S education platform into the "No Child Left Behind" platform. ([C. Alston dep.] 50:15-24).

The United States objects to this statement on two grounds.  First, the DLC claimed success about many of its proposals before 2000; therefore, the claim that the DLC "did not meet with much success" is at issue.  During the years at issue, Al From, the DLC's president, claimed a number of broad successes.  *See, e.g.,*  United States Statement of Facts ¶¶ 22 (in 1997:  "New Democratic ideas shaped by the DLC and our affiliated think tank, the Progressive Policy Institute, have transformed the Democratic party. . ."); 24 (in 1998: "We have been instrumental to the success of our nation's first two-term Democratic President since Franklin Roosevelt. We have become the prime source of intellectual leadership and innovation for a party that once seemed hopelessly wedded to the status quo. And we've begun to reclaim the Democratic Party from the hard left and move it back into the vital center of American politics"); and, 25 ("Our triumph is that New

-3-

Democrats, led by President Clinton and Vice President Gore, have redefined the

center of American politics and in doing so we've also redefined our party.")

Second, to the extent that the DLC suggests that it is undisputed that the

DLC approved of or sought out the Republicans using DLC policies for gain, the

statement is disputed.  While we do not object to the statement of what occurred in

2000, the DLC did not generally refer to Republicans using DLC policy proposals in

favorable terms, and the only reasonable inference is that the DLC's purpose was to

favor Democrats or New Democrats and not members of other parties.  *See*, *e.g.*,

United States Statement of Facts ¶¶ 30, 31 (From speech, "After all we went

through, we're not going to sit idly by and let the Republicans reclaim the political

center on the cheap.  That's why this conversation and what we do over the next

two days is so important.  You are the future of the New Democrat movement." Ex.

118), 34, and 55 (From in memorandum to DLC Trustees, "In other words, we need

to increase the value of our brand—so that being labeled a New Democrat candidate

is as valuable as receiving interest group money."  Ex. 107, p. 3.).

- 31.    DLC did not recruit or support political candidates, nor did it
  engage in any sort of voter registration or get-out-the-vote activity.  ([From
  dep.] 170:24); (Alston dep. 18:22-25); (W. Marshall dep. 154:3-22, Feb. 8,
  2006, attached as Exhibit F).

The United States objects to this statement to the extent it claims the DLC

did not provide any "support" to any candidates.  Several statements by the DLC

claim that the DLC's activities did in fact provide benefits to candidates.  *See*

United States Statement of Facts ¶ 23 ("Our triumph is President Clinton's historic

-4-

reelection victory, the culmination of an effort we have waged together for more than a decade to pick the Republican lock on the electoral college and to put and keep a New Democrat in the White House."); Hubbert Declaration Ex. 113 p. 7 ("Now our challenge is to carry our successes forward with the next generation of New Democrat ideas put into action by the next generation of New Democrat leaders. If we meet that challenge, we can both shape the next politics in our country and make the Democratic Party our nation's dominate political party again. That is our hope, that is our goal, that is the end toward which we will work relentlessly in the Democratic Leadership Council and the Progressive Policy Institute. And, we're going to accomplish it."); Hubbert Declaration Ex. 114, pp. 1-2 (In a 1998 speech, From says the DLC was formed because it was "essential to reversing our party's fortunes in presidential elections and building a New Democratic majority national politics." After recounting Bill Clinton's electoral success, From went on to say, "That political success is no accident. It is the result of hard work in forums across the country to develop innovative ideas that earn public support—because they are all grounded in New Democratic principles and because they work.").

- 34. DLC worked with Democrats, for the simple reason that DLC's proposals were progressive, and the natural base of support was primarily within the Democratic side of the aisle. ([From dep.] 59:11-16).

The United States objects to this request to the extent it implies that the DLC was entitled to target its activities and purposes because no member of other political parties was interested in the DLC's work. In addition, several statements

-5-

contradict any claim that the DLC was indifferent about who used its policies and

proposals and for what purposes. *See* United States Statement of Facts ¶¶ 30, 31,

34, and 55; *see also* the United States objections to the DLC Statement of Material

Facts ¶¶ 19 and 31, above. Moreover, the DLC put its work in electoral terms.

