IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

DEMOCRATIC LEADERSHIP COUNCIL,
INC.,

               Plaintiff,

     v.

UNITED STATES,

               Defendant.

No. 1:05-cv-1067 (JGP)


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


Robert F. Bauer (D.C. Bar No. 938902)
Marc E. Elias (D.C. Bar No. 442007)
Ezra W. Reese (D.C. Bar No. 487760)
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C.  20005-2011
(202) 628-6600

Attorneys for Democratic Leadership Council,
Inc.

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................... 1

II.   ARGUMENT ......................................................................................... 2

    A.    Standard for Summary Judgment........................................................ 2

    B.    DLC Is Tax-Exempt under Section 501(c)(4) ................................... 2

        1.    The Law Does Not Support Defendant's Position ................. 2

            a)    IRS Treatment of 501 (c)(4) Public Policy
               Promotion By Political Party Leaders ......................... 3

            b)    The IRS's Ruling in the Matter of Speaker
               Gingrich and the Progress and Freedom
               Foundation .................................................................. 7

            c)    The American Campaign Academy Case is
               Inapposite.................................................................... 8

        2.    DLC Does Not Benefit the Democratic Party or
           New Democrat Elected Officials ......................................... 10

            a)    DLC Founding and Application for
               Exemption................................................................... 10

            b)    DLC Operations Since Its Founding........................... 11

            c)    Public Access to DLC Activities and
               Publications................................................................ 11

            d)    Bipartisan Advocacy.................................................. 13

            e)    Policy Development with Democratic
               Elected Officials ........................................................ 15

            f)    Absence of Political Activity..................................... 16

            g)    The Facts Indicate that DLC Did Not
               Privately Benefit Candidates or the
               Democratic Party ....................................................... 18

      C.     IRS's Revocation was Retroactive ................................................... 20

III.    CONCLUSION ........................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Am. Campaign Acad. v. Comm'r*, 92 T.C. 1053 (1989) ..........................................8, 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................2

*Comm'r v. Lake Forest Inc.*, 305 F.2d 814 (4th Cir. 1962)...........................................4

*Diamond v. Atwood*, 43 F.3d 1538 (D.C. Cir. 1995) ...................................................2

*Prince Edward Sch. Found v. Comm'r*,  478 F. Supp. 107 (D.D.C. 1979) .................25

*Virginia Educ. Fund v. C.I.R.*,  85 T.C. 743 (1985).....................................................25

**Statutes**

I.R.C. § 501 (2006)..................................................................................................3, 7

**Regulations**

Treas. Reg. § 1.501(c)(4)-1 (2006) ............................................................................3

Treas. Reg. § 601.201 (2006)...................................................................................25

**Rules**

Fed. R. Civ. P. 56(c)...................................................................................................2

## I.  INTRODUCTION

The Democratic Leadership Council, Inc. ("DLC") has operated as a think tank and public policy organization for the past twenty-five years.  It operates exclusively to develop and promote its "Third Way" progressive issue agenda.  Its materials are publicly available, and it enjoys a long history of working on a bipartisan basis to achieve its policy goals.  Its only connections to the Democratic Party are those fully disclosed to the Internal Revenue Service ("IRS") – along with a full and complete description of DLC's activities – when DLC applied for, and received, tax-exempt status under section 501(c)(4) of the Internal Revenue Code.

The IRS revoked DLC's tax-exempt status for 1997, 1998, and 1999, on a novel theory that DLC was privately benefiting New Democrat elected officials and the Democratic Party as a whole.  DLC brought suit against the United States to challenge that revocation, and now appears before this Court on cross-motions for summary judgment.  Plaintiff relies on its arguments filed in support of its Motion for Summary Judgment as well as those presented below.

The government does not attempt a global analysis of DLC's activities to prove its case, despite a thorough discovery period and access to all of DLC's documents, including a review of the entirety of its financial records, during the years in question.  Instead, it has merely assembled a string of unrelated and isolated facts, in an attempt to color all of DLC's activities as impermissible political private benefit.  At the conclusion of those facts, Defendant includes a mere three pages of analysis, in which it asks rhetorically, "How can the DLC meet its burden of showing that its primary purpose during the years at issue was creating policies intending to benefit the community . . . ?"  (Def.'s Br. 37).

The answer to that question is found by examining the activities of DLC, an established and well-known public and issue advocacy organization operating in a public and bipartisan fashion since its founding twenty years ago. The answer to that question is found through the sworn testimony of those individuals who have worked to advance DLC's social welfare agenda, as well as three expert witnesses who testified regarding DLC's role in the think tank and political world. The answer is found through DLC's consistent record of bipartisan activity in single-minded pursuit of its progressive vision. And the answer is found in the materials DLC originally submitted to the IRS in its application for tax-exempt status, which clearly and definitively laid out DLC's role in shaping public policy both within and beyond the Democratic Party.

## II. ARGUMENT

### A.  Standard for Summary Judgment

A motion for summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). All justifiable inferences must be drawn in the nonmoving party's favor, and the Court should accept the nonmoving party's evidence as true. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.  DLC Is Tax-Exempt under Section 501(c)(4)

#### 1.  The Law Does Not Support Defendant's Position

An entity organized under section 501(c)(4) of the Code must be:

> [N]ot organized for profit but operated exclusively for the
> promotion of social welfare, or local associations of employees,

> the membership of which is limited to the employees of a
> designated person or persons in a particular municipality, and the
> net earnings of which are devoted exclusively to charitable,
> educational, or recreational purposes.

I.R.C. § 501(c)(4) (2006.  IRS regulations define the statutory requirements further.

