IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:05-cv-1067 (JGP) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## Reply Brief in Support of
## United States Motion for Summary Judgment

The United States moved for a summary judgment dismissing the

Democratic Leadership Council's complaint seeking a $20,083 refund of income

taxes paid when the Internal Revenue Service revoked the DLC's tax exempt status

for 1997, 1998, and 1999. The DLC had been granted tax exempt status under

Section 501(c)(4) in 1985 because it represented its purpose was to benefit the

community as a whole by developing new ideas and policies on important public

issues. Considering all of the undisputed facts, however, the DLC's activities

during the years at issue demonstrate a primary purpose of benefitting a private

group: individuals who might run for office, were running for elected office, or had

been elected to office as Democrats, or particularly New Democrats.

The DLC opposes the United States motion for summary judgment on three

broad grounds. First, although the DLC agrees that organizations exempt under 26

U.S.C. § 501(c)(4) cannot operate primarily for the private benefit of individuals or a

2

private group, it advocates a legal standard that allows an organization to remain

exempt as long as it remains "independent" from political parties. The DLC's

standard, however, lacks support in the statute, regulations, or case law, and is so

narrow that it would allow substantial abuse. When all the undisputed facts and

circumstances are considered, as we have argued, the DLC's "secondary" benefit to

a private group of a individuals running for office constitutes a non-exempt primary

purpose. Second, the DLC disputes some of the evidence the Government relies on

in its brief. Most of the disputes are based on errors in our citations to the record.

When those are corrected, the statements are supported and undisputed. The DLC

also objects to the summary of evidence submitted by Taylor Lincoln in his affidavit.

The DLC's objections, however, misrepresent Lincoln's testimony. Lincoln did not

have any personal knowledge of the events at issue, nor has he offered an opinion

under Rules 701 or 702 of the Federal Rules of Evidence. Instead, as Lincoln

testified in his Declaration, he was given the documents the DLC produced in

response to the United States' requests in discovery, and prepared a summary of

that voluminous information. The only information that did not come directly from

the DLC's documents were the party affiliation of some individuals identified in the

DLC's documents. Those affiliations were taken from published sources, Lincoln

Declaration, Ex. 2 n. 11., and where an affiliation was not available, Lincoln did not

draw a conclusion or opine about an individual's party affiliation. This testimony is

just the sort of summary contemplated in Rule 1006 of the Federal Rules of

Evidence. Finally, the DLC argues that the United States motion for summary

3

judgment should be denied because the revocation was "retroactive." This is the

same argument in the DLC's motion for summary judgment, and our response is in

our opposition to the DLC's motion. We will not repeat the response here, but the

argument is ineffective in defeating the Government's motion for summary

judgment.

**The private benefit doctrine prohibits exempt organizations from operating to benefit a private group.**

To be tax exempt under § 501(c)(4), during each year of operations, an

organization must be "primarily engaged" in promoting the common good. Treas.

Reg. §1.501(c)(4)-1(a)(2); *e.g.*, *American Women Buyers Club, Inc. v. United States*,

338 F.2d 526, 528 (2d Cir. 1964)("[t]he word 'exclusively' as used in the statute has

not been given a strict interpretation ... but rather has been interpreted to mean

'primarily'."). A non-exempt activity—such as benefitting a private group—cannot

be an organization's primary purpose. Whether an organization is primarily

engaged in promoting social welfare is a "facts and circumstances" determination.

*See IHC Health Plans, Inc. v. Commissioner*, 325 F.3d 1188, 1199 (10th Cir.

2003)(Tax Court correctly reviewed all facts and circumstances in considering

community benefit test); *see also* Rev. Rul. 68, 45, 1968-1 C.B. 259 ("All facts and

circumstances are taken into account in determining an organization's primary

activity.").

