IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, INC.,<br><br>        Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>        Defendant. | No. 1:05-cv-1067 (JGP) |

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Dated: August 29, 2006    _____/s/_____
Robert F. Bauer (D.C. Bar No. 938902)
Marc E. Elias (D.C. Bar No. 442007)
Ezra W. Reese (D.C. Bar No. 487760)
PERKINS COIE
607 Fourteenth Street, N.W.
Washington, D.C.  20005-2011
(202) 628-6600

Attorneys for Democratic Leadership Council, Inc.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................. 1

II. ARGUMENT ................................................................................................... 2

    A. The Law Governing this Case Is Well Defined ................................ 2

    B. The Service Mistakenly Suggests that Policy Development and Analysis is Not 501(c)(4) Activity, If the Sponsors Are Associated with One Party .................................... 3

    C. The Service Cannot Dismiss the Weight of the Experts' Testimony .......................................................................................... 6

    D. The IRS's Revocation Was Retroactive and Erroneous ................... 10

III. CONCLUSION .............................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Abrosini v. Labarrague*, 101 F.3d 129 (D.C. Cir. 1996) ..........................................6, 7

*\*Am. Campaign Acad. v. Comm'r*, 92 T.C. 1053 (1989) ................................................2

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ...........................................7

*Green v. Connally*, 330 F. Supp. 1150 (D.D.C. 1971)...................................................11

*Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1
   (D.D.C. 2002) ..........................................................................................................6, 9

*Hanover Bank v. Comm'r,*.  369 U.S. 672 (1962) .......................................................2

*\*Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .............................................7, 9

*Presbyterian & Reformed Publ'g Co. v. Comm'r*, 79 T.C. 1070 (1982).......................11

*\*Prince Edward Sch. Found v. Comm'r*,  478 F. Supp. 107 (D.D.C.
   1979).....................................................................................................................10, 11

*Transco Exploration Co. v. Comm'r*, 95 T.C. 373 (1990) ............................................2

*Virginia Educ. Fund v. C.I.R.*,  85 T.C. 743 (1985)......................................................10

*Vons Cos. v. United States*, 51 Fed. Cl. 1 (Ct. Fed. Cl. 2001) ......................................2

**Statutes**

I.R.C. § 7422 (2006)........................................................................................................11

I.R.C. § 7428 (2006)........................................................................................................11

**Regulations**

Treas. Reg. § 601.201 (2006)..............................................................10, 11, 12, 13

**Other Authorities**

Rev. Proc. 90-27, 1990-18 I.R.B. 17........................................................................10

## I. INTRODUCTION

Defendant United States of America offers an Opposition largely evasive in nature. It wishes to deny that there is relevant law, or that there is agreement on material facts, and to the extent that it acknowledges controlling law or relevant facts, it mischaracterizes them both. While Plaintiff Democratic Leadership Council, Inc. ("DLC") has pointed out that the Internal Revenue Service ("IRS" or "the Service") has addressed precisely the central issues in this case, in other very public proceedings, the Opposition mentions none of these. In fact, it now disavows the explicit and erroneous grounds for the administrative determination below, denying that these matter much, such as the determination that DLC's position is adversely affected by the use of the name "Democratic." Instead, Defendant, by quoting a few speeches and statements from DLC's founder and CEO, attempts to characterize all of DLC's activities as politically motivated. The government's assertions are without foundation.

If there is a substantive position to be found in its Opposition, it is this: that DLC may be independent of any party, but that this does make its activities any less "partisan" and thus private in character, even though Defendant admits that DLC engages in no electioneering activity. What Defendant is seeking to avoid is the core fact established by the record and not in dispute: DLC is a leading "think tank" that has made its name, for over twenty years, with public policy advocacy attractive to both Democrats and Republicans. There is no dispute, on this record, that it has worked with Republican Members of Congress or employed Republican staff; there is no disagreement possible, on the uncontroverted facts, that some of its leading initiatives, such as the proposal for National Service or "No Child Left Behind" education reform, have drawn as much support from Republican legislators as from

Democrats – or still more from the former than from the latter. DLC has also shown how its work with elected officials is a means not of helping them win office but of influencing their style of governance *when in office*.

