UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEMOCRATIC LEADERSHIP | ) | |
| COUNCIL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1067 (LFO) |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM AND OPINION

In 1985, several prominent Democrats, including then-Governor Bill Clinton, formed the

Democratic Leadership Council (DLC). The IRS granted the DLC tax-exempt status as a

"social-welfare" organization under I.R.C. § 501(c)(4). In 2002, the IRS revoked the DLC's tax-

exempt status for the years 1997, 1998, and 1999, concluding that the DLC rendered an

impermissible level of private benefit during those years—namely, support to Democratic

officials. The DLC paid approximately $20,000 in total taxes and interest for those years, but

filed this suit for a refund. The DLC contends that it acted within the bounds of § 501(c)(4) for

the three years in question and that, in any event, the IRS's own regulations prohibit the

retroactive revocation of tax-exempt status that occurred here. The parties have filed cross

motions for summary judgment. Though there may be legitimate questions whether the DLC

was entitled to § 501(c)(4) status, the DLC did not omit or misstate a material fact in its 1985

application for that status or operate in a manner materially different from that originally

1

represented when the IRS granted it that status. Accordingly, the IRS violated its regulations when it retroactively revoked that status, and the DLC is entitled to summary judgment and a refund of the taxes it paid for the years in question.

## I.  BACKGROUND

For purposes of the pending summary-judgment motions, the following facts are undisputed.

### A.    The Founding of The DLC as a Tax-Exempt Organization

The Democratic Leadership Council was founded by prominent members of the Democratic Party and incorporated on March 4, 1985.  Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") [dkt # 18], Ex. B at 11–13, 161.  The DLC's Articles of Incorporation designated Senator Charles S. Robb, Senator Sam Nunn, and Congressman Richard A. Gephardt as directors.  *Id.* at 12.  For all relevant times, Alvin From has been the DLC's President and Chief Executive Officer.  *Id.* at 42.  As stated in its Articles of Incorporation, the DLC was founded "for the promotion of welfare within the meaning of Section 501(c)(4)" and "for the purpose of bringing about civil betterments and social improvements."  Pl.'s Mot., Ex. A, Part II.  President From described the individuals who formed the organization as "interested in pushing a different kind of agenda, sort of like a third way, which was progressive."  Pl.'s Mot., Ex. B at 12.  President From believed the DLC was founded on a philosophy different from that under which the Democratic Party operated at the time:

> We thought that the economic agenda of the Democratic
> Party was grounded in redistribution and not growing the economy.
> We believe[d] that you had to grow the economy.  But we also
> differed from the conservatives.  They were concerned only about
> growing the economy and not about helping ordinary people

> benefit from that growth.
>
> And so we developed a set of policies grounded in fiscal
> discipline, investing in people, in technologies, and expanding
> trade that I believe had a great impact when they were actually put
> into place.

*Id.* at 17. The DLC uses the terms "Third Way" and "New Democrat" to refer generally to its

approach and policies. *E.g.*, *id.* at 19 ("And we thought the country needed an alternative. And

that's what we set out to do. I think that's what we did. It's called the Third Way

[i]nternationally. It is a progressive agenda. And the brand here is New Democrat.").

On November 8, 1985, the DLC filed its Form 1024 application with the IRS for tax-

exempt status as a "social-welfare" organization under § 501(c)(4). The application included the

DLC's Articles of Incorporation. It further explained that the DLC "was organized in early 1985

by certain elected officials and others who were concerned with the formulation of national

policy and with the direction of policy debate within the Democratic Party." Pl.'s Mot., Ex. A,

Part III, Question 3 at 1. The application stated that "the organization was conceived as an active

forum for the development of fresh policy options and approaches which could spark and

advance public debate." *Id.* To further this purpose, the application stated, the DLC intended to

engage in the following activities: create task forces; hold town meetings and issue forums with

business, labor, civic, student, and other audiences; hold policy meetings; contract for studies;

initiate public-affairs programs (including press conferences, meetings with editorial boards, and

press releases); and host fund-raising receptions. *Id.* at 1–2. The application also represented

that the DLC would "not intervene in campaigns on behalf of any public candidate," nor "seek to

influence voter perceptions indirectly, such as by establishing voting records or other ratings of

candidates." *Id.* at 2–3.

The application also specifically addressed the DLC's relationship with the Democratic

Party:

> The Democratic Leadership Council is so named because it was
> founded by federal and state elected officials who are Democrats
> and who were concerned with the direction of the policy debate
> within their party, as well as within the country as a whole.
> Through the establishment of DLC, these officials and others with
> similar interests and goals expected to improve the overall
> contribution to Democratic leaders, in the federal and state
> government, to national policy debate, and to urge upon both the
> party and the general public new and innovative approaches to
> policy.

*Id.* at 2.