Doug Wilson, the DLC's political director at the time, wrote after the November

1998 elections, "Midterm election results validate key DLC messages and

principles." Hubbert Second Declaration, Ex 43, p. 1. Further, in a 1998 speech

given to the Democratic Nucleus Club in Phoenix, Arizona, From stated, ""We need

to build a new 21st century politicial infrastructure—a new information based

political network, if you will—that will help, not hinder, our candidates who run on

the New Democrat message. We can do that. And, the DLC is expending

considerable energy to find tomorrow's leaders in our party and to build that

network." Hubbert Declaration, Appendix 1, Part 3, Ex. 114 p. 5. The inference

from the evidence is that the DLC was attuned to the manner in which its policies

were being used, and the DLC's involvement with them was not happenstance as

the statement in paragraph 34 suggests. Accordingly, the statement is in dispute.

- 35. DLC worked with Republican elected officials and organizations whenever possible, with the goal of advancing DLC'S policy positions. (From dep. 14:23); (C. Dooley dep. 50:8-13, Mar. 9, 2006, attached as Exhibit G).

While the DLC sometimes worked with elected officials of all parties, it did

not work with Republicans "whenever possible" to the extent that the DLC is

implying that it was indifferent about who exploited its ideas and for what

purposes. *See* United States Statement of Facts ¶¶ 30, 31 (From speech, "After all

-6-

we went through, we're not going to sit idly by and let the Republicans reclaim the

political center on the cheap. That's why this conversation and what we do over the

next two days is so important. You are the future of the New Democrat movement."

Ex. 118), 34, and 55 (From in memorandum to DLC Trustees, "In other words, we

need to increase the value of our brand—so that being labeled a New Democrat

candidate is as valuable as receiving interest group money." Ex. 107, p. 3.). In 1999

From wrote in *The New Democrat* magazine in May 1999, "The evidence is clear:

Republicans are trying to steal our politics," and later added, "We can't afford to

take this intellectual piracy lightly." Hubbert Declaration, MSJ Ex. 6, p. 2. These

statements contradict, and put at issue, the statement the DLC worked with

Republicans whenever possible.

- 42.     DLC regularly worked with coalitions made up of both
  Democrats and Republican legislators to promote and enact legislation.
  ([From dep.] 230:1-12).

The United States objects to "regularly." There is no support in the DLC's

statement of facts that during 1997, 1998, and 1999 such bipartisan work was

"regular." In fact, there are instances of benefits granted only to Democrats. The

leadership workshops described in the United States memorandum in support of

the motion for summary judgment were provided only to Democrats, and the DLC

provided an orientation for newly elected Representatives in the House, but only

Democrats were invited. *See* United States Statement of Facts ¶¶ 35-49, and 52-54.

In addition, the DLC held a retreat in New Orleans in 1998, where the DLC paid for

travel from Washington, D.C. to New Orleans by chartered jet, as well as and other

-7-

travel and hotel expenses, for members of Congress.  All were Democrats.  *See*

Alston dep. (DLC Ex. E) at pp. 220-221 and Cooley dep. (DLC Ex. G) at pp. 28-29.

- 44.    Al From stated that DLC worked with Republicans "wherever we could."  (From dep. 14:23).

The statement correctly quotes From's testimony.  From's deposition

testimony contradicts statements he made during the years indicating the DLC did

not encourage Republicans to use the DLC's proposals for electoral gains.

Therefore, to the extent, however, the statement implies the DLC worked

cooperatively with Republicans "whenever [it] could," there is a genuine issue of

fact.  *See* United States Statement of Facts ¶¶ 30, 31 (From speech, "After all we

went through, we're not going to sit idly by and let the Republicans reclaim the

political center on the cheap.  That's why this conversation and what we do over the

next two days is so important.  You are the future of the New Democrat movement."

Ex. 118), 34, and 55 (From in memorandum to DLC Trustees, "In other words, we

need to increase the value of our brand—so that being labeled a New Democrat

candidate is as valuable as receiving interest group money."  Ex. 107, p. 3.).  *See*

*also* the United States objections to DLC Statement of Material Facts ¶¶ 19 and 31,

above.