> An organization is operated exclusively for the promotion of
> social welfare if it is primarily engaged in promoting in some
> way the common good and general welfare of the people of the
> community.  An organization embraced within this section is one
> which is operated primarily for the purpose of bringing about
> civic betterments and social improvements.

Treas. Reg. § 1.501(c)(4)-1(a)(2)(i) (2006.  The term "promotion of social welfare"

expressly does not include "direct or indirect participation or intervention in political

campaigns on behalf of or in opposition to any candidate for public office."  *Id.*

§ 1.501(c)(4)-1(a)(2)(ii).

No court has ever revoked a section 501(c)(4) organization for conferring a

private benefit in the form of public policy development and advocacy conducted by

individuals associated with a particular political party or program.  Indeed, invited to

do precisely that in recent years, the IRS has declined to take this position.  Had it

acted otherwise, it would have disregarded the plain terms of the exemption available

for policy promotion under § 501(c)(4).  It would have essentially confused the

prohibition on partisan intervention with some new notion that individuals – even

officials—associated with the same party cannot collaborate in developing and

promoting fresh public policy proposals.

### a)  IRS Treatment of 501 (c)(4) Public Policy Promotion By Political Party Leaders

In a series of cases and revenue rulings, the IRS has established that a

prohibition on excessive "private benefit," much like one binding on 501(c)(3)

organizations, applies to section 501(c)(4) organizations.  In *Commissioner of Internal*

*Revenue v. Lake Forest Inc.*, 305 F.2d 814 (4th Cir. 1962), the Fourth Circuit found that where membership in an organization purchasing apartment complexes was open to the public, but no benefits were received by anyone other than members in the organization, the organization was not tax-exempt under section 501(c)(4), because it was "not a movement of the citizenry of the community." *Id.* at 818. The court contrasted this organization with ones that served the public without regard to membership, such as a nonprofit radio station devoted to "liberal and progressive social views," and a nonprofit public utility providing electricity "to be enjoyed by the public at large." *Id.* at 819-20. The law recognizes that a section 501(c)(4) organization must not be a "privately-devoted endeavor." *Id.* at 818.

The IRS has considered claims made very specifically about the nature of public policy promotion associated with individuals belonging to a particular political party. And it has held specifically that the benefit generated by such organizations is public, not private, within the meaning of § 501(c)(4). In l997, the IRS considered the application for (c)(4) recognition by an organization called Empower America which, among other activities, had distributed issue briefings critical of the Clinton administration, and "endorsements of policies similar, if not identical, to those expressed by the Republican Party." The organization also held candidate schools to "educate candidates . . . from a conservative perspective," featuring instructors connected to the Republican Party. (IRS Letter to Empower America, Feb. 21, 1997, *attached as* Exhibit K).[1]

The IRS initially concluded that Empower America was "a partisan issues-oriented organization – one that was designed to promote the electoral interests of the

---

[1] Plaintiff has marked its exhibits to conform with the identification of exhibits filed with Plaintiff's Motion for Summary Judgment

Republican Party and politicians affiliated with the Republican Party."  (*Id.* at 10).
But it then reconsidered and held to the contrary, ruling that Empower America
qualified for section 501(c)(4) tax-exempt status.

        In making this determination, the IRS identified those activities not allowed to
a (c)(4) organization with political or partisan associations.  Such organizations may
not solicit or receive financial support from political parties; the advocacy issues on
which they focus must be chosen by the board of directors for their importance to the
nation, not in coordination with any other organization; any director running for office
must disassociate from the organization; and the organization may "not operate to
further the private interests of any political party, candidate, or prospective
candidate."  (IRS Exemption Ruling 97-32503 (Nov. 21, 1997), *reprinted in* 1997 Tax
Notes Today 231-15 (Dec. 2, 1997), *attached as* Exhibit L).  The IRS's decision was
grounded, therefore, in the absence of election-related activities or financial
connections to party organizations, and in the independent conduct of activities with
intent and effect of providing policy and other related benefits to the public at large.

        In every material respect, the decision on Empower America should mirror the
disposition of this case.  That the DLC is not engaged in election-related activities is
not disputed by the IRS, which has not brought any claim of partisan "intervention."
Like Empower America, DLC was organized, and is today run, by individuals with an
active background and current involvement in a particular party; but it is their
declared purpose and the nature of their activities in forming an operating a (c)(4) that
determines the availability of the exemption.  Neither this purpose nor this nature,
fully disclosed to the IRS at the time of seeking exemption, are here in question: DLC
has done what it set out to do, which is to develop for public promotion and bipartisan
support fresh and effective policies in the public interest on the crucial issues of the
day.  The IRS made clear in Empower America that this history and mode of

operation, in fulfillment of this stated purpose, falls squarely within the public purposes on which a properly awarded (c)(4) exemption rests.

Indeed, many section 501(c)(4) organizations are affiliated with partisan causes, and the IRS has granted – and has not acted to revoke – the exemptions of any of these. The Log Cabin Republicans, for example, is a tax-exempt organization that the IRS has permitted to file under section 501(c)(4). (Def.'s Answers to Pl.'s Interrog. 53-54). The Ripon Society, a Republican-affiliated organization, is also a section 501(c)(4) organization whose exemption the IRS has not attempted to revoke. (*Id.* 55-56). And the Republican Main Street Partnership is a section 501(c)(4) organization whose mission is " to **G**row **O**ur **P**arty through a pragmatic approach to governing that reaches out to a broad base of Americans who share the Republican ideals of fiscal responsibility and limited government." Republican Main Street Partnership, RMSP Mission, *at* http://www.republicanmainstreet.org/mission_temp.htm (emphasis in original); *see also* David D. Kirkpatrick, "G.O.P. Moderates Rebuff Lobbyists, Then Woo Them," *New York Times*, Apr. 30, 2006.