The United States submits that on the record as a whole it is undisputed that

the primary purpose of the DLC's activities during the years 1997, 1998, and 1999

4

was to benefit a group of elected Democratic officials and individuals running as New Democrats. Benefits to partisan interests serve a private, not public, interest. The activities providing those benefits are, therefore, non-exempt activities. While the purpose of the DLC's activities during 1997, 1998, and 1999 is the ultimate issue, the inquiry must begin with the DLC's activities and who benefitted from them.[1]

The analysis in this case is most like that in *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), where the Tax Court denied exemption under section 501(c)(3) to an otherwise tax exempt school organized to train individuals for careers as political campaign professionals because the school operated for the substantial nonexempt purpose of benefitting the private interests of Republican Party entities and candidates.[2] Many of the Academy's organizers and officials had close ties to the Republican National Committee, but there is no finding in the opinion that the RNC controlled the Academy. And although applicants were not asked to identify their party affiliation before being admitted to the school, the record reflected that the Academy's graduates predominantly worked for Republican candidates. *Am. Campaign Acad.*, 92 T.C. at 1060-1061. Importantly,

---

[1] *Cf.* Frances Hill and Douglas Mancino, *Taxation of Exempt Organizations* ¶ 4.02[1][a] n. 9 (2006)("Use of the term 'private benefit' is somewhat misleading because it suggests the focus of the analysis is on the benefits given to the recipient individual or organization rather than on the purpose intended to be served by the organization's provision of those benefits.").

[2] While the quantum of allowed private benefit differs between § 501(c)(3) and § 501(c)(4), the analysis of determining the private benefit does not.

5

the Academy's courses were educational, and 90 percent of the Academy's budget went to running the school, with the other 10 percent dedicated to research and publishing material available to the general public. *Am. Campaign Acad.*, 92 T.C. at 1061. Nonetheless, the Tax Court concluded that "educational activities with the partisan objective of benefitting Republican candidates and entities" were non-exempt activities. *Am. Campaign Acad.*, 92 T.C. at 1070. The Academy was not directly intervening in elections in favor of one candidate or another, rather its educational activities were undertaken to provide a benefit to the individual Republican candidates who could hire the Academy's graduates, and all such partisan interests are private interests, not the common good. *Am. Campaign Acad.*, 92 T.C. at 1072. It was this secondary benefit of the Academy's educational activities that was the impermissible purpose.

This pattern of facts and circumstances is much the same here. The Government has acknowledged that the DLC undertook policy development, but we have presented evidence that in each of the years at issue the reason and purpose of those activities was to increase the number of individuals elected as Democrats. For example, Al From, the DLC's chief executive officer, said in 1998 that the DLC was seeking to create policies that constituted a "valuable brand" for candidates to use in being elected or reelected. (*See* Ex. 107, p. 3.) From's repeated statements during the years at issue give context to the DLC's other activities. When viewed as a whole, the record shows that the DLC's primary purpose was not the common

6

good as required by the statute and regulations, but was, instead, benefitting those individuals running for office as New Democrats.

The DLC makes two arguments on the merits in opposing summary judgment. First, the DLC argues that the test the Government has cited for determining when a § 501(c)(4) organization has a primary purpose of providing a private benefit is not supported by the law. Second, the DLC argues that its activities are sufficient to support of finding that its primary purpose is the common good. Neither argument is sufficient to deny the United States motion for summary judgment.

The DLC first argues the Government is applying the wrong legal standard by contending that no other organization's exempt status has been revoked for public policy development. The DLC supports the argument by citing several letter rulings by the Internal Revenue Service and reports about how other organizations claim to have been treated. *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, at pp. 2-8.[3] But as we discuss more fully in opposing the DLC's motion for summary judgment, 26 U.S.C. § 6110(k)(3) provides

---

[3]    While the letter ruling is irrelevant, it is interesting to note that the document put forth by the DLC as a letter ruling to Progress & Freedom Foundation was released to the press by someone other than the Internal Revenue Service. *See Unreleased TAM Rules Foundation Involved with Gingrich Course was Exempt*, 1999 TNT 24-25 (February 5, 1999)(filed as DLC Ex. M). The article begins, "In a forthcoming technical advice memorandum," indicating that the document was not released by the Service. Although the DLC has cited this document on several occasions, it has never noted the origin of the published document it is citing as an authentic Government document.