Hard as it tries in its effort to inject some fog into the record, Defendant is unable to change this history: one of fact, beyond disagreement, and decisive in resolving the question of whether DLC operates for the public welfare. The IRS's revocation of DLC's tax exempt status was erroneous, and this Court should grant DLC a refund of all taxes paid in the years 1997, 1998, and 1999.

## II. ARGUMENT

### A. The Law Governing this Case Is Well Defined

Defendant seeks to remove from consideration various cases that the Service used to articulate a position on the scope of the (c)(4) exemption. It argues, for example, that Technical Advice Memoranda are not precedent. What is not precedent, in the sense that it is not controlling, is not for that reason without use or significance. Instead, DLC has properly cited them to provide the Court with a history of the IRS's activities in this area of law. *See Vons Cos. v. United States*, 51 Fed. Cl. 1, 12 (Ct. Fed. Cl. 2001) (noting that written determinations may be cited to note that "the IRS has issued rulings regarding a particular subject"). Moreover, "such rulings do reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws." *Hanover Bank v. Comm'r*,. 369 U.S. 672, 686-87 (1962), *quoted in Transco Exploration Co. v. Comm'r*, 95 T.C. 373, 389 (1990). Indeed, the Service itself, in issued TAMs, routinely cites other TAMs.

But even where the Service addresses decisions of undisputed precedential significance, it fails to characterize them accurately. *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), concerned the operation of a school to recruit,

train and deploy campaign workers, for the benefit of Republican candidates.  It is not correct to say that the "Tax Court did not find the organization [to be] dominated or controlled by the Republican Party"; the court stressed, in fact, that the program was an "outgrowth" of one operated by a national party committee, and that organized Republican interests funded it.  *Id.* at 1056, 1061.

It also mistaken to argue, as Defendant does, that DLC has proposed a standard under which the campaign school in that case would have remained exempt if it operated "independently" of formal Republican Party organizations.  Independence is important, of course; affiliation with party organizations, which is an indication that their interests and not the public's are the ones served, would bear on the presence of a social welfare purpose.  But this affiliation would also affect the finding of a narrow partisan purpose – an electoral purpose – rather than one accessible to the public and calculated to serve its interests more broadly, without regard to party affiliation.

DLC does not produce services for use in campaigns, and it does not train campaign operatives.  It is not affiliated in any way with party organizations. It is an organization dedicated to policy analysis and formation, and for its advocacy on a bi-partisan basis.  *The American Campaign Academy* case is inapposite. On a technical level, moreover, it is not relevant, since the finding in that case rested on a determination that Republican party candidates, secondary beneficiaries of the organization's work, did not constitute a charitable class.  This is a finding without relevance to a determination under section 501(c)(4).

### B. The Service Mistakenly Suggests that Policy Development and Analysis is Not 501(c)(4) Activity, If the Sponsors Are Associated with One Party

The government would have the Court believe that bona fide, nationally recognized policy development and advocacy is poisoned at the source if those involved in it are associated with one party.  But it says nothing about its contrary

positions in the highly public cases involving Speaker Gingrich, in the Progress and Freedom Foundation case, and a host of other prominent national Republicans in the Empower America case. There the IRS, under public pressure, made abundantly clear that political association – and even political rhetoric – is not disqualifying for (c)(4) purposes. It is the nature of the product and its distribution that defines the organization's objectives.

      DLC has never concealed its association with Democratic elected leadership, and it has not, for a moment, denied its belief that the progressive policies it advocates are more consistent with the Democratic Party's intellectual heritage. It has, as Defendant points out, strongly criticized the Republican Party. For the very same reasons, however, it has been critical, too, of the Democratic party, and on particular issues, as the undisputed record shows, it has found support in both parties and even stood in opposition to the elected national leadership of the Democratic Party.

      Defendant cannot prove to the contrary by quoting from speeches and statements, mostly attributed to CEO AL From, in which Democrats are praised and Republicans disparaged. Defendant has provided not even a scintilla of evidence that connects the speeches and statements by Al From given in front of political audiences to the larger purposes of DLC, which has conclusively established to be the development and promotion of a policy agenda. This attempt to confuse the rhetoric of an officer with the purpose of the organization – to hope to use a basketful of words to obscure two decades of well recognized policy work –represents the sum total of the IRS's and Defendant's weak position.