On February 7, 1986, based on the DLC's application for exempt status, the IRS

recognized the DLC as a tax-exempt organization under § 501(c)(4). Pl.'s Mot., Ex. C at 20–21.

The recognition letter stated that the IRS was "assuming [the DLC's] operations will be as stated

in [the] application." *Id.* It also requested that the DLC notify the IRS if its "purpose, character,

or method of operation change." *Id.*

In the ensuing years, the DLC undertook to advance its mission in various ways,

including "trying to attract prominent political figures," who were also Democrats. Pl.'s Mot.,

Ex. F at 20. The DLC held public meetings organized around these Democratic officials. *Id.* at

21. Additionally, the DLC disseminated its policy positions through publications such as the

*DLC Update* and *New Democrat* magazine. Def.'s Mot. for Summ. J. ("Def.'s Mot."), Ex. 2, 8.

**B.**     **The DLC's Activities During 1997, 1998, and 1999**

The DLC engaged in similar activities during the tax years in question: 1997, 1998, and

1999.  Its activities continued to reflect its connections to the Democratic Party.  The DLC,

however, also continued to work with Republicans "wherever [it] could" to promote common

issues.  Pl.'s Mot., Ex. B at 14.

Speakers at the DLC's Annual Policy Conference during these years included prominent

Democratic elected officials, including President Clinton and Vice-President Gore, both of whom

had substantial involvement in DLC activities for many years, including President Clinton's role

in the founding of the DLC and serving as its Chairman.  Def.'s Mot., Ex. 1, 80, 81.  The DLC

also held certain events that were attended exclusively, or nearly exclusively, by Democrats.  In

1998, for example, the DLC designed and tested a program to teach elected officials and other

rising political leaders how to develop and articulate a New Democrat governing agenda.  Pl.'s

Mot., Ex. D at 53–54.  Every state and local official who attended these workshops was a

Democrat.  Likewise, in February 1999, the DLC held an orientation for the newly elected

members of the House of Representatives, and only Democrat members were invited.  Pl.'s Mot.,

Ex. B at 112.

These leadership workshops imposed a cost amounting to approximately two or three

percent of the DLC's annual budget.  *Id.* at 189.  The DLC's chief of staff estimated that 95 to 99

percent of the budget was spent on materials and conferences open to and available to the public.

Pl.'s Mot., Ex. D at 89.  President From explained why the House orientation event was geared

solely to Democrats: "[T]he purpose of the DLC is to promote a new progressive agenda.

Republicans aren't likely to support that.  The agents for promoting it are elected officials who

5

are Democrats.  Now, sometimes Republicans also support the ideas.  And when they do, we

work with them."  Pl.'s Mot., Ex. B at 112.

DLC publications further discussed its purposes and connection to the Democratic Party.

In May 1997, for example, From wrote in the *DLC Update* that passing a balanced budget in

Congress "with Democratic support is crucial to the future of our Party."  Def.'s Mot., Ex. 8 at 1.

That statement further noted that, otherwise, "much of the ground we have gained since 1992

achieving political parity with the Republicans will be rapidly lost as we once again get labeled

as 'tax and spend' liberals unfit to guard taxpayers' money."  *Id.*  Additionally, in the

January/February 1998 DLC magazine *The New Democrat*, From authored an essay known as the

"Political Memo," in which he remarked that "the best way for Democrats to further our enduring

values in the Information Age is to [sic–"promote"] New Democrat ideas and govern as New

Democrats."  Def.'s Mot., Ex. 2 at 2.  President From wrote similar statements in other issues of

the magazine.  *See, e.g.*, Def.'s Mot., Ex. 3 at 1 ("We began the decade hoping to end the

Democratic Party's losing streak in presidential politics.  We end it . . . with our sights set on

returning a transformed Democratic Party to its rightful place as the majority party in American

politics.").  The DLC magazines *Blueprint* and *New Democrat*, however, were available to every

member of Congress.  Pl.'s Mot., Ex. B. at 185–86.

President From made several speeches delivering similar messages.  Some of his

comments relayed efforts to shift the Democratic Party's policies closer to the DLC's policies.

For example, in October 1997, at the DLC Annual Conference, From remarked on "the state of

the New Democrat movement," and stated that "we've begun to reclaim the Democratic Party

from the hard left and move it back into the vital center of American politics."  David A. Hubbert

6

Decl., Ex. 112 at 1.  President From also noted that this shift could help Democrats at the polls.