- 49.    Republicans as well as Democrats could use DLC ideas for both legislative and electoral purposes.  ([From] dep. 32:3-6).[1]

_____

[1]    The original citation was to the Alston deposition, but the testimony appears in From's deposition.

-8-

While this is true because, for example, DLC did not protect its intellectual property and refuse to let non-members use it, to the extent the statement implies that the DLC's purpose was to provide benefits without concern about the party affiliation of those using the DLC's proposals, the statement is incomplete and at issue. *See* United States Statement of Facts ¶¶ 30, 31, 34, and 55. *See also* Hubbert Declaration, MSJ Ex. 6, p. 2. (In 1999 From wrote in *The New Democrat* magazine in May 1999, "The evidence is clear: Republicans are trying to steal our politics," and later added, "We can't afford to take this intellectual piracy lightly.")

- 50.    Many Republicans ran for office on DLC ideas, including George W. Bush.  ([From dep.] [1]79:19); (From dep. 180:1-3).

Although the statement claims that "[m]any Republicans" used DLC's ideas, From's testimony cites just two examples, George Bush and John McCain.  "Many" seems to overstate the evidence, and in the context of the three years at issue, should be seen as "few" or "it was seldom that" when viewing the inferences from the evidence in favor of the United States.   Moreover, the United States objects to the statement to the extent it implies that the DLC supported Republicans using the DLC's ideas for electoral gain.  *See* United States Statement of Facts ¶¶ 30, 31 (From speech, "After all we went through, we're not going to sit idly by and let the Republicans reclaim the political center on the cheap.  That's why this conversation and what we do over the next two days is so important.  You are the future of the New Democrat movement." Ex. 118), 34, and 55 (From in memorandum to DLC Trustees, "In other words, we need to increase the value of our brand—so that being

-9-

labeled a New Democrat candidate is as valuable as receiving interest group

money." Ex. 107, p. 3.).

●         51.    DLC did occasionally host small events meant to be attended
exclusively by Democratic elected officials and their staff, such as policy
briefings or leadership training workshops. These were not a large part of
DLC activities; for instance, the leadership workshop trainings on average
took no more than two or three percent of DLC'S annual budget. (From dep.
189:18).

We do not object to this statement, except to the extent the DLC is implying

that expenditures is the only way to measure an organization's purpose. To the

extent that is the inference the DLC asserts, the evidence does not support the

claim. In addition, the examples are not fixed in time, and there is no evidence to

support an inference they were during the years at issue.

●         53.    Except for the leadership workshops and policy briefings, all
DLC events were open to the public, and to members of both political parties.
(From dep.186:17).

The statement is not fixed in time. To the extent it suggests that during the

years at issue the DLC encouraged or solicited individuals affiliated with other

parties to participate, it is at issue. In addition to the leadership workshops and

policy briefings that the DLC concedes were made available only to Democrats,

newly-elected Democrats were the only House members invited to an orientation in

1999. *See* United States Statement of Facts ¶¶ 52-54. Similarly, the DLC held a

retreat in New Orleans in 1998, where travel was provided from Washington, D.C.

by chartered jet and other travel and hotel expenses were paid for members of

-10-

Congress. All were Democrats. *See* Alston dep. (DLC Ex. E) at pp. 220-221 and

Cooley dep. (DLC Ex. G) at pp. 28-29.

●      54.     The fruits of DLC's labor were made available to the public at large, on a nonpartisan basis. Every copy of the DLC magazines *Blueprint* and *New Democrat* went to every member of Congress of both parties, and every Governor no matter his or her political affiliation; the magazines are also available on DLC'S website to be accessed by the general public. ([From dep.] 119:79, 186:2-7); (Alston dep. 60:16-17, 61:15-18).

The United States does not dispute that DLC magazines were mailed to a

wide range of elected officials. The statement, however, that the "fruits of DLC's

labors" were made available on a nonpartisan basis is without support, and in

dispute. *See* United States objections to DLC Statement of Material Facts ¶¶ 19,

31, 35, and 42, above.

●      60.     Donors were, as a rule, not motivated by partisan interests. (C. Alston Dep. 117:1-11).