In fact, the IRS has already once passed on the essential purposes of DLC, closely examining the activities of one of its state chapters, the Ohio DLC. On June 20, 2000, the IRS revoked the exemption of the Ohio chapter of DLC, the Ohio Democratic Leadership Council ("Ohio DLC") under section 501(c)(4), effective January 1, 1995. It did so on a finding exactly like the one before the Court in this case: that Ohio DLC was "operated primarily to benefit a small group rather than the community as a whole." (Def.'s Answer 45). And yet, in reviewing the record of this chapter, operating on the model of the national organization, the IRS was required to set this finding aside and to uphold the Chapter's exemption. On June 18, 2001, the Tax Court entered a stipulated decision that rescinded the IRS's revocation of Ohio

DLC's exemption.  Of greatest significance is the IRS stipulation that "specifically petitioner's activity did not impermissibly confer a private benefit on any person inconsistent with its I.R.C. § 501(c)(4) status." (Def.'s Answer 48).

### b)  The IRS's Ruling in the Matter of Speaker Gingrich and the Progress and Freedom Foundation

The IRS has considered the question of the public rather than private benefit associated with public policy promotion by political party leaders in at least one other case of note: the Progress & Freedom Foundation ("PFF"), an educational think tank, exempt under section 501(c)(3), created by former Speaker Newt Gingrich.  PFF was a (c)(3) organization that planned to develop a teleconference course; sponsor research and writing; produce a magazine; and sponsor conferences.  The teleconference course, the focus of the IRS's inquiry, was entitled "Renewing American Civilization," and was disseminated broadly.  Gingrich's goal was to use the course "as a means of communicating the message of the movement."  PFF Technical Advice Memorandum, *reprinted in* 1999 Tax Notes Today 24-25 (Feb. 5, 1999), *attached as* Exhibit M).

As the record before the IRS clearly established, the program also had strong ties to the Republican Party.  Gingrich's political action committee, GOPAC, "was planning to use RAC principles in its political message, and it used the RAC message extensively in its training and development during 1993 and 1994."  (*Id.*)  Gingrich also stated that one goal of the course was:

> [T]o have 200,000-plus activists trained in the course, with a common vision and commitment to renew America and replace the welfare state; to have these activists run for government office (including hospital and school boards) and work on campaigns; to have the media and the public discussing the course; *and to have all Republican candidates using the same language and having the same goals.*  It was hoped that by 1996

the Republican Party, with RAC as its platform, would win the elections at all levels of government.

(*Id.* emphasis supplied).  Similarly, the GOPAC finance director described the goals of RAC as "to educate the American voting population to Republican ideals, increasing our opportunity to win local, state and Congressional seats."  (*Id.*)  RAC looked, in short, to the broader public for the realization of its goals.

The IRS district office first concluded that PFF "provided more than incidental private benefit to Mr. Gingrich, GOPAC, and other Republican entities, individuals, and interests."  (*Id.*).  This finding was overruled by the IRS.  The IRS stressed that the key to a tax-exempt analysis was the nature of the work itself:

> The central problem in arguing that PFF provided more than incidental private benefit to Mr. Gingrich, GOPAC, and other Republican entities was that the content of the RAC course and the course book, which were PFF's major activities in its first tax year, were educational and, within the four corners of the materials, were not biased toward any of those who were supposed to be benefited. Moreover, the RAC course and course book were widely disseminated by PFF in its educational form.

(*Id.*)  In short, PFF was found to have been independently organized and operated as an educational think tank; the fact that its founders saw PFF and its RAC course as part of a larger political framework was irrelevant so long as PFF's operation was for an exempt purpose, directed toward the benefit of the public at large.  The IRS found that Mr. Gingrich's frequent public statements of partisan purpose were allowable statement of personal political preference, made outside his role as a spokesperson for PPF.

### c)  The American Campaign Academy Case is Inapposite

The case relied on by Defendant, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), is entirely inapposite.  In that case, the IRS

upheld the tax-exempt revocation of an organization under 501(c)(3) because of its formal relationship to political party organizations, and because of its intention, and foreseeable effect, of benefiting only a class of Republican party organizations, candidates and campaign workers.  The petitioner operated a school to train individuals to staff political campaigns; the school described itself as an "outgrowth" of a program operated by the National Republican Congressional Committee; and it was funded entirely by a Republican-affiliated political committee.  *Id.* at 1056, 1062.

> To the extent that there was "bias" toward any beneficiaries – in the words of the IRS in the PPF case – it was plain enough, since it consisted of training operatives for service to a class of candidates in one particular political party.  The court was not troubled by the benefit accruing to the individuals being educated.  *Id.* at 1074.  The Court took issue with the secondary benefit provided to the Republican Party at large; it found that the benefit to "Republican entities and candidates who employ petitioner's skilled alumni" was more than incidental, constituting, in lieu of a broader public benefit, the focus of the organization's efforts.  *Id.*  But that was indeed its focus, an altogether private one.  The case was not, like this one, about public policy but instead about campaign mechanics, and the organization seeking exemption was targeting this instruction to a class of candidates from one political party.

> Moreover, the decision turned on whether the Academy's activities benefited a charitable class, which is of no relevance to a case decided under section 501(c)(4).  The court ruled that the school, to maintain tax-exempt status under section 501(c)(3), "must establish that the Republican entities and candidates benefiting from the employment of its graduates are members of a charitable class and within that charitable class do not comprise a select group of members earmarked to receive benefits."  *Id.*  The court refused to find that, despite its large size, the Republican Party was a charitable class.  *Id.* at 1077.  Because the school conferred a more than

incidental benefit on a non-charitable class, it could not be tax-exempt under section 501(c)(3). *Id.* at 1079.