7

that letter rulings and TAMs "may not be used or cited as precedent."[4]  *See Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1, 12 (Ct. Fed. Cl. 2001)("Private letter rulings and technical advice memoranda, in accordance with section 6110(k)(3) of the Code may not be used or cited in any precedential way and thus, *a fortiori*, may not be used to support, in any fashion, an argument that one interpretation of the Code is more authoritative than another.").  Similarly, the Court of Appeals for this Circuit has held that claims of disparate treatment are insufficient to support a claim for exempt status.  *Stichting Pensioenfonds Voor De Gezohdheid, Geestelijke En Maatschappelijke Belangen v. United States*, 129 F.3d 195, 200-201 (D.C. Cir. 1997)(pension fund's claim that it should be granted relief because similar funds were treated differently does not state a claim); *see also* United States Statement of Genuine Issues of Material Fact, at p. 20.  Thus, the DLC's discussion of letter rulings issued to other organizations and how information available to the public appears to show how other organizations were treated is irrelevant to the proper standard for tax exempt status to this case.  *See generally*, *Pierce v. Underwood*, 487 U.S. 552, 568 (1988)("Respondents contend that the lack of substantial justification for the Government's position was demonstrated by its willingness to settle the litigation on unfavorable terms. Other factors, however, might explain the settlement equally well--for example, a change in substantive policy instituted by a

---

[4]    Section 6110(k)(3) refers to "written determination," which is defined in § 6110(b)(1)(A) to include "a ruling determination letter, technical advice memorandum, or Chief Counsel advice."

8

new administration. The unfavorable terms of a settlement agreement, without inquiry into the reasons for settlement, cannot conclusively establish the weakness of the Government's position. To hold otherwise would not only distort the truth but penalize and thereby discourage useful settlements.").

After building an argument on material that is not precedent, the DLC then attempts to distinguish the *American Campaign Academy* on the grounds that the Academy was "training operatives for candidates in one particular party" and that it was a case about campaign operations and not policy development. *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, at p. 9.[5] The DLC's reading of the case is artificially restricted. The premise that the Academy was overtly training students of one party is wrong. The record in that case indicated applicants were not asked to formally declare a party affiliation. And although the court noted that an applicant's party affiliation could be deduced from past campaign experiences, there is no finding that the Academy purposefully admitted only individuals who would work for Republican candidates. Rather, the Tax Court found that the Academy carried out its educational activity with a partisan purpose, benefitting Republican candidates. *Am. Campaign Acad.*, 92 T.C. at 1072. The finding was based on evidence of the Academy's organization, how it

---

[5]     The DLC also comments on page 9 that defining a charitable class has no relevance to determining the DLC's status under § 501(c)(4). We agree with the notion about charitable classes in considering the common good, but the conclusion in *American Campaign Academy* that benefitting partisan interests is a private benefit, not a public one, does apply here.

9

operated, and who benefitted from its activities.  But that finding differs from the

blatant partisan selection of students that the DLC implies took place.

In fact, the Academy operated much like the DLC: both undertook exempt

activities—education and policy development—that expended almost all of their

budgets with a purpose of benefitting certain candidates, either through campaign

workers or policies as "valuable" as campaign contributions.  Similarly, although

the Academy was training campaign operatives to work on campaigns, the Tax

Court did not consider the case to be one of political intervention as the DLC

contends.[6]  *See Am. Campaign Acad.*, 92 T.C. at 1063 (Commissioner conceded

Academy was not involved in "proscribed campaign activities").  Thus, the issue was

the purpose of the Academy's activities.  The DLC's attempts to distinguish

*American Campaign Academy* are ineffective.  The Tax Court's decision based on

the statute and regulations provides a useful guide to discerning when exempt

activity nevertheless provides a non-exempt secondary benefit to a private group

that does not control the organization.