      Also mischaracterized in Defendant's position is the character of the relationship between DLC and the Democratic elected leadership who have been engaged in the organization's work. This is not a case where the DLC confers a "private benefit" on "individuals running for elected office as Democrats or New

Democrats."  As the record demonstrates, DLC has elected to influence government by calling on those holding office to embrace and apply a certain class of policies, centrist policies, to the solution of major problems facing the country.  The benefit to be conferred here is for the public as a whole.  The candidates and officeholders urged to adopt these policies are the means for their implementation for the broad public benefit.  Indeed, this was the same means chosen by the Progress and Freedom Foundation and Empower America, both of which affiliated with specific partisan interests but did so with the objective of influencing policy for the country as a whole.  And this focus on policy formation and dissemination is the reason why DLC, where it serves these purposes, famously works with representatives and even leaders of both political parties.  Try as it does, it simply contrary to the facts of this case for the Service to say that this willingness to work with both sides is "clearly in dispute."  (Def.'s Br. 11).

For the first time, the government, hoping in vain to strengthen its position, offers what it calls a "subtle" reason for the DLC to work with both Democrats and Republicans.  It suggests that DLC works with both parties to sustain its claim to be "centrist."  This is not only pure speculation, it is unsupported by any of the testimony or documents yield by the full-scale discovery in this case. And it is untrue, utterly inconsistent with that evidence, which shows an organization committed by the best means available to promote the policies it viewed as being in the broad public interest.

Finally, Defendant hopes to turn the evidence upside down, and to argue that DLC produced policy ideas for electoral purposes, seeking "electoral success for individuals who used their policies."  (Def.'s Br. 15.)  Of course, Defendant here cannot escape the fact that never in the course of this case did it or the IRS charge DLC with electoral intervention.  More to the point, Defendant has simply attempted to flip the facts, which demonstrate – over a twenty year period – that policies, not

electoral objectives, have always shaped its program.  DLC has hoped for an electoral process that resulted in success for particular policy program; it has not decided on policies only on the basis of their likely contribution to electoral success.  This is proved, and put beyond any reasonable contention, by the fact that DLC's pursuit of innovative centrist policies has remained unchanged for over two decades, regardless of whether in a particular period they seem likely or calculated to produce electoral success.

### C.  The Service Cannot Dismiss the Weight of the Experts' Testimony

DLC produced experts, all highly qualified, who testified to points of central importance in this case.  Unhappy with the result, Defendant now wishes to deny its significance. Defendant's objection is that the expert witness testimony is based on personal experience, and "each admitted he did not investigate or fully understand the DLC's activities during the years at issue before coming to an opinion."  (Def.'s Br. 9). To support its argument that this Court should not consider this expert testimony, Defendant cites only two cases; in both cases the court admitted the expert testimony in question.  *See Abrosini v. Labarrague*, 101 F.3d 129, 141 (D.C. Cir. 1996); *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6-13 (D.D.C. 2002).

The IRS is plainly mistaken about the applicable law. Federal Rule of Evidence 702 governs the admissibility of expert opinions:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), established a series of factors that should be used by trial courts to assess the reliability and relevance of scientific expert testimony. *See id.* at 593-94. But these factors are not a "definitive checklist or test," *id.* at 593; for non-scientific testimony that is "highly particular and has not attracted scientific scrutiny," courts must consider "other indicia of reliability." *Ambrosini*, 101 F.3d at 134. "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

Each of these experts offered evidence damaging to Defendant's position on the crucial issues. Each was intimately familiar with the mission of the DLC which, as the record in this case establishes, commits the vast majority of its work to public view and inspection. "Investigation," as Defendant terms it, is not a requirement where the organization operates for public purposes and provides its work product for public use and review. The DLC does not operate in the shadows, engaged in activities that these experts somehow missed for failing to further "investigate" them; anyone seeking to understand the mission of the DLC can easily obtain the necessary information, all of which is publicly provided by the organization and the vast majority of which is publicly accessible to anyone with an interest.[1] In each case, the experts had ample information in the public domain on which to base their conclusions about the DLC and its role in the policy circles of the nation's capital.