For example, in April 1998, at the Democratic Nucleus Club in Phoenix, Arizona, From

remarked that the DLC's founders formed the DLC to redefine the Democratic party—something

they believed "was essential to reversing our party's fortunes in presidential elections and

building a New Democratic majority in national politics."  Hubbert Decl., Ex. 114 at 1.  And on

June 13, 1999, at the Jefferson-Jackson Dinner in Boise, Idaho, From issued the following

remarks:

> With a young governor from Arkansas and a freshman senator
> from Tennessee, we formed the Democratic Leadership Council.
> We believed that if we held firmly to the first principles of the
> Democratic Party, but furthered those principles with fresh ideas
> and modern means; if we built a modern, centrist, progressive
> Democratic Party that tackles America's most difficult challenges
> with bold and innovative ideas, the American people would once
> again turn to us for national leadership.
>
> That is what we did, and that is what they did.  We built the
> New Democrat movement, and the American people responded.

Hubbert Decl., Ex. 117 at 1.  President From also emphasized that the DLC's policies were

generally designed to help Democrats, not Republicans.  For example, at the July 1999 National

Convention, From noted that the New Democrat agenda "has been so successful that the

Republicans are trying to parrot our politics."  Hubbert Decl., Ex. 118 at 2.  President From

further stated, "After all we went through, we're not going to sit idly by and let the Republicans

reclaim the political center on the cheap."  *Id.* at 2–3.

**C.**     **Retroactive Revocation of Tax-Exempt Status for 1997, 1998, and 1999**

On October 14, 1999, IRS Agent George T. Smith sent a letter notifying the DLC that the IRS was examining its 1997 tax return.  Pl.'s Mot., Ex. H.  The letter explained that the IRS "examine[s] returns to verify the correctness of income or gross receipts, deductions, and credits and to determine that the organization is operating in the manner stated and for the purpose set forth in its application for recognition of exemption."  *Id.* at 1.  Agent Smith's examination of the DLC occurred over the next few years.  Pl.'s Mot., Ex. Q at 76.

On June 28, 2002, the IRS issued a Proposed Adverse Action Letter revoking the DLC's § 501(c)(4) tax-exempt status for 1997 and 1998.  Pl.'s Mot., Ex. I.  The IRS "conclude[d] that the DLC primarily benefits affiliated New Democrat elected officials (and secondarily the Democratic Party) rather than the community as a whole."  *Id.* at 30.  The IRS explained further:

> The benefit to affiliated New Democrat elected officials (developing ideological message, moving the Democratic party toward their position, and generating public support for their positions and themselves, using the name of a specific political party (Democrat) in the organization's name); formation, control and membership by affiliated elected officials; and the source of resources indicate that the primary activity of the DLC is benefiting related New Democrat elected officials.

*Id.*  The memorandum emphasized the DLC's relationship with the Democratic Party as key: "We finally note that the fact that elected officials from one named political party were dominant in the creation, control and policies of the DLC are *the key factors* in our conclusion that DLC is not described in section 501(c)(4)."  *Id.* (emphasis added).  The memorandum does not mention any restrictions on retroactive revocation of § 501(c)(4) status.

On August 7, 2002, the IRS issued a Notice of Deficiency, requiring that the DLC pay a

8

tax of $3,839.00 for 1997 and $5,264.00 for 1998. Def.'s Answer [dkt # 6] ¶ 21. On November 22, 2002, the IRS sent the DLC a Notice of Tax Due for these amounts plus interest, which totaled $5,510.24 for tax year 1997 and $6,985.82 for tax year 1998. *Id.* ¶ 22.

On February 24, 2003, the DLC paid the IRS these amounts and also submitted a claim (through Form 1120) to have them refunded. *Id.* ¶¶ 23, 24. On April 16, 2003, the DLC paid additional amounts of $134.21 and $176.14 for interest accrued on the tax due for those two tax years, 1997 and 1998, respectively. *Id.* ¶ 25. On July 28, 2003, the IRS denied the DLC's refund claim. *Id.* ¶ 26.

On August 1, 2003, the IRS issued an Examination Report that proposed to revoke the DLC's exempt status for tax year 1999 and found a tax deficiency of $5,595.00. *Id.* ¶ 27. On August 28, 2003, the DLC appealed the Examination Report. *Id.* ¶ 30. On October 30, 2003, the IRS sent a Notice of Deficiency to the DLC for tax year 1999, in the amount of $5,595.00. *Id.* ¶ 31. On March 22, 2004, the DLC paid $7,276.50 for payment of this tax plus interest. *Id.* ¶ 32. On April 5, 2004, the IRS denied the DLC's appeal for tax year 1999. *Id.* ¶ 34.

The IRS has not revoked the DLC's tax-exempt status for any time period since tax year 1999. *Id.* ¶ 35. Accordingly, since that time, the DLC has filed each year as a tax-exempt, § 501(c)(4) organization.

On May 27, 2005, the DLC filed this lawsuit under 28 U.S.C. § 1346 (originally assigned to the late Honorable John Garrett Penn), contending that the IRS improperly revoked the DLC's tax-exempt status for the years 1997, 1998, and 1999, and seeking a refund of the taxes and interest it paid for those years—a total of $20,082.91. In July 2006, the parties filed cross motions for summary judgment. On October 1, 2007, the District Court Calendar Committee

9

ordered this case transferred to the undersigned.