The United States objects to this statement. When asked what motivated

donors, Alston testified at page 117 of his deposition, lines 6-7 (DLC Ex. E), " You

know, I can't speak for what was in their mind. " The statement improperly

characterizes the testimony and is speculative.

●      62.     Ninety-five to ninety-nine percent of the budget is spent on materials and conferences open to and available to the public. (Cox dep. 89:16-17).

Bultan referred to the DLC's "work" in giving percentages in the testimony

cited, not "budget."

-11-

- 92.    DLC has instead been "more than pleased" when Republican officials use DLC ideas, because "it widens the audience for [DLC] ideas." ([Marshall] dep. 149:2-15).[2]

The United States asserts this statement is in dispute for the reasons the statements in  DLC Statement of Material Facts paragraphs 31, 34, 35, 42, and 45, above, are in dispute.  We incorporate those objections here.

- 99.    DLC did not provide members of the New Democrat Coalition in the House of Representatives with any resources or services that would not have been available to any other member of Congress.  (Dooley dep. 22:7-8).

The issue is in dispute.  From wrote in 1998 in a memorandum to the DLC's Trustees (Hubbert Declaration, Ex. 107, p. 5):

> At the Congressional level, we are working closely with members of the New Democrat Coalition in the House, who increasingly look to us for ideas and guidance on major issues.  The emergence of the NDC is a major political development in Washington and our ability to arm it with good ideas has made it all the more formidable.  NDC members are engaged in a number of the PPI projects and work particularly closely with PPI scholars. Through the DLC Congressional outreach effort, we are making a concerted effort to engage promising young NDC members in our efforts.

- 100.    Legislators are not DLC'S actual audience for ideas; instead, they serve an amplification function.  (Marshall dep. 141:16-22).

The United States objects to this statement because it does not capture the primary purpose the DLC's activities during the years at issue.  The DLC promoted policies for individuals running as New Democrats or Democrats to use for electoral gain.

---

[2]    The original citation is to the Alston deposition, but the statements quoted appear in Marshall's testimony, not Alston's.

-12-

For example, in From's speech to the 1998 DLC Annual Conference, he first

described a newly emerging electorate that was more responsive to "idea politics"

and then later tied generating the DLC's ideas to electoral gains.  In fact, From said

the DLC would work "relentlessly" to achieve electoral gains.  From said (Hubbert

Declaration, Ex. 113, p. 3 and 7):

> "But the Democrats need to learn something, too.  This
> new, more educated, more affluent, more independent
> electorate is not going to respond to our old interest group
> politics.  We're going to have to practice idea politics
> because these voters aren't going to be told by
> intermediaries how they should vote."
>
> "Now our challenge is to carry our successes forward with
> the next generation of New Democrat ideas put into
> action by the next generation of New Democrat leaders.
> If we meet that challenge, we can both shape the next
> politics in our country and make the Democratic Party
> our nation's dominate political party again.  That is our
> hope, that is our goal, that is the end toward which we
> will work relentlessly in the Democratics Leadership
> Council and the Progressive Policy Institute.  And, we're
> going to accomplish it."

From echoed this same point in his 1998 speech to the Democratic Nucleus Club in

Phoenix, Arizona, when he referred to how candidates for "our party" had to use

New Democrat messages, "We need to build a new 21st century politicial

infrastructure—a new information based political network, if you will—that will

help, not hinder, our candidates who run on the New Democrat message.  We can do

that.  And, the DLC is expending considerable energy to find tomorrow's leaders in

our party and to build that network."  Hubbert Declaration, Appendix 1, Part 3, Ex.

-13-

114 p. 5.  The DLC did not create policies for all legislators and candidates to

discuss with the public, but did so for electoral gains.

- 101.   DLC does not provide any public policy resources for the purpose of aiding legislators' campaigns.  (Dooley dep. 23:1-8, 51:14:24).

The United States objects to this statement.  It is not fixed in time, and

contradicted by other evidence.  *See* United States objections to DLC Statement of

Material Facts ¶¶ 19, 31, 34, 35, 44, and 49, above.

- 102.   DLC'S leadership workshops were created to help state and local elected officials to promote DLC policies.  (Cox-Bultan dep. 82:6-15).