### 2. DLC Does Not Benefit the Democratic Party or New Democrat Elected Officials

#### a) DLC Founding and Application for Exemption

DLC was founded "for the promotion of welfare" under section 501(c)(4) of the Code, "for the purpose of bringing about civil betterments and social improvements." DLC also barred any "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." (DLC Form 1024, *attached as* Exhibit A).[2]    The founders were Democratic officeholders concerned, as their positions in public life required, with the formulation of national policy. Their interest lay "in pushing a different kind of an agenda, sort of like a third way, which was progressive." (A. From dep. 12:2-11, Feb. 23, 2006, *attached as* Exhibit B).[3]    DLC's Application for Recognition of Exemption noted: "The Democratic Leadership Council was organized in early 1985 by certain elected and others who were concerned with the formulation of national policy and with the direction of policy debate within the Democratic Party." (DLC Form 1024, Part III, Question 3, at 1).  It stated further:

> The Democratic Leadership Council is so named because it was founded by federal and state elected officials who are Democrats and who were concerned with the direction of policy debate within their party, as well as within the country as a whole. Through the establishment of DLC, these officials and others with similar interests and goals expected to improve the overall contribution to Democratic leaders, in the federal and state

---

[2] This is the same document marked by Defendant as "Pltf Ex 2."

[3] Defendant has previously entered specific pages from this transcript into the record; Plaintiff enters the entire transcript as an exhibit.

> government, to national policy debate, and to urge upon both the
> party and the general public new and innovative approaches to
> policy.

(*Id.* Part III, Question 3, at 1). DLC's mission was, and is, "To develop a progressive agenda for the country and get that agenda enacted into law." (From dep. 16:11-12). DLC was founded on a progressive modern philosophy different fundamentally different from the Democratic Party as it existed at the time. (*Id.* 17:11-25). DLC's position was often at odds with traditional Democratic Party values. (D. Cox-Bultan dep. 85:10-87:23, *attached as* Exhibit D).[4]

### b) DLC Operations Since Its Founding

As conceded by the IRS, *see* Section C, *infra*, the DLC has operated precisely, and with increasing renown, in accordance with its original plan, as disclosed to and approved by the IRS. Its activities have been public; the policies developed and advocated have been aimed at broad acceptance, by Democrats and Republicans alike; its advocacy has been pursued in some cases cooperatively with Republican political leadership, on a bipartisan basis; its work with Democratic party elected officials has been solely in the service of policy development for national advocacy and bipartisan acceptance; and it has eschewed any intervention in political campaigns, which is a matter of fact not disputed by the IRS.

### c) Public Access to DLC Activities and Publications

The fruits of DLC's labor were made available to the public at large, on a nonpartisan basis. Every copy of the DLC magazines *Blueprint* and *New Democrat* went to every member of Congress of both parties, and to every Governor no matter his or her political affiliation; the magazines are also available on DLC's website to be

---

[4] Defendant has previously entered specific pages from this transcript into the record; Plaintiff enters the entire transcript as an exhibit.

accessed by the general public.  (From dep. 119:7-9, 186:2-7); (Alston dep. 60:16-17, 61:15-18 , Feb. 10, 2006, *attached as* Exhibit E).[5]  The *Blueprint* magazine was even distributed on the shuttle from Washington, D.C. to New York and Boston.  (From dep. 190:2-3).  Policy statements sent by facsimile were also distributed on a bipartisan basis.  (Alston dep. 66:1-4).  The DLC Briefing, another policy paper, was sent out on a purely bipartisan basis.  (*Id.* 70:9-10).  And all print materials produced by DLC were available on the Internet.  (*Id.* 87:8-9).

DLC publishes two magazines: *New Democrat* and *Blueprint*.  The "DLC Update" is a regular fax that was sent to thousands of public officials, activists and supporters.  The "DLC Briefing" is a regular product in which DLC describes a policy controversy and DLC's public policy principles and recommendation.  The "DLC Talking Points" succinctly describes DLC's position on the issues of the day.  (*Id.* 58:1-73:24).  The "New Dem Daily" was a daily policy update, later changed to the "New Dem Dispatch."  (*Id.* 84:2-6).  The "Idea of the Week" is a summary of DLC's weekly policy stances.  (*Id.* 75:1-24).  The "Monthly State Leadership Update" is sent around the country.  (*Id.* 77:3-19).  The "DLC News Release" is, as the name suggests, meant for reporters.  (*Id.* 81:16-20).  And all materials are published on the Internet.  (*Id.* 87:8-9).

DLC spends at least seventy percent of its annual budget on public policy materials that are published to the general public, according to its CEO.  (From dep. 190:22).  According to DLC's Chief of Staff, ninety-five to ninety-nine percent of the budget is spent on materials and conferences open to and available to the public.  (Cox-Bultan dep. 89:16-17).

---

[5] Defendant has previously entered specific pages from this transcript into the record; Plaintiff enters the entire transcript as an exhibit.

### d)  Bipartisan Advocacy

DLC works Republicans whenever it can, in order to promote its issue agenda. (From dep. 14:23 ; C. Dooley dep. 50:8-13, Mar. 9, 2006, *attached as* Exhibit G).  For instance, DLC's efforts to expand trade were supported by "many more" Republicans than Democrats in Congress.  (From dep. 14:11-13).    DLC lobbied for the President having  fast track trade promotion authority; it "wanted to actually see these policies that we thought were good for the country and have a chance at going into effect." (*Id.* 90:21-96:17).  It lobbied for the bill in Congress, and even went so far as to raise funds for a television advertisement promoting the fast track legislation.  (*Id.* 94:23-25).  In this instance, DLC did not successfully make its case, and the legislation died in Congress.  "[I]t got almost all the Republican votes and only a handful of the Democratic votes."  (*Id.* 21-23).  Another example was Americorps, a DLC proposal that was supported most fervently in the Senate by Senators Bayh, a Democrat, and McCain, a Republican.  (*Id.* 14:1-6).  Welfare reform, another DLC policy proposal, was supported by over twice as many Republicans in Congress than Democrats.  (*Id.* 14:7-11).