The DLC next argues that it was exempt in its operations.  It is not necessary

to go through all of the facts point by point, as the parties have done in their

opening and responsive briefs.  For our purposes here, it is sufficient to note that

the DLC's argument has two fatal flaws.  First, the DLC's claims of bipartisan

---

[6]     Similarly, the United States does not contend here that the DLC was
intervening in elections during the years at issue.  Therefore, the DLC's arguments
on pages 16 to 18 of its Opposition that it was not intervening in elections are
irrelevant.

10

activity are ambiguous and vastly overstated.  Second, the DLC's attempts to

dismiss statements by its officers and agents, and in particular those by Al From, as

either irrelevant or relevant only to a political intervention theory are misplaced.

When the facts are considered in light of the actual standard of review, the DLC's

arguments lose all force.

The DLC spends considerable time arguing that it at times worked with

Republicans on policies, or lobbying Republicans to have policies adopted.

*Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary*

*Judgment*, at pp. 13-15.  That argument, however, must be measured with the

DLC's burden of "'unambiguously' prov[ing] entitlement to an exemption" *Stichting*,

129 F.3d at 197, and the fact that this is a refund suit for three individual years,

1997, 1998, and 1999 in mind.  With those standards as the gauge, the DLC's short

list of various activities loses focus.  Many statement are just conclusory claims

without any specific support, *e.g.,* "worked with Republicans 'whenever we could',"

and—with the exception of two events tied to years not in issue—none of the events

are specifically tied to 1997, 1998, or 1999.  In the DLC's *Plaintiff's Memorandum in*

*Opposition to Defendant's Motion for Summary Judgment*, it claims these specific

actions of bipartisan activity:

- efforts to expand trade (p. 13, no year given);

- fast track trade promotion authority (p. 13, no year given);

- Americorps (p. 13, no year given);

- welfare reform (p. 13, no year given);

11

- bipartisan coalitions in lobbying efforts (p. 13, no year given and record cite incorrect);

- events with Empower America (p. 14, no year given);

- conference with Heritage Foundation in 1991 (p. 14); and,

- healthcare event with Heritage Foundation in 1996 (p. 14).

While we will concede the court can take judicial notice that the debate on giving President Clinton fast track trade authority took place largely in 1997, the DLC has done nothing to put the other activities into the context of this case. The DLC has picked activities over a number of years, many apparently not at issue here, and seeks to have the court consider the DLC's primary purpose in 1997, 1998, and 1999 based on activities in years not at issue. But the DLC has not cited any support for that approach in a refund suit. In the Government's motion, on the other hand, after describing how the DLC was formed in the mid-1980s, all of the evidence we put into the record focused on the three years at issue. The DLC's failure to produce relevant evidence of its activities in the years at issue supports the United States motion for summary judgment.

The United States has conceded that the DLC engaged in policy development during the years at issue, and spent a good deal of its budget doing so.[7] Developing

---

[7] The DLC has cited no support for its contention that the Court should look solely to the percentage of the budget spent on various activities when evaluating its activities. Such a numerical measurement of primary purpose ignores the impact of inexpensive activities, how volunteers were used, asset allocations, intangible resources, and the focus of the organization's management and

(continued...)

12

policies on issues important to the public can be an exempt activity.  Thus, we have not denied or disputed the DLC's policy development activity.[8]  Rather, the United States has argued that by looking at all of the facts and circumstances during the years at issue, the DLC's primary purpose in developing its policies was to provide a private benefit.  The DLC's recitation of events in years not at issue does nothing to rebut the Government's argument.

The DLC's failure to muster significant evidence of its bipartisan activities during the years at issue is in stark contrast to what the DLC represented in its application for exempt status.  In its application, the DLC stated that it would be undertaking task forces, town meetings, issue forums for businesses, or contracts for studies on specific issues.  (Hubbert Declaration, Appendix 1, Pltf Ex. 2 at pp. 23-24.)[9]  But the record as it now stands has scant evidence that the DLC did so during the years at issue in a bipartisan fashion.  While the record has instances of the DLC holding leadership workshops where only Democrats attended, orientations for new members of Congress where only Democrats were invited,

---

[7](...continued)
leadership.  As such, the inquiry—alone—is incompatible with a facts and circumstances test.