---

[1] The leadership workshops are not a secret, well known to those who follow the DLC, but since their purpose is to train public officials, their attendance is accordingly restrictive. The record shows, however, that the workshop consumed roughly three percent of the DLC budget in any of the years in question, and no more than five percent in any year of DLC's existence.

Each of the experts, moreover, testifies from an expert vantage point, not once challenged by Defendant, in assessing the significance of this public work.

Mr. Engel, for example, was a senior manager of the affairs of the national Democratic Party, whose professional life has been spent in the official party network at the national level, and he speaks with clear authority on the question of whether DLC operates in support of "electoral" objectives. He testified that DLC had nothing to do with party electoral strategies: "The DLC did not provide any tangible benefit to the Democratic Party or its candidates for public office in the years l997, l998, or l999." (Pl.'s Ex. N). Indeed it "did not carry out any functions of the Democratic Party, and it did not alleviate any burden, financial or otherwise, of the Democratic Party." *Id.*

Defendant bases its objection to the Engel testimony on the fact that during Engel's deposition, he conceded that he was not an expert in DLC's structure or operations. (Def.'s Br. 15). But this ignorance does not undercut Engel's expertise; it is instead further proof of the lack of a connection between DLC and the Democratic Party. He could, however, speak authoritatively to what DLC was not doing: benefiting either the Democratic Party or individual candidates. If DLC played any significant role in electing Democratic candidates, Engel could not help but be aware and appreciative of it. Instead, Engel testified, based on his extensive and unimpeachable personal experience, that DLC played no meaningful rule in electoral activity. As a top executive in both the Democratic National Committee and the Democratic Congressional Campaign Committee, Engel was poised to recognize any DLC contributions to elections of Democratic candidates; he saw none.

The Engel testimony spoke directly to alleged electoral purpose, while Professor Moskos brought a lifetime of dispassionate academic achievement and expertise to his appraisal of DLC's nonpartisan policy objectives. Professor Moskos

established that DLC presents no risks for a scholar who needs, as a matter of his professional standing, to avoid association with any partisan enterprise. Moskos is an expert on public policy organizations and their role in academic discourse; he has not been proffered as an expert in DLC's internal affairs. Like Mr. Engel, Professor Moskos did not testify as to DLC's day-to-day operations; he testified that DLC's public policy activities were nonpartisan and operating for the broader good instead of for narrow partisan interests. (Pl.'s Ex. O). And his testimony was buttressed by James Pinkerton, who is both a Republican and a policy analyst active in the think tank community, and who noted his own involvement with the DLC as an organization "committed to the broadest sphere of influence, beyond just Democrats." (Pl. Ex. P).

Defendant had the opportunity to cross-examine each of Plaintiff's expert witnesses. After this opportunity, all Defendant objects to is that the expert witnesses have relied on their personal experiences to inform their opinions. But it is well-established that an expert witness may testify based on personal experience, so long as the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co.*, 526 U.S. at 152; *see also Groobert*, 219 F. Supp. 2d at 7 ("[T]he standard under Federal Rule of Evidence 702 is a liberal and 'flexible' one, and that personal experience can be a reliable and valid basis for expert testimony.") (quoting *Kuhmo Tire Co.*, 526 U.S. at 149). Defendant is free to make objections based on the reliability of the witnesses' methods; it has found no basis for doing so. Defendant argues only, with no support whatsoever, that these witnesses should have adopted a different methodology. This is argument concerning credibility, which the Service is free to make at trial.

### D. The IRS's Revocation Was Retroactive and Erroneous

DLC received its exemption from tax under section 501(c)(4) in 1986. That exemption was in full effect during the tax years 1997, 1998, and 1999. (Pl.'s Ex. C). The IRS first informed DLC that it was examining DLC in October 1999, and that letter only referred to tax years 1997, and did not suggest that DLC's exemption might be revoked. (Pl.'s Ex. H). The first warning given to DLC that the IRS was considering revoking DLC's tax exemption was in June 2002. (Pl.'s Ex. I). The revocation of DLC's tax status was therefore retroactive.