## II.  DISCUSSION

The DLC contends that it is entitled to summary judgment because (1) it qualified as a § 501(c)(4) organization during 1997, 1998, and 1999; and (2), even if it did not so qualify, the IRS improperly revoked the DLC's § 501(c)(4) status *retroactively* in violation of Treasury Regulation 601.201(n)(6) because the DLC did not "omit[] or misstate[] a material fact, [or] operate[] in a manner materially different from that originally represented."  26 C.F.R. § 601.201(n)(6)(i) (2006).  The Government contends that it is entitled to summary judgment because (1) the DLC did not qualify as a § 501(c)(4) organization during those years; and (2) the retroactive revocation of § 501(c)(4) status was permissible, as (a) Treasury Regulation 601.201(n)(6) does not apply in refund suits such as this one, and (b), in any event, the IRS complied with that regulation.  As explained below, the court concludes that the regulation limiting retroactive revocation of tax-exempt status applies in this refund suit and that the IRS violated that regulation.  Accordingly, even assuming that the DLC did not qualify as a § 501(c)(4) organization during the years in question, the IRS was not permitted to retroactively revoke that status and the DLC is entitled to a full refund.

### A.     Legal Framework

#### 1.     Summary-Judgment Standard

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[W]hen ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to

10

judgment as a matter of law upon material facts that are not genuinely disputed." *Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 244 (D.D.C. 2002) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

2.      **Section 501(c)(4)**

Section 501(c)(4) of the Internal Revenue Code exempts from taxation "social-welfare" groups, that is, "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare . . . and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."  I.R.C. § 501(c)(4) (2006).

Although the statutory language states that such organizations must operate "exclusively" for the promotion of social welfare, the Treasury Regulations state that these organizations must only be "primarily engaged" in promoting social welfare:

> An organization is operated exclusively for the promotion of social welfare if it is *primarily engaged* in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is operated *primarily* for the purpose of bringing about civic betterments and social improvements.

26 C.F.R. § 1.501(c)(4)–1(a)(2)(i) (2006) (emphasis added).

Federal courts have long interpreted the statute consistently with the regulations: a § 501(c)(4) organization must *primarily* operate to bring about social improvements.  *See FEC v. Beaumont*, 539 U.S. 146, 150 n.1 (2003) (noting that a § 501(c)(4) organization may engage in political activities "as long as it is primarily engaged in activities that promote social welfare"); *Monterey Public Parking Corp. v. United States*, 481 F.2d 175, 176 (9th Cir. 1973) ("[U]nder Section 501(c)(4) 'not organized for profit but operated exclusively for the promotion of social

11

welfare' means that the taxpayer must be primarily engaged in promoting the common good and
general welfare of the community. . . ."); *People's Educ. Camp Society, Inc. v. Comm'r*, 39 T.C.
756, 768 (1963) ("[B]oth the pertinent Treasury regulation and judicial authority recognize that
the existence of a primary or predominant purpose to yield benefits to the community as a whole
is an essential prerequisite to the allowance of such statutory exemptions from tax." (emphasis
deleted)).  Though the Supreme Court has not explicitly held that the somewhat counterintuitive
definition of "exclusively" as "primarily" is permissible, the parties agree that this is the
applicable definition.

Section 501(c)(4) organizations "are permitted to engage in substantial lobbying to
advance their exempt purposes." *Reagan v. Taxation with Representation*, 461 U.S. 540, 543
(1983).  Indeed, many "of the Nation's most politically powerful organizations" are § 501(c)(4)
organizations. *Beaumont*, 539 U.S. at 160 (noting, as examples, the Colorado Right to Life
Committee, the Christian Coalition, the AARP, the National Rifle Association, and the Sierra
Club).  But where an organization "provides substantial and different benefits to both the public
and its private members," it is not "'primarily' devoted to the common good as required by even
the most liberal reading of § 501(c)(4)." *Contracting Plumbers Coop. Restoration Corp. v.
United States*, 488 F.2d 684, 687 (2nd Cir. 1973).[1]

---

[1]In contrast to § 501(c)(4) organizations, § 501(c)(3) organizations are not permitted to
engage in substantial lobbying—but contributions to them are tax deductible.  *Reagan*, 461 U.S.
at 543.