The United States admits the leadership workshops helped state and local

officials promote DLC policies.  But the leadership workshops were also designed to

provide individuals, all Democrats during the years at issue, with policies that

would bring electoral success.  *See* United States Statement of Facts ¶¶ 35-49.

Moreover, in drawing all inferences in favor of the United States, From's statement

that the DLC was "expending considerable energy to find tomorrow's leaders for our

party" and give them a New Democrat message which to use, puts this statement at

issue.  *See* Hubbert Declaration, Appendix 1, Part 3, Ex. 114 p. 5

- 114.   DLC was operating within the terms of its exemption ruling in the years 1997, 1998, and 999. ([Smith dep.] 43:13-44:18, 50:12-18, 56:11-57:10, 57:23, 58:21).

The United States objects to this statement of the ultimate issue on three

grounds.  First, evidence supports a finding that the primary purpose behind the

DLC's activities during the years at issue was to provide private benefits to

individual running for office as New Democrats or Democrats.  *See, e.g.,* United

-14-

States Statement of Facts ¶¶ 14-17, 20-31, 38, 47, 51-53, and 55.  Second, the cited

support for the statement is solely the conclusions of a revenue agent during an

audit.  An agent's conclusions are not relevant evidence in a refund suit.  *E.g., Vons

Companies, Inc. v. United States*, 51 Fed. Cl. 1, 6 (Ct. Fed. Cl. 2001)("[T]his court's

determination of plaintiff's tax liability must be based upon the facts and merits

presented to the court and does not require (or even ordinarily permit) this court to

review findings or a record of previously developed at the administrative level.").

Third, the revenue agent testified that he was not provided all the information he

requested during the audit about the DLC's activities.  Smith dep. (DLC Ex. Q) at

pp. 75-76 ("...DLC would not give up the information that we needed to review.")

Therefore, his statements are speculative.  For these reasons, the DLC's statement

in paragraph 114 is in dispute.

### Objections to opinion testimony.

- 87.    Robert Engel testified , "The DLC did not provide any tangible
benefit to the Democratic Party or its candidates for public office in the years
1997, 1998, or 1999. DLC did not carry out any functions of the Democratic
Party, and it did not alleviate any burden, financial or otherwise, of the
Democratic Party." (Expert Report of R. Engel, *attached as* Exhibit N).

The United States objects on two grounds:  Engel is not qualified to provide

an opinion about the benefits the DLC provided, and the opinion does not assist the

Court.  Without knowing what the DLC's activities were during the years at issue

and based exclusively on his personal experiences with the Democratic Party, Engel

provides an opinion about the DLC's activities with respect to the Democratic party

-15-

*and* Democratic candidates for office. When asked about the bases for his opinion

stated in paragraph 97, Engel stated (Engel Dep. p. 12 - 13):

> Q.   Okay.  In drafting this particular written testimony, did you
> conduct any analysis of the Democratic party for purposes of this
> particular written testimony?
>
> A.   No.
>
> Q.   So you wrote this testimony based on the knowledge that you had
> acquired in those positions you testified before?
>
> A.   Yes.
>
> Q.   Correct?
>
> A.   Absolutely.
>
> Q.   Mr. Engel, what is your understanding of what the DLC is and
> what its mission is?
>
> A.   I'm unclear of what the DLC'S mission truly is and how they
> operate at times.
>
> Q.   Okay.  In preparation of this particular written testimony, then I
> take it you did not undertake an investigation of the activities –
>
> A.   Right.
>
> Q.   -- of the DLC for the years '97 –
>
> A.   Right.
>
> Q.   -- '98 and 1999?
>
> A.   Right.
>
> Q.   Is that a fair statement?
>
> A.   Absolutely.

-16-

Engel admits that he does not know, and did not investigate, what the DLC's

mission or operations were during the years at issue. And Engel's opinion is based

on his experience, and nothing else. Obviously, the totality of his experience is not

delineated, nor did Engel find any gap in his experience that required him to gather

any additional information to consider before opining that the DLC provided no

benefit to candidates for elected office. Engel's testimony does not even disclose

who he believes constitutes the universe of candidates for elected office during the

years at issue, and how he concluded that those individuals received no benefits.