DLC worked with bipartisan coalitions in its lobbying efforts, (*Id.* 230:1-12), and invited Republicans to participate in public events when they supported DLC's issue positions.  (Marshall dep. 153:1-5 , Feb. 8, 2006, *attached as* Exhibit F).[6] Indeed, DLC worked with Republicans "wherever we could."  (From dep. 14:23). DLC also allied with Democrats who did not believe in the New Democrat philosophy, in those instances where they agreed with DLC.  (Alston dep. 226:4-227:8).  And, of course, since all DLC materials were publicly available, Republicans

---

[6] Defendant has previously entered specific pages from this transcript into the record; Plaintiff enters the entire transcript as an exhibit.

as well as Democrats could use them.  (From dep. 32:3-6).  As a result, many Republicans ran for office on DLC ideas, including George W. Bush.  (Alston dep. 179:19; From dep. 180:1-3).

DLC also jointed with Republican and conservative entities to host events. DLC has held events with Empower America, affiliated with Jack Kemp, former vice-presidential candidate.  (Alston dep. 63:19-25).  In 1991, DLC cosponsored a conference with the Heritage Foundation.  (Marshall dep. 31:15-20).  In 1996, DLC hosted another event with the Heritage Foundation, on the subject of healthcare; it was co-hosted by Bob Bennett, a Republican from Utah; Dennis Hastert, now-Speaker of the House; John Tanner, a Democrat from Tennessee, and Joe Lieberman, a Democrat from Connecticut.  (From dep. 62:10:63-9).

A partisan approach would have made it impossible for DLC to meet its goals. Charles Moskos, professor emeritus at Northwestern University and one of plaintiff's designated expert witnesses, works with both Republicans and Democrats on the subject of military recruitment.  Professor Moskos testified: "Indeed a public intellectual risks reputational and other professional risks if he or she associates with an organization operating for the narrow benefit of a particular political party or set of partisan interests.  This is not a risk presented by my association with the DLC . . . ." (Expert Report of C. Moskos, *attached* as Exhibit O).

Jim Pinkerton, another of Plaintiff's expert witnesses, is an avowed Republican who has worked for both Republican candidates and officeholders as well as being a respected author and scholar.  Mr. Pinkerton, who has authored numerous articles for DLC magazines and materials, testified that DLC "is committed to the broadest sphere of influence, beyond just Democrats, if it is to succeed in its missions, which is to change the direction of national policy as a whole."  "DLC falls squarely in the

camp of those motivated by belief and ideas, as opposed to partisanship and electioneering." (Expert Report of J. Pinkerton, *attached* as Exhibit P).

DLC donors were aware of its bipartisan approach; contributors were a wide variety of individuals and organizations; Republican donors often contributed to the DLC. (From dep. 51:1-2). Donors were not generally motivated by partisan interests. (Alston Dep. 117:1-11). The Democratic Party did not fundraise for DLC, and DLC did not use Democratic Party fundraising lists. (*Id.* 118:6-120:8).

### e) Policy Development with Democratic Elected Officials

To the extent that DLC, founded by Democratic party officials, has been aligned in that sense with one party, it simply because it is in that party that DLC's founders locate the impetus for the development of a new progressive agenda. Because the goal of DLC is to produce and support policies in keeping with its Third Way agenda, it necessarily worked with the elected officials who had the power to enact those policies. (From dep. 223:13-20).

> Q.     Now, to get an agenda enacted into law, how did you intend to go about doing that?
>
> A.     Well, the way we intended to go about doing that is exactly what we did, which is we developed ideas. Sometimes we developed them on our own. Sometimes we took ideas that we found around the country. And what we tried to do was push them in the public debate. And the agents who were pushing them in the public debate were our elected officials.

(From dep. 16:14-22). Because DLC's proposals were progressive, the natural base of support was primarily within the Democratic side of the aisle. (*Id.* 59:11-16).

DLC occasionally hosted small events meant to be attended exclusively by Democratic elected officials and their staff, such as policy briefings or leadership training workshops. These officials, like DLC's founders, were prepared to act as

spokesperson for the organization's policy program.  Their value to DLC did not lie in any partisan potential: they already held office, and from their positions as officeholders, they could advocate and adopt major prongs of the Third Way governance agenda.

Moreover, these trainings were not a large part of DLC activities; for instance, the leadership workshop trainings on average took no more than two or three percent of DLC's annual budget.  (From dep. 189:18).  At its peak, the workshops consumed less than five percent of DLC's $4 million budget.  (Cox-Bultan dep. 88:24-25, 91:12-13).  With this exception – an exception directly related to the same policy promotion program of the organization – all DLC events were open to the public, and to members of both political parties.  (From dep. 186:17).

### f)  Absence of Political Activity

DLC has never  become involved in elections for public office.  (From dep. 21:23-24).  DLC did not recruit or support political candidates, nor did it engage in any election-related activity whatsoever.  (*Id.* 170:24 ; Alston dep. 18:22-25 ; W. Marshall dep. 154:3-22).  DLC has never made donations to any state or local candidates, even when otherwise permitted by state campaign finance law, and it has never endorsed any candidate for public office.  (From dep. 170:23-171:17).