[8]      The United States' theory in this case accepts the DLC's policy development, but focuses instead on the purpose of those activities, as required by the statute and regulations.  This is an important distinction from the DLC's theory for its motion for summary judgment, where all of the statements about the DLC's purpose creates an unavoidable issue of material fact.

[9]      The same exhibit is found at DLC Exhibit A, pages 24 - 25.

charted plane flights to New Orleans where only Democrats were given seats, a compendium of policy papers addressed "Dear Democratic Leader,"and conferences where only Democrats were featured speakers, the DLC, on the other hand, has proffered scattered evidence that leaves one guessing if it relates to the years at issue.  There is no evidence of Republicans helping develop policy in 1997, 1998, or 1999, except for the fast track trade authority in 1997 if the inference is drawn in the DLC's favor.  And there is no evidence of Republicans speaking at important DLC events, or the DLC and other organizations holding issue or policy sessions during the years at issue.[10]  The record has insufficient evidence to unambiguously establish the DLC's exempt status for the years at issue, and fails to show the United States is not entitled to summary judgment.

After failing to provide its own affirmative evidence, the DLC next tries to argue that the many instances of providing benefits only to Democrats and statements by its officers that the DLC intended to provide policies for electoral success are irrelevant.  *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, at pp. 17-18.  In essence the DLC argues that

---

[10]    In a similar vein, the DLC claims that it worked with many Republicans who were using its policies.  When asked to identify Republicans using the DLC's policies, From testified that he "can identify one," and mentioned President George W. Bush.  From Dep. at p. 179 (DLC Ex. B).  While we also recognize that Senator John McCain was also identified with a DLC policy, the evidence does not support the implication that the DLC consistently worked with Republicans to promote its policies.  And the manner in which the DLC officials spoke of Republicans "pilfering" its policies for their own electoral gain, belies the notion that the DLC actively worked with Republicans to promote its policies.

14

because its policies come from a progressive background, its policies are more attractive to individuals who are Democrats. This argument is a slight variation on the American Campaign Academy's "happenstance" argument that it could not control which candidates its graduates worked for, and therefore could not be held responsible for the fact that the graduates who worked on campaigns apparently all worked for Republicans. *Am. Campaign Acad.*, 92 T.C. at 1078. The Tax Court rejected that argument, however, in two ways. First, it reasoned that there was no support for the notion that "nonincidental benefits must be controllable by the organization." The court went on to conclude that "Secondary benefits which advance a substantial purpose cannot be construed as incidental to the organization's exempt educational purpose" because the court was looking at the organization's activities to determine its purpose. *Am. Campaign Acad.*, 92 T.C. at 1078.

The same reasoning applies here; the DLC cannot disavow its activities and statements directed to its role in electoral success by claiming the benefits were happenstance. Instead, the DLC admittedly sought to benefit individuals running for office as New Democrats with DLC policies. From went so far as to write to the DLC's trustees in 1998 that the organization needed to make its policies "as valuable as receiving interest group money." (Ex. 107, p. 3.) These statements are powerful evidence of the primary purpose behind the DLC's activities.

The DLC would render all evidence of its purpose irrelevant simply because it produced policy materials. The DLC asserts that the proper standard would have

15

the court look no further than, "[T]he production of public policy material and proposals, even if organized and directed by individuals associated with one party, is properly treated as exempt social welfare activity." *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, at p. 18. While delving into an organization's activities to determine its purpose causes "difficult and murky problems," the task is accomplished by examining all the facts and circumstances during the years at issue to determine the DLC's exempt status. *Presbyterian & Reformed Pub. Co. v. Commissioner,* 743 F.2d 148, 155 (3d Cir. 1984).