Under IRS regulations, exemption rulings and determination letters may be revoked or modified retroactively only "if the organization omitted or misstated a material fact [or] operated in a manner materially different from that originally represented . . . ." Treas. Reg. § 601.201(n)(6)(i) (2006). Revenue Procedure 90-27 also reflects this standard. *See* Rev. Proc. 90-27, 1990-18 I.R.B. 17. "[T]he Secretary has limited the Commissioner's discretion to revoke retroactively a favorable ruling on exempt status." *Virginia Educ. Fund v. C.I.R.*, 85 T.C. 743, 752 (1985). Barring the conditions noted above, the IRS may revoke an exemption only from the date the organization "was placed on notice . . . that its tax-exempt ruling letter might be revoked or modified." P*rince Edward Sch. Found. v. Comm'r*, 478 F. Supp. 107, 113 (D.D.C. 1979).

Defendant argues that in a refund action, the court reviews the merits of the claims *de novo*, and therefore "the retroactivity argument has no effect." Def.'s Br. 17. This argument is, frankly, bizarre. If an organization could not rely on a tax exempt ruling in a refund action, then there would be no reliance purpose to an exemption ruling at all. Defendant does not seem to be arguing that to rely on an exemption ruling, an organization must bring suit in tax court as opposed to a United States District Court, though that claim would make no more sense; the choice of a

petition in tax court or a refund suit in federal district court has no bearing on the standard of review.

In short, Defendant argues that Treas. Reg. § 601.201(n)(6)(i) be given no effect whatsoever. Were this true, there would be no reason for an organization operating under section 501(c)(4) to apply for tax exempt status. Unlike section 501(c)(3) organizations, section 501(c)(4) organizations such as the DLC need not apply for tax exempt status; were Defendant's position accurate, and an exemption ruling given no authority in a refund suit, then no section 501(c)(4) organization would bother to submit an application for exemption.

Defendant's argument is without support in either regulation or case law. While Plaintiff could identify no case in which retroactivity was an issue in a section 501(c)(4) refund suit, it is well established that in section 501(c)(3) declaratory judgment actions, the IRS may only retroactively revoke tax exemption based on the factors outlined in Treas. Reg. § 601.201(n)(6)(i). *See* P*rince Edward Sch. Found.*, 478 F. Supp. at 113; *Green v. Connally*, 330 F. Supp. 1150, 1156 n.4 (D.D.C. 1971). The Tax Court has also held that these same restrictions apply to a section 501(c)(6) organization. *Presbyterian & Reformed Publ'g Co. v. Comm'r*, 79 T.C. 1070, 1088 (1982), *rev'd on other grounds*, 743 F.3d 148 (3d Cir. 1984). There is no reason, then, why this regulation would not similarly constrain the IRS's retroactive revocation of a section 501(c)(4) organization.

Defendant confuses this issue with another one: whether the review of a revocation is limited to the arguments and evidence considered by the IRS at the administrative stage. Plaintiff agrees that unlike a declaratory judgment action under I.R.C. § 7428 – in which courts review only the record created by the IRS when making the determination –Defendant is free to present new evidence and arguments in a refund suit under I.R.C. § 7422. Plaintiff has not objected to Defendant's right to

do so, and indeed, Defendant does rely on new evidence and arguments from those at the administrative stage.

But Defendant's right to expand on the administrative record does not affect the high hurdle it must clear when revoking an organization's tax exempt status retroactively. The government must still be able to prove that DLC "omitted or misstated a material fact [or] operated in a manner materially different from that originally represented . . . ." Treas. Reg. § 601.201(n)(6)(i). Whether relying on the evidence and argument of the administrative stage, or on the additional evidence collected in proceedings before this Court, Defendant cannot present facts to contradict the plain truth that DLC put the IRS well on notice that it planned to operate to promote "policy debate within the Democratic Party." (Pl.'s Ex. A).

The testimony of George Smith, the revenue agent assigned to this case, puts to rest any doubt that DLC was operating within the confines of its tax exempt ruling. He testified, based on his years of examination of DLC, that DLC's activities were consistent with DLC's application for tax exempt status to the IRS. (Smith dep. 43:13-44:18, 50:12-18, 46:11-57:10). Defendant may like to believe that "the actions and beliefs of the examining agent are irrelevant," Def.'s Br. 23, but because this agent spent three years and over 400 hours reviewing DLC materials, (Smith dep. 76:5-6), his opinion of DLC's activities is very much relevant to these proceedings.