3.        Retroactive Revocation Under Treasury Regulation 601.201(n)(6)

The IRS may *prospectively* revoke an organization's tax-exempt status upon a determination that the organization no longer qualifies as exempt.  26 C.F.R. § 601.201(n)(6)(i) (2006) ("An exemption ruling or determination letter may be revoked or modified by a ruling or determination letter addressed to the organization . . . .").  If the organization contests this conclusion after paying taxes due and is unsuccessful in pursuing a refund claim with the IRS, it may file a refund suit in federal court.  *See generally* 15 Mertens, Law of Federal Income Taxation § 58:4 (2008).  Such a refund suit is a de novo proceeding.  *Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 5 (Ct. Fed. Cl. 2001) ("We begin with the axiomatic principle that tax refund cases are de novo proceedings." (citing *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932))).  Accordingly, the court's determination of the plaintiff's tax liability in that context "does not require (or even ordinarily permit) th[e] court to review findings or a record previously developed at the administrative level."  *Id.* at 6.

When the IRS seeks to revoke tax-exempt status retroactively, however, it faces certain restrictions.  Under 26 U.S.C. § 7805(b), the Secretary of Treasury "may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect."  26 U.S.C. § 7805(b)(8) (2006).  The Supreme Court has held that the IRS Commissioner has broad discretion, under section 7805(b) and its predecessor, to decide whether to revoke a ruling retroactively and that such a determination is reviewable by the courts only for abuse of that discretion.  *Automobile Club of Michigan v. Comm'r*, 353 U.S. 180, 184 (1957); *see also Virginia Educ. Fund v. Comm'r*, 85 T.C. 743, 752 (T.C. 1985) *aff'd*, 799 F.2d 903 (4th Cir.

13

1986). Treasury Regulation 601.201(n)(6)(i), however, limits the Commissioner's discretion to revoke retroactively a favorable ruling on exempt status:

> The revocation or modification may be retroactive if the organization *omitted or misstated a material fact, operated in a manner materially different from that originally represented*, or engaged in a prohibited transaction of the type described in subdivision (vii) of this subparagraph [which addresses diverting monies from the exempt purpose]. In any event, revocation or modification will ordinarily take effect no later than the time at which the organization received written notice that its exemption ruling [or] determination letter might be revoked or modified.

§ 601.201(n)(6)(i) (emphasis added); *see also Buzzetta Constr. Corp. v. Comm'r*, 92 T.C. 641, 649 (1989) ("The Commissioner . . . has limited his own discretion to revoke retroactively a favorable ruling."); *Prince Edward Sch. Found. v. Comm'r*, 478 F. Supp. 107, 113 (D.D.C. 1979) (concluding that retroactive revocation of tax-exempt status was permissible because it was "consistent with this statement of the Service's procedural rules").

## B.    Analysis

As noted, the Government contends that it is entitled to summary judgment because the DLC did not qualify as a § 501(c)(4) organization for 1997, 1998, and 1999. Although DLC engaged in "considerable policy work" and "at times worked with Republicans to advance its policies," Def.'s Br. at 23, the Government argues that the DLC did not primarily serve the public interest; rather, it impermissibly benefitted a private group, namely, Democratic elected officials:

> [W]hen all the facts and circumstances are reviewed, the DLC's organization, the DLC's events that presented only elected Democrats, the statements of DLC's purpose by its leaders, the way it contrasted its policies from those of Republicans, and the way the DLC trained only Democrats to implement its policies,

14

> shows the DLC's primary purpose for its activities in 1997, 1998,
> and 1999.  That purpose was to assist individuals running for office
> as Democrats or elected to office as Democrats.

*Id.* at 23–24.

The DLC responds that it qualified as a § 501(c)(4) organization because it is a "think tank that makes the fruits of its labor publicly available," and it "has never had any relationship, formal or otherwise, with the Democratic National Committee or any other Democratic Party organization."  (Pl.'s Opp. Br. at 1.)  It is not necessary to resolve this dispute because, as discussed below, even if the DLC did not qualify as a § 501(c)(4) organization, the IRS improperly revoked that status retroactively.

1.      **Treasury Regulation 601.201(n)(6) Applies Here**

As an initial matter, the Government contends that Treasury Regulation 601.201's restrictions on retroactive revocation are simply not applicable in refund suits brought under 28 U.S.C. § 1346, including this one.  Def.'s Opp. Br. at 17.  Rather, the Government states, those restrictions are limited to suits for a declaratory judgment regarding exempt status: "The DLC appears to have confused the manner in which determinations on exempt status are reviewed in declaratory judgment actions under 26 U.S.C. § 7428 with how refund suits are reviewed under 26 U.S.C. § 7422 [which addresses "[c]ivil actions for refund"] and 28 U.S.C. § 1346 [which provides jurisdiction over refund suits]."  *Id.* at 19.

The Government's argument is not persuasive.  Courts consistently apply the IRS's retroactivity restrictions in refund suits, including those brought under § 1346.  *See Int'l Bus. Machines Corp. v. United States*, 343 F.2d 914, 924 (Ct. Cl. 1965) ("[A] *refund suit lies* for the past period whenever the Service has improperly made its ruling retroactive as to the suing

taxpayer.") (emphasis added)); *The Phillies v. United States*, 153 F. Supp. 2d 612, 617 (E.D. Pa.