It is impossible for the court to review Engel's methodology, or measure its

reliability. Engel's testimony is the result-driven sort of opinion that should be

excluded under the Rules of Evidence. *Abrosini v. Labarrague*, 101 F.3d 129, 132-

134 (D.C. Cir. 1996)(the basis of an expert's opinion must be evident, and then the

court should weigh whether the method is reliable and if the testimony will assist

the fact finder). While we recognize some opinions can be based on experience and

not just peer-reviewed science, Engel's testimony lacks any explanation of the

method in which he used his experience, and why his limited experience is not the

basis for "subjective belief or unsupported speculation." *Groobert v. President and

Directors of Georgetown College*, 219 F.Supp.2d 1, 5 (D.D.C. 2002), *citing, Daubert v.

Merrel Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).

If Engel's testimony is reliable, it should be excluded because it will not assist

the court in finding the facts. There is no showing that the court is unable to

-17-

discern the benefits conferred by the DLC's activities to the Democratic Party, or

any other group or individual.

- 88.  Charles Moskos testified that DLC is not an organization
  operated for the  narrow benefit of a particular political party or set of
  partisan interests.  (Expert Report of C. Moskos, *attached* as Exhibit O).

Much like the opinion asserted by Engel, Moskos seeks to provide an opinion

using a methodology based solely on Moskos's beliefs from limited, general personal

experience.  When Moskos was asked if he was familiar with all of the DLC's

activities during the years at issue, he testified he was not.  Here is the testimony

(Moskos dep. at p. 16),

Q.  Have you in the preparation of your written testimony conducted an
investigation of all of the activities of the DLC in those particular years?

A.  Probably not.  Not all the activities I would say.  I'm on the board with
Mark McGee and Will Marshal and wrote a lot of national service proposals.
But I would say that broadly speaking I was -- I knew what all the DLC was
doing, but when it came to nitty-gritty smaller details, no.

There is no evidence that experts on how an organization operates reach opinions

without understanding all of an organization's activities.  It is the sort of "subjective

belief or unsupported speculation" that should be excluded.  *Groobert,* 219

F.Supp.2d at 5.  As such, the United States objects to his opinion because it is not

admissible evidence.  At the very least, the statement is at disputed for summary

judgment purposes.  In addition, there is no basis to conclude that the Court

requires assistance in determining the benefits conferred by the DLC.

- 89.  Jim Pinkerton testified that DLC is committed to influence
  beyond just Democrats, and that DLC is motivated by belief and ideas, as

-18-

opposed to partisanship and electioneering. (Expert Report of J. Pinkerton, *attached* as Exhibit P).

Like Engel and Moskos, Pinkerton draws an opinion about the DLC's motivations and purposes without investigating what the DLC did during the years at issue.  When asked if he had concluded an analysis of the DLC's activities during 1997, 1998, or 1999 before writing his opinion, Pinkeron admitted, "Have I conducted an analysis.  No.  I have called upon my accumulated wisdom about how think tanks worked, and I've asked myself have I – were they a vital part of the vital center.  And I asked myself that question."  Pinkerton dep. at p. 20.  Pinkerton then went on to recount some of the data he did consider.  But his testimony and opinion remain flawed by his failing to either (1) inform himself of all of the DLC's activities before opining about the DLC's motivations and purposes or (2) articulate a methodology beyond "accumulated wisdom" that does not require that information to form an opinion.  Pinkerton's testimony leaves the court unable to evaluate the reliability of his methods.  And it should be disregarded for summary judgment purposes.  *Groobert,* 219 F.Supp.2d at 5.

### *Objections to statements that are not relevant.*

Although not statements for which there is a genuine dispute, the DLC's statement of facts includes a number of immaterial or irrelevant statements to which the United States objects:

80.    On June 20, 2000, the IRS revoked the exemption of the Ohio chapter of DLC, the Ohio Democratic Leadership Council ("Ohio DLC") under section

-19-

501(c)(4), effective January 1, 1995. The revocation was based on a finding that Ohio DLC was "operated primarily to benefit a small group rather than the community as a whole." (Def.'s Answer 45).