Robert Engel, another of plaintiff's designated expert witnesses, has worked in Democratic party electoral politics for almost twenty-five years, serving as Political Director of the Democratic Congressional Campaign Committee in 1997 and 1998, and as Executive Director of the Democratic National Committee in 1999.  He testified unequivocally, "The DLC did not provide any tangible benefit to the Democratic Party or its candidates for public office in the years 1997, 1998, or 1999. DLC did not carry out any functions of the Democratic Party, and it did not alleviate

any burden, financial or otherwise, of the Democratic Party." (Expert Report of R. Engel, *attached as* Exhibit N).

The government's only argument of a political tint to DLC's activities is based on no more than the facts of DLC's founding and control by Democratic elected officials, and individual speeches by DLC's CEO Al From given in political contexts. This is all the IRS has to show for years of audit and review. Yet this is not a claim of political intervention. Nor is it an effort to show that DLC, acclaimed for its successes in the national policy debate, is not committed as its well-established mission to the development and advocacy of policy. When all is said and done, the IRS argues simply that those who organized it are Democrats and that one of them, long active in national politics, delivers partisan speeches to political audiences. Neither the law nor the facts support this claim.

There is no evidence that From's speeches and statements have anything to do with either the activities of DLC, or the motives behind them. Defendant takes the political content of these speeches as evidence that all of DLC's activities are political. Not only is there no evidence to support such a claim; the only facts on record point to precisely the opposite conclusion. As Al From himself stated, "the fact that I make political speeches doesn't mean that the activities of the DLC are political." (From dep. 166:13-15).[7] Moreover, these speeches and statements were plainly not an

_____

[7] When asked about the speeches Defendant relies upon, Al From replied:

> [I]f you go through these speeches, you will find they are all about ideas. Our means of trying to change the political dialogue in the country also had important political effects. And this is one of the political effects. But the challenge for us was to change the political – it was to change the political agenda for the country.

(From dep. 163:22-164:3).

attempt to influence elections; most were given to a private audience, and they were typically made after elections, not before them.

There is also no support in IRS precedent for the government's reliance on a few political statements as evidence of the primary purpose of an organization. These speeches and statements are no more representative of DLC's overall activities than the comments made by Newt Gingrich, which the IRS explicitly put aside during its analysis of PFF. (PFF Technical Advice Memorandum). Al From's statements may not be used as a substitute for actual evidence –lacking in the government's recitation of facts – that DLC actually operated to benefit only the Democratic Party. And they become irrelevant when compared with the copious evidence presented by Plaintiff, both here and in Plaintiff's Motion for Summary Judgment, that DLC has consistently pursued its social welfare mission in a bipartisan fashion.

### g)  The Facts Indicate that DLC Did Not Privately Benefit Candidates or the Democratic Party

The IRS's treatment of PFF and Empower America, entirely distinguishable from American Campaign Academy, demonstrates that the production of public policy material and proposals, even if organized and directed by individuals associated with one party, is properly treated as exempt social welfare activity. The IRS has looked to the nature of the activity, not the partisan affiliation of the sponsors. It considered whether the analysis and proposals offered by the organization center on policy, for public distribution and adoption, and it has distinguished this kind of activity from ventures funded by political party organizations for a narrow class of beneficiaries within their partisan community. It is a functional test: the question is simply one of, what does the organization do, and for whose benefit?

The IRS suggests that some question of the "public" nature of the benefit provided is raised by the policy training offered to Democratic elected officials. This

would be insufficient, in any event, to carry the government's case.  Even if these workshops were conducted outside the approved exempt purpose, they would represent such an inconsequential portion of the organization's activity that they could not put the exemption in jeopardy.  The record in this case shows that DLC's leadership workshops, at their peak, represented less than five percent of DLC's $4 million annual budget (Cox-Bultan dep. 88:24-25, 91:12-13).

The workshops cannot, even when examined in substance, support any claim of an impermissible "private benefit."  DLC doesn't "do things on request for people; not the corporations who funds us or the members."  (*Id.* 41:21-23).  Even elected officials who consider themselves to be "New Democrats" do not agree with DLC positions all of the time.  (*Id.* 225:1-23), and the former Chair of the House "New Democrats" testified that The DLC did not provide members of the New Democrat Coalition in the House of Representatives with any resources or services "that would not have been available to any other member of Congress."  (Dooley dep. 22:7-8). All of DLC's materials were distributed on a bipartisan basis – they were not just available to the public via the Internet, but also sent at no charge to all Democratic and Republican member of Congress.  (From dep. 119:7, 186:2-7, 190:2-3; Alston dep. 60:16-17, 61:15-18, 66:1-4, 70:9-10).  These are not the characteristics of an organization bent on supporting  only a subset of public officials.

The leadership workshops only highlight the more pertinent facts, also clear on this record, that at least seventy percent of DLC's  annual budget is devoted to public policy materials published to the general public, and ninety-five to ninety-nine percent of the budget is spent on materials and conferences open to and available to the public.  (From dep. 190:22; Cox-Bultan dep. 89:16-17).  The record is replete with examples of DLC working with Republican elected officials to promote its legislative

agenda.  Some of its leading initiatives – such as education reform known as "No Child Left Behind" – have been embraced by representatives of both parties.

DLC's structure and operation fits squarely within section 501(c)(4) of the Code.  As the IRS's treatment of Empower America illustrates, an organization avoids excessive private benefit to a political party or elected officials by operating independently of formal party structures, in pursuit of issues rather than partisan gain. DLC has done more than that: it has consistently worked to further its ideals by partnering with any legislator, Republican or Democrat, willing to support them.  It is not only unaffiliated with the national Democratic Party, but it has, for most of its existence, contested against the party on major policy issues such as trade and education reform.  It is an independent social welfare organization committed to the successful promotion of public policy in the national interest – fully qualified, as the IRS concluded 20 years ago, under section 501(c)(4) of the Code.