For this reason, the DLC's attempt to dismiss From's statements as something other than "actual evidence" (*Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, at p. 18) is without merit. From's statements are admissions by the DLC's chief executive officer, and his speeches—political frolics according to the DLC—are very much a part of the DLC's activities during the years at issue. As the undisputed evidence demonstrates, From, and other DLC officials, said during the years at issue that the purpose behind the DLC's activities—and particularly its policy development—was to create a Democratic majority in elected bodies. That purpose is to confer a private benefit on individuals running for elected office as Democrats, and those running as New Democrats in particular.

The test proposed by the DLC would allow an organization staffed by operatives of a political party to create policies with the intent of benefitting

16

candidates of a particular party—and announce to the public that doing so was its

purpose—as long as it (1) actually developed policies and (2) remained

"independent" from the political party.  But the DLC provides no insight into why

those policies do not improperly benefit a private group or what constitutes

"independence."  And a test that focuses on less than all of the facts and

circumstances would create the potential for considerable abuse by tax exempt

entities who were not engaged in developing policies for the common good, but were

developing policies for partisan gain.  In fact, one commentator has noted, in the

context of political intervention by § 501(c)(3) organizations, that a test failing to

consider an organization's purpose would be ineffective in enforcing the statute:

> "[P]urpose permits a distinction between educational and political
> activities that preserves the general principle that substance and not
> form must control the tax treatment of activities.  Without inquiry into
> the purpose of activities, there would be no meaningful way to
> distinguish education from politics.  The result would be cynical, form-
> based manipulation of political activities so that virtually all forms of
> participation or intervention in political campaign would qualify as
> exempt educational activities."

Frances R. Hill, *The Role of Intent in Distinguishing Between Education and*

*Politics*, 9 Journal of Taxation of Exempt Organizations 9, 15 (1997).

In the end, the DLC's arguments on the merits are founded on a legal test far

too narrow, and without support in the statute, regulations, or precedent.

Moreover, the evidence cited by the DLC to show its bipartisan activities, with one

exception, is not tied to the years at issue.  And the evidence of the DLC's purpose

through the speeches of its officers puts the DLC's other activities in context.  When

all the facts and circumstances are considered, the United States is entitled to

summary judgment for each of the years at issue.

**The DLC's objections to the United States' statements of fact do not create genuine issues of fact.**

The DLC objected to several statements in the Government's statement of

material fact, and objected to Taylor Lincoln's testimony. We will address the

Lincoln testimony in our opposition to the motion to strike. With respect to the

statements to which the DLC objected, in large part the DLC agreed with each

statement, but objected to the citation. We apologize for any inconvenience our

miscitations caused. Our attempt to limit the size of the exhibits was perhaps

misplaced, and attached is an Appendix that provides the proper citations. In doing

so, we have generally cited the exhibits filed by the DLC to avoid duplication.

One substantive objection was to a Denver Post article cited in the United

States' Statement no. 5 to establish that Colorado Governor Roy Romer was a

Democrat and had been the DLC's vice chairman during the years at issue.[11] The

DLC objected on the grounds that the newspaper article was hearsay, but agreed

with the statement. While we agree that the newspaper article as a whole is

hearsay, Statement no. 5 is a fact that would have been generally known at the

---

[11]    Statement no. 5 reads:  The Vice Chairman during 1997 through 1999 was Gov. Roy Romer (D-Colo).  Romer, in 1998, also served as Chairman of the Democratic National Committee.  (*See Romer 'relieved' to step down as Chairman of DNC*, The Denver Post p. A-22, September 24, 1999.)

18

time.  As such the Court can take judicial notice of the fact as reported in a

newspaper.  *See Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991).