While Defendant is correct that there was a dispute concerning what materials were turned over to the IRS, that dispute was limited to tax year 1999. Moreover, the IRS had before it speeches by Al From similar in character to what Defendant relies on here; those speeches formed the bulk of the IRS's position at the administrative stage. (Pl.'s Exs. I & J). Revenue Agent Smith was therefore well aware of the fact that Al From occasionally gave speeches with a partisan tint, and yet he still maintained that DLC was operating within its Form 1024 application.

More fundamentally, these speeches and statements – which are the only facts Defendant relies upon to defend the IRS's retroactive revocation, (Def.'s Br. 20) – do not belie DLC's description of its purpose to the IRS as "to improve the overall contribution of Democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  (Pl.'s Ex. A).  DLC made clear its relationship with and affinity for the Democratic Party, going so far as to include the word "Democratic" in its name.  These issues were before the IRS at the time exemption was granted, and that grant of tax exempt status cannot be revoked absent a showing that the factors of Treas. Reg. § 601.201(n)(6)(i) have been met.  Defendant cannot marshal the facts necessary for such a showing.  The IRS's revocation of DLC's tax exempt status was therefore in violation of IRS regulations.

### III.   CONCLUSION

The question before this Court is whether the DLC, as it represented in its application for exemption some twenty years ago, has consistently worked to develop, publish and advocate a public policy direction for the country.  Everything it has established on the public record, available for public review, answers this question in the affirmative.  It is a record of both effort and of accomplishment.  Nothing established on the record of this case contradicts this conclusion or can erase this history.

In a repetition of events some years ago, when the IRS acted against the Ohio DLC but then retreated and conceded its social welfare purposes, Defendant has uncovered nothing in the protracted litigation now before the Court to support the IRS's revocation of the exemption for the years in question.  Its case now is an exercise in putting off the moment of judgment, and it does so by distancing itself from the IRS's prior cases, contriving questions about the expert testimony, and

manufacturing factual differences with the DLC.  At most it asks the Court to mistake rhetoric for substance, and to disqualify the organization's policy work because officials of the organization resort from time to time, before particular audiences, to pointed rhetoric.  The weak lifelines it is grasping for cannot save it.

     For the foregoing reasons, and for the reasons contained in Plaintiff's Motion for Summary Judgment, Plaintiff Democratic Leadership Council's Motion for Summary Judgment should be granted.


     Dated August 29, 2006         Respectfully Submitted,


                          _____/s/_____
                          Robert F. Bauer (D.C. Bar No. 938902)
                          Marc E. Elias (D.C. Bar No. 442007)
                          Ezra W. Reese (D.C. Bar No. 487760)
                          PERKINS COIE LLP
                          607 Fourteenth Street, N.W.
                          Washington, D.C.  20005-2011
                          (202) 628-6600

                          Attorneys for Democratic Leadership Council, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC LEADERSHIP COUNCIL, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>               Defendant. | CIVIL ACTION NO. 05-1067 (JGP) |

**CERTIFICATE OF SERVICE**

I hereby certify that service of the foregoing Democratic Leadership Council's Reply in Support of Plaintiff's Motion for Summary Judgment was made on August 29, 2006 via the Court's electronic case management system, to:

>Michael Martineau
>Tax Division
>U.S. Department of Justice
>P.O. Box 227
>Washington, DC 20044

And via first-class United States mail, to:

>Kenneth L. Wainstein
>United States Attorney
>United States Attorney's Office for the District of Columbia
>555 4th Street NW
>Washington, DC 20530

>David A. Hubbert
>Tax Division
>U.S. Department of Justice
>P.O. Box 227
>Washington, DC 20044

-2-

Dated: August 29, 2006                     _____/s/_____
                                           Robert F. Bauer (D.C. Bar No. 938902)
                                           Marc E. Elias (D.C. Bar No. 442007)
                                           Ezra W. Reese (D.C. Bar No. 487760)
                                           PERKINS COIE
                                           607 Fourteenth Street, N.W.
                                           Washington, D.C.  20005-2011
                                           (202) 628-6600

                                           Attorneys for Democratic Leadership Council, Inc.