2001) (allowing refund under Federal Insurance Contribution Act where conditions required for

retroactive revocation of private letter ruling under regulation 601.201 were absent); *Scottish Rite*

*Found. v. United States*, No. 85-0613, 1986 U.S. Dist. LEXIS 29718, at *4 (W.D. Ky. Feb. 3,

1986) (allowing retroactive revocation in § 1346 refund suit because "the facts subsequently

developed are materially different from the facts upon which" the exemption determination was

based); *Pittman Constr. Co. v. United States*, 436 F. Supp. 1215, 1220 (E.D. La. 1977) (allowing

retroactive revocation of exempt status in refund suit and noting that lack of notice under

regulation 601.201(n)(6) was not prejudicial); *Thomas G. Faria Corp. v. United States*, No. 109-

70, 1977 U.S. Ct. Cl. LEXIS 576, at *29 (Ct. Cl. Feb. 2, 1977) (allowing refund where

government "violat[ed] its own procedural rules" when retroactively revoking tax-exempt

status); *Huff-Cook Mut. Burial Ass'n v. United States*, 327 F. Supp. 1209, 1213–14 (W.D. Va.

1971) (allowing retroactive revocation in § 1346 refund suit because the organization operated in

a "manner different from that originally represented" under regulation 601.201(n)(6)); *see also A.*

*Duda & Sons Coop. Ass'n v. United States*, 504 F.2d 970, 976 (5th Cir. 1974) ("The government

here contends," in a refund suit, "that it can show both an omission of material fact and operation

in a manner materially different from that originally represented and hence retroactive revocation

should be permitted.").

    The Government's contention arises from the well-established principle, noted earlier,

that refund suits generally are de novo proceedings in which the IRS's prior rulings are

irrelevant. *See, e.g.*, *Vons*, 51 Fed. Cl. at 6 ("We begin with the axiomatic principle that tax

refund cases are de novo proceedings."). Consistent with this principle, a federal statute

specifically prohibits courts from relying on prior IRS determinations as precedent to guide a ruling on exempt status. *See* 26 U.S.C. § 6110(k)(3) (2006) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent."). The Government reasons that if the IRS's prior rulings—including one granting an organization exempt status—are irrelevant in refund suits, then any restrictions on retroactive revocation of such prior rulings must not apply. But IRS rulings are irrelevant in refund suits where the revocation is *prospective*; the question there is whether, taking a fresh look at the organization, the organization simply *qualifies as exempt*—no retroactivity issue exits.

By contrast, where, as here, the organization bases its claim for refund not on its qualifications for exempt status but on *improper retroactive revocation* of exempt status, the IRS's prior exemption ruling is properly considered. *See USA Choice Internet Serv., LLC v. United States*, 73 Fed. Cl. 780, 789, 797 n.29 (Ct. Fed. Cl. 2006) (acknowledging that a "tax refund suit is a de novo proceeding" but stating that "a letter ruling can be considered by a court when determining whether the IRS has abused its discretion in proscribing retroactive application of such a ruling under I.R.C. § 7805(b)(8)."). In other words, such a ruling is not considered for its substance (i.e., that the organization qualifies as exempt); rather, it is considered to show that the IRS violated its own rules—regardless of the organization's qualifications for exempt status. *See Vons*, 51 Fed. Cl. at 12 (noting that private IRS rulings "may be relied upon *not for their substance*, but . . . as indication . . . of the IRS' administrative practice (i.e., that it has issued rulings regarding a particular subject . . . .)"); *cf.* Fed. R. Evid. 801, 802 (defining as inadmissible hearsay an out-of-court statement offered "to prove the truth of the matter asserted," yet allowing the same statement if offered for a permissible purpose).

17

In sum, the IRS's retroactivity restrictions apply here.  The remaining question is whether the IRS violated those restrictions.

### 2.        The Retroactive Revocation Here Was Improper

The DLC did not "omit[]or misstate[] a material fact [or] operate[] in a manner materially different" in 1997, 1998, or 1999 "from that originally represented . . . ."  26 C.F.R. § 601.201(n)(6)(i).[2]  Accordingly, the IRS abused its discretion by retroactively revoking the exempt status it originally granted to the DLC.