81. On June 18, 2001, the Tax Court entered a stipulated decision that rescinded the IRS's revocation of Ohio DLC'S exemption. The IRS stipulated that "specifically petitioner's activity did not impermissibly confer a private benefit on any person inconsistent with its I.R.C. § 501(c)(4) status." (Def.'s Answer 48).

83. The IRS initially concluded that Empower America was "a partisan issues-oriented organization—one that was designed to promote the electoral interests of the Republican Party and politicians affiliated with the Republican Party." (IRS Letter to Empower America, Feb. 21, 1997, attached as Exhibit K)).

84. The IRS eventually concluded that Empower America qualified for section 501(c)(4) tax-exempt status. (IRS Exemption Ruling 97-32503 (Nov. 21, 1997), reprinted in 1997 Tax Notes Today 231-15 (Dec. 2, 1997), attached as Exhibit L).

85. The IRS granted section 501(c)(3) status to the Progress & Freedom Foundation despite evidence of its creation for a partisan purpose. (PFF Technical Advice Memorandum, reprinted in 1999 Tax Notes Today 24-25 (Feb. 5, 1999), attached as Exhibit M).

105. The Log Cabin Republicans is a tax-exempt organization that the IRS has permitted to file under section 501(c)(4). (Def.'s Answers to Pl.'s Interrog. 53-54).

-20-

106.   The Ripon Society is a section 501(c)(4) organization whose exemption the IRS has not revoked.  (*Id.* 55-56).

These statements about organizations not parties to this suit are irrelevant to the issue whether the DLC is entitled to refunds for the years at issue.  *Stichting Pensioenfonds Voor De Gezohdheid, Geestelijke En Maatschappelijke Belangen v. United States*, 129 F.3d 195, 200-201 (D.C. Cir. 1997)(pension fund's claim that it should be granted relief because similar funds were treated differently does not state a claim); *see generally Dickman v. Commissioner*, 465 U.S. 330, 343 (1984)(Commisioner may change his interpretation of the law and give it retroactive application, even if a taxpayer has relied on the prior position to its detriment).  In *Stichting* a pension fund argued that similar funds had been given exempt status and the Commissioner abused his discretion in not giving all similar pension funds the same treatment.  The Court of Appeals rejected the argument on three grounds.  First, the pension funds were not "direct competitors" and so the scant disparate treatment case law did not apply.  *Stichting*, 129 F.3d at 200-201.  Second, the court noted the suit was a refund action, and the "retroactivity" of the application was not relevant to whether the tax was owed.  *Stichting*, 129 F.3d at 201.  Finally, the Court of Appeals recognized that if a mistake is made, the Service does not have to perpetuate an error just because other organizations may be "similar."  *Stichting*, 129 F.3d at 201.  The reasoning applies in full force here, and the statements about other organizations are irrelevant and should be disregarded.

-21-

## Conclusion

The statements addressed in this objection, put forth by the DLC as undisputed, are indeed in genuine dispute, inadmissible, immaterial, or irrelevant. Therefore, they should be disregarded in considering the DLC's motion for summary judgment.

Dated: August 15, 2006

Respectfully Submitted,

/s/ Pat S. Genis
PAT S. GENIS, #446244
DAVID A. HUBBERT
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, DC 20044
Phone/Fax: (202) 307-6390/514-6866
Email: pat.genis@usdoj.gov

OF COUNSEL:

KENNETH L. WAINSTEIN
United States Attorney

<u>CERTIFICATE OF SERVICE</u>

IT IS CERTIFIED that the foregoing UNITED STATES' STATEMENT OF GENUINE

ISSUES OF MATERIAL FACTS IN OPPOSITION TO DLC'S MOTION FOR SUMMARY

JUDGMENT was caused to be served upon  plaintiff's counsel on the 15th day of

August, 2006, in accordance with the Court's ECF procedures, and by depositing a

copy thereof in the United States mail, postage prepaid, addressed as follows:


ROBERT F. BAUER, ESQUIRE
MARC E. ELIAS, ESQUIRE
EZRA W. REESE, ESQUIRE
Perkins Coie
607 Fourteenth Street, NW,
Suite 800
Washington, DC  20005-2011.
rbauer@perkinscoie.com




/s/ Pat S. Genis
PAT S. GENIS