### C. IRS's Revocation was Retroactive

Defendant's evidence of  primary benefit derives almost exclusively either from facts of DLC's partisan affiliation it disclosed in its Form 1024 application, or else from evidence from the Form 1024 and attachments themselves.  Treasury regulations make crystal clear that an organization's tax-exempt status, once granted, cannot be retroactive revoked unless it has "omitted or misstated a material fact [or] operated in a manner materially different from that originally represented . . . ." Treas. Reg. § 601.201(n)(6)(i) (2006).  Because the IRS's revocation of DLC's tax exempt status was entirely retroactive, and because DLC has been operated in the manner described in its Form 1024 application, the revocation was erroneous.

Defendant relies on six categories of facts in support of its allegation that DLC's primary purpose in 1997, 1998, and 1999 was to privately benefit Democratic elected officials and the Democratic Party.  First, Defendant relies on the facts of

DLC's organization, relying on DLC's Form 1024 and an attached document to that form, "Winning in the World Economy."  Second, Defendant relies on the fact that DLC events predominantly featured and were attended by Democrats.  Third, Defendant relies on speeches and statements from DLC's CEO, Al From, in political settings, that Defendant alleges proves that DLC's purpose was to create "attractive public policies . . . . to benefit Democrats."  (Def.'s Br. 7).  Fourth, Defendant includes speeches and statements of Al From that Defendant alleges takes credit for Democratic electoral victories.  Fifth, Defendant notes that Democrats were more likely than Republicans to use DLC materials, and alleges that DLC intended its materials to be used by Democrats.  And sixth, Defendant cites DLC's leadership workshops.

    With the exception of the leadership workshops, discussed below, all of these facts were disclosed to the IRS in DLC's application for tax-exempt status.  The IRS knew the details of DLC's organization and the contents of "Winning in the World Economy."  The IRS was made aware that DLC was formed for the purpose of "improv[ing] the overall contribution of Democratic leaders, in the federal and state government, to national policy debate."  (DLC Form 1024, Part III, Question 3).  DLC made clear that its goal was, in part, "to urge upon both the [Democratic] party and the general public new and innovative approaches to policy."  (*Id.*)  And DLC made explicit its relationship with the Democratic Party.  (*Id.*)

    DLC received a letter of exemption from the IRS on February 7, 1986.  The exemption letter included no caveats limiting DLC's operations, other than a request that DLC notify the IRS if its "purpose, character, or method of operation change."  (DLC Exemption Letter, *attached as* Exhibit C).  This application was based on a Form 1024 Application for Recognition of Exemption under Section 501(a), which was filed along with DLC's Articles of Incorporation.  The application was filed under

the name "Democratic Leadership Council," and the attached Articles of
Incorporation showed that the applying organization was incorporated under the name
"Democratic Leadership Council, Inc."  (DLC Form 1024).

In the answer to Form 1024, Part III, Question 3, DLC made clear that it was
founded by "federal and state elected officials who are Democrats."  The Articles of
Incorporation list, as the initial Directors, three prominent Democratic elected
officials: Senator Sam Nunn; Representative Richard Gephardt; and then-Governor
Charles Robb.  And the Application also listed the members of two task forces: the
"Task Force on National Defense Strategy" and the "Task Force on Economic Growth
and Competitiveness."  The first task force was comprised of four Senators, three
Congressmen, and a Governor – all Democratic elected officials.  The second task
force was comprised of four Senators, nine Congressmen, and four Governors – also
all Democratic elected officials. (*Id.*)

DLC also made its operation and goals clear in its Form 1024.  In DLC's
answer to Part III, question 3, DLC stated that DLC was founded by "certain elected
officials and others who were concerned with the formulation of national policy and
with the direction of policy debate within the Democratic Party."  DLC was created
"to improve the overall contribution of Democratic leaders, in the federal and state
government, to national policy debate, and to urge upon both the party and the general
public new and innovative approaches to policy."  (*Id.*)   In response to this
application, the IRS granted DLC's tax-exempt status.  (DLC Exemption Letter).

George T. Smith, the original revenue agent on the DLC matter, investigated
DLC over a period of three years.  (G. Smith dep. 76:14-16, Mar. 30, 2006, *attached
as* Exhibit Q).  Smith agreed that DLC was, in fact, operating within the terms of its
exemption ruling in the years 1997, 1998, and 999.

THE WITNESS: You're saying, when I went out and looked at their activities, did it comply with what was in the – what was in the articles of incorporation?

BY MR. ELIAS:

Q.  Yes.

A.  Were they in fact doing that?

Q.  Yes.

A.  I would say they were doing that, what they said they was doing, they were doing that.

Q.  Okay.  And specifically did you find any activities that they were engaged in that were inconsistent with what they described as their activities would be in their application for recognition and exemption?

A.  Okay.  Repeat the question one more time.

MR. ELIAS:  Why don't you read it back.

THE WITNESS:  Read it back.

(The record was read as follows:)

"QUESTION:  And specifically did you find any activities that they were engaged in that were inconsistent with what they described as their activities would be in their application for recognition and exemption?"

THE WITNESS: No.  I would not say – I didn't see any activities that they would – that they were not doing as they stated in the exempt – in their articles of incorporation.

(*Id.* 43:13-44:18).

Q.  So when you reviewed what they had done in 1997, 1998, and 1999, after the fact, your after-the-fact review, the DLC's activities during those three years were consistent with what they told the IRS they would be doing.

A. Right.

(*Id.* 50:12-18).

Q.  Do you see – maybe you should read the – that paragraph for the record.  "The Democratic Leadership Council is so named because it was founded by federal and state elected officials who are democrats and who were concerned with the direction of policy debate within their party, as well as within the country as a whole."  Let's just stop there.  Do you believe that's consistent with –

A.  Definitely.

Q.  You believe –

MR. MARTINEAU: Let him ask the question.