**The argument that the revocation of the DLC's tax exempt status was
retroactive and therefore void is not sufficient to preclude summary
judgment for the United States.**

      In its own motion for summary judgment, the DLC argued that it was

entitled to summary judgment because the Internal Revenue Service followed the

wrong procedure in revoking the DLC's tax exempt status.  In the United States'

opposition to the DLC's motion, we demonstrated that the argument does not apply

in a refund suit and, in any event, failed to consider that the agent testified that he

was not provided all the information he requested during the audit.  Therefore, the

argument not only used an incorrect legal standard, but was premised on

unjustified inferences from disputed facts.  When all of the information in the

record now before the Court is considered, the DLC cannot claim during 1997, 1998,

and 1999 it was operating in absolute conformity with its application.  We

incorporate here our argument on pages 17 to 23 of the United States Opposition to

the Democratic Leadership Council's Motion for Summary Judgment.  For the

reasons fully stated there, the DLC's argument is no impediment to summary

judgment for the United States.

**Conclusion.**

      Based on the record as a whole, the undisputed material facts show that the

primary purpose of the DLC's activities during 1997, 1998, and 1999 was to create

policies that would allow Democratic majorities to be elected and sustained.  That

19

purpose and those activities benefit a private group of individuals.  And that

primary purpose and those activities disqualify the DLC from being tax exempt

under § 501(c)(4) during 1997, 1998, and 1999.  The DLC's opposition consists of a

legal standard that is not correct, and facts that largely do not relate to the years at

issue.  Accordingly, summary judgment should be entered for the United States,

and the complaint dismissed.

Dated: August 28, 2006

                                   Respectfully Submitted,


                                   /s/ Pat S. Genis
                                   PAT S. GENIS, #446244
                                   DAVID A. HUBBERT
                                   Trial Attorneys, Tax Division
                                   U.S. Department of Justice
                                   P.O. Box 227
                                   Washington, DC 20044
                                   Phone/Fax: (202) 307-6390/514-6866
                                   Email: pat.genis@usdoj.gov




OF COUNSEL:

KENNETH L. WAINSTEIN
United States Attorney

20

APPENDIX OF CORRECTIONS TO RECORD
CITATIONS IN STATEMENT OF FACTS IN SUPPORT
OF UNITED STATES' MOTION FOR SUMMARY JUDGMENT

- 14.    Speakers at the 1997, 1998 and 1999 annual DLC conferences included prominent Democratic elected officials, including President Clinton and Vice-President Gore, both of whom have had substantial involvement in DLC activities for many years, including President Clinton's role in the founding of DLC and serving as its Chairman.  *(See* Gov't MSJ Ex. 1; Ex. 80; and, Ex. 81.)

  DLC Objection:  **Agree, but object on the grounds that the cited materials do not support the statement of fact.  None of the cited material reference President's Clinton's role in the DLC's founding or his position as chairman, or Clinton's "substantial involvement in DLC activities for many years."  Ex. 80 and 81 do not mention him at all, and Ex. 1 only supports the proposition that he spoke at one event.**

  From testified about President Clinton in his deposition at page 33 (DLC Ex.

B): "He was chairman of the DLC and had a big role in helping us shape our

agenda.  And, you know, when he decided to run for President, he gave up his

chairmanship with the DLC."

- 16.    Speakers at the 1999 conferences included President Clinton, then Vice-President and 2000 Democratic Presidential Candidate Al Gore, and Senator and 2000 Democratic Vice-Presidential candidate Joe Lieberman. (Ex. 81.)

  DLC Objection: **Disagree; Ex. 81 has no mention of President Clinton.  Otherwise agree.**

  President Clinton was the honored guest at the DLC's 1999 Leadership

Dinner held on October 13, 1999, the evening before the 1999 Conference.  *See* "Idea

of the Week: Third Way on Trade and Globalization," *New Dem Daily* (October 18,

1999)("The search for common ground on trade and globalization took a big step

21

forward at the DLC'S Leadership Dinner on the eve of our Annual Conference, as

President Bill Clinton announced a new U.S. negotiating position for the Seattle

ministerial summit of the WTO.")(available at the DLC's website,

http://www.dlc.org/ndol_ci.cfm?contentid=540&kaid=131&subid=207 .)  We agree

that he was not a speaker at the 1999 Conference.