The DLC's originally stated purpose and operations are not disputed.  As the original application explains, the DLC "expected to *improve the overall contribution to Democratic leaders*, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  Pl.'s Mot., Ex. A, Part III, Question 3, at 1 (emphasis added).  Indeed, the Government (in an effort to show that the DLC does not qualify for tax-exempt status) emphasizes the DLC's *original* connections to the Democratic Party.  As the Government notes, "all of the members of both task forces *cited in the application* were elected Democrats."  Def.'s Br. at 4 & n.4 (listing each of the 27 Democrats) (emphasis added); *see also id.* at 6 (noting that President Clinton and Vice-President Gore "have had substantial involvement in DLC activities *for many years, including President Clinton's role in the founding of DLC . . . .*") (emphasis added)).  The Government further notes that the application included a copy of "Winning the World Economy" as an example of the type of publication the DLC would make available to the public.  *Id.*  "This publication's preface," the

---

[2]The other condition listed in the regulation for retroactive revocation (transactions diverting monies from the exempt purpose) is not at issue.

Government points out, "reiterates that, '[t]he Council (DLC) is an unprecedented collaboration of elected Democrats at all levels: governors, senators, representatives, state legislators and mayors.'" *Id.* (quoting Ex. 65). The publication lists "'The Republican Record' on several economic issues and then outlines a 'Democratic Competitive Strategy' that recommends approaches 'as an alternative to Republican inaction and a point of departure for a vigorous debate on competitiveness . . . .'" *Id.* (quoting Ex. 65). The conclusion states that "the Republican Party offers no coherent response to the greatest domestic challenge facing America during the rest of this century," and that "[t]he Democratic Party—traditionally the agent of change and progress in America—must fill the leadership vacuum and illuminate the way ahead." *Id.* (quoting Ex. 65).

These initial representations of the DLC's connections to the Democratic Party materialized consistently through the years, including through 1997, 1998, and 1999. As the Government itself states, this publication attached to the DLC's exemption application "*hints at what became clear in 1997, 1998, and 1999*: the DLC was committed to policy development as it represented in its application, but in practice it saw and presented those policies as a way for Democrats to best Republicans." *Id.* at 5 (emphasis added). Moreover, the IRS's revocation of exempt status makes no mention of restrictions on its ability to revoke exempt status retroactively; the revocation relied on the DLC's *originally disclosed* connections to the Democratic Party to conclude that DLC rendered an impermissible level of private benefit. *See* Pl.'s Mot., Ex. I ("[T]hat elected officials from one named political party were dominant in the *creation*, control and policies of the DLC are *the key factors* in our conclusion that the DLC is not described in section 501(c)(4).") (emphasis added).

Though the IRS failed to specify material changes in the DLC's operation as a basis for the revocation, the Government now attempts to raise what it views as some differences between the application and the DLC's later operations.  The Government cites to certain of DLC President From's statements and notes that the DLC's exemption application "did not, for example, state that the DLC would be seeking to create policies that were as valuable for candidates running as New Democrats as campaign contributions"; the application did not state that the DLC "wanted to help elect a Democrat President . . . "; nor did the application "state as an activity stopping the Republicans from 'pilfering' its policies and reclaiming the 'political center on the cheap.'"  Def.'s Opp. Br. at 20 (quoting From's statements).  The Government further notes that, contrary to statements of proposed activities in the DLC's application for exemption, "there is no evidence about task forces, town meetings, issue forums for businesses, or contracts for studies on specific issues during 1997, 1998, or 1999."  *Id.*

To the extent that From's statements reflect on the DLC's operations, the statements do not show a *material* change from that originally represented.  As noted above, the Government has emphasized the potential private benefits to Democrats alluded to in the DLC's *original application*.  President From's comment that DLC policies could be as valuable to Democratic candidates as campaign contributions reflects the expectation, stated in the application, that such policies "could improve the overall contribution of Democratic leaders."  Indeed, From's statements, on which the Government heavily relies, indicate that benefits to Democrats have been a hoped-for effect of the DLC since its *inception*.  *See, e.g.*, Hubbert Decl., Ex. 114 (stating that the DLC's "*founders formed the DLC to redefine the Democratic party*"—something they believed "was essential to reversing our party's fortunes in presidential elections and *building a*

20

*New Democratic majority* in national politics") (emphasis added).  Moreover, statements

favoring Democrats over Republicans are entirely consistent with the publication attached to the

exemption application, stating that "the Republican Party offers no coherent response to the

greatest domestic challenge facing America during the rest of this century," and that "[t]he

Democratic Party—traditionally the agent of change and progress in America—must fill the

leadership vacuum and illuminate the way ahead."  Hubbert Decl., Ex. 65.  Finally, regardless

whether the DLC held certain events, such as town meetings, that it proposed in its application,

nothing indicates that the DLC operated in a *materially* different manner than it proposed.