BY MR. ELIAS:

Q. Is that consistent with what activity they engaged in?

A.  Let me read it again.  (Pause in the proceedings.)  Yes, that's –

Q.  that's consistent with?

A.  What they're doing.

Q.  With what they're doing?

A.  Yes.

(*Id.* 56:11-57:10).

Q.  And the next sentence: "Through the establishment of DLC, these officials and others with similar interests and goals expected to improve the overall contribution of democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  Is that consistent with what you reviewed their actual activities to be?

A.  Sure, sure.

*---*---*

Q.  So is it fair to say that the DLC accurately described the activity it was going to engage in?

A.  It sure is.

Q.  Engaged in that activity?

A.  It sure did.

(*Id.* 57:23-58:21).  Revenue Agent Smith, whose investigation was the basis of the IRS's decision to revoke DLC's tax-exempt status, stated unequivocally that DLC was operating in accordance with its tax-exempt application in the years in question.  He testified that his belief that DLC's tax-exempt status should be revoked stemmed not from a finding that DLC misstated or omitted any facts in its application, or that it operated in a different manner than represented in its application, but because he disagreed that DLC should ever have received an exemption letter in the first place.

Treasury Regulation  601.201 specifies that determination letters shall only be issued "where a determination can be made on the basis of clearly established rules."  Treas. Reg. § 601.201(a)(3).  Once issued, exemption rulings and determination letters may be revoked or modified retroactively only "if the organization *omitted or misstated a material fact [or] operated in a manner materially different from that originally represented . . . .*"  *Id.* § 601.201(n)(6)(i) (emphasis supplied).  Revenue Procedure 90-27 reiterates this standard.  *See* Rev. Proc. 90-27. 1990-18 I.R.B. 17.  "[T]he Secretary has limited the Commissioner's discretion to revoke retroactively a favorable ruling on exempt status."  *Virginia Educ. Fund v. C.I.R*.,  85 T.C. 743, 752 (1985).  Barring the conditions noted above, the IRS may revoke an exemption only from the date the organization "was placed on notice . . . that its tax-exempt ruling letter might be revoked or modified."  P*rince Edward Sch. Found v. Comm'r*, 478 F. Supp. 107, 113 (D.D.C. 1979).

The IRS revoked DLC's tax-exemption retroactively.  The IRS's first communication on this subject was a letter dated October 14, 1999, notifying DLC that the IRS was examining its return, and this letter did not suggest that DLC's exemption might be revoked.  (Letter from G. Smith, *attached as* Exhibit H).  The letter stated merely, "We plan to examine the form [990]," and it requested a series of documents.  The letter also noted, "An examination of a return does not suggest suspicion of any wrongdoing."  (*Id.*)

The IRS first indicated that it might revoke DLC's tax-exempt status for any year on June 28, 2002.  (Proposed Adverse Action Letter (tax years 1997 & 1998), *attached as* Exhibit I).  In the end, the IRS revoked tax-exempt status only for calendar years 1997, 1998, and 1999.  (*Id.*; *see* also Examination Report (tax year 1999), *attached as* Exhibit J).  Therefore, the entire revocation was retroactive.

Because it was retroactive, the IRS must base the revocation on either the misstatement of a material fact, or operation in a materially different manner.  Defendant argues neither of these.  Defendant cites only one set of facts not contained in DLC's application: the leadership workshops.  As noted above, these consumed less than five percent of DLC's resources at their peak.  (Cox-Bultan dep. 88:24-25, 91:12-13).  Even if this activity were evidence of private benefit, it is not large enough to overwhelm DLC's primary purpose, and it is not evidence that DLC was operating in a manner materially different than it originally represented.

DLC has, since its inception, operated in the manner described in its application, including its control by Democratic elected officials, and its creation "to improve the overall contribution of Democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  (DLC 1024).  The IRS's revocation of DLC's tax-exempt status was in violation of Treasury Regulation  601.201.

## III.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

Dated August 15, 2006                    _____/s/_____
                                         Robert F. Bauer (D.C. Bar No. 938902)
                                         Marc E. Elias (D.C. Bar No. 442007)
                                         Ezra W. Reese (D.C. Bar No. 487760)
                                         PERKINS COIE LLP
                                         607 Fourteenth Street, N.W.
                                         Washington, D.C.  20005-2011
                                         (202) 628-6600

                                         Attorneys for Democratic Leadership Council, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRATIC LEADERSHIP COUNCIL,
INC.,

               Plaintiff,

     v.

UNITED STATES OF AMERICA,

               Defendant.

CIVIL ACTION NO. 05-1067 (JGP)

## CERTIFICATE OF SERVICE

      I hereby certify that service of the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment was made on August 15, 2006 via the Court's electronic case management system, to:

        Michael Martineau
        Tax Division
        U.S. Department of Justice
        P.O. Box 227
        Washington, DC 20044

And via first-class United States mail, to:

        Kenneth L. Wainstein
        United States Attorney
        United States Attorney's Office for the District of Columbia
        555 4th Street NW
        Washington, DC 20530

        David A. Hubbert
        Tax Division
        U.S. Department of Justice
        P.O. Box 227
        Washington, DC 20044

Respectfully Submitted,

Dated: August 15, 2006

_____/s/_____
Robert F. Bauer (D.C. Bar No. 938902)
Marc E. Elias (D.C. Bar No. 442007)
Ezra W. Reese (D.C. Bar No. 487760)
PERKINS COIE
607 Fourteenth Street, N.W.
Washington, D.C.  20005-2011
(202) 628-6600

Attorneys for Democratic Leadership Council,
Inc.