- 35.    The DLC began conducting these workshops in 1998 to teach state and
  local elected officials how to implement the DLC's values and policies.

  DLC Objection: **Agree, but object on the grounds that there is no
  reference to a part of the record relied on, in violation of LcvR
  7(h)**.

  The statement is supported by the citation to the next statement, No. 35:

Bultan Dep. p. 53-54 , Ex. 57.  In addition, at page 20 of Bultan's deposition (DLC

Ex D) she testified, "The DLC  leadership workshops are a project we started in

1998 to help elected officials and others understand the New Democrat philosophy

and help them learn how to develop policies and ideas consistent with that

philosophy."

- 42.    The initial DLC Leadership Workshop, held in June, 1998, shows the
  design, goals, and content of the program.

  DLC Objection: **Agree, but object on the grounds that there is no
  reference to a part of the record relied on, in violation of LcvR
  7(h)**.

  Exhibit 57, Hubbert Declaration, Appendix 1, Part 2, is a summary of the

1998 leadership workshops and has three headings: DLC Leadership Workshop

Design; Workshop Goals; and, Workshop Content.

22

- 52.    The DLC, along with its related think tank the Public Policy Institute, held a short orientation in February 1999 for the "freshman class" of newly elected members of the House of Representatives.  (From Dep. p. 11.)

  DLC Objection: **<u>Agree</u>, but object on the grounds that he cited pages of the deposition does not contain this testimony, nor does any page submitted to the Court by the Defendant.**

  The testimony is found at From Dep. page 112, filed with the Court as DLC

Exhibit B.

- 53.    Only Democrat members were invited.  (From Dep. p. 11.)

  DLC Objection: **<u>Agree</u>, but object on the grounds that he cited pages of the deposition does not contain this testimony, nor does any page submitted to the Court by the Defendant.**

  The testimony is found at From Dep. page 112, filed with the Court as DLC

Exhibit B.

- 54.    From testifies about the orientation (From Dep. p. 11 .)

  Q    No newly elected freshman Republicans were invited to this particular briefing?

  A    That's right.

  Q    What would be the purpose of a briefing of newly elected freshman Democrats?

  A    Well, again, to try to encourage them to support our point of view. As we have discussed over and over again, you know, on a major issues of ours, which was trade, we had just lost a major vote in the House. We were trying to build support for the New Democrat philosophy among the most likely audience.

  The Republicans at this point were trying to impeach a Democratic president.  They probably weren't particularly eager to, you know, hear or to join in on ideas that reflected a philosophy that he also embraces. But, you know, we were trying to build support.  I mean, again, just to

23

make it very clear, the purpose of the DLC is to promote a new progressive agenda.  Republicans aren't likely to support that.  The agents for promoting it are elected officials who are Democrats.  Now, sometimes Republicans also support the ideas.  And when they do, we work with them.

But we were building -- we were trying to encourage more people in the Democratic party to go against the party orthodoxy and support our ideas.

DLC Objection: **<u>Agree</u>, but object on the grounds that he cited pages of the deposition does not contain this testimony, nor does any page submitted to the Court by the Defendant.**

The testimony is found at From Dep. page 112-113, filed with the Court as

DLC Exhibit B.

<u>CERTIFICATE OF SERVICE</u>

IT IS CERTIFIED that the foregoing REPLY BRIEF IN SUPPORT OF

UNITED STATES MOTION FOR SUMMARY JUDGMENT was caused to

be served upon  plaintiff's counsel on the 29th day of August 2006, in accordance

with the Court's ECF procedures, and by depositing a copy thereof in the United

States mail, postage prepaid, addressed as follows:

> ROBERT F. BAUER, ESQUIRE
> MARC E. ELIAS, ESQUIRE
> EZRA W. REESE, ESQUIRE
> Perkins Coie
> 607 Fourteenth Street, NW,
> Suite 800
> Washington, DC  20005-2011.
> rbauer@perkinscoie.com


> /s/ Pat S. Genis
> PAT S. GENIS