The IRS's own investigation of the DLC's activities only confirms that the retroactive

revocation was improper here.  Agent Smith investigated the DLC over a period of three years

and unequivocally stated in his deposition that the DLC was operating within the terms of its

exemption ruling during the years at issue.  (Smith questioned whether the IRS should have

granted the DLC exempt status *in the first place*, noting that he "personally, would have

problems granting the exemption . . . ."  Pl.'s Mot., Ex. Q at 58.)  When asked whether the DLC

was complying with its Articles of Incorporation during the years in question, Smith stated, "I

would say they were doing that, what they said they was [sic] doing, they were doing that."  *Id.* at

43; *see also id.* at 44 ("*[I] didn't see any activities that they . . . were not doing as they stated . . .

in their articles of incorporation*.") (emphasis added).  Smith agreed that the DLC's activities

during 1997, 1998, and 1999 "were consistent with what they told the IRS they would be doing."

*Id.* at 50.  Smith reiterated these views when questioned about the exact language of the DLC's

original exemption request:

Q:     Do you see—maybe you should read the—that paragraph for the record.  "The Democratic Leadership Council is so named because it was founded by federal and state elected officials who are democrats and who were concerned with the direction of policy debate within their party, as well as within the country as a whole."  Let's just stop there.  Do you believe that's consistent with—

A:     Definitely.

*     *     *

Q:     Is that consistent with what activity they engaged in?

A:     Let me read it again.  (Pause in the proceedings.)  Yes, that's—

Q.     that's consistent with?

A.     What they're doing.

Q.     With what they're doing?

A.     Yes.

*     *     *

Q.     And the next sentence: "Through the establishment of DLC, these officials and others with similar interests and goals expected to improve the overall contribution of democratic leaders, in the federal and state government, to national policy debate, and to urge upon both the party and the general public new and innovative approaches to policy."  Is that consistent with what you reviewed their actual activities to be?

A.     Sure, sure.

*     *     *

Q.     So is it fair to say that the DLC accurately described the activity it was going to engage in?

A.     It sure is.

*Id.* at 57–58.

The Government notes, however, that Agent Smith testified that he did not receive all the information that he requested in his examination. Def.'s Opp. Br. at 21. But Agent Smith spent over 400 hours over the course of three years reviewing materials provided to him regarding the DLC. *Id.* at 76. His testimony is entitled to some weight.

In any event, as noted above, Agent Smith's testimony simply confirms what the record shows: the DLC acted in *material* conformity with, and did not otherwise omit or misstate a *material* fact in, its original application. Accordingly, the retroactive revocation of tax-exempt status for years 1997, 1998, and 1999 violated Treasury Regulation 601.201 and was an abuse of discretion. *See Buzzetta Constr.*, 92 T.C. at 651 ("'[W]hen a taxpayer has put substantial good faith reliance upon an IRS determination of its tax position and when a retroactive revocation of that determination will produce an inordinate adverse effect, *the Commissioner's failure to abide strictly by his own regulations limiting retroactive revocation of a favorable ruling amounts to an abuse of discretion.*'" (quoting *Lansons, Inc. v. Comm'r*, 622 F.2d 774 (5th Cir. 1980)) (emphasis added); *Thomas G. Faria Corp.*, 1977 U.S. Ct. Cl. LEXIS 576, at *28–29 ("[I]t must be held that defendant's retroactive revocation in the present case constitutes a clear abuse of discretion" because the applicable IRS ruling "cannot be retroactively applied to plaintiff without the IRS's violating its own procedural rules."); *cf. Prince Edward Sch. Found. v. Comm'r*, 478 F. Supp. 107, 113 (D.D.C. 1979) (allowing retroactive revocation of tax-exempt status because such revocation was "consistent with" Treasury Regulation 601.201(n)(6)(i)). Thus, the DLC is entitled to a refund for each of those years.

### III.  CONCLUSION

As the Government's agent acknowledged, and the undisputed facts reveal, the DLC has not omitted or misstated a material fact or operated in a manner materially different from that originally represented.  Accordingly, the IRS abused its discretion when it retroactively revoked the DLC's tax-exempt status.  *See* 26 C.F.R. 601.201(n)(6)(i).  In the end, the Government proves too much: by emphasizing the DLC's *original* connection to the Democratic Party in an effort to show that the DLC benefits a private group, the Government reveals that the DLC did not operate in a materially different manner when it continued that connection in 1997, 1998, and 1999.  It may be that the DLC is unworthy of 501(c)(4) status.  But the Government gave it that status and cannot *retroactively* revoke it in these circumstances.  An accompanying order will grant the DLC's motion for summary judgment and deny the Government's motion for summary judgment.[3]  The foregoing does not preclude the IRS from revoking *prospectively* the DLC's exempt status, should it conclude again that the DLC is not entitled to that status.


Dated: April 4, 2008.

                                        Louis F. Oberdorfer
                                        UNITED STATES DISTRICT JUDGE

---

[3]The order will also deny as moot [dkt #24] *Plaintiff's* Motion to Strike Declaration of Taylor Lincoln.  That declaration does not affect the court's resolution of this matter in Plaintiff